1  **Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
     Direct Dial:  (503) 802-2013
2       Facsimile:    (503) 972-3713
     E-Mail:       al.kennedy@tonkon.com
3  **Timothy J. Conway**, OSB No. 851752
     Direct Dial:  (503) 802-2207
4       Facsimile:    (503) 972-3727
     E-Mail:       tim.conway@tonkon.com
5  **Michael W. Fletcher**, OSB No. 010448
     Direct Dial:  (503) 802-2169
6       Facsimile:    (503) 972-3869
     E-Mail:       michael.fletcher@tonkon.com
7  **Ava L. Schoen**, OSB No. 044072
     Direct Dial:  (503) 802-2143
8       Facsimile:    (503) 972-3843
     E-Mail:       ava.schoen@tonkon.com
9  **TONKON TORP** LLP
1600 Pioneer Tower
10 888 S.W. Fifth Avenue
Portland, OR  97204
11
     Attorneys for Debtor
12

13           UNITED STATES BANKRUPTCY COURT

14              DISTRICT OF OREGON

15 In re                                          Case No. 13-64561-fra11

16 C & K Market, Inc.,                            **NOTICE OF FILING OF FINANCING
                                                  AGREEMENT BETWEEN U.S. BANK
17         Debtor.            NATIONAL ASSOCIATION, AND C &
                                                  K MARKET, INC. AND C & K
18 _____                EXPRESS, LLC**

19 * * *

20 * * *

21 * * *

22 * * *

23 * * *

24 * * *

25 * * *

26 * * *

**Page 1 of 2** -  NOTICE OF FILING OF FINANCING AGREEMENT BETWEEN U.S. BANK
           NATIONAL ASSOCIATION, AND C & K MARKET, INC. AND C & K EXPRESS,
           LLC

1    Debtor hereby files the attached Financing Agreement Between U.S. Bank

2 National Association, C & K Market, Inc. and C & K Express, LLC (excluding exhibits and

3 schedules).

4    DATED this 19th day of November, 2013.

5    TONKON TORP LLP

6

7    By /s/ Albert N. Kennedy
        Albert N. Kennedy, OSB No. 821429
8       Timothy J. Conway, OSB No. 851752
        Michael W. Fletcher, OSB No. 010448
9       Ava L. Schoen, OSB No. 044072
        Attorneys for Debtor

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 2 of 2** -   NOTICE OF FILING OF FINANCING AGREEMENT BETWEEN U.S. BANK
                    NATIONAL ASSOCIATION, AND C & K MARKET, INC. AND C & K EXPRESS,
                    LLC

# EXHIBIT 1

**FINANCING AGREEMENT BETWEEN
U.S. BANK NATIONAL ASSOCIATION, C & K
MARKET, INC., AND C & K EXPRESS, LLC
(EXCLUDING EXHIBITS AND SCHEDULES)**

U.S. $47,000,000

FINANCING AGREEMENT,

dated as of October 28, 2010

among

THE LENDERS FROM TIME TO TIME PARTY TO THIS AGREEMENT,

U.S. BANK NATIONAL ASSOCIATION,

as Agent

and

C&K MARKET, INC.,

And

C&K EXPRESS, LLC

as Borrowers

# TABLE OF CONTENTS

1.  DEFINITIONS. .....................................................................................................................1
    1.1  Defined Terms .............................................................................................................1
    1.2  Other Definitions .......................................................................................................37
    1.3  Other Definitional Provisions; Construction ............................................................38
    1.4  Classes of Loans ........................................................................................................39

2.  LOANS AND OTHER FINANCIAL ACCOMMODATIONS. ............................................39
    2.1  Total Facility .............................................................................................................39
    2.2  Revolving Loans ........................................................................................................39
    2.3  Term Loans. ...............................................................................................................39
    2.4  Letters of Credit. .......................................................................................................39
    2.5  Advance Requests ......................................................................................................44
    2.6  Initial Interest Election ..............................................................................................44
    2.7  Funding of Loans .......................................................................................................44
    2.8  Notes; Records of Advances of Credit ......................................................................47
    2.9  No Limitation on Liens ..............................................................................................47
    2.10  [Intentionally omitted.] ............................................................................................48
    2.11  Cross-Collateralized .................................................................................................48
    2.12  Lending Installations .................................................................................................48
    2.13  Termination of Commitments ....................................................................................48
    2.14  Increased Costs. ........................................................................................................49
    2.15  Taxes. ........................................................................................................................51
    2.16  Mitigation of Obligations; Replacement of Lenders ...............................................51

3.  PRINCIPAL PAYMENTS; INTEREST CHARGES; FEES ..............................................52
    3.1  Payments and Prepayments of Principal. ..................................................................52
    3.2  Interest on Obligations; Margins ..............................................................................54
    3.3  Interest Payment Dates ..............................................................................................56
    3.4  Agent Fees .................................................................................................................57
    3.5  [Intentionally omitted.] .............................................................................................57
    3.6  Unused Commitment Fee ...........................................................................................57
    3.7  Letter of Credit Fees .................................................................................................57
    3.8  Calculation of Certain Charges .................................................................................57
    3.9  Payment in Full on Applicable Maturity Date ..........................................................57
    3.10  Maximum Rate ..........................................................................................................58

4.  PAYMENTS; APPORTIONMENT OF PAYMENTS; DEFAULTING LENDER. ..............58
    4.1  Payments by Borrower. ..............................................................................................58
    4.2  Settlement with Lenders ............................................................................................59
    4.3  Pro Rata Treatment; Application of Payments. .........................................................60
    4.4  Non-Receipt of Funds from Borrower .......................................................................61
    4.5  Payments to Defaulting Lender .................................................................................61

| | | |
|---|---|---|
| | 4.6 | No Third Party Beneficiary ............................................................61 |
| 5. | | PRECONDITIONS TO CREDIT EXTENSIONS. .................................................62 |
| | 5.1 | Initial Credit Extensions ...............................................................62 |
| | 5.2 | General Conditions .......................................................................64 |
| 6. | | SECURITY. ..........................................................................................64 |
| | 6.1 | Security Documents ......................................................................64 |
| | 6.2 | Control Agreements ......................................................................65 |
| | 6.3 | Guaranty Agreement .....................................................................65 |
| | 6.4 | Subordinated Debt ........................................................................65 |
| 7. | | RECEIVABLES; INVENTORY; COLLECTION OF RECEIVABLES; DISPUTED RECEIVABLES; PROCEEDS OF INVENTORY. ...............................................65 |
| | 7.1 | Agreements Regarding Receivables ...............................................65 |
| | 7.2 | Agreements Regarding Inventory ..................................................66 |
| | 7.3 | Agreements Regarding Remittances...............................................66 |
| | 7.4 | Special Accounts...........................................................................68 |
| | 7.5 | Crediting of Remittances ..............................................................69 |
| | 7.6 | Cost of Collection .........................................................................69 |
| | 7.7 | [Intentionally omitted.] .................................................................70 |
| | 7.8 | Fees for Agent's Account ..............................................................70 |
| | 7.9 | Monthly Activity...........................................................................70 |
| | 7.10 | Prescription Files ..........................................................................70 |
| 8. | | EXAMINATION OF LOAN COLLATERAL; REPORTING. ............................70 |
| | 8.1 | Maintenance of Books and Records ..............................................70 |
| | 8.2 | Access and Inspection...................................................................70 |
| | 8.3 | Reporting Regarding Receivables and Notes Receivable................71 |
| | 8.4 | Reporting Regarding Inventory .....................................................71 |
| | 8.5 | Interim Financial Statements; Payable Information ........................72 |
| | 8.6 | Annual Projections........................................................................72 |
| | 8.7 | Annual Financial Statements ........................................................72 |
| | 8.8 | Management Reports .....................................................................73 |
| | 8.9 | Comparisons to Financials; Certificates ........................................73 |
| | 8.10 | Tax Returns; Additional Information..............................................73 |
| | 8.11 | Prescription Files ..........................................................................73 |
| | 8.12 | Agricultural Products ....................................................................73 |
| | 8.13 | Other Reporting Requirements ......................................................73 |
| 9. | | WARRANTIES AND REPRESENTATIONS AND COVENANTS. ...........................75 |
| | 9.1 | Corporate Status...........................................................................75 |
| | 9.2 | Due Authorization; Validity .........................................................75 |
| | 9.3 | No Violation..................................................................................76 |
| | 9.4 | Use of Loan Proceeds ...................................................................76 |

-ii-

| | | |
|---|---|---|
| 9.5 | Management; Ownership of Assets; Licenses; Patents | 76 |
| 9.6 | Indebtedness | 76 |
| 9.7 | Title to Property; No Liens | 76 |
| 9.8 | Restrictions; Labor Disputes; Labor Contracts | 77 |
| 9.9 | No Violation of Law | 77 |
| 9.10 | Hazardous Substances | 77 |
| 9.11 | Absence of Default | 78 |
| 9.12 | Accuracy of Financials; No Material Changes | 78 |
| 9.13 | Pension Plans | 78 |
| 9.14 | Taxes and Other Charges | 79 |
| 9.15 | No Litigation | 79 |
| 9.16 | No Brokerage Fee | 79 |
| 9.17 | Affiliates | 79 |
| 9.18 | Capitalization; Warrants | 79 |
| 9.19 | Noncompetition Agreements | 80 |
| 9.20 | Deposit and Other Accounts | 80 |
| 9.21 | Solvency | 80 |
| 9.22 | Full Disclosure | 80 |
| 9.23 | Casualties | 80 |
| 9.24 | Leases | 80 |
| 9.25 | Insurance Policies | 80 |
| 9.26 | Consents | 80 |
| 9.27 | Tax Regulations | 81 |
| 9.28 | Anti-Terrorism Laws | 81 |
| 10. | COVENANTS | 81 |
| 10.1 | Payment of Certain Expenses | 81 |
| 10.2 | Notice of Litigation | 81 |
| 10.3 | Notice of ERISA Events; DOL Judgment | 81 |
| 10.4 | Notice of Labor Disputes | 82 |
| 10.5 | Compliance with Laws | 82 |
| 10.6 | Notice of Violations of Law, Tax Assessments | 82 |
| 10.7 | Notice of Violations of Certain Agreements | 82 |
| 10.8 | Notice of Customer Defaults | 82 |
| 10.9 | Taxes and Charges | 82 |
| 10.10 | Indebtedness; Guaranties; Liens. | 83 |
| 10.11 | Restrictions; Labor Disputes | 84 |
| 10.12 | Pension Plans | 84 |
| 10.13 | Solvency | 84 |
| 10.14 | Property Insurance | 84 |
| 10.15 | Liability Insurance | 85 |
| 10.16 | Mergers; Acquisitions | 85 |
| 10.17 | Investments | 85 |
| 10.18 | Distributions; Redemptions | 86 |
| 10.19 | Loans and Fees | 86 |
| 10.20 | Stock Rights | 87 |

-iii-

10.21   Capital Structure; Fiscal Year ...............................................................87
10.22   Affiliate Transactions...........................................................................87
10.23   Operating Accounts; Cash Management ...............................................87
10.24   Sale of Assets......................................................................................88
10.25   Intervention by Governmental Authority..............................................89
10.26   Levy Against Loan Collateral...............................................................89
10.27   Judgments ...........................................................................................89
10.28   Financial Covenants ............................................................................89
10.29   Payments on and Changes to Subordinated Debt. ..............................89
10.30   Tax Shelter Regulations.......................................................................90
10.31   Limitation on Rate Hedging Agreements .............................................90
10.32   Anti-Terrorism Laws ...........................................................................90
10.33   Express Operation ...............................................................................91
10.34   Further Assurances..............................................................................91

11.   EVENTS OF DEFAULT. ...................................................................................91

11.1    Events of Default .................................................................................91
11.2    Cure Periods........................................................................................94

12.   LENDERS' RIGHTS AND REMEDIES..............................................................95

12.1    Acceleration ........................................................................................95
12.2    [Intentionally omitted.] .......................................................................96
12.3    Fees and Expenses ..............................................................................96
12.4    Actions in Respect of Letters of Credit................................................96
12.5    Other Secured Agreements ..................................................................97
12.6    Instructions Regarding Loan Collateral ...............................................97
12.7    Application of Payments ......................................................................97

13.   AGENT. ............................................................................................................101

13.1    Appointment ........................................................................................101
13.2    Delegation of Duties ............................................................................101
13.3    Exculpatory Provisions ........................................................................101
13.4    Reliance by Agent................................................................................102
13.5    Notice of Default..................................................................................103
13.6    Non-Reliance on Agent and Other Lenders...........................................103
13.7    Indemnification ...................................................................................104
13.8    Agent in Its Individual Capacity ..........................................................104
13.9    Resignation of Agent ...........................................................................104
13.10   Loan Collateral Matters. ......................................................................105
13.11   Overadvances ......................................................................................107
13.12   No Third Party Beneficiary ..................................................................108
13.13   No Reliance on Agent's Customer Identification Program ....................108
13.14   USA Patriot Act ...................................................................................108
13.15   Cash Management Services ..................................................................108

14.     AMENDMENTS; WAIVERS; ASSIGNMENTS; PARTICIPATIONS ......................................108

     14.1     Amendments and Waivers. ...........................................................................108
     14.2     Assignment. .................................................................................................112
     14.3     Participations...............................................................................................114
     14.4     Law Requirements .......................................................................................115
     14.5     Set Off Right ................................................................................................115

15.     GENERAL. ..................................................................................................................115

     15.1     Severability .................................................................................................115
     15.2     Governing Law ............................................................................................115
     15.3     WAIVER OF JURISDICTION ....................................................................115
     15.4     Survival .......................................................................................................116
     15.5     Application of Payments; Revival of Obligations .....................................116
     15.6     Fees and Expenses. ......................................................................................116
     15.7     Notices; Electronic Mail. ............................................................................117
     15.8     Indemnification ...........................................................................................118
     15.9     Additional Waivers by Borrowers ..............................................................119
     15.10    Equitable Relief ..........................................................................................120
     15.11    Entire Agreement; Beneficiaries.................................................................120
     15.12    Headings .....................................................................................................120
     15.13    Cumulative Remedies .................................................................................120
     15.14    Recourse to Directors or Officers ..............................................................120
     15.15    WAIVER OF JURY TRIAL........................................................................120
     15.16    California Judicial Reference.......................................................................120
     15.17    PATRIOT ACT NOTICE ...........................................................................121
     15.18    Advertising..................................................................................................121
     15.19    Waivers .......................................................................................................121
     15.20    Confidentiality ............................................................................................122
     15.21    NOTICE.......................................................................................................122

## EXHIBITS

| | |
|---|---|
| Exhibit A | Revolving Loan Note Form |
| Exhibit B-1 | Term Loan A Note Form |
| Exhibit B-2 | Term Loan B Note Form |
| Exhibit C | Advance Request Form |
| Exhibit D | Borrowing Base Certificate Form |
| Exhibit E | Officer's Certificate Form |
| Exhibit F | Financial Covenants |
| Exhibit G | Assignment and Acceptance Form |
| Exhibit H | Borrower Security Agreement |
| Exhibit I | Trademark Security Agreement |
| Exhibit J | Individual Guaranty Agreement |

## SCHEDULES

| | |
|---|---|
| Schedule 1 | Lender Commitments |
| Schedule 2 | Financial Statements |
| Schedule 3 | Borrowers' Facilities |
| Schedule 6.1 | Property and Title Insurance |
| Schedule 6.4 | Subordination Agreements |
| Schedule 7.3 | Deposit Accounts |
| Schedule 9.1 | List of Jurisdictions of Incorporation and Qualification |
| Schedule 9.5 | Licenses; Trademarks; Patents; Copyrights |
| Schedule 9.7 | Permitted Liens |
| Schedule 9.8 | Labor Matters |
| Schedule 9.9 | Compliance With Laws |
| Schedule 9.10 | Environmental Matters |
| Schedule 9.13 | Pension Matters |
| Schedule 9.14 | Tax Matters |
| Schedule 9.15 | Litigation Matters |
| Schedule 9.17 | Affiliates; Affiliate Transactions |

Schedule 9.18    Stockholders

Schedule 9.20    Bank Accounts

Schedule 9.24    Leases

Schedule 9.25    Insurance Policies

Schedule 10.3    DOL Judgment

Schedule 10.10    Existing Indebtedness

Schedule 10.14    Property Insurance

Schedule 10.15    Liability Insurance

Schedule 10.31    Rate Hedging Agreements

DWT 13644165v19 0017787-000222

## FINANCING AGREEMENT

THIS FINANCING AGREEMENT (this "Agreement"), is dated as of October 28, 2010, and is entered into by and among C&K MARKET, INC., an Oregon corporation ("Market"), C&K EXPRESS, LLC, an Oregon limited liability company ("Express"), each of the Lenders from time to time party hereto, and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as LC Issuer and as Agent. Market and Express are referred to herein individually as a "Borrower" and collectively as the "Borrowers."

1.    DEFINITIONS.

    1.1    Defined Terms.  In addition to the other terms defined in this Agreement, whenever the following capitalized terms (whether or not underscored) are used, they shall be defined as follows:

    "12 Month Period" has the meaning given on Exhibit F.

    "Advance Rates" means percentage(s) applied to Eligible Inventory, Eligible Receivables and Eligible Prescription Files, and used to calculate the Borrowing Base.  The Advance Rates are defined and described as follows:

        (i)    "Inventory Advance Rate(s)" means the Advance Rate(s) applied to the four categories of Eligible Inventory: (a) Pharmacy Inventory, (b) Perishable Inventory, (c) Alcoholic Beverage Inventory and (d) Non-Perishable Inventory.  The Inventory Advance Rates are the lower of 75% of the cost of such Eligible Inventory and 85% of the Net Orderly Liquidation Value of such Eligible Inventory; provided that the Inventory Advance Rates on the aggregate of all categories of Eligible Inventory will never exceed 70% of the cost of such aggregate Eligible Inventory.

        (ii)    "Prescription Files Advance Rate" means the Advance Rate applied to Eligible Prescription Files.  The Prescription Files Advance Rate is 85%.

        (iii)    "Receivables Advance Rate(s)" means the Advance Rates applied to the two categories of Eligible Receivables:  (a) Eligible Credit Card Receivables, and (b) Eligible Pharmacy Receivables.  The Advance Rate for Eligible Credit Card Receivables and Eligible Pharmacy Receivables is 85%.

    "Advance Request" means Borrowers' written request for a Revolving Loan pursuant to Section 2.5 in the form attached as Exhibit C.

    "Affiliate" means, as to any Person (the "Subject Person"), any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, the Subject Person.  For purposes of this definition, "control" of a Person means the power, direct or indirect, (i) to vote 10% or more of the securities (or other ownership interests) having voting power for the election of directors (or managers in the case of a limited liability company) of the Person or (ii) otherwise to direct or cause the direction of the management and policies of the Person, whether by contract or otherwise.  Without limiting the generality of the foregoing, each

of the following will be deemed an Affiliate of a Borrower for purposes of this Agreement: (i) all of such Borrower's officers, directors and Subsidiaries, (ii) any partnership in which a Borrower or a Subsidiary is a general partner, (iii) Douglas A. Nidiffer, and (iv) the Nidiffer Family LLC.

"Agent" means U.S. Bank in its capacity as contractual representative of LC Issuer and the Lenders pursuant to Section 13, and not in its individual capacity as a Lender, and any successor Agent appointed pursuant to Section 13.

"Agent Advance" means any advance Agent makes pursuant to Section 13.10.6 hereof on behalf of the Lenders which Agent, in its judgment, deems necessary or desirable to:

   (i)  preserve or protect the Loan Collateral, or any portion thereof,

   (ii)  collect any of the Obligations,

   (iii)  sell, liquidate, dispose of, or otherwise realize on, any of the Loan Collateral,

   (iv)  preserve, interpret, enforce, or defend any rights or remedies of Agent, the Lenders, or any of them, conferred by the Loan Documents,

   (v)  enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations,

   (vi)  pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement, including costs, fees and expenses as described in Section 15.6.

"Agent Advance Exposure" means, with respect to any Lender at any time, an amount equal to (i) the outstanding amount of Agent Advances held by such Lender at such time plus (ii) such Lender's Agent Advance Exposure Percentage of the total outstanding Agent Advances held by Agent at such time.

"Agent Advance Exposure Percentage" means, with respect to any Lender at any time, the ratio of (i) the sum of (a) the Revolving Credit Commitment of such Lender at such time or, if the Revolving Credit Commitments are terminated, the Revolving Credit Exposure of such Lender at such time, plus (b) the outstanding principal amount of any Term Loan held by such Lender at such time to (ii) the sum of (a) the Revolving Credit Commitments then in effect at such time or, if the Revolving Credit Commitments are terminated, the Revolving Credit Exposure of all of the Lenders at such time, plus (b) the outstanding principal amount of the Term Loans at such time.

"Agent's Liens", "Lien in favor of Agent", "Lien granted to Agent", "security interest of Agent" or words of similar import mean the Liens granted to Agent, for the benefit of Agent, LC Issuer and Lenders, pursuant to this Agreement and the other Loan Documents.

"Alcoholic Beverage Inventory" means Inventory owned by Market consisting of beer, wine and liquor.

"Anti-Terrorism Laws" means any law, rule or regulation relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act, the laws, rules and regulations comprising or implementing the Bank Secrecy Act and the laws, rules and regulations administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing may be amended).

"Applicable Agreement" means any agreement, commitment, arrangement or instrument to which, as of any relevant date, a Borrower is a party or by which a Borrower or any of its properties is bound, in each case, pursuant to which a Borrower has purchased, or could reasonably be expected to purchase, at least 15 percent of such Borrower's aggregate annual purchases of Inventory during any Fiscal Year.

"Applicable LIBOR Rate Margin" and "Applicable LOC Fee" means, as of any date, the applicable per annum rate or fee shown in the applicable column in Section 3.2.2 based on the then applicable Fixed Charge Coverage Ratio.

"Attorneys' Fees" means the reasonable fees, costs and expenses of all attorneys, including in-house counsel (and all paralegals and other staff employed by such attorneys) retained by Agent, LC Issuer or any Lender from time to time in connection with, or arising out of, the matters encompassed by the reference to the capitalized term Attorneys' Fees in the applicable provisions of the applicable agreement, instrument or other document.

"Authorized Representative" means, with respect to any Borrower, any of (i) the Chief Executive Officer, (ii) the President, (iii) the Chief Financial Officer, (iv) the Treasurer, or (v) any other employee, officer or director of such Borrower which has been so designated by such Borrower in writing and delivered to Agent.

"Bandon Acquisition" means the acquisition by Market from the estate of John B. McNutt, its successors or assigns, of sole title to certain real property and fixtures associated with the strip mall portion of a shopping center located at 66 Michigan Avenue, Bandon, Oregon, in connection with the termination of the general partnership between Market and the estate of John B. McNutt existing as of the date of this Agreement (the "Bandon General Partnership") for an aggregate purchase price not to exceed $3,000,000, with such aggregate purchase price consisting of not more than $2,650,000 in assumed note obligations and $350,000 in cash.

"Bankruptcy Case" means any case, petition, proceeding or other action by or against a Borrower under any Insolvency Law.

"Blocked Person" means any Person (i) that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (ii) owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (iii) with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (iv) that commits,

threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; (v) that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list; or (vi) who is affiliated or associated with a person or entity listed above.

"Borrower Security Agreement" means the Security Agreement of even date herewith between Agent and Borrowers, in the form attached hereto as Exhibit H.

"Borrowers' Facilities" means, collectively, those facilities described on Schedule 3 which are owned or leased by either Borrower.  "Borrower's Facility" means each of the foregoing facilities.

"Borrowing Base" means, as of any time, an amount in Dollars equal to the sum of:

      (i)     the applicable Receivables Advance Rate applied, with respect to Eligible Credit Card Receivables, to the then Net Amount of Eligible Credit Card Receivables of either Borrower then outstanding;

      plus   (ii)     the applicable Receivables Advance Rate applied, with respect to Eligible Pharmacy Receivables, to the then Net Amount of Eligible Pharmacy Receivables of either Borrower then outstanding;

      plus   (iii)     the applicable Inventory Advance Rate applied, with respect to the applicable categories of Eligible Inventory, to the then Eligible Inventory;

      plus   (iv)     the Prescription Files Advance Rate applied to the Prescription Files Value;

      plus   (v)     during the Temporary Overadvance Period, and so long as no Event of Default has occurred and is continuing, the Temporary Overadvance Amount;

      less   (vi)     the then Reserve Amount;

*provided, however,* that if the calculation of the Borrowing Base as described above at any time results in the amount of Eligible Inventory that is Perishable Inventory multiplied by the applicable Inventory Advance Rate exceeding 15% of the total Borrowing Base, the amount of the Borrowing Base shall be reduced by the amount of such excess.

"Borrowing Base Certificate" means a certificate of Borrowers in substantially the form attached as Exhibit D.

"Borrowing Base Deficiency" means the failure, as of any time, of the Revolving Credit Availability to be greater than or equal to zero Dollars.

"Borrowing Date" means a date on which a Credit Extension is made hereunder.

-4-

"Business Day" means any day (other than a Saturday or Sunday) on which commercial banks in Minneapolis, Minnesota, are required by law to be open for business. Periods of days referred to in this Agreement will be counted in calendar days unless Business Days or New York Banking Days are expressly prescribed.

"Capital Stock" means all shares, interests, participations, rights to purchase, options, warrants, general or limited partnership interests, or limited liability company interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the Rules and Regulations promulgated by the Securities and Exchange Commission (17 C.F.R. § 240.3a11-1) under the Securities and Exchange Act of 1934, as amended.

"Cash Dominion Period" means (i) any period during which an Event of Default has occurred and is continuing, or (ii) if Borrowers' average Excess Availability for any consecutive 60-day period is less than $3,000,000, a period commencing on the last day of such 60-day period and continuing until Borrowers' average Excess Availability has exceeded $3,000,000 for any subsequent 60-day period.

"Cash Management Services" means treasury, depository, overdraft, credit or debit card, electronic funds transfer and other similar cash management services and arrangements.

"Change of Control" means any of the following (or any combination of the following) whether arising from any single transaction or event or any series of transactions or events (whether as the most recent transaction in a series of transactions) which, individually or in the aggregate, results in (i) a change in the ownership of Market, such that Douglas A. Nidiffer, his spouse, his children, the Nidiffer Family LLC and the DAN and NMN Family, LLC, together, fail to (a) own legally and beneficially, free and clear of any Liens (other than Liens securing the purchase price therefor), at least 51%, on a fully diluted basis, of the issued and outstanding voting securities of Market or (b) have the power to direct or cause the direction of the management and policies of Market; or (ii) a change in the ownership of Express such that Market fails to be the sole member thereof.

"Charges" means any fees or charges provided for in this Agreement or in any other Loan Document.

"Class" has the meaning given in Section 1.4.

"Closing Date" means the date upon which all of the conditions precedent to the effectiveness of this Agreement, as described in Section 5.1, are satisfied or waived by the Agent, the LC Issuer and each of the Lenders.

"Code" means the Uniform Commercial Code, as enacted in the State of Oregon, as amended.

"Collateral" has the meaning given in the Borrower Security Agreement.

-5-

"Commitments" means the Revolving Credit Commitments or the Term Loan Commitments or any combination thereof (as the context requires). "Commitment" means, when used with reference to a particular Lender, its Revolving Credit Commitment or Term Loan Commitment or any combination thereof (as the context requires).

"Controlled Disbursement Account" means an account established at Agent, which will be structured and utilized as a non-interest bearing, controlled disbursement account in accordance with Agent's controlled disbursement account policies and procedures from time to time in effect.

"Controlled Group" means all members of a controlled group of corporations and other entities and all trades or businesses (whether or not incorporated) under common control which, together with Borrower, are treated as a single employer under Section 414(b) or 414(c) of the Internal Revenue Code or Section 4001 of ERISA.

"Credit Card Acknowledgment" means an agreement of each Credit Card Processor that is party to a Credit Card Agreement acknowledging Agent's first priority security interest in the monies due and to become due to a Borrower under the applicable Credit Card Agreement, and agreeing to transfer all such amounts to a Store Account.

"Credit Card Agreements" means all agreements now or hereafter entered into by any Borrower with any Credit Card Issuer or any Credit Card Processor, including all amendments thereto.

"Credit Card Issuer" means any Person who issues or whose members issue credit cards or debit cards.

"Credit Card Processor" means any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card, debit card or check purchases by customers using credit cards or debit cards issued by any Credit Card Issuer or using a check that the Credit Card Processor has been engaged by a Borrower to process.

"Credit Card Receivable" means, collectively, (i) all present and future rights of any Borrower to payment from any Credit Card Issuer, Credit Card Processor or other Person arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit card, debit card or check (if a Credit Card Processor has been engaged by a Borrower to process the payment of such check), and (ii) all present and future rights of any Borrower to payment from any Credit Card Issuer, Credit Card Processor or other Person in connection with the sale or transfer of Receivables arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card, debit card or check (if a Credit Card Processor has been engaged by a Borrower to process the payment of such check), including, but not limited to, all amounts due or to become due from any Credit Card Issuer, Credit Card Processor or other Person under Credit Card Agreements or otherwise.

"Credit Card Setoff Policies" means the practices or policies of a Credit Card Issuer or Credit Card Processor that allows for setoffs of fees or chargebacks under Borrowers' Credit Card Agreements, as in effect on the date of this Agreement, and as such practices or policies are changed or amended as a result of changes to the practices and policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the unique circumstances of Borrowers.

"Credit Exposure" means, with respect to any Lender at any time, an amount equal to (i) the Revolving Credit Exposure of such Lender at such time, plus (ii) the amount of the outstanding Term Loans held by such Lender at such time, plus (iii) the Agent Advance Exposure of such Lender at such time.

"Credit Extension" means the making of any Loan or the issuance of a Letter of Credit hereunder.

"Cure Period" means any period of time during which Borrowers have the right to cure a Potential Event of Default pursuant to Section 11.2(i).

"Default Rate" means with respect to all Obligations, the applicable rates of interest set forth in Section 3.2.1 plus an additional 2.00%.

"Defaulting Lender" means any Lender that fails to make any Loan (or other extension of credit) that it is required to make hereunder on the date that it is required to do so hereunder.

"Deficiency" means (collectively and individually) a Borrowing Base Deficiency and a Letter of Credit Deficiency.

"DOL Judgment" means a consent judgment and order with the U.S. Department of Labor in substantially the form attached hereto as Schedule 10.3.

"DOL Payments" means all payments made by Borrowers pursuant to the DOL Judgment.

"Dollars" and "$" means dollars in lawful currency of the United States of America unless otherwise indicated.

"EBITDA" has the meaning given in Exhibit F.

"EBITDAR" has the meaning given in Exhibit F.

"Eligible Assignee" means (i) any Lender or Affiliate of a Lender; (ii) any bank having a combined capital and surplus of at least $500,000,000, provided that so long as no Event of Default has occurred and is continuing, Borrowers' consent (which consent shall not be unreasonably withheld, conditioned or delayed) shall be required in connection with an assignment to any such bank, or (iii) any other Person, provided that so long as no Event of Default has occurred and is continuing, Borrowers' consent shall be required in connection with an assignment to any such Person.

"Eligible Credit Card Receivables" shall mean, as to each Borrower, Credit Card Receivables of such Borrower which meet the criteria set forth below:

(i)     Such Credit Card Receivables arise from the actual and bona fide sale and delivery of goods or rendition of services by such Borrower in the ordinary course of the business of such Borrower, which transactions are completed in accordance with the terms and provisions contained in any agreements binding on such Borrower or the other party or parties related thereto;

(ii)    such Credit Card Receivables are not past due (beyond any stated applicable grace period, if any, therefor) pursuant to the terms set forth in the Credit Card Agreements with the Credit Card Issuer or Credit Card Processor of the credit card, debit card or check used in the purchase which give rise to such Credit Card Receivables;

(iii)   such Credit Card Receivables are not unpaid more than five (5) Business Days after the date of the sale of Inventory giving rise to such Credit Card Receivables;

(iv)    all material procedures required by the Credit Card Issuer or the Credit Card Processor of the credit card, debit card or check used in the purchase which gave rise to, such Credit Card Receivables shall have been followed by such Borrower (including obtaining any required authorization and approval by such Credit Card Issuer or Credit Card Processor for the sale giving rise to such Credit Card Receivables and submitting all materials required by the Credit Card Issuer or Credit Card Processor obligated in respect of such Credit Card Receivables in order for such Borrower to be entitled to payment in respect thereof) and all documents required for the authorization and approval by such Credit Card Issuer or Credit Card Processor shall have been obtained in connection with the sale giving rise to such Credit Card Receivables;

(v)     Agent shall have received, in form and substance reasonably satisfactory to Agent, a Credit Card Acknowledgment duly authorized, executed and delivered by the Credit Card Processor for the credit card, debit card or check used in the sale which gave rise to such Credit Card Receivable, such Credit Card Acknowledgment shall be in full force and effect and, to Borrowers' Knowledge, the Credit Card Processor party thereto shall be in compliance in all material respects with the terms thereof;

(vi)    the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivables has not asserted a counterclaim, defense or dispute and does not have, and does not engage in transactions which may give rise to, any right of setoff against such Credit Card Receivables (other than pursuant to their respective Credit Card Setoff Policies), but the portion of the Credit Card Receivables owing by such Credit Card Issuer or Credit Card Processor in excess of the amount owing by such Borrower to such Credit Card Issuer or Credit Card Processor pursuant to such fees and chargebacks may be deemed Eligible Credit Card Receivables;

(vii)   the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivables has not setoff against amounts otherwise payable by such Credit Card Issuer or Credit Card Processor to such Borrower for the purpose of establishing a reserve or collateral for

-8-

obligations of such Borrower to such Credit Card Issuer or Credit Card Processor (notwithstanding that the Credit Card Issuer or Credit Card Processor may have setoffs for fees and charge backs consistent with its respective Credit Card Setoff Policies) but the portion of the Credit Card Receivables owing by such Credit Card Issuer or Credit Card Processor in excess of the amount of such reserve may be deemed Eligible Credit Card Receivables;

      (viii)   there are no facts, events or occurrences which would impair the validity, enforceability or collectability of such Credit Card Receivables;

      (ix)   such Credit Card Receivables are subject to the first priority, valid and perfected Lien of Agent, for and on behalf of itself and Lenders, as to such Credit Card Receivables of such Borrower and any goods giving rise thereto are not, and were not at the time of the sale thereof, subject to any Lien in favor of any Person other than Agent except in each case to the extent, if any, of any Permitted Liens of the type described in clauses (i), (iv), (ix), (xii) and (xiii) of that definition and any other Permitted Liens acceptable to Agent in its Permitted Discretion;

      (x)   there are no proceedings or actions which are pending against the Credit Card Issuers or Credit Card Processors with respect to such Credit Card Receivables which would reasonably be expected to result in any material adverse change in the financial condition of any such Credit Card Issuer or Credit Card Processor;

      (xi)   such Credit Card Receivables are owed by Credit Card Issuers or Credit Card Processors determined to be creditworthy at all times by Agent in its Permitted Discretion;

      (xii)   no event of default has occurred under any applicable Credit Card Agreement with respect to the credit card or debit card used in the sale which gave rise to such Credit Card Receivables which event of default gives such Credit Card Issuer or Credit Card Processor the right to cease or suspend payments to such Borrower and no event shall have occurred which gives such Credit Card Issuer or Credit Card Processor the right to setoff against amounts otherwise payable to such Borrower (other than for then current fees and charge backs consistent with the Credit Card Setoff Policies of such Credit Card Issuer or Credit Card Processor), except as may have been waived in writing on terms and conditions reasonably satisfactory to Agent pursuant to the Credit Card Acknowledgment by such Credit Card Issuer or Credit Card Processor or the right to establish reserves or establish or demand collateral, and the Credit Card Issuer or Credit Card Processor has not sent any written notice of default and/or notice of its intention to cease or suspend payments to such Borrower in respect of such Credit Card Receivables or to establish reserves or cash collateral for obligations of such Borrower to such Credit Card Issuer or Credit Card Processor, and such Credit Card Agreements are otherwise in full force and effect and constitute the legal, valid, binding and enforceable obligations of the parties thereto;

      (xiii)   the terms of the sale giving rise to such Credit Card Receivables and all practices of such Borrower with respect to such Credit Card Receivables comply in all material respects with applicable Federal, State, and local laws and regulations;

(xiv)    the customer using the credit card or debit card or issuing the check giving rise to such Credit Card Receivable shall not have returned and been issued a credit for the merchandise, the purchase of which gave rise to such Credit Card Receivables; provided that a return for cash will not make such Receivable ineligible; and

(xv)    Such Credit Card Receivables are not Receivables which Agent, in its Permitted Discretion, has deemed to be ineligible.

"Eligible Inventory" means, as to each Borrower, Inventory of such Borrower which meets the criteria in clause (i) below of this definition and is not ineligible pursuant to clause (ii) below. Eligible Inventory will be valued, for purposes of determining the Borrowing Base, at the lower of market value or cost, determined in accordance with a "first in-first out" cost accounting system.

(i)    Except as otherwise provided in clause (ii) below, Inventory is eligible if it is, and continues to be, (a) Inventory held by a Borrower at a Borrower's Facility (or is in transit to a Borrower's Facility if and to the extent permitted by clause (ii)(f) below) for sale in the ordinary course of a Borrower's business as presently conducted by it, exclusive of Inventory (other than motor oil, antifreeze, propane and other household products included in Inventory, so long as Borrower's purchase, storage, handling and sale thereof are in accordance in all material respects with all Environmental Requirements) which are comprised of Hazardous Substances and (b) subject to a valid and prior, fully perfected security interest of Agent, free and clear of all Liens of any Person (except to the extent, if any, of any Permitted Liens of the type in described in clauses (i), (ii), (iv) and (ix) of that definition, and any other Permitted Liens acceptable to Agent in its Permitted Discretion).

(ii)    Without limiting Agent's discretion as to other Inventory, the following Inventory will not, in any event, constitute Eligible Inventory:

(a)    Inventory which is not readily saleable in the ordinary course of a Borrower's business (including all Inventory for which reserves for obsolescence have been provided for in Borrower's financial statements or for which obsolescence reserves are anticipated);

(b)    Raw materials and work-in-process (other than raw materials and work-in-process associated with Market's deli, meat and bakery operations and Express' pharmacy operations, to the extent those operations are materially similar to the operations conducted as of the Closing Date);

(c)    Supplies and packaging materials; spare parts; display items; or rack samples;

(d)    Inventory that is located outside of the United States;

(e)    Inventory which has been consigned to or by a Borrower or has been sold to a Borrower in any sale on approval or sale and return transaction;

(f)     Inventory that is located on any premises not owned or leased by a Borrower or is in the possession of any Person other than a Borrower except (subject to any additional requirements imposed by Agent, in its Permitted Discretion, to protect a Borrower's title thereto or the Agent's Liens thereon) (1) Inventory in the possession of a warehouseman or other bailee (including an inventory processor) if Agent has received a bailee waiver letter reasonably acceptable to Agent from such warehouseman or bailee and such warehousemen or bailee has not issued a negotiable document of title as to any of the Inventory, and (2) Inventory that is in transit and is otherwise Eligible Inventory; provided that, as to retail store locations leased by a Borrower, Agent may, in its Permitted Discretion, establish Reserve Amounts in respect of one month's rental payments and other amounts relating to such leased location of types and to the extent Agent shall determine (in accordance with the definition of the term "Reserve Amounts" herein);

(g)     Inventory that is subject to any trademark, trade name, patent or licensing arrangement that could, in any instance in Agent's Permitted Discretion, limit or impair the ability of Agent to promptly exercise any of its rights with respect thereto;

(h)     Inventory (1) with respect to which insurance proceeds, if any, are not payable to Agent as mortgagee or loss payee in accordance with the Loan Documents or (2) which is subject to a negotiable warehouse receipt or other negotiable instrument;

(i)     Inventory that is in transit to or from one of Borrower's Facilities (provided that to the extent the aggregate of Borrowers' otherwise Eligible Inventory that is in transit has a cost not exceeding $1,000,000 and is in transit for no more than three (3) consecutive days, such Inventory will be treated as Eligible Inventory);

(j)     Inventory which is custom made for a particular customer of a Borrower (other than custom orders of bakery, deli, meat, produce and pharmacy items) for which Borrower's customer did not issue a purchase order to a Borrower; or

(k)     Inventory which Agent, in its Permitted Discretion, deems to be ineligible.

"Eligible Pharmacy Receivables" means, as to each Borrower, such of the Pharmacy Receivables owing to such Borrower that meet the criteria in clause (i) below of this definition and are not ineligible pursuant to clause (ii) below.

(i)     Except as provided in clause (ii) below, Pharmacy Receivables which meet, and continue to meet, all of the following criteria are Eligible Pharmacy Receivables:

(a)     Pharmacy Receivables which consist of ordinary accounts receivable owned solely by a Borrower, payable in cash in Dollars which arise out of an outright, bona fide, lawful and final sale of Pharmacy Inventory or the provision of Pharmacy Services in the ordinary course of a Borrower's business;

(b)    Pharmacy Receivables with respect to which the Inventory or Pharmacy Services covered thereby have been delivered to the Express customer and accepted by such customer;

(c)    Pharmacy Receivables with respect to which not more than 60 days have elapsed since the date of the invoice or electronic transaction posting applicable thereto;

(d)    as to Medicare Receivables and Medicaid Receivables, (1) the claim for reimbursement related to such Receivable has been submitted by a Borrower to the appropriate Governmental Authority or Fiscal Intermediary or an administrator who is responsible for submitting the claim to the Governmental Authority or Fiscal Intermediary, in accordance with the applicable regulations under Medicare or Medicaid within sixty (60) days from the date the related Pharmacy Inventory or Pharmacy Services were delivered or within sixty (60) days of receiving the provider identification number (so long as such Borrower has delivered evidence, in form and substance reasonably satisfactory to Agent that it has received such identification number), (2) the person to whom the Pharmacy Inventory or Pharmacy Services were provided is, to Borrowers' Knowledge after due inquiry customary in the industry, an eligible Medicare or Medicaid recipient at the time such goods are sold or services delivered, (3) such Receivable is owed to a Borrower who is not known to be under any investigation under any Healthcare Law (other than the periodic audits or reviews conducted by a Fiscal Intermediary in the ordinary course of business) or subject to any action or proceeding concerning the status of such Borrower as a certified Medicare or Medicaid provider (other than routine surveys and site visits) and/or the payments under Medicare or Medicaid to such Borrower have not been contested, suspended, delayed, deferred or otherwise postponed due to any investigation, action or proceeding by any Fiscal Intermediary, the U.S. Justice Department or any other Governmental Authority, (4) the amount of such Receivable does not exceed the amounts to which a Borrower is entitled as reimbursement for such eligible Medicare or Medicaid recipient under applicable Medicare or Medicaid regulations, (5) all authorization and billing procedures and documentation required in order for a Borrower to be reimbursed and paid on such Receivable by the Fiscal Intermediary have been properly completed and satisfied to the extent required in order for such Borrower to be so reimbursed and paid and (6) the terms of the sale or services giving rise to such Receivables and all practices of a Borrower with respect to such Receivables comply in all material respects with applicable Federal, state, and local laws and regulations; and

(e)    as to Pharmacy Receivables where the account debtor is a Third Party Payor (other than for Medicare Receivables and Medicaid Receivables), (1) a Borrower has a valid and enforceable agreement with the Third Party Payor providing for payment to such Borrower and such Borrower is otherwise entitled to payment under the terms of its arrangements with the insurance company that is the Third Party Payor or such insurance company's agent, and such agreement and arrangements are in full force and effect and there is no default thereunder that would be a basis for such Third Party Payor or such insurance company agent to cease or suspend any payments to such Borrower (including any deductions, setoffs or defenses), (2) the Pharmacy Inventory or Pharmacy Services giving rise to such Receivables are of the type that are covered under the agreement or arrangement with the Third

-12-

Party Payor and the party receiving such goods or services is entitled to coverage under such agreement or arrangement, and the party receiving such Pharmacy Inventory or Pharmacy Services validly assigned his or her claim for such coverage to such Borrower, (3) such Borrower has contacted the Third Party Payor or otherwise received confirmation from such Third Party Payor that the party receiving the Pharmacy Inventory or Pharmacy Services is entitled to coverage under the terms of the agreement with such Third Party Payor and the Borrower is entitled to reimbursement for such Receivable, (4) the amount of such Receivable does not exceed the amounts to which such Borrower is entitled as reimbursement for the Pharmacy Inventory or Pharmacy Services under the terms of such agreements or arrangements, (5) all authorization and billing procedures and documentation required in order for such Borrower to be reimbursed and paid on such Receivable by the Third Party Payor have been properly completed and satisfied to the extent required for such Borrower to be so reimbursed and paid, and (6) the terms of the sale giving rise to such Receivables and all practices of such Borrower with respect to such Receivables comply in all material respects with applicable Federal, State, and local laws and regulations; provided, however, that Pharmacy Receivables owing by any Third Party Payor that does not owe Borrowers more than $10,000 at any applicable time and are otherwise Eligible Pharmacy Receivables will be treated as Eligible Pharmacy Receivables without complying with clauses (1) through (6) above, so long as Borrowers have no Knowledge that such Third Party Payor has any reason to reject the claims giving rise to such Receivables.

(ii)    Without limiting Agent's discretion as to other Pharmacy Receivables, the following Pharmacy Receivables will not, in any event, constitute Eligible Receivables:

(a)    Pharmacy Receivables with respect to which the account debtor has filed or had filed against it a petition in bankruptcy or for reorganization, made an assignment for the benefit of creditors, or failed, suspended business operations, become insolvent or in respect of which a receiver, custodian, or a trustee was appointed for a significant portion of its assets or affairs, or Pharmacy Receivables with respect to which the account debtor is incompetent or has died;

(b)    Pharmacy Receivables with respect to which (1) the account debtor is not qualified to do business in one or more States of the United States of America or any Canadian provinces or (2) the account debtor has its principal place of business or chief executive office outside of the United States of America or any Canadian provinces unless, in either or both of such events (1) or (2), the Pharmacy Receivable is supported by (A) an irrevocable, clean letter of credit or acceptance issued (I) by a financial institution reasonably satisfactory to Agent and (II) on terms reasonably acceptable to Agent, and, if so requested by Agent, delivered to Agent in pledge for negotiation and presentment or (B) foreign credit insurance reasonably satisfactory to Agent in its Permitted Discretion and as to which Agent is named as the loss payee;

(c)    Pharmacy Receivables owing from the same account debtor, either alone or together with those of its Affiliates of which Borrowers have Knowledge, if 25% or more of such Pharmacy Receivables are ineligible for any reason;

-13-

(d)    Pharmacy Receivables owing from any single account debtor to the extent, as of any date, that the total amount of such account debtor's Indebtedness to Borrowers (whether evidenced by such Receivables or otherwise) exceeds $750,000 (less maximum discounts, credits and allowances which may be taken by, or granted to, such account debtor in connection therewith) of the then outstanding Eligible Pharmacy Receivables of Borrowers;

(e)    Pharmacy Receivables (other than Medicare Receivables and Medicaid Receivables and Receivables owing by a Third Party Payor) with respect to which the account debtor is a Governmental Authority, unless with respect to such Pharmacy Receivables the Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 and 41 U.S.C. § 15) or, as applicable, comparable state statute or regulation has been complied with to Agent's reasonable satisfaction;

(f)    Pharmacy Receivables which (1) consist (or to the extent consisting) of deposits or C.O.D. sales, (2) consist (or to the extent consisting) of vendor warranty claims, (3) consist (or to the extent consisting) of finance charges, service charges, or interest on delinquent accounts, (4) are payable by an Affiliate of a Borrower (other than an officer, director or employee of a Borrower in connection with the sale of Pharmacy Inventory or the provision of Pharmacy Services to such Person in the ordinary course of a Borrower's business), or (5) are (or to the extent consisting of) debit memoranda;

(g)    Pharmacy Receivables which are evidenced by a promissory note, chattel paper or other instrument;

(h)    Pharmacy Receivables (1) with respect to which set-offs, credits, contras, allowances or adjustments have been asserted by the account debtor (except discounts allowed for prompt payment), or (2) with respect to which the account debtor has returned any of the Inventory from the sale from which the Pharmacy Receivables arose, *provided* that (y) in either or both of such events (1) or (2), the net amount owed by such account debtor to Borrower in respect of such Pharmacy Receivable, as determined by Agent in its Permitted Discretion, will, if otherwise eligible, be an Eligible Pharmacy Receivable, and (z) Pharmacy Receivables described in clause (1), if otherwise eligible, will be treated as Eligible Pharmacy Receivables so long as the aggregate amount of set-offs, credits, contras, allowances and adjustments so asserted does not exceed five percent (5%) of the aggregate Pharmacy Receivables, and so long as the amounts of the set-offs, credits, contras, allowances and adjustments are reflected in Borrowers' books and records in a timely manner;

(i)    Pharmacy Receivables which are generated by a sale on approval, a bill and hold sale, a sale on consignment, or other type of conditional sale (other than a sale pursuant to Borrowers' customary return policies in effect from time to time) or which are subject to progress billing;

(j)    Pharmacy Receivables which are not subject to the first priority security interest of Agent or are subject to any Lien of any Person (except to the extent, if any, of

any Permitted Liens of the type described in clause (i), (iv), (ix) and (xiii) of that definition and any other Permitted Liens acceptable to Agent in its Permitted Discretion);

(k)    Pharmacy Receivables with respect to which the account debtor is located in a state requiring Borrowers to qualify to do business or file a fictitious name report, a notice of business activities report or similar report in order to permit Borrowers to seek judicial enforcement in such state of payment of such Pharmacy Receivable, unless Borrowers have qualified to do business in such state or have filed such a report for the then current year, or such failure to file and inability to seek judicial enforcement is capable of being remedied without any material delay or material cost;

(l)    Pharmacy Receivables with respect to which a Borrower has received a check for payment of such Pharmacy Receivable which has been returned uncollected, or Pharmacy Receivables with respect to which Agent, in its Permitted Discretion, believes that the collection of such Pharmacy Receivable is in doubt or impaired or that such Pharmacy Receivable may not be paid by reason of the account debtor's financial inability to pay; or

(m)    Receivables which Agent, in its Permitted Discretion, deems to be ineligible.

"Eligible Prescription Files" means, as to each Borrower, Prescription Files of such Borrower that meet the criteria in clause (i) below of this definition and are not ineligible pursuant to clause (ii) below.

(i)    Except as provided in clause (ii) below, Eligible Prescription Files are Prescription Files which have arisen and are maintained in the ordinary course of business of such Borrower.

(ii)    Without limiting Agent's discretion as to other Prescription Files, the following Prescription Files will not, in any event, constitute Eligible Prescription Files:

(a)    Prescription Files which are not of a kind or nature similar to those included in an appraisal of Prescription Files received by Agent in accordance with the requirements of Agent;

(b)    Prescription Files located at premises other than the Borrowers' Facilities;

(c)    Prescription Files which are not subject to the first priority security interest of Agent or are subject to any Lien of any Person (except to the extent, if any, of any Permitted Liens of the type described in clause (i) or (iv) of that definition and any other Permitted Liens acceptable to Agent in its Permitted Discretion);

(d)    Prescription Files for which Borrowers' pharmacy store computer and phone systems, in Agent's Permitted Discretion, (1) are inadequate to facilitate the sale of prescriptions to a potential purchaser, and (2) do not facilitate the transfer of pharmacy prescriptions to a potential purchaser;

-15-

(e)    Prescription Files that are not in a form that may be sold or transferred or are subject to regulatory restrictions (other than Healthcare Laws in effect on the date of this Agreement) on the transfer thereof that are not acceptable to Agent in its Permitted Discretion; or

(f)    Prescription Files which Agent, in its Permitted Discretion, deems to be ineligible.

"Eligible Receivables" means Eligible Credit Card Receivables and Eligible Pharmacy Receivables.

"Environmental Activity" means any actual, proposed or threatened storage, holding, existence, Release, emission, discharge, generation, manufacturing, producing, refining, creating, processing, abatement, removal, disposition, handling, transportation or disposal of any Hazardous Substance from, under, into or on any of Borrower's property or otherwise relating to any of Borrower's property or any Use of any of Borrower's property which is regulated by or for which standards of conduct or liability are imposed by any Environmental Requirements or which may or does create a hazard to human or animal health or the environment.

"Environmental Law" means the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. §6901 *et seq.*, the Hazardous Materials Transportation Act, 49 U.S.C. §5101 *et seq.*, the Toxic Substances Control Act, 15 U.S.C. §2601 *et seq.*, the Federal Water Pollution Control Act, 33 U.S.C. §1251 *et seq.*, the Clean Water Act, 33 U.S.C. §1321 *et seq.*, the Clean Air Act, 42 U.S.C. §7401 *et seq.*, the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.*, the Federal Insecticide, Fungicide & Rodenticide Act, 7 U.S.C. § 136 et seq., regulations promulgated thereunder, and any other federal, state, county, municipal, local or other statute, law, ordinance or regulation, or any common law (including common law that may impose strict liability), which may relate to or deal with human health, the environment, natural resources, or Hazardous Substances, all as amended.

"Environmental Liability" means any Indebtedness, or duty of, any claim or demand against, any requirement imposed on, or any amount owed by or payable from, a Borrower, which is based on, results from, is in connection with, arises out of, or otherwise is related to any Environmental Activity, whether the foregoing described liability now exists or arises in the future, is contingent or absolute, primary or secondary, liquidated or unliquidated, due or to become due, and however created, incurred, acquired, owing or arising.

"Environmental Requirements" means all present and future laws, including Environmental Laws, authorizations, approvals, judgments, injunctions, decrees, concessions, grants, orders, franchises, agreements and other restrictions and requirements (whether or not arising under statutes or regulations) relating to any Hazardous Substances or Environmental Activity.

"Equipment" means equipment as defined in the Code.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Event of Default" has the meaning given in Section 11.

"Excess Availability" means the Revolving Credit Availability as of any applicable date, minus the total, as of such date, of the amount of (i) Borrowers' accounts payable which remain unpaid greater than 90 days past the date of the original invoices applicable thereto, unless Borrowers have received extended terms, in which case they remain unpaid as of the due date thereof, and (ii) any book overdraft of Borrowers relating to accounts payable more than 90 days past the date of the original invoices applicable thereto.

"Excess Cash Flow" means Borrowers' EBITDAR minus (i) Fixed Charges, (ii) DOL Payments, (iii) cash taxes paid, and (iv) cash payments in connection with the redemption of Capital Stock, but only to the extent permitted by Section 10.18.

"Excluded Taxes" means, with respect to Agent, LC Issuer and any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrowers hereunder, or any of the other Loan Documents, Taxes imposed on its overall revenue or net income, and franchise Taxes imposed on it, by (i) the jurisdiction under the laws of which such Lender, LC Issuer or Agent is incorporated or organized or (ii) the jurisdiction in which such Lender, LC Issuer or Agent's applicable Lending Installation is located.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as amended.

"Farm Products" means crops, livestock, supplies used or produced in a farming operation and products of crops or livestock and including farm products as such term is defined in the Food Security Act and the Code.

"Farm Products Seller" means a seller or supplier to any Borrower of any farm products (as such term is defined in the Food Security Act and the Code) and including any perishable agricultural commodity (as defined in PACA) or livestock (as defined in the PSA), meat, meat food products or livestock products derived therefrom, or any poultry or poultry products derived therefrom.

"Federal Funds Rate" means, for any day, an interest rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published for such day (or, if such day is not a Business Day, for the immediately preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations at approximately 10:00 a.m. Minneapolis, Minnesota time on such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by Agent in its sole discretion.

"Fee Letter" means the fee letter between Borrowers and Agent of even date herewith.

"Financial Covenants" means the covenants set forth in Exhibit F.

-17-

"Financials" means those financial statements attached as Schedule 2.

"Fiscal Intermediary" means any Person that has entered into an ongoing relationship with any Governmental Authority to make payments to payees under Medicare, Medicaid or any other Federal, state or local public health care or medical assistance program pursuant to any of the Healthcare Laws.

"Fiscal Month" has the meaning given on Exhibit F.

"Fiscal Quarter" has the meaning given on Exhibit F.

"Fiscal Year" has the meaning given on Exhibit F.

"Fixed Charge Coverage Ratio" has the meaning given on Exhibit F.

"Fixed Charges" has the meaning given on Exhibit F.

"Food Security Act" means the Food Security Act of 1985, as amended, and all rules and regulations thereunder.

"Food Security Act Notice" means a written notice pursuant to the applicable provisions of the PSA, PACA, the Food Security Act, the UCC or any other applicable local law from (i) any Farm Products Seller, (ii) any lender to any Farm Products Seller, or (iii) the Secretary of State (or equivalent official) or other Governmental Authority in which any Farm Products purchased by a Borrower are produced, in each case advising or notifying such Borrower of the intention of such Farm Products Seller or other Person to preserve the benefits of any trust applicable to any assets of any Borrower established in favor of such Farm Products Seller or other Person under the provisions of any law or claiming a Lien on any perishable agricultural commodity or any other Farm Products which may have been purchased by a Borrower.

"Funded Debt to EBITDA Ratio" has the meaning given on Exhibit F.

"GAAP" means generally accepted accounting principles in the United States of America as in effect at the time any determination is made or financial statement or information is required or furnished under this Agreement.

"General Intangibles" means general intangibles as defined in the Code.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, government or any agency or instrumentality thereof (including any central bank).

"Hazardous Substances" means, at any time, (i) any "hazardous substance" as defined in §101(14) of CERCLA (42 U.S.C. §9601(14)) or regulations promulgated thereunder; (ii) any "solid waste," "hazardous waste," or "infectious waste," as such terms are defined in any Environmental Law at such time; (iii) asbestos, urea-formaldehyde, polychlorinated biphenyls

-18-

("PCBs"), nuclear fuel or material, chemical waste, radioactive material, explosives, known carcinogens, petroleum products, mold, and by-products and other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials or substances which may be hazardous to human health or animal health or the environment or which are listed or identified in, or regulated by, any Environmental Law; and (iv) any additional substances or materials which at such time are classified or considered to be hazardous or toxic under any Environmental Law.

"Healthcare Laws" means all federal, state and local laws, rules and regulation, interpretations, guidelines, ordinances and decrees primarily relating to patient healthcare, any health care provider, medical assistance and cost reimbursement programs, as now or at any time hereafter in effect, applicable to any Borrower, including but not limited to the Social Security Act, the Social Security Act Amendments of 1972, the Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977, the Medicare and Medicaid Patient and Program Protection Act of 1987 and HIPAA.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended, and the rules and regulations thereunder.

"Indebtedness" means all of a Person's obligations, indebtedness and liabilities to any other Person, including all debts, claims and indebtedness, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, however evidenced, created, incurred, acquired or owing and however arising, whether under written or oral agreement, operation of law or otherwise. Borrowers' Indebtedness includes: (i) the Obligations, (ii) obligations or liabilities of any Person secured by a Lien granted by a Borrower on property owned by a Borrower, regardless of whether such Borrower has assumed or become liable for the payment therefor, (iii) obligations or liabilities created or arising under any lease of real or personal property, any conditional sales contract or other title retention agreement with respect to property used or acquired by a Borrower, even though the rights and remedies of the lessor, seller, or lender thereunder are limited to repossession of such property, and (iv) the net cost (without duplication) to a Borrower under any interest rate, commodity or foreign currency exchange, swap, collar, cap or similar agreements.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Individual Guarantor" means Douglas A. Nidiffer or a substitute guarantor as provided and approved in accordance with Section 11.1(q).

"Individual Guaranty Agreement" means the Unconditional Guaranty Agreement given by the Individual Guarantor to Agent in the form attached hereto as Exhibit J.

"Insolvency Law" means any existing or future bankruptcy, insolvency, reorganization, liquidation or arrangement or readjustment of debt law or any similar existing or future law of any applicable jurisdiction.

-19-

"Interim Advance Exposure" means, with respect to any Lender at any time, such Lender's Revolving Credit Commitment Percentage of the total Interim Advances outstanding at such time.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Inventory" means inventory as defined in the Code.

"Involuntary Proceeding" means any involuntary Bankruptcy Case.

"Judgment" means any judicial judgment, order or award, whether for the payment of money or otherwise.

"Knowledge" means, with respect to Borrowers, the actual conscious awareness of any Authorized Representative, without any inquiry unless otherwise indicated.

"LC Issuer" means U.S. Bank, as the issuer of Letters of Credit under Section 2.4, together with its successors and assigns in such capacity.

"Lenders" means each of the financial institutions that is a signatory hereto identified under the caption "LENDERS" on the signature pages of this Agreement, and each Person that becomes a "Lender" after the date hereof pursuant to Section 14.2.

"Lending Installation" means, with respect to Agent, a Lender or LC Issuer, the office, branch, subsidiary or Affiliate of Agent, such Lender or LC Issuer listed on the signature pages hereof or otherwise selected by Agent, such Lender or LC Issuer pursuant to Section 2.12.

"Letter of Credit" means a standby letter of credit or a commercial letter of credit issued by LC Issuer pursuant to Section 2.4.

"Letter of Credit Application" means a letter of credit application and reimbursement agreement on LC Issuer's then customary form.

"Letter of Credit Availability" means, as at any time, an amount equal to the lesser of (i) an amount equal to (a) $3,000,000 less (b) the then Letter of Credit Exposure and (ii) the then Revolving Credit Availability.

"Letter of Credit Deficiency" means any failure of the Letter of Credit Availability to be greater than or equal to zero Dollars.

"Letter of Credit Documents" means, with respect to each and every Letter of Credit, (i) a Letter of Credit Application, and (ii) any other agreements, certificates, documents and information as LC Issuer may reasonably request relating to a Letter of Credit.

"Letter of Credit Exposure" means, as at any time, the sum of (i) the Letter of Credit Face Amount of all outstanding Letters of Credit and (ii) all unreimbursed drawings under any Letters of Credit (whether or not outstanding). The Letter of Credit Exposure of any Lender at any time

shall be its Revolving Credit Commitment Percentage of the total Letter of Credit Exposure at such time.

"Letter of Credit Face Amount" of any Letter of Credit means, at any time, the face amount of the Letter of Credit, after giving effect to all drawings paid thereunder and other reductions of the face amount and to all reinstatements of the face amount effected, pursuant to the terms of the Letter of Credit, prior to such time.

"Letter of Credit Obligations" means, at any time, the sum of (i) the Letter of Credit Exposure plus (ii) the aggregate amount of Borrower's other unpaid obligations in respect of all Letters of Credit (whether or not outstanding) under this Agreement and the Letter of Credit Documents, including any Indebtedness incurred or arising in connection with any Letters of Credit (including any drafts or acceptances thereunder, all amounts charged or chargeable to Borrower or LC Issuer, including any and all charges, expenses, fees and commissions, and all duties and Taxes and costs of insurance which may pertain either directly or indirectly to such Letters of Credit).

"Letter of Credit Reserve" means, as at any time, the sum of 100% of the then Letter of Credit Exposure with respect to all Letters of Credit.

"LIBOR Rate" means the one-month LIBOR rate quoted by Agent from Reuters Screen LIBOR01 Page or any successor thereto (which shall be that one-month LIBOR rate in effect two New York Banking Days prior to the Reprice Date), adjusted for any reserve requirement and any subsequent costs arising from a change in government regulation, such rate rounded up to the nearest one-sixteenth percent and such rate to be reset monthly on each Reprice Date. Agent's internal records of applicable interest rates shall be determinative in the absence of manifest error.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, charge, security interest, encumbrance, lien (statutory or other), or any preference, priority or other security agreement or any preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any lease deemed under the UCC to be intended for security, and the authorized filing by or against a Person as debtor of any financing statement under the UCC or comparable law of any jurisdiction).

"Loan" means each Revolving Loan (including each Overadvance), each Interim Advance, each Agent Advance, and each Term Loan, and the total of all such Revolving Loans, Interim Advances, Agent Advances and Term Loans outstanding at any time may be referred to as "Loans".

"Loan Collateral" means the Collateral, the Property, the Trademark Collateral (as defined in the Trademark Security Agreement) and any other security or collateral provided from time to time by, or on behalf of, Borrower or any other Person for the Obligations.

"Loan Documents" means this Agreement, the Notes, the Letter of Credit Documents, the Individual Guaranty Agreement, the Security Documents, and all other agreements, instruments

-21-

and documents relating to the Credit Extensions, including mortgages, deeds of trust, security agreements, subordination agreements, intercreditor agreements, pledges, powers of attorney, consents, collateral assignments, locked box agreements, letter agreements, contracts, notices, leases, financing statements and all other writings, all of which must be in form and substance satisfactory to Agent, LC Issuer, and the Lenders, which have been, are as of the date of this Agreement, or will in the future be signed by, or on behalf of, Borrowers and delivered to Agent, LC Issuer, or the Lenders.

"Material Adverse Effect" means a material adverse effect on (i) Borrowers' (a) business, property, assets, operations or condition, financial or otherwise, on a combined basis taken as a whole or (b) ability to perform any of their respective payment or other Obligations under this Agreement or any of the other Loan Documents, (ii) the recoverable value of any material portion of the Loan Collateral or Agent's, LC Issuer's or Lenders' rights or interests therein, in each case on a combined basis taken as a whole, or (iii) the ability of Agent, LC Issuer or Lenders to exercise any of their material rights or remedies under the Loan Documents or provided by law.

"Medicaid" means the health care program jointly financed and administered by the Federal and state governments under Title XIX of the Social Security Act, as amended.

"Medicaid Receivable" means any Pharmacy Receivables of a Borrower to be paid by a Fiscal Intermediary or by the United States of America acting under the Medicaid program, any state or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Social Security Act or any other Governmental Authority under Medicaid.

"Medicare" means the health care program under Title XVIII of the Social Security Act, as amended.

"Medicare Receivable" means any Pharmacy Receivables of a Borrower to be paid by a Fiscal Intermediary or by the United States of America acting under the Medicare program or any other Governmental Authority under Medicare.

"Money Markets" means one or more wholesale funding markets available to and selected by Agent, including negotiable certificates of deposit, commercial paper, eurodollar deposits, bank notes, federal funds, interest rate swaps or others.

"Mortgages" means the Deeds of Trust, Assignments of Rents, Security Agreements and Fixture Filings dated as of the date of this Agreement and granted by Market to Agent, as described in Schedule 6.1.

"Net Amount of Eligible Credit Card Receivables" and "Net Amount of Eligible Pharmacy Receivables" means, at any time, the gross amount of Eligible Credit Card Receivables or Eligible Pharmacy Receivables, as the case may be, less returns, discounts, claims, credits and allowances of any nature at any time issued, owing, granted, outstanding, available or claimed.

"Net Orderly Liquidation Value" means, with respect to each item of Eligible Inventory and Eligible Prescription Files, the orderly liquidation value of such item of Eligible Inventory or Eligible Prescription Files as set forth on the most recent appraisal ordered and received by Agent with respect thereto, net of reasonable liquidation expenses.

"New York Banking Day" means any day (other than a Saturday or Sunday) on which commercial banks are open for business in New York, New York.

"Nidiffer Note" means that certain Second Amended and Restated Promissory Note dated October 28, 2010 issued by Market in favor of Nidiffer Family LLC in the principal amount of $10,000,000.

"Non-Perishable Inventory" means Inventory owned by Market that is not Perishable Inventory, Pharmacy Inventory or Alcoholic Beverage Inventory.

"Notes" means the Revolving Loan Notes and the Term Loan Notes.

"Obligations" means (i) the Loans, the Letter of Credit Obligations, and Rate Hedging Obligations owing to Agent, LC Issuer or any Lender or any Affiliate of any such Persons, (ii) all other loans, advances, debts, liabilities, obligations, indemnities, covenants and duties owing to Agent, LC Issuer and the Lenders from Borrowers and their respective Subsidiaries (individually and collectively) of any kind, present or future, evidenced by or arising out of this Agreement or any of the other Loan Documents. "Obligations" do not include obligations owed to Agent or any Lender with respect to Cash Management Services provided by Agent or such Lender, but do include Borrowers' obligation to indemnify Agent and Lenders pursuant to Section 15.8 with respect to the provision of such Cash Management Services.

"Operating Account(s)" means non-interest bearing, DDA operating account(s) maintained by Agent.

"Other Taxes" means any and all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery, filing or enforcement of, or otherwise with respect to, this Agreement or the other Loan Documents.

"PACA" means the Perishable Agricultural Commodities Act of 1930, as amended, and the rules and regulations thereunder.

"Payment in Full" means that Borrowers shall have (i) paid to Agent all outstanding and unpaid Obligations that are not contingent Obligations, and (ii) shall have furnished cash collateral to Agent in such amounts, or other indemnity reasonably satisfactory to Agent, as Agent determines are reasonably necessary to secure Agent, LC Issuer and Lenders from loss, cost, damage or expense, including reasonable attorneys' fees and expenses, in connection with any contingent Obligations, including issued and outstanding Letter of Credit Obligations and checks or other payments provisionally credited to the Obligations and/or as to which Agent or any Lender has not yet received final and indefeasible payment (and including any

-23-

contingent liability of Agent to any bank at which deposit accounts of Borrowers are maintained under any deposit account control agreement) and for any of the Obligations arising under Section 15.8(v). The amount of such cash collateral as to any Letter of Credit Obligations shall be in the amount equal to one hundred five (105%) percent of the amount of the Letter of Credit Obligations plus the amount of any fees and expenses payable in connection therewith through the end of the latest expiration date of such Letter of Credit Obligations. Any cash collateral collected by Agent to secure payment of checks or other payments provisionally credited to the Obligations and/or as to which Agent or any Lender has not yet received final and indefeasible payment or for any of the Obligations arising under Section 15.8(v) and not applied by Agent to the Obligations 30 days after Payment in Full shall be returned to Borrowers.

"Pension Plan" means a "pension plan", as such term is defined in section 3(2) of ERISA, as to which Borrower or any corporation or other entity, trade or business that is, along with Borrower, a member of a Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of section 4063 of ERISA at any time during any preceding six year period, or by reason of being deemed to be a contributing sponsor under section 4069 of ERISA.

"Perishable Inventory" means Inventory that is included in the following categories as reported by Borrowers consistent with then current industry practices: bakeries, produce, floral, dairy, fresh seafood, meat and deli.

"Permitted Acquisition" means any purchase or acquisition by any Borrower of all or substantially all of the assets of any Person or the assets comprising any line of business or business unit or division of an ongoing business that are or is similar to, consistent with, or complementary of the lines of business of Borrowers as of the date of this Agreement that satisfies each of the following conditions, or is otherwise approved in writing by Agent in its discretion exercised in good faith:

(i)    Borrowers have (x) given Agent at least 30 days' prior written notice of such acquisition (or such lesser notice as Agent may agree to in writing), (y) provided Agent with such financial, collateral and other information concerning such acquisition as Agent reasonably may request, and (z) for any acquisition or series of related acquisitions where the combined value of the Inventory, Receivables and Prescription Files is greater than or equal to $1,000,000, provided Agent with access to the assets to be acquired in order for Agent to conduct such field exams prior to consummation of the acquisition as Agent shall require (such exams to be at the cost and expense of Borrowers, payable upon demand);

(ii)    the assets being acquired are located in the United States and will be used in operations the scope and nature of which are consistent with the lines of business in which Borrowers are engaged at the time of the acquisition;

(iii)    the total cash purchase price (including fees and expenses, but excluding the portion of the purchase price payable for Eligible Inventory, Eligible Receivables, cash and cash equivalents) for all acquisitions made in any Fiscal Year, including the acquisition in

question, by either or both Borrowers (whether payable at closing, or at any time or times after closing of the applicable acquisition, and, if payable after closing and not determinable prior to closing, as reasonably estimated by Borrowers) but not including the Bandon Acquisition, does not exceed $3,500,000;

(iv)   if the total cash purchase price for the acquisition in question (excluding the portion of the purchase price payable for Inventory and Receivables) is more than $500,000, then Borrowers will have provided (a) a calculation of pro forma results for the trailing twelve months prior to the consummation of the acquisition and (b) a projection prepared on a basis consistent with the previous projections prepared by Borrowers for Agent of the subsequent twelve months after the consummation of the acquisition that demonstrates covenant compliance with both the Fixed Charge Coverage Ratio and the Funded Debt to EBITDA Ratio, all of which will be subject to the reasonable discretion of Agent;

(v)   both immediately before and immediately after giving effect to such acquisition, no Event of Default shall have occurred and be continuing;

(vi)   Borrowers shall have executed such other Loan Documents as Agent shall reasonably require in order for Agent to obtain a first perfected security interest (subject only to Permitted Liens) in all assets acquired by Borrowers in connection with any such acquisition, and, in connection with any fee interest in real property acquired by any Borrower in connection with any such acquisition, Borrowers shall have procured a title insurance policy insuring agent's Lien in such real property in the amount of the appraised value of such property, in form and substance reasonably satisfactory to Agent;

(vii)   after giving effect to the consummation of such acquisition and the payment of all amounts required to be paid by any Borrower in connection therewith (including closing costs, whether or not paid at closing and repayment of all debts to be paid at closing), upon such consummation, Borrowers will have Excess Availability of at least $5,000,000; and

(viii)   such acquisition is not prohibited under the terms of any other agreement executed by any Borrower, including any agreement pertaining to or evidencing any other permitted Indebtedness of any Borrower.

The Bandon Acquisition shall be a Permitted Acquisition so long as (A) the Indebtedness incurred or assumed by Market in connection therewith does not exceed $2,670,000 in principal amount, (B) it occurs within 18 months after the Closing Date, and (C) there is compliance with clauses (v) through (viii) of the foregoing definition in connection therewith.

"Permitted Discretion" means Agent's good faith credit judgment determined in accordance with its credit procedures for similar transactions in industries similar to Borrowers' industries, which determination may be based upon any factor or circumstance which it believes in good faith: (i) will or could reasonably be expected to adversely affect the value of the Loan Collateral included in the Borrowing Base, the enforceability or priority of Agent's Liens thereon or the amount which Agent and the Lenders would likely receive (after giving consideration to delays in payment and costs of enforcement) in the liquidation of such Loan Collateral; (ii)

-25-

suggests that any collateral report or financial information delivered to Agent by or on behalf of Borrowers is incomplete, inaccurate or misleading in any material respect; (iii) could reasonably be expected to materially increase the likelihood of a bankruptcy, reorganization or other insolvency proceeding involving any Borrower; or (iv) creates or reasonably could be expected to create an Event of Default. In exercising such judgment, Agent may consider, without limitation, any of the following: (A) without duplication of any Reserve Amounts or items that are otherwise addressed or excluded through eligibility criteria, the financial and business climate and prospects of any Borrower's industry and general macroeconomic conditions; (B) changes in demand for and pricing of Inventory; (C) changes in any concentration of risk with respect to Inventory; (D) any other factors or circumstances that will or could reasonably be expected to have a Material Adverse Effect; and (E) audits of books and records by third parties, history of chargebacks or other credit adjustments. Notwithstanding the foregoing, it shall not be within Permitted Discretion for Agent to establish Reserve Amounts which are duplicative of each other whether or not such reserves fall under more than one reserve category, or which are duplicative of any items otherwise addressed or excluded through eligibility criteria.

"Permitted Disposition" means a sale, transfer or other disposition of Property or Equipment permitted by Section 10.24 or consented to by the Required Term Loan Lenders as contemplated by Section 13.10.2 or Section 13.10.3.

"Permitted Liens" means the Liens and interests in favor of Agent for the benefit of Agent, LC Issuer and the Lenders granted or provided under the Loan Documents and to the extent not materially impairing the operations of a Borrower or any performance under, or contemplated by, the Loan Documents:

(i)      Liens arising by operation of law for Taxes not yet due and payable;

(ii)      Liens of mechanics, materialmen, shippers and warehousemen for services or materials for which payment is not yet due;

(iii)      Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security;

(iv)      Liens, if any, specifically permitted by the Required Revolving Credit Lenders and the Required Term Loan Lenders from time to time in writing;

(v)      Liens on Equipment or real estate (other than the Property described in Schedule 6.1) securing Permitted Purchase Money Indebtedness;

(vi)      Liens for Taxes, assessments and other similar charges to the extent payment thereof shall not at the time be required to be made in accordance with the provisions of Section 10.9;

DWT 13644165v19 0017787-000222

(vii)    those Liens described on Schedule 9.7; *provided* that those Liens secure only the Indebtedness which the Liens secured on the Closing Date or any Refinancing Debt thereof;

(viii)    Liens arising from the claims or demands of materialmen, mechanics, carriers, warehousemen, landlords, bailees and other like Persons ("Third Party Claims") if each of the following conditions is met: (a) the validity or amount of the Third Party Claim is being contested in good faith and by appropriate and lawful proceedings promptly initiated and diligently conducted, (b) a Borrower has given prompt notice to Agent of the Third Party Claim after Borrowers have Knowledge of the Third Party Claim, (c) a Borrower has established reserves or posted a bond for the Third Party Claim, in each case reasonably satisfactory to Agent, (d) levy, attachment, garnishment and execution on the Third Party Claim have been and continue to be stayed, (e) a Borrower's right to use the Loan Collateral subject to the Third Party Claim is not, in Agent's judgment exercised in good faith, materially affected thereby, and (f) the amount of all Third Party Claims does not exceed, as of any date, $1,000,000 in the aggregate; and, *provided, further*, that Borrower must promptly pay each such Third Party Claim to the extent the dispute is finally settled in favor of the claimant thereof;

(ix)    Liens on cash deposits in connection with bids, tenders or real property leases or as security for surety or appeal bonds in the ordinary course of business;

(x)    Liens resulting from any Judgment that is not an Event of Default;

(xi)    Easements, rights of way and other real property restrictions and irregularities that do not materially interfere with or impair the use or operation of Borrower's Facilities;

(xii)    possessory Liens on credit balances of a Borrower with a Credit Card Issuer or Credit Card Processor (but not on any other assets or properties of a Borrower) to secure the payment of fees and chargebacks owed to such Credit Card Issuer or Credit Card Processor; and

(xiii)    Liens on Medicare Receivables and Medicaid Receivables arising under the Social Security Act, as amended, the rules and regulations hereunder, and related state laws, and other Liens arising under Healthcare Laws acceptable to Agent in its Permitted Discretion.

"Permitted Purchase Money Indebtedness" means purchase money or capital lease Indebtedness incurred by a Borrower to acquire any Equipment or real estate or to make any Permitted Acquisition if each of the following conditions is satisfied: (i) the total amount of obligations secured by the purchase money security interests or the subject of capitalized leases during any period does not, together with any other capital expenditures made by Borrower for the applicable period, exceed the maximum amount permitted during such period for capital expenditures pursuant to Section 1 of Exhibit F to this Agreement; provided, however, that in no event shall the amount of such Indebtedness incurred in transactions that are not Permitted Acquisitions exceed $5,000,000 in the aggregate at any time; (ii) such purchase money Indebtedness or capitalized lease Indebtedness will not be secured by any of the Loan Collateral

-27-

other than the property so acquired and any identifiable proceeds; (iii) any Liens relating to such purchase money Indebtedness or capitalized lease Indebtedness will not extend to or cover any property of such Borrower other than the property so acquired and any identifiable proceeds, and will not extend to or cover any Inventory, Receivables or other intangible property or assets acquired in connection with such Permitted Acquisition, or any proceeds thereof, (iv) the principal amount of such capitalized lease or purchase money Indebtedness will not, at the time of the incurrence thereof, exceed the value of the property so acquired, and (v) any purchase money Indebtedness incurred in connection with a Permitted Acquisition and attributable or allocated (as determined by Agent in good faith) to the acquisition of Inventory, Receivables or other intangible property or assets shall be subordinated in right of payment to Agent and Lenders pursuant to a subordination agreement in form and substance reasonably acceptable to Agent.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, limited liability company, corporation, institution, entity, party or Governmental Authority.

"Pharmacy Inventory" means Inventory owned by Express consisting of prescription and non-prescription medications, medical devices and other related goods.

"Pharmacy Receivables" means Receivables generated by the sale of Pharmacy Inventory or the provision Pharmacy Services.

"Pharmacy Services" means the services provided by Express, including patient counseling, immunizations and medication therapy management programs.

"Presentments" means checks and other items presented to Agent for payment or drawn on a Controlled Disbursement Account.

"Prescription Files" means, as to each Borrower, all of such Borrower's now owned or hereafter existing or acquired retail customer files, including prescriptions for retail customers and other medical information related thereto, maintained by the retail pharmacies of such Borrower, wherever located.

"Prescription Files Value" means (i) the number of Eligible Prescription Files filled by Borrowers in the previous consecutive three (3) month period for all retail store locations of Borrowers that are operating as of the date of the delivery of the most recent Borrowing Base Certificate multiplied by (ii) four (4) multiplied by (iii) the per script Net Orderly Liquidation Value for Prescription Files set forth in the most recent appraisal delivered to Agent.

"Pre-Settlement Determination Date" means the Business Day immediately preceding a Settlement Date.

"Prime Rate" means the prime rate announced by U.S. Bank from time to time. The "Prime Rate" hereunder will be adjusted each time that such announced prime rate changes. The prime rate announced by U.S. Bank is determined solely by U.S. Bank pursuant to market factors

-28-

and its own operating needs and is not necessarily U.S. Bank's best or most favorable rate for commercial or other loans.

"Property" means the "Property" identified on Schedule 6.1.

"PSA" means the Packers and Stockyard Act of 1921, as amended, and the rules and regulations thereunder.

"Rate Hedging Agreement" means any agreement, device or arrangement designed to protect at least one of the parties thereto from the fluctuations of interest rates, exchange rates or forward rates applicable to such party's assets, liabilities or exchange transactions, including dollar-denominated or cross-currency interest rate exchange agreements, forward currency exchange agreements, interest rate cap or collar protection agreements, forward rate currency or interest rate options, puts and warrants.

"Rate Hedging Obligations" of a Person means any and all Indebtedness of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under any Rate Hedging Agreements, and any and all cancellations, buy backs, reversals, terminations or assignments thereof.

"Receivables" means accounts as defined in the Code.

"Reduction Fee" has the meaning given in Section 2.13.3.

"Refinance" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, modify, supplement, restructure, replace, refund or repay (in full), or to issue other Indebtedness in exchange or replacement for, such Indebtedness in whole or in part. "Refinanced" and "Refinancing" shall have correlative meanings.

"Refinancing Debt" means, as to any Indebtedness, the Refinancing of such Indebtedness, *provided* that the following conditions are satisfied with respect to such Refinancing Indebtedness:

        (i)       the principal amount of such Refinancing Debt shall be less than or equal to the sum of the principal amount then outstanding of, plus accrued and unpaid interest on and financing fees related to, the Indebtedness being refinanced;

        (ii)      the respective obligor or obligors shall be the same on the Refinancing Debt as on the Indebtedness being refinanced;

        (iii)     the priority of payment of such Refinancing Debt, vis-a-vis the Loans, shall be the same as or lower than the ranking of the Indebtedness being Refinanced;

        (iv)     the security, if any, for the Refinancing Debt shall be the same as that for the Indebtedness being refinanced (except to the extent that less security is granted to holders of the Refinancing Debt);

DWT 13644165v19 0017787-000222

(v)      the terms of such Refinancing Debt (including covenants, events of default and remedies) are not materially less favorable to Borrowers than the terms of the Indebtedness being refinanced at the time such Indebtedness is being Refinanced;

(vi)      Borrowers are in compliance with the Financial Covenants, on a *pro forma* basis, after giving effect to the incurrence of such Refinancing Debt and the repayment of the Indebtedness being Refinanced. To determine whether there is *pro forma* compliance with the Financial Covenants, Borrowers will, on a *pro forma* basis, (a) restate the financial statements received by Agent for the Fiscal Month, Fiscal Quarter or the Fiscal Year, as applicable, ended most closely before the date such Refinancing Debt is proposed to be incurred as if the proposed Refinancing Debt had been made, and the Indebtedness had been Refinanced, at the beginning of the applicable Test Period and (b) calculate the Fixed Charge Coverage Ratio under <u>Section 2</u> of <u>Exhibit F</u> taking into account such proposed Refinancing Debt as if the proposed Refinancing Debt had been made, and the Indebtedness had been refinanced, at the beginning of the applicable Test Period; and

(vii)      additionally, in the case of any Refinancing of the Subordinated Debt, (a) the interest rate on, and fees with respect to, such Refinancing Debt are less than or equal to the interest rate on, and fees with respect to, such Subordinated Debt and (b) the holders of such Refinancing Debt have entered into a subordination agreement with Agent on the then current terms of the applicable Subordination Agreement; provided, however, that no Refinancing of the Nidiffer Note shall be permitted hereunder unless (1) such Refinancing consists of an assignment to a purchaser in an amount not to exceed $5,000,000 in the aggregate, (2) no Event of Default has occurred or would be caused by such Refinancing, and (3) the purchaser in any such Refinancing is issued a new promissory note that provides for no amortization or other payments of principal until after the Term Loan A Maturity Date.

"<u>Release</u>" includes, but is not limited to, spilling, leaking, pumping, pouring, paving, emitting, emptying, discharging, injecting, escaping, contaminating, leaching, disposing, releasing or dumping into the environment.

"<u>Remittances</u>" means proceeds from the sale of Inventory or provision of Pharmacy Services, in whatever form.

"<u>Reportable Event</u>" means an event described in Section 4043 of ERISA and the regulations issued thereunder (other than an event not subject to the provision for 30 day notice to the Pension Benefit Guaranty Corporation under such regulations).

"<u>Reprice Date</u>" means the first day of each calendar month.

"<u>Required Revolving Credit Lenders</u>" means, at any time, Revolving Credit Lenders holding more than 66.67% of the Revolving Credit Commitments then in effect at such time, or, if the Revolving Credit Commitments are terminated, the aggregate Revolving Credit Exposure of all of the Lenders then outstanding; provided that while there are fewer than three Revolving Credit Lenders, the term "Required Revolving Credit Lenders" will mean all Revolving Credit Lenders.

"Required Term Loan Lenders" means, at any time, Term Loan Lenders holding more than 66.67% of the then outstanding principal amounts of the Term Loans; provided that while there are fewer than three Term Loan Lenders, the term "Required Term Loan Lenders will mean all Term Loan Lenders.

"Reserve Amount" means, as at any time, the amounts that Agent, in its Permitted Discretion may from time to time establish in determining the Borrowing Base.  Without limiting Agent's Permitted Discretion, Agent may establish reserves in respect of any one or more of the following:

        (i)    for price adjustments, damages, unearned discounts, gift cards, coupons, returned Inventory, credit memoranda (issued or unissued), credits, contras and other similar offsets to a Borrower's accounts receivable except to the extent that any of the foregoing in this item (i) has been dealt with by Agent by designating a specific Receivable or Receivables as being ineligible pursuant to the terms of this Agreement as opposed to the establishment of a reserve general in nature;

        (ii)    for any claims, interests, or rights (including Permitted Liens and including Liens disclosed in any Food Security Act Notices that have not been waived to Agent's reasonable satisfaction) of any Person ("Priming Interests") which (a) as of the date Agent learns or is notified of the existence of the applicable Priming Interest, has priority over Agent's Liens on any or all of the Loan Collateral or (b) will have priority over Agent's Liens on any or all of the Loan Collateral after any required notice or filing, the passage of time, the satisfaction of any other condition, or otherwise;

        (iii)    for aged credits maintained by a Borrower in respect of its accounts receivable except to the extent that any of the foregoing in this item (iii) has been dealt with by Agent by designating a specific Receivable or Receivables as being ineligible pursuant to the terms of this Agreement as opposed to the establishment of a reserve general in nature;

        (iv)    for any amounts expended by Agent to protect or preserve any Loan Collateral or Agent's or any Lender's rights under the Loan Documents which have not been reimbursed by a Borrower; or

        (v)    100% of the aggregate mark-to-market exposure, as determined by Agent, of all Rate Hedging Obligations then owing by a Borrower to one or more Lenders (or their Affiliates) under a Rate Hedging Agreement.

"Revolving Credit Availability" means, as of any time, an amount, in Dollars, equal to:

        (i)    an amount equal to the lesser of: (a) the then Borrowing Base or (b) the then effective Revolving Credit Commitments;

        less    (ii)    the then aggregate outstanding principal amount of all Revolving Loans and Interim Advances and all due but unpaid interest on the Revolving Loans and Interim

Advances, and all fees, commissions, expenses and other charges posted to Borrower's loan account with Agent;

> less    (iii)    the then Letter of Credit Exposure.

"Revolving Credit Commitment" means, when used with reference to a particular Lender, its obligation to make Revolving Loans and to participate in Letters of Credit and Interim Advances. The maximum amount of each Lender's Revolving Credit Commitment is set forth on Schedule 1, as such commitment may be (i) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 14.2, (ii) reduced or terminated pursuant to Section 2.13 and (iii) terminated pursuant to Section 12. "Revolving Credit Commitments" means, collectively, the aggregate amount of all Revolving Credit Commitments of the Lenders.

"Revolving Credit Commitment Percentage" means, with respect to any Revolving Credit Lender at any time, the ratio of (i) the amount of the Revolving Credit Commitment of such Lender at such time to (ii) the Revolving Credit Commitments then in effect at such time; *provided, however*, if all the Revolving Credit Commitments have been terminated, the "Revolving Credit Commitment Percentage" shall be determined according to the Revolving Credit Commitments in effect immediately prior to such termination, giving effect to any assignments.

"Revolving Credit Commitment Period" means the period from and including the Closing Date to, but not including, the Revolving Credit Commitment Termination Date.

"Revolving Credit Commitment Termination Date" means the Revolving Loan Maturity Date or such earlier date on which the Revolving Credit Commitments shall be terminated in accordance with this Agreement.

"Revolving Credit Exposure" means, with respect to any Lender at any time, an amount equal to (i) the outstanding principal amount of such Lender's Revolving Loans, plus (ii) the Letter of Credit Exposure of such Lender, plus (iii) the Interim Advance Exposure of such Lender.

"Revolving Credit Lenders" means (i) on the date hereof, the Lenders having Revolving Credit Commitments as set forth on Schedule 1 and (ii) thereafter, the Lenders from time to time holding Revolving Credit Exposure and Revolving Credit Commitments after giving effect to any assignments thereof permitted by Section 14.2.

"Revolving Loan Maturity Date" means the earlier to occur of (i) October 31, 2014, and (ii) the Voluntary Termination Date.

"Revolving Loan Note" means a promissory note duly executed and delivered by Borrowers to each of the Revolving Credit Lenders substantially in the form of Exhibit A, with blanks appropriately completed in conformity herewith.

"Revolving Loan Priority Collateral" means all of the Loan Collateral that is not Term Loan Priority Collateral.

"Revolving Loans" has the meaning given in Section 2.2, and shall include, subject to the terms hereof, all Overadvances.

"Security Documents" means the Borrower Security Agreement, the Mortgages, the Trademark Security Agreement and any other agreements, instruments or documents executed and delivered from time to time by, or on behalf of, Borrower or any other Person as collateral security for the Obligations.

"Solvent" means, with respect to any Person, as of any date of determination, (i) the amount of the "fair saleable value" of the assets of such Person will, as of such date, exceed (a) the value of all "liabilities of such person, including contingent and other liabilities," as of such date, as such quoted terms are generally determined in accordance with applicable federal laws governing determinations of the insolvency of debtors, and (b) the amount that will be required to pay the probable liabilities of such person on its existing debts (including contingent liabilities) as such debts become absolute and matured, (ii) such Person will not have, as of such date, an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged following such date, and (iii) such Person will be able to pay its liabilities, including contingent and other liabilities, as they mature. For purposes of this definition, "not have an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged" and "able to pay its liabilities, including contingent and other liabilities, as they mature" means that such person can reasonably be expected to generate enough cash from operations, assets dispositions or refinancing, or a combination thereof, to meet its obligations as they become due.

"Special Account" means, with respect to Market, a non-interest bearing account at Agent in the name of Market, bearing Market's federal tax identification number, Account No. 153910689162, and, with respect to Express, during a Cash Dominion Period, a non-interest bearing account at Agent in the name of Express, bearing Express' federal tax identification number, and in each case pledged to Agent.

"Store Account" means a deposit account established by Market and used for receiving store receipts from a retail location of Market.

"Subsidiary" means any Person as to which a Borrower owns, directly or indirectly, at least 50% of the outstanding shares of Capital Stock or other interests having ordinary voting power for the election of directors, officers, managers, trustees or other controlling Persons or an equivalent controlling interest in Agent's judgment.

"Subordinated Creditor" means each of Endeavour Structured Equity and Mezzanine Fund I, L.P., THL Credit, Inc. and Nidiffer Family LLC, their respective permitted successors and assigns, and any other holder of Subordinated Debt. To the extent a term or provision of this Agreement is applicable to a "Subordinated Creditor", it is applicable to each of the Subordinated Creditors unless the context expressly indicates otherwise. For the avoidance of

-33-

doubt, no Subordinated Creditor will be treated as a Lender hereunder or under the Loan Documents unless a Lender has assigned all or a portion of its rights and obligations hereunder to such Subordinated Creditor in accordance with the provisions of Section 14.2.

"Subordinated Debt" means the Subordinated Indebtedness as defined in the applicable Subordination Agreement, and any Refinancing Debt in respect thereof.

"Subordinated Debt Default" means any of the following (or any combination of the following): (i) a default or breach of or under any of the Subordinated Debt Documents that is not cured within any applicable cure period, or (ii) the maturity of any of the Subordinated Debt without such Subordinated Debt being fully paid, performed and satisfied as of October 31, 2015.

"Subordinated Debt Documents" means, collectively, the Subordination Agreements and all other agreements, instruments, and documents signed or delivered by or on behalf of Borrower in connection with the Subordinated Debt, as any or all of the foregoing documents, instruments, and agreements are now in effect or, subject to Section 10.29, as at any time after the date of this Agreement amended, modified, supplemented, restated, renewed, extended, replaced or otherwise changed and any documents, instruments, or agreements given, subject to Section 10.29, in substitution of any of them.

"Subordination Agreement" means each of the Subordination Agreements by one or more Subordinated Creditors in favor of Agent and Lenders dated as of the date of this Agreement, and any other subordination agreement entered into in favor of Agent and Lenders relating to Refinancing Debt in respect of any of the Subordinated Debt described in such Subordination Agreements.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Temporary Overadvance Amount" means, during the Temporary Overadvance Period, the amount of (i) $1,000,000 from the Temporary Overadvance Commencement Date through June 30, 2011, (ii) $750,000 from July 1, 2011 or the Temporary Overadvance Commencement Date (whichever occurs later), through July 31, 2011, (iii) $500,000 from August 1, 2011 or the Temporary Overadvance Commencement Date (whichever occurs later) through August 31, 2011, and (iv) $250,000 from September 1, 2011 or the Temporary Overadvance Commencement Date (whichever occurs later), through September 30, 2011.

"Temporary Overadvance Commencement Date" means the date that is five (5) days after Agent's receipt of a written request from Borrowers (which request shall be irrevocable) requesting that a temporary overadvance be made available.

"Temporary Overadvance Period" means the period commencing on the Temporary Overadvance Commencement Date and ending October 1, 2011.

-34-

"Term Loan A" means the Loan evidenced by one or more Term Loan A Notes and this Agreement.

"Term Loan B" means the Loan evidenced by one or more Term Loan B Notes and this Agreement.

"Term Loans" means Term Loan A and Term Loan B.

"Term Loan A Commitment" means, when used with reference to a particular Lender, its obligation to make a Term Loan A. The amount of each Lender's Term Loan A Commitment is set forth on Schedule 1. "Term Loan A Commitments" means, collectively, the aggregate amount of all Term Loan A Commitments of the Lenders.

"Term Loan B Commitment" means, when used with reference to a particular Lender, its obligation to make a Term Loan B. The amount of each Lender's Term Loan B Commitment is set forth on Schedule 1. "Term Loan B Commitments" means, collectively, the aggregate amount of all Term Loan B Commitments of the Lenders.

"Term Loan Commitment" means, when used with reference to a particular Lender, its obligation to make a Term Loan. The amount of each Lender's Term Loan Commitment is set forth on Schedule 1. "Term Loan Commitments" means, collectively, the aggregate amount of all Term Loan Commitments of the Lenders.

"Term Loan A Lenders" means (i) on the date hereof, the Lenders having Term Loan A Commitments on Schedule 1, and (ii) thereafter, the Lenders from time to time holding the Term Loans A, after giving effect to any assignments thereof permitted by Section 14.2.

"Term Loan B Lenders" means (i) on the date hereof, the Lenders having Term Loan B Commitments on Schedule 1, and (ii) thereafter, the Lenders from time to time holding the Term Loans B, after giving effect to any assignments thereof permitted by Section 14.2.

"Term Loan Lenders" means the Term Loan A Lenders and the Term Loan B Lenders.

"Term Loan A Maturity Date" means the earlier to occur of (i) April 30, 2015, and (ii) the Voluntary Termination Date.

"Term Loan B Maturity Date" means the earlier to occur of (i) April 30, 2013, and (ii) the Voluntary Termination Date.

"Term Loan A Note" means a promissory note duly executed and delivered by Borrowers to the Term Loan A Lenders substantially in the form of Exhibit B-1, with blanks appropriately completed in conformity herewith.

"Term Loan B Note" means a promissory note duly executed and delivered by Borrowers to the Term Loan B Lenders substantially in the form of Exhibit B-2, with blanks appropriately completed in conformity herewith.

"Term Loan A Principal Payment Date" means the last Business Day of each month, commencing on December 31, 2010, and continuing through April 30, 2015.

"Term Loan B Principal Payment Date" means the last Business Day of each January, April, July and October, commencing on January 31, 2011, and continuing through April 30, 2013.

"Term Loan Priority Collateral" means (i) the Property, (ii) all equipment and fixtures now owned or hereafter acquired by Borrowers, (iii) the Loan Collateral subject to the Trademark Security Agreement, and (iv) to the extent not otherwise included in clauses (i), (ii) or (iii), all proceeds of each of the foregoing (including insurance proceeds), and all accessions to, substitutions and replacements for and rents and products of each of the foregoing.

"Third Party Payor" shall mean any Person (such as a Fiscal Intermediary or a private health insurance company) which is obligated to reimburse or otherwise make payments to Persons who provide medical care or medical assistance or other goods or services for eligible patients under Medicare, Medicaid, any similar federal or state insurance program and any private insurance contract, and includes any Governmental Authority that self-insures with respect to medical care, medical assistance and other goods and services for its own employees.

"Total Credit Exposure" means, at any time, the aggregate Credit Exposure of all of the Lenders at such time.

"Total Exposure Percentage" means, with respect to any Lender at any time, the ratio of (i) such Lender's Credit Exposure at such time to (ii) the Total Credit Exposure at such time.

"Trademark Security Agreement" means the Trademark Security Agreement of even date herewith between Agent and Borrowers, in the form attached hereto as Exhibit I.

"UCC" means the Uniform Commercial Code, as enacted in any applicable jurisdiction, as amended.

"Unused Commitment Fee" has the meaning set forth in Section 3.6.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as amended.

"U.S. Bank" means U.S. Bank National Association, a national banking association.

"Use" includes, but is not limited to, use, ownership, development, construction, maintenance, management, operation or occupancy.

"Voluntary Reduction Date" means any date on which the Revolving Credit Commitments are voluntarily reduced in accordance with Section 2.13.1.

"Voluntary Termination Date" means the date on which the Revolving Credit Commitments are voluntarily terminated in their entirety by Borrowers in accordance with Section 2.13.2.

1.2     Other Definitions.  As used in this Agreement, the following capitalized terms shall have the meanings set forth in the following Sections of this Agreement:

> "Affected Lender" – Section 3.4.1(iv)
> "Agent E-mail Address" – Section 15.7.2
> "Assignment and Acceptance" – Section 14.2.2
> "Available Funds" – Section 7.4
> "Benefited Lender" – Section 4.3.2
> "Buy-Out Notice" Section 14.1.3
> "Change in Law" – Section 2.14.1
> "CIP Regulations" – Section 13.13
> "Classes" and "Classes of Loans" – Section 1.4
> "Determination Date" – Section 3.2.2
> "Environmental Default" – Section 11.1(i)(p)
> "Expenses" – Section 15.6
> "Indemnified Liabilities"– Section 15.8
> "Indemnified Party" and "Indemnified Parties" – Section 15.8
> "Interim Advance" – Section 2.7.1(i)
> "Letter of Credit Collateral Account" – Section 2.4.11
> "LIBOR Rate Loan" – Section 3.2.1(i)
> "LC Payment Date" – Section 2.4.5
> "Maximum Rate" – Section 3.10
> "Medicare/Medicaid Account" – Section 7.3.3
> "Notice of Assignment" – Section 14.2.2
> "Originating Lender" – Section 14.3.1
> "Overadvance" – Section 13.11
> "Participant" – Section 14.3.1
> "Permitted Investment" – Section 10.17
> "Permitted Overadvance" – Section 13.11
> "Pharmacy Account" – Section 7.3.3
> "Potential Event of Default" – Section 11.2(ii)
> "Reduction Fee" – Section 2.13.3
> "Register" – Section 14.2.2
> "Reports" – Section 15.7.2
> "Revolving Loan Priority Advances" – Section 13.10.6(i)
> "Revolving Loan Priority Collateral Agent Advances" – Section 13.10.6(i)
> "Settlement Date" – Section 4.2
> "Term Loan Priority Advances" – Section 13.10.6(i)
> "Term Loan Priority Collateral Agent Advances" – Section 13.10.6(i)
> "Third Party Payor Account" – Section 7.3.3
> "Unused Commitment Fee" – Section 3.6

1.3     <u>Other Definitional Provisions; Construction</u>.  Unless otherwise specified,

(i)     All terms defined in this Agreement, whether or not defined in this <u>Section 1</u>, have the defined meanings provided in this Agreement when used in this Agreement, in any other of the Loan Documents, or any other certificate, instrument or other document made or delivered pursuant to this Agreement or any other Loan Document, unless otherwise defined therein.

(ii)    As used in this Agreement, in any other of the Loan Documents, or in any other certificate, instrument or document made or delivered pursuant hereto or thereto, accounting terms relating to Borrower not defined in this Agreement have the respective meanings given to them in accordance with GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either any Borrower or Agent shall so request, Agent and Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided that, until so amended (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein, and (ii) Borrowers shall provide to Agent and Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

(iii)   The definition of any agreement, document or instrument includes all schedules, attachments and exhibits thereto and all renewals, extensions, supplements, modifications, restatements and amendments thereof.  All references to statutes include (a) all rules and regulations promulgated thereunder, (b) any amendments, renewals, extensions or replacements of such statutes, rules or regulations promulgated thereunder, and (c) any successor statutes, rules and regulations, including any comparable provision of the applicable statute, ordinance, code, regulation or other law as amended after the date of this Agreement.

(iv)    "Hereunder," "herein," "hereto," "this Agreement" and words of similar import refer to this entire document; "including" is used by way of illustration and not by way of limitation, unless the context clearly indicates the contrary; the singular includes the plural and conversely; and any action required to be taken by a Person is to be taken promptly, unless the context clearly indicates the contrary.

(v)     All of the uncapitalized terms contained in the Loan Documents which are now or hereafter defined under the Code will, unless defined in the Loan Documents or the context indicates otherwise, have the meanings now or hereafter provided for in the Code.

(vi)    The term "<u>good faith</u>" means honesty in fact in the conduct or transaction concerned.

(vii)   All Exhibits and Schedules attached to this Agreement are incorporated into, made and form an integral part of, this Agreement for all purposes.

-38-

(viii)   The existence of references to a Borrower's Subsidiaries throughout this Agreement is for a matter of convenience only.  Any references to Subsidiaries of a Borrower set forth herein shall not in any way be construed as consent by Agent, LC Issuer or the Lenders to the establishment, maintenance or acquisition of any Subsidiary.

1.4    Classes of Loans.    Loans and Commitments hereunder are distinguished by "Class". The "Class" of a Loan refers to whether such Loan is a Revolving Loan, an Interim Advance, a Term Loan or an Agent Advance, each of which constitutes a Class of Loan.  The "Class" of a Commitment refers to whether such Commitment is a Revolving Credit Commitment or a Term Loan Commitment.

2.    LOANS AND OTHER FINANCIAL ACCOMMODATIONS.

2.1    Total Facility.    Subject to the terms and conditions of this Agreement, LC Issuer and the Lenders will make up to $47,000,000 in total credit available to, or for the benefit of, Borrowers in the form of the following Credit Extensions advanced or to be made under the following facilities: (i) the Revolving Loans, (ii) a Letter of Credit subfacility, (iii) Term Loan A, and (iv) Term Loan B, all as more particularly described below.

2.2    Revolving Loans.    During the Revolving Credit Commitment Period, and subject to the other terms and conditions of this Agreement, each Revolving Credit Lender, severally and not jointly, agrees to make loans ("Revolving Loans") to Borrowers in an amount not exceeding such Lender's Revolving Credit Commitment Percentage of the Revolving Credit Availability then in effect; *provided* that after giving effect to the making of any such Revolving Loan (i) such Revolving Credit Lender's Revolving Credit Exposure will not exceed such Lender's Revolving Credit Commitment and (ii) the Revolving Credit Exposure of all of the Lenders will not exceed the total Revolving Credit Commitments.  At no time shall a Revolving Loan be made if, after giving effect thereto, the Revolving Credit Availability would be less than $0. Within the foregoing limits, and subject to the other terms and conditions of this Agreement, Borrower may reborrow Revolving Loans after the repayment thereof.

2.3    Term Loans.

2.3.1    Term Loan A.    Subject to the terms and conditions of this Agreement, the Term Loan A Lenders agree to make Term Loan A on the Closing Date in an aggregate amount of $13,500,000.  Borrowers shall repay Term Loan A in accordance with the provisions of this Agreement and the Term Loan A Notes.  No part of Term Loan A made to Borrowers may, on the repayment thereof, be redrawn or reborrowed by Borrowers.

2.3.2    Term Loan B.    Subject to the terms and conditions of this Agreement, the Term Loan B Lenders agree to make Term Loan B on the Closing Date in an aggregate amount of $3,500,000.  Borrowers shall repay Term Loan B in accordance with the provisions of this Agreement and the Term Loan B Notes.  No part of Term Loan B made to Borrowers may, on the repayment thereof, be redrawn or reborrowed by Borrowers.

2.4    Letters of Credit.

2.4.1  <u>Letter of Credit Subfacility</u>.  During the Revolving Credit Commitment Period and subject to the other terms and conditions of this Agreement, Borrowers may request LC Issuer to issue one or more of its standard standby Letters of Credit or its standard commercial Letters of Credit in favor of such beneficiary(ies) as are designated by Borrowers by delivering to LC Issuer, with a copy to Agent: (i) a Letter of Credit Application completed to the reasonable satisfaction of LC Issuer, together with the proposed form of the Letter of Credit (which, in all respects, will comply with the applicable requirements of <u>Section 2.4.2</u>), (ii) a Borrowing Base Certificate which calculates the Letter of Credit Availability by giving effect to the proposed Letter of Credit, and (iii) such other Letter of Credit Documents that LC Issuer then requires.  LC Issuer, in addition to the other terms of this Agreement, will have no obligation to issue the proposed Letter of Credit if, after giving effect to such proposed Letter of Credit, the Letter of Credit Availability will be less than zero Dollars.  The making of each Letter of Credit request by Borrowers will be deemed to be a representation by Borrowers that the Letter of Credit may be issued in accordance with, and will not violate the terms of, this <u>Section 2.4.1</u>. Letters of Credit issued hereunder shall constitute a utilization of the Revolving Credit Commitments.

2.4.2  <u>Terms of Letter of Credit</u>.  Each Letter of Credit issued under this Agreement will, among other things, (i) be in such form requested by Borrower as is acceptable to LC Issuer in its discretion exercised in good faith, (ii) be denominated in Dollars, and (iii) be issued to support a Borrower's obligations that finance its business needs incurred in the ordinary course of a Borrower's business (and, in the case of commercial Letters of Credit, solely for the purchase of Inventory).  In no event will any standby Letter of Credit have a term of more than one year or any commercial Letter of Credit have a term of more than 180 days; furthermore, and, in addition to the foregoing term limitation, LC Issuer will have no obligation to issue any Letter of Credit with an expiry date later than 30 days prior to the last day of the Revolving Credit Commitment Period; *provided* that a Letter of Credit may be subject to one or more renewal terms so long as any such renewal term does not extend beyond the last day of the Revolving Credit Commitment Period.

2.4.3  <u>Advice of Issuance or Non-Issuance</u>.  Upon receipt of a request from Borrowers to open any Letter of Credit and of all attendant Letter of Credit Documents satisfactorily completed, LC Issuer, within three Business Days, may either (i) issue the requested Letter of Credit to the beneficiary thereof and transmit a copy to Borrowers, or (ii) elect, in its discretion exercised in good faith, not to issue the proposed Letter of Credit.  If LC Issuer elects not to issue such Letter of Credit, LC Issuer will communicate in writing to Borrower the reason(s) why LC Issuer has declined such request.

2.4.4  <u>Reimbursement by Borrower</u>.  Borrowers shall be irrevocably and unconditionally and jointly and severally obligated to reimburse LC Issuer on or before the applicable LC Payment Date for any amounts to be paid by LC Issuer upon any drawing under any Letter of Credit, without presentment, demand, protest or other formalities of any kind; *provided, however,* that neither Borrowers nor any Lender shall hereby be precluded from asserting any claim for direct and actual damages suffered by a Borrower or such Lender to the extent, but only to the extent, caused by (i) the willful misconduct or gross negligence of LC Issuer in determining whether a request presented under any Letter of Credit issued by it

-40-

complied with the terms of such Letter of Credit or (ii) LC Issuer's failure to pay under any Letter of Credit issued by it after the presentation to it of a request strictly complying with the terms and conditions of such Letter of Credit. LC Issuer will pay to each Lender ratably in accordance with its Revolving Credit Commitment Percentage all amounts received by it from Borrowers for application in payment, in whole or in part, of the reimbursement obligation in respect of any Letter of Credit issued by LC Issuer, but only to the extent such Lender has made payment to LC Issuer in respect of such Letter of Credit pursuant to Section 2.4.5. Subject to the terms and conditions of this Agreement (including the submission of an Advance Request and the satisfaction of the applicable conditions precedent set forth in Section 5.2), Borrowers may request a Revolving Loan hereunder for the purpose of satisfying any reimbursement obligation.

2.4.5   Administration; Reimbursement by Lenders.   Upon receipt from the beneficiary of any Letter of Credit of any demand for payment under a Letter of Credit, LC Issuer shall notify Agent and Agent shall promptly notify Borrowers and each other Lender as to the amount to be paid by LC Issuer as a result of such demand and the proposed payment date (the "LC Payment Date"). The responsibility of LC Issuer to Borrowers and each Lender shall be only to determine that the documents (including each demand for payment) delivered under each Letter of Credit in connection with such presentment shall be in conformity in all material respects with such Letter of Credit. LC Issuer shall endeavor to exercise the same care in the issuance and administration of the Letters of Credit as it does with respect to letters of credit in which no participations are granted, it being understood that in the absence of any gross negligence or willful misconduct by LC Issuer, each Lender shall be unconditionally and irrevocably liable without regard to the occurrence of any Event of Default or any condition precedent whatsoever, to reimburse LC Issuer on demand for (i) such Lender's Revolving Credit Commitment Percentage of the amount of each payment made by LC Issuer under each Letter of Credit to the extent such amount is not reimbursed by Borrower pursuant to Section 2.4.4, plus (ii) interest on the foregoing amount to be reimbursed by such Lender, for each day from the date of LC Issuer's demand for such reimbursement (or, if such demand is made after 2:00 p.m. Minneapolis, Minnesota time) on such date, from the next succeeding Business Day) to the date on which such Lender pays the amount to be reimbursed by it, at a rate of interest per annum equal to the Federal Funds Rate for the first three days and, thereafter, at the rate of interest applicable to Revolving Loans.

2.4.6   Obligations Absolute.   Borrowers' obligations under this Section 2.4 shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment which Borrowers may have or have had against LC Issuer, any Lender or any beneficiary of a Letter of Credit. Borrower further agrees with LC Issuer and the Lenders that LC Issuer and the Lenders shall not be responsible for, and Borrowers' reimbursement obligation in respect of any Letter of Credit shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even if such documents should in fact prove to be in any or all respects invalid, fraudulent or forged, or any dispute between or among Borrowers, any of its Affiliates, the beneficiary of any Letter of Credit or any financing institution or other party to whom any Letter of Credit may be transferred or any claims or defenses whatsoever of Borrower or of any of its Affiliates against the beneficiary of any Letter of Credit or any such transferee. LC Issuer shall not be liable for any error,

-41-

omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit. Borrowers agree that any action taken or omitted by LC Issuer or any Lender under or in connection with each Letter of Credit and the related drafts and documents, if done without gross negligence or willful misconduct, shall be binding upon Borrowers and shall not put LC Issuer or any Lender under any liability to Borrower. Nothing in this <u>Section 2.4.6</u> is intended to limit the right of Borrowers to make a claim against LC Issuer for damages as contemplated by the proviso to the first sentence of <u>Section 2.4.4</u>.

2.4.7   <u>Actions of LC Issuer</u>. LC Issuer shall be entitled to rely, and shall be fully protected in relying, upon any Letter of Credit, draft, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, facsimile, telex or teletype message, statement, order or other document believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel, independent accountants and other experts selected by LC Issuer. LC Issuer shall be fully justified in failing or refusing to take any action under this Agreement unless it shall first have received such advice or concurrence of the Required Revolving Credit Lenders as it reasonably deems appropriate or it shall first be indemnified to its reasonable satisfaction by the Revolving Credit Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Notwithstanding any other provision of this Section 2.4, LC Issuer shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement in accordance with a request of the Required Revolving Credit Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon the Lenders and any future holders of a participation in any Letter of Credit.

2.4.8   <u>Indemnification</u>.   Borrowers hereby jointly and severally agree to indemnify and hold harmless each Lender, LC Issuer and Agent, and their respective directors, officers, agents and employees from and against any and all claims and damages, losses, liabilities, costs or expenses which such Lender, LC Issuer or Agent may incur (or which may be claimed against such Lender, LC Issuer or Agent by any Person whatsoever) by reason of or in connection with the issuance, execution and delivery or transfer of or payment or failure to pay under any Letter of Credit or any actual or proposed use of any Letter of Credit, including any claims, damages, losses, liabilities, costs or expenses which LC Issuer may incur by reason of or in connection with (i) the failure of any other Lender to fulfill or comply with its obligations to LC Issuer hereunder (but nothing herein contained shall affect any rights Borrower may have against any Defaulting Lender) or (ii) by reason of or on account of LC Issuer issuing any Letter of Credit which specifies that the term "Beneficiary" included therein includes any successor by operation of law of the named Beneficiary, but which Letter of Credit does not require that any drawing by any such successor Beneficiary be accompanied by a copy of a legal document, reasonably satisfactory to LC Issuer, evidencing the appointment of such successor Beneficiary; *provided* that Borrowers shall not be required to indemnify any Lender, LC Issuer or Agent for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, caused by (a) the willful misconduct or gross negligence of LC Issuer in determining whether a request presented under any Letter of Credit complied with the terms of such Letter of Credit or (b) LC Issuer's failure to pay under any Letter of Credit after the presentation to it of a request

-42-

strictly complying with the terms and conditions of such Letter of Credit.   Nothing in this Section 2.4.8 is intended to limit the obligations of Borrower under any other provision of this Agreement.  The Obligations described under this Section 2.4.8 shall survive any termination of this Agreement.

2.4.9   Lenders' Indemnification.  Each Revolving Credit Lender shall, ratably in accordance with its Revolving Credit Commitment Percentage, indemnify LC Issuer, its Affiliates and their respective directors, officers, agents and employees (to the extent not reimbursed by Borrower) against any cost, expense (including Attorneys' Fees), claim, demand, action, loss or liability (except such as result from such indemnitees' gross negligence or willful misconduct or LC Issuer's failure to pay under any Letter of Credit after the presentation to it of a request strictly complying with the terms and conditions of the Letter of Credit) that such indemnitees may suffer or incur in connection with this Section 2.4 or any action taken or omitted by such indemnitees hereunder.  The obligations of the Lenders described under this Section 2.4.9 shall survive any termination of this Agreement.

2.4.10   Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of LC Issuer or the Lenders, LC Issuer hereby grants to each Revolving Credit Lender, and each Revolving Credit Lender hereby acquires from LC Issuer, a participation in such Letter of Credit equal to such Revolving Credit Lender's Revolving Credit Commitment Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Revolving Credit Lender hereby absolutely and unconditionally agrees to pay to Agent, for the account of LC Issuer, such Revolving Credit Lender's Revolving Credit Commitment Percentage of each unreimbursed drawing under any Letter of Credit, or of any reimbursement payment required to be refunded to Borrowers for any reason.  Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of an Event of Default, the failure of any condition in Section 5 to be satisfied, or any reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.  Following receipt by Agent of any payment by Borrowers in respect of any unreimbursed drawing or of any refunded reimbursement payment, Agent shall disburse such payment to LC Issuer, or to the extent that the Lenders have made payments pursuant to this Section 2.4.10 to LC Issuer, then to such Lenders and LC Issuer, as their interest may appear.  The purchase of participations in Letters of Credit pursuant to this Section 2.4.10 shall not constitute a Loan and shall not relieve Borrower of its reimbursement and other obligations under this Section 2.4.

2.4.11   Actions in Respect of Letters of Credit.  If a Letter of Credit Deficiency shall have occurred and be continuing, Agent may make demand upon Borrowers to, and forthwith upon such demand Borrowers will, pay to Agent in same day funds at Agent's office designated in such demand, for deposit in a special non-interest bearing cash collateral account (the "Letter of Credit Collateral Account") to be maintained at such office of Agent, an amount equal to the amount by which the Letter of Credit Availability is less than zero.  The Letter of

-43-

Credit Collateral Account shall be in the name of Agent (as a cash collateral account), and under the sole dominion and control of Agent exercised in good faith (with sole right of withdrawal) and subject to the terms of this Agreement and the other Loan Documents.  On each drawing under a Letter of Credit during which a Letter of Credit Deficiency is continuing, Agent shall seek reimbursement from any amounts then on deposit in the Letter of Credit Collateral Account; *however*, if (i) no amounts are then on deposit in the Letter of Credit Collateral Account, (ii) the amount then on deposit in the Letter of Credit Collateral Account is insufficient to pay the amount of such drawing, or (iii) Agent is legally prevented or restrained from immediately applying amounts on deposit in the Letter of Credit Collateral Account, then the amount of each unreimbursed drawing under such Letter of Credit and payment required to be made under this Section 2.4.11 shall automatically be converted into a LIBOR Rate Loan made on the date of such drawing for all purposes of this Agreement.  To the extent that Agent applies amounts on deposit in the Letter of Credit Collateral Account as provided in this Section 2.4.11, and, thereafter, such application (or any portion thereof) is rescinded or any amount so applied must otherwise be returned by Agent upon the insolvency, bankruptcy or reorganization of a Borrower or otherwise, then the amount so rescinded or returned shall automatically be converted into a LIBOR Rate Loan made on the date of such drawing for all purposes of this Agreement.

       2.4.12 Letter of Credit Obligations.    All Letter of Credit Obligations will constitute part of the Obligations and be secured by the Loan Collateral.

       2.5    Advance Requests.  The Term Loans will be funded in full on the first Business Day following the Closing Date by a deposit of the amount thereof to the Operating Account for Market identified by Market.  To obtain each advance of Revolving Loans, Borrowers shall submit a fully completed Advance Request.  Each such Advance Request by Borrowers shall be irrevocable.  Each Advance Request shall be given to Agent by no later than 12:00 noon (Minneapolis, Minnesota time) on the Borrowing Date of the applicable LIBOR Rate Loan. Each Advance Request must be signed by an Authorized Representative; provided that Agent may rely on the authority of any officer or employee of Borrowers whom Agent in good faith believes to be authorized to request advances.

       2.6    Initial Interest Election.  If the initial Loans made on the Closing Date are made on a day other than a Reprice Date, the LIBOR Rate applicable to such Loan(s) shall be that LIBOR Rate in effect two New York Banking Days prior to the date of the initial advance, which rate plus the Applicable Margin shall remain in effect until the next Reprice Date.

       2.7    Funding of Loans

       2.7.1    Funding of Loans.  Each Term Loan Lender shall remit to Agent the amount of its Term Loan Commitment of the amount of the Term Loan on or prior to 12:00 noon (Minneapolis, Minnesota time) on the Closing Date.  With respect to any Revolving Loans requested by Borrowers hereunder, each Lender agrees that the Agent may in its sole discretion, but shall not be obligated to, make such requested Revolving Loans to Borrowers on behalf of Lenders as an Interim Advance.  If Borrowers make a request for a Revolving Loan as provided herein, Agent, at its option and in its discretion, shall do either of the following:

-44-

(I)

(i)     at its sole discretion, advance the amount of the proposed Revolving Loan to Borrowers disproportionately (an "Interim Advance") out of Agent's own funds on behalf of Lenders, which advance shall be on the Borrowing Date specified in the relevant Advance Request, and thereby elect settlement in accordance with Section 4.2 such that upon such settlement each Lender's share of the outstanding Revolving Loans (including the amount of any such Interim Advance settled on such date) equals its Revolving Credit Commitment Percentage of the then outstanding Revolving Loans. Interim Advances constitute LIBOR Rate Loans, are secured by the Loan Collateral, are Obligations hereunder and constitute a utilization of the Revolving Credit Commitments. All payments on any Interim Advance shall be payable to Agent solely for its own account (and for the account of the holder of any participation interest with respect to such Interim Advance). No part of any Interim Advance may, on the repayment thereof, be redrawn or reborrowed by Borrowers, except as a result of an election by Agent in its sole discretion, to have such amounts advanced as a new Interim Advance in accordance with this Section 2.7.1 pursuant to an effective Advance Request; or

(ii)     notify each Lender by facsimile, electronic mail or other similar form of teletransmission of the proposed Revolving Loan on the same Business Day that Agent is notified or deemed notified by Borrowers of their request for such proposed a Revolving Loan pursuant to this Agreement, and thereupon each Lender shall remit to, so that Agent shall have received, on or prior to 2:00 p.m. (Minneapolis, Minnesota time), on the date such Revolving Loans are to be advanced, immediately available funds in an amount equal to such Lender's Revolving Credit Commitment Percentage of such Revolving Loan.

2.7.2   Operating Account. Borrowers irrevocably authorize Agent to make all disbursements of Revolving Loans after the Closing Date into one or more Operating Accounts that will be structured and utilized for that purpose in accordance with Agent's standard policies and procedures from time to time in effect. Unless other arrangements are made with, and expressly agreed to by, Agent (e.g., disbursements of Revolving Loans by wire transfer), all advances of the Revolving Loans, will be credited to an Operating Account at the end of the applicable Business Day on which the advance is made. With respect to advances requested by Borrowers to cover Presentments in a Controlled Disbursement Account, Borrowers hereby irrevocably authorize Agent, without any further written or oral request of Borrowers, to transfer funds automatically from such Operating Account to the Controlled Disbursement Account in amounts necessary for the payment of such Presentments. Agent may, but shall under no circumstances be required to, pay any Presentments in the Controlled Disbursement Account in excess of funds available in an Operating Account for any reason, including the failure of Borrowers to determine the correct amount of Presentments in its Advance Request, and the amounts so paid by Agent will be deemed to be an advance of Revolving Loans for all purposes of this Agreement and are hereby ratified and approved by Borrowers. Notwithstanding anything to the contrary in this Section 2.7.2, Agent may, upon 20 days written notice (or at any time after the occurrence of an Event of Default on oral or written notice to Borrowers), elect to discontinue the automatic sweeping of funds from the Operating Accounts to the Controlled Disbursement Account, but Agent instead may disburse proceeds of a Revolving Loan by crediting only an Operating Account. Furthermore, Agent reserves the right to discontinue providing controlled disbursement accounts to its customers, including Borrowers. Each request

submitted by Borrowers for a new advance of a Revolving Loan via wire transfer of funds must be initiated with Agent's wire transfer department (or by telephone or on-line functions made available by Agent's wire transfer department from time to time) via a duly completed and signed outgoing wire transfer form (or any replacement form promulgated by Agent).

2.7.3   <u>Availability of Loans</u>.   The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided, however*, that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender' failure to make Loans as required.  Unless Agent shall have been notified by a Lender prior to the time a Loan is to be made hereunder that such Lender does not intend to make its share of such Loan available to Agent, Agent may assume that such Lender will make its share of such Loan available to Agent, and Agent may in reliance upon such assumption make available to Borrowers a corresponding amount.  If such corresponding amount is not in fact made available to Agent by such Lender and Agent has made such amount available to Borrowers, Agent shall be entitled to receive such amount from such Lender forthwith upon its demand, together with interest thereon in respect of each day during the period from and including the date such amount was made available to Borrowers to but excluding the date Agent recovers such amount from such Lender at a rate per annum equal to the Federal Funds Rate for the first three days and, thereafter, at a rate per annum equal to the rate applicable to Revolving Loans.  If such amount is not in fact made available to Agent by such Lender upon such demand, Agent shall be entitled to receive such amount from Borrowers forthwith upon its demand, together with interest thereon at the rate applicable to Revolving Loans in respect of each day during the period commencing on the date such amount was made available to Borrowers and ending on but excluding the date Agent recovers such amount from Borrowers; provided that if Agent makes such a demand in any such case, Borrowers shall have the right within 120 days thereafter to terminate the Revolving Credit Commitments and cause the Payment in Full of all of the Obligations pursuant to <u>Section 2.13</u> without being required to pay any Reduction Fee or Prepayment Fee.

2.7.4   <u>Loans on Prepayment Dates</u>.   If Lenders are required to make a new Loan hereunder to Borrowers on a day on which Borrowers are required to or have elected to repay all or any part of an outstanding Loan from Lenders, Lenders shall apply the proceeds of the new Loan to make such repayment and only an amount equal to the difference (if any) between the amount being borrowed and the amount being repaid shall be made available by Lenders to Borrowers as provided in <u>Section 2.7.2</u>.

2.7.5   <u>Authority of Individuals</u>.   Borrowers hereby irrevocably authorize Agent and each Lender to rely on telephonic, telegraphic, facsimile, telex or written instructions of any individual whom Agent or any Lender in good faith believes to be authorized to request a Credit Extension or a repayment hereunder with respect to any request to make a Credit Extension or a repayment hereunder, and on any signature which Agent or any such Lender believes to be genuine, and Borrowers shall be bound thereby in the same manner as if such person were actually authorized or such signature were genuine.  Borrowers also hereby jointly and severally agree to indemnify Agent and each of the Lenders and hold Agent and each of the Lenders harmless from and against any and all claims, demands, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and expenses) relating to or arising out of or in

-46-

connection with the acceptance of instructions for making Credit Extensions or repayments hereunder from such individuals. The Obligations described under this Section 2.7.5 shall survive any termination of this Agreement.

2.7.6   Participation in Interim Advances. By the making of an Interim Advance and without any further action on the part of Agent or the Revolving Credit Lenders, Agent hereby grants to each Revolving Credit Lender, and each Revolving Credit Lender hereby acquires from Agent, a participation in such Interim Advance equal to such Revolving Credit Lender's Revolving Credit Commitment Percentage of such Interim Advance. In consideration and in furtherance of the foregoing, each Revolving Credit Lender hereby absolutely and unconditionally agrees to pay to Agent, for the account of Agent, such Revolving Credit Lender's Revolving Credit Commitment Percentage of each Interim Advance, or of any payment on any Interim Advance required to be refunded to Borrowers for any reason. Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Interim Advances is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of an Event of Default, the failure of any condition in Section 5 to be satisfied, or any reduction or termination of the Commitments or a reduction in the Revolving Credit Availability, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Following receipt by Agent of any payment by Borrowers in respect of any Interim Advance, Agent shall apply such amounts to the then outstanding Agent Advances and, to the extent that the Revolving Credit Lenders have made payments pursuant to this Section 2.7.6 to Agent, to the Revolving Credit Lenders, as their interest may appear. The purchase of participations in an Interim Advance pursuant to this Section 2.7.6 shall not relieve Borrowers of any default in the payment thereof.

2.8   Notes; Records of Advances of Credit. Borrowers' obligation to pay the principal of, and interest on, the Revolving Loans and the Term Loans made by the Lenders shall be evidenced (i) if Revolving Loans, by a Revolving Loan Note duly executed and delivered by Borrowers to each Revolving Credit Lender, (ii) if Term Loan A, by a Term Loan A Note duly executed and delivered by Borrowers to each Term Loan A Lender, and (iii) if Term Loan B, by a Term Loan B Note duly executed and delivered by Borrowers to each Term Loan B Lender. Agent and each Lender is hereby authorized to record the date and amount of each advance of the Loans, and the date and amount of each payment or prepayment thereof, by any or all of the following: (1) on a schedule constituting a part of the applicable Note which schedule may be attached thereto and made a part thereof, (2) by entries made into Agent and each Lender's electronic systems, or (3) on internal memoranda maintained by Agent and each Lender, and any such recordation will be rebuttably presumptive evidence of the accuracy of the information so recorded absent manifest error; *however*, the failure of Agent or any Lender to make any such recordation will not affect the unconditional obligation of Borrowers to repay the outstanding principal, interest, or other Obligations due under this Agreement, under the Notes, or the other Loan Documents in accordance with the terms of this Agreement and the other Loan Documents.

2.9   No Limitation on Liens. The limits on outstanding advances against the Borrowing Base are not intended and shall not be deemed to limit in any way Agent's Liens on the Receivables, Inventory, Equipment, General Intangibles, or any other Loan Collateral.

-47-

2.10    [Intentionally omitted.]

2.11    <u>Cross-Collateralized</u>.  The Loans and Letter of Credit Exposure and all other advances or extensions of credit to, or for the benefit of, Borrower under this Agreement or the other Loan Documents are made on the security of all of the Loan Collateral.  All obligations of Borrowers under this Agreement shall be the joint and several obligations of Borrowers unless otherwise specifically stated.

2.12    <u>Lending Installations</u>. Agent and each Lender may book its Loans and other Credit Exposure, if any, and LC Issuer may book the Letter of Credits, at any Lending Installation selected by Agent, such Lender or LC Issuer, as the case may be, and may change its Lending Installation from time to time.  All terms of this Agreement shall apply to any such Lending Installation and the Loans, Letters of Credit, and other Credit Exposure, and any Notes issued hereunder shall be deemed held by Agent, each Lender or LC Issuer, as the case may be, for the benefit of any such Lending Installation.  Agent, each Lender and LC Issuer may, by written notice to Agent and Borrower in accordance with <u>Section 15.7</u>, designate replacement or additional Lending Installations through which Loans will be made by it or Letters of Credit and other Credit Exposure will be issued or maintained by it and for whose account payments are to be made.

2.13    <u>Termination of Commitments</u>

2.13.1    <u>Voluntary Reduction of Commitments</u>.  Borrowers may from time to time permanently reduce the Revolving Credit Commitments by (i) giving Agent 60 days advance notice of the date on which the Revolving Credit Commitments are to be so reduced, and (ii) paying on such date the principal amount of Revolving Loans that exceed the amount of the Revolving Credit Commitments as so reduced.  The Revolving Credit Commitments may be reduced pursuant to this <u>Section 2.13.1</u> only in increments of $1,000,000, and may not be reduced below $15,000,000.

2.13.2    <u>Voluntary Termination of Commitments</u>.  Borrowers may voluntarily terminate the Revolving Credit Commitments by (i) giving Agent 60 days notice of the date on which the Revolving Credit Commitments are to be so terminated, and (ii) causing the Payment in Full of all Obligations on such date.

2.13.3    <u>Reduction Fee</u>.  If any Voluntary Reduction Date or Voluntary Termination Date is earlier than October 31, 2014, Borrowers shall pay to as compensation to the Lenders for loss of bargain with respect to the credit advanced hereunder, and not as a penalty, the Prepayment Fee payable under <u>Section 3.1.3</u>, and a reduction fee ("<u>Reduction Fee</u>") in the amounts set forth below:

-48-

| Voluntary Reduction Date or Voluntary Termination Date | Reduction Fee |
|---|---|
| On or before October 31, 2011 | 1.0% of the Revolving Credit Commitment Amount reduced or terminated; |
| After October 31, 2011 but on or before October 31, 2012 | 0.75% of the Revolving Credit Commitment Amount reduced or terminated; |
| After October 31, 2012 but before October 31, 2013 | 0.50% of the Revolving Credit Commitment Amount reduced or terminated |
| After October 31, 2013 but before October 31, 2014 | 0.25% of the Revolving Credit Commitment Amount reduced or terminated |

Notwithstanding the foregoing, no Reduction Fee shall be due or payable if (1) Borrowers provide Agent with 60 days advance notice of the termination in whole of the Revolving Credit Commitments and cause the Payment in Full of all Obligations on or within 30 days prior to October 31, 2014, (2) the Commitments are refinanced by a division of U.S. Bank, or (3) Borrowers provide Agent with 60 days advance notice of the termination in whole of the Revolving Credit Commitments and cause the Payment in Full of all Obligations within 120 days after Borrowers have paid Agent, LC Issuer or any Lender a charge assessed pursuant to Section 2.7.3 or Section 2.14.

2.13.4 Scheduled Termination of Commitments. The Term Loan Commitments will automatically terminate at 5:00 p.m. (Minneapolis, Minnesota time) on the Business Day immediately following the Closing Date. The Revolving Credit Commitments will automatically terminate on the Revolving Credit Commitment Termination Date.

2.13.5 Permanent Reduction of Commitments. Each reduction or termination of Commitments shall be permanent.

2.13.6 Borrower Remains Liable. Notwithstanding any reduction or termination of the Commitments under this Agreement, until the Payment in Full of all of the Obligations, Borrowers shall remain liable for the full and prompt performance and payment of the Obligations, and Agent, LC Issuer, and the Lenders shall retain all of their respective individual and collective rights and privileges under the Loan Documents, including the retention of Agent's Liens on and interest in and to all of the Loan Collateral until the Payment in Full of all of the Obligations.

2.14   Increased Costs.

2.14.1 Increased Costs Generally. If there occurs (i) the adoption of any law, rule or regulation after the date of this Agreement, (ii) any change in any rule or regulation or in the interpretation or application thereof by any Governmental Authority having jurisdiction thereover after the date of this Agreement or any change in the applicability of such law, rule or

-49-

regulation, on the interpretation thereof, with respect to Agent, LC Issuer, a Lender or any applicable Lending Installation, or (iii) compliance by Agent, LC Issuer, any Lender or any applicable Lending Installation with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement (each, a "Change in Law"), and such Change in Law shall:

> (i)   impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by any Lender, LC Issuer or any applicable Lending Installation (except any such reserve requirement reflected in the LIBOR Rate); or

> (ii)   impose on any Lender, LC Issuer or any applicable Lending Installation or the London interbank market any other condition affecting this Agreement or LIBOR Rate Loans made by such Lender or applicable Lending Installation or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or applicable Lending Installation of making or maintaining any LIBOR Rate Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender, LC Issuer or applicable Lending Installation of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender, LC Issuer or applicable Lending Installation hereunder (whether of principal, interest or otherwise), then Borrowers will pay to such Lender or LC Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or LC Issuer, as the case may be, for such additional costs incurred or reduction suffered.

> 2.14.2 <u>Costs Attributable to Regulatory Change or Risk-Based Capital Guidelines</u>. If Agent, any Lender or LC Issuer determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on Agent's, such Lender's or LC Issuer's capital or on the capital of Agent's, such Lender's or LC Issuer's holding company, if any, as a consequence of this Agreement or the Loans made by or participation in Letters of Credit held by Agent, such Lender, or the Letters of Credit issued by LC Issuer, to a level below that which Agent, such Lender or LC Issuer or Agent's, such Lender's or LC Issuer's holding company could have achieved but for such Change in Law (taking into consideration Agent's, such Lender's or LC Issuer's policies and the policies of Agent's, such Lender's or LC Issuer's holding company with respect to capital adequacy), then from time to time Borrowers will pay to Agent, such Lender or LC Issuer such additional amount or amounts as will compensate Agent, such Lender or LC Issuer or Agent's, such Lender's or LC Issuer's holding company for any such reduction suffered.

> 2.14.3 <u>Certification</u>. A certificate of Agent, a Lender or LC Issuer setting forth the amount or amounts necessary to compensate Agent, such Lender or LC Issuer or its holding company, as the case may be, as specified in <u>Sections 2.14.1</u> and <u>2.14.2</u> of this Section shall be delivered to Borrowers and shall be conclusive absent manifest error. Borrowers shall pay Agent, such Lender or LC Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

2.14.4 <u>Delay in Requests</u>.  Failure or delay on the part of Agent, any Lender or LC Issuer to demand compensation pursuant to this <u>Section 2.14</u> shall not constitute a waiver of Agent's, such Lender's or LC Issuer's right to demand such compensation; *provided* that Borrowers shall not be required to compensate Agent, a Lender or LC Issuer pursuant to this Section for any increased costs or reductions incurred more than one year prior to the date that Agent, such Lender or LC Issuer notifies Borrowers of the Change in Law giving rise to such increased costs or reductions and of Agent's such Lender's or LC Issuer's intention to claim compensation therefor; *provided further* that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the one year period referred to above shall be extended to include the period of retroactive effect thereof.

2.14.5 <u>Survival</u>.  The Obligations described under this <u>Section 2.14</u> shall survive any termination of this Agreement.

2.15  <u>Taxes</u>.

2.15.1 <u>Gross-Up</u>.  Any and all payments by or on account of any obligation of Borrowers hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; *provided* that if Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) Agent, Lender or LC Issuer (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrowers shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

2.15.2 <u>Other Taxes</u>.  In addition, Borrowers shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

2.15.3 <u>Indemnity for Taxes</u>.  Borrowers shall indemnify Agent, each Lender and LC Issuer, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by Agent, such Lender or LC Issuer, as the case may be, on or with respect to any payment by or on account of any obligation of Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrowers by a Lender or LC Issuer, or by Agent on its own behalf or on behalf of a Lender or LC Issuer, shall be conclusive absent manifest error.

2.15.4 <u>Survival</u>.  The Obligations described under this <u>Section 2.15</u> shall survive any termination of this Agreement.

2.16  <u>Mitigation of Obligations; Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 2.14</u>, or if Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to

DWT 13644165v19 0017787-000222

Section 2.15, or if any Lender is a Defaulting Lender, then Borrowers may, at their sole expense and effort, upon notice to such Lender and Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 14.2), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (i) Borrowers shall have received the prior written consent of Agent, which consent shall not unreasonably be withheld, conditioned or delayed (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrowers (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.14 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrowers to require such assignment and delegation cease to apply.

3.     PRINCIPAL PAYMENTS; INTEREST CHARGES; FEES

        3.1     Payments and Prepayments of Principal.

                3.1.1     Repayment of Principal.

                (i)     Borrowers hereby jointly and severally promise to pay the entire unpaid principal balance of the Revolving Loans, and the unpaid principal of each Revolving Loan will be due and payable, on the earlier to occur of (a) the Revolving Loan Maturity Date and (b) the date the Revolving Loans are due and payable pursuant to Section 12.

                (ii)     Borrowers hereby jointly and severally promise to pay the unpaid balance of Term Loan A, and the principal balance of Term Loan A will be due and payable, in consecutive equal monthly installments in the amount of $48,913.00 on the each Term Loan A Principal Payment Date. The entire unpaid principal balance of Term Loan A, if not sooner repaid, will be due and payable on the earlier to occur of (a) the Term Loan A Maturity Date, and (b) the date Term Loan A is due and payable pursuant to Section 12.

                (iii)     Borrowers hereby jointly and severally promise to pay the unpaid balance of Term Loan B, and the principal balance of Term Loan B will be due and payable, in consecutive equal quarterly installments in the amount of $350,000.00 on each Term Loan B Principal Payment Date. The entire unpaid principal balance of Term Loan B, if not sooner repaid, will be due and payable on the earlier to occur of (a) the Term Loan B Maturity Date, and (b) the date Term Loan B is due and payable pursuant to Section 12.

                (iv)     Borrowers hereby jointly and severally promise to pay (subject to settlement thereof by the Lenders as provided in Section 4.2) the entire outstanding principal balance of each Interim Advance, and each Interim Advance shall be due and payable, on the earliest to occur of (a) the next succeeding Settlement Date following such Interim Advance, (b)

the Revolving Loan Maturity Date, and (c) the date the Interim Advances are due and payable pursuant to Section 12.

(v)     Borrowers hereby jointly and severally promise to pay the entire outstanding principal balance of each Agent Advance, and each Agent Advance shall be due and payable, on demand.

(vi)    Borrowers hereby jointly and severally promise to pay the entire outstanding principal balance of any other Obligations not otherwise specified in this Section 3.1.1 at the times provided in the Loan Documents or, if not so provided, on demand by Agent.

3.1.2   Correction of Deficiency.   Notwithstanding anything in this Agreement to the contrary, if, as at any time, a Deficiency occurs or exists, Borrowers will immediately, without demand or notice, reduce the sum of the then outstanding principal balance of the Loans so that a Deficiency no longer exists unless the Deficiency results solely from any Permitted Overadvance.   Any payments made by Borrowers in respect of a Deficiency will be applied to the Revolving Loans until a Deficiency no longer exists.

3.1.3   Optional Prepayments of Loans.   Subject to Borrowers' obligations under Section 2.13.1, Borrowers may from time to time optionally prepay any or all of the principal balance of any Loan.   Any prepayment of a Term Loan shall be applied to the last to mature of the monthly payments required under Section 3.1.   At the time of any prepayment of Term Loan A, Borrowers shall pay, as compensation to the Term Lenders for loss of a bargain with respect to the credit advanced hereunder, and not as a penalty, a prepayment fee in the amounts set forth below:

| Prepayment Date | Prepayment Fee |
| --- | --- |
| On or before  October 31, 2011 | 1.0% of the amount prepaid; |
| After October 31, 2011 but on or before October 31, 2012 | 0.75% of the amount prepaid; |
| After October 31, 2012 but before October 31, 2013 | 0.50% of the amount prepaid; |
| After October 31, 2013 but before October 31, 2014 | 0.25% of the amount prepaid. |

Notwithstanding the foregoing, no Prepayment Fee shall be due or payable if (1) Borrowers provide Agent with 60 days advance notice of the termination in whole of the Revolving Credit Commitments and cause the Payment in Full of all Obligations on or within 30 days prior to October 31, 2014, (2) the Commitments are refinanced by a division of U.S. Bank, (3) Borrowers provide Agent with 60 days advance notice of the termination in whole of the Revolving Credit Commitments and cause the Payment in Full of all Obligations within 120 days

DWT 13644165v19 0017787-000222

after Borrowers have paid Agent, LC Issuer or any Lender a charge assessed pursuant to Section 2.14 or Section 2.7; (4) a prepayment of Term Loan A is made pursuant to Section 10.24 or by application of the proceeds of any insurance policy as required under any Mortgage; or (5) a mandatory prepayment of any Term Loan is made pursuant to Section 3.1.4.

3.1.4   Mandatory Prepayments.

(i)   Not later than July 31 of each year, commencing on July 31, 2011, Borrowers shall deliver to Agent a written calculation of Excess Cash Flow for the immediately preceding Fiscal Year, certified by the Chief Financial Officer of Borrowers, and prepay Term Loan B in an amount equal to the lesser of 50% of such Excess Cash Flow or $1,500,000.

(ii)   Upon the occurrence after Closing of an uninsured casualty loss or Borrowers' Knowledge after Closing of any uninsured Environmental Liability, either of which diminishes or could reasonably be expected to diminish the value of any Term Loan Priority Collateral by at least $250,000, Borrowers shall deliver to Agent within 90 days a written calculation of such loss and a written plan for the restoration, repair, abatement or remediation of the affected Term Loan Priority Collateral.  If such plan is not reasonably satisfactory to Agent, Agent may require Borrowers to prepay Term Loan B, or if Term Loan B has been fully repaid, Term Loan A, in an amount equal to the Uninsured Loss Payment.  Such Uninsured Loss Payment shall be applied to the last to mature of the monthly payments required under Section 3.1.  "Uninsured Loss Payment" shall be equal to the lesser of (a) the amount of any uninsured casualty loss or any uninsured Environmental Liability to the extent it diminishes the value of Term Loan Priority Collateral, or (b) the amount by which the unpaid balance of the Term Loans exceeds 75 percent of the value of the Term Loan Priority Collateral as reflected in appraisals acceptable to Agent and conducted after such casualty loss occurs or such Environmental Liability becomes known to Borrowers.  If no Event of Default has occurred and is continuing, Agent shall, at Borrowers' request, not commission the appraisals referred to in clause (b) above, and the Uninsured Loss Payment shall be the amount referred to in clause (a) above.

3.2   Interest on Obligations; Margins.  Borrowers will pay Lenders interest on the Obligations as follows:

3.2.1   Interest on Loans and Other Obligations.

(i)   Interest on each Revolving Loan and Interim Advance and the Term Loans (each, for purposes of this Section 3.2, a "LIBOR Rate Loan") shall accrue at the Applicable LIBOR Rate Margin plus the LIBOR Rate; provided, however, that during the Temporary Overadvance Period, if any, an amount of Revolving Loans and Interim Advances outstanding on any applicable date equal to the Temporary Overadvance Amount on such date shall bear interest at the Applicable LIBOR Rate Margin for Term Loan B plus the LIBOR Rate, and the balance of Revolving Loans and Interim Advances outstanding on such date shall bear interest at the Applicable LIBOR Rate Margin for Revolving Loans plus the LIBOR Rate.

(ii)   The principal balance of all other outstanding Obligations (except that portion of the Obligations, if any, arising under any agreement other than this Agreement if such

-54-

other agreement provides for the payment of interest at a rate specified therein) will bear interest at an annual rate equal to the Applicable LIBOR Rate Margin then in effect for Revolving Loans plus the LIBOR Rate.

(iii)   The per annum rates of interest applicable at all times after the occurrence and during the continuance of an Event of Default shall be the Default Rate.

(iv)   Agent's internal records of applicable interest rates shall be conclusive, absent manifest error.

(v)   Notwithstanding any other provisions of this Section 3.2 to the contrary, if at any time and for so long as (a) deposits in Dollars are not available in the London interbank market or (b) by reason of national or international financial, political or economic conditions or by reason of any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect or the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or compliance by a Lender with any request or directive of such authority (whether or not having the force of law), including exchange controls, Agent determines in good faith that: (1) it is impracticable, unlawful or impossible for the Lenders to maintain the LIBOR Rate Loans at an interest rate based on the LIBOR Rate, (2) adequate and fair means do not exist for ascertaining the interest rate applicable hereunder to LIBOR Rate Loans, or (3) the LIBOR Rate determined by Agent will not adequately and fairly reflect the cost to the Lenders, determined by Agent in good faith, of making or maintaining any LIBOR Rate Loans, then (x) Borrowers may not request any LIBOR Rate Loans, and if a LIBOR Rate Loan is outstanding it shall be immediately converted to a Loan bearing interest at the Prime Rate (if such Loan is a Revolving Loan), a Loan bearing interest at the Prime Rate plus 0.85% (if such Loan is Term Loan A), and a Loan bearing interest at the Prime Rate plus 2.05% (if such Loan is Term Loan B), and (y) any Loan so made shall bear interest at the Prime Rate (in the case of a Revolving Loan), the Prime Rate plus 0.85% (in the case of a Term Loan A), and the Prime Rate plus 2.05% (in the case of a Term Loan B).

(vi)   Notwithstanding any other provisions of this Section 3.2 to the contrary, if any individual Lender determines, in its discretion exercised in good faith, that it is unlawful under applicable law to make or maintain LIBOR Rate Loans as contemplated by this Agreement, the affected Lender (the "Affected Lender") will provide prompt written notice of such determination to Borrowers and (A) the Affected Lender's commitment hereunder to make LIBOR Rate Loans will be converted automatically into a commitment to make Loans bearing interest at the Prime Rate and (B) the Affected Lender's Loans then outstanding as LIBOR Rate Loans, if any, will be converted automatically to Loans bearing interest at the Prime Rate (if such Loans are Revolving Loans), Loans bearing interest at the Prime Rate plus 0.85% (if any such Loans are a Term Loan A), or Loans bearing interest at the Prime Rate plus 2.05% (if any such Loans are a Term Loan B).

3.2.2   Applicable LIBOR Rate Margin, Applicable LOC Fee.   Each of the Applicable LIBOR Rate Margins and the Applicable LOC Fee will be determined from time to time by reference to the table set forth below on the basis of the then Fixed Charge Coverage Ratio as described in this Section 3.2.2.

-55-

| Fixed Charge Coverage Ratio | Applicable LIBOR Rate Margin for Revolving Loans and Interim Advances | Applicable LIBOR Rate Margin for Term Loan A | Applicable LIBOR Rate Margin for Term Loan B | Applicable LOC Fee |
|---|---|---|---|---|
| < 1.25 to 1.0 | 3.00% | 3.75% | 5.00% | 3.00% |
| ≥ 1.25 to 1.0 and < 1.35 to 1.0 | 2.75% | 3.75% | 5.00% | 2.75% |
| ≥1.35 to 1.0 | 2.50% | 3.75% | 5.00% | 2.50% |

For purposes of determining the Applicable LIBOR Rate Margins and the Applicable LOC Fee, the Fixed Charge Coverage Ratio will, after the date of this Agreement, be determined as of the end of each Fiscal Year occurring during the term of this Agreement (the end of each Fiscal Year being a "Determination Date"). The first Determination Date after the date of this Agreement is December 31, 2010. The Fixed Charge Coverage Ratio will be determined as of the Determination Date for the immediately preceding 12 Month Period. On Agent's receipt of Borrowers' financial statements required to be delivered to Agent pursuant to Section 8.7, the Applicable LIBOR Rate Margins and the Applicable LOC Fee will be subject to adjustment in accordance with the table set forth in this Section 3.2.2 based on the then Fixed Charge Coverage Ratio. The foregoing adjustment, if applicable, to the Applicable LIBOR Rate Margins and the Applicable LOC Fee, will become effective for LIBOR Rate Loans made and other Obligations outstanding and LOC Fees due with respect to Letters of Credit issued or renewed, on and after the first day of the first calendar month following the due date of Borrower's financial statements required to be delivered to Agent pursuant to Section 8.7 until the next succeeding effective date of adjustment pursuant to this Section 3.2.2. Each of the financial statements required to be delivered to Agent must be delivered to Agent in compliance with Section 8.7. If Borrower, however, has not timely delivered its financial statements in accordance with Section 8.7, then, at Agent's option, commencing on the date upon which such financial statements should have been delivered in accordance with Section 8.7 and continuing until such financial statements are actually delivered in accordance with Section 8.7, it shall be assumed for purposes of determining the Applicable LIBOR Rate Margins and the Applicable LOC Fee that the Fixed Charge Coverage Ratio was less than 1.15 to 1.0 and the pricing associated with a Fixed Charge Coverage Ratio of less than 1.15 to 1.0 will be applicable on the then applicable Determination Date. As of the date of this Agreement, the Applicable LIBOR Rate Margin for Revolving Loans and Interim Advances is 2.75% per annum, and the Applicable LOC Fee is 2.75% per annum.

3.3   Interest Payment Dates. Interest on all Obligations shall be payable (i) with respect to Revolving Loans, on the first Business Day of each calendar month or such earlier date on which the Revolving Credit Commitments shall be terminated, (ii) with respect to Term Loan A, on the last Business Day of each calendar month and on the Term Loan A Maturity Date, (iii) with respect to Term Loan B, on the last Business Day of each calendar month and on the Term Loan B Maturity Date, and (iv) on demand by Agent for each Agent Advance, Interim Advance or other Obligation; *provided, however,* that any interest accrued or accruing at the Default Rate, or accrued or accruing on or after the Revolving Loan Maturity Date, Term Loan A

-56-

Maturity Date or Term Loan B Maturity Date, as applicable, shall be payable on the earlier of the applicable interest payment date identified in this Section or demand by Agent.

3.4    Agent Fees. Borrowers will pay to Agent the fees as set forth in the Fee Letter.

3.5    [Intentionally omitted.]

3.6    Unused Commitment Fee. Commencing on the first day of the first calendar month immediately following the Closing Date and continuing on the first Business Day of each and every calendar month thereafter until the Payment in Full of the Obligations, Borrowers will pay to Agent for the account of the Revolving Credit Lenders (ratably in accordance with their respective Revolving Credit Commitment Percentages) a fee ("Unused Commitment Fee") in an amount equal to 0.375% per annum multiplied by the amount by which the then Revolving Credit Commitments exceed the average daily Revolving Loans advanced to Borrowers during the preceding calendar month (or portion thereof during which any Revolving Loans (including any Interim Advances and the then Letter of Credit Exposure) were outstanding or during which this Agreement was in full force and effect). The Unused Commitment Fee will be calculated on the basis of the actual number of days elapsed in a 360 day year.

3.7    Letter of Credit Fees. Borrowers will pay (i) to LC Issuer for its own account, with respect to each Letter of Credit, a fronting fee equal to $1/8^{th}$ of 1.0% of the face amount of each such Letter of Credit, and (ii) to Agent for the account of the Revolving Credit Lenders (ratably in accordance with their respective Revolving Credit Commitment Percentages) the then Applicable LOC Fee on the amount available to be drawn under each Letter of Credit from, and including, the issuance date of the Letter of Credit to and including the expiry date thereof. In addition, Borrowers will pay to LC Issuer, on its demand for payment, LC Issuer's then current issuance, opening, closing, transfer, amendment, draw, renewal, negotiation and other letter of credit administration fees, charges and out of pocket expenses with respect to each Letter of Credit. The fronting fee is fully earned by LC Issuer when paid and will be due and payable upon issuance of each Letter of Credit. The Applicable LOC Fee is fully earned by Agent for the benefit of the Lenders when paid and will be due and payable in advance on the issuance of each Letter of Credit. The Applicable LOC Fee will be calculated on the basis of the actual number of days elapsed in a 360-day year. If any Letter of Credit is cancelled for any reason before the stated expiry date thereof, any Applicable LOC Fee paid in advance will not be refunded and will be retained by Agent and the Lenders solely for their account.

3.8    Calculation of Certain Charges. Interest on the Loans and other Obligations shall be charged for the actual number of days elapsed over a year of 360 days on the actual daily balance of such Loans and other Obligations. Interest on the unpaid principal balance of the Loans and other Obligations shall accrue from the date such Loan is made or Obligation occurs to the date such Loan or other Obligation is paid in full. Except the fees and expenses set forth in Sections 2.14, 2.15, 3.4 and 3.7 which shall be paid in accordance with such Sections, all such charges and other fees shall be paid in arrears.

3.9    Payment in Full on Applicable Maturity Date. On the Revolving Loan Maturity Date, (i) all Revolving Loans and all other Obligations relating thereto will automatically and

-57-

immediately become due and payable, and (ii) Agent's and the Lenders' obligations under this Agreement to make Revolving Loans and Interim Advances will automatically and immediately terminate, without notice or demand, which Borrowers hereby expressly waive.  On the Term Loan A Maturity Date, Term Loan A and all other Obligations will automatically and immediately become due and payable, and Agent's and Lenders' obligations under this Agreement and the Loan Documents will automatically and immediately terminate without notice or demand, which Borrowers hereby expressly waive.  On the Term Loan B Maturity Date, Term Loan B and all Obligations relating thereto will automatically and immediately become due and payable.

3.10    Maximum Rate.  If, at any time, the rate of interest contracted for, and computed in the manner provided, in this Section 3 ("Applicable Rate"), together with all Charges, which are treated as interest under applicable law, exceeds the maximum lawful rate (the "Maximum Rate") allowed under applicable law, it is agreed that such contracting for, charging or receiving of such excess amount was an accidental and bona fide error and the provisions of this Section 3.10 will govern and control.  The rate of interest payable hereunder, together with all Charges, shall be limited to the Maximum Rate; provided, however, that any subsequent reduction in the LIBOR Rate plus the Applicable LIBOR Rate Margins then in effect shall not reduce the Applicable Rate below the Maximum Rate until the total amount of interest earned hereunder, together with all Charges, equals the total amount of interest which would have accrued at the Applicable Rate if the Applicable Rate had at all times been in effect.  If any payment hereunder, for any reason, results in Borrowers having paid interest in excess of that permitted by applicable law, then all excess amounts theretofore collected by Agent shall be credited on the principal balance of the Obligations (or, if all sums owing hereunder have been paid in full, refunded to Borrowers), and the amounts thereafter collectible hereunder shall immediately be deemed reduced, without the necessity of the execution of any new document, so as to comply with applicable law and permit the recovery of the fullest amount otherwise called for hereunder.

4.    PAYMENTS; APPORTIONMENT OF PAYMENTS; DEFAULTING LENDER.

4.1    Payments by Borrower.

4.1.1    Payment.  Except to the extent otherwise provided herein, all payments of principal, interest and other amounts to be made by Borrowers under this Agreement and the Notes, and, except to the extent otherwise provided therein, all payments to be made by Borrower under any other Loan Document, shall be made in Dollars, in immediately available funds, without deduction, set-off, offset, recoupment or counterclaim, to Agent, not later than 12:00 noon (Minneapolis, Minnesota time), on the date on which such payment shall become due (each such payment made after such time on such due date to be deemed to have been made on the next succeeding Business Day) and any applicable interest or fee shall continue to accrue until such following Business Day.

4.1.2    Business Days.  If any payment under this Agreement becomes due and payable on a day other than a Business Day, the maturity of the payment will be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon will be payable at the then applicable rate during that extension.

-58-

4.1.3  <u>Charging of Accounts</u>.  Borrowers hereby irrevocably authorize Agent, at Agent's option, to charge any account of any Borrower at U.S. Bank or charge or increase the Revolving Loans for the payment or repayment of any interest or principal of the Loans, any fees, charges, expenses, or other amounts due to Agent, Lenders or LC Issuer under the Loan Documents, and any or all of the other Obligations.

4.2  <u>Settlement with Lenders</u>.  On a weekly basis (or more frequently if required by Agent) (a "<u>Settlement Date</u>"), Agent shall provide each Lender with a statement of the outstanding balance of the Revolving Loans and any Interim Advances and any Agent Advances as of the end of the Pre-Settlement Determination Date and the current balance of the Revolving Loans and any Agent Advances actually funded by each Lender (whether made directly by such Lender to Borrowers or constituting a settlement by such Lender of a previous Interim Advance made by Agent on behalf of such Lender to Borrowers).  Agent will provide such statement to each Lender at or prior to 10:00 a.m. (Minneapolis, Minnesota time) on each Settlement Date.  If such statement discloses that (i) such Lender's current balance of the Revolving Loans exceeds such Lender's Revolving Credit Commitment Percentage of the Revolving Loans and Interim Advances or (ii) any Agent Advances actually funded by such Lender as of the Pre-Settlement Determination Date exceeds such Lender's Agent Advance Exposure Percentage of any Agent Advances outstanding as of the Pre-Settlement Determination Date, then Agent shall on the Settlement Date, transfer, by wire transfer to be received at or prior to 2:00 p.m. (Minneapolis, Minnesota time) on such Settlement Date, the net amount due to such Lender in accordance with such Lender's instructions.  If such statement discloses that (a) such Lender's current balance of the Revolving Loans as of the Pre-Settlement Determination Date is less than such Lender's Revolving Credit Commitment Percentage of the Revolving Loans and Interim Advances or (b) such Lender's Agent Advances actually funded by such Lender as of the Pre-Settlement Determination Date is less than such Lender's Agent Advance Exposure Percentage of the Agent Advances outstanding as of the Pre-Settlement Determination Date, then such Lender shall on the Settlement Date, transfer, by wire transfer to be received at or prior to 2:00 p.m. (Minneapolis, Minnesota time) on such Settlement Date, the net amount due to Agent in accordance with Agent's instructions.  Each Lender acknowledges and agrees that its obligation to make payments under this paragraph in respect of settled Loans is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of an Event of Default, the failure of any condition in <u>Section 5</u> to be satisfied, any reduction or termination of the Commitments or a reduction in the Revolving Credit Availability, and that each such payment shall be made without offset, abatement, withholding or reduction whatsoever.  The statements provided by Agent to Lenders pursuant to this Section 4.2 shall be prima facie evidence of the existence and amounts set forth therein.  In addition, payments actually received by Agent with respect to the following items shall be distributed by Agent to Lenders as follows:

(i)  Within one (1) Business Day after receipt thereof by Agent, payments to be applied to interest on the Loans, subject to any adjustments for any Interim Advances and Agent Advances so that Agent shall receive interest on the Interim Advances and Agent Advances during such period as Agent has advanced such funds (which payments shall be

payable solely for Agent's own account) and each Lender shall only receive interest on the amount of funds actually advanced by such Lender;

(ii)    Within one (1) Business Day after receipt thereof by Agent, payment to be applied to the Unused Commitment Fee; and

(iii)    Within one (1) Business Day after receipt thereof by Agent, payment to be applied to the Applicable LOC Fee.

4.3    Pro Rata Treatment; Application of Payments.

4.3.1    Apportionment of Payments.    Subject to Section 4.2 and except as otherwise provided with respect to Defaulting Lenders and as otherwise provided herein and in the other Loan Documents, (i) each borrowing of Loans of a particular Class from the Lenders shall be made from the relevant Lenders and each termination or reduction of the amount of the Commitments of a particular Class of Loans shall be applied to the respective Commitments of such Class of the relevant Lenders, pro rata according to the amounts of their respective Commitments of such Class; (ii) each payment or prepayment of principal of Loans of any Class by Borrowers shall be made for account of the relevant Lenders pro rata in accordance with the respective unpaid principal amounts of the Loans of such Class held by them; and (iii) each payment of interest on Loans of any Class by Borrowers shall be made for account of the relevant Lenders pro rata in accordance with the amounts of interest on such Loans then due and payable to the respective Lenders.    Except as otherwise provided in the Loan Documents, payments of fees and expenses shall be made ratably among the parties entitled thereto in accordance with the amount of fees and expenses then due.    Following the occurrence of an Event of Default and acceleration of the Loans, all payments shall be remitted to Agent and all such payments and all proceeds of Loan Collateral received by Agent shall be applied as set forth in Section 12.7.    Agent will distribute to each Lender at its address set forth on the applicable signature page of this Agreement, or at any other address as a Lender may request in writing, the amount of funds as the Lender may be entitled to receive in accordance with the terms of this Agreement and the Settlement procedures set forth in Section 4.2.

4.3.2    Sharing of Payments or Collateral.    If any Lender (a "Benefited Lender") at any time receives any payment of all or part of its Loans or other Obligations owing to it, any interest on those amounts, or any collateral in respect of any or all of the foregoing (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Sections 11.1(i)(e) or 11.1(i)(f), or otherwise), in a greater proportion than any payment to or collateral received by any other Lender having Commitments in the same Class, if any, in respect of the other Lender's Loans or other Obligations owing to it, as the case may be, or any interest on those amounts, the Benefited Lender will (i) purchase for cash from the other Lenders a participating interest in that portion of each other Lender's Loans or other Obligations owing to each of them, as the case may be, or (ii) provide the other Lenders with the benefits of any collateral, or the proceeds of any collateral obtained by the Benefited Lender, as is necessary to cause the Benefited Lender to share the excess payment or benefits of the applicable collateral or proceeds ratably with each of the Lenders; *however,* if all or any portion of that excess payment or benefits is thereafter recovered from the Benefited Lender, the purchase by the Benefited

-60-

Lender from the other Lenders will be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest unless the Benefited Lender is obligated to pay interest to the applicable Person in which case the other Lenders will pay their pro rata share of the interest payment.

4.4     Non-Receipt of Funds from Borrower. Unless Agent shall have received notice from Borrowers prior to the date on which any payment is due hereunder that Borrowers will not make such payment, Agent may assume that Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, LC Issuer or Agent, as the case may be, the amount due. In such event, if Borrowers have not in fact made such payment, then each of the Lenders, LC Issuer or Agent, as the case may be, severally agrees to repay to Agent forthwith on demand the amount so distributed to such Lender, LC Issuer or Agent with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to Agent, at the greater of the Federal Funds Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation, it being understood that the return by the Lenders, LC Issuer or Agent, as the case may be, of such payment shall not limit the obligation of Borrower under Section 3.2 to pay interest at the rate set forth therein in respect of such payment.

4.5     Payments to Defaulting Lender. Agent shall not be obligated to transfer to any Defaulting Lender any payments made by Borrower to Agent for the Defaulting Lender's benefit; nor will a Defaulting Lender be entitled to the sharing of any payments hereunder. Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent. Agent may hold and, in its discretion, re-lend to Borrowers the amount of all such payments received or retained by it for the account of such Defaulting Lender. Any amounts so re-lent to Borrowers shall for all purposes of this Agreement be treated as if they were Revolving Loans; *provided, however*, that for purposes of voting or consenting to matters with respect to the Loan Documents and determining ratable shares, such Defaulting Lender shall be deemed not to be a "Lender", and each of such Defaulting Lender's Commitments and the unpaid principal balance of the Loans owing to such Defaulting Lender shall be deemed to be zero (-0-). Until a Defaulting Lender cures its failure to fund its share of any Loan (i) such Defaulting Lender shall not be entitled to any portion of the Unused Commitment Fee or Applicable LOC Fee and (ii) the Unused Commitment Fee or Applicable LOC Fee shall accrue in favor of Lenders which have funded their respective pro rata share of such requested Loan and shall be allocated among such performing Lenders ratably based upon their relative Commitments. This Section shall remain effective with respect to such Lender until such time as the Defaulting Lender shall no longer be in default of any of its obligations under this Agreement. The terms of this Section shall not be construed to increase or otherwise affect the Commitment of any Lender, or relieve or excuse the performance by Borrowers of their respective duties and obligations hereunder or under any of the other Loan Documents.

4.6     No Third Party Beneficiary. The provisions of Sections 4.2, 4.3, 4.4 and 4.5 are solely for the benefit of Agent, LC Issuer and the Lenders, and Borrowers will not have any rights as third party beneficiary of any of the provisions thereof.

5.     PRECONDITIONS TO CREDIT EXTENSIONS.

     5.1     Initial Credit Extensions.     Notwithstanding any provision contained in this Agreement to the contrary, the Lenders and LC Issuer shall have no obligation to make the initial Credit Extensions under this Agreement unless Agent, LC Issuer and the Lenders shall have first received:

          (i)     this Agreement and the Notes, each duly executed by Borrowers;

          (ii)     the other Loan Documents, each duly executed and delivered by Borrowers, the Individual Guarantor and the other Persons party thereto;

          (iii)     a copy of (A) resolutions of the Board of Directors of Market, duly adopted, which authorize the execution, delivery and performance by Market of this Agreement, the Notes and the other Loan Documents to which Market is a party, certified by the Secretary of Borrower, and (B) resolutions of the manager(s) of Express, duly adopted, which authorize the execution, delivery and performance by Express of this Agreement, the Notes and the other Loan Documents to which Express is a party;

          (iv)     a copy of the Articles of Incorporation or Organization of each Borrower, including any amendments thereto, certified by the Secretary of State of the State of Oregon;

          (v)     a copy of (A) the By-Laws of Market, including any amendments thereto, certified by the Secretary of Market, and (B) the operating agreement of Express, including any amendments thereto, certified by a manager of Express;

          (vi)     an incumbency certificate, executed by the Secretary of Market, which shall identify by name and title and bear the signatures of all of the officers of Market executing any of the Loan Documents to which Borrowers are a party;

          (vii)     certificates of corporate or limited liability company good standing of Borrowers issued by the Secretary of State of the State of California;

          (viii)     an opinion of outside counsel to Borrowers, in form and substance reasonably satisfactory to Agent and Agent's counsel;

          (ix)     the initial Borrowing Base Certificate required by Section 8.3;

          (x)     the initial Advance Request required by Section 2.5;

          (xi)     evidence of the proper filing of financing statements perfecting first priority security interests in favor of Agent for the benefit of the Lenders in all of the Loan Collateral;

          (xii)     termination statements or payoff letters reasonably satisfactory to Agent authorizing or agreeing to make a filing of termination statements for all financing statements filed of record against any Borrower other than financing statements relating to Permitted Liens;

(xiii)    evidence reasonably satisfactory to Agent of the insurance required by this Agreement and the other Loan Documents together with endorsements in form and substance reasonably satisfactory to Agent, duly executed by the insurance company;

(xiv)    copies of all financial statements and other Exhibits and Schedules required by this Agreement and the other Loan Documents;

(xv)    a letter of direction from Borrowers with respect to the disbursement of the proceeds of the initial Credit Extensions under this Agreement;

(xvi)    with respect to each parcel of real property which is required to be subject to a Lien in favor of Agent, each of the following, in form and substance reasonably satisfactory to Agent:

(a)    evidence that a counterpart of the Mortgage has been recorded in the place necessary, in Agent's judgment, to create a valid and enforceable first or second, as applicable (subject to Permitted Liens), priority Lien in favor of Agent for the benefit of the Lenders;

(b)    an opinion of counsel in the state in which such parcel of real property is located in form and substance and from counsel reasonably satisfactory to Agent; and

(c)    such other information, documentation, and certifications as may be reasonably required by Agent.

(xvii)    such mortgagee, bailee, landlord or warehousemen's waivers as Agent may deem necessary regarding locations at which any Loan Collateral is or will be stored or otherwise located;

(xviii)    pay-off letters from General Electric Capital Corporation and GoldenTree Mezzanine Fund, L.P. (and its applicable affiliates), each  in form and substance reasonably satisfactory to Agent;

(xix)    evidence reasonably satisfactory to Agent and the Lenders that there is Excess Availability of at least $5,000,000;

(xx)    evidence of Borrowers' capital structure and material accounts and terms and conditions of all Indebtedness (including the Subordinated Debt) of Borrowers, acceptable to Agent and the Lenders;

(xxi)    (a) collateral audits, reasonably satisfactory to Agent, and (b) appraisals, prepared by an independent appraiser engaged directly by Agent, of each parcel of real property or interest in real property described in the Mortgages, which appraisals satisfy the requirements of the Financial Institutions Reform, Recovery and Enforcement Act, as amended, and the regulations promulgated thereunder, if applicable, and which shall evidence compliance with the supervisory loan-to-value limits set forth in the Federal Deposit Insurance Corporation Improvement Act of 1991, as amended, and the regulations promulgated thereunder, if

-63-

applicable, which audits and appraisals shall be reasonably satisfactory to Agent, together with evidence of compliance with applicable federal regulations governing loans in areas having special flood hazards;

(xxii)  appraisals, prepared by an independent appraiser engaged directly by Agent, of the Equipment and Property which is being made available for purposes of the Term Loans, which appraisals shall be reasonably satisfactory to Agent; and

(xxiii)  such other agreements, documents, instruments and certificates as Agent may reasonably request.

5.2  General Conditions.  In addition to any other provisions contained in this Agreement, the making of any Credit Extension under this Agreement will be subject to the continued existence or fulfillment to the satisfaction of Agent, LC Issuer and the Lenders of each of the following conditions throughout the term of this Agreement:

(i)  After giving effect to any such Credit Extension, no Deficiency exists, unless the Deficiency results solely from any Permitted Overadvance;

(ii)  No Event of Default has occurred and is continuing;

(iii)  No law or regulation prohibits, and no order, judgment or decree of any arbitrator or Governmental Authority enjoins or restrains Agent or the Lenders, from making the requested advance; and

(iv)  Borrowers' representations and warranties contained in this Agreement and the other Loan Documents to which it is a party are true and correct as of the date of this Agreement and continue to be true and correct as of the date of each such Credit Extension with the same effect as though such representations and warranties had been made again on the date of such Credit Extension (except where such representations and warranties speak solely as of an earlier date) subject to such changes as are not prohibited hereby or do not constitute Events of Default under this Agreement.

The giving of each Advance Request and request for the issuance of a Letter of Credit by Borrowers hereunder shall constitute a certification by Borrowers to the effect set forth in the preceding sentence (both as of the date of such Advance Request or request and, unless Borrowers otherwise notify Agent prior to the date of such borrowing or issuance, as of the date of such borrowing or issuance).

6.  SECURITY.

6.1  Security Documents.  The Obligations shall be secured (in such order as may be determined by Agent in its discretion) by a first or second, as applicable, priority Lien on all Loan Collateral (subject to Permitted Liens), including:

(i)  a first priority security interest in all of the Collateral pursuant to the Borrower Security Agreement and accompanying financing statements;

-64-

(ii)     a first priority security interest in all of the Trademark Collateral, as defined in the Trademark Security Agreement; and

(iii)     (a) a first priority lien on Market's interests in its owned real property described in Part A of Schedule 6.1 under Mortgages granted by Market to Agent, (b) a second priority lien on Market's interests in its owned real property described in Part B of Schedule 6.1 under Mortgages granted by Market to Agent, and (c) a first priority lien on Market's interest in its leased real property described in Part C of Schedule 6.1 under Mortgages granted by Market to Agent;

(iv)     With respect to the Property described in Part D of Schedule 6.1, Borrowers will cause a nationally recognized title insurance company, acceptable to Agent, on the Closing Date to have irrevocably committed itself in writing to deliver to Agent a title insurance policy in the full amount of the appraised value of such Property (as defined in the Mortgages), insuring the Mortgages, with all standard and general exceptions deleted or endorsed over (other than the deletion of any survey exception) so as to afford full "extended form coverage" and showing as exceptions only the survey exception and items reasonably acceptable to Agent and containing those additional endorsements which are reasonably required by Agent.

6.2    Control Agreements.    Borrowers will use commercially reasonable efforts to obtain such account control agreements, in such form as Agent may reasonably require, as Agent may deem necessary to perfect Agent's security interest in any cash, deposit accounts or investment accounts of Borrowers that are not maintained with Agent.

6.3    Guaranty Agreement.    Borrower acknowledges that the Term Loan B Lenders are being induced to accept the Loan Documents and to advance Term Loan B to Borrowers based, in part, on reliance on the agreement of the Individual Guarantor to sign and deliver to Agent contemporaneously with this Agreement the Individual Guaranty Agreement.

6.4    Subordinated Debt.    As a condition of this Agreement, Borrowers will cause each of the Subordinated Creditors to execute and deliver to Agent a Subordination Agreement dated as of the date of this Agreement pursuant to which the Subordinated Creditors subordinate their right to receive payments in respect of the Subordinated Debt to Agent's, LC Issuer's and the Lenders' and certain other parties' rights in respect of the Obligations, in form and substance reasonably satisfactory to Agent. Following the Closing Date, Borrowers will use commercially reasonable efforts to obtain the consent of the parties to the subordination agreements delineated in Schedule 6.4 to the assignment of such agreements to Agent in form and substance reasonably satisfactory to Agent.

7.    RECEIVABLES; INVENTORY; COLLECTION OF RECEIVABLES; DISPUTED RECEIVABLES; PROCEEDS OF INVENTORY.

7.1    Agreements Regarding Receivables.    Borrowers will follow usual and customary industry practices relating to Pharmacy Receivables. Borrowers may not make any sales on extended dating or credit terms beyond those that are customary in Borrowers' industry. In

-65-

addition to the Borrowing Base Certificate to be delivered in accordance with <u>Section 8.3</u>, Borrowers shall notify Agent promptly upon Borrowers' learning thereof, in the event any Eligible Receivable or Eligible Credit Card Receivable becomes ineligible for any reason, other than the aging of such Receivable, and of the reasons for such ineligibility.  Borrowers shall also notify Agent promptly of all material disputes and claims with respect to  their respective Receivables, and Borrowers will settle or adjust such material disputes and claims at no expense to Agent or the Lenders; *however*, Borrowers may not, without Agent's consent, grant (i) any discount, credit or allowance in respect of their respective Receivables (a) which is outside the ordinary course of business and (b) which discount, credit or allowance exceeds an amount equal to $100,000 in the aggregate with respect to any individual Receivable or (ii) any materially adverse extension, compromise or settlement to any customer or account debtor with respect to any then Eligible Receivable.  Nothing permitted by this <u>Section 7.1</u> or <u>Section 7.2</u>, however, may be construed to alter in any way the criteria for Eligible Receivables, Eligible Prescription Files or Eligible Inventory provided in <u>Section 1.1</u>.

7.2    <u>Agreements Regarding Inventory</u>.  In addition to the Borrowing Base Certificate to be delivered in accordance with <u>Section 8.3</u>, Borrowers shall notify Agent promptly of all material returns and recoveries of Inventory.  Without obtaining Agent's prior consent and in compliance with the applicable terms of the Borrower Security Agreement, Borrowers will not: (i) accept any returns of Inventory outside the ordinary course of business, (ii) enter into any agreement, practice, arrangement, or transaction under which title to, or ownership of, any Inventory which is being sold by Borrowers to a Person is, or purports to be, transferred to, or held by, such Person before such Inventory is delivered to such Person by Borrowers, (iii) make a sale of Inventory to any customer on a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment or any other repurchase or return basis other than, in each case, in accordance with Borrowers' return policies in effect from time to time.  Borrowers will give Agent thirty (30) days written notice prior to storing any Inventory with, or placing any Inventory in the possession or control of, any bailee, processor, warehouseman, consignee or any other Person (other than a carrier for transit), not a party to a bailee, warehouseman or similar agreement with Agent, under any arrangement, practice or agreement (oral or written).

7.3    <u>Agreements Regarding Remittances.</u>

7.3.1    <u>Account Arrangements</u>.  Each Borrower may establish and maintain, at its expense, deposit account arrangements and merchant payment arrangements with the banks set forth on <u>Schedule 7.3</u> and subject to <u>Section 10.23</u> hereof such other banks as such Borrower may hereafter select and are reasonably acceptable to Agent. The banks set forth on <u>Schedule 7.3</u> constitute, as of the Closing Date, all of the banks with which Borrowers have deposit account arrangements and merchant payment arrangements and identifies each of the Store Accounts at such banks or otherwise describes the nature of the use of such deposit account by such Borrower.  Borrowers hereby grant to Agent a Lien on and security interest in each Store Account and all funds held therein as security for the Obligations.

7.3.2    <u>Market Accounts.</u>

(i)    Market shall deposit all Remittances constituting checks and other payments in respect of Credit Card Receivables from each retail store of Market into a Store Account of Market maintained at Agent, and, subject to Section 7.3.2(ii), shall deposit all Remittances constituting cash from each retail store location of Market into the Store Account of Market for such store location, in each case in accordance with the then current practices of Market, but in any event no less frequently than once every three (3) Business Days.

(ii)    Each retail store of Market may retain coin and currency outside of its applicable Store Account for use in its operations; provided that the average amount held by all retail stores does not exceed $31,000 per retail store.

7.3.3    Express Accounts.

(i)    If a Cash Dominion Period is not in effect, Express shall deposit all Remittances (other than Remittances for payment of Medicare Receivables and Medicaid Receivables and payments from Third Party Payors) constituting cash, checks and other payments in respect of Credit Card Receivables from each retail pharmacy location of Express in such deposit accounts as it may elect (each, a "Pharmacy Account"), and until the Medicare and Medicaid Account and the Third Party Payor Account are established, shall deposit all Remittances for payment of Medicare Receivables and Medicaid Receivables and payments from Third Party Payors into a deposit account at Chetco Federal Credit Union (the "Express DDA Account"), in each case subject to the requirements of Section 6.2.

(ii)    Not later than 360 days after the date hereof (or longer as Agent shall reasonably permit provided Express is diligently attempting to comply), Express shall establish and maintain at Agent a separate deposit account (a "Medicare and Medicaid Account") into which Express shall promptly deposit, and shall direct each Third Party Payor (including any Financial Intermediary) in accordance with the applicable Medicare and Medicaid regulations to directly remit, all payments in respect of any Medicare Receivables or Medicaid Receivables (other than for Medicare Advantage Plans). Such separate deposit accounts shall only be used for purposes of receiving payments in respect of Medicare Receivables and Medicaid Receivables and shall be under the sole control of Express. Not later than 360 days after the date hereof (or longer as Agent shall reasonably permit provided Express is diligently attempting to comply), Express shall establish and maintain at Agent a separate deposit account (a "Third Party Payor Account") into which Express shall promptly deposit all Remittances from Third Party Payors that are not payments with respect to Medicare Receivables or Medicaid Receivables.

(iii)    During a Cash Dominion Period, (a) Agent shall be entitled to sweep all funds in the Third Party Payor Account and the Pharmacy Accounts into Express' Special Account; (b) Express shall remit by wire transfer or other electronic funds transfer reasonably acceptable to Agent, no less frequently than every third Business Day, all collected funds in the Medicare and Medicaid Account into Express' Special Account; and (c) until the Medicare and Medicaid Account and the Third Party Payor Account have been established, Borrowers will provide written instructions to the depository bank providing the Express DDA Account to, upon receipt of a written notice from Agent that a Cash Dominion Period is then in effect, remit by wire transfer or other electronic funds transfer reasonably acceptable to Agent, no less frequently

-67-

than every third Business Day, all collected funds in the Express DDA Account to Express' Special Account.  During a Cash Dominion Period, such written instructions may only be changed after not less than three Business Days prior written notice to the depository bank and Agent, and with the prior written consent of Agent.

(iv)    Each pharmacy of Express may retain coin and currency outside of its applicable Pharmacy Account for use in operations, provided that the average amount held by all pharmacies does not exceed $5,000 per pharmacy.

7.3.4    Reimbursement.  Borrowers agree to reimburse Agent on demand for any amounts owed or paid to any bank or other financial institution at which a Store Account or any other deposit account or investment account is established or any other bank, financial institution or other Person involved in the transfer of funds to or from the Store Accounts arising out of Agent's payments to or indemnification of such bank, financial institution or other Person. The obligations of Borrowers to reimburse Agent for such amounts pursuant to this Section 7.3.4 shall survive the termination of this Agreement.

7.4    Special Accounts.

7.4.1    Market shall establish and maintain a Special Account.  During any Cash Dominion Period, Express shall establish and maintain a Special Account.  All collected funds on deposit in the Store Accounts shall be sent by wire transfer or other electronic funds transfer reasonably acceptable to Agent, not less frequently than every third Business Day, to the Market Special Account, and during a Cash Dominion Period, all collected funds on deposit in the Pharmacy Accounts shall be sent to the Express Special Account by wire transfer or other electronic funds transfer reasonably acceptable to Agent, not less frequently than every third Business Day.

7.4.2    Notwithstanding Section 7.4.1 above to the contrary, (i) nominal amounts (which nominal amounts, together with all amounts held at the retail store locations and not yet deposited in the Store Accounts and the Pharmacy Accounts, shall not in the aggregate exceed $2,100,000 (provided that such amount shall be permanently reduced each time a retail store of Market is closed or sold by $31,000 and by $5,000 each time a pharmacy of Express is closed or sold, and increased by $31,000 each time a retail store of Market and $5,000 each time a pharmacy of Express is opened or acquired pursuant to any Permitted Acquisition)) at any one time may be retained in the Store Accounts, (ii) additional amounts may be held in the retail stores or the Store Accounts or the Pharmacy Accounts on Saturday, Sunday or other days where the applicable depository bank is closed, which additional amounts are to be, and shall be, transferred on the next Business Day to a Special Account, (iii) unless a Cash Dominion Period is in effect, Remittances payable to Express may be retained in the Pharmacy Accounts, the Express DDA Account, the Medicare and Medicaid Account or the Third Party Payor Account, as applicable (and the proceeds thereof may be expended for the corporate purposes of Express, subject to compliance with the provisions of this Agreement), and (iv) Agent may permit Borrowers to retain other amounts in other accounts of Borrowers by a written agreement of Borrowers and Agent.

-68-

7.4.3    Any Remittance or other proceeds of Receivables or other Loan Collateral at any time in the possession of Borrowers or their respective employees, agents and subsidiaries shall be deemed held by Borrowers in trust and as fiduciary for Agent. Agent shall have sole access to the Special Accounts, and Borrowers shall have no access thereto. Agent shall have, and Borrowers hereby grant to Agent, a Lien on and security interest in all funds held in the Special Accounts and as security for the Obligations. The Special Accounts shall not be subject to any deduction, set-off, bank's lien or any other right in favor of any Person other than Agent and other than Permitted Liens of the types described in clauses (i), (iv), (vi), (viii), (xii) and (xiii) of the definition thereof. Unless an Event of Default has occurred and is continuing, deposits to the Special Accounts shall be applied to the Obligations in accordance with Section 4.3.1. Any funds in the Special Accounts remaining after the applications set forth in the preceding sentence ("Available Funds") will be paid over by Agent to Borrowers. At any time on and after the occurrence and during the continuation of an Event of Default, all Available Funds shall be applied as described in Section 12.7 hereof. If any Remittance deposited in the Special Accounts is dishonored or returned unpaid for any reason, Agent, in its discretion, may charge the amount of such dishonored or returned Remittance directly against Borrowers and any account maintained by Borrowers with Agent and such amount shall be deemed part of the Obligations. Agent shall not be liable for any loss or damage resulting from any error, omission, failure or negligence on the part of Agent with respect to the operation of the Special Accounts or the services to be provided by Agent under this Agreement, except to the extent, but only to the extent, of any actual and direct damages suffered by Borrowers from Agent's gross negligence or willful misconduct. Until a payment is received by Agent for Agent's account in finally collected funds, all risks associated with such payment will be borne solely by Borrowers. From time to time, each of Agent may adopt such regulations and procedures as it may deem reasonable and appropriate with respect to the operation of the Special Accounts, and the services to be provided by Agent under this Agreement so long as the adoption of such regulations and procedures will not change the material terms of this Agreement and are applied to similarly situated borrowers.

7.5    Crediting of Remittances. For the purpose of calculating interest, all Remittances and other proceeds of Receivables and other Loan Collateral (but not including proceeds of a Permitted Disposition) shall be credited (conditional on final collection) against the unpaid Revolving Loan balance on the first Business Day after the Business Day that Agent received the same into a Special Account. Notwithstanding anything to the contrary in this Section 7.5, Borrowers acknowledge and agree that deposits made and other items credited to a Special Account are subject to applicable laws and regulations governing availability of funds and Agent's funds availability policies and may not be immediately available for application to the Loans or the other Obligations.

7.6    Cost of Collection. All reasonable costs of collection of Borrowers' Receivables, including Attorneys' Fees, out-of-pocket expenses, administrative and recordkeeping costs, and all service charges and costs related to the establishment and maintenance of the Special Accounts shall be the sole responsibility of Borrowers, whether the same are incurred by Agent or Borrowers, and Agent, at its discretion following the occurrence and during the continuation of an Event of Default, may charge any of the same incurred by Agent against Borrowers and

any account maintained by Borrowers with Agent and the same shall be deemed part of the Obligations.

7.7    [Intentionally omitted.]

7.8    Fees for Agent's Account.  Any fees, charges or income created by, or resulting from, the Cash Management Services to be provided by Agent under or as a result of the application or operation of the terms or conditions of this Section 7 are, as among the Agent and the Lenders, for the sole benefit and account of the Agent.

7.9    Monthly Activity.  Agent will provide Borrowers monthly with a statement of advances, charges and payments made pursuant to this Agreement, and such account rendered by Agent shall be conclusive evidence of the amount of the Obligations owing and unpaid by Borrowers and shall be deemed to be an account stated and binding as against Borrowers unless a written statement of Borrowers' or Agent's exceptions is received by the other within 60 days (one year in the case of manifest error) after the statement is mailed to Borrowers; *however*, Agent will have no obligation to correct any error or errors specified by Borrowers unless Agent, in its discretion exercised in good faith, believes that an error was made.

7.10    Prescription Files.  Borrowers shall at all times use, store and maintain the Prescription Files with reasonable care and caution in a manner consistent in all material respects with applicable standards of any insurance and in compliance in all material respects with all applicable laws, statutes, regulations, rules or ordinances of any Governmental Authority, including all Healthcare Laws.  Borrowers shall keep the Prescription Files in good and marketable condition.  Borrowers shall not remove any Prescription Files from the Borrowers' Facilities without the prior written consent of Agent, except for transfers of Prescription Files in the ordinary course of business (including at the request of customers with respect to such customer's own Prescription Files).  Borrowers assume all responsibility and liability arising from or related to the use and sale of prescriptions and the maintenance and use of the Prescription Files.

8.    EXAMINATION OF LOAN COLLATERAL; REPORTING.

8.1    Maintenance of Books and Records.  Borrowers shall keep and maintain complete books of account, records and files with respect to their respective businesses in accordance with GAAP consistently applied.

8.2    Access and Inspection.  Agent, and following the occurrence and during the continuation of an Event of Default, the Lenders, may at all times during normal business hours have (i) access to, and the right to examine and inspect, all of Borrowers' real and personal property and (ii) access to, and the right to inspect, audit and make extracts from, all of Borrowers' records, files and books of account, and Borrowers shall execute and deliver at the request of Agent, or, if applicable, the Lenders such instruments as may be necessary for Agent or such Lender to obtain such information concerning the business of Borrowers as Agent or such Lender may require from any Person; *however*, unless an Event of Default has occurred and is continuing, Agent will give Borrowers reasonable notice before it makes the inspections and

-70-

examinations at any office or place of business of Borrowers. Borrowers shall furnish Agent, and following the occurrence and during the continuation of an Event of Default, the Lenders, at reasonable intervals with such statements and reports regarding Borrower's financial condition and the results of Borrowers' operations, in addition to those hereinafter required, and such other information as Agent, and following the occurrence and during the continuation of an Event of Default, the Lenders, may reasonably request from time to time.

8.3     Reporting Regarding Receivables and Notes Receivable. Not less frequently than weekly, Borrowers shall deliver to Agent (i) a Borrowing Base Certificate not later than Friday of each week (or, if more frequent reporting is in effect under this Section 8.3 as provided above, by the deadlines and based on the values then established by Agent) and (ii) reports of Borrowers' sales, credits to sales or credit memoranda applicable to sales, collections and non-cash charges (from whatever source, including sales and noncash journals or other credits to Receivables) for the applicable period, and acceptable supporting documentation thereto (including, a report indicating the Dollar value of Borrower's Eligible Receivables, and all other information deemed necessary by Agent to determine levels of that which is and is not Eligible Receivables). By no later than the 20th day after the end of each calendar month, or sooner if available, Borrower shall deliver to Agent monthly agings, broken down by due date, of Receivables listed by invoice date, in each case reconciled to the Borrowing Base Certificate for the end of such month and Borrower's general ledger, and setting forth any changes in the reserves made for bad accounts or any extensions of the maturity of, any refinancing of, or any other material changes in the terms of any Receivables in such format as is specified by Agent from time to time, together with such further information with respect thereto in such format as Agent may then reasonably require. If an Event of Default has occurred and is continuing, Agent may require reporting of Credit Card Receivables and sales more frequently than weekly.

8.4     Reporting Regarding Inventory. Borrowers will continue their current practice of cycle counts of Inventory in accordance with procedures approved by Borrowers' independent certified public accountants and Agent. By no later than the 45th day after the end of each calendar month, or sooner if available, Borrowers shall submit to Agent an inventory report reconciled to (i) the Borrowing Base Certificate for the end of such month, (ii) Borrowers' inventory records, and (iii) Borrowers' general ledger, broken down into such detail and with such categories as Agent shall reasonably require (including a report indicating the type, location, and dollar value of Borrowers' Inventory, and all other information deemed necessary by Agent to determine levels of that which is and is not Eligible Inventory). Values shown on reports of Inventory shall be at the lower of cost or market value determined in accordance with a "first in-first out" cost accounting system. Not less frequently than weekly, Borrowers shall deliver to Agent a Borrowing Base Certificate, and acceptable supporting documentation thereto, by no later than Friday of each week, reporting the value of Borrowers' Inventory as of the end of the immediately preceding Sunday (or, if more frequent reporting is in effect under this Section 8.4 as provided above, by the deadlines and based on the values then established by Agent); provided, however, that the value of certain Inventory categories may be updated on a monthly basis, at Agent's discretion. Once per calendar year, at Agent's discretion and Borrowers' expense, an appraisal will be performed of Borrowers' Inventory by an appraiser acceptable to Agent. The results of such appraisal may be utilized by Agent, in its Permitted

-71-

Discretion, to adjust Net Orderly Liquidation Values used in determining Inventory Advance Rates.

8.5     Interim Financial Statements; Payable Information.  Promptly when available and in any event not later than 45 days after the end of each Fiscal Month and each Fiscal Quarter, Borrowers shall furnish to Agent, with sufficient copies for each Lender, a monthly (and, as applicable, quarterly) consolidated income statement, balance sheet and cash flow statement, (a) showing Borrowers' financial condition and the results of Borrowers' operations for the periods covered by such statements in such detail as Agent may from time to time require, (b) prepared in accordance with GAAP consistently applied (except as otherwise disclosed to Agent to the extent such exceptions are acceptable to Agent and subject to normal year-end adjustments and the omission of footnotes), (c) containing all information required to fully and accurately present the financial position and results of operations of Borrowers in accordance with GAAP consistently applied (subject to normal year-end adjustments and the omission of footnotes) and to make such statements not misleading under the circumstances, and (d) setting forth in comparative form, the figures for the year-to-date income statement, year-to-date cash flow statement, and balance sheet for the corresponding Fiscal Month and the corresponding portion of Borrowers' previous Fiscal Year.  By no later than the end of each Fiscal Month, Borrowers shall deliver to Agent monthly agings of accounts payable listed by invoice date and by due date, in each case reconciled to Borrowers' general ledgers for the end of such month, in such format as is reasonably specified by Agent from time to time.

8.6     Annual Projections.  Promptly when available and in any event not later than 10 days after the end of each of Borrowers' Fiscal Years, Borrowers shall furnish to Agent, with sufficient copies for each Lender, detailed projections for the next Fiscal Year, in consolidated form, setting forth projected income and cash flow for each month, the monthly balance sheet, and the monthly borrowing availability of Borrowers, in each case accompanied by a certificate of Market's chief financial officer, countersigned by Market's chief executive officer, stating (i) the material assumptions on which the projections were prepared, (ii) that the assumptions, except as otherwise noted, were prepared on a consistent basis with the operation of Borrowers' business during the immediately preceding Fiscal Year and adjusted by factors known to exist as of the date of the certificate or reasonably anticipated to exist during the periods covered by the projections, and (iii) that the officer signing the certificate has no reason to believe that the projections are incorrect or misleading in any material respect.

8.7     Annual Financial Statements.  Promptly when available and in any event not later than 120 days after the end of each of Borrowers' Fiscal Years, Borrowers shall submit to Agent, with sufficient copies for each Lender, financial statements showing their financial condition, the results of their operations, a balance sheet and related statements of income, stockholders' equity, and changes in their cash flows and financial position for the year then ended, all on a consolidated basis, and setting forth in comparative form, the figures for the previous Fiscal Year, unless a change in accounting methodology precludes the presentation of the previous Fiscal Year.  All of the foregoing annual financial statements must be: (i) audited in accordance with generally accepted auditing standards by an independent certified public accounting firm acceptable to Agent, (ii) prepared and presented in accordance with GAAP consistently applied, and (iii) accompanied by an audit report of Borrowers' independent certified public accountants.

-72-

8.8    Management Reports.  Borrowers shall furnish to Agent, with sufficient copies for each Lender, promptly on receipt copies of all management letters and any other material reports provided by Borrowers' independent accountants.  Borrowers hereby authorize Agent and the Lenders to communicate directly with Borrowers' independent accountants to discuss Borrowers' affairs, finances, accounts and such other matters as Agent and the Lenders deem necessary.

8.9    Comparisons to Financials; Certificates.  With each monthly or annual financial statement submitted by Borrowers to Agent under Sections 8.5 and 8.7, Borrowers will deliver to Agent, with sufficient copies for each Lender: (i) a comparison prepared by Borrowers of the projected financial position and results of operations of Borrowers provided for in Section 8.6 with the actual financial position and results of operations of Borrowers for the applicable period and an explanation of any material variations between them; and (ii) a comparison prepared by Borrowers between actual calculated results for the applicable quarterly period and the covenanted results for each of the Financial Covenants.  Borrowers shall also furnish Agent together with all materials required pursuant to Sections 8.5, 8.6, and 8.7, a certificate signed by the chief financial officer of Market in the form of Exhibit E.

8.10    Tax Returns; Additional Information.  Promptly upon Agent's request after Borrowers have filed their Tax returns with each applicable Governmental Authority, Borrowers shall deliver to Agent, with sufficient copies for each Lender, a copy of all federal (and at Agent's request all state and local) income Tax returns and schedules filed by Borrowers in respect of each taxable year ending on and after December 31, 2009.  Borrowers shall furnish all other Tax and financial information as Agent may reasonably request from time to time.

8.11    Prescription Files.  By no later than the 45th day after the end of each calendar month, or sooner if available, Borrowers shall submit to Agent a report reconciled to the Borrowing Base Certificate for the end of such month detailing the number and dollar volume of prescriptions filled by Express for each of the preceding fiscal months, broken down by store, and all other information deemed by Agent to be reasonably necessary to determine which Prescription Files are Eligible Prescription Files.

8.12    Agricultural Products.  Each Borrowing Base Certificate submitted by Borrowers to Agent hereunder will fully and accurately disclose, in such detail as Agent may reasonably require, the Liens reflected in all Food Security Act Notices and amendments thereto received by Borrowers.  Borrowers will provide Agent with copies of any such notices and amendments, and any information relating thereto, upon request.

8.13    Other Reporting Requirements.

(i)    Borrowers shall give Agent prompt written notice of (a) the establishment by a Borrower of any new deposit account or securities account, and (b) the filing of an application for registration of a patent or trademark with the United States Patent and Trademark Office.

(ii)     Borrowers shall provide Agent, promptly after obtaining Knowledge of the facts and circumstances described therein, a written report setting forth the information that would be required to be set forth on Schedule 9.14 in order to make the representations and warranties set forth in Section 9.14 true and correct as of the date of such report, as if such representations and warranties were being given as of the date of such report, but only to the extent that the facts or circumstances disclosed could reasonably be expected in each case to impose on Borrowers or require Borrowers to incur obligations, losses, costs, liabilities, damages or expenses in an amount in excess of $500,000.

(iii)     Borrowers shall provide Agent, promptly after obtaining Knowledge of the facts and circumstances described therein, with a written report identifying or setting forth the information that would be required to be set forth on the following schedules to this Agreement in order to make the representations and warranties set forth in the corresponding Sections of this Agreement true and correct as of the date of the report, but only to the extent that the facts or circumstances disclosed could reasonably be expected in each case to adversely affect the value of any material portion of the Loan Collateral: Schedule 9.9, Schedule 9.10 and Schedule 9.15.

(iv)     With each monthly compliance certificate submitted pursuant to Section 8.9, Borrowers shall submit to Agent a written report identifying or setting forth, with respect to the month covered by such compliance certificate,

(a)     the jurisdictions in which any Borrower qualified to do business as a foreign corporation or other entity during such month,

(b)     the information that would be required to be set forth on the following schedules to this Agreement in order to make the representations and warranties set forth in the corresponding Sections of this Agreement true and correct as of the end of the month to which the compliance certificate applied, as if such representations and warranties were being given as of the end of such month: Schedule 9.13, Schedule 9.14, Schedule 9.17, and Schedule 9.24 (but only with respect to real property leases executed and delivered by a Borrower during such month requiring annual rental payments equal to or exceeding $100,000 per year), and

(c)     the information that would be required to be set forth on the following schedules to this Agreement in order to make the representations and warranties set forth in the corresponding Sections of this Agreement true and correct as of the end of the month to which the compliance certificate applied, as if such representations and warranties were being given as of the end of such month, but only to the extent that the facts or circumstances disclosed could reasonably be expected in each case to impose on Borrowers or require Borrowers to incur obligations, losses, costs, liabilities, damages or expenses in an amount in excess of $500,000: Schedule 9.8, Schedule 9.9, Schedule 9.10, Schedule 9.15.

(v)     With each annual compliance certificate submitted pursuant to Section 8.9, Borrowers shall submit to Agent a report identifying or setting forth, with respect to the year covered by such compliance certificate, the information that would be required to be set forth on the following schedules to this Agreement in order to make the representations and warranties set

forth in the corresponding Sections of this Agreement true and correct as of the end of the year to which such compliance certificate applied, as if such representations and warranties were being given as of the end of such year: Schedule 9.5, Schedule 9.8, Schedule 9.9, Schedule 9.10, Schedule 9.15, Schedule 9.18, Schedule 9.24 and Schedule 9.25.

(vi)   Compliance with the requirements of this Section shall not be construed as a cure of any Event of Default occurring as a result of any representation or warranty made in Section 9 hereof being false in any material respect when made or furnished or when treated as being made or furnished.

9.   WARRANTIES AND REPRESENTATIONS AND COVENANTS.

In order to induce Agent, the Lenders and LC Issuer to enter into this Agreement and to make Credit Extensions hereunder, Borrowers jointly and severally warrant, represent and covenant that, as of the date hereof, any date upon which a Credit Extension is made hereunder, and until the Obligations are fully paid, performed and satisfied (and all Letters of Credit have been cancelled and returned to LC Issuer) and no Commitment of any Lender exists, the representations, warranties and covenants set forth in this Section 9 are and shall remain true; provided that to the extent any such representations, warranties and covenants are specifically made as of a specified date, such representations, warranties and covenants shall be and remain true and correct as of such date.

9.1   Corporate Status.   Each Borrower (i) is duly organized and is and shall remain validly existing under the laws of its state of organization, and is and shall remain qualified to do business as a foreign corporation under the laws of the jurisdictions listed on Schedule 9.1 and under the laws of each other jurisdiction in which the failure to be so qualified and in good standing would have a Material Adverse Effect, and (ii) has and shall maintain all requisite power and authority, corporate or otherwise, to conduct its business, to own its property, to execute, deliver and perform all of its obligations under this Agreement and each of the other Loan Documents, and to grant the Liens on the Loan Collateral provided by it.  No Borrower is (a) an "investment company", (b) an "investment adviser", (c) a company "controlled" by an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended, or (d) a "holding company" as that term is defined in, and is not otherwise subject to regulation under, the Public Utility Holding Company Act of 1935, as amended.

9.2   Due Authorization; Validity.   The signing and delivery of the Loan Documents, the performance by Borrowers of their respective Obligations under the Loan Documents, and the grant of the Liens on or security interests in, the Loan Collateral provided by Borrowers have been duly authorized by all requisite corporate or other action of Borrowers.  This Agreement and each of the other Loan Documents have been duly executed and delivered by Borrowers, and each will constitute, upon the due execution and delivery thereof by the other parties thereto, the legal, valid, and binding obligations of Borrowers enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally.

9.3     No Violation.  The execution, delivery and performance by Borrowers of this Agreement and the other Loan Documents and the grant of the Liens on or security interests in the Loan Collateral provided by Borrowers, do not and will not (i) constitute a violation of any applicable law except where such violation, in each case, could not reasonably be expected to have a Material Adverse Effect, (ii) constitute a breach of any provision contained in Market's Articles of Incorporation or By-Laws or Express' Articles of Organization or operating agreement or contained in any Applicable Agreement, (iii) constitute a violation of any order of any court or other Governmental Authority except where such violation, in each case, could not reasonably be expected to have a Material Adverse Effect, or (iv) result in the creation or imposition of any Lien on any of Borrowers' properties (other than (a) Agent's Liens and (b) any other Permitted Lien).

9.4     Use of Loan Proceeds.  Borrowers' uses of the proceeds of the Credit Extensions to Borrowers pursuant to this Agreement are, and will continue to be, legal and proper uses (duly authorized by each Borrower's Boards of Directors or managers, as applicable).  Such uses do not and shall not violate any applicable laws as in effect as of the date hereof or hereafter, except to the extent such violation could not reasonably be expected to have a Material Adverse Effect.  The Loans are not and shall not be secured, directly or indirectly, by any stock for the purpose of purchasing or carrying any margin stock or for any purpose which would violate either Regulation U, 12 C.F.R. Part 221, or Regulation X, 12 C.F.R. Part 224, promulgated by the Board of Governors of the Federal Reserve System.

9.5     Management; Ownership of Assets; Licenses; Patents.  Each Borrower employs and shall continue to employ active, full-time, professional management adequate to handle its affairs, and each Borrower has, and will continue to have, adequate employees, assets, governmental approvals, licenses, permits, patents, copyrights, trademarks and trade names necessary to continue to conduct its business as heretofore and hereafter conducted by it, and all of Borrowers' patents, registered copyrights, trademarks and trade names and all licenses (whether as licensor or licensee) of any patents, trademarks, and copyrights by Borrowers existing as of the Closing Date are described in Schedule 9.5.

9.6     Indebtedness.  Except for (i) Indebtedness identified on Schedule 10.10, (ii) the Obligations, (iii) Indebtedness (a) which is unsecured, (b) which is not for borrowed money, (c) which has been incurred in the ordinary course of business, (d) which is not otherwise prohibited under any provision of this Agreement, and (e) the nonpayment of or other default under which could not reasonably be expected to have a Material Adverse Effect, and (iv) other Indebtedness permitted to be incurred or paid by either Borrower pursuant to Section 10.10, no Borrower has any Indebtedness.  Except as otherwise set forth or reflected in the Financials, no Borrower has guaranteed the obligations of any Person (except by endorsement of negotiable instruments payable at sight for deposit or collection or similar banking transactions in the usual course of Borrower's business).

9.7     Title to Property; No Liens.  Each Borrower has (i) good and indefeasible title to, and ownership of, all of its personal property (exclusive of that property for which it has only a leasehold estate), including the Loan Collateral provided by it and (ii) good and marketable fee simple title to all of its real property, in each case, free and clear of all Liens except to the extent

-76-

of Permitted Liens. None of the Equipment included in the appraisal which Agent has made eligible for purposes of the Term Loans is the subject of any Lien or capitalized lease of any Person, other than Permitted Liens. Schedule 9.7 sets forth certain Liens existing as of the Closing Date, which Liens are Permitted Liens.

9.8    Restrictions; Labor Disputes; Labor Contracts. Except as described in Schedule 9.8, no Borrower is a party or subject to, any charge, corporate restriction, judgment, decree or order, for which Borrower's compliance or non-compliance could reasonably be expected to have a Material Adverse Effect. Except as described on Schedule 9.8, as of the Closing Date no Borrower is a party to any written employment contract or labor contract. No Borrower is the subject of any labor dispute that could reasonably be expected to have a Material Adverse Effect. No collective bargaining agreement or other labor contract identified on Schedule 9.8 is scheduled to expire during the term of this Agreement except as described on Schedule 9.8. To Borrower's Knowledge, as of the Closing Date, no union or other labor organization is seeking to organize, or to be recognized as, a collective bargaining unit of employees of either Borrower or any of its respective Subsidiaries or for any similar purpose. To Borrowers' Knowledge, no key employee of either Borrower is subject to any agreement in favor of anyone other than a Borrower which restricts or limits that individual's right to engage in the type of business activity conducted by either Borrower in any manner which could materially impair the ability of such individual to carry out his or her duties with a Borrower or to use any property or confidential information or which grants to any Person, other than a Borrower, any rights to inventions or other ideas susceptible to legal protection developed or conceived by any such key employee of a Borrower, in each case to the extent that could reasonably be expected to result in a Material Adverse Effect.

9.9    No Violation of Law. Except as described on Schedule 9.9, no Borrower is in violation of any applicable statute, regulation or ordinance of any Governmental Authority (including any such statute, regulation or ordinance relating to ecology, human health or the environment and including all Healthcare Laws), where such violation could reasonably be expected to have a Material Adverse Effect. Each Borrower has all necessary material permits, licenses, franchises, certificates and other approvals or authorizes of Governmental Authority as are required under applicable statutes, regulations and ordinances (including all Healthcare Laws) for the operation of its business. Each Borrower has maintained in all material respects all records required to be maintained under Healthcare Laws. All Inventory manufactured or produced by a Borrower has been manufactured or produced in compliance in all material respects with all applicable requirements of Sections 6, 7 and 12 of the Fair Labor Standards Act, as amended, and all regulations and orders of the United States Department of Labor.

9.10    Hazardous Substances. Except as described on Schedule 9.10, (i) no investigations, inquiries, orders, hearings, actions or other proceedings by or before any Governmental Authority are pending or, to the Knowledge of Borrowers, threatened in connection with any Environmental Activity or alleged Environmental Activity that could reasonably be expected to have a Material Adverse Effect; (ii) no Hazardous Substances have been integrated into any of Borrowers' Facilities in such manner or quantity as may reasonably be expected to or in fact does (a) violate any applicable Environmental Requirement in any material respect or (b) materially and adversely affect the value of any of Borrowers' Facilities;

-77-

(iii) the use of Borrowers' Facilities does not result in any Environmental Activity in violation of any applicable Environmental Requirements; (iv) to Borrowers' Knowledge, no occurrence or condition on any real property adjoining or in the vicinity of any of Borrowers' Facilities exists which could reasonably be expected to cause any of Borrowers' Facilities to be subject to any restrictions on ownership, occupancy, transferability or operation under any Environmental Requirements, in each case which could reasonably be expected to have a Material Adverse Effect; (v) to Borrowers' Knowledge, none of Borrowers' Facilities prior to when Borrowers have owned or leased them has been used for the disposal of Hazardous Substances or was the site of any Release of Hazardous Substances in violation of any Environmental Requirements, in each case which could reasonably be expected to have a Material Adverse Effect; (vi) to Borrower's Knowledge, none of Borrowers' respective business operations have contaminated the lands, waters or other property of others with Hazardous Substances except in compliance in all material respects with applicable Environmental Requirements; (vii) to Borrower's Knowledge, no underground or above ground storage tank (regardless of contents) has been in the past, or is now, located on, at or beneath any of Borrowers' Facilities, except for such storage tanks that have been decommissioned in compliance with applicable Environmental Requirements; and (viii) none of Borrowers' Facilities since Borrowers have owned or leased them has been used by Borrowers for the production, treatment, storage, generation, disposal or Release of any Hazardous Substance other than in accordance in all material respects with applicable Environmental Requirements.

9.11   Absence of Default. No Borrower is in default in any material respect under any Applicable Agreement. Each Credit Card Agreement to which any Borrower is a party constitutes the legal, valid and binding obligation of the Borrower that is a party thereto and to Borrowers' Knowledge, the other parties thereto, enforceable in accordance with its respective terms. No default or event of default that would entitle the Credit Card Issuer or Credit Processor to terminate or suspend payments or terminate any such Credit Card Agreement has occurred and is continuing. Each Borrower has complied in all material respects with all of the terms and conditions of the Credit Card Agreements to the extent necessary for such Borrower to be entitled to receive payments thereunder.

9.12   Accuracy of Financials; No Material Changes. The Financials (i) have been prepared in accordance with GAAP consistently applied and are true, correct and complete in all material respects and (ii) fairly present Borrowers' assets, liabilities and financial condition and results of operations and those of such other Persons described therein as of their respective dates (subject to normal year-end adjustments and the lack of footnotes in the case of monthly, quarterly or *pro forma* Financials). Between the respective dates of the Financials and the date of this Agreement, there has been no material and adverse change in Borrowers' assets, liabilities or financial condition nor has there been, between the respective dates of the Financials and the date of this Agreement any material damage to or loss of Borrowers' assets or properties. Borrowers' outstanding advances to any Person do not constitute any equity or long term investment in any Person which is not reflected in the Financials. Borrowers' Fiscal Year is from January 1 to December 31.

9.13   Pension Plans. Except as described on Schedule 9.13, neither Borrowers nor any Controlled Group member has ever sponsored, maintained, or contributed (or become obligated

-78-

to sponsor, maintain, or contribute) to a Pension Plan subject to Title IV of ERISA. Neither Borrowers nor any Controlled Group member has ever sponsored, maintained, or contributed (or become obligated to sponsor, maintain, or contribute) to any "multiemployer plan" (as defined in ERISA). Except as described on Schedule 9.13, no "prohibited transaction," or "reportable event", as those terms are defined by ERISA, has occurred or is continuing as to any Pension Plan of Borrowers or any Controlled Group member, which poses a threat of the imposition of Taxes or penalties against such Pension Plans (or trusts related thereto), Borrowers or any Controlled Group member, the imposition or payment of which could have a Material Adverse Effect. Each Pension Plan that is intended to meet the requirements of qualified pension benefit plans under Sections 401(a) and 501(a) of the Internal Revenue Code has received a current favorable determination letter to that effect under the Internal Revenue Code, and neither Borrowers nor, to Borrowers' Knowledge, any Controlled Group member has violated such requirements with respect to any Pension Plan.

9.14   <u>Taxes and Other Charges</u>. Each Borrower has filed all federal and state Tax returns and all material local Tax returns and other reports which it is required by law to file. All of such Tax returns and reports accurately and properly reflect the Taxes due for the periods covered thereby. Except as described on Schedule 9.14, each Borrower has paid all Taxes that are due and payable except for any such Taxes which are being contested in good faith in accordance with the terms of <u>Section 10.9</u>. Except as disclosed on Schedule 9.14, each Borrower has withheld all employment and similar Taxes which it is required by law to withhold and has maintained adequate reserves for the payment of all Taxes. Except as described on Schedule 9.14, no Tax Liens have been filed with respect to a Borrower and, to the Knowledge of Borrowers, no claims are being asserted with respect to any such Taxes (and no basis exists for any such claims). There are not in effect any waivers of applicable statutes of limitations for federal, foreign, state or local Taxes for any period. No Borrower is a party to any Tax-sharing agreement or arrangement.

9.15   <u>No Litigation</u>. Except as described on Schedule 9.15, there is not, as of the Closing Date, any litigation, action or proceeding pending or, to Borrowers' Knowledge, threatened, against any Borrower.

9.16   <u>No Brokerage Fee</u>. No brokerage, finder's or similar fee or commission is due to any Person by reason of Borrowers entering into this Agreement or by reason of any of the transactions contemplated by the Loan Documents, and Borrowers shall indemnify and hold Agent, the Lenders and LC Issuer harmless from all such fees and commissions.

9.17   <u>Affiliates</u>. All Persons who are Borrowers' Affiliates as of the Closing Date are identified in Schedule 9.17. Except as set forth on Schedule 9.17, no Affiliate of any Borrower (i) sells or leases any goods or real property to a Borrower, (ii) sells any services to a Borrower, (iii) purchases or leases any goods or real property, or purchases any services from a Borrower, or (iv) is a party to any contract or commitment with a Borrower, other than, in each case, pursuant to terms that satisfy the requirements of <u>Section 10.22</u>.

9.18   <u>Capitalization; Warrants</u>. Schedule 9.18 sets forth the number of shares of Capital Stock of each Borrower which are authorized and the number of such shares which are

DWT 13644165v19 0017787-000222

outstanding as of the Closing Date. Each outstanding share of Capital Stock is duly authorized, validly issued, fully paid and nonassessable. Set forth in <u>Schedule 9.18</u> is a complete and accurate list of all Persons who are record and beneficial owners of more than three percent of any class of the Capital Stock of each Borrower on the Closing Date. All warrants, subscriptions, options, instruments, rights and agreements existing as of the Closing Date under which any shares of Capital Stock of Borrower are or may be redeemed, retired, converted, encumbered, bought, sold or issued are described in <u>Schedule 9.18</u>. Express is a wholly-owned Subsidiary of Market.

9.19   <u>Noncompetition Agreements</u>.   No Borrower is subject to any contract or agreement containing a covenant of a Borrower not to compete in any line of business with any Person which could reasonably be expected to have a Material Adverse Effect.

9.20   <u>Deposit and Other Accounts</u>.   All of the accounts maintained by any Borrower with any bank, brokerage house or other financial institution as of the Closing Date are set forth in <u>Schedule 9.20</u>.

9.21   <u>Solvency</u>.   Each Borrower will be Solvent after (i) receipt and application of the Loans in accordance with the terms of this Agreement, (ii) the execution and delivery of this Agreement and the other Loan Documents to which any of them is a party, and (iii) the filing of any financing statements or other perfecting notices or actions in connection with this Agreement.

9.22   <u>Full Disclosure</u>.   No representation or warranty made by any Borrower or the Individual Guarantor, as the case may be, in this Agreement, any other Loan Document to which it is a party, or in any other document furnished from time to time in connection herewith or therewith contains or will contain at the time such representation is made or such document furnished, any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements herein or therein not misleading.

9.23   <u>Casualties</u>.   Neither the business nor the properties of any Borrower are affected by any fire, explosion, accident, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty loss which could reasonably be expected to have a Material Adverse Effect.

9.24   <u>Leases</u>.   Except as listed on <u>Schedule 9.24</u>, as of the Closing Date no Borrower is a party to or bound by any lease, sublease, or other agreement relating to any real property or leasehold interest in real property, or any material equipment or other material personal property, and <u>Schedule 9.24</u> correctly describes each such lease, sublease and other agreement.

9.25   <u>Insurance Policies</u>.   Schedule 9.25 correctly sets forth all of the insurance policies maintained by each Borrower as of the Closing Date, including the carriers thereof, and the types of coverage and insured amounts covered thereby.

9.26   <u>Consents</u>.   No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required for the due execution,

DWT 13644165v19 0017787-000222

delivery and performance by each Borrower of any Loan Document to which it is or will be a party, other than filings or recordings contemplated by the Security Documents.

9.27    Tax Regulations.    Borrowers do not intend to treat the Loans, or any related transactions contemplated by this Agreement, as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4).

9.28    Anti-Terrorism Laws.    As of the Closing Date, none of Borrowers or any Subsidiary or any Affiliate of any Borrower (including, to Borrowers' Knowledge, Bandon General Partnership) is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.    As of the Closing Date, none of Borrowers nor any Subsidiary of any Borrower or, to the Knowledge of Borrowers, their respective agents acting or benefiting in any capacity in connection with the Credit Extensions or other transactions hereunder, is a Blocked Person.    As of the Closing Date, none of Borrowers nor, to the Knowledge of Borrowers, any of their respective agents acting in any capacity in connection with the Credit Extensions or other transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

10.    COVENANTS.    Until the Obligations are fully paid, performed and satisfied, (and all Letters of Credit have been cancelled and returned to LC Issuer) and no Commitment of any Lender exists, Borrowers will observe, perform, and comply with each of the covenants set forth below in this Section 10.

10.1    Payment of Certain Expenses.    Borrowers will pay to Agent, each of the Lenders and LC Issuer, immediately on Agent's demand any and all fees, costs and expenses which Agent, each of the Lenders and LC Issuer pays to a bank or other similar institution arising out of or in connection with (i) the forwarding to Borrowers, or any other Person on Borrowers' behalf, by Agent, any Lender or LC Issuer of proceeds of any Credit Extension made to Borrower pursuant to this Agreement, and (ii) the depositing for collection by Agent, any Lender or LC Issuer of any check or item of payment received or delivered to Agent, any Lender or LC Issuer on account of the Obligations.    Borrowers will reimburse Agent, any Lender and LC Issuer, immediately, for any claims asserted by any bank at which a blocked account is established for the deposit of proceeds of the Loan Collateral in connection with such blocked account or any returned or uncollected checks received by such bank as proceeds of the Loan Collateral.

10.2    Notice of Litigation.    Borrowers will notify Agent in writing, promptly on Borrowers' learning thereof, of any litigation, suit or administrative proceeding which may have a Material Adverse Effect, whether or not the claim is considered by Borrowers to be covered by insurance.

10.3    Notice of ERISA Events; DOL Judgment.    Borrowers will notify Agent in writing (i) at least 10 days prior to the adoption by Borrower or any Controlled Group member of any

Pension Plan subject to Title IV of ERISA; (ii) promptly on the occurrence of any Reportable Event, and (iii) at least 30 days prior to any termination, partial termination or merger of a Pension Plan or a transfer of a Pension Plan's assets. Within three days after the funding of the initial Credit Extensions hereunder, Borrowers will consent to the DOL Judgment.

10.4    <u>Notice of Labor Disputes</u>.  Borrowers will notify Agent in writing (i), promptly upon Borrower's learning thereof, of (a) any labor dispute to which a Borrower may become a party and which could reasonably be expected to have a Material Adverse Effect or (b) any strikes, walkouts, or lockouts relating to any of its plants or other facilities, and (ii) the entering into of any labor contract relating to any of its plants or other facilities.

10.5    <u>Compliance with Laws</u>.  Borrowers will comply with the requirements of all applicable laws, statutes, regulations, rules or ordinances of any Governmental Authority, including all Healthcare Laws, except where such noncompliance could not reasonably be expected to have a Material Adverse Effect.

10.6    <u>Notice of Violations of Law, Tax Assessments</u>.  Borrowers will notify Agent in writing, promptly upon Borrowers' learning thereof, of any violation of any law, statute, regulation, rule or ordinance of any Governmental Authority, and of the imposition of any federal, state or local Tax withholding or assessment, applicable to a Borrower, but only if the violation or imposition thereof could reasonably be expected to have a Material Adverse Effect. Borrowers will (i) provide Agent with copies of all material communications (and upon request by Agent, all communications) between any Borrower and any Governmental Authorities which relate to Environmental Activities, Environmental Requirements, or Hazardous Substances affecting Borrower; (ii) notify Agent promptly after obtaining Knowledge of the Release or alleged Release in a reportable quantity (as defined under applicable Environmental Law) of any Hazardous Substances on, in, under or affecting any Borrower's property or any surrounding area, and (iii) notify Agent promptly after obtaining Knowledge of any noncompliance by Borrowers with any Environmental Requirement which could reasonably be expected to have a Material Adverse Effect.

10.7    <u>Notice of Violations of Certain Agreements</u>.  Borrowers will notify Agent in writing, within three Business Days after the earlier of when any Borrower learns, or is notified of the occurrence, of (i) any material breach by a Borrower of, a notice of termination or acceleration, or any demand for adequate assurances under, any Applicable Agreement, or (ii) any demand for adequate assurances relating to the Nidiffer Note.

10.8    <u>Notice of Customer Defaults</u>.  Borrowers will notify Agent in writing, promptly upon Borrowers' learning thereof, of any default by any obligor under any material note or other material evidence of debt payable to a Borrower or of anything which might have a material adverse effect on the ability of any obligor of a Borrower to pay any material amount of Indebtedness owing to a Borrower.

10.9    <u>Taxes and Charges</u>.  Each Borrower will (i) file all federal, state and local Tax returns and other reports which it is required by law to file, (ii) pay all Taxes that are due and payable, (iii) withhold all employment and similar Taxes which it is required by law to withhold,

and (iv) maintain adequate reserves for the payment of all Taxes; *provided, however*, that no such Taxes need be paid during such period as they are being contested in good faith by a Borrower, in appropriate proceedings promptly commenced and diligently prosecuted, if adequate reserves in accordance with GAAP have been set aside on such Borrower's books, and the continuance of any such contest does not (a) result in Loan Collateral having a value in excess of $500,000 or any other material portion of the property of such Borrower being made the subject of (1) any proceeding in foreclosure, (2) any levy or execution (which shall not have been stayed or dismissed), or (3) any seizure or other loss and (b) prevent Agent from having a perfected first priority security interest in, or as applicable, mortgage Lien on, the Loan Collateral or with respect to future advances made hereunder; and *provided, further*, that such Borrower will promptly pay such Tax when the dispute is finally settled.

10.10   Indebtedness; Guaranties; Liens.

(i)    Other than the Obligations, no Borrower will incur any Indebtedness other than:

(a)    existing Indebtedness identified on Schedule 10.10 which is otherwise not expressly provided for in this Section 10.10 and any Refinancing Debt in respect thereof;

(b)    Indebtedness and any Refinancing Debt in respect thereof: (1) which is unsecured, (2) which is not for borrowed money, or the issuance of any letter of credit, acceptance transaction, or similar credit instrument or facility, (3) which is incurred in the ordinary course of business, (4) which is not otherwise prohibited under any provision of this Agreement, and (5) the incurrence of which could not reasonably be expected to have a Material Adverse Effect;

(c)    Indebtedness in respect of Taxes or other governmental charges to the extent that payment thereof shall not at the time be required to be made in accordance with the provisions of Section 10.9;

(d)    Indebtedness in respect of Judgments in the manner and to the extent permitted by Section 10.27;

(e)    Permitted Purchase Money Indebtedness and any Refinancing Debt in respect thereof;

(f)    Indebtedness incurred pursuant to new store leases, and amendments and renewals of existing store leases;

(g)    Indebtedness incurred pursuant to the DOL Judgment; and

(h)    Subordinated Debt;

-83-

*provided,* that no Indebtedness otherwise permitted under this <u>Section 10.10</u> to be incurred shall be permitted to be incurred if, after giving effect to the incurrence thereof, any Event of Default shall have occurred and be continuing.

(ii)    No Borrower will guaranty or enter into any agreements of guaranty or indemnity of the obligations of any Person (except by endorsement of negotiable instruments payable at sight for deposit or collection or similar banking transactions in the usual course of Borrower's business).

(iii)    No Borrower will permit any of its assets or properties (including the Loan Collateral) to become subject to any Liens other than Permitted Liens.

10.11    <u>Restrictions; Labor Disputes.</u>  No Borrower will become a party or subject to any charge, corporate restriction, judgment, decree or order or any labor dispute or enter into any contract, agreement or arrangement which, in any case, could reasonably be expected to have a Material Adverse Effect.

10.12    <u>Pension Plans.</u>  No Borrower will, or will allow any Controlled Group member to, permit any Reportable Event or "prohibited transaction" (as defined by ERISA) for which no statutory or class exemption exists under Sections 407 or 408 of ERISA or Sections 4975(c)(2) or 4975(d) of the Internal Revenue Code to occur or to continue as to any Pension Plan of such Borrower or any Controlled Group member, which poses a threat of (i) termination of such Pension Plans (or trusts related thereto), which termination could reasonably be expected to have a Material Adverse Effect or (ii) the imposition of Taxes or penalties against such Pension Plans (or trusts related thereto), such Borrower, or any Controlled Group member, the imposition or payment of which could reasonably be expected to have a Material Adverse Effect.  With respect to each Pension Plan that is intended to meet the requirements of qualified pension benefit plans under Sections 401(a) and 501(a) of the Internal Revenue Code, Borrowers and the applicable Controlled Group members shall continue to maintain the qualified status of such Pension Plans, and all contributions to Pension Plans which Borrower or any member of the Controlled Group is obligated to make shall be timely made when due, unless the failure to do so could not reasonably be expected to have a Material Adverse Effect.  No Borrower may, and Borrowers will not permit any Controlled Group member to, incur any liability to the Pension Benefit Guaranty Corporation, the incurrence of which could reasonably be expected to have a Material Adverse Effect.

10.13    <u>Solvency.</u>  Borrowers will continue to be Solvent.

10.14    <u>Property Insurance.</u>  Borrowers will insure the Property as required by the Mortgages.  Borrowers will insure all of their other respective real and personal property, including the Loan Collateral provided by Borrowers, against loss or damage, consistent in all material respects with the insurance in place as of the Closing Date, as set forth in <u>Schedule 10.14</u>.  The policies or a certificate thereof signed by the insurer evidencing that such insurance coverage is in effect for periods of not less than one year (as measured from the date of renewal) shall be delivered to Agent within 5 Business Days after the issuance of the policies to Borrowers and after each renewal thereof.  All premiums thereon shall be paid by Borrowers

when due so as to keep such insurance in full force and effect at all times. Each such policy shall name Agent as loss payee and, as appropriate, mortgagee. Such lender's loss payable endorsements shall specify that the proceeds of such insurance shall be payable to Agent as its interests may appear and further specify that Agent and Lenders shall be paid regardless of any act or omission by any Borrower or any of its Affiliates, and shall provide that such policy may not be amended or canceled without 30 days prior written notice to Agent. If Borrowers fail to do so, Agent may (but shall not be required to) procure such insurance and charge the cost to Borrowers' loan account as part of the Obligations payable on demand and secured by the Loan Collateral. In that regard, pursuant to Oregon law (ORS 746.201), Agent hereby gives Borrowers the following notice:

### WARNING

**Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.**

**You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.**

**The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by applicable law.**

10.15 Liability Insurance. Borrowers will, at all times, maintain in full force and effect such liability insurance with respect to its activities consistent in all material respects with the insurance in place as of the Closing Date, as set forth on Schedule 10.15. Such insurance shall name Agent as an additional insured containing a severability of interest/cross-liability endorsement reasonably acceptable to Agent.

10.16 Mergers; Acquisitions. No Borrower will merge or consolidate or be merged or consolidated with or into any other Person, or otherwise reorganize, liquidate or wind-up or dissolve itself. No Borrower will (i) purchase or otherwise acquire (a) all or substantially all of the assets of any Person or the assets comprising any line of business or business unit or division, except in connection with a Permitted Acquisition, or (b) any partnership, joint venture or limited liability company interest in or with any Person or (ii) create or form any Person (including a Subsidiary).

10.17 Investments. No Borrower will, and will not permit any Subsidiary to, invest in any Person, whether payment therefor is made in cash or Capital Stock of a Borrower or any

-85-

Subsidiary, and whether such investment is by acquisition of Capital Stock or Indebtedness, or by loan, advance, transfer of property out of the ordinary course of business, capital contribution, equity or other profit sharing interest, extension of credit on terms other than those normal in the ordinary course of business or otherwise, or deposit with a financial institution except the following and after compliance with the applicable terms of the Borrower Security Agreement (a "Permitted Investment"): (i) any evidence of indebtedness issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States of America is pledged in support thereof) in each case maturing not more than three months from the date of acquisition thereof; (ii) certificates of deposit or acceptances of any financial institution that is a member of the Federal Reserve System having combined capital and surplus and undivided profits of not less than $500,000,000 in each case maturing not more than three months from the date of acquisition thereof; and (iii) commercial paper issued by a corporation that is not an Affiliate of a Borrower and is organized under the laws of any state of the United States or the District of Columbia and rated at least A-1 by Standard & Poor's Rating Services or at least P-1 by Moody's Investors Services, Inc. in each case maturing not more than three months from the date of acquisition thereof; (iv) repurchase agreements, having terms of less than ninety (90) days, for government obligations of the type specified in this Section 10.17 with a commercial bank or trust company which is rated at least A-2/A by Standard & Poor's Rating Services; (v) additional shares in Unified Grocers in connection with Permitted Acquisitions and stock dividends paid by Unified Grocers; and (vi) except as permitted under Section 10.18; *provided*, that no Permitted Investments under clauses (i), (ii), (iii), or (iv) of this Section 10.17 otherwise permitted under this Section 10.17 may be made if (a) any Event of Default has occurred and is continuing or is created thereby or (b) after making the investment, any Revolving Loans or Interim Advances are then outstanding.

10.18   Distributions; Redemptions.  No Borrower will (i) declare or pay cash or stock distributions (including any return of capital) or dividends upon any of such Borrower's Capital Stock (including any preferred stock now or hereafter issued by such Borrower), (ii) make any distributions of such Borrower's assets, (iii) voluntarily or pursuant to any contractual or other obligations, redeem, retire, purchase, repurchase or otherwise acquire, directly or indirectly, or exercise any call rights relating to, Borrower's Capital Stock or any other securities now or hereafter issued by such Borrower (including any warrants or options for any Capital Stock of Borrower); except that (a) Express may pay cash distributions to Market, (b) Market may declare and pay cash dividends or redeem or repurchase any of its Capital Stock so long as (i) the amount of the cash dividends and the purchase or redemption price to be paid in connection with all dividends, redemptions and repurchases does not exceed, in the aggregate, $1,000,000 in any Fiscal Year, (ii) no Event of Default has occurred and is continuing, or would result from any such dividend, redemption or repurchase, and (iii) after giving effect to any such redemption or repurchase, Borrowers would have Excess Availability of at least $4,000,000, and (c) Market may issue non-cash stock dividends to its officers, directors and employees pursuant to any stock grant plan or program in effect at any applicable time, so long as such issuance does not cause a Change in Control.

10.19   Loans and Fees.  No Borrower will (i) incur, permit, or make any loans, advances or extensions of credit to any Person, including any of such Borrower's Affiliates, officers,

-86-

employees, or directors, or (ii) pay any consulting, management or directors' fees to or for the account of any stockholder, director, officer, or other Affiliate of such Borrower, except that (a) Borrowers may make loans, advances and extensions of credit to each other, (b) a Borrower may make advances to its officers and employees with respect to expenses incurred by those officers and employees which (1) expenses are (A) ordinary and necessary business expenses and (B) reimbursable by such Borrower and (2) do not exceed in the aggregate, $50,000 as to both Borrowers outstanding at any one time, (c) Market may pay fees to its directors not exceeding $50,000 in the aggregate in any Fiscal Year in addition to any benefits that are otherwise available to its officers, (d) Borrowers may extend credit to officers, directors and employees in connection with ordinary course purchases of goods and services as permitted by Section 10.22, and (e) Borrowers may make advances to Bandon General Partnership as permitted by Section 10.22.

10.20  Stock Rights.  No Borrower will (i) change the rights or obligations associated with, or the terms of, any class of Capital Stock now issued by such Borrower or (ii) issue any new class of Capital Stock of such Borrower, in either case in any manner that could require such Borrower to pay dividends or distributions, or redeem or repurchase such Capital Stock in violation of Section 10.18.

10.21  Capital Structure; Fiscal Year.  No Borrower will make any change in any of such Borrower's business objectives, purposes and operations which could reasonably be expected to have a Material Adverse Effect.  No Borrower will change such Borrower's Fiscal Year.  No Borrower will form any Subsidiary after the Closing Date.  Within 15 days after the Closing Date, Market will cause the dissolution of its Subsidiary, C&K Pharmacy, LLC.

10.22  Affiliate Transactions.  No Borrower will enter into, or be a party to, any transaction with any of such Borrower's Affiliates, except (i) transactions (a) in the ordinary course of business pursuant to the reasonable requirements of such Borrower's business and (b) upon fair and reasonable terms which are no less favorable to such Borrower than such Borrower could obtain in a comparable arm's length transaction with a Person who is not such Borrower's Affiliate, (ii) so long as no Event of Default has occurred and is continuing, Market may make unsecured loans or advances to Bandon General Partnership in amounts not exceeding $100,000 in principal outstanding at any time, (iii) in the manner and to the extent permitted by Section 10.18, and (iv) so long as no Event of Default has occurred and is continuing, the Bandon Acquisition.  Notwithstanding the foregoing, and except as between Borrowers, a Borrower may not (1) extend credit to, or have amounts owing from, its Affiliates, except as permitted by Section 10.19 and for ordinary course purchases of goods and services in an amount not exceeding $15,000 for each such Affiliate at any one time outstanding, or (2) pay in whole or in part any Indebtedness of a Borrower to any Affiliate except as expressly permitted by a subordination agreement entered into by such Affiliate in favor of Agent and Lenders.

10.23  Operating Accounts; Cash Management.  At all times until Payment in Full of the Obligations, each Borrower will maintain its primary operating accounts with Agent.  No Borrower will arrange with any Lender other than Agent to provide Cash Management Services without the prior written consent of Agent.

10.24   Sale of Assets. No Borrower will sell, lease or otherwise dispose of or transfer, whether by sale, merger, consolidation, liquidation, dissolution, or otherwise (including by a sale-leaseback transaction), any of its assets, including the Loan Collateral provided by any Borrower, except that Borrowers may make any of the following sales, leases, dispositions and transfers:

(i)   the sale of Inventory in the ordinary course of business; however, a sale in the ordinary course of business will not include a transfer in total or partial satisfaction of Indebtedness that is not Indebtedness to trade creditors incurred in the ordinary course of business except as otherwise permitted by clause (v) below;

(ii)   the sale of Property in a sale/leaseback transaction (a) to the extent it is part of a Permitted Acquisition, or (b) if (1) the consideration for such sale is cash, and (2) the sale price is not less than 90 percent of the appraised value of the Property sold as indicated by an appraisal conducted within six months prior to the sale and reasonably acceptable to Agent;

(iii)   the sale of any item of Equipment for cash (other than in connection with a sale described in clause (v) below) in an arm's-length transaction having a fair market value of less than $250,000, provided that in any 12 month period the total amount of Equipment sold by Borrowers may not exceed an aggregate fair market value equal to $500,000;

(iv)   the sale of Property (other than in connection with a sale described in clause (v) below) on the terms and subject to the conditions (including the consent of Agent) set forth in the applicable Mortgage;

(v)   the sale of assets in connection with the liquidation, closing or sale of a retail store location(s) of such Borrower, including the bulk sale of Inventory, Prescription Files, Equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such locations; provided that, as to each and all such sales, (a) as of the date of such sale and after giving effect thereto, no Event of Default shall exist or have occurred and be continuing, (b) such sale shall be for cash consideration only, and (c) and the number of retail store locations which may be sold in reliance on this Section 10.24(iv) shall be limited to five (5) in any Fiscal Year of Borrowers.

All of the proceeds from any disposition of any Equipment or Property (including proceeds from a sale/leaseback) will be delivered to Agent to be applied by Agent to the repayment of Term Loan A (to the last to mature of the monthly payments required under Section 3.1), or, if Term Loan A has been fully repaid, to the repayment of Term Loan B (to the last to mature of the monthly payments required under Section 3.1), or, if Term Loan B has been fully repaid, to the repayment of the other Obligations in such amount in any order that Agent may elect in its discretion exercised in good faith; provided, however, that (a) if the proceeds of any single disposition or series of related dispositions of Equipment or Property do not exceed $50,000, such proceeds may be retained by Borrowers, or (b) if (i) Term Loan B has been repaid in full, and (ii) the unpaid principal balance of Term Loan A does not exceed 75 percent of the value of the Term Loan Priority Collateral as reflected in appraisals acceptable to Agent (such appraisals to be no more than six months old), all such proceeds may be retained by Borrowers.

-88-

Any repayment of Term Loans made in accordance with this <u>Section 10.24</u> will not change the due dates or the amounts of the monthly principal payments required by <u>Section 3.1</u>.

10.25  <u>Intervention by Governmental Authority</u>.  No Borrower will permit to occur any seizure by, or the vesting of or intervention by or under the jurisdiction of, any Governmental Authority by which such Borrower's management is displaced or its authority in the conduct of its business is materially curtailed.

10.26  <u>Levy Against Loan Collateral</u>.  Except for the imposition (but not the enforcement) of Permitted Liens, no Borrower will permit any attachment, garnishment, execution, levy, distraint or similar legal process of or against Loan Collateral having a value in excess of $1,000,000, if the Excess Availability minus the value of such Loan Collateral is $4,000,000 or less, or $2,000,000, if the Excess Availability minus the value of such Loan Collateral is greater than $4,000,000.

10.27  <u>Judgments</u>.  No Borrower will permit any Judgment to be rendered against it:  (i) (a) in excess of the Judgment Amount (as defined below) (or any number of Judgments in excess in the aggregate of the Judgment Amount), or (b) which could reasonably be expected to have a Material Adverse Effect (regardless of monetary amount or insurance coverage), and (ii) which (a) has not been vacated, discharged or satisfied within 10 days of the entry thereof without the holder thereof becoming a lien creditor within the meaning of the Code or (b) if appealable by such Borrower, such Borrower: (1) has not appealed such Judgment within the time allotted for such appeal under applicable law, (2) has ceased prosecuting such appeal diligently and in good faith, (3) has not bonded or obtained a stay of such Judgment pending such appeal, or (4) the holder of such Judgment has become a lien creditor within the meaning of the Code.  For purposes of this Section, the term "Judgment Amount" means $1,000,000 in excess of any available insurance coverage, as determined by Agent in its discretion exercised in good faith, in effect to satisfy such Judgment for which the insurer has admitted in writing its liability for the full amount thereof, if, as of the date of entry of any applicable Judgment, the Excess Availability minus the amount of all such Judgments is $4,000,000 or less, and means $2,000,000 in excess of any such insurance coverage, if, as of the date of entry of any applicable Judgment, the Excess Availability minus the amount of all such Judgments is greater than $4,000,000.  For purposes of this Section, Excess Availability will be determined without taking into account any Reserve Amounts that may have been established by Agent relating directly to any such Judgments.

10.28  <u>Financial Covenants</u>.  Borrowers will observe, perform and comply with all of the Financial Covenants.

10.29  <u>Payments on and Changes to Subordinated Debt</u>.

10.29.1 <u>Payments on Subordinated Debt</u>.  No Borrower will (i) make any payment (including any principal, premium, interest, fee or charge) with respect to any Subordinated Debt except, in each instance, payments to the extent, and in the manner, expressly permitted by the applicable Subordination Agreement or (ii) repurchase, redeem or defease prior to any scheduled payment or maturity date, acquire or reacquire for value any of the Subordinated Debt.

-89-

10.29.2 Changes to Subordinated Debt Documents.   Borrowers will not seek, agree to or permit, directly or indirectly, the amendment, waiver or other change to (i) any of the terms of payment (including, principal, interest or premium provisions) of or applicable to, or the provisions governing the priority of or security for the payment and performance of the obligations under or applicable to, or acceleration, termination, or default provisions of or applicable to, any of the Subordinated Debt Documents or (ii) any other material term of or applicable to any of the Subordinated Debt Documents, in each case except as not prohibited by the applicable Subordination Agreement.   For purposes of this Section 10.29, "material" means any modification, waiver, or amendment of any of the Subordinated Debt Documents, which, in the judgment of Agent exercised in good faith, could (a) adversely affect any of Agent, LC Issuer or any Lender's rights or remedies under the Loan Documents, the value of the Loan Collateral, or Agent, LC Issuer or any Lender's security interest in or other Lien on the Loan Collateral (including the priority thereof) or (b) create or result in an Event of Default.

10.29.3 Payments on Nidiffer Note.   No Borrower shall make any payment of principal with respect to the Nidiffer Note unless: (a) no Event of Default shall have occurred and be continuing or shall result therefrom, (b) Excess Availability immediately after any such payment is at least (1) $7,500,000, if such payment is made in the period from January 1 of any calendar year until and including April 30 of such calendar year or (2) $10,000,000, if such payment is made in the period from May 1 of any calendar year until and including December 31 of such calendar year, (c) Borrowers, on a *pro forma* basis, are in compliance with the Financial Covenants immediately after any such payment, (d) Borrowers' Funded Debt to EBITDA Ratio does not exceed 3.00:1.00 immediately after any such payment, and (e) Term Loan B has been paid in full immediately preceding any such payment.

10.30   Tax Shelter Regulations.   Borrowers do not intend to treat the Credit Extensions and related transactions as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4).   If Borrowers determine to take any action inconsistent with such intention, it will promptly notify Agent thereof.   If Borrowers so notify Agent, Borrowers acknowledge that any one or more of Agent and Lenders may treat its Loans and/or its other Credit Exposure and LC Issuer may treat the issuance of Letters of Credit as part of a transaction that is subject to Treasury Regulation Section 301.6112-1, and Agent and such Lender or Lenders, and LC Issuer, as applicable, will maintain the lists and other records required by such Treasury Regulation.

10.31   Limitation on Rate Hedging Agreements.   No Borrower will at any time enter into any Rate Hedging Agreement except those listed on Schedule 10.31 without the consent of the Required Revolving Credit Lenders and the Required Term Loan Lenders.

10.32   Anti-Terrorism Laws.   Borrowers will not knowingly, and will not knowingly cause or permit any Subsidiary to, (i) conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions

-90-

set forth in Executive Order No. 13224, the USA Patriot Act or any other Anti-Terrorism Law. Borrowers shall deliver to Agent, LC Issuer and the Lenders any certification or other evidence requested from time to time by Agent, LC Issuer or the Lenders in their sole discretion confirming compliance with this Section 10.32.

10.33 <u>Express Operation</u>. Express will not conduct or engage in any business activities or operations other than the operation of retail pharmacies and activities incident thereto. Express will not acquire an interest in real property other than leases of premises used for pharmacy operations.

10.34 <u>Further Assurances</u>. Borrowers will execute and deliver or cause to be executed and delivered any and all further documents and instruments and to take any and all further actions as may be determined by Agent to be necessary or appropriate to the transactions contemplated herein or in the other Loan Documents.

11. <u>EVENTS OF DEFAULT.</u>

11.1 <u>Events of Default</u>.

(i) Each of the following events, whether or not caused by or within the control of Borrower, will constitute an "Event of Default" under this Agreement:

(a) Borrowers do not (x) pay, when due, any principal of or interest on any of the Loans within one (1) Business Day after the same become due, or (y) pay any of the other Obligations within three (3) Business Days after the same become due;

(b) (1) Borrowers do not observe, perform, or comply with any of the Financial Covenants, (2) any material provision of any of the Loan Documents ceases, for any reason, to be in full force and effect, or any Borrower or any other Person which is a party to any of the Loan Documents so asserts in writing, (3) any of the Liens created by any of the Loan Documents ceases to be enforceable in accordance with its terms with respect to any material portion of the Loan Collateral, or (4) any Loan Document ceases to be effective to grant perfected Liens on any material portion of the Loan Collateral with the priority purported or warranted to be created thereby;

(c) any Borrower does not observe, perform, or comply with any term or provision of this Agreement or of any of the other Loan Documents to which it is a party (exclusive of those defaults covered by the other clauses of this Section 11.1(i) and Section 11.1(iii));

(d) Any representation, warranty or statement made by, or on behalf of any Borrower or the Individual Guarantor, (1) in this Agreement, in connection with this Agreement, in connection with any transaction relating to this Agreement or in any of the other Loan Documents to which it is a party was false in any material respect when made or furnished or when treated as being made or furnished or (2) to induce Lenders to make any Loan or LC

-91-

Issuer to issue any Letter of Credit was false in any material respect when made or furnished or when treated as being made or furnished;

(e)     Any Borrower: (1) makes a general assignment for the benefit of creditors, or (2) calls a meeting of creditors for the composition of debts; or the Board of Directors of such Borrower (or any committee thereof) adopts a resolution authorizing or has otherwise authorized the actions described in subitems (1) or (2) of this clause (e);

(f)     (1) There is filed by any Borrower any Bankruptcy Case under any Insolvency Law, (2) an Involuntary Proceeding is commenced against any Borrower under any Insolvency Law and the Involuntary Proceeding is not controverted within 10 days, or is not dismissed within 45 days, after the commencement of the Bankruptcy Case, or (3) a custodian, receiver, trustee, sequestrator, or agent is appointed or authorized to take charge of any of any Borrower's properties;

(g)     An event has occurred or a condition exists that has a Material Adverse Effect;

(h)     There is enacted any legislation (federal, state or local) which allows any Person to obtain a Lien on any material portion of the Loan Collateral which is superior to the Liens and interests of Agent, the Lenders or LC Issuer's on and in such portion of the Loan Collateral;

(i)     There occurs an uninsured casualty loss with respect to any of the Loan Collateral having an aggregate fair market value of greater than $1,000,000, such that when the loss amount is deducted from Excess Availability as of the date of the casualty loss (or at Agent's discretion, the end of the month immediately following the casualty loss), the resulting amount is less than $4,000,000;

(j)     (1) Any default occurs and continues past any applicable cure period under the terms applicable to any Indebtedness of any Borrower in an aggregate amount exceeding $500,000 which represents any borrowing or financing from, by or with any Person, or (2) there occurs a material breach by any Borrower under any Applicable Agreement that continues past any applicable cure period, the result of which breach is to permit or cause the suspension of the other parties' performance thereunder, the delivery of a notice of acceleration, or the termination of such Applicable Agreement;

(k)     A contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA;

(l)     There is instituted against any Borrower any criminal proceeding for which forfeiture of any material asset is a potential penalty, or any Borrower is enjoined, restrained or in any way prevented by order of any Governmental Authority from conducting any material part of its business affairs and such order is not completely stayed, to the reasonable satisfaction of Agent, or dissolved within five (5) Business Days from the effective date of such order;

-92-

(m)    Any Borrower shall voluntarily dissolve or cease to exist, or any final and nonappealable order or Judgment shall be entered against Borrower decreeing its involuntary dissolution;

(n)    There occurs a Change of Control;

(o)    The audit report required pursuant to <u>Section 8.7</u> is not an unqualified audit report;

(p)    Any Borrower or any of its Subsidiaries discovers, identifies, is given notice by any Person, or otherwise has Knowledge of (1) the existence of any Environmental Liability or (2) any Release of Hazardous Substances on, about or affecting a Borrower's Facility or such Borrower's or such Subsidiary business operations, which, in each case by itself (an "<u>Environmental Default</u>") will or could reasonably be estimated to subject such Borrower or such Subsidiary to indebtedness, liability, or obligations in excess of $1,000,000, and when the amount of such indebtedness, liability and obligations is deducted from Excess Availability as of the date of such Knowledge (or at the Agent's discretion, the end of the month immediately following such Knowledge), the resulting amount is less than $4,000,000; or two or more Environmental Defaults have occurred which will or could reasonably be estimated to subject such Borrower or such Subsidiary to indebtedness, liability or obligations in excess of $5,000,000, in the aggregate over the term of this Agreement, and when the amount of such indebtedness, liability and obligations is deducted from Excess Availability as of the date of Knowledge of the last to occur of the Environmental Defaults (or at Agent's discretion, the end of the month immediately following such Knowledge), the resulting amount is less than $4,000,000;

(q)    (1) There is filed by the Individual Guarantor any Bankruptcy Case under any Insolvency Law; (2) an Involuntary Proceeding is commenced against the Individual Guarantor under any Insolvency Law and the Involuntary Proceeding is not controverted within 10 days, or is not dismissed within 60 days, after the commencement of the Involuntary Proceeding; (3) a custodian, receiver, trustee, sequestrator, or agent is appointed or authorized to take charge of the Individual Guarantor or any of the Individual Guarantor's properties; (4) the Individual Guarantor defaults under his Individual Guaranty Agreement; (5) the Individual Guarantor denies his obligation to guarantee the Guaranteed Obligations (as defined in the Individual Guaranty Agreement) or attempts to limit or terminate his obligation to guarantee the Guaranteed Obligations; (6) the Individual Guarantor is, as of any date, not Solvent; provided, however, that in determining whether the Individual Guarantor is Solvent, the Individual Guarantor's contingent liability under the Individual Guaranty Agreement shall not be taken into account with respect to any period of time during which the Agent does not have the right under Section 5.1 of the Individual Guaranty Agreement to proceed directly against the Individual Guarantor; (7) the Individual Guarantor dies; or (8) there is instituted against the Individual Guarantor any criminal proceeding for which forfeiture of any material asset is a potential penalty; unless Borrowers, within 180 days of the death of the Individual Guarantor or within 90 days after the occurrence of any of the other events described in this <u>Section 11.1(i)(q)</u>, provides collateral or other security or a substitute guarantor, which, in each case, is reasonably satisfactory to Agent.

-93-

(r)    (1)    There occurs a Subordinated Debt Default, (2) any Subordination Agreement is terminated or ceases, for any reason, to be in full force and effect, or (3) any Subordinated Creditor denies its obligations under the applicable Subordination Agreement or attempts to limit or terminate or revoke its obligations under the applicable Subordination Agreement;

(ii)    Each Event of Default will be deemed continuing until it is waived in writing by, or cured to the written satisfaction of, the Lenders in accordance with Section 14.1.

(iii)    Each Borrower shall, within three (3) Business Days after its Knowledge thereof, give notice to Agent of the occurrence of any Event of Default or any event or the existence of any condition which would be, after notice, the lapse of applicable cure periods, or the satisfaction of any other condition, an Event of Default.

11.2    Cure Periods.

(i)    Subject to Section 11.2(ii),

(a)    an event or condition of the type described in clause (c) of Section 11.1(i) (exclusive of a default arising under Sections 7.3 or 7.4, Sections 8.2, 8.3, 8.4, 8.5, 8.7, insofar as insurance coverage is no longer in effect, Sections 10.14 or 10.15, or Section 10.28) will be considered an Event of Default only if Borrowers fail to cure the default within 30 days after the earlier of (1) the date on which any Borrower has Knowledge of the existence of such event or condition or (2) the date on which Agent notifies Borrowers of the existence of such event or condition; however, if a period of cure is provided for in any of the other Loan Documents with respect to a default under such other Loan Documents, the period of cure set forth in this Section 11.2(i)(a) will not be applicable to such default;

(b)    an event or condition of the type described in clause (c) of Section 11.1(i) in connection with any default arising under Section 7.3.1, Section 7.3.2(ii), Section 7.3.3(ii), Section 7.3.3(iv), Section 7.4.2, Sections 8.3, 8.4, 8.5, 8.7, or, insofar as insurance coverage is no longer in effect, Sections 10.14 or 10.15, will be considered an Event of Default only if Borrowers fail to cure the default within three (3) Business Days after the earlier of (1) the date on which any Borrower has Knowledge of the existence of such event or condition or (2) the date on which Agent notifies Borrowers of the existence of such event or condition;

(c)    an event or condition of the type described in clause (c) of Section 11.1(i) in connection with any default arising under Section 7.3.2(i), Section 7.3.3(i), Section 7.3.3(iii), Section 7.4.1, or Section 7.4.3 will be considered an Event of Default only if Borrowers fail to cure the default within one (1) Business Day after the earlier of (1) the date on which any Borrower has Knowledge of the existence of such event or condition or (2) the date on which Agent notifies Borrowers of the existence of such event or condition; and

(d)    an event or condition of the type described in clause (g), (i), (j) or (p) of Section 11.1(i) will be considered an Event of Default only if (1) Agent shall have first given written notice thereof to Borrowers, and (2) either (A) Borrowers shall fail, within 15 days

after the delivery of such notice from Agent, to deliver a business or remediation plan to Agent which, to the Required Revolving Credit Lenders' and the Required Term Loan Lenders' sole satisfaction, shall provide an acceptable means to cure such default or (B) Borrowers fail to cure such default to Required Revolving Credit Lenders' and the Required Term Loan Lenders' sole satisfaction within 15 days after Agent gives Borrowers written approval of such remediation or business plan. Nothing in this clause (b) of <u>Section 11.2(i)</u>, however, obligates Required Revolving Credit Lenders or Required Term Loan Lenders under any circumstances to (w) support any business or remediation plan proposed by Borrowers, (x) consider any more than the original business or remediation plan proposed by Borrowers, or (y) consider any business or remediation plan proposed by Borrowers if any other Event of Default has occurred and is continuing.

(ii)    Any event which would constitute an Event of Default, but for the applicability of a Cure Period identified in <u>Section 11.2(i)</u> shall be referred to as a "<u>Potential Event of Default</u>." The Cure Periods identified in <u>Section 11.2(i)</u> will not be applicable with regard to (a) any Potential Event of Default which by its nature is not susceptible of cure, (b) a default if, within the 12 calendar months immediately preceding the occurrence of such default, any Borrower has previously breached the same provision of this Agreement, or (c) any default, as a result of which, the Required Revolving Credit Lenders or the Required Term Loan Lenders believe, in the exercise of their judgment in good faith, that there exists an immediate and material risk, threat, or danger to the value of a material portion of the Loan Collateral, Agent, LC Issuer's or the Lenders' interests in a material portion of the Loan Collateral, or the collectability of a material portion of the Obligations.

(iii)    Notwithstanding any Cure Period as provided in <u>Section 11.2(i)</u>, all of Agent's, LC Issuer's and Lenders' rights under the Loan Documents during the continuance of a Potential Event of Default, including the interest rate described in <u>Section 3.2</u> applicable during the continuance of the Potential Event of Default, will, at the Required Revolving Credit Lenders' and the Required Term Loan Lenders' option, be applicable until any such event is cured to the written satisfaction of the Required Revolving Credit Lenders and the Required Term Loan Lenders.

(iv)    Except as specifically set forth in <u>Section 11.2(i)</u>, (a) Agent shall not be obligated to give notice to any Borrower with respect to any Event of Default, and (b) Borrowers shall not have any right to cure any Event of Default which has occurred.

12.    <u>LENDERS' RIGHTS AND REMEDIES.</u>

12.1    <u>Acceleration.</u>  Upon the occurrence of any Event of Default, in addition to all other rights and remedies provided in the Loan Documents or available at law or in equity, Agent, without further notice or demand but subject to <u>Section 11.2</u>, (i) may, and will (if requested by the Required Revolving Credit Lenders and the Required Term Loan Lenders), (a) declare the Loans and all other Obligations to be immediately due and payable, whereupon the Loans and all other Obligations shall be immediately due and payable, and (b) terminate the obligation and power of LC Issuer to issue Letters of Credit and terminate all or any portion of the Commitments, and thereupon such obligations, powers and Commitments shall terminate

-95-

immediately (except that with respect to any Event of Default under Section 11.1(i)(e) or (f) (exclusive of an Involuntary Proceeding), such acceleration of the Loans and other Obligations, termination of the obligation and power of LC Issuer to issue Letters of Credit and termination of the Commitments shall be automatic), (ii) may terminate this Agreement, (iii) will have all rights to sue on the Notes and/or the Individual Guaranty Agreement, or any of them, as permitted by applicable law (provided that neither Agent or any Lender will seek a money judgment with respect to the Notes or any of the other Obligations without the consent of the Required Revolving Credit Lenders and the Required Term Loan Lenders), (iv) may, with the consent of, or shall upon the request of, the Required Revolving Credit Lenders, realize upon, and exercise Agent's, LC Issuer's and the Lenders' rights with respect to, the Revolving Loan Priority Collateral pursuant to this Agreement and the other Loan Documents, and as otherwise provided by applicable law, (v) may, with the consent of, or shall upon the request of, the Required Term Loan Lenders, realize upon, and exercise Agent's, LC Issuer's and the Lenders' rights with respect to, the Term Loan Priority Collateral pursuant to this Agreement and the other Loan Documents, as otherwise provided by applicable law, and (vi) will have the rights to avail itself of any other right or remedy available under this Agreement, the other Loan Documents and applicable law.

12.2    [Intentionally omitted.]

12.3    Fees and Expenses. In the event of any Event of Default under this Agreement, Borrowers shall pay to Agent, immediately and as part of the Obligations, on demand, all fees and expenses incurred by Agent, LC Issuer or the Lenders in connection therewith, including Attorney Fees or fees of accountants, appraisers, environmental inspectors, consultants, expert witnesses, arbitrators, mediators and court reporters. Without limiting the generality of the foregoing, Borrowers shall pay all such Attorney Fees, costs of sale, other costs and expenses incurred in connection with: (a) arbitration or other alternative dispute resolution proceedings, trial court actions and appeals; (b) bankruptcy or other insolvency proceedings of Borrowers, or either of them, or of the Individual Guarantor, or any other party liable for any of the Obligations or any party having any interest in any Loan Collateral; (c) judicial or nonjudicial foreclosure on, or appointment of a receiver for, any of the Loan Collateral; (d) post-judgment collection proceedings; (e) all claims, counterclaims, cross-claims and defenses asserted in any of the foregoing whether or not they arise out of or are related to this Agreement; (f) all preparation for any of the foregoing; and (g) all settlement negotiations with respect to any of the foregoing.

12.4    Actions in Respect of Letters of Credit. If any Event of Default shall have occurred and be continuing, Agent may, whether in addition to taking any of the actions described in Section 12.1 or otherwise, make demand upon Borrowers to, and forthwith upon such demand Borrowers will, pay to Agent in same day funds at Agent's office designated in such demand, for deposit in the Letter of Credit Collateral Account, an amount equal to 105% of the Letter of Credit Exposure from time to time in existence. On each drawing under a Letter of Credit, Agent may, at Agent's option apply amounts then on deposit in the Letter of Credit Collateral Account as payment to reimburse such drawing; however, if (i) no amounts are then on deposit in the Letter of Credit Collateral Account, (ii) the amount then on deposit in the Letter of Credit Collateral Account is insufficient to pay the amount of such drawing, or (iii) Agent is legally prevented or restrained from immediately applying amounts on deposit in the Letter of

Credit Collateral Account, then the amount of each unreimbursed drawing under such Letter of Credit and payment required to be made under this Section 12.4 shall automatically be converted into a Revolving Loan made on the date of such drawing for all purposes of this Agreement. To the extent that Agent applies amounts on deposit in the Letter of Credit Collateral Account as provided in this Section 12.4, and, thereafter, such application (or any portion thereof) is rescinded or any amount so applied must otherwise be returned by Agent upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, then the amount so rescinded or returned shall automatically be converted into a Revolving Loan made on the date of such drawing for all purposes of this Agreement.

12.5    Other Secured Agreements.  If any Event of Default shall have occurred and be continuing, Agent may with the consent of the Lender a party to such agreement, declare each Rate Hedging Agreement between a Borrower and a Lender to be terminated, whereupon each such agreement shall be terminated; provided, however, that the Agent shall not be obligated to take any of the actions specified in this Section. Each of the Lenders acknowledges that in the event that such Lender does not consent to the termination of the Rate Hedging Agreement to which it is a party, the election and enforcement of certain remedies under the other Loan Documents could preclude a subsequent enforcement of rights and remedies under the Rate Hedging Agreement to which it is a party, it being understood that a non-judicial foreclosure sale pursuant to the Loan Documents could destroy, by operation of California Code of Civil Procedure Section 580d, all rights of any party to a deficiency judgment against the Borrowers and, as a consequence, could destroy all rights that each such Lender would otherwise have to proceed against a Borrower under any such Rate Hedging Agreement. Each Lender agrees that in no event shall Agent have any liability to such Lender for any losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of such Lender being precluded from the enforcement of rights or remedies under the Rate Hedging Agreement to which it is a party as a result of the election or enforcement of any remedy or remedies under the other Loan Documents.

12.6    Instructions Regarding Loan Collateral.  Subject to the provisions of Section 14.1 hereof and subject to Agent's rights under Section 13, (a) the Required Revolving Credit Lenders shall have the exclusive right to issue instructions to Agent with respect to the management, performance, enforcement and the taking of action with respect to the Revolving Loan Priority Collateral, to instruct Agent to exercise and enforce all privileges and rights thereunder including the right to take or retake control or possession of such Collateral and to hold, prepare for sale, process, sell, lease, dispose of, or liquidate such Collateral, and (b) the Required Term Loan Lenders shall have the exclusive right to issue instructions to Agent with respect to the management, performance, enforcement and the taking of action with respect to the Term Loan Priority Collateral, to instruct Agent to exercise and enforce all privileges and rights thereunder including the right to take or retake control or possession of such Collateral and to hold, prepare for sale, process, sell, lease, dispose of, or liquidate such Collateral.

12.7    Application of Payments.  Following the occurrence of an Event of Default and acceleration of the Loans, all payments shall be remitted to Agent, and all such payments and all proceeds of Loan Collateral received by Agent, shall be applied as set forth in this Section 12.7. If Agent is uncertain as to the proper application of payments or proceeds of the Loan Collateral,

DWT 13644165v19 0017787-000222

or if any dispute or disagreement shall arise with respect thereto, Agent may interplead such payments or proceeds in any court of competent jurisdiction. Agent shall not be liable for any application of amounts made by it in good faith and, if any such application is subsequently determined to have been made in error, the sole recourse of any Lender or other Person to which such amount should have been made shall be to recover the amount from the Person that actually received it (and, if such amount was received by any Lender, such Lender hereby agrees to return it). No application of funds pursuant to this <u>Section 12.7</u> shall be treated as a setoff unless specifically elected by Agent.

12.7.1 <u>Application of Proceeds of Revolving Loan Priority Collateral</u>. All proceeds of Revolving Loan Priority Collateral received by Agent shall be applied as follows:

(a) <u>first</u>, to pay any Revolving Loan Priority Collateral Agent Advances or Interim Advances, interest, fees, expenses or indemnities due to Agent under the Loan Documents, until paid in full;

(b) <u>second</u>, to pay any Letter of Credit Obligations (including any unsatisfied obligation of Borrowers to make any deposit in the Letter of Credit Collateral Account), fees, expenses or indemnities then due to LC Issuer under the Loan Documents, until paid in full;

(c) <u>third</u>, to pay any expenses or indemnities then due to any or all of the Lenders under the Loan Documents, until paid in full;

(d) <u>fourth</u>, to pay any fees then due to any or all of the Lenders under the Loan Documents, including fees and premiums with respect to any Rate Hedging Agreement, until paid in full;

(e) <u>fifth</u>, to pay interest due to any or all of the Revolving Credit Lenders under the Loan Documents in respect of the Revolving Loans and, with respect to any Rate Hedging Agreement with a Revolving Credit Lender, any premiums, scheduled periodic payments and any interest thereon, in each case until paid in full;

(f) <u>sixth</u>, to pay any other Obligations due to the Revolving Credit Lenders (in their capacity as such) until paid in full, including principal of the Revolving Loans, ratably in accordance with their respective Revolving Credit Commitment Percentages;

(g) <u>seventh</u>, to pay any Agent Advances that are not Revolving Loan Priority Collateral Agent Advances due to Agent under the Loan Documents, until paid in full;

(h) <u>eighth</u>, to pay interest due to any or all of the Term Loan Lenders under the Loan Documents in respect of the Term Loans, and with respect to any Rate Hedging Agreement with a Revolving Credit Lender, any premiums, scheduled periodic payments and any interest thereon, in each case until paid in full;

DWT 13644165v19 0017787-000222

(i)      ninth, to pay any other Obligations due to the Term Loan Lenders (in their capacity as such) until paid in full, including principal of the Term Loans, ratably in accordance with their respective Term Loan Commitments;

(j)      tenth, with respect to any Rate Hedging Agreement, to pay any breakage, termination or payment due under such Rate Hedging Agreement to the Lenders, until paid in full; and

(k)      eleventh, to Borrowers or such other Person entitled thereto under applicable law.

12.7.2  Application of Proceeds of Term Loan Priority Collateral.  All proceeds of Term Loan Priority Collateral received by Agent shall be applied as follows:

(a)      first, to pay any Term Loan Priority Collateral Agent Advances, interest, fees, expenses or indemnities due to Agent under the Loan Documents, until paid in full;

(b)      second, to pay any expenses or indemnities then due to any or all of the Lenders under the Loan Documents, until paid in full;

(c)      third, to pay any fees then due to any or all of the Lenders under the Loan Documents, including fees and premiums with respect to any Rate Hedging Agreement, until paid in full;

(d)      fourth, to pay interest due to any or all of the Term Loan Lenders under the Loan Documents in respect of the Term Loans, and with respect to any Rate Hedging Agreement with a Revolving Credit Lender, any premiums, scheduled periodic payments and any interest thereon, in each case until paid in full;

(e)      fifth, to pay any other Obligations due to the Term Loan Lenders (in their capacity as such) until paid in full, including principal of the Term Loans, ratably in accordance with their respective Term Loan Commitments;

(f)      sixth, to pay any Letter of Credit Obligations (including any unsatisfied obligation of Borrowers to make any deposit in the Letter of Credit Collateral Account), fees, expenses or indemnities then due to LC Issuer under the Loan Documents, until paid in full;

(g)      seventh, to pay any Interim Advances and any Agent Advances that are not Term Loan Priority Collateral Agent Advances, until paid in full;

(h)      eighth, to pay interest due to any or all of the Revolving Credit Lenders under the Loan Documents in respect of the Obligations and, with respect to any Rate Hedging Agreement with a Revolving Credit Lender, any premiums, scheduled periodic payments and any interest thereon, in each case until paid in full;

DWT 13644165v19 0017787-000222

(i)    ninth, to pay any other Obligations due to the Revolving Credit Lenders (in their capacity as such) until paid in full, including principal of the Revolving Loans, ratably in accordance with their respective Revolving Credit Commitment Percentages;

(j)    tenth, with respect to any Rate Hedging Agreement, to pay any breakage, termination or payment due under such Rate Hedging Agreement to the Lenders, until paid in full; and

(k)    eleventh, to Borrowers or such other Person entitled thereto under applicable law.

12.7.3 Application of Payments under Individual Guaranty Agreement. Any payments received by Agent with respect to the Individual Guaranty Agreement shall be applied as follows:

(a)    first, to pay any Agent Advances made in connection with the enforcement of the Individual Guaranty Agreement, until paid in full;

(b)    second, to pay interest due to any or all of the Term Loan B Lenders under the Loan Documents in respect of Term Loan B and, with respect to any Rate Hedging Agreement relating to Term Loan B, any premiums, scheduled periodic payments and any interest thereon, until paid in full;

(c)    third, to pay the principal of and other Obligations relating to Term Loan B due to the Term Loan B Lenders until paid in full, ratably in accordance with their respective Term Loan B Commitments;

(d)    fourth, with respect to any Rate Hedging Agreement relating to Term Loan B, to pay any breakage, termination or payment due under such Rate Hedging Agreement to the Term Loan B Lenders, until paid in full; and

(e)    fifth, to the Individual Guarantor or such other Person entitled thereto under applicable law.

12.7.4 Application of Other Payments. Any payments received by Agent and not described in Section 12.7.1, Section 12.7.2 or Section 12.7.3 above shall be applied as follows:

(a)    first, to pay any Agent Advances or Interim Advances, interest, fees, expenses or indemnities due to Agent under the Loan Documents, until paid in full;

(b)    second, to pay any Letter of Credit Obligations, fees, expenses or indemnities then due to LC Issuer under the Loan Documents, until paid in full;

(c)    third, to pay any expenses or indemnities then due to any or all of the Lenders under the Loan Documents, until paid in full;

DWT 13644165v19 0017787-000222

(d)    fourth, to pay any fees then due to any or all of the Lenders under the Loan Documents, including fees and premiums with respect to any Rate Hedging Agreement, until paid in full;

(e)    fifth, to pay interest due to any or all of the Lenders under the Loan Documents in respect of the Obligations and, with respect to any Rate Hedging Agreement, any premiums, scheduled periodic payments and any interest thereon;

(f)    sixth, to pay any other Obligations due to the Lenders until paid in full, including principal of the Loans, ratably in accordance with their Total Exposure Percentage;

(g)    seventh, with respect to any Rate Hedging Agreement, to pay any breakage, termination or payment due under such Rate Hedging Agreement to the Lenders; and

(h)    eighth, to Borrowers or such other Person entitled thereto under applicable law.

13.    AGENT.

13.1    Appointment. Each Lender and LC Issuer hereby irrevocably designates and appoints U.S. Bank, as the contractual representative of each Lender and LC Issuer under this Agreement and the other Loan Documents (in such capacity, the "Agent"). Each Lender and LC Issuer irrevocably authorizes U.S. Bank, as agent for each Lender and LC Issuer, to take any and all actions on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise any and all powers and perform any and all duties as are expressly delegated to Agent by the terms of this Agreement and the other Loan Documents together with any and all other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, Agent will not have any duties or responsibilities except those expressly set forth in this Agreement or any fiduciary relationship with any Lender or LC Issuer, and no implied covenants, functions, responsibilities, duties, obligations or liabilities may be read into this Agreement or any other Loan Document or otherwise exist against Agent. Each Lender and LC Issuer authorizes and directs Agent, on behalf the Lenders and LC Issuer, to enter into each of the Loan Documents. Each Lender agrees that it will be bound by and subject to any obligations of Lenders under the Subordination Agreements, as if it were a party thereto.

13.2    Delegation of Duties. Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents, contractors, or attorneys-in-fact and will be entitled to advice of counsel concerning all matters pertaining to those duties. Agent will not be responsible for the negligence or misconduct of any agents, contractors, or attorneys-in-fact selected by it in good faith.

13.3    Exculpatory Provisions. Neither Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates may be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent of any direct damages suffered from its or such

-101-

Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders or LC Issuer (a) for any recitals, statements, representations or warranties made by Borrowers or any officer or agent of a Borrower contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document or electronic transmission referred to, or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, (b) for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, (c) the value of the Loan Collateral, the perfection or priority of any interest of Agent, the Lenders or LC Issuer in the Loan Collateral purported to be created or perfected by the Loan Documents, or with respect to rights and interests pertaining to the Loan Documents, (d) for any failure of any Borrower to perform its obligations under this Agreement or any other Loan Document, (e) for any loss or depreciation of, lack of insurance on, or failure to realize on, any Loan Collateral or for the failure or delay in collecting or receiving payment of any sums from Borrower, or for any mistake, omission, or error of judgment in passing upon or accepting any Loan Collateral, or in the making of any examination, or for granting extensions or indulgences to Borrowers permitted to be made hereunder, (f) for any apportionment or distributions of payments made by it pursuant to Section 4 or Section 12.7 hereof, absent gross negligence or willful misconduct or, (g) with respect to the income or withholding Tax status with respect to any interest on, or fees in respect of, the Loans. Agent will not be under any obligation to any Lender or LC Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of Borrowers.

13.4 Reliance by Agent. Agent will be entitled to rely, and will be fully protected in relying, on any agreement, instrument, writing, resolution, notice, consent, certificate, affidavit, letter, facsimile, telex, teletype, or email message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and on advice and statements of legal counsel (including counsel to Borrowers), independent accountants and other experts selected by Agent. Agent may deem and treat each Lender as the owner of its Loans for all purposes unless an assignment thereof has been made in accordance with the terms of this Agreement. As to any matters not expressly provided for by this Agreement and the other Loan Documents (including enforcement and collection of the Notes), Agent may, but shall not be required to, exercise any discretion or take any action, but Agent shall, subject to the terms of this Agreement, be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) (a) in respect to matters described in clause (a) of Section 12.6 hereof upon the instructions of the Required Revolving Credit Lenders, (b) in respect to matters described in clause (b) of Section 12.6 hereof upon the instructions of the Required Term Loan Lenders, and (c) in respect to any other matters, upon the instructions of the Required Revolving Credit Lenders and the Required Term Loan Lenders, in each case whenever such instruction shall be requested by Agent or required hereunder, or a greater or lesser number of the Lenders if so required hereunder, and such instructions shall be binding upon all Lenders and all future holders of the Obligations; provided, that Agent will be fully justified as between itself and the Lenders and LC Issuer in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent has first received such advice or concurrence of the Required Revolving Credit Lenders

-102-

and the Required Term Loan Lenders as Agent deems appropriate or Agent has been first indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Without limiting the foregoing, (i) Agent shall not be required to comply with any direction of the Required Term Loan Lenders to sell or dispose of any Property unless and until Agent has made arrangements satisfactory to the Required Revolving Credit Lenders for access to such Property for purposes of taking possession, holding, preparing for sale and selling any Revolving Loan Priority Collateral remaining on such Property following such sale or disposition, and (ii) Agent shall not be required to accept a deed in lieu of foreclosure with respect to any Property or accept any Loan Collateral in full or partial satisfaction of the Obligations without the consent of the Required Revolving Credit Lenders and the Required Term Loan Lenders.

13.5   Notice of Default. Agent will be deemed not to have knowledge or notice of the occurrence of any Event of Default unless Agent has received notice from a Lender or Borrowers referring to this Agreement, describing the Event of Default and stating that the notice is a "notice of default". If Agent receives such a notice, Agent will give notice thereof to the Lenders. Subject to the terms of this Agreement, Agent will take such action reasonably promptly with respect to such Event of Default as is reasonably directed by the Required Revolving Credit Lenders and the Required Term Loan Lenders; *however*, unless and until Agent has received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it believes advisable in the best interests of the Lenders. Notwithstanding anything to the contrary in this Section 13, at no time will Agent be required under any circumstance to take any action that, in its sole and absolute judgment, (i) is contrary to the terms of the Loan Documents or applicable law, or (ii) would expose Agent to liability.

13.6   Non-Reliance on Agent and Other Lenders. Each Lender and LC Issuer expressly acknowledges that neither Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to any Lender or LC Issuer and that no act by Agent in the future taken, including any review of the affairs of Borrowers, will be deemed to constitute any representation or warranty by Agent to any Lender or LC Issuer. Each Lender and LC Issuer represents to Agent that the Lender and LC Issuer has, independently and without reliance on Agent or any other Lender, and based on such documents and information as the Lender or LC Issuer has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of Borrowers and Loan Collateral and made its own decision to make its Credit Extensions under this Agreement and enter into this Agreement. Each Lender and LC Issuer also represents that it will, independently and without reliance on Agent or any other Lender, and based on such documents and information as each Lender or LC Issuer deems appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrowers. Each Lender shall be entitled to grant or withhold its consent with respect to any matter requiring the consent of any number of Lenders hereunder in its sole and absolute discretion, without liability to any other Lenders.

13.7    Indemnification. The Lenders will indemnify Agent in its capacity as such (to the extent not reimbursed by Borrowers and without limiting the obligation of Borrowers to do so), ratably according to their Total Exposure Percentage in effect on the date on which indemnification is sought under this Section 13.7 (or, if indemnification is sought after the date on which the Revolving Credit Commitments have terminated and the Loans shall have been paid in full, ratably in accordance with their Total Exposure Percentage immediately before that date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including at any time following the payment of the Obligations) be imposed on, incurred by or asserted against Agent in any way relating to or arising out of this Agreement, any of the other Loan Documents or any documents contemplated by or referred to in this Agreement or in any of the other Loan Documents or the transactions contemplated by this Agreement or by any of the other Loan Documents or any action taken or omitted by Agent under or in connection with any of the foregoing; *provided* that (a) a Lender will not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent resulting from Agent's gross negligence or willful misconduct so long as the Lender had no part in such action or omission by Agent and did not receive any benefit from such action or omission by Agent; (b) a Revolving Credit Lender will not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent resulting from or arising out of Agent's compliance with request or direction of the Required Term Loan Lenders with respect to the Term Loan Priority Collateral, so long as the Revolving Credit Lender had no part in such action or omission by Agent and did not receive any benefit from such action or omission by Agent; and (c) a Term Loan Lender will not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent resulting from or arising out of Agent's compliance with request or direction of the Required Revolving Credit Lenders with respect to the Revolving Loan Priority Collateral, so long as the Term Loan Lender had no part in such action or omission by Agent and did not receive any benefit from such action or omission by Agent. The agreements in this Section 13.7 will survive the payment of the Obligations.

13.8    Agent in Its Individual Capacity. Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with Borrowers and their Affiliates as though Agent were not an agent under this Agreement and under the other Loan Documents. With respect to its Loans made or renewed by it, Agent will have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not Agent, and the terms "Lender" and "Lenders" will include Agent in its individual capacity.

13.9    Resignation of Agent. Agent may resign as Agent on 30 days advance notice to the Lenders, Borrowers and LC Issuer and will resign as Agent if U.S. Bank, in its capacity as a Lender, no longer has any Loans outstanding. If Agent resigns as Agent under this Agreement and the other Loan Documents, then the Required Revolving Credit Lenders and the Required Term Loan Lenders will, within 30 days after notice of Agent's resignation, appoint from among the Lenders a successor agent for the Lenders, which, unless an Event of Default has occurred

DWT 13644165v19 0017787-000222

and is continuing, successor agent must be approved by Borrowers (which approval shall not be unreasonably withheld, delayed or conditioned), whereupon (i) such successor agent will succeed to the rights, powers and duties of Agent, (ii) the term "Agent" will mean such successor agent effective on such appointment and approval, and (iii) the former Agent's rights, powers and duties as Agent will be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Obligations; *however*, if a successor agent has not so been appointed within that 30 day period, the retiring Agent will have the right to appoint a successor agent, which shall be a commercial bank organized under the laws of the United States of America or of any state thereof and having a combined capital and surplus of at least $500,000,000 who will serve as "Agent" until the time, if ever, as the Required Revolving Credit Lenders and the Required Term Loan Lenders appoint a successor Agent as provided in this Section 13.9. After any retiring Agent's resignation as Agent, (a) the provisions of this Section 13 will inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents and (b) the retiring Agent will be relieved of all further duties and obligations as Agent.

13.10    Loan Collateral Matters.

13.10.1Perfection/Enforcement Actions.    Agent will hold the Loan Collateral under the Security Documents as agent for the benefit of Agent, the LC Issuer and Lenders, subject to the terms of this Agreement and the Security Documents. Agent is hereby authorized on behalf of all of the Lenders and LC Issuer, without the necessity of any notice to or further consent from any Lender or the LC Issuer, from time to time, to take any action with respect to any Loan Collateral which may be necessary or desirable to perfect and maintain perfected the security interest in and Liens on the Loan Collateral granted pursuant to the Loan Documents. Payment and performance of the Obligations under this Agreement and the other Loan Documents may be enforced only by the action of Agent, and no Lender or LC Issuer will have any right individually to seek to enforce or to enforce payment or performance of the Obligations or this Agreement or the Security Documents, it being understood and agreed that such rights and remedies may be exercised only by Agent, for the benefit of Agent, LC Issuer and the Lenders, upon the terms of this Agreement and the Security Documents.

13.10.2Release of Loan Collateral. The Lenders and LC Issuer hereby authorize Agent, at its option and in its discretion, to release any Agent's Liens on any Loan Collateral (i) on termination of the Commitments and payment and satisfaction of all of the Obligations (and all Letters of Credit have been cancelled and returned to LC Issuer) at any time arising under or in respect of this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, (ii) constituting property in which a Borrower did not own an interest at the time the Lien was granted to Agent, (iii) to the extent required to effect any sale or other disposition of any Loan Collateral in connection with any exercise of remedies of Agent and Lenders pursuant to the Loan Documents, (iv) owned by or leased to a Borrower or any of its Subsidiaries which is subject to a purchase money security interest or which is the subject of a capital lease, in either case, entered into pursuant to Section 10.10(i)(e), (v) constituting property leased to a Borrower under a lease which has expired or been terminated in a transaction permitted under this Agreement or is about to expire and which has not been, and is not intended

-105-

by a Borrower to be, renewed or extended, or (vi) in connection with a Borrower's disposition of such Loan Collateral as permitted by Section 10.24.  On request by Agent at any time, the Lenders and LC Issuer will confirm in writing Agent's authority to release particular types or items of Loan Collateral pursuant to this Section 13.10.  In the event of any sale or transfer of Loan Collateral, or any foreclosure with respect to any of the Loan Collateral, Agent is authorized to deduct all of the expenses incurred by Agent from the proceeds of any such sale, transfer or foreclosure.

13.10.3 Automatic Release of Loan Collateral.  The Lenders and LC Issuer hereby agree that Agent's Liens in any property sold or disposed of in accordance with the provisions of Section 10.24 will, if no Event of Default has occurred and is then continuing, be automatically released.

13.10.4 Execution of Release Documents.  To the extent, pursuant to the provisions of Sections 13.10.2 and 13.10.3, Agent's execution of a direction to release is required to release Agent's Liens on any sale and transfer of Loan Collateral which is expressly permitted pursuant to the terms of this Agreement, or consented to in writing as required by Section 14.1, and on at least five (5) Business Days prior written request by Borrowers, Agent will (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to release of Agent's Liens in the Loan Documents on the Loan Collateral that was sold or transferred; *provided* that (i) Agent will not be required to execute any such document on terms which, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty and (ii) such release will not in any manner discharge, affect or impair the Obligations or any Liens on (or obligations of Borrowers in respect of) all interests retained by Borrowers, including the proceeds of the sale, all of which will continue to constitute part of the Loan Collateral.

13.10.5 Agency for Perfection by Possession.  Each Lender and LC Issuer are hereby appointed as agent of Agent for the purpose of perfecting Agent's Liens on property which, in accordance with the UCC or other applicable law, can be perfected only by possession or control.  Should any Lender or LC Issuer (other than Agent but inclusive of any Lender's Participant) obtain possession of any collateral or security for the Obligations, that Lender or LC Issuer will notify Agent and, promptly on Agent's request, that Lender or LC Issuer will deliver the collateral to Agent or in accordance with Agent's instructions.

13.10.6 Agent Expenditures.

(i)     Subject to the limitations set forth in this Section 13.10.6, Agent is hereby authorized by Borrowers and the Lenders, from time to time in Agent's discretion, (a) if an Event of Default has occurred and is continuing, or (b) at any time that any of the other applicable conditions precedent set forth in Section 5.2 have not been satisfied, to make Agent Advances; *provided* that (x) the Required Revolving Credit Lenders may at any time revoke Agent's authorization contained in this Section 13.10.6 to make the Agent Advances for the purposes described in clauses (i) or (iii) of the definition of Agent Advances with respect to the Revolving Loan Priority Collateral ("Revolving Loan Priority Collateral Agent Advances"), (y) the Required Term Loan Lenders may at any time revoke Agent's authorization contained in this

-106-

Section 13.10.6 to make the Agent Advances for the purposes described in clauses (i) or (iii) of the definition of Agent Advances with respect to the Term Loan Priority Collateral ("Term Loan Priority Collateral Agent Advances"), and (z) the Required Revolving Credit Lenders and the Required Term Loan Lenders may at any time revoke Agent's authorization contained in this Section 13.10.6 to make any other Agent Advances, any such revocation to be in writing and to become effective prospectively upon Agent's receipt thereof. Agent shall promptly notify each Lender in writing of each such Agent Advance. Each Agent Advance will be evidenced solely by entries upon Agent's books and records.

(ii)     Each Agent Advance shall be secured by the Loan Collateral and shall constitute a Loan and an Obligation bearing interest at the Default Rate specified in Section 3.2.1(iii) for an Obligation which would have borne interest under Section 3.2.1(ii) at the Applicable LIBOR Rate Margin for all other Obligations (including Agent Advances) plus the LIBOR Rate. No part of any Agent Advance may, on the repayment thereof, be redrawn or reborrowed by Borrowers.

(iii)     By the making of an Agent Advance and without any further action on the part of Agent or the Lenders, Agent hereby grants to each Lender, and each Lender hereby acquires from Agent, a participation in such Agent Advance equal to such Lender's Agent Advance Exposure Percentage of such Agent Advance. In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to Agent, for the account of Agent, such Lender's Agent Advance Exposure Percentage of each Agent Advance, or of any payment on an Agent Advance required to be refunded to Borrowers for any reason. Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Agent Advances is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of an Event of Default, the failure of any condition in Section 5 to be satisfied, or any reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Following receipt by Agent of any payment by Borrowers in respect of any Agent Advance, Agent shall apply such payments to such Agent Advance and, to the extent that the Lenders have made payments pursuant to this Section 13.10.6(iii) to Agent, then to Agent and such Lenders, as their interest may appear. The purchase of participations in any Agent Advance pursuant to this Section 13.10.6(iii) shall not relieve Borrowers of any default in the payment thereof.

13.11   Overadvances.   Notwithstanding anything to the contrary in this Agreement, Borrowers and the Lenders agree that Agent in its sole discretion may, but shall not be obligated to, elect on behalf of the Lenders, on one or more occasions, to exceed the limits of the Borrowing Base and thereby increase the Revolving Credit Availability by such amount from time to time (each Revolving Loan resulting therefrom, an "Overadvance"); *provided* that (i) no Overadvance shall be for a period longer than 30 days and (ii) all such Overadvances outstanding as of any date shall not exceed an amount equal to $1,000,000 in the aggregate (Overadvances meeting those conditions, being "Permitted Overadvances"). All Overadvances shall constitute Revolving Loans for all purposes of this Agreement. The making of any Overadvance shall not constitute a waiver by Agent, LC Issuer or the Lenders of their right to refuse the making of any further Credit Extensions at any time any Overadvance exists.

13.12  No Third Party Beneficiary.  The provisions of this Section 13 are solely for the benefit of Agent, the Lenders, and LC Issuer, and Borrowers will not have any rights as a third party beneficiary of any of the provisions of this Section 13.  In performing its functions and duties as Agent under this Agreement and the other Loan Documents, Agent acts solely as the agent of the Lenders and LC Issuer and does not assume and will not be deemed to have assumed any obligation toward, or relationship of agency or trust with or for, Borrowers or any Affiliate of any Borrower.

13.13  No Reliance on Agent's Customer Identification Program.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA Patriot Act or the regulations thereunder, including the regulations contained in 31 C.F.R. Section 103.121 (as hereafter amended, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with Borrowers, their respective Affiliates or their agents, this Agreement or the Loan Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or such other laws.

13.14  USA Patriot Act.  Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA Patriot Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign Lender that maintains a physical presence in the United States or foreign county, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign Lender) shall deliver to the Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA Patriot Act and the applicable regulations: (1) within 10 days after the Closing Date, and (2) as such other times as are required under the USA Patriot Act.

13.15  Cash Management Services.  No Lender (other than U.S. Bank) will agree or arrange with a Borrower to provide Cash Management Services to such Borrower without the prior written consent of Agent.

14.    AMENDMENTS; WAIVERS; ASSIGNMENTS; PARTICIPATIONS

14.1    Amendments and Waivers.

14.1.1  Amendments Permitted by Consent of Required Lenders.

(i)      Neither this Agreement nor the other Loan Documents may be amended, supplemented or modified except in writing and in accordance with the provisions of this Section 14.1.    Agent may, with the consents of the LC Issuer and the Lenders as described in this Section 14.1.1, from time to time (a) enter into with Borrowers written amendments, supplements or modifications to this Agreement and the other Loan Documents or (b) waive at

-108-

Borrowers' request, on the terms and conditions as may be specified in the applicable instrument of waiver, any of the requirements of this Agreement or the other Loan Documents or any Event of Default and its consequences.

(ii)     So long as no Event of Default has occurred and is continuing, any such amendment, supplement, modification or waiver described in <u>Section 14.1.2</u> shall require the consent of the affected Lenders (or LC Issuer) as described in <u>Section 14.1.2</u>.

(iii)     If an Event of Default has occurred and is continuing, any such amendment, supplement, modification or waiver described in <u>Section 14.1.2</u> shall require the consent of the affected Lenders (or LC Issuer) as described in <u>Section 14.1.2</u>, and the consent of the Required Revolving Credit Lenders and the Required Term Loan Lenders.

(iv)     Any such amendment, supplement, modification or waiver not described in <u>Section 14.1.2</u> shall require the consent of the Required Revolving Credit Lenders and the Required Term Loan Lenders.

(v)     Notwithstanding anything to the contrary contained in this <u>Section 14.1.1</u>, for purposes of this <u>Section 14.1</u>, a waiver, amendment, supplement, or modification of a Rate Hedging Agreement, if between a Borrower and any Lender, will require only the consent of such Borrower and the Lender party thereto notwithstanding that such Rate Hedging Agreement is a Loan Document, and a waiver, amendment, supplement or modification of any contract or agreement relating to Cash Management Services provided by U.S. Bank shall require only the consent of Borrowers and U.S. Bank.

14.1.2   <u>Amendments Permitted by Consent of Affected Parties</u>.

(i)     <u>Consent of All Revolving Credit Lenders</u>.  No proposed waiver and no amendment, supplement or modification of this Agreement or any of the other Loan Documents may be agreed to in each case without the consent of all Revolving Credit Lenders if the waiver, amendment, supplement, or modification would:

(a)     reduce the amount of, or extend the time for payment of, any payment of principal or interest due under this Agreement with respect to Revolving Loans exclusive of any decrease in interest resulting from the cancellation of the Default Rate,

(b)     reduce the stated rate of any interest or fee (except as provided in Section 14.1.2(iv)(b)) payable under this Agreement or any other Loan Document to the Revolving Credit Lenders,

(c)     increase the aggregate Revolving Credit Commitments exclusive of any increase which may result from a Permitted Overadvance or Agent Advance,

(d)     waive any requirement for the reduction or termination of any of the Revolving Credit Commitments (it being understood that a waiver of an Event of Default will not constitute a change in the terms of any Revolving Credit Commitment of any Revolving Credit Lender),

-109-

(e)     extend the scheduled Revolving Loan Maturity Date,

(f)     release any Revolving Loan Priority Collateral from the Liens created by the Loan Documents except as expressly permitted by Section 13.10,

(g)     reduce the percentage specified in the definition of Required Revolving Credit Lenders,

(h)     reduce the amount of, or extend the time for payment of the Unused Commitment Fee or the Applicable LOC Fee or reduce the stated rate of the Unused Commitment Fee or the Applicable LOC Fee payable under this Agreement, or

(i)     increase any Advance Rate above that amount expressly stated to be the maximum thereof in the definition of "Advance Rate" or "Borrowing Base" (exclusive of any increase which, in any instance, may result from a Permitted Overadvance).

Notwithstanding the foregoing, no increase in the Commitments of any Revolving Credit Lender over the amount of the applicable Revolving Credit Commitment then in effect exclusive of any increase which may result from a Permitted Overadvance or Agent Advance (it being understood that a waiver of an Event of Default will not constitute a change in the terms of any Revolving Credit Commitment of any Revolving Credit Lender) may be made without the consent of such Lender.

(ii)     Consent of All Term Loan Lenders.  No proposed waiver and no amendment, supplement or modification of this Agreement or any of the other Loan Documents may be agreed to in each case without the consent of all Term Loan Lenders if the waiver, amendment, supplement, or modification would:

(a)     reduce the amount of, or extend the time for payment of, any payment of principal or interest due under this Agreement with respect to Term Loans exclusive of any decrease in interest resulting from the cancellation of the Default Rate,

(b)     reduce the stated rate of any interest or fee (except as provided in Section 14.1.2(iv)(b) payable under this Agreement or any other Loan Document to the Term Loan Lenders,

(c)     increase the aggregate Term Loan Commitments exclusive of any increase which may result from an Agent Advance,

(d)     waive any requirement for the prepayment of Term Loans (it being understood that a waiver of an Event of Default will not constitute a change in the terms of prepayment of any Term Loan),

(e)     extend the scheduled Term Loan A Maturity Date or Term Loan B Maturity Date,

-110-

(f)     or reduce the percentage specified in the definition of Required Term Loan Lenders, or

(g)     release any Term Loan Priority Collateral except as expressly permitted by Section 13.10.

Notwithstanding the foregoing, no increase in the Commitments of any Term Loan Lender over the amount of the applicable Term Loan Commitment then in effect exclusive of any increase which may result from an Agent Advance (it being understood that a waiver of an Event of Default will not constitute a change in the terms of any Term Loan Commitment of any Term Loan Lender), may be made without the consent of such Lender.

(iii)    Consent of All Lenders. No proposed waiver and no amendment, supplement or modification of this Agreement or any of the other Loan Documents may be agreed to in each case without the consent of all Lenders if the waiver, amendment, supplement, or modification would:

(a)     amend, modify or waive any provision of this Section 14.1,

(b)     amend, modify or waive any provision of Section 4.3.1 or Section 12.7, or

(c)     permit a Borrower or the Individual Guarantor to assign, transfer or dispose of any of its rights or obligations under any Loan Document.

(iv)    Consent of Other Affected Parties. No proposed waiver and no amendment, supplement or modification of this Agreement or any of the other Loan Documents may be agreed to in each case without the consent of the party identified below if the waiver, amendment, supplement, or modification would:

(a)     amend, modify or waive any provision of Section 13 or of any other provision relating to the rights or obligations of the then Agent without the written consent of the then Agent,

(b)     amend, modify or waive any provision relating to LC Issuer without the consent of LC Issuer, or

(c)     release any Borrower except as expressly permitted herein or in the other Loan Documents, without the written consent of all Lenders, or release the Individual Guarantor except as expressly permitted herein or in the other Loan Documents, without the written consent of all Term Loan B Lenders.

In each case above, the required consent of all or any of the Lenders shall be exclusive of a Defaulting Lender. Notwithstanding the fact that the consent of all the Lenders is required in certain circumstances as set forth above, (I) each Lender acknowledges that the provisions of Section 1126(c) of The Bankruptcy Code of 1978, as amended, 11 U.S.C. § 101 *et seq.*, as amended, supersedes the unanimous consent provisions set forth herein and (II) the

-111-

Required Revolving Credit Lenders may consent to allow a Borrower to use cash collateral in the context of a Bankruptcy Case.

14.1.3 <u>Consent Matters.</u>

(i)    If (a) Agent requests a Lender's written consent to any proposed waiver (including any waiver of any Event of Default), amendment, supplement or modification of this Agreement or any of the other Loan Documents pursuant to <u>Sections 14.1.1</u> or <u>14.1.2</u> or for any other matter relating to the Obligations or any of the Loan Documents and (b) the Lender does not notify Agent of the Lender's refusal to grant the consent requested by Agent within 10 Business Days after receipt of Agent's request for the Lender's consent, then the Lender's consent will be treated as having been granted unless such amendment, supplement or modification would require the consent of all of the Lenders, and Agent and the other Lenders will thereafter be permitted to take the actions described in the request for consent as though the Lender had affirmatively consented to the requested actions.

(ii)    If (a) Agent requests a Lender's written consent to any proposed waiver (including any waiver of any Event of Default), amendment, supplement or modification of this Agreement or any of the other Loan Documents pursuant to <u>Sections 14.1.1</u> or <u>14.1.2</u> or for any other matter relating to the Loan Documents and (b) the Lender refuses to give its consent, Agent, at its option, may, at any time within 45 days after the Lender notifies Agent of the Lender's refusal to grant the requested consent, acquire on notice to the applicable Lender (a "<u>Buy-Out Notice</u>") all, but not less than all, of that Lender's Loans, other Credit Exposure and Commitments by paying to that Lender an amount equal to the unpaid principal balance of the Loans held by that Lender plus all accrued interest and fees then due to the Lender as set forth in this Agreement. From and after the date on which Agent delivers a Buy-Out Notice to the Lender, Agent and the other Lenders may amend, modify, and supplement the Loan Documents or waive any of the provisions of the Loan Documents (including any Event of Default), or all of the foregoing, as though the non-consenting Lender had, in fact, affirmatively consented to the requested actions.

14.1.4 <u>Binding Effect</u>.    Any waiver and any amendment, supplement or modification pursuant to this <u>Section 14.1</u> will apply to each of the Lenders and shall be binding on Borrowers, the Lenders, LC Issuer and Agent and all future holders of the Obligations.

14.1.5 <u>No Waiver</u>.    Failure by Agent, LC Issuer or any Lender to exercise any right, remedy or option under this Agreement or in any Loan Document or delay by Agent, LC Issuer or any Lender in exercising the same shall not operate as a waiver by Agent, LC Issuer or any Lender of its right to exercise any such right, remedy or option.

14.2    <u>Assignment.</u>

14.2.1 <u>Borrower Assignments</u>.    No Borrower may assign, transfer or otherwise dispose of any of its rights or obligations hereunder or under any other Loan Document, by operation of law or otherwise without the consent of Agent, LC Issuer and each Lender, and any

such assignment, transfer or other disposition without the consent of Agent, LC Issuer and each Lender shall be void.

### 14.2.2  Lender Assignments.

(i)      Any Lender may, in the ordinary course of its business and in accordance with applicable law, at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and Credit Exposure) in accordance with the provisions of this Section 14.2.2; provided that in no event shall a Lender be permitted to assign any of its rights and obligations under this Agreement to a Borrower or an Affiliate of a Borrower.  Each assignment shall be on a constant, and not a varying, ratable percentage of the assigning Lender's rights and obligations assigned under this Agreement.  Each assignment by a Term Loan Lender of Term Loans shall be made only if, after giving effect thereto, such Term Loan Lender continues to hold an equal ratable percentage of Term Loan A and Term Loan B.  Borrower will not have any obligation to reimburse any Lender for any costs, fees or expenses incurred by a Lender (exclusive of any expenses of Agent in its capacity as Agent) in connection with the assignment by that Lender of any portion of its Commitment or any Loans owing to it.

(ii)      Each assignment (an "Assignment and Acceptance") shall be substantially in the form of Exhibit G and shall not be permitted hereunder unless such assignment is either for all of such Lender's rights and obligations under the Loan Documents or involves Loans, other Credit Exposure and Commitments in an aggregate amount of at least $5,000,000.  Notice to Agent and consent of Agent and, in the case of an assignment of a Revolving Credit Commitment, LC Issuer (which consent shall not be unreasonably withheld or delayed) shall be required prior to an assignment becoming effective with respect to an Eligible Assignee which is not a Lender or a Person controlling or controlled by a Lender.

(iii)      Upon (a) delivery to Agent of a notice of assignment (a "Notice of Assignment"), together with any consent required by Section 14.2.2(ii), and (b) payment of a $3,500 fee to Agent for processing such assignment, such assignment shall become effective on the effective date specified in such Notice of Assignment.  On and after the effective date of such assignment, such Eligible Assignee, if not already a Lender, shall for all purposes be a Lender party to this Agreement and any other Loan Documents executed by the Lenders and shall have all the rights and obligations of a Lender under the Loan Documents, to the same extent as if it were an original party hereto, and no further consent or action by Borrower, the Lenders, LC Issuer or Agent shall be required to release the transferor Lender with respect to the percentage of the Commitments and Loans assigned to such Eligible Assignee.  Borrowers and each Lender, on the request of Agent, will enter into an amendment of Schedule 1 to this Agreement to reflect the Commitments of the Eligible Assignee.

(iv)      The Register.  Agent shall maintain at its address referred to in Section 15.7 a copy of each assignment delivered to and accepted by it pursuant to this Section 14.2.2 and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitment and Credit Exposure of and principal amount of the Loans owing to, each Lender from time to time and whether such Lender is an original Lender or the assignee of

another Lender pursuant to an assignment under this Section 14.2.2. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and Borrowers, Agent, LC Issuer and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrowers, LC Issuer or any Lender at any reasonable time and from time to time upon reasonable prior notice.

14.2.3 Benefit; Binding Effect. All of the rights, privileges, remedies and options given to LC Issuer and the Lenders under the Loan Documents shall inure to the benefit of LC Issuer and each Lender's successors and assigns, and all the terms, conditions, covenants, provisions and warranties herein shall inure to the benefit of and bind the permitted successors and assigns of Borrower and LC Issuer and the Lenders, respectively.

14.3    Participations.

14.3.1 Permitted Participations. Notwithstanding anything to the contrary in Section 14.2, any Lender may at any time, with the written consent of Agent, sell to one or more banks or other Persons other than a Borrower or an Affiliate of a Borrower (a "Participant") participating interests in its Loans, other Credit Exposure, Commitments, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, however, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Loans, other Credit Exposure, Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrower, Agent, LC Issuer and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would require the consent of all of the Lenders; (v) subject to Section 14.3.2, all amounts payable by Borrowers hereunder shall be determined as if such Lender had not sold such participation; and (vi) no Lender shall transfer or grant any participating interest to any competitor of any Borrower. The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, LC Issuer, Agent, Borrower, the Loan Collateral, or otherwise in respect of the Obligations. No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

14.3.2 Disclosure of Information. Each Borrower authorizes each Lender granting a participation to disclose to any Participant any and all financial information in the Lender's possession concerning such Borrower which has been delivered to the Lender by Borrowers pursuant to the Loan Documents or in connection with the Lender's credit evaluation

of Borrowers or which has been obtained independently by the Lender in its credit evaluation or audit of Borrowers. Each Participant must agree to keep confidential the information received by it from a Lender regarding Borrowers pursuant to Section 15.20 to the same extent as if it were a Lender.

14.4   Law Requirements. Nothing in the Loan Documents will prohibit any Lender from pledging or assigning its interests in the Loans to any Federal Reserve Bank in accordance with applicable law.

14.5   Set Off Right. Borrowers agree that if amounts outstanding under this Agreement are due and unpaid or have been declared or have become due and payable, each Participant, to the extent permitted by applicable law, will be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; *provided* that any Participant exercising that right will be obligated to share with the Lenders, as if such participant were a "Lender" under this Agreement, the amount of any such setoff; and *provided, further*, that if all or any portion of such excess payment or other recovery is thereafter recovered from the Participant by or on behalf of Borrowers, the Participant's obligation to share such excess payment will be rescinded and such payment shall be returned to Participant to the extent of such recovery. No Lender or Participant may exercise any right of setoff except with the consent of Agent, the Required Revolving Credit Lenders and the Required Term Loan Lenders.

15.   GENERAL.

15.1   Severability. If any term of this Agreement is found invalid under Oregon law or laws of mandatory application by a court of competent jurisdiction, the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement.

15.2   Governing Law.   THIS AGREEMENT HAS BEEN DELIVERED AND ACCEPTED AT AND SHALL BE DEEMED TO HAVE BEEN MADE AT PORTLAND, OREGON. THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF OREGON (WITHOUT REFERENCE TO CONFLICTS OF LAW PRINCIPLES).

15.3   WAIVER OF JURISDICTION.   AS A SPECIFICALLY BARGAINED INDUCEMENT FOR AGENT, LC ISSUER AND THE LENDERS TO ENTER INTO THIS AGREEMENT AND EXTEND CREDIT TO BORROWERS, BORROWERS AGREE THAT ANY ACTION, SUIT OR PROCEEDING IN RESPECT OF OR ARISING OUT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, THEIR VALIDITY OR PERFORMANCE, AND ON THE ABILITY OF AGENT, LC ISSUER AND LENDERS, THEIR SUCCESSORS AND ASSIGNS, TO EXERCISE ALL RIGHTS AS TO THE LOAN COLLATERAL AND TO INITIATE AND PROSECUTE IN ANY APPLICABLE JURISDICTION ACTIONS RELATED TO REPAYMENT AND COLLECTION OF THE OBLIGATIONS, MAY BE INITIATED AND PROSECUTED AS TO ALL PARTIES AND THEIR SUCCESSORS AND ASSIGNS AT PORTLAND, OREGON. BORROWERS,

-115-

AGENT, LC ISSUER AND THE LENDERS EACH CONSENT TO AND SUBMIT TO THE EXERCISE OF JURISDICTION OVER ITS PERSON BY ANY COURT SITUATED AT PORTLAND, OREGON HAVING JURISDICTION OVER THE SUBJECT MATTER, AND CONSENTS THAT ALL SERVICE OF PROCESS BE MADE BY CERTIFIED MAIL DIRECTED TO BORROWERS, AGENT, LC ISSUER, AND LENDERS AT THEIR RESPECTIVE ADDRESSES SET FORTH IN SECTION 15.7 OR AS OTHERWISE PROVIDED UNDER THE LAWS OF THE STATE OF OREGON. BORROWERS, AGENT, LC ISSUER AND THE LENDERS WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER, AND CONSENT TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.   NOTHING IN THIS AGREEMENT, IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE AGENT, ANY LENDER, OR THE L/C ISSUER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST BORROWERS OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

15.4   Survival.   All of Borrowers' covenants, agreements, representations and warranties contained in this Agreement, the other Loan Documents and in the certificates or other instruments delivered in connection herewith and therewith shall be considered to have been relied upon by the parties hereto and shall survive the execution, delivery and acceptance of this Agreement and the making of any Credit Extensions, regardless of any investigation made by any such party or on its behalf and notwithstanding that Agent, LC Issuer or any Lender may have notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until the Obligations are fully performed, paid and satisfied (and all Letters of Credit have been cancelled and returned to LC Issuer) and no Commitment of any Lender exists.

15.5   Application of Payments; Revival of Obligations.   Agent, LC Issuer and the Lenders shall have the continuing right to apply or reverse and reapply any payments to any portion of the Obligations.   To the extent a Borrower makes a payment or payments to Agent, LC Issuer or any Lender or Agent, LC Issuer or any Lender receives any payment or proceeds of the Loan Collateral or any other security for Borrower's benefit, which payment(s) or proceeds or any part thereof are subsequently voided, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or part thereof intended to be satisfied shall be revived and shall continue in full force and effect, as if such payment or proceeds had not been received.

15.6   Fees and Expenses.

(i)   Borrowers shall pay or, as applicable, reimburse Agent, LC Issuer, the Lenders, or any one or more of them, for the following costs, fees, expenses and obligations ("Expenses"):

(a)      Borrowers will pay or, as applicable, reimburse Agent and LC Issuer for all reasonable costs, fees, expenses and obligations incurred by Agent or LC Issuer, whether an Event of Default has occurred and is continuing, in connection with, arising out of, or related to: (1) the entering into, negotiation, preparation, closing, administration (including amendment, waiver, or other consent with respect to) of this Agreement or any of the other Loan Documents, the credit facilities provided hereby, or the exercise of any of the rights or remedies of Agent, LC Issuer or the Lenders hereunder and thereunder (including the printing and distribution of materials to the Lenders and all costs associated with bank meetings); (2) any Credit Extensions made by the Lenders hereunder and the issuance of Letters of Credit by LC Issuer; (3) any transaction contemplated by this Agreement or the other Loan Documents; (4) any inspection, audit, appraisal, or verification of the Loan Collateral or Borrowers or any Guarantor (Agent currently charges, in addition to any field examination fee that may be provided pursuant to the terms of this Agreement, $850 per diem based on an 8 hour day plus out-of-pocket expenses) per auditor or field examiner for the services of its auditors and field examiners and a potentially greater amount if the auditor is not an Agent employee; (5) any liability under Section 3505 of the Internal Revenue Code and all other local, state and federal statutes of similar import; or (6) any dispute relating to the interpretation, enforcement or performance of any obligation set out in this Agreement; and

(b)      Borrowers will pay or, as applicable, reimburse Agent, LC Issuer, the Lenders, or any one or more of them, for all costs, fees, expenses and obligations incurred by Agent, LC Issuer, the Lenders, or any one or more of them, following the occurrence and during the continuance of an Event of Default, which are in connection with, arise out of, or are related to: (1) enforcing any Obligation or in foreclosing against any of the Loan Collateral or exercising, enforcing or preserving any other right or remedy available by reason of any Event of Default, (2) any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or in any insolvency or bankruptcy proceeding, (3) commencing, defending or intervening in any litigation or in filing a petition, complaint, answer, motion or other pleadings in any legal proceeding relating to a Borrower and related to or arising out of the transactions contemplated hereby or by any of the Loan Documents, (4) taking any other action in or with respect to any suit or proceeding (whether in bankruptcy or otherwise), (5) protecting, preserving, collecting, leasing, selling, taking possession of, or liquidating any of the Loan Collateral, or (6) attempting to enforce or enforcing any Agent's Liens on any of the Loan Collateral or any other rights under the Loan Documents.

(ii)      The Expenses (a) will include Attorneys' Fees and fees of other professionals, all lien search and title search fees, all filing and recording fees and all travel expenses and (b) are part of the Obligations, payable upon Agent's demand, and will be secured by the Loan Collateral.

(iii)      The Obligations described under this Section 15.6 shall survive any termination of this Agreement.

15.7    Notices; Electronic Mail.

-117-

15.7.1 <u>Notice</u>. Any notice required, permitted or contemplated hereunder shall, except as expressly provided in this Agreement or the other Loan Documents, be in writing and addressed to the party to be notified at the address set forth below or at such other address as each party may designate for itself from time to time by notice hereunder, and shall be deemed validly given (i) three days following deposit in the U.S. certified mails (return receipt requested), with proper postage prepaid, or (ii) the next Business Day after such notice was delivered to a regularly scheduled overnight delivery carrier with delivery fees either prepaid or an arrangement satisfactory with such carrier, made for the payment thereof, or (iii) upon receipt of notice given by facsimile or personal delivery: To Agent, a Lender, LC Issuer, and Borrowers at their respective addresses listed on the applicable signature page of this Agreement.

15.7.2 <u>Electronic Mail</u>. Agent may, in its discretion, elect, from time to time, to receive certain routine information, including reports, otherwise required by the terms of this Agreement or the other Loan Documents ("<u>Reports</u>") from Borrowers via electronic mail transmission ("<u>e-mail</u>"). Agent will designate from time to time its e-mail address to Borrowers (the "<u>Agent E-mail Address</u>"). All e-mail transmissions of Reports from Borrowers shall contain the information as specified in this Agreement, shall be formatted or displayed in a manner and order substantially similar to that shown in this Agreement or otherwise required by Agent and shall conform to the specifications described in this Agreement. Borrowers will be solely responsible for the confidentiality of the contents of e-mail transmissions during transmission to the Agent E-mail Address, as Borrowers acknowledge that none of Agent or any Lender is responsible for any compromise of data transmitted across public computer networks or telecommunications facilities, including the Internet. Borrowers will be responsible for the accuracy of all information provided to Agent via e-mail transmission to the Agent E-mail Address, and any information so received by Agent will be deemed to have been submitted by and received from Borrowers. In the event of a failure of the transmission of the Reports, it is the responsibility of Borrowers to transmit the contents of any pending transmission to Agent using an alternative method which is timely and in accordance with this Agreement. Borrowers agree that, by sending Agent the Reports via e-mail transmission, Borrowers are certifying the truthfulness and accuracy of the Reports submitted each and every time Borrowers send Agent the Reports. Borrowers further agree that, on each occasion when Borrowers send Agent e-mail transmissions containing Reports, Borrowers are warranting and representing to Agent the truthfulness and accuracy of the representations and warranties relevant to that Report set forth in the relevant Loan Document. Borrowers consent to and represent that it is Borrowers' intent that by Borrowers' insertion of Borrowers' names in the subject line of the transmitting e-mail, or on the Reports (including the header and/or the certification line), Borrowers intend such to constitute a legally binding and enforceable signatures of Borrowers, and in all aspects the legal equivalent of Borrowers' handwritten signatures.

15.8 <u>Indemnification</u>. In consideration of the execution and delivery of this Agreement by Agent, LC Issuer and the Lenders and the making of any Loan and the issuance of any Letter of Credit hereunder, Borrowers hereby jointly and severally indemnify and hold Agent, LC Issuer and the Lenders and each of their officers, directors, employees, Affiliates, and agents (collectively the "<u>Indemnified Parties</u>" and, individually, as "<u>Indemnified Party</u>") free and harmless from and against any and all actions, causes of action, suits, demands, investigations,

-118-

obligations, judgments, losses, costs, liabilities, damages, and expenses (irrespective of whether such Indemnified Party is a party to the action for which indemnification hereunder is sought), including Attorneys' Fees and disbursements (the "Indemnified Liabilities"), which are incurred by, accrued, asserted, made or brought against, charged to, or recoverable from the Indemnified Parties or any of them as a result of, or arising out of, or relating to, or as a direct or indirect result of:

       (i)     any transaction financed or to be financed in whole or in part or directly or indirectly with the proceeds of any Loan;

       (ii)    the entering into and performance by any of the Indemnified Parties of this Agreement and the other Loan Documents;

       (iii)   any breach by a Borrower of any term, provision, representation, warranty or covenant of this Agreement or the other Loan Documents;

       (iv)   any Environmental Liability, regardless of whether or not caused by, or within the control of, a Borrower; or

       (v)    any Remittance deposited in any Special Account which is dishonored or returned unpaid for any reason, and any other Indemnified Liabilities arising out of overdrafts on checking, deposit or other accounts or electronic funds transfers (whether through automatic clearing houses or otherwise) or out of Agent, LC Issuer's or Lenders' non-receipt of, or inability to collect, funds or otherwise not being made whole in connection with depository transfer checks or other similar arrangements;

except to the extent that the Indemnified Liability is caused by or results from the gross negligence or willful misconduct of the Indemnified Party, as determined by a court of competent jurisdiction in a final non-appealable Judgment or order. If and to the extent that the foregoing undertaking may be unenforceable for any reason, Borrowers hereby agree to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law, except to the extent that such Indemnified Liabilities have arisen by reason of an Indemnified Party's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final non-appealable Judgment or order. The Obligations described under this Section 15.8 will survive any termination of this Agreement and shall be due and payable on demand.

15.9    Additional Waivers by Borrowers. Borrowers waive presentment and protest of any instrument and notice thereof, and, except as expressly provided in the Loan Documents, demand, notice of default and all other notices to which Borrowers might otherwise be entitled. EACH BORROWER AGREES THAT IT SHALL ASSERT NO CLAIM AGAINST AGENT, LC ISSUER OR ANY LENDER ON ANY THEORY OF LIABILITY FOR CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES. EACH PARTY AGREES THAT IT SHALL ASSERT NO CLAIM AGAINST ANY OTHER PARTY ON ANY THEORY OF LIABILITY FOR PUNITIVE DAMAGES.

15.10 <u>Equitable Relief</u>. Borrowers recognize that, in the event a Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to Agent, LC Issuer and the Lenders; therefore, Borrowers agree that Agent, LC Issuer and Lenders, if Agent, LC Issuer and the Lenders so request, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

15.11 <u>Entire Agreement; Beneficiaries</u>. This Agreement and the other Loan Documents set forth the entire agreement of the parties with respect to its subject matter and supersede all previous understandings, written or oral, in respect thereof. Two or more duplicate originals of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument. Any documents delivered by, or on behalf of, any party by fax transmission or other electronic delivery of an image file reflecting the execution hereof: (i) may be relied on by the other parties as if the document were a manually signed original and (ii) will be binding for all purposes of the Loan Documents. This Agreement and the other Loan Documents are solely for the benefit of the parties hereto and thereto and their permitted successors and assigns, and no other Person (including any Subordinated Creditor unless such Subordinated Creditor is a permitted assignee of a party hereto) will have any rights as a third party beneficiary of this Agreement.

15.12 <u>Headings</u>. Section headings in this Agreement are included for convenience of reference only and shall not relate to the interpretation or construction of this Agreement.

15.13 <u>Cumulative Remedies</u>. The remedies provided in this Agreement and the other Loan Documents are cumulative and not exclusive of any remedies provided by law. Exercise of one or more remedy(ies) by Agent, LC Issuer or Lenders does not require that all or any other remedy(ies) be exercised and does not preclude later exercise of the same remedy.

15.14 <u>Recourse to Directors or Officers</u>. The obligations of the parties under this Agreement are solely the corporate or limited liability obligations of the parties. No recourse shall be had for the payment of any amount owing in respect to this Agreement or for the payment of any fee hereunder or thereunder or for any other obligation or claim arising out of or based upon this Agreement against any stockholder, employee, manager, member, officer, or director of any party, except with respect to the Individual Guaranty.

15.15 <u>WAIVER OF JURY TRIAL</u>. AS A SPECIFICALLY BARGAINED INDUCEMENT FOR AGENT, LC ISSUER AND THE LENDERS TO ENTER INTO THIS AGREEMENT AND EXTEND CREDIT TO BORROWERS, BORROWERS AND AGENT, LC ISSUER AND THE LENDERS EACH WAIVE TRIAL BY JURY WITH RESPECT TO ANY ACTION, CLAIM, SUIT OR PROCEEDING IN RESPECT OF OR ARISING OUT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS OR THE CONDUCT OF THE RELATIONSHIP BETWEEN OR AMONG AGENT, LC ISSUER, THE LENDERS AND BORROWERS.

15.16 <u>California Judicial Reference</u>. If any action or proceeding is filed in a court of the State of California by or against any party hereto in connection with any of the transactions

contemplated by this Agreement or any other Loan Document, (a) the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, provided that at the option of any party to such proceeding, any such issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8 shall be heard and determined by the court, and (b) without limiting the generality of Section 15.6, the Borrowers shall be solely responsible to pay all fees and expenses of any referee appointed in such action or proceeding.

15.17  PATRIOT ACT NOTICE.  To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each party who opens an account.  Agent will ask each party to a financial transaction their name, address and other information that will allow Agent to identify such party.  Agent may also ask to see other documents that substantiate a party's identity.

15.18  Advertising.  Borrowers hereby authorize and permit Agent to use Market's name and logo, and to disclose Borrowers' transaction with Agent and Lenders in connection with any advertising program to be conducted by Agent (which program may include so-called "tombstone" advertisements, in various formats, in one or more publications selected by Agent). Market agrees that neither Agent, Lenders or any of their respective affiliates and/or advertising agents, nor any employees of any of the foregoing, shall have any liability to either Borrower in connection with any use or disclosure contemplated by the preceding sentence.

15.19  Waivers.  Each Borrower agrees that it is jointly and severally liable to Agent, LC Issuer and Lenders for the payment and performance of the Obligations, and that such liability is independent of the obligations of any other Borrower.  Each obligation, promise, covenant, representation and warranty in this Agreement shall be deemed to have been made by, and be binding upon, each Borrower, unless this Agreement expressly provides otherwise.  Agent may bring an action against any Borrower, whether an action is brought against any other Borrower. Each Borrower agrees that any release which may be given by Agent, LC Issuer or Lenders to any other Borrower will not release such Borrower from its obligations under this Agreement. Each Borrower waives any right to assert against Agent, LC Issuer or any Lender any defense, setoff, counterclaim, or claims which such Borrower may have against any other Borrower. Each Borrower waives any defense by reason of any other Borrower's or any other Person's defense, disability, or release from liability.  Agent, LC Issuer and Lenders may exercise their respective rights against each Borrower even if any other Borrower no longer is liable because of a statute of limitations or for other reasons.  Each Borrower agrees that it is solely responsible for keeping itself informed as to the financial condition of the other Borrower and of all circumstances which bear upon the risk of nonpayment.  Each Borrower waives any right it may have to require Agent, LC Issuer or Lenders to disclose to such Borrower any information which Agent, LC Issuer or Lenders may now or hereafter acquire concerning the financial condition of the other Borrower.  Each Borrower waives all rights to notices of default or nonperformance by any other Borrower under this Agreement or any other Loan Document.  Each Borrower further waives all rights to notices of the existence or the creation of new indebtedness by any other

-121-

Borrower and all rights to any other notices to any party liable on any of the credit extended under this Agreement. Borrowers agree that Agent and Lenders will not be required to inquire as to the disposition by any Borrower of funds disbursed in accordance with the terms of this Agreement. Until all Obligations have been paid in full and this Agreement has terminated, each Borrower (a) waives any right of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute, which such Borrower may now or hereafter have against any other Borrower with respect to the indebtedness incurred under this Agreement; (b) waives any right to enforce any remedy which Agent, LC Issuer or any lender now has or may hereafter have against any other Borrower, and waives any benefit of, and any right to participate in, any security now or hereafter held by Agent. Each Borrower waives any right to require Agent, LC Issuer or any Lender to proceed against any other Borrower or any other person, proceed against or exhaust any security, or pursue any other remedy. Further, each Borrower consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of the Borrowers under this Agreement or which, but for this provision, might operate as a discharge of Borrowers (or any of them).

15.20 Confidentiality. Agent, LC Issuer and each Lender agrees that it will hold any information identified in writing as by Borrowers as "Confidential Information" in confidence, and not disclose such information to persons other than its directors, officers, employees, agents, accountants, auditors, legal counsel and other representatives, except as follows: (i) if Agent, LC Issuer or any Lender is required to disclose such information (a) to a bank regulatory agency or in connection with an examination of its records by bank examiners, (b) at the express direction of any other authorized government agency, (c) pursuant to a subpoena or other court order or (d) as may be otherwise required by applicable law; (ii) in connection with legal proceedings in its lending capacity; or (iii) to participants, assignees, potential participants and potential assignees who agree to be bound by the provisions of this Section. Confidential Information shall not include information (A) in the public domain; (B) independently received by Agent, LC Issuer or any Lender in good faith from a third party who is not known by the recipient to be bound by a confidentiality agreement with Borrowers or known by the recipient to be otherwise prohibited from transmitting the information to Agent, LC Issuer or any Lender by a contractual, legal or fiduciary obligation; (D) independently generated by Agent, LC Issuer or any Lender; or (E) approved for release or disclosure by Borrowers in a separate writing.

15.21 NOTICE. UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY AGENT OR THE LENDERS CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY THE BORROWERS' RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION, AND BE SIGNED BY THE LENDERS TO BE ENFORCEABLE.

*{Signature Pages Follow}*

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

## BORROWERS:

C & K Market, Inc.

By: _____
Douglas A. Nidiffer, President
and Chief Executive Officer

C&K Express LLC
By C & K Market, Inc., its manager

By: _____
Douglas A. Nidiffer, President
and Chief Executive Officer

Address for notices:

615 5th Street
Brookings, Oregon  97415
Attention: Chief Financial Officer
Telephone: 541-469-3113
Facsimile: 541-469-6717

**LENDERS**:

U.S. Bank National Association, as a Revolving Credit Lender

By: _____
        Robert Alexander, Vice President

U.S. Bank National Association, as a Term Loan A Lender

By: _____
        ~~Chris A. Jacomino~~, Vice President
        Philip E. Lamb

U.S. Bank National Association, as a Term Loan B Lender

By: _____
        ~~Chris A. Jacomino,~~ Vice President
        Philip E. Lamb

Address for notices:

111 SW Fifth Avenue, Suite 400
Portland, Oregon  97204
Attention: Robert Alexander
Telephone: 503-275-8655
Facsimile: 503-275-8073

**AGENT**:

U.S. Bank National Association, as Agent

By: _Robert C Alexander_

Robert Alexander, Vice President


**LC ISSUER:**

U.S. Bank National Association, as LC Issuer

By: _Robert C Alexander_

Robert Alexander, Vice President


Address for notices:

111 SW Fifth Avenue, Suite 400
Portland, Oregon  97204
Attention: Robert Alexander
Telephone: 503-275-8655
Facsimile: 503-275-8073

Exhibits and Schedules Intentionally Omitted

**EXECUTION VERSION**

## FIRST AMENDMENT TO FINANCING AGREEMENT

This FIRST AMENDMENT TO FINANCING AGREEMENT (this "Amendment"), dated as of March 15, 2012, is entered into by and among C & K MARKET, INC. and C&K EXPRESS, LLC (the "Borrowers"), U.S. BANK NATIONAL ASSOCIATION, as agent for itself and the lenders party to the Financing Agreement dated October 28, 2010 (as amended, modified, supplemented or restated from time to time, the "Financing Agreement"), and U.S. BANK NATIONAL ASSOCIATION, as sole Lender under the Financing Agreement.

## RECITALS

Borrowers, Lender and Agent are parties to the Financing Agreement.  The parties wish to make certain amendments to the Financing Agreement, as set forth in this Amendment.

THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1.    <u>Defined Terms</u>.  Unless otherwise defined herein, each capitalized term used herein shall have the meaning assigned thereto in the Financing Agreement.

2.    <u>Amendments to Defined Terms</u>.

(a)    Clause (v) of the definition of "Borrowing Base" set forth in Section 1.1 of the Financing Agreement is amended and restated to read in its entirety as follows:

> "(v)    during the Temporary Overadvance Period, and so long as (A) no Event of Default has occurred and is continuing, and (B) Borrowers are in compliance with the Overadvance Covenant, the Temporary Overadvance Amount;"

(b)    The definition of "Temporary Overadvance Amount" set forth in Section 1.1 of the Financing Agreement is amended and restated to read in its entirety as follows:

> "'<u>Temporary Overadvance Amount</u>' means, during the Temporary Overadvance Period, the amount of $1,000,000."

(c)    The definition of "Temporary Overadvance Period" set forth in Section 1.1 of the Financing Agreement is amended and restated to read in its entirety as follows:

> "'<u>Temporary Overadvance Period</u>' means the period commencing February 24, 2012 and ending May 31, 2012."

(d)    The following defined terms are added to Section 1.1 of the Financing Agreement in their proper alphabetical order:

"'Overadvance Covenant' means that, as of the date of any Advance Request that requests a Temporary Overadvance, Borrowers' EBITDA, in each case as reported on Schedule 1 to the most recently delivered officer's certificate required by Section 8.9 hereof (and such officer's certificate shall include during the Temporary Overadvance Period a monthly calculation of Borrowers' EBITDA) (i) for the one month period ending January 31, 2012, is greater than or equal to $652,000; (ii) for the two month period ending February 29, 2012, is greater than or equal to $1,687,000; and (iii) for the three month period ending March 31, 2012, is greater than or equal to $2,808,000."

"'Temporary Overadvance' means as of any date, or with respect to any requested borrowing of a Revolving Loan, the amount by which the principal balance of Revolving Loans and Interim Advances outstanding (or, with respect to any requested borrowing, outstanding after giving effect to such borrowing) exceeds the sum of the amounts described in clauses (i), (ii), (iii), (iv) and (vi) of the definition of 'Borrowing Base' herein."

For the avoidance of doubt, the parties acknowledge and agree that the Borrowers' compliance with the Overadvance Covenant is a condition to including the Temporary Overadvance Amount in the calculation of the Borrowing Base, but the Borrowers' failure to comply with the Overadvance Covenant shall in no event constitute an Event of Default under the Financing Agreement.

(e)    A new clause (ix) is added to the definition of "Permitted Acquisition" set forth in Section 1.1 of the Financing Agreement, to read in its entirety as follows:

"(ix)    During the Temporary Overadvance Period, the purchase price for any such acquisitions may be paid only from the proceeds of Subordinated Debt newly incurred in 2012."

3.    Amendment to Financing Agreement. Section 3.2.1(i) of the Financing Agreement is amended and restated in its entirety to read as follows:

"(i)    Interest on each Revolving Loan and Interim Advance and the Term Loans (each, for purposes of this Section 3.2, a 'LIBOR Rate Loan') shall accrue at the Applicable LIBOR Rate Margin plus the LIBOR Rate; provided, however, that during the Temporary Overadvance Period, any Temporary Overadvance outstanding on any date shall bear interest at the Applicable LIBOR Rate Margin plus the LIBOR Rate plus 0.50%."

4.      <u>Amendment to Exhibit F to Financing Agreement</u>.  The first paragraph of Section 2 of Exhibit F to the Financing Agreement is amended and restated in its entirety to read as follows:

> "Borrowers will, for each 12-Month Period, comply with the Fixed Charge Coverage Ratio requirement set forth in paragraph (i) below and the Alternate Fixed Charge Coverage Ratio set forth in paragraph (ii) below."

5.      <u>Representations and Warranties</u>.  Borrowers hereby represent and warrant to Agent and Lender as follows:

(a)     No Event of Default or event which, with the passage of time or the giving of notice or both would constitute an Event of Default has occurred and is continuing.

(b)     The execution, delivery and performance by Borrowers of this Amendment have been duly authorized by all necessary corporate and other action and do not and will not require any registration with, consent or approval of, or notice to or action by any Person (including any Governmental Authority) in order to be effective and/or enforceable. Each of this Amendment and the Financing Agreement as amended by this Amendment constitutes (assuming the due execution and delivery hereof by the other parties hereto) the legal, valid and binding obligations of Borrowers, enforceable against them, without defense, counterclaim or offset, in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforceability of creditors' rights.

(c)     All representations and warranties of Borrowers contained in the Financing Agreement and the statements set forth in the recitals of this Amendment are true and correct on and as of the date hereof (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date).

6.     <u>Amendment Fee</u>. Not later than the Effective Date (as defined below), Borrowers will pay Agent an amendment fee in the amount of $20,000. Such fee may be charged against Borrowers' loan account.

7.     <u>Effective Date</u>. This Amendment will become effective upon the full execution and delivery hereof by the parties hereto (the "Effective Date").

8.     <u>No Further Amendments</u>. Other than the specific amendments of the Financing Agreement as set forth herein, (a) nothing contained herein shall be deemed a waiver of any provision, or any other existing or future noncompliance with any provision, of the Financing Agreement (including the Financing Agreement as amended hereby); and (b) all of the terms, covenants and provisions of the Financing Agreement are and shall remain in full force and effect.

9.     <u>Miscellaneous</u>.

(a)     All references in the Financing Agreement and in the other Loan Documents to the Financing Agreement shall henceforth refer to the Financing Agreement as amended by this Amendment. This Amendment shall be deemed incorporated into, and a part of, the Financing Agreement. This Amendment is a Loan Document.

(b)     This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns. No third party beneficiaries are intended in connection with this Amendment.

(c)     Borrowers hereby release Agent, Lender, their respective successors and assigns, and their respective officers, employees and agents, from all claims of every nature known or unknown arising out of or related to the Loans which exist, or but for the passage of time, could be asserted, on the date Borrowers sign this Amendment.

(d)     This Amendment shall be governed by and construed in accordance with the law of the State of Oregon.

(e)     This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Each of the parties hereto understands and agrees that this document (and any other document required herein) may be delivered by any party thereto either in the form of an executed original or an executed original sent by facsimile transmission to be followed promptly by delivery of a hard copy original, and that receipt by Agent of a facsimile transmitted document purportedly bearing the signature of Lender or Borrowers (or Individual Guarantor) shall bind Lender or Borrowers (or Individual Guarantor), respectively, with the same force and effect as the delivery of a hard copy original. Any failure by Agent to receive the hard copy executed original of such document shall not diminish the binding effect of receipt of the facsimile transmitted executed original of such document of the party whose hard copy page was not received by Agent.

(f)     If any term or provision of this Amendment shall be deemed prohibited by or invalid under any applicable law, such provision shall be invalidated without affecting the remaining provisions of this Amendment or the Financing Agreement, respectively.

(g)     Borrowers covenant to pay to or reimburse Agent, upon demand, for all reasonable costs and expenses (including reasonable attorneys' fees) incurred in connection with the development, preparation, negotiation, execution and delivery of this Amendment and any related documents.

(h)     UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY AGENT OR LENDER CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY THE BORROWER'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION, AND BE SIGNED BY AGENT AND LENDER TO BE ENFORCEABLE.

[Signatures appear on the following page.]

IN WITNESS WHEREOF, the parties have caused this Amendment to be duly executed and delivered as of the date first written above.

C & K MARKET, INC.

By: _____
Douglas C. Nidiffer, President and
Chief Executive Officer

U.S. BANK NATIONAL ASSOCIATION,
as Agent

By: _____
Robert Alexander, Senior Vice President

C&K EXPRESS, LLC
By C & K Market, Inc., its manager

By: _____
Douglas C. Nidiffer, President and
Chief Executive Officer

U.S. BANK NATIONAL ASSOCIATION
as Lender

By: _____
Robert Alexander, Senior Vice President

## GUARANTOR ACKNOWLEDGMENT AND CONSENT

The undersigned Individual Guarantor hereby: (i) acknowledges and consents to the terms, and the execution, delivery and performance, of the foregoing Amendment (the "Amendment") (without implying the need for any such acknowledgment or consent); and (ii) represents and warrants to Agent and Lender that, both before and after giving effect to the Amendment: (A) the Individual Guaranty remains in full force and effect as an enforceable obligation of Individual Guarantor (except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforceability of creditors' rights), without defense, counterclaim or offset; and (B) he is in compliance with all of his covenants contained in his Individual Guaranty and in each other Loan Document applicable to him.  Individual Guarantor hereby releases Agent, Lender, their respective successors and assigns, and their respective officers, employees and agents, from all claims of every nature known or unknown arising out of or related to the Loans which exist, or but for the passage of time, could be asserted, on the date Individual Guarantor signs this Acknowledgment and Consent.

IN WITNESS WHEREOF, the undersigned Individual Guarantor has executed this Guarantor Acknowledgment and Consent as of February 24, 2012.

_____
Douglas C. Nidiffer

IN WITNESS WHEREOF, the parties have caused this Amendment to be duly executed and delivered as of the date first written above.

C & K MARKET, INC.

By: _____
Douglas A. Nidiffer, President and
Chief Executive Officer

U.S. BANK NATIONAL ASSOCIATION,
as Agent

By: _____
    Robert Alexander, Senior Vice President

C&K EXPRESS, LLC
By C & K Market, Inc., its manager

By: _____
Douglas A. Nidiffer, President and
Chief Executive Officer

U.S. BANK NATIONAL ASSOCIATION
as Lender

By: _____
    Robert Alexander, Senior Vice President

## GUARANTOR ACKNOWLEDGMENT AND CONSENT

The undersigned Individual Guarantor hereby: (i) acknowledges and consents to the terms, and the execution, delivery and performance, of the foregoing Amendment (the "Amendment") (without implying the need for any such acknowledgment or consent); and (ii) represents and warrants to Agent and Lender that, both before and after giving effect to the Amendment: (A) the Individual Guaranty remains in full force and effect as an enforceable obligation of Individual Guarantor (except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforceability of creditors' rights), without defense, counterclaim or offset; and (B) he is in compliance with all of his covenants contained in his Individual Guaranty and in each other Loan Document applicable to him. Individual Guarantor hereby releases Agent, Lender, their respective successors and assigns, and their respective officers, employees and agents, from all claims of every nature known or unknown arising out of or related to the Loans which exist, or but for the passage of time, could be asserted, on the date Individual Guarantor signs this Acknowledgment and Consent.

IN WITNESS WHEREOF, the undersigned Individual Guarantor has executed this Guarantor Acknowledgment and Consent as of February 24, 2012.

_____
Douglas A. Nidiffer

## SECOND AMENDMENT TO FINANCING AGREEMENT
## AND FIRST AMENDMENT TO SECURITY AGREEMENT

This SECOND AMENDMENT TO FINANCING AGREEMENT AND FIRST AMENDMENT TO SECURITY AGREEMENT (this "Amendment"), dated as of November __, 2012, is entered into by and among C & K MARKET, INC. and C&K EXPRESS, LLC (the "Borrowers"), U.S. BANK NATIONAL ASSOCIATION, as agent for itself and the lenders party to the Financing Agreement dated October 28, 2010 (as amended, modified, supplemented or restated from time to time, the "Financing Agreement"), and U.S. BANK NATIONAL ASSOCIATION, as sole Lender under the Financing Agreement.

### RECITALS

Borrowers, Lender and Agent are parties to the Financing Agreement. Borrowers and Agent are also parties to a Security Agreement dated as of October 28, 2010 (the "Borrower Security Agreement"), pursuant to which the Borrowers granted a security interest in the collateral described therein to secure the Obligations (as defined in the Financing Agreement). The parties wish to make certain amendments to the Financing Agreement and to the Borrower Security Agreement, as set forth in this Amendment.

THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

### AGREEMENT

1.    <u>Defined Terms</u>. Unless otherwise defined herein, each capitalized term used herein shall have the meaning assigned thereto in the Financing Agreement.

2.    <u>Amendments to Financing Agreement</u>. Section 12.7.1(h) of the Financing Agreement is amended and restated in its entirety to read as follows:

> (h) <u>eighth</u>, to pay interest due to any or all of the Term Loan Lenders under the Loan Documents in respect of the Term Loans, and with respect to any Rate Hedging Agreement with a Term Loan Lender, any premiums, scheduled periodic payments and any interest thereon, in each case until paid in full;

Section 12.7.2(d) of the Financing Agreement is amended and restated in its entirety to read as follows:

> (d) <u>fourth</u>, to pay interest due to any or all of the Term Loan Lenders under the Loan Documents in respect of the Term Loans, and with respect to any Rate Hedging Agreement with a Term Loan Lender, any premiums, scheduled periodic payments and any interest thereon, in each case until paid in full;

3.   <u>Amendment to Borrower Security Agreement</u>. Exhibits 5.1, 5.3, 5.4, 5.5, 5.6, 5.7 and 5.8 of the Borrower Security Agreement are amended and restated, by replacing each such exhibit with the corresponding exhibit attached hereto.

4.   <u>Representations and Warranties</u>. Borrowers hereby represent and warrant to Agent and Lender as follows:

(a)   No Event of Default or event which, with the passage of time or the giving of notice or both would constitute an Event of Default has occurred and is continuing.

(b)   The execution, delivery and performance by Borrowers of this Amendment have been duly authorized by all necessary corporate and other action and do not and will not require any registration with, consent or approval of, or notice to or action by any Person (including any Governmental Authority) in order to be effective and/or enforceable. Each of this Amendment, and the Financing Agreement and the Borrower Security Agreement as amended by this Amendment, constitutes (assuming the due execution and delivery hereof by the other parties hereto) the legal, valid and binding obligations of Borrowers, enforceable against them, without defense, counterclaim or offset, in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforceability of creditors' rights.

(c)   All representations and warranties of Borrowers contained in the Financing Agreement and the statements set forth in the recitals of this Amendment are true and correct on and as of the date hereof (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date).

5.   <u>Effective Date</u>. This Amendment will become effective upon the full execution and delivery hereof by the parties hereto (the "Effective Date").

6.   <u>No Further Amendments</u>. Other than the specific amendments of the Financing Agreement and the Borrower Security Agreement as set forth herein, (a) nothing contained herein shall be deemed a waiver of any provision, or any other existing or future noncompliance with any provision, of the Financing Agreement or the Borrower Security Agreement (including the Financing Agreement and the Borrower Security Agreement as amended hereby); and (b) all of the terms, covenants and provisions of the Financing Agreement and the Borrower Security Agreement are and shall remain in full force and effect.

7.   <u>Miscellaneous</u>.

(a)   All references in the Financing Agreement and in the other Loan Documents to the Financing Agreement or to the Borrower Security Agreement shall henceforth refer to the Financing Agreement, or to the Borrower Security Agreement, as appropriate, as amended by this Amendment. This Amendment shall be deemed incorporated into, and a part of, the Financing Agreement and the Borrower Security Agreement. This Amendment is a Loan Document.

(b)     This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.  No third party beneficiaries are intended in connection with this Amendment.

(c)     Borrowers hereby release Agent, Lender, their respective successors and assigns, and their respective officers, employees and agents, from all claims of every nature known or unknown arising out of or related to the Loans which exist, or but for the passage of time, could be asserted, on the date Borrowers sign this Amendment.

(d)     This Amendment shall be governed by and construed in accordance with the law of the State of Oregon.

(e)     This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Each of the parties hereto understands and agrees that this document (and any other document required herein) may be delivered by any party thereto either in the form of an executed original or an executed original sent by facsimile transmission to be followed promptly by delivery of a hard copy original, and that receipt by Agent of a facsimile transmitted document purportedly bearing the signature of Lender or Borrowers (or Individual Guarantor) shall bind Lender or Borrowers (or Individual Guarantor), respectively, with the same force and effect as the delivery of a hard copy original. Any failure by Agent to receive the hard copy executed original of such document shall not diminish the binding effect of receipt of the facsimile transmitted executed original of such document of the party whose hard copy page was not received by Agent.

(f)     If any term or provision of this Amendment shall be deemed prohibited by or invalid under any applicable law, such provision shall be invalidated without affecting the remaining provisions of this Amendment, or the Financing Agreement or the Borrower Security Agreement, respectively.

(g)     Borrowers covenant to pay to or reimburse Agent, upon demand, for all reasonable costs and expenses (including reasonable attorneys' fees) incurred in connection with the development, preparation, negotiation, execution and delivery of this Amendment and any related documents.

(h)     UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY AGENT OR LENDER CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY THE BORROWER'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION, AND BE SIGNED BY AGENT AND LENDER TO BE ENFORCEABLE.

[Signatures appear on the following page.]

IN WITNESS WHEREOF, the parties have caused this Amendment to be duly executed and delivered as of the date first written above.

C & K MARKET, INC.

By: _____
Alan W. Nidiffer, Secretary


C&K EXPRESS, LLC
By C & K Market, Inc., its manager

By: _____
Alan W. Nidiffer, Secretary

U.S. BANK NATIONAL ASSOCIATION,
as Agent

By: _____
Robert Alexander, Senior Vice President


U.S. BANK NATIONAL ASSOCIATION
as Lender

By: _____
Robert Alexander, Senior Vice President


## GUARANTOR ACKNOWLEDGMENT AND CONSENT

The undersigned Individual Guarantor hereby: (i) acknowledges and consents to the terms, and the execution, delivery and performance, of the foregoing Amendment (the "Amendment") (without implying the need for any such acknowledgment or consent); and (ii) represents and warrants to Agent and Lender that, both before and after giving effect to the Amendment: (A) the Individual Guaranty remains in full force and effect as an enforceable obligation of Individual Guarantor (except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforceability of creditors' rights), without defense, counterclaim or offset; and (B) he is in compliance with all of his covenants contained in his Individual Guaranty and in each other Loan Document applicable to him.  Individual Guarantor hereby releases Agent, Lender, their respective successors and assigns, and their respective officers, employees and agents, from all claims of every nature known or unknown arising out of or related to the Loans which exist, or but for the passage of time, could be asserted, on the date Individual Guarantor signs this Acknowledgment and Consent.

IN WITNESS WHEREOF, the undersigned Individual Guarantor has executed this Guarantor Acknowledgment and Consent as of November ___, 2012.

_____
Douglas C. Nidiffer

SECURITY AGREEMENT

Exhibit 5.1

1. Borrowers' Jurisdiction of Organization – (5.1(i))

   C&K Market, Inc.:     Oregon

   C&K Express, LLC:    Oregon

2. Borrowers' Chief Executive Office and Principal Place of Business – (5.1(ii), (iii))

   C&K Market, Inc.
   615 5th Street
   Brookings, OR  97415

   C&K Express, LLC
   615 5th Street
   Brookings, OR  97415

3. Borrowers' Offices or Locations Where Any Collateral is Located – (5.1(iv))

   See attached

4. Federal Tax Identification Numbers – (5.1(v))

   C&K Market, Inc.    93-0564163

   C&K Express, LLC    75-3001392

5. Organizational Identification Numbers – (5.1(vi))

   C&K Market, Inc.    081611-19

   C&K Express, LLC    067998-94

**Exhibit 5.1 (continued)**

Ray's Food Place #1
906 Chetco Avenue
Brookings, OR 97415

Shop Smart #2
97900 Shopping Center Avenue
Harbor, OR 97415

Ray's Food Place #4
12500 Highway 96
Hoopa, CA 95546

Ray's Food Place #5
506 East Main Street
Rogue River, OR 97537

Ray's Food Place #7
5000 Valley West Blvd.
Arcata, CA 95521

Ray's Food Place #8
29560 Ellensburg Avenue
Gold Beach, OR 97444

Ray's Food Place #9
126 East Pine Street
Central Point, OR 97502

Ray's Food Place #10
735 N. Main Street
Phoenix, OR 97535

Ray's Food Place #12
3500 Merlin Road
Grants Pass, OR 97526

Ray's Food Place #14
7200 Williams Hwy
Murphy, OR 97533

Ray's Food Place #15
301 Fred Haight Drive
Smith River, CA 95567

Ray's Food Place #17
909 South Main Street
Myrtle Creek, OR 97457

Ray's Food Place #18
66 Michigan Avenue
Bandon, OR 97411

Ray's Food Place #23
175 N. Weed Street
Weed, CA 96094

Ray's Food Place #24
160 Morgan Way
Mt. Shasta, CA 96067

Ray's Food Place #25
124 Collier Way
Etna, CA 96027

Ray's Food Place #26
11307 Main Street
Ft. Jones, CA 96032

Shop Smart #28
205 Watkins Street
Cave Junction, OR 97523

Shop Smart #29
498 S. Pacific Hwy
Tri City, OR 97457

Ray's Food Place #30
625 M Street
Crescent City, CA 95531

Ray's Food Place #31
121 Montague Road
Yreka, CA 96097

Shop Smart #32
3430 Redwood Avenue
Redway, CA 95560

Ray's Food Place #33
1718 S. Main Street
Willits, CA 95490

Ray's Food Place #36
15930 Dam Road
Clearlake, CA 95422

Ray's Food Place #37
1500 Anna Sparks Way, Ste. A
McKinleyville, CA 95519

Ray's Food Place #38
3460 Broadway
Eureka, CA 95503

Ray's Food Place #39
25013 Highway 126
Veneta, OR 97487

Ray's Food Place #41
210 SW Century Drive
Bend, OR 97702

Ray's Food Place #42
1139 S. Cloverdale Blvd
Cloverdale, CA 95425

Ray's Food Place #43
868 2nd Avenue
Gold Hill, OR 97525

Ray's Food Place #44
580 NE Broadway
Waldport, OR 97394

Ray's Food Place #45
635 N. Arrowleaf Trail
Sisters, OR 97759

Shop Smart #46
915 S. Main Street
Yreka, CA 96097
Ray's Food Place #47
2009 Main Street
Fortuna, CA 95540

Ray's Food Place #48
190 Emerald Parkway
Creswell, OR 97426

Shop Smart #49
953 Northcrest Drive
Crescent City, CA 95531

**Schedule 5.1 (continued)**

Ray's Food Place #50
48067 Highway 58
Oakridge, OR  97463

Ray's Food Place #51
35831 Highway 58
Pleasant Hill, OR  97455

Ray's Food Place #52
43622 Highway 299 East
Fall River Mills, CA  96028

Shop Smart #54
51370 Highway 97
LaPine, OR  97739

Ray's Food Place #55
1555 Oregon Street
Port Orford, OR  97465

Shop Smart #56
811 East Central
Sutherlin, OR  97479

Ray's Food Place #57
4601 Carnes Road
Roseburg, OR  97470

Shop Smart #58
151 Douglas Blvd.
Winston, OR  97496

Ray's Food Place #60
1535 NE 3rd Street
Prineville, OR  97754

Ray's Food Place #61
11100 Highway 62
Eagle Point, OR  97524

Shop Smart #62
7521 Crater Lake Hwy
White City, OR  97503

Ray's Food Place #63
401 North 5th Street
Jacksonville, OR  97530

Ray's Food Place #64
875 Redwood Drive
Garberville, CA  95542

Ray's Food Place #65
900 SW 23rd Street
Redmond, OR  97756

Ray's Food Place #66
151 NE Main Street
Canyonville, OR  97417

Ray's Food Place #67
1427 NE 7th Street
Grants Pass, OR  97526

Ray's Food Place #68
1555 Williams Hwy
Grants Pass, OR  97527

Ray's Food Place #70
621 NW Hickory Street
Albany, OR  97321

Ray's Food Place #71
110 Deer Creek Road
Selma, OR  97538

C&K Market #72
39317 McKenzie Hwy
Walterville, OR  97489

Bruno's Shop Smart #73
355 Lakeport Blvd.
Lakeport, CA  95453

Ray's Food Place #75
38915 Highway 299
Willow Creek, CA  95573

Ray's Food Place #76
51537 Highway 97
La Pine, OR  97739

C&K Market #77
231 Highway 101
Yachats, OR  97498

C&K Market #78
110 SW Arrow Street
Waldport, OR  97394

Ray's Food Place #79
112 West Main Street
Willamina, OR  97396

Ray's Food Place #80
1740 Main Street
Philomath, OR 97370

Ray's Food Place #81
308 N. First Street
Drain, OR  97435

Ray's Food Place #82
215 East Wagner Street
Talent, OR 97540

**Schedule 5.1 (continued)**

## PHARMACIES

Chetco Pharmacy & Gifts #1
890 Chetco Avenue
Brookings, OR  97415

Pharmacy Express #2
97900 Shopping Center Ave., Ste 9
Harbor, OR  97415

Pharmacy Express #9
136 E. Pine Street
Central Point, OR  97502

Pharmacy Express #17
821 S. Main Street
Myrtle Creek, OR  97457

Pharmacy Express #24
160 Morgan Way
Mt. Shasta, CA  96067

Pharmacy Express #28
308 S. Redwood Hwy
Cave Junction, OR  97523

Pharmacy Express #41
210 SW Century Drive
Bend, OR  97702

Pharmacy Express #48
190 Emerald Parkway
Creswell, OR  97426

Pharmacy Express #57
4601 Carnes Road, Ste. 8
Roseburg, OR  97470

Pharmacy Express #64
875 Redwood Drive
Garberville, CA  95542

Pharmacy Express #65
900 SW 23rd Street
Redmond, OR  97756

Pharmacy Express #70
621 NW Hickory
Albany, OR  97321

Pharmacy Express #78
110 SW Arrow Street
Waldport, OR  97394

**Schedule 5.1 (continued)**

## OTHER FACILITIES

C&K Market, Inc. Administrative Office #6
615 5th Street
Brookings, OR 97415

Ray's Food Place #74 (closed)
150 Oroyan Avenue
Eugene, OR 97404

Brookings-Harbor Shopping Center
97900 Shopping Center Ave.
Harbor, OR 97415

Mount Shasta Shopping Center
160 Morgan Way
Mt. Shasta, CA 96067

Green Valley Plaza
4601 Carnes Road
Roseburg, OR 97470

Eagle Point Shopping Center
11100 Hwy 62
Eagle Point, OR 97524

Sentry Arms Apartments
635 5th Street
Brookings, OR 97415

Chetco Duplex
912 Chetco Avenue
Brookings, OR 97415

Rental House
246 Lorraine Avenue
Eagle Point, OR  97524

Commercial Rental
924 Chetco Avenue
Brookings, OR  97415

Ray's Food Place #59 (closed)
330 Dakota Street
Sutherlin, OR 97479

Ray's Food Place #69 (closed)
1405 Pacific Highway North
Cottage Grover, OR 97424

Security Agreement
Exhibit 5.3
Trade Names, Assumed Names and Fictitious Names

**1.**      **Corporate Names**

C&K Market, Inc.                    C&K Express, LLC

**2.**      **Store Specific Trade Names**

| | | |
|---|---|---|
| Ray's Food Place #1 | Ray's Food Place #41 | Ray's Food Place #68 |
| Shop Smart #2 | Ray's Food Place #42 | Ray's Food Place #70 |
| Ray's Food Place #4 | Ray's Food Place #43 | Ray's Food Place #71 |
| Ray's Food Place #5 | Ray's Food Place #44 | C&K Market #72 |
| Ray's Food Place #7 | Ray's Food Place #45 | Bruno's Shop Smart #73 |
| Ray's Food Place #8 | Shop Smart #46 | Ray's Food Place #75 |
| Ray's Food Place #10 | Ray's Food Place #47 | Ray's Food Place #76 |
| Ray's Food Place #12 | Ray's Food Place #48 | C&K Market #77 |
| Ray's Food Place #14 | Shop Smart #49 | C&K Market #78 |
| Ray's Food Place #15 | Ray's Food Place #50 | Ray's Food Place #79 |
| Ray's Food Place #17 | Ray's Food Place #51 | Ray's Food Place #80 |
| Ray's Food Place #18 | Ray's Food Place #52 | Ray's Food Place #81 |
| Ray's Food Place #23 | Shop Smart #54 | Ray's Food Place #82 |
| Ray's Food Place #24 | Ray's Food Place #55 | Chetco Pharmacy and Gifts #1 |
| Ray's Food Place #25 | Shop Smart #56 | Pharmacy Express #2 |
| Ray's Food Place #26 | Ray's Food Place #57 | Pharmacy Express #9 |
| Shop Smart #28 | Shop Smart #58 | Pharmacy Express #17 |
| Shop Smart  #29 | Ray's Food Place #60 | Pharmacy Express #24 |
| Ray's Food Place #30 | Ray's Food Place #61 | Pharmacy Express #28 |
| Ray's Food Place #31 | Shop Smart #62 | Pharmacy Express #41 |
| Shop Smart #32 | Ray's Food Place #63 | Pharmacy Express #48 |
| Ray's Food Place #33 | Ray's Food Place #63 | Pharmacy Express #57 |
| Ray's Food Place #36 | Ray's Food Place #64 | Pharmacy Express #64 |
| Ray's Food Place #37 | Ray's Food Place #65 | Pharmacy Express #65 |
| Ray's Food Place #38 | Ray's Food Place #66 | Pharmacy Express #70 |
| Ray's Food Place #39 | Ray's Food Place #67 | Pharmacy Express #78 |

**3.**      **Miscellaneous Trade Names**

Sentry Arms Apartments
Mt. Shasta Shopping Center
Green Valley Plaza
Brookings-Harbor Shopping Center
Eagle Point Shopping Center
Bandon Shopping Center Partnership – 50% owner

**Security Agreement**

**Exhibit 5.4**
**Investment Property**

<u>Brokerage Account</u>

Wells Fargo Advisors
MAC N9325-03480
South Eighth Street, Ste 300
Minneapolis, MN 55479

<u>Businesses</u>

Unified Grocers Stock
- 17,308 Class B Shares
- 21,528 Class E Shares

**SECURITY AGREEMENT**

**Exhibit 5.5**
**Letter-of-Credit Rights**

None.

**SECURITY AGREEMENT**

**Exhibit 5.6**
**Electronic Chattel Paper**

None.

**Security Agreement**

**Exhibit 5.7**
**Commercial Tort Claims**

_C&K Express, LLC v. Michael S. Edmondson, et al._, Deschutes County Circuit Court Case No. 08CV0089ST – an action brought by C&K Express, LLC against a former employee-pharmacist for interference with business relations, among other causes of action.

Additional information on these matters may be obtained upon request.

**SECURITY AGREEMENT**

**Exhibit 5.8**
**Instruments**

None.