UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

In re                                                    )  Case No. _____
                                                         )
                                                         )  NOTICE OF **PRELIMINARY**
                                                         )  HEARING ON MOTION
                                                         )     FOR USE OF CASH COLLATERAL
                                                         )     TO OBTAIN CREDIT
Debtor(s)                                                )  *(Check One)*

YOU ARE NOTIFIED THAT:

1.    The undersigned moving party, _____, filed a Motion     For Use of Cash Collateral     To Obtain Credit *(check one)*. A copy of the motion is attached; and it includes BOTH (i) the statement required by Local Form #541.7, and (ii) the following allegations:

   a.  The immediate and irreparable harm that will come to the estate pending a final hearing is _____.

   b.  The amount of     cash collateral     credit *(check one)* necessary to avoid the harm detailed above prior to the final hearing is _____.

2.    The name and service address of the moving party's attorney (or moving party, if no attorney) are: _____.

3.    A **PRELIMINARY** HEARING on the motion WILL BE HELD ON _____ AT _____ IN _____.
Testimony will be received if offered and admissible.

4.    If you wish to object to the motion, you must do one or both of the following: (1) attend the preliminary hearing; and/or (2) file with the Clerk of Court (i.e., if the 5-digit portion of the Case No. begins with "3" or "4", mail to 1001 SW 5th Ave. #700, Portland OR 97204; OR if it begins with "6" or "7", mail to 405 E 8th Ave #2600, Eugene OR 97401), a written response, which states the facts upon which you will rely and, if the response is filed within three business days before the hearing, notify the judge's chambers by telephone immediately after filing the document, as required by LBR 9004-1(b). See Local Form #541.51 for details.

5.    On _____ copies of BOTH this notice AND the motion were served pursuant to FRBP 7004 on the debtor(s); any debtor's attorney; any trustee; any trustee's attorney; members of any committee elected pursuant to 11 U.S.C. §705; any Creditors' Committee Chairperson [or, if none serving, on all creditors listed on the list filed pursuant to FRBP 1007(d)]; any Creditors' Committee attorney; the U.S. Trustee; and all affected lien holders whose names and addresses used for service are as follows:




_____
Signature

_____
(If debtor is movant) Debtor's Address & Taxpayer ID#(s) (last 4 digits)

541.1 (12/1/13)    **\*\*LOCAL FORM #541.51 ATTACHED IF this NOTICE served on PAPER\*\***

1    **Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
     Direct Dial: (503) 802-2013
2      Facsimile: (503) 972-3713
     E-Mail: al.kennedy@tonkon.com
3    **Timothy J. Conway**, OSB No. 851752
     Direct Dial: (503) 802-2027
4      Facsimile: (503) 972-3727
     E-Mail: tim.conway@tonkon.com
5    **Michael W. Fletcher**, OSB No. 010448
     Direct Dial: (503) 802-2169
6      Facsimile: (503) 972-3869
     E-Mail: michael.fletcher@tonkon.com
7    **Ava L. Schoen**, OSB No. 044072
     Direct Dial: (503) 802-2143
8      Facsimile: (503) 972-3843
     E-Mail: ava.schoen@tonkon.com
9    **TONKON TORP** LLP
   1600 Pioneer Tower
10   888 S.W. Fifth Avenue
   Portland, OR 97204
11

12      Attorneys for Debtor

13          UNITED STATES BANKRUPTCY COURT

14             DISTRICT OF OREGON

|  |  |
|---|---|
| 15   In re | Case No. 13-64561-fra11 |
| 16   C & K Market, Inc., | **DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS** |
| 17          Debtor. |  |
| 18 | *EXPEDITED HEARING REQUESTED* |

19

20          C & K Market, Inc., as debtor and debtor-in-possession ("C&K" or "Debtor"),

21 hereby moves this Court (this "Motion") for entry of interim and final orders authorizing it to

22 obtain secured credit for the purposes and on the terms set forth herein. In support of this

23 Motion, Debtor incorporates the statements contained in the Declaration of Edward

24 Hostmann in Support of First Day Pleadings ("First Day Declaration") filed

25 contemporaneously herewith, and further respectfully states as follows:

26

**Page 1 of 24 -**    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                 ON INTERIM AND FINAL BASIS

1    **JURISDICTION AND VENUE**

2          1.      On November 19, 2013 ("Petition Date") Debtor filed a voluntary

3    petition for relief under Chapter 11 of the Bankruptcy Code with the clerk of this Court.

4    Debtor continues to operate its business and manage its assets as debtor-in-possession

5    pursuant to Bankruptcy Code Sections 1107(a) and 1108.

6          2.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C.

7    §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C.

8    § 157(b)(2).  The bases for the relief requested herein are Sections 105, 361, 362, 363 and

9    364 of the Bankruptcy Code, Rules 2002, 4001, 6004 and 9014 of the Bankruptcy Rules, and

10   Rule 4001-1 of the Local Rules.

11         3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and

12   1409.

13    **SUMMARY OF RELIEF REQUESTED**

14         4.      Debtor, pursuant to Sections 105, 361, 362, 363, 364 and 507 of the

15   Bankruptcy Code, Rules 2002, 4001, and 9014 of the Bankruptcy Rules, and Rule 4001-1 of

16   the Local Rules, requests the immediate entry of an interim order (the "Interim Order")

17   substantially in the form attached hereto as **Exhibit 1**:

18              (a)      authorizing Debtor to obtain from U.S. Bank National

19   Association ("U.S. Bank") secured post-petition financing on a Superpriority basis (the "DIP

20   Facility");

21              (b)      authorizing Debtor to execute and enter into the Third

22   Amendment to Financing Agreement (the "Third Amendment"), substantially in the form

23   attached hereto as **Exhibit 2**, which amends the Financing Agreement dated as of October 28,

24   2010, between Debtor, C&K Express, LLC ("Express" and, together with Debtor, the

25   "Borrowers"), and U.S. Bank (the "2010 Financing Agreement, as amended, including, as

26

**Page 2 of 24** -    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                      ON INTERIM AND FINAL BASIS

1  amended by the Third Amendment, the "Financing Agreement"[1]), and to perform such other

2  and further acts as may be required in connection with the DIP Facility;

3          (c)     providing and granting liens, security interests, Superpriority

4  administrative expense claims and other adequate protection to U.S. Bank; and

5          (d)     scheduling a final hearing (the "Final Hearing") to consider

6  entry of a final order authorizing Debtor to obtain financing under the DIP Facility (the "Final

7  Order").

8  **SUMMARY OF MATERIAL TERMS OF DIP FACILITY**

9       5.    The material terms of the DIP Facility are[2]:

10          (a)     <u>DIP Facility</u>.  The DIP Facility will be comprised of a

11  committed, secured revolving line of credit in an aggregate principal amount as of any day

12  (the "DIP Commitment Amount") equal to the lesser of (i) $23,000,000 (the "Maximum

13  Commitment Amount"); (ii) the Borrowing Base as of such day plus $12,000,000 (the

14  "Borrowing Base Commitment Amount"); or (iii) the sum of the amounts set forth in the

15  Budget[3] for such day under the line items entitled "Projected Ending Revolver Balance" and

16  "DIP Ending Balance," plus $4,000,000, plus the Unrealized Sale Amount for such day.

17  "Unrealized Sale Amount" as of any day means: (i) the amount set forth under the "Proceeds

18  from Sale of Inventory" line in the Budget, if the sale giving rise to the anticipated sale

19  proceeds set forth in such line item of the Budget has not closed on or before such day or

---

20
21  [1] A copy of the Financing Agreement (exclusive of schedules and exhibits) has been filed with the Bankruptcy Court and is available on the Bankruptcy Court's website, and is also available upon request by contacting counsel for Debtor.

22
23  [2] The description of the DIP Facility contained in this Motion is a summary only and should not be construed as modifying or limiting the terms thereof.  In the event of a conflict between the provisions of the Interim Order (or Final Order, as applicable), the Motion and the Loan Documents, the provisions of the Interim Order (or Final Order, as applicable) shall govern.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Financing Agreement.

24
25

26  [3] The initial Budget is attached to the proposed Interim Order as Exhibit 1.

**Page 3 of 24 -**    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                  ON INTERIM AND FINAL BASIS

(ii) $0, if such sale has occurred on or before such day  The DIP Facility will commence on the date the Interim Order is entered by the Bankruptcy Court approving the terms of the DIP Facility and terminating on the Maturity Date (as defined below).  All advances under the DIP Facility (the "DIP Advances") and all other post-petition indebtedness owing to U.S. Bank shall be entitled to Superpriority administrative expense status.  All DIP Advances shall be deemed additional advances under the Financing Agreement and shall be governed by the terms and conditions thereof (as amended by the Third Amendment).

(b)    <u>Maximum Available Amount</u>.  As of any day, the maximum available amount under the DIP Facility will be an amount equal to (i) the DIP Commitment Amount as of such day; minus (ii) the aggregate outstanding principal balance of all DIP Advances as of such day, plus any then-outstanding Pre-Petition Indebtedness owing in respect of the Revolving Loan.

(c)    <u>Use of Proceeds</u>.  The DIP Facility shall be used to fund the working capital requirements and other general corporate needs of Debtor during the pendency of the Case, and to pay certain fees and other costs and expenses (including the "Carveout" (defined below)) consistent with the Budget (the initial Budget, together with all updates thereto which are acceptable to U.S. Bank in its reasonable discretion, the "Budget"), subject to certain permitted variances.

(d)    <u>Use of Cash Collateral/Roll Over of Pre-Petition Debt</u>.  Any cash collateral of U.S. Bank used by Debtor will constitute Post-Petition Indebtedness under the DIP Facility.  On a daily basis, Debtor will pay over to U.S. Bank all cash proceeds (and cash equivalents) of Collateral for application to the Pre-Petition Indebtedness and the Post-Petition Indebtedness, as provided in the Financing Agreement.

(e)    <u>Interest Rate</u>.  Outstanding advances under the DIP Facility will bear interest at the rate per annum applicable to Revolving Loans as set forth in the Financing Agreement (generally LIBOR plus 2.5% to LIBOR plus 3%) (without giving effect

**Page 4 of 24 -**    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

1    to the current default rate), plus 2%.  Upon the occurrence and during the continuance of an

2    Event of Default, the aggregate principal amount of all outstanding obligations under the DIP

3    Facility will bear interest at the rate described above, plus 2%.

4                    (f)    Facility Fee.  A non-refundable fee in the amount of $350,000,

5    which fee shall be deemed fully earned as the closing date of the DIP Facility.  Such fee will

6    be due and payable on the earlier to occur of the Maturity Date or the date that is one year

7    after the Petition Date.  If within nine months after the Petition Date there has been confirmed

8    a plan of reorganization that provides for payment, in cash, on the effective date of such plan

9    of all obligations of Debtor to U.S. Bank, then 50% of such fee will be waived by U.S. Bank;

10   if such a plan has been confirmed within one year after the Petition Date, then $100,000 of

11   such fee will be waived by U.S. Bank.

12                    (g)    Maturity Date.  The DIP Facility shall mature, and all

13   indebtedness, liabilities and other obligations of Debtor shall be due and payable in full in

14   cash, on the earliest to occur of (i) the date that is one year after the Petition Date, (ii) upon the

15   closing of any sale of all or substantially all of the assets of Debtor pursuant to Section 363 of

16   the Bankruptcy Code, or (iii) upon the effective day of a confirmed plan under Section 1129

17   of the Bankruptcy Code.

18                    (h)    Collateral.  The DIP Facility will be secured by a first-priority

19   perfected security interest and lien in favor of U.S. Bank on all Collateral (as defined in the

20   Financing Agreement) plus all other assets of Debtor, subject only to valid, perfected, prior

21   pre-petition liens, Priming Interests and Permitted Liens (as defined in the Financing

22   Agreement) and the Carveout, and excepting any avoidance actions and the proceeds thereof

23   under Sections 544, 547, 548, 549 and 553 of the Bankruptcy Code.

24                    (i)    Perfection of Liens.  Entry of the Interim Order will

25   automatically perfect the liens granted by the Interim Order

26

**Page 5 of 24** -    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
            ON INTERIM AND FINAL BASIS

(j)  <u>Superpriority Administrative Expense</u>.  The DIP Advances and all other post-petition indebtedness owing to U.S. Bank will be allowable under Section 503(b)(1) of the Code as an administrative expense with priority pursuant to the provisions of Section 364(c)(1) of the Code over all other administrative expenses of the kind specified in Section 503(b) or Section 507(b) of the Code and all other expenses and claims, subject only to the Carve-Out.

(k)  <u>Carve-Out</u>.  U.S. Bank has agreed to a "carve-out" from U.S. Bank's pre-petition and postpetition claims (whether secured or unsecured), including U.S. Bank's superpriority administrative expense claim, in an amount equal to the sum of (i) $100,000 for unpaid administrative expenses incurred following an Event of Default, plus (ii) the amount of funds then on deposit in the Professional Fee Holding Account as described below, plus (iii) the amount of administrative expenses then incurred but not yet paid into the Professional Fee Holding Account in an aggregate amount not to exceed $100,000.  Such administrative expenses shall be limited to allowed fees and expenses of the U.S. Trustee's office, Debtor's counsel and other professionals that are approved by the Bankruptcy Court, and any professionals employed by an official creditors' committee (except to the extent such fees and expenses are incurred in prosecuting claims against U.S. Bank or in hindering, delaying or otherwise attempting to prevent the enforcement by U.S. Bank of its liens or realization upon any collateral).  Subject to the terms of the Financing Agreement (as amended by the Third Amendment), U.S. Bank will fund a DIP Advance as of the 15th day of each month in an amount equal to such administrative expenses incurred by Debtor during the immediately preceding month and billed before such 15th day, and the proceeds of such DIP Advance shall be remitted into a segregated deposit account of Debtor maintained with U.S. Bank (the "Professional Fee Holding Account").  Funds on deposit in the Professional Fee Holding Account may be used to pay any such administrative expenses as approved (or when allowed to be paid) by the Bankruptcy Court; provided, however, Debtor will not pay

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   any expenses incurred by Debtor except in accordance with the Budget.  U.S. Bank shall have

2   a perfected security interest in the Professional Fee Holding Account.  To the extent that any

3   funds remain in the Professional Fee Holding Account after payment of such administrative

4   expenses, the excess funds may be applied by U.S. Bank to payment of any indebtedness,

5   liabilities and other obligations at any time owing by Debtor to U.S. Bank in such order of

6   application as U.S. Bank shall determine in its reasonable discretion.

7            (l)          <u>Loan Covenants/Reporting Requirements</u>.  The DIP Facility

8   includes the following covenants:

9            (i)          Debtor will not seek any other debtor-in-possession

10  financing during the pendency of the Case unless such financing is sufficient in amount and

11  is actually used to fully repay all Pre-Petition Indebtedness and Post-Petition Indebtedness of

12  Debtor to U.S. Bank.  In certain circumstances, the Financing Agreement allows Debtor to

13  seek post-petition financing secured by a priming lien following termination of the agreement

14  by U.S. Bank.

15           (ii)          Debtor shall not use any funds or the proceeds of any

16  DIP Advance in a manner or for a purpose other than in accordance with the Financing

17  Agreement and the Budget.  In certain circumstances, the Financing Agreement does allow

18  Debtor to seek use of cash collateral following termination of the agreement by U.S. Bank.

19           (iii)          Debtor shall not (a) as of any week, permit

20  disbursements for all Operating Expenses to exceed 115% (tested on a four-week cumulative

21  trailing basis) of the aggregate amount of Operating Expenses set forth in the Budget for such

22  week; provided, however, that Debtor may increase disbursements for expenditures under the

23  "Inventory Purchase" line in the Budget by an amount equal to 68 cents of each dollar of

24  grocery sale revenue collected by Debtor in excess of the amount of such revenue set forth in

25  the Budget for such week, (b) at any time, permit disbursements for any line item of Non-

26  Operating Expense (other than disbursements for Financing Costs and Expenses) to exceed

**Page 7 of 24 -**     DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                        ON INTERIM AND FINAL BASIS

1  the maximum aggregate amount set forth in the Budget with respect to such line item of Non-

2  Operating Expense (tested on a cumulative basis from the commencement of the bankruptcy

3  case), or (c) as of any week, permit revenues of Debtor generated in the ordinary course of

4  business to be less than 85% of the amount of revenues set forth in the Budget (tested on a

5  four-week cumulative trailing basis).  "Operating Expenses" means those categories of

6  operating expenses as set forth in the Budget, and "Non-Operating Expenses" means those

7  categories of non-operating expenses as set forth in the Budget

8                    (iv)    Debtor will cause the funds and other assets currently

9  held by a trustee in connection with Debtor's nonqualified deferred compensation plan(s) to

10  be promptly remitted into the Bankruptcy estate for use in the Bankruptcy case.

11                    (v)    Not later than one year after the commencement of the

12  bankruptcy case, Debtor shall have confirmed a plan of reorganization that provides for

13  payment, in full in cash, on the effective date of the plan, of all obligations of Debtor to

14  U.S. Bank.

15                    (vi)    Debtor shall (a) deliver to U.S. Bank not later than

16  30 days after the Petition Date a listing of locations that Debtor and Food Partners have

17  identified as locations to potentially be sold pursuant to Section 363 of the Bankruptcy Code,

18  (b) 30 days after the Petition Date, apply for court approval of Debtor's retention of its real

19  estate broker (or similar professional) engaged by Debtor in connection with its potential sale

20  of such locations, and (c) not later than close of business (Pacific time) on Wednesday of

21  each week, deliver to U.S. Bank a written update of all sales and sale processes, including,

22  without limitation, the sale process and potential sale of the foregoing locations, all going-

23  out-of-business sales, and all sales under Section 363 of the Bankruptcy Code.

24                    (vii)    Without the prior written consent of U.S. Bank, Debtor

25  will not sell, lease or otherwise transfer any assets of Debtor other than (i) inventory in the

26  ordinary course of business; and (ii) other inventory and equipment in an aggregate amount

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    not to exceed $50,000; provided, however, Debtor may file a motion to seek approval of such

2    sale, lease or other transfer before having received such consent of U.S. Bank.

3                    (viii)    If, within eight months after the commencement of the

4    bankruptcy case, Debtor has not filed a plan that provides for payment in full in cash on the

5    effective date of the plan of all Pre-Petition Indebtedness, DIP Advances and all other Post-

6    Petition Indebtedness of Debtor to U.S. Bank, Debtor shall promptly deliver to U.S. Bank a

7    non-binding plan with respect to a proposed sale of all or substantially all of the assets of

8    Debtor pursuant to Section 363 of the Bankruptcy Code.

9                    (ix)    All disbursements of Debtor shall be consistent with the

10    Budget and shall be under the control of the chief restructuring officer or other board-

11    appointed turnaround professional of Debtor.

12                    (x)    No Financial Covenants (as defined in the Financing

13    Agreement), other than compliance with the Budget as set forth above.

14                    (xi)    By the close of business (Pacific time) on Wednesday

15    of each week, Debtor shall provide U.S. Bank an actual-to-Budget comparison as of the end

16    of the previous week (for the four-week cumulative trailing period and on a cumulative basis

17    from the commencement of the bankruptcy case).

18                    (xii)    Debtor shall deliver to U.S. Bank (a) as soon as

19    available and in any event not later than the close of business (Pacific time) on Wednesday of

20    each week, a Borrowing Base Certificate calculated as of the end of the immediately

21    preceding Sunday (or, as of January 1, 2014 and thereafter, calculated as of the end of the

22    immediately preceding Saturday), together with (i) reports of Debtor's sales, credits to sales

23    or credit memoranda applicable to sales, collections and non-cash charges for the applicable

24    period and acceptable supporting documentation thereto; (ii) reports of Debtor's inventory

25    (with the value of grocery and GM inventory categories to be updated on a weekly basis and

26    all other inventory categories to be updated on a monthly basis, and acceptable supporting

**Page 9 of 24 -**    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

1  documentation thereto; and (iii) agings of accounts payable listed by invoice date and due

2  date, in each case reconciled to Debtor's general ledger as of the end of the immediately

3  preceding month; (b) as soon as available and in any event not later than the 20th day after

4  the end of each calendar month, an inventory report as further described in Section 8.4 of the

5  Financing Agreement; and (c) as soon as available and in any event not later than the 25th

6  day after the end of each calendar month, each of the financial statements described in

7  Section 8.5 of the Financing Agreement.

8  (xiii)  Debtor shall deliver to U.S. Bank any other information

9  U.S. Bank may reasonably request, including, without limitation, the status of any

10  recapitalization or reorganization of Debtor and any other business plans of Debtor.

11  (xiv)  Debtor shall engage in a telephone conference with

12  representatives of U.S. Bank on Thursday of every week at 10:00 a.m. Pacific Time, or at

13  such other time as may be acceptable to U.S. Bank.

14  (xv)  Debtor shall not open any new deposit or securities

15  accounts, except new deposit or securities accounts maintained with U.S. Bank.

16  (xvi)  Debtor shall pay all regularly scheduled principal

17  payments and interest on the Pre-Petition Indebtedness and the DIP Advances as and when

18  due under the Financing Agreement.

19  (xvii)  The DIP Facility will also contain certain other

20  covenants, representations and warranties contained in 2010 Financing Agreement (as

21  amended by the Third Amendment).

22  (m)  Events of Default.  Events of Default are limited to the

23  following:

24  (i)  any failure to pay, when due, any principal of or interest

25  on any Loan or any other amount with respect to any Pre-Petition Indebtedness or Post-

26  Petition Indebtedness;

**Page 10 of 24** -  DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

1                       (ii)      any failure to immediately remit to Agent any net

2 proceeds of any sale, lease, transfer or other disposition of assets of any Borrower;

3                      (iii)      any failure to deliver any reports or other information

4 when due; provided, however, that no Event of Default shall occur the first three times such

5 failure occurs if, with respect to each such occurrence, Borrowers deliver such reports or

6 other information within three Business Days after receipt of written notice from Agent that

7 the same are required to be delivered to Agent;

8                      (iv)      any default in the performance, or breach, of any other

9 covenant or agreement under the Financing Agreement (as amended by the Third

10 Amendment) exclusive of those defaults set forth elsewhere in this Section 11.1(i) of the

11 Financing Agreement (as amended by the Third Amendment);

12                      (v)      either the Interim Order or the Final Order, or any

13 portion thereof, shall be vacated, reversed or modified;

14                      (vi)      relief from the automatic stay under the Bankruptcy

15 Code shall be granted in favor of any other secured creditor to foreclose on any Loan

16 Collateral;

17                      (vii)      a Chapter 11 Trustee or examiner with expanded

18 powers shall be appointed, or the Bankruptcy Case shall be converted to a case under

19 Chapter 7 of the Bankruptcy Code;

20                      (viii)      the Bankruptcy Case shall be dismissed;

21                      (ix)      Market's chief restructuring officer or other board-

22 appointed turnaround professional of Market resigns or is terminated by Market and no

23 replacement acceptable to Agent shall have been named by Market within two weeks after

24 such resignation or termination, or the chief restructuring officer or other board-appointed

25 turnaround professional shall no longer have all of the authority and responsibilities set forth

26 in its engagement letter with Market;

**Page 11 of 24 -**   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                   ON INTERIM AND FINAL BASIS

1          (x)     any representation, warranty or statement made by or

2   on behalf of any Borrower, Express (in its capacity as a guarantor) or the Individual

3   Guarantor (1) in this Agreement, in connection with this Agreement, in connection with any

4   transaction relating to this Agreement, or in any of the other Loan Documents to which it is a

5   party was false in any material respect when made or furnished or when treated as being

6   made or furnished; or (2) to induce Lenders to make any Loan or LC Issuer to issue any

7   Letter of Credit was false in any material respect when made or furnished, or when treated as

8   being made or furnished;

9          (xi)    there occurs an uninsured casualty loss with respect to

10  any of the Loan Collateral having an aggregate fair market value of greater than $1,000,000,

11  such that when the loss amount is deducted from Excess Availability as of the date of the

12  casualty loss (or at Agent's discretion, the end of the month immediately following the

13  casualty loss), the resulting amount is less than $4,000,000;

14         (xii)   a contribution failure occurs with respect to any

15  Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA;

16         (xiii)  there is instituted against any Borrower any criminal

17  proceeding for which forfeiture of any material asset is a potential penalty, or any Borrower

18  is enjoined, restrained or in any way prevented by order of any Governmental Authority from

19  conducting any material part of its business affairs and such order is not completely stayed,

20  to the reasonable satisfaction of Agent, or dissolved within five (5) Business Days from the

21  effective date of such order;

22         (xiv)   there occurs a Change of Control; or

23         (xv)    any Borrower or any of its Subsidiaries discovers,

24  identifies, is given notice by any Person, or otherwise has Knowledge of (1) the existence of

25  any Environmental Liability or (2) any Release of Hazardous Substances on, about or

26  affecting a Borrower's Facility or such Borrower's or such Subsidiary business operations,

**Page 12 of 24** -   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

1   which, in each case by itself (an "Environmental Default") will or could reasonably be

2   estimated to subject such Borrower or such Subsidiary to indebtedness, liability, or

3   obligations in excess of $1,000,000, and when the amount of such indebtedness, liability and

4   obligations is deducted from Excess Availability as of the date of such Knowledge (or at the

5   Agent's discretion, the end of the month immediately following such Knowledge), the

6   resulting amount is less than $4,000,000; or two or more Environmental Defaults have

7   occurred which will or could reasonably be estimated to subject such Borrower or such

8   Subsidiary to indebtedness, liability or obligations in excess of $5,000,000 in the aggregate

9   over the term of this Agreement, and when the amount of such indebtedness, liability and

10  obligations is deducted from Excess Availability as of the date of Knowledge of the last to

11  occur of the Environmental Defaults (or at Agent's discretion, the end of the month

12  immediately following such Knowledge), the resulting amount is less than $4,000,000.

13              (n)    Cure Periods.  The Financing Agreement (see Section 11.2)

14  provides certain cure periods for certain Events of Default.

15              (o)    Amendments and Modifications.  Debtor and U.S. Bank may

16  enter into any non-material amendments or modifications to the Financing Agreement and the

17  Loan Documents without notice or a hearing or further order of this Court; provided,

18  however, that any such modifications shall be filed with the Court and shall not be adverse to

19  Debtor or its Estate.

20                      **DISCLOSURES REQUIRED BY LBF 541.7**

21              6.     Debtor hereby identifies the following provisions identified in

22  LBF 541.7 that will be included in the Financing Agreement, the Interim Order or the Final

23  Order.

24              (a)    Item 3.  "*Provisions or findings of fact that bind Debtor, the*

25  *estate and/or all parties in interest with respect to the validity, perfection, relative priority or*

26  *amount of the secured party's lien or debt.*"  As a condition to providing the DIP Facility,

**Page 13 of 24** -   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                    ON INTERIM AND FINAL BASIS

U.S. Bank has required that Debtor make certain acknowledgments and admissions with respect to the Pre-Petition Indebtedness (see Interim Order).  The Interim Order provides that Debtor's acknowledgments and admissions shall be binding on its Estate, all parties in interest, including, without limitation, any Committee, unless the Committee or other party in interest has filed an adversary proceeding or contested matter challenging any such acknowledgements or admissions no later than the date that is the later of (i) 90 days after the entry of this Interim Order; or (ii) 60 days from the date of formation of the Committee, and provides further that if no such adversary proceeding or contested matter is timely commenced as of such date, the Pre-Petition Indebtedness of U.S. Bank shall constitute allowed secured claims, not subject to objection or subordination and otherwise unavoidable, and the pre-petition liens of U.S. Bank on the Pre-Petition Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind or subordination, and otherwise unavoidable.  The above provisions are justified because Debtor does not dispute the validity, perfection, relative priority or amount of U.S. Bank's lien or debt and on multiple occasions pre-petition acknowledged the amount of debt owing to U.S. Bank. The provision also allows ample time for the Committee or other non-Debtor parties to analyze and, if necessary, challenge the acknowledgments or admissions.

(b)    Item 4.  *"Any language that characterizes any postpetition payments as payments of interest, fees or costs on a pre-petition loan."*  The Financing Agreement requires post-petition principal and interest payments on pre-petition debt.  The Financing Agreement requires Debtor to pay over to U.S. Bank all cash proceeds (and cash equivalents) of Collateral for application to the Pre-Petition Indebtedness and the Post-Petition Indebtedness as provided in the Financing Agreement.  In addition, the Financing Agreement requires Debtor to pay all scheduled principal and interest payments on term debt owing to U.S. Bank.  The above provisions are required by U.S. Bank as a condition to provide the amount of financing requested by Debtor, and on the financial terms agreed to by U.S. Bank.

**Page 14 of 24** -   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    Including these provisions is justified in that the U.S. Bank financing is less expensive than

2    the Sunstone alternative DIP facility, and obtaining financing from U.S. Bank allows Debtor

3    to avoid a cash collateral fight and "priming" contest with U.S. Bank.  Obtaining financing

4    from U.S. Bank also provides greater certainty to critical suppliers, employees and other

5    interested parties, and helps to ensure a smoother transition into Chapter 11.

6              (c)      <u>Item 5</u>.  *"Waiver of Bankruptcy Code § 506(c) right to seek to*

7    *charge collateral of secured party for the trustee's expenses in preserving or disposing of*

8    *assets for the benefit of the secured party.*"  The Financing Agreement and Interim Order

9    provide that none of U.S. Bank's Collateral shall be subject to any surcharge under

10   Section 506(c) of the Bankruptcy Code.  Debtor believes the above provision is justified

11   because U.S. Bank is greatly over-secured, so there should be no need to surcharge

12   U.S. Bank's collateral.

13             (d)      <u>Item 7</u>.  *"Waiver or release by debtor or the estate of any or all*

14   *claims Debtor/estate may have against the lender/secured party, including waiver of avoiding*

15   *power causes of action against the lender/secured party or against insiders of the*

16   *lender/secured party."*  Pursuant to the Financing Agreement, Debtor releases U.S. Bank from

17   any and all known claims.  Debtor believes the above provision is justified because Debtor is

18   not aware of any claims it has against U.S. Bank, and on multiple occasions pre-petition

19   (including in connection with the Express pharmacy sales) Debtor waived any claims it may

20   have against U.S. Bank.

21             (e)      <u>Item 8</u>.  *"Waiver by debtor or the estate of the right to seek to*

22   *"prime" the secured position of the lender/secured party under Item Bankruptcy Code*

23   *§364(d)."*  The Financing Agreement prohibits Debtor from seeking any other debtor-in-

24   possession financing during the pendency of its bankruptcy proceedings unless such financing

25   is sufficient in amount and is actually used to fully repay all Pre-Petition Indebtedness, all DIP

26   Advances and all other Post-Petition Indebtedness of Debtor to U.S. Bank.  Debtor believes

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   the above provision is justified because the U.S. Bank financing is designed to provide Debtor

2   with sufficient financing such that Debtor should not need to seek alternative DIP financing.

3   In addition, in certain circumstances, the Financing Agreement allows Debtor to seek post-

4   petition financing secured by a priming lien following termination of the agreement by

5   U.S. Bank.

6          (f)   <u>Item 11</u>.   *"Waiver, effective on default, or expiration of a prior*

7   *court order, of Debtor's right to move for a court order pursuant to Bankruptcy Code*

8   *§363(c)(2)(B), authorizing the use of cash collateral in the absence of the secured party's*

9   *consent."*  The Financing Agreement provides that Debtor will not seek authority for the use

10   of cash collateral of U.S. Bank without the prior written consent of U.S. Bank.  Debtor

11   believes the above provision is justified because the U.S. Bank financing is designed to

12   provide Debtor with sufficient financing such that Debtor should not need to seek use of

13   U.S. Bank's cash collateral.  In addition, in certain circumstances, the Financing Agreement

14   does allow Debtor to seek use of cash collateral following termination of the agreement by

15   U.S. Bank.

16          7.   The above items were required by U.S. Bank as a condition to

17   U.S. Bank agreeing to provide the DIP Facility.  For the reasons set forth above and for the

18   reasons set forth below under the section titled "**THE DIP FINANCING SHOULD BE**

19   **APPROVED**," Debtor believes the DIP Facility should be approved notwithstanding the

20   inclusion of the above provisions.

21          **GENERAL BACKGROUND FACTS**

22         8.   C & K is a family owned grocery store company headquartered in

23   Brookings, Oregon.  Ray Nidiffer founded the company in 1956 with a single store in

24   Brookings.  Over the next 50 years, the Nidiffer family and its employees grew the company

25   to a chain of 60 stores, operating mostly in small rural communities, with 41 stores in Oregon

26   and 19 stores in northern California.

**Page 16 of 24** -   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

9.    The stores operate under the banners Ray's Food Place, Shop Smart and C & K Market ("Market").  Market employs over 2,300 employees, approximately 57% of whom are full-time.  Market has an average biweekly payroll in excess of $2,700,000 and provides family health insurance for all its full-time employees.

10.    Historically, Debtor operated in small rural communities.  Often, Debtor operated the only grocery store in the community and the only grocery store for miles around.  As a result of both Debtor's expansion into more populated areas, and the expansion of large discounters such as Costco and Walmart into less populated areas and into the grocery business, Debtor has faced increasingly greater competition and resulting pressure on its sales and margins.

11.    Currently, most of Debtor's stores are located within 40 miles of a large discount grocery operation such as Walmart or Costco.  In the last half of 2012, new "Super Walmarts" negatively affected at least 30 of Debtor's markets.  As a result of the evolving marketplace, several of Debtor's stores are no longer viable.  Debtor has already closed or sold several stores, and is faced with the necessity of closing or selling at least 16 more stores.  Although the closures will enhance Debtor's profitability, the downsizing will result in additional debt as a result of lease rejections, and will diminish Debtor's ability to service its legacy debt incurred during its period of expansion.  As a result, Debtor must restructure its obligations.

12.    Debtor still maintains at least 40 grocery stores with proven profitability in markets that will continue to prosper.  Debtor's restructuring will enable it to emerge as a viable entity that will continue to contribute to the communities in which it operates.

13.    C & K Express, LLC ("Express") is a wholly-owned subsidiary of Debtor.  Express owned and operated 15 pharmacies.  Several of the pharmacies were located in Debtor's grocery stores and several were stand-alone operations.  Express is a co-borrower

**Page 17 of 24** -    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

1    with Debtor on Debtor's loans with U.S. Bank.  U.S. Bank has a security interest in virtually

2    all of Express' assets.  In July of 2013, Debtor engaged The Food Partners, LLC ("Food

3    Partners") to assist Debtor in the sale of the pharmacies.  Express has entered into asset

4    purchase agreements for the sale of the pharmacy inventory and intangible assets at twelve of

5    its thirteen stores.  The purchasers are Albertsons, Safeway, Rite Aid, and Coastal

6    Pharmacies.  Twelve of the sales have closed and the remaining sale is scheduled to close in

7    early December.  After all sales have closed, Express' accounts have been collected, and its

8    remaining assets have been liquidated, Debtor projects that approximately $13,000,000 of

9    proceeds will be applied in reduction of the debt owed to U.S. Bank.

10           14.     Prior to the sale of the assets of Express, U.S. Bank was owed

11   approximately $37,000,000 secured by substantially all assets of Debtor and Express.  After

12   the pharmacy sales are closed and the proceeds of the pharmacy assets are applied to

13   U.S. Bank's debt, U.S. Bank will be owed approximately $24,000,000.  U.S. Bank's claim is

14   secured by all of Debtor's accounts, inventory, equipment, intangibles and most of Debtor's

15   real property and cash.  U.S. Bank is over-secured.

16           15.     Debtor's assets, exclusive of the Express assets, include inventories at

17   cost of approximately $32,000,000, accounts receivable of approximately $2,000,000, real

18   estate with appraised values totaling in excess of $38,000,000, equipment with a book value

19   of approximately $30,000,000, stock in Unified Grocers, Inc. with a redemption value of

20   approximately $7,000,000, and cash in transit and in stores of approximately $4,500,000.

21   The value of Debtor's business after Debtor has sold or liquidated its non-viable stores and

22   sold the pharmacy assets is projected to exceed $90,000,000.

23                          **SUMMARY OF PRE-PETITION BANK LOANS**

24           16.     U.S. Bank is the holder of a claim as of November 18, 2013, against

25   Debtor in the approximate sum of $34,031,109.05 consisting of borrowings of

26   $32,687,600.27; accrued interest and unused line fees of $93,508.78; reimbursement

**Page 18 of 24** -    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                       ON INTERIM AND FINAL BASIS

1    obligations for outstanding letters of credit of $1,250,000; plus all other costs, fees and

2    obligations owing, including, without limitation, all costs and expenses of administration,

3    collection and enforcement incurred by U.S. Bank prior to the Petition Date (the

4    "Pre-Petition Indebtedness").

5         17.    The Pre-Petition Indebtedness is evidenced by, without limitation,

6    (i) the Financing Agreement, (ii) a Financing Agreement dated November 2, 2012, among

7    Debtor and U.S. Bank, as the same may have been amended or supplemented; (iii) a

8    $30,000,000 Revolving Loan Note dated November 3, 2010, by Borrowers in favor of

9    U.S. Bank; (iv) a $13,500,000 Term Loan A Note dated November 3, 2010, by Borrowers in

10   favor of U.S. Bank; (v) a $6,131,088 Term Loan Note dated November 2, 2012, by

11   Borrowers in favor of U.S. Bank; (vi) and by certain other documents relating to the

12   foregoing, including the Loan Documents (as defined in the Financing Agreement).

13        18.    The Pre-Petition Indebtedness is secured by a security interest and lien

14   in substantially all of Debtor's real and personal property (the "Pre-Petition Collateral").

15                    **DEBTOR'S NEED FOR DIP FINANCING**

16        19.    Debtor's cash flow budget projects that Debtor will need

17   approximately $2,600,000 of post-petition financing in the next five to six weeks.  The

18   projected borrowing requirements result primarily from $1,000,000 in projected utility

19   deposits and the seasonal inventory build-up required during the holiday season.  However,

20   Debtor's projections are based on assumptions that Debtor's transition into Chapter 11 will

21   be relatively smooth and that most suppliers will extend trade credit.  Debtor's projections do

22   not account for the potential that all or most PACA suppliers demand payment of pre-petition

23   obligations and demand payment in advance for future deliveries.  Further, the projections do

24   not contain a contingency for a disruption such as a major snowstorm that could close stores

25   for several days and result in a short term but significant decline in revenue and a short term

26   need to borrow money to pay ongoing operating expenses.  None of the foregoing

**Page 19 of 24** -    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                       ON INTERIM AND FINAL BASIS

1  circumstances would jeopardize Debtor's business or operations, but could result in

2  significant short term cash flow shortages.  Debtor needs access to post-petition financing to

3  maintain operations and to deal with any disruptions to its business.

4          20.      Debtor requires the DIP Facility to continue to operate as a going

5  concern, to pay employees and trade creditors, and to preserve the value of its assets.  Absent

6  such financing, Debtor's Estate will be immediately and irreparably harmed.  Debtor believes

7  that consummation of the DIP Facility is in the best interest of Debtor's Estate.

8                    **THE DIP FACILITY SHOULD BE APPROVED**

9          21.      The DIP Facility is a result of extensive negotiations between Debtor

10  and U.S. Bank, with input from Debtor's two largest unsecured creditors.

11          22.      Prior to filing, Debtor spoke with numerous other potential DIP

12  financing sources (including other banks and non-bank lenders).  Only one party besides

13  U.S. Bank (Sunstone Business Finance, LLC) is willing and able to provide DIP financing to

14  Debtor on terms acceptable to Debtor.  The Sunstone term sheet is attached hereto as

15  **Exhibit 3**.  Debtor and Sunstone have agreed to the form of definitive financing documents.

16          23.      Although the proposed Sunstone financing does not contain many of

17  the controls or restrictions contained in the U.S. Bank DIP Facility, the Sunstone facility is

18  likely to be a more expensive facility than the DIP Facility because of higher fees and a

19  higher interest rate.  In addition, because all of Debtor's assets are encumbered by liens and

20  security interests in favor of U.S. Bank, obtaining financing from Sunstone would require a

21  cash collateral fight and "priming" contest with U.S. Bank, the results of which cannot be

22  predicted with certainty.

23          24.      After considering all aspects of the DIP Facility and the proposed

24  Sunstone facility, Debtor determined in the exercise of its business judgment that it was in

25  the best interest of Debtor and its Estate to obtain the DIP Facility from U.S. Bank.  Doing so

26  is less expensive to the Estate, and will avoid an expensive and uncertain cash collateral and

**Page 20 of 24** -  DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                    ON INTERIM AND FINAL BASIS

1  priming fight with U.S. Bank.  Obtaining financing from U.S. Bank (Debtor's existing

2  lender) provides greater certainty to critical suppliers, employees and other interested parties,

3  and helps to ensure a smoother transition into Chapter 11.

4         25.    Section 364(c) of the Bankruptcy Code provides that if a debtor is

5  unable to obtain unsecured credit allowable as an administrative expense under

6  Section 503(b)(1) of the Bankruptcy Code, the court may authorize a debtor-in-possession to

7  obtain credit or incur debt that has priority over "ordinary" administrative expenses and, in

8  particular, "(a) with priority over any or all administrative expenses of the kind specified in

9  Section 503(b) or 507(b) of this title; (b) secured by a lien on property of the estate that is not

10  otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is

11  subject to a lien." 11 U.S.C. § 364(c)(l)-(3).

12         26.    Other than the requirement of notice and a hearing, the only statutory

13  prerequisite under Section 364(c) for obtaining credit on a secured and superpriority basis is

14  that debtor-in-possession must be unable to obtain credit allowable as an "ordinary"

15  administrative expense.  11 U.S.C. § 364(c)(2); *see also In re Garland Corp.*, 6 B.R. 456,

16  461 n.11 (B.A.P. 1st Cir. 1980) (secured credit under Section 364(c)(2) is authorized, after

17  notice and a hearing, upon showing that unsecured credit cannot be obtained); *In re Ames*

18  *Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y 1990) (debtor must show that it has

19  made a reasonable effort to seek other sources of financing under Sections 364(a) and (b) of

20  the Bankruptcy Code).

21         27.    Debtor is unable to obtain adequate unsecured credit allowable under

22  Section 503(b)(1) of the Bankruptcy Code as an administrative expense.  Debtor is also

23  unable to obtain secured credit under Section 364(c) and (d) of the Bankruptcy Code on

24  equal or more favorable terms than those set forth in the Financing Agreement and Loan

25  Documents.  The terms of the Financing Agreement and the Loan Documents are fair and

26  reasonable, were negotiated by the parties at arm's length and in good faith and, in Debtor's

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  business judgment, are the best available to Debtor under present market conditions and

2  Debtor's financial circumstances.

3          28.      Courts generally give broad deference to the business decisions of a

4  debtor.  *See, e.g.*, *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986);

5  *Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Air Lines,*

6  *Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp.*

7  (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *Walter v. Sonwest Bank* (*In re*

8  *Walter*), 83 B.R. 14 (B.A.P. 9th Cir. 1987) (quoting *In re Cont'l*, 780 F.2d at 1226).  In

9  particular, a bankruptcy court should defer to a debtor's reasonable business judgment

10  regarding the need for financing so long as the proposed financing agreement does not

11  contain terms that leverage the bankruptcy process or benefit a third party rather than the

12  bankruptcy estate.  This was explained by the bankruptcy court in *In re Ames*:

13          [A] court's discretion under Section 364 is to be utilized on
            grounds that permit reasonable business judgment to be exercised
14          so long as the financing agreement does not contain terms that
            leverage the bankruptcy process and powers or its purpose is not
15          so much to benefit the estate as it is to benefit a party-in-interest.

16  115 B.R. at 40.

17          29.      Here, Debtor's decision to obtain the DIP Facility from U.S. Bank

18  represents a sound exercise of its business judgment.  The DIP Facility provides Debtor with

19  the funding it needs to meet its operational needs and fund its restructuring costs.  Without

20  the financing, Debtor's going concern value and the value of its assets will be substantially

21  and irreparably impaired.

22                          **INTERIM APPROVAL SHOULD BE GRANTED**

23          30.      Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a

24  motion to use cash collateral or obtain credit, respectively, may not be commenced earlier

25  than 14 days after the service of such motion.  Upon request, however, the Court is

26  empowered to conduct a preliminary expedited hearing on the motion and authorize the use

**Page 22 of 24** -   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                        ON INTERIM AND FINAL BASIS

1    of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and

2    irreparable harm to a debtor's estate pending a final hearing.

3           31.    Pursuant to Bankruptcy Rules 4001(b) and (c), Debtor requests that the

4    Court conduct an expedited preliminary hearing on this Motion and (a) authorize Debtor to

5    borrow under the DIP Financing on an interim basis, pending entry of a final order, in order

6    to avoid immediate and irreparable harm and prejudice to Debtor's estate and all parties-in-

7    interest; and (b) schedule a hearing to consider entry of a final order.

8           32.    Debtor has an urgent and immediate need for cash to preserve and

9    maximize the value of its assets.  Currently, Debtor does not have sufficient unencumbered

10   funds with which to do so.  Absent authorization from the Court to obtain secured credit and

11   use of Cash Collateral, as requested, on an interim basis pending a final hearing on the

12   Motion, Debtor will be immediately and irreparably harmed.

13                                        **NOTICE**

14          33.    Notice of this Motion has been given to, among other parties,

15   (a) Bank's attorneys, (b) the United States Trustee, (c) Debtor's other secured creditors, and

16   (d) creditors holding the 20 largest unsecured claims.  Further notice is impractical in the

17   circumstances.  Debtor submits that the foregoing constitutes good and sufficient notice and

18   that no other or further notice need be given in the circumstances.

19

20

21

22

23

24

25

26

**Page 23 of 24** -   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                      ON INTERIM AND FINAL BASIS

1        WHEREFORE, Debtor requests entry of an order granting the relief requested

2  herein, setting a final hearing on the Motion, and such other and further relief as is

3  appropriate.

4        DATED this 19th day of November, 2013.

5        TONKON TORP LLP

6

7        By /s/ Albert N. Kennedy

8          Albert N. Kennedy, OSB No. 821429
            Timothy J. Conway, OSB No. 851752
            Michael W. Fletcher, OSB No. 010448

9          Ava L. Schoen, OSB No. 044072
            Attorneys for Debtor

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 24 of 24** -   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
               ON INTERIM AND FINAL BASIS

# EXHIBIT 1 TO MOTION

## PROPOSED FORM OF INTERIM ODER

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 13-64561-fra11 |
| C & K Market, Inc., | **INTERIM ORDER GRANTING DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS** |
| Debtor. | |

This matter came before the Court on November [___], 2013, upon the motion (the "Motion"), dated November 19, 2013, filed by the debtor (the "Debtor") in the above-captioned chapter 11 case (the "Case") pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-1 of the Local Rules (the "Local Rules") of the United States Bankruptcy Court for the District of Oregon, requesting, among other things entry of this interim order (this "Interim Order"):

(i)      authorizing the Debtor to obtain secured post-petition financing on a super-priority basis (the "DIP Facility") subject to only to the Permitted Liens (as defined in the Financing Agreement (defined herein)) and Priming Interests (as defined in the Financing Agreement);

(ii)      authorizing the Debtor to execute and enter into the Third Amendment to Financing Agreement (the "Third Amendment"), which amends the Financing Agreement dated as of October 28, 2010, between the Debtor, C&K Express, LLC ("Express" and together with the

**Page 1 of 18** -     INTERIM ORDER GRANTING DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Debtor, the "Borrowers"), and U.S. Bank National Association ("U.S. Bank")  (as amended, including as amended by the Third Amendment, the "Financing Agreement") (a copy of which, including all amendments (but excluding schedules and exhibits), has been filed with the Court, is available on the Court's website and is also available upon request by contacting counsel for the Debtor), and to perform such other and further acts as may be required in connection with the Financing Agreement and the Loan Documents (as defined in the Financing Agreement);

(iii)     granting super-priority administrative expense claims to U.S. Bank for the post-petition financing payable from, and having recourse to all of the pre-petition and post-petition property of the Debtor's estate (the "Estate") and all proceeds thereof (except for avoidance actions and the proceeds of avoidance actions) subject only to the Carve-Out (defined herein), the Permitted Liens and Priming Interests, and granting liens for the post-petition financing to U.S. Bank in all Post-Petition Collateral (defined herein) in accordance with the Financing Agreement, the Loan Documents and this Interim Order;

(iv)     scheduling a final hearing (the "Final Hearing") to be held within [__] days of the entry of this Interim Order to consider entry of a final order authorizing, among other things, the Debtor to obtain financing under the DIP Facility, the Financing Agreement and the other Loan Documents on a final basis (the "Final Order");

(v)     an interim hearing (the "Interim Hearing") on the Motion having been held before the Court on November [__], 2013, to consider entry of this Interim Order, appearances being noted on the record, the Debtor and U.S. Bank having agreed to the entry of this Interim Order, all objections to the Interim Order being resolved, overruled or withdrawn, and after due deliberation and consideration and sufficient cause appearing therefor:

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, THAT:

**Page 2 of 18** -     ORDER GRANTING DEBTOR'S MOTION FOR ORDER AUTHORIZING CONTINUED USE OF EXISTING BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM

1.      Jurisdiction; Petition Date.

(a)     This Court has jurisdiction to hear this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(D), (K), (M), and (O).

(b)     On November 19, 2013, the Debtor filed its chapter 11 petition (the "Petition Date").  Since the Petition Date, the Debtor has remained in possession and control of its assets as a debtor-in-possession pursuant to sections 1107 and 1108 of Title 11 of Bankruptcy Code.

2.      Disposition. The Motion is hereby granted on an interim basis on the terms set forth herein.  Any objections to the Motion or to the interim relief sought in the Motion have been resolved, withdrawn or are hereby overruled on the merits.  This Interim Order shall be valid, binding on all parties in interest and fully effective on an interim basis upon entry by the Court.

3.      Notice.  The Interim Hearing with respect to the Motion was held pursuant to the authorization of Bankruptcy Rule 4001(c)(2).  Notice was served on the parties listed on the certificate of service filed in respect of the Motion.

4.      Debtor's Stipulations Regarding Pre-Petition Indebtedness.  In connection the Financing Agreement, the other Loan Documents and this Interim Order, the Debtor acknowledges, represents, stipulates and agrees (subject to paragraph 20 below) that:

(a)     U.S. Bank is the holder of a claim as of November 18, 2013, against the Debtor in the approximate sum of $34,031,109.05 consisting of borrowings of $32,687,600.27, accrued interest and unused line fees of $93,508.78, reimbursement obligations for outstanding letters of credit  of $1,250,000, plus all other costs, fees and obligations owing, including, without limitation, all costs and expenses of administration, collection and enforcement incurred by U.S. Bank  prior to the Petition Date (the "Pre-Petition Indebtedness").  To the extent permitted under §

**Page 3 of 18** -     ORDER GRANTING DEBTOR'S MOTION FOR ORDER AUTHORIZING
CONTINUED USE OF EXISTING BANK ACCOUNTS AND CASH
MANAGEMENT SYSTEM

506(b) of the Bankruptcy Code, U.S. Bank is also entitled to interest accrued after commencement

of the Case and the reasonable fees, costs and charges referred to in § 506(b).

   (b)  The Pre-Petition Indebtedness is evidenced by, without limitation, (i) the

Financing Agreement, (ii) a Financing Agreement dated November 2, 2012, among the Borrowers

and U.S. Bank, as the same may have been amended or supplemented; (iii) a $30,000,000

Revolving Loan Note in dated November 3, 2010, by the Borrowers in favor of U.S. Bank; (iv) a

$13,500,000 Term Loan A Note dated November 3, 2010, by the Borrowers in favor of U.S. Bank;

(v) a $6,131,088 Term Loan Note dated November 2, 2012, by the Borrowers in favor of

U.S. Bank; (vi) and by certain other documents relating to the foregoing, including the Loan

Documents (as defined in the Financing Agreement).

   (c)  Payment of the Pre-Petition Indebtedness is absolutely and unconditionally

due and payable, without defense, offset or counterclaim, and the Debtor waives and  releases

(i) any right to object to the allowance of, and any defense with respect to, the Pre-Petition

Indebtedness, and (ii) any right to contest the priority, perfection or validity the liens securing such

Pre-Petition Indebtedness.

   (d)  Pursuant to section 552(b) of the Bankruptcy Code and the Loan

Documents, including, without limitation, a Security Agreement dated as of October 28, 2010,

between the Borrowers and U.S. Bank, the Pre-Petition Indebtedness is secured by a security

interest and lien in substantially all of the Debtor's real and personal property, whether now owned

or hereafter acquired, including, without limitation, all accounts, chattel paper and electronic

chattel paper, deposit accounts, documents, equipment, general intangibles, goods, instruments,

investment property, intellectual property rights, inventory intellectual property rights, inventory,

letter-of-credit rights, letters of credit, together with all substitutions and replacements for and

**Page 4 of 18** -  ORDER GRANTING DEBTOR'S MOTION FOR ORDER AUTHORIZING
       CONTINUED USE OF EXISTING BANK ACCOUNTS AND CASH
       MANAGEMENT SYSTEM

products of any of the foregoing, the proceeds of any and all of the foregoing and all proceeds and products of such collateral security acquired by the Estate after the commencement of the Case (such collateral security, proceeds and products are herein called the "Pre-Petition Collateral"). The Pre-Petition Collateral does not include certain real property interests and proceeds from the sale of certain real property located in Criswell, Oregon in which U.S. Bank did not have a security interest and the funds held by Wilmington Trust Retirements and Institutional Services Company pursuant to the C&K Market, Inc. Deferred Compensation Plan deemed effective January 1, 2009.

5.      Findings Regarding the DIP Facility Based on the Record at the Interim Hearing.

(a)      It is necessary for the Debtor to obtain post-petition financing for a period of time and in an amount which would allow the Debtor to continue to operate as a going concern, to enable the Debtor to continue to operate its grocery store chain, to pay employees, and to preserve the value of its assets.  An immediate need exists for the Debtor to obtain further credit from U.S. Bank.  Without such funds the Debtor will not be able to continue the operation of its business and to pay its employees, and reorganization may become impossible.

(b)      U.S. Bank has indicated a willingness to extend post-petition secured credit under the terms and conditions of this Interim Order, the Financing Agreement and the Loan Documents.  The Debtor is unable to obtain financing on terms more favorable than terms offered by U.S. Bank under the Financing Agreement and the Loan Documents and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtor is also unable to obtain secured credit under section 364(c) and (d) of the Bankruptcy Code on terms more favorable than those set forth in the Financing Agreement and Loan Documents.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

(c)     The terms of the Financing Agreement and the Loan Documents are fair and reasonable, were negotiated by the parties at arm's length and in good faith and are the best available to the Debtor under present market conditions and the Debtor's financial circumstances. Based on the foregoing, any credit extended under the Financing Agreement and the other Loan Documents by U.S. Bank is extended in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

(d)     The Debtor, in order to satisfy its interim need for post-petition financing, as determined in the exercise of its sound business judgment, desires the Court to enter this Interim Order.  Entry of this Interim Order is necessary to prevent irreparable harm to the Debtor, including the harm that would result from the disruption of the Debtor's business, will increase the possibilities for a successful reorganization as a going concern, and is in the best interest of the Debtor's Estate.  Absent entry of this Interim Order, the Debtor's Estate will be immediately and irreparably harmed.  Consummation of the DIP Facility is in the best interest of the Debtor's Estate.

6.     <u>Authorization of the DIP Facility and Third Amendment</u>.

(a)     The Borrower is authorized to enter into the DIP Facility and the Third Amendment and to incur postpetition debt under the DIP Facility pursuant to the terms of the Financing Agreement, the Loan Documents and this Interim Order.  To the extent of any conflict between this Interim Order and the Third Amendment or any other Loan Documents, this Interim Order shall govern.

(b)     In accordance with the terms of this Interim Order, the Financing Agreement and the other Loan Documents, the DIP Facility shall be used to (i) fund the working capital requirements and other financing needs of the Debtor during the pendency of the Case,

**Page 6 of 18** -     ORDER GRANTING DEBTOR'S MOTION FOR ORDER AUTHORIZING CONTINUED USE OF EXISTING BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM

(ii) pay certain transaction fees and other costs of expenses of the administration of the Case,

(iii) pay fees and expenses (including, without limitation, attorney's fees and advisory fees owed to U.S. Bank under the Loan Documents, including, without limitation, reasonable fees and expenses incurred prior to the commencement of the Case). Use of funds shall further be consistent with the Budget attached hereto as Exhibit 1, which may be amended from time to time by delivery of a revised and updated Budget by the Debtor to U.S. Bank and which shall be effective and become the Budget referred to herein only upon written approval of such amended Budget by U.S. Bank in its reasonable discretion. Compliance with the Budget shall be determined as follows: (a) Operating Expenses (as defined in the Financing Agreement) shall not exceed 115% of the aggregate amount of Operation Expenses set forth in the Budget for such week (tested on a four-week trailing basis); provided, however, that the Debtor may increase disbursements for expenditures under the "Inventory Purchase" line in the Budget by an amount equal to 68 cents of each dollar of grocery sale revenue collected by the Debtor in excess of the amount of such revenue set forth in the Budget for such week, (b) at any time, disbursements for any line item of Non-Operating Expense (as defined in the Financing Agreement) (other than disbursements for Financing Costs (as defined in the Financing Agreement) and Expenses (as defined in the Financing Agreement)) shall not exceed the maximum aggregate amount set forth in the Budget with respect to such line item of Non-Operating Expense (tested on a cumulative basis from the beginning of the Case), and (c) revenues generated in the ordinary course of business of the Debtor shall not be less than 85% of the amount of revenues set forth in the Budget (tested on a four-week trailing basis). The DIP Facility shall not be used to pay any fees or expenses incurred at any time in connection with the filing or prosecution of any action which seeks to invalidate, challenge, dispute, avoid, subordinate or otherwise impair the claims U.S.

**Page 7 of 18** -    ORDER GRANTING DEBTOR'S MOTION FOR ORDER AUTHORIZING
CONTINUED USE OF EXISTING BANK ACCOUNTS AND CASH
MANAGEMENT SYSTEM

Bank, or any liens or priorities in favor of U.S. Bank, or which seeks to recover on any claims

against or transfers made to U.S. Bank; provided, however, that any official committee of

unsecured creditors (the "Committee") may investigate the liens, security interests, and claims of

U.S. Bank.

      (c)     Subject to the Local Rules, any and all fees and expenses paid or required to

be paid in connection with the Financing Agreement shall be paid by the Debtor as detailed

therein.

      (d)     The Debtor is hereby authorized and directed to pay the DIP Facility Fee (as

defined in the Financing Agreement) in accordance with the terms of the Financing Agreement.

      (e)     In furtherance of the foregoing and without further approval of the Court,

the Debtor is authorized and directed on an interim basis to perform all acts, to make, execute and

deliver all instruments and documents (including the execution or recordation of security

agreements, mortgages and financing statements) that may be required, necessary (including

necessary by reason of request by U.S. Bank) for the Debtor's performance under the Financing

Agreement, the Loan Documents or this Interim Order.

      (f)     Upon execution of the Third Amendment and the entry of this Interim

Order, obligations, agreements and covenants of the Debtor under the Financing Agreement and

the Loan Documents shall be valid and binding and enforceable against the Debtor under the terms

of the Financing Agreement, the Loan Documents and this Interim Order.  Subject to paragraph 20

below, no payment, advance, financial accommodation, transfer or grant of security under the

Financing Agreement, the Loan Documents or this Interim Order shall be voidable or recoverable

under the Bankruptcy Code or under any applicable law (including section 502(d) of the

Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

**Page 8 of 18** -    ORDER GRANTING DEBTOR'S MOTION FOR ORDER AUTHORIZING
                  CONTINUED USE OF EXISTING BANK ACCOUNTS AND CASH
                  MANAGEMENT SYSTEM

7.  <u>DIP Facility Advances; Effective Date</u>.

(a)  Revolving advances made and the letters of credit issued (or renewed) under the DIP Facility from and after the DIP Facility Effective Date (defined herein) until the Maturity Date (defined herein) shall be governed by the terms and conditions of the Financing Agreement, the Loan Documents and this Interim Order, including, without limitation, the terms and conditions governing the applicable interest rates.  The "Maturity Date" shall mean the earliest of (i) one year following the Petition Date, (ii) the sale of all or substantially all of the assets of the Debtor pursuant to a sale under section 363 of the Bankruptcy Code, or (iii) the date on which the Debtor's plan of reorganization becomes effective.  The "Post-Petition Indebtedness" shall be all Obligations (as such term is defined in the Financing Agreement) arising subsequent to the date on which the Debtor filed its petition for relief in the Case, including post-petition interest.  The "DIP Facility Effective Date" shall be the date upon which the Court enters this Interim Order.

(b)  U.S. Bank shall not be required to extend credit under the DIP Facility unless and until U.S. Bank and its legal counsel are satisfied that:  (i) the conditions precedent for such revolving advances and Letters of Credit set forth in the Financing Agreement have been met; and (ii) no Event of Default under this Interim Order has occurred.

8.  <u>Post-Petition Indebtedness; Liens and Priority</u>.

(a)  The Post-Petition Indebtedness shall be:

(1)  allowable under § 503(b)(1) of the Code as an administrative expense with priority pursuant to the provisions of § 364(c)(1) of the Code over all other administrative expenses of the kind specified in § 503(b) or § 507(b) of the Code and all other expenses and claims, subject only to the Carve Out; and

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

(2)        secured by (and U.S. Bank, is hereby granted) a security interest in

and lien on all present and future property of the Estate, including both real and

personal property, whether now held or hereafter acquired by the Estate, and

including specifically and without limitation (excepting avoidance actions and the

proceeds thereof under sections 544, 547, 548, 549 and 553 of the Bankruptcy

Code) (A) all of the Estate's now owned or hereafter acquired accounts, chattel

paper and electronic chattel paper, deposit accounts, documents, equipment,

general intangibles, goods, instruments, investment property, intellectual property

rights, inventory intellectual property rights, inventory, letter-of-credit rights,

letters of credit, and any items in any lockbox account; together with (i) all

substitutions and replacements for and products of any of the foregoing; (ii) in the

case of all goods, all accessions; (iii) all accessories, attachments, parts, and repairs

now or hereafter attached or affixed to or used in connection with any goods;

(iv) all warehouse receipts, bills of lading and other documents of title now or

hereafter covering any of the foregoing; (v) all collateral subject to the lien of any

security document in favor of U.S. Bank; (vi) any money, or other assets of the

Debtor that may or hereafter come into possession, custody or control of

U.S. Bank; (vii) proceeds of any and all of the foregoing; (viii) books and records

of the Debtor, including all mail or electronic mail addressed to the Debtor; (ix) all

of the foregoing, whether now owned or existing or hereafter acquired or arising or

in which the Debtor now has or hereafter acquires any rights; and (x) all proceeds

and products of such collateral security acquired by the Estate, (B) the Pre-Petition

Collateral, (C) all real estate of the Estate, and (D) all proceeds, products, rents,

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

issues and profits of all of the foregoing (all herein referred to as the "Post-Petition Collateral"), which lien and security interest shall have priority over all other liens, claims and expenses in the Debtor's Case except with respect to the (i) Carve-Out and (ii) all other valid, duly perfected pre-petition statutory liens, security interests and other liens in assets of the Debtor which are Permitted Liens.  The liens and security interests granted above to secure payment of the Post-Petition Indebtedness shall be valid and enforceable regardless of whether the Court determines that some or all of the security interests and liens held by U.S. Bank in the Pre-Petition Collateral are unenforceable for any reason.

9.      Perfection of U.S. Bank Liens; Termination.  Entry of this Interim Order automatically perfects the liens granted by paragraph 8 of this Interim Order.

10.     U.S. Bank; Use of Collateral; Adequate Protection; Application of Funds.

(a)     Any cash collateral of U.S. Bank used by the Debtor since the commencement of the Debtor's Case shall constitute Post-Petition Indebtedness under the DIP Facility.  Notwithstanding the foregoing, the Debtor is not authorized to use U.S. Bank's cash collateral (other than to the extent advances under the DIP Facility constitute cash collateral).

(b)     On a daily basis, the Debtor shall pay over to U.S. Bank all cash proceeds (and cash equivalents) of Collateral for application to the Pre-Petition Indebtedness and the Post-Petition Indebtedness as provided in the Financing Agreement.

(c)     Absent manifest error, application of funds by U.S. Bank to the reduction of the Pre-Petition Indebtedness or the Post-Petition Indebtedness shall be final.  Nothing shall impair the validity of such application or such security interest or lien, subject to paragraph 20 below.

**Page 11 of 18** -   ORDER GRANTING DEBTOR'S MOTION FOR ORDER AUTHORIZING CONTINUED USE OF EXISTING BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

11.     <u>Events of Default</u>.  The Events of Default contained in the Financing Agreement (as amended by the Third Amendment) are hereby approved and incorporated herein by reference.

12.     <u>U.S. Bank's Remedies</u>.  Upon the occurrence of an Event of Default:

(a)     U.S. Bank may refuse to make revolving advances or to issue (or renew) Letters of Credit; and

(b)     U.S. Bank shall be entitled to relief from the automatic stay to enforce its rights and remedies under this Interim Order, the Financing Agreement, the Loan Documents and any applicable law upon filing an affidavit (the "Affidavit") with the Court certifying the occurrence of an Event of Default.   Contemporaneously with such filing, (i) U.S. Bank shall serve a copy of the Affidavit upon the Debtor, the Committee and the U.S. Trustee's Office, and (ii) U.S. Bank may request an expedited hearing regarding relief from the automatic stay, which such hearing may be scheduled within 72 hours of the filing of the Affidavit.  The Debtor shall be entitled to file a response to the Affidavit with the Court, but such response must be limited to whether an Event of Default has occurred that has not been cured.  If the Borrower fails to file such a response, the Court shall enter an order terminating the automatic stay.

13.     <u>No Marshalling</u>.  Subject to the entry of a final order, in no event shall U.S. Bank be subject to the equitable doctrine of marshalling or any similar doctrine.

14.     <u>Retention of Counsel and Consultants; Costs and Expenses</u>. U.S. Bank is authorized to retain such counsel and consultants (including financial consultants and investment bankers) as U.S. Bank may determine from time to time in its reasonable discretion.  Payment of fees and expenses incurred by U.S. Bank in connection with the Loan Documents, the Case, and all matters related to any of the foregoing, including, without limitation, all fees and disbursements of

**Page 12 of 18** -   ORDER GRANTING DEBTOR'S MOTION FOR ORDER AUTHORIZING CONTINUED USE OF EXISTING BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

legal counsel of U.S. Bank, all fees and disbursements of consultants to U.S. Bank (including

financial consultants), all appraisal fees, all title costs or fees, filing fees, mortgage registry tax,

recording and other out-of-pocket expenses incurred by U.S. Bank shall be paid by the Debtor

pursuant to the terms of the Financing Agreement and the Loan Documents, subject to the

procedures set forth in the Local Rules.

      15.   <u>Allowance for Improvements made by the Estate</u>.  Subject to the entry of a

final order, in consideration of the Debtor's use of the Collateral in accordance with the Loan

Documents, and in view of the effect of such use, (i) the Collateral shall not be subject to any

surcharge under Section 506(c) of the Bankruptcy Code and (ii) the "equities of the case"

exception in Section 522 shall not apply with respect to the Collateral.

      16.   <u>Successors and Assigns</u>.  Except as otherwise stated herein, the provisions

of this Interim Order shall be binding upon all persons and entities and shall inure to the benefit of

U.S. Bank, the Debtor and their respective successors and assigns, including, without limitation,

any subsequent chapter 11 or chapter 7 trustee.

      17.   <u>Carve-Out for United States Trustee Fees and Professional Fees</u>.  Subject to

the terms and conditions contained in this paragraph 17, all prepetition and postpetition claims

(whether secured or unsecured) of U.S. Bank, including U.S. Bank's super-priority administrative

expense claim, are subordinate to the Carve Out (as defined below).  As used herein, the term

"Carve Out" shall mean amounts: (a) payable pursuant to 28 U.S.C. § 1930(a)(6) and fees payable

to the clerk of the Court, (b) $100,000 for reasonable fees and expenses of attorneys and financial

advisors employed by the Debtor or by the Committee (including allowed expenses of the

members of such statutory committees) pursuant to Sections 327 and 1103 of the Bankruptcy Code

incurred following an Event of Default, (c) the amount of funds then on deposit in the Professional

**Page 13 of 18** -   ORDER GRANTING DEBTOR'S MOTION FOR ORDER AUTHORIZING
CONTINUED USE OF EXISTING BANK ACCOUNTS AND CASH
MANAGEMENT SYSTEM

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Fee Holding Account, and (d) the amount of administrative expenses incurred but not yet paid into

the Professional Fee Holding Account in an aggregate amount not to exceed $100,000.  The Carve

Out shall exclude any fees and expenses incurred in connection with the assertion or joinder in any

claim, counterclaim, action, proceeding, application, motion, objection, defenses or other

contested matter, the purpose of which is to seek any order, judgment, determination or similar

relief invalidating, setting aside, avoiding, subordinating, or otherwise adversely affecting

U.S. Bank's claims against the Estate (including the Pre-Petition Indebtedness, the Post-Petition

Indebtedness, and U.S. Bank's liens on the Collateral).

      18.   <u>Stay; Modification</u>.  No subsequent stay, modification, termination, failure

to extend the term or vacation of this Interim Order shall affect, limit or modify the validity,

priority or enforceability of any liability of the Debtor under the Financing Agreement or the other

Loan Documents, or any lien or security interest granted to U.S. Bank under the such documents.

All credit extended under the Financing Agreement and the other Loan Documents is made in

reliance on this Interim Order, and, except as set forth below, the obligations the Debtor incurs to

U.S. Bank under the Financing and the other Loan Documents cannot be subordinated, lose

superpriority status, or be deprived of the benefit of the senior liens granted to U.S. Bank, by any

subsequent order in the Debtor's chapter 11 case or a converted chapter 7 case.  The provisions of

this Interim Order dealing with the liability of the Debtor under the Financing Agreement and the

other Loan Documents shall not be modified or superseded by any order confirming a plan of

reorganization (including the use of the cram-down provisions of section 1129(b) of the Code) in

the Debtor's Case.  If any party shall appeal the order approving the DIP Facility or shall

successfully challenge the validity, perfection or priority of any pre-petition liens in favor of U.S.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Bank (a "Special Event"), U.S. Bank may terminate its commitment to fund any DIP Advances and stop funding any DIP Advances upon seven days prior written notice to the Debtor. No termination (if any) of U.S. Bank's commitment to fund any DIP Advance shall affect, limit or modify the validity, priority or enforceability of any liability of the Debtor under the Financing Documents or any lien granted to U.S. Bank thereunder, provided, however, that if such termination is due to a Special Event, then the DIP Advances and all other post-petition obligations owing to U.S. Bank under the DIP Facility will have super priority administrative expense status and other priority status provided under 11 U.S.C. § 364 only to the extent of any increase in exposure of U.S. Bank during the pendency of the Bankruptcy Case, and the Debtor may seek to use U.S. Bank's cash collateral and may also seek to obtain alternative post-petition financing, and U.S. Bank may oppose any such use of cash collateral and any such alternative post-petition financing.

19.    <u>Preservation of Rights Under This Interim Order</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) converting the Debtor's Case to a chapter 7 case, (b) confirming or consummating any plan of reorganization of the Debtor or (c) dismissing the Debtor's Case or any subsequent chapter 7 case pursuant to sections 303, 305 or 1112 of the Bankruptcy Code, and the terms and provisions of this Interim Order as well as the priorities in payment, liens and security interests granted pursuant to this Interim Order, the Financing Agreement and the other Loan Documents shall continue in this or any superseding case under the Bankruptcy Code, and such priorities in payment, liens and security interests shall maintain their priority as provided by this Interim Order until all Obligations are indefeasibly paid and satisfied.

**Page 15 of 18** -   ORDER GRANTING DEBTOR'S MOTION FOR ORDER AUTHORIZING
CONTINUED USE OF EXISTING BANK ACCOUNTS AND CASH
MANAGEMENT SYSTEM
**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

20.    <u>Challenge of Claim or Lien.</u>  The acknowledgements and admissions of the

Debtor in paragraph 4 of hereof shall be binding on its Estate, all parties in interest, including,

without limitation, any Committee, unless the Committee or other party in interest has filed an

adversary proceeding or contested matter challenging any such acknowledgements or admissions

no later than the date that is the later of (i) 90 days after the entry of this Interim Order; and (ii) 60

days from the date of formation of the Committee.  If no such adversary proceeding or contested

matter is timely commenced as of such date, the Pre-Petition Indebtedness of U.S. Bank shall

constitute allowed secured claims, not subject to objection or subordination and otherwise

unavoidable, and the pre-petition liens of U.S. Bank on the Pre-Petition Collateral shall be deemed

legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind or

subordination, and otherwise unavoidable.

21.    <u>Right to Credit Bid</u>.  The right of U.S. Bank to credit bid the Obligations

owed to U.S. Bank by the Debtor (pursuant to section 363(k) of the Bankruptcy Code), in whole or

in part, in connection with any sale or disposition of assets in the Case (including in connection

with a plan of reorganization for which confirmation is sought under section 1129(b)(2)(A)(i)) is

hereby expressly reserved and preserved by this Interim Order.

22.    <u>Amendments and Modifications</u>.  The Debtor and U.S. Bank may enter into

any non-material amendments or modifications to the Financing Agreement and the Loan

Documents without notice or a hearing or further order of this Court; provided, however, that any

such modifications shall be filed with the Court and shall not be adverse to the Debtor or its Estate.

23.    <u>Interim Order Governs</u>.  Except as otherwise specifically provided in this

Interim Order, in the event of a conflict between the provisions of this Interim Order, the Motion

and the Loan Documents, the provisions of this Interim Order shall govern.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

24.    <u>Final Hearing</u>.  The final hearing on approval of the DIP Facility is scheduled for [____], 2012, at [____] [_].m. (Pacific).

25.    <u>Notice of Final Hearing; Objections to Entry of Final Order</u>.  The Debtor shall mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including notice that the Debtors will seek at the Final Hearing a waiver of rights under section 506(c) of the Bankruptcy Code) within three (3) business days from the date of entry of this Interim Order to the parties that received notice of the Interim Hearing, any other party that has filed a request for notices with the Court, to the Office of the United States Trustee and to counsel for any Committee that may be appointed in the Case.  Any party in interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file and serve such objection so as to be received no later than [_____], 2013, at 4:00 p.m. PST on the following:

(a)    Tonkon Torp LLP; 1600 Pioneer Tower; 888 SW Fifth Avenue; Portland, Oregon 97204; Attention: Albert Kennedy; Albert.Kennedy@tonkon.com;

(b)    Faegre Baker Daniels, LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota 55402; Attention: Michael Stewart, Breia Schleuss and Colin Dougherty; Michael.Stewart@Faegrebd.com; Breia.Schleuss@Faegrebd.com; Colin.Dougherty@Faegrebd.com;

(c)    Miller Nash LLP, 3400 U.S. Bancorp Tower, 111 S.W. Fifth Avenue, Portland, Oregon 97204; Attention: Teresa Pearson; Teresa.Pearson@MillerNash.com;

(d)    Buchalter Nemer, A Professional Corporation, 1000 Wilshire Boulevard, Suite 1500, Los Angeles, California 90017; Attention: Pamela Webster and William Schoenholz; pwebster@buchalter.com; wscholenholz@buchalter.com;

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

(e)    Greene & Markley, P.C., 1515 S.W. Fifth Avenue, Suite 600; Portland,

Oregon 97201; Attention David Foraker; David.Foraker@GreeneMarkley.com; and

(f)    Office of the United States Trustee for the District of Oregon.

### 

I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).

Presented by:

TONKON TORP LLP

By _____
    Albert N. Kennedy, OSB No. 821429
    Timothy J. Conway, OSB No. 851752
    Michael W. Fletcher, OSB No. 010448
    Ava L. Schoen, OSB No. 044072
    888 S.W. Fifth Avenue, Suite 1600
    Portland, OR 97204-2099
    Telephone:    503-221-1440
    Facsimile:    503-274-8779
    E-mail:    al.kennedy@tonkon.com
        tim.conway@tonkon.com
        michael.fletcher@tonkon.com
        ava.schoen@tonkon.com
    Attorneys for Debtor

cc:    List of Interested Parties

**Page 18 of 18** -   ORDER GRANTING DEBTOR'S MOTION FOR ORDER AUTHORIZING
CONTINUED USE OF EXISTING BANK ACCOUNTS AND CASH
MANAGEMENT SYSTEM

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

# EXHIBIT 1 TO INTERIM ORDER

### BUDGET

# C&K Market, Inc.

**Cash Flow Forecast**
CK Projection DIP Loan v14
11/19/2013

| | Week 1 11/24/13 | Week 2 12/1/13 | Week 3 12/8/13 | Week 4 12/15/13 | Week 5 12/22/13 | Week 6 12/29/13 | Week 7 1/5/14 | Week 8 1/12/14 | Week 9 1/19/14 |
|---|---|---|---|---|---|---|---|---|---|
| **Cash - Beginning of week** | - | - | - | - | - | - | - | - | - |
| **CASH RECEIPTS:** | | | | | | | | | |
| *Operating:* | | | | | | | | | |
| Sales - Market | 5,076,880 | 7,159,623 | 5,596,797 | 5,346,016 | 6,278,478 | 5,239,410 | 5,747,578 | 5,301,828 | 5,087,110 |
| Other | 12,500 | 41,500 | 104,500 | 10,000 | 10,000 | 10,000 | 75,500 | 75,500 | 12,500 |
| Total Operating | 5,089,380 | 7,201,123 | 5,701,297 | 5,356,016 | 6,288,478 | 5,249,410 | 5,823,078 | 5,377,328 | 5,099,610 |
| *Non-Operating:* | | | | | | | | | |
| Cash balances - Sold/Closed stores | - | - | - | - | 277,810 | - | - | - | - |
| Proceeds from Sale of Inventory | - | 543,128 | 977,631 | 977,631 | 977,631 | 977,631 | 977,631 | - | - |
| Proceeds from Sale of Equipment | - | - | - | 683,373 | 683,373 | 683,373 | - | - | - |
| Proceeds from Sale of Real Estate (net) | - | - | - | - | - | - | - | - | - |
| Total Non-Operating | - | 543,128 | 977,631 | 1,661,004 | 1,938,814 | 1,661,004 | 977,631 | - | - |
| **Total Receipts** | 5,089,380 | 7,744,252 | 6,678,927 | 7,017,020 | 8,227,292 | 6,910,414 | 6,800,709 | 5,377,328 | 5,099,610 |
| **CASH DISBURSEMENTS:** | | | | | | | | | |
| *Operating:* | | | | | | | | | |
| Inventory purchases - Market | (2,047,482) | (6,548,022) | (4,299,285) | (3,778,336) | (4,228,054) | (3,726,921) | (4,031,230) | (3,718,591) | (3,567,992) |
| Salaries & Benefits - Market | - | (2,366,965) | - | (2,366,965) | - | (2,366,965) | - | (2,165,319) | - |
| Payment of accrued liabilities | - | - | - | - | - | (171,686) | (343,371) | (343,371) | - |
| Operating Expenses - Market | (553,423) | (648,168) | (1,497,898) | (483,980) | (568,397) | (474,329) | (510,041) | (1,462,016) | (451,431) |
| Operating Expenses - Corporate | (49,990) | (282,589) | (52,385) | (415,614) | (58,766) | (264,616) | (79,907) | (422,530) | (70,724) |
| Total Operating | (2,650,895) | (9,845,745) | (5,849,568) | (7,044,895) | (4,855,217) | (7,004,517) | (4,964,549) | (8,111,827) | (4,090,147) |
| *Non-Operating:* | | | | | | | | | |
| Operating Expenses - Corporate Prof Fees | - | - | (265,000) | - | - | - | (295,000) | - | - |
| Operating Expenses - Lender Prof Fees | - | - | - | - | - | - | - | - | - |
| PACA Payments | (1,600,000) | - | - | (683,373) | (683,373) | (683,373) | - | - | - |
| Debt principal payments | - | - | (182,839) | - | - | - | (74,459) | (109,103) | - |
| Debt interest payments | (29,577) | - | (190,543) | - | - | - | (123,575) | (37,709) | - |
| Capital Expenditures | - | (23,661) | (23,661) | (23,661) | (23,661) | (23,661) | (62,500) | (62,500) | (62,500) |
| Store Closing costs | (130,000) | (130,000) | (52,000) | (52,000) | (52,000) | (52,000) | (52,000) | - | - |
| Deposits - Utilities | - | (500,000) | (500,000) | - | - | - | - | - | - |
| Other | - | - | - | (25,000) | - | - | - | - | - |
| Total Non-Operating | (1,759,577) | (653,661) | (1,214,043) | (784,034) | (759,034) | (759,034) | (607,534) | (209,312) | (62,500) |
| **Total Disbursements** | (4,410,472) | (10,499,406) | (7,063,611) | (7,828,929) | (5,614,251) | (7,763,551) | (5,572,083) | (8,321,139) | (4,152,647) |
| **NET CASH INFLOW/(OUTFLOW)** | 678,908 | (2,755,154) | (384,683) | (811,910) | 2,613,041 | (853,137) | 1,228,625 | (2,943,810) | 946,962 |

DRAFT (watermark)

# C&K Market, Inc.

Cash Flow Forecast
CK Projection DIP Loan v14
11/19/2013

| | Week 1 11/24/13 | Week 2 12/1/13 | Week 3 12/8/13 | Week 4 12/15/13 | Week 5 12/22/13 | Week 6 12/29/13 | Week 7 1/5/14 | Week 8 1/12/14 | Week 9 1/19/14 |
|---|---|---|---|---|---|---|---|---|---|
| **REVOLVER LOAN BALANCE:** | | | | | | | | | |
| Projected Beginning Revolver Balance | 13,706,071 | 12,485,662 | 10,535,999 | 10,535,999 | 10,535,999 | 10,535,999 | 10,535,999 | 8,487,123 | 8,487,123 |
| Borrowing (Payment) on revolver | (678,908) | 2,755,154 | 384,683 | 811,910 | (2,613,041) | 853,137 | (1,228,625) | 2,943,810 | (946,962) |
| Less: Cash Balance-market (sold/closed stores) | | | | | | | | | |
| Less: DIP (Borrowings) Payments | (541,501) | (4,704,818) | (384,683) | (811,910) | 2,613,041 | (853,137) | (820,250) | (2,943,810) | 946,962 |
| **Projected Ending Revolver Balance** | 12,485,662 | 10,535,999 | 10,535,999 | 10,535,999 | 10,535,999 | 10,535,999 | 8,487,123 | 8,487,123 | 8,487,123 |
| DIP Beginning Balance | - | 541,501 | 5,246,319 | 5,631,002 | 6,442,912 | 3,829,871 | 4,683,008 | 5,503,259 | 8,447,069 |
| DIP Borrowing (Repayment) | 541,501 | 4,704,818 | 384,683 | 811,910 | (2,613,041) | 853,137 | 820,250 | 2,943,810 | (946,962) |
| **DIP Ending Balance** | 541,501 | 5,246,319 | 5,631,002 | 6,442,912 | 3,829,871 | 4,683,008 | 5,503,259 | 8,447,069 | 7,500,106 |
| **Total Borrowing (revolver + DIP)** | 13,027,163 | 15,782,317 | 16,167,001 | 16,978,910 | 14,365,869 | 15,219,007 | 13,990,381 | 16,934,192 | 15,987,229 |
| **Availability before $4 million cap** | 9,972,837 | 6,753,681 | 6,368,998 | 5,557,088 | 8,170,129 | 7,316,992 | 6,496,741 | 3,552,931 | 4,499,894 |
| **Maximum Availability** | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | 3,552,931 | 4,000,000 |
| **Borrowing Base:** | | | | | | | | | |
| Credit Card Receivables | 1,860,000 | 1,488,000 | 1,488,000 | 1,488,000 | 1,488,000 | 1,488,000 | 1,488,000 | 1,488,000 | 1,488,000 |
| Inventory: Non-Perishable | 9,855,281 | 8,466,239 | 8,466,239 | 8,466,239 | 8,466,239 | 8,466,239 | 7,077,197 | 7,077,197 | 7,077,197 |
| Inventory: Liquor, Beer, Wine | 1,676,479 | 1,440,190 | 1,440,190 | 1,440,190 | 1,440,190 | 1,440,190 | 1,203,900 | 1,203,900 | 1,203,900 |
| Inventory: Perishable | 3,005,051 | 2,581,507 | 2,581,507 | 2,581,507 | 2,581,507 | 2,581,507 | 2,157,964 | 2,157,964 | 2,157,964 |
| PACA | (1,600,000) | (1,200,000) | (1,200,000) | (1,200,000) | (1,200,000) | (1,200,000) | (1,200,000) | (1,200,000) | (1,200,000) |
| Money Order/Western Union | (536,400) | (536,400) | (536,400) | (536,400) | (536,400) | (536,400) | (536,400) | (536,400) | (536,400) |
| Loyalty Card | (316,500) | (269,025) | (269,025) | (269,025) | (269,025) | (269,025) | (269,025) | (269,025) | (269,025) |
| LOC | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) |
| Gift Cards | (158,250) | (134,513) | (134,513) | (134,513) | (134,513) | (134,513) | (134,513) | (134,513) | (134,513) |
| Rent Reserve | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
| **Total Borrowing Base** | 12,485,662 | 10,535,999 | 10,535,999 | 10,535,999 | 10,535,999 | 10,535,999 | 8,487,123 | 8,487,123 | 8,487,123 |
| **DIP Commitment Amount** | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |
| **DIP Facility** | 23,000,000 | 22,535,999 | 22,535,999 | 22,535,999 | 22,535,999 | 22,535,999 | 20,487,123 | 20,487,123 | 20,487,123 |

## C&K Market, Inc.

**Cash Flow Forecast**
CK Projection DIP Loan v14
11/19/2013

| | Week 10 1/26/14 | Week 11 2/2/14 | Week 12 2/9/14 | Week 13 2/16/14 | Week 14 2/23/14 | Week 15 3/2/14 | Week 16 3/9/14 | Week 17 3/16/14 | Week 18 3/23/14 |
|---|---|---|---|---|---|---|---|---|---|
| **Cash - Beginning of week** | - | - | - | - | - | - | - | - | - |
| **CASH RECEIPTS:** | | | | | | | | | |
| *Operating:* | | | | | | | | | |
| Sales - Market | 4,818,401 | 5,570,582 | 5,475,759 | 5,642,657 | 5,141,733 | 5,235,851 | 5,368,962 | 5,068,503 | 4,899,916 |
| Other | 12,500 | 44,000 | 107,000 | 12,500 | 12,500 | 41,500 | 104,500 | 10,000 | 10,000 |
| Total Operating | 4,830,901 | 5,614,582 | 5,582,759 | 5,655,157 | 5,154,233 | 5,277,351 | 5,473,462 | 5,078,503 | 4,909,916 |
| **Non-Operating:** | | | | | | | | | |
| Cash balances - Sold/Closed stores | - | - | - | - | 116,950 | - | - | - | - |
| Proceeds from Sale of Inventory | - | - | 768,132 | 768,132 | 768,132 | 768,132 | - | - | - |
| Proceeds from Sale of Equipment | - | - | - | - | 666,896 | 666,896 | - | - | - |
| Proceeds from Sale of Real Estate (net) | - | - | - | - | 1,050,108 | 1,050,108 | - | - | - |
| Total Non-Operating | - | - | 768,132 | 768,132 | 2,602,086 | 2,485,136 | - | - | - |
| **Total Receipts** | 4,830,901 | 5,614,582 | 6,350,891 | 6,423,290 | 7,756,319 | 7,762,487 | 5,473,462 | 5,078,503 | 4,909,916 |
| **CASH DISBURSEMENTS:** | | | | | | | | | |
| *Operating:* | | | | | | | | | |
| Inventory purchases - Market | (3,379,525) | (3,903,323) | (3,836,880) | (3,953,827) | (3,602,827) | (3,681,452) | (3,775,046) | (3,563,786) | (3,445,249) |
| Salaries & Benefits - Market | (2,165,319) | - | (1,728,547) | - | (1,728,547) | - | (1,677,567) | - | (1,677,567) |
| Payment of accrued liabilities | - | - | - | (128,764) | (128,764) | (128,764) | - | - | (128,764) |
| Operating Expenses - Market | (427,586) | (394,120) | (1,075,785) | (399,219) | (363,779) | (349,155) | (966,639) | (337,996) | (326,754) |
| Operating Expenses - Corporate | (265,809) | (72,893) | (270,473) | (73,836) | (266,102) | (65,869) | (266,364) | (63,764) | (260,463) |
| Total Operating | (6,238,239) | (4,370,336) | (6,911,685) | (4,555,646) | (6,090,019) | (4,225,241) | (6,685,617) | (3,965,545) | (5,710,033) |
| **Non-Operating:** | | | | | | | | | |
| Operating Expenses - Corporate Prof Fees | - | (365,000) | - | - | - | (55,000) | - | - | - |
| Operating Expenses - Lender Prof Fees | - | (457,600) | - | - | - | - | - | - | - |
| PACA Payments | - | - | - | - | - | - | - | - | - |
| Debt principal payments | - | - | (567,066) | (384,066) | (2,101,070) | (1,526,518) | (538,133) | - | - |
| Debt interest payments | - | - | (161,844) | - | - | - | (134,256) | - | - |
| Capital Expenditures | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) |
| Store Closing costs | - | - | - | - | - | - | - | - | - |
| Deposits - Utilities | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | (25,000) | - |
| Total Non-Operating | (62,500) | (885,100) | (791,410) | (446,566) | (2,163,570) | (1,644,018) | (734,888) | (87,500) | (62,500) |
| **Total Disbursements** | (6,300,739) | (5,255,436) | (7,703,095) | (5,002,212) | (8,253,589) | (5,869,259) | (7,420,505) | (4,053,045) | (5,772,533) |
| **NET CASH INFLOW/(OUTFLOW)** | (1,469,838) | 359,146 | (1,352,204) | 1,421,077 | (497,270) | 1,893,227 | (1,947,042) | 1,025,458 | (862,616) |

EXHIBIT 1
Page 3 of 6

# C&K Market, Inc.

**Cash Flow Forecast**
CK Projection DIP Loan v14
11/19/2013

| | Week 10 1/26/14 | Week 11 2/2/14 | Week 12 2/9/14 | Week 13 2/16/14 | Week 14 2/23/14 | Week 15 3/2/14 | Week 16 3/9/14 | Week 17 3/16/14 | Week 18 3/23/14 |
|---|---|---|---|---|---|---|---|---|---|
| **REVOLVER LOAN BALANCE:** | | | | | | | | | |
| Projected Beginning Revolver Balance | 8,487,123 | 8,487,123 | 8,511,963 | 8,511,963 | 8,511,963 | 8,511,963 | 6,739,131 | 6,739,131 | 6,739,131 |
| Borrowing (Payment) on revolver | 1,469,838 | (359,146) | 1,352,204 | (1,421,077) | 497,270 | (1,893,227) | 1,947,042 | (1,025,458) | (1,025,458) |
| Less: Cash Balance-market (sold/closed stores) | (1,469,838) | 383,986 | (1,352,204) | 1,421,077 | (497,270) | 120,396 | (1,947,042) | 1,025,458 | (862,616) |
| Less: DIP (Borrowings) Payments | | | | | | | | | |
| **Projected Ending Revolver Balance** | 8,487,123 | 8,511,963 | 8,511,963 | 8,511,963 | 8,511,963 | 6,739,131 | 6,739,131 | 6,739,131 | 6,739,131 |
| | | | | | | | | | |
| DIP Beginning Balance | 7,500,106 | 8,969,945 | 8,585,959 | 9,938,163 | 8,517,086 | 9,014,356 | 8,893,960 | 10,841,002 | 9,815,545 |
| DIP Borrowing (Repayment) | 1,469,838 | (383,986) | 1,352,204 | (1,421,077) | 497,270 | (120,396) | 1,947,042 | (1,025,458) | 862,616 |
| DIP Ending Balance | 8,969,945 | 8,585,959 | 9,938,163 | 8,517,086 | 9,014,356 | 8,893,960 | 10,841,002 | 9,815,545 | 10,678,161 |
| | | | | | | | | | |
| Total Borrowing (revolver + DIP) | 17,457,068 | 17,097,922 | 18,450,126 | 17,029,049 | 17,526,319 | 15,633,091 | 17,580,134 | 16,554,676 | 17,417,293 |
| | | | | | | | | | |
| Availability before $4 million cap | 3,030,055 | 3,414,041 | 2,061,837 | 3,482,914 | 2,985,644 | 3,106,040 | 1,158,998 | 2,184,455 | 1,321,839 |
| Maximum Availability | 3,030,055 | 3,414,041 | 2,061,837 | 3,482,914 | 2,985,644 | 3,106,040 | 1,158,998 | 2,184,455 | 1,321,839 |
| | | | | | | | | | |
| **Borrowing Base:** | | | | | | | | | |
| Credit Card Receivables | 1,488,000 | 1,339,200 | 1,339,200 | 1,339,200 | 1,339,200 | 1,339,200 | 1,339,200 | 1,339,200 | 1,339,200 |
| Inventory: Non-Perishable | 7,077,197 | 7,077,197 | 7,077,197 | 7,077,197 | 7,077,197 | 5,875,300 | 5,875,300 | 5,875,300 | 5,875,300 |
| Inventory: Liquor, Beer, Wine | 1,203,900 | 1,203,900 | 1,203,900 | 1,203,900 | 1,203,900 | 999,446 | 999,446 | 999,446 | 999,446 |
| Inventory: Perishable | 2,157,964 | 2,157,964 | 2,157,964 | 2,157,964 | 2,157,964 | 1,791,484 | 1,791,484 | 1,791,484 | 1,791,484 |
| PACA | (1,200,000) | (1,080,000) | (1,080,000) | (1,080,000) | (1,080,000) | (1,080,000) | (1,080,000) | (1,080,000) | (1,080,000) |
| Money Order/Western Union | (536,400) | (482,760) | (482,760) | (482,760) | (482,760) | (482,760) | (482,760) | (482,760) | (482,760) |
| Loyalty Card | (269,025) | (269,025) | (269,025) | (269,025) | (269,025) | (269,025) | (269,025) | (269,025) | (269,025) |
| LOC | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) |
| Gift Cards | (134,513) | (134,513) | (134,513) | (134,513) | (134,513) | (134,513) | (134,513) | (134,513) | (134,513) |
| Rent Reserve | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
| Total Borrowing Base | 8,487,123 | 8,511,963 | 8,511,963 | 8,511,963 | 8,511,963 | 6,739,131 | 6,739,131 | 6,739,131 | 6,739,131 |
| DIP Commitment Amount | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |
| DIP Facility | 20,487,123 | 20,511,963 | 20,511,963 | 20,511,963 | 20,511,963 | 18,739,131 | 18,739,131 | 18,739,131 | 18,739,131 |

# C&K Market, Inc.

**Cash Flow Forecast**
CK Projection DIP Loan v14
11/19/2013

| | Week 19<br>3/30/14 | Week 20<br>4/6/14 | Week 21<br>4/13/14 | Week 22<br>4/20/14 | Week 23<br>4/27/14 | Week 24<br>5/4/14 | Check Total |
|---|---|---|---|---|---|---|---|
| **Cash - Beginning of week** | - | - | - | - | - | - | |
| **CASH RECEIPTS:** | | | | | | | |
| **Operating:** | | | | | | | |
| Sales - Market | 5,290,666 | 5,349,169 | 5,138,840 | 4,932,749 | 5,023,966 | 5,083,899 | 128,875,374 |
| Other | 10,000 | 44,000 | 107,000 | 12,500 | 12,500 | 44,000 | 936,500 |
| Total Operating | 5,300,666 | 5,393,169 | 5,245,840 | 4,945,249 | 5,036,466 | 5,127,899 | 129,811,874 |
| **Non-Operating:** | | | | | | | |
| Cash balances - Sold Closed stores | - | - | - | - | - | - | 394,760 |
| Proceeds from Sale of Inventory | - | - | - | - | - | - | 8,503,810 |
| Proceeds from Sale of Equipment | - | - | - | - | - | - | 3,383,910 |
| Proceeds from Sale of Real Estate (net) | - | - | - | - | - | - | 2,100,216 |
| Total Non-Operating | - | - | - | - | - | - | 14,382,696 |
| **Total Receipts** | **5,300,666** | **5,393,169** | **5,245,840** | **4,945,249** | **5,036,466** | **5,127,899** | **144,194,570** |
| **CASH DISBURSEMENTS:** | | | | | | | |
| **Operating:** | | | | | | | |
| Inventory purchases - Market | (3,719,994) | (3,758,912) | (3,611,112) | (3,466,290) | (3,530,389) | (3,572,505) | (90,747,028) |
| Salaries & Benefits - Market | - | (1,628,694) | - | (1,628,694) | - | (1,794,358) | (23,295,508) |
| Payment of accrued liabilities | - | - | - | - | - | - | (1,244,720) |
| Operating Expenses - Market | (352,811) | (357,319) | (952,112) | (329,503) | (335,596) | (335,058) | (13,953,117) |
| Operating Expenses - Corporate | (66,558) | (269,150) | (67,564) | (263,675) | (66,054) | (237,401) | (4,273,097) |
| Total Operating | (4,139,364) | (6,014,075) | (4,630,788) | (5,688,161) | (3,932,039) | (5,939,322) | (133,513,470) |
| **Non-Operating:** | | | | | | | |
| Operating Expenses - Corporate Prof Fees | - | (25,000) | - | - | - | (25,000) | (1,030,000) |
| Operating Expenses - Lender Prof Fees | - | - | - | - | - | (448,800) | (906,400) |
| PACA Payments | - | - | - | - | - | - | (1,600,000) |
| Debt principal payments | - | (74,459) | (108,276) | - | - | (74,459) | (7,790,517) |
| Debt interest payments | - | (101,669) | (58,806) | - | - | (27,759) | (836,159) |
| Capital Expenditures | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (1,272,883) |
| Store Closing costs | - | - | - | - | - | - | (520,000) |
| Deposits - Utilities | - | - | - | - | - | - | (1,000,000) |
| Other | - | - | - | - | - | - | (50,000) |
| Total Non-Operating | (62,500) | (263,628) | (229,532) | (62,500) | (62,500) | (638,518) | (15,005,959) |
| **Total Disbursements** | **(4,201,864)** | **(6,277,704)** | **(4,860,320)** | **(5,750,661)** | **(3,994,539)** | **(6,577,840)** | **(148,519,430)** |
| **NET CASH INFLOW/(OUTFLOW)** | **1,098,803** | **(884,535)** | **385,520** | **(805,413)** | **1,041,927** | **(1,449,940)** | **(4,324,860)** |

EXHIBIT 1
Page 5 of 6

DIP Loan v14　　　　　　　　　　　CONFIDENTIAL DRAFT 11/19/2013　　　　　　　　　　　Page 5

# C&K Market, Inc.
**Cash Flow Forecast**
CK Projection DIP Loan v14
11/19/2013

| | Week 19<br>3/30/14 | Week 20<br>4/6/14 | Week 21<br>4/13/14 | Week 22<br>4/20/14 | Week 23<br>4/27/14 | Week 24<br>5/4/14 | Check Total |
|---|---|---|---|---|---|---|---|
| **REVOLVER LOAN BALANCE:** | | | | | | | |
| Projected Beginning Revolver Balance | 6,739,131 | 6,739,131 | 6,779,485 | 6,779,485 | 6,779,485 | 6,779,485 | |
| Borrowing (Payment) on revolver | (1,098,803) | 884,535 | (385,520) | 805,413 | (1,041,927) | 1,449,940 | |
| Less: Cash Balance-market (sold/closed stores) | | | | | | | |
| Less DIP (Borrowings) Payments | 1,098,803 | (844,181) | 385,520 | (805,413) | 1,041,927 | (1,449,940) | |
| Projected Ending Revolver Balance | 6,739,131 | 6,779,485 | 6,779,485 | 6,779,485 | 6,779,485 | 6,779,485 | |
| | | | | | | | |
| DIP Beginning Balance | 10,678,161 | 9,579,359 | 10,423,540 | 10,038,019 | 10,843,432 | 9,801,505 | |
| DIP Borrowing (Repayment) | (1,098,803) | 844,181 | (385,520) | 805,413 | (1,041,927) | 1,449,940 | |
| DIP Ending Balance | 9,579,359 | 10,423,540 | 10,038,019 | 10,843,432 | 9,801,505 | 11,251,446 | |
| | | | | | | | |
| Total Borrowing (revolver + DIP) | 16,318,490 | 17,203,025 | 16,817,504 | 17,622,917 | 16,580,991 | 18,030,931 | |
| | | | | | | | |
| Availability before $4 million cap | 2,420,641 | 1,576,460 | 1,961,981 | 1,156,568 | 2,198,495 | 748,554 | |
| Maximum Availability | 2,420,641 | 1,576,460 | 1,961,981 | 1,156,568 | 2,198,495 | 748,554 | |
| | | | | | | | |
| **Borrowing Base:** | | | | | | | |
| Credit Card Receivables | 1,339,200 | 1,339,200 | 1,339,200 | 1,339,200 | 1,339,200 | 1,339,200 | |
| Inventory: Non-Perishable | 5,875,300 | 5,875,300 | 5,875,300 | 5,875,300 | 5,875,300 | 5,875,300 | |
| Inventory: Liquor, Beer, Wine | 999,446 | 999,446 | 999,446 | 999,446 | 999,446 | 999,446 | |
| Inventory: Perishable | 1,791,484 | 1,791,484 | 1,791,484 | 1,791,484 | 1,791,484 | 1,791,484 | |
| PACA | (1,080,000) | (1,080,000) | (1,080,000) | (1,080,000) | (1,080,000) | (1,080,000) | |
| Money Order/Western Union | (482,760) | (482,760) | (482,760) | (482,760) | (482,760) | (482,760) | |
| Loyalty Card | (269,025) | (242,123) | (242,123) | (242,123) | (242,123) | (242,123) | |
| LOC | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | |
| Gift Cards | (134,513) | (121,061) | (121,061) | (121,061) | (121,061) | (121,061) | |
| Rent Reserve | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | |
| Total Borrowing Base | 6,739,131 | 6,779,485 | 6,779,485 | 6,779,485 | 6,779,485 | 6,779,485 | |
| DIP Commitment Amount | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | |
| DIP Facility | 18,739,131 | 18,779,485 | 18,779,485 | 18,779,485 | 18,779,485 | 18,779,485 | |

EXHIBIT 1
Page 6 of 6

# EXHIBIT 2 TO MOTION

## THIRD AMENDMENT TO FINANCING AGREEMENT

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

# THIRD AMENDMENT TO FINANCING AGREEMENT

This Third Amendment to Financing Agreement (this "<u>Amendment</u>"), dated as of _____ __, 2013, is made by and among C & K Market, Inc., an Oregon corporation ("<u>Market</u>"), C&K Express, LLC, an Oregon limited liability company ("<u>Express</u>" and, together with Market, the "<u>Borrowers</u>" and, each, a "<u>Borrower</u>"), and U.S. Bank National Association, a national banking association ("<u>U.S. Bank</u>"), as sole Lender, LC Issuer and Agent (each as defined in the Financing Agreement described below).

## RECITALS

The Borrowers and U.S. Bank are parties to that certain Financing Agreement dated as of October 28, 2010 (as amended by a First Amendment to Financing Agreement dated as of March 15, 2012 and a Second Amendment to Financing Agreement and First Amendment to Security Agreement dated as of November __, 2012, and as may be further amended, restated, supplemented or otherwise modified from time to time, the "<u>Financing Agreement</u>"). Capitalized terms used in these recitals have the meanings given to them in the Financing Agreement and in Paragraph 1 below.

On **[_____ __, 2013]**, Market filed a petition under Chapter 11 of the Bankruptcy Code. Market intends to act as a debtor-in-possession of its bankruptcy estate in the Bankruptcy Case. Market has requested that U.S. Bank provide debtor-in-possession financing to Market in the Bankruptcy Case under the terms and conditions of the Financing Agreement as amended by this Amendment, and the Borrowers have requested that U.S. Bank agree to certain amendments to the Financing Agreement to incorporate such financing. U.S. Bank is willing to grant such requests subject to the terms and conditions of this Amendment and the Financing Agreement as amended hereby.

Accordingly, in consideration of the premises and of the mutual covenants and agreements herein contained, it is agreed as follows:

1.    **Defined Terms**.  Capitalized terms used in this Amendment that are defined in the Financing Agreement shall have the same meanings as defined therein, unless otherwise defined herein.

(a)    In addition, Section 1.1 of the Financing Agreement is amended by adding or amending and restating, as the case may be, the following definitions:

"<u>2012 Financing Agreement</u>" means the Financing Agreement dated as of November 2, 2012 among the Borrowers and U.S. Bank, as supplemented by the Supplemental Agreement dated as of November 2, 2012 among the Borrowers and U.S. Bank.

"<u>2012 Security Agreement</u>" means the Security Agreement dated as of November 2, 2012 among the Borrowers and U.S. Bank.

EXHIBIT 2
Page 1 of 41

"<u>Administrative Expenses</u>" means (i) the allowed fees and expenses of the clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b), and (ii) the allowed fees and expenses payable under Sections 330 and 331 of the Bankruptcy Code to professional persons retained by Market pursuant to an order of the Bankruptcy Court or by any statutory committee appointed in the Bankruptcy Case; provided, however, "Administrative Expenses" shall not include any fees or expenses incurred, directly or indirectly, in respect of, arising from or relating to (a) the initiation or prosecution of any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims or causes of action against Agent or any Lender or with respect to this Agreement or any of the other Loan Documents, the Obligations or the Pre-Petition Indebtedness or (b) hindering, delaying or otherwise attempting to prevent the enforcement by Agent or any Lender of its Liens or realization upon any Loan Collateral).

"<u>Advance Rate Amount</u>" has the meaning set forth in Section 12.7.

"<u>Advance Request</u>" means Borrowers' written request for a Revolving Loan or DIP Advance pursuant to Section 2.5.

"<u>Applicable LIBOR Rate Margin</u>" and "<u>Applicable LOC Fee</u>" mean, as of any date, the applicable per annum rate or fee shown in the applicable column in <u>Section 3.2.2</u>.

"<u>Bankruptcy Case</u>" means the Chapter 11 bankruptcy case of Market pending before the Bankruptcy Court entitled In re C & K Market, Inc., Case No. [**13-_____**], including without limitation any adversary proceedings, jointly administered cases or other ancillary proceedings.

"<u>Bankruptcy Code</u>" means 11 U.S.C. § 101 et seq.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Oregon, including any judge presiding over the Bankruptcy Case.

"<u>Borrowing Base</u>" means (collectively and individually as the context requires) the Market Borrowing Base and the Express Borrowing Base.

"<u>Borrowing Base Certificate</u>" means a certificate of Market or Express with respect to the Market Borrowing Base or the Express Borrowing Base, respectively, in substantially the form attached hereto as Exhibit D.

"<u>Borrowing Base DIP Commitment Amount</u>" means, as of any day, an aggregate amount equal to the Market Borrowing Base as of such day plus $12,000,000, as such amount may be reduced from time to time pursuant to Section 12.7.

"<u>Budget</u>" has the meaning specified in Section 10.28.

2

EXHIBIT 2
Page 2 of 41

"<u>Budgeted DIP Commitment Amount</u>" means, as of any day, an aggregate amount equal to the sum of the amounts set forth in the Budget for such day under the line items entitled "Projected Ending Revolver Balance" and "DIP Ending Balance", plus $4,000,000, plus the Unrealized Sale Amount for such day.

"<u>Carveout</u>" means a carveout from Agent's pre-petition and post-petition claims (whether secured or unsecured), including its Superpriority Claim, in an aggregate amount equal to the sum of (a) $100,000 for unpaid Administrative Expenses incurred following a Post-Petition Event of Default, plus (b) the amount of funds then on deposit in the Professional Fee Holding Account, plus (c) the amount of Administrative Expenses then incurred but not yet paid into the Professional Fee Holding Account in an aggregate amount not to exceed $100,000.

"<u>Cash Dominion Period</u>" means the period commencing on the Third Amendment Effective Date and continuing thereafter until the Obligations have been paid in full in cash.

"<u>Commitments</u>" means the DIP Facility Commitment, the Revolving Credit Commitments or the Term Loan Commitments or any combination thereof (as the context requires). "<u>Commitment</u>" means, when used with reference to a particular Lender, its DIP Facility Commitment, Revolving Credit Commitment or Term Loan Commitment or any combination thereof (as the context requires).

"<u>Credit Exposure</u>" means, with respect to any Lender at any time, an amount equal to (i) the Revolving Credit Exposure of such Lender at such time, plus (ii) the amount of the outstanding Term Loans held by such Lender at such time, plus (iii) the Agent Advance Exposure of such Lender at such time, plus (iv) the DIP Facility Exposure of such Lender at such time.

"<u>Deficiency</u>" means (collectively and individually) a Borrowing Base Deficiency, a DIP Deficiency and a Letter of Credit Deficiency.

"<u>DIP Advance</u>" has the meaning set forth in Section 2.2.

"<u>DIP Commitment Amount</u>" means, as of any day, an amount equal to the lesser of (a) the Maximum DIP Commitment Amount, (b) the Borrowing Base DIP Commitment Amount or (c) the Budgeted DIP Commitment Amount.

"<u>DIP Deficiency</u>" means any time during which the DIP Facility Exposure exceeds the DIP Commitment Amount.

"<u>DIP Facility</u>" means the debtor-in-possession revolving credit facility being made available to Market by the DIP Lender pursuant to Section 2.2(b).

"<u>DIP Facility Collateral</u>" means (i) all assets of Market, including, without limitation, all real estate and all personal property of Market, (ii) all Collateral, Property, Trademark Collateral (as defined in the Trademark Security Agreement)

3

EXHIBIT 2
Page 3 of 41

and all assets subject to the Refinancing Trust Deeds, and (iii) all other security or collateral provided from time to time by, or on behalf of, Market or any other Person securing any of the Obligations of Market, whether incurred before or after the Petition Date; together with (a) all substitutions and replacements for and products of any of the foregoing; (b) in the case of all tangible goods, all accessions; (c) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any tangible goods; (d) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods, and (e) all proceeds of any and all of the foregoing.

"DIP Facility Commitment" means the obligation of the DIP Lender to make DIP Advances and to participate in Letters of Credit under the DIP Facility. The maximum amount of the DIP Facility Commitment as of any day is the DIP Commitment Amount as of such day, as such commitment may be (i) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 14.2 and (ii) terminated pursuant to Section 12.

"DIP Facility Commitment Period" means the period from and including the Third Amendment Effective Date to but excluding the DIP Facility Commitment Termination Date.

"DIP Facility Commitment Termination Date" means the DIP Facility Maturity Date or any earlier date on which the DIP Facility Commitment is terminated in accordance with this Agreement.

"DIP Facility Exposure" means, as of any day, an amount equal to (i) the aggregate outstanding principal balance of all DIP Advances, plus (ii) the Letter of Credit Exposure, plus (iii) the aggregate outstanding principal balance of all Pre-Petition Revolving Loans.

"DIP Facility Maturity Date" means the earliest to occur of (a) the date that is one year after the Petition Date, (b) upon the closing of any sale of all or substantially all of the assets of Market pursuant to Section 363 of the Bankruptcy Code, or (c) upon the effective day of a confirmed plan under section 1129 of the Bankruptcy Code.

"DIP Lender" means U.S. Bank and any successor or assign thereof from time to time holding any DIP Facility Exposure or any DIP Facility Commitment.

"Eligible Assignee" means (i) any Lender or Affiliate of a Lender, (ii) any bank having a combined capital and surplus of at least $500,000,000 or (iii) any other Person.

"Express Borrowing Base" means, as of any time, an amount in Dollars equal to the sum of:

EXHIBIT 2
Page 4 of 41

(i)      the applicable Receivables Advance Rate applied, with respect to Eligible Credit Card Receivables, to the then Net Amount of Eligible Credit Card Receivables of Express then outstanding; plus

(ii)     the applicable Receivables Advance Rate applied, with respect to Eligible Pharmacy Receivables, to the then Net Amount of Eligible Pharmacy Receivables of Express then outstanding; plus

(iii)    the applicable Inventory Advance Rate applied, with respect to the applicable categories of Eligible Inventory, to the then Eligible Inventory of Express; plus

(iv)     the Prescription Files Advance Rate applied to the Prescription Files Value applicable to the Eligible Prescription Files of Express; plus

(v)      during the Temporary Overadvance Period, and so long as no Event of Default has occurred and is continuing, the Temporary Overadvance Amount; less

(vi)     the then Reserve Amount as established by Agent in accordance with the definition thereof with respect to the assets and liabilities of Express;

provided, however, that if the calculation of the Express Borrowing Base as described above at any time results in the amount of Eligible Inventory of Express that is Perishable Inventory multiplied by the applicable Inventory Advance Rate exceeding 15% of the total Express Borrowing Base, the amount of the Express Borrowing Base shall be reduced by the amount of such excess.

"Express Guaranty" means the Guaranty dated as of [_____ __, 2013] by Express in favor of Agent under which Express guaranties the payment and performance of the Post-Petition Indebtedness.

"Express Revolving Loans" has the meaning set forth in Section 2.2(a)(ii).

"Final Order" means the final order, in form and substance satisfactory to Agent in its sole discretion, entered by the Bankruptcy Court, which, among other things, (i) approves the Third Amendment, this Agreement as amended thereby and the other Loan Documents, (ii) authorizes Market to enter into the Third Amendment, this Agreement as amended thereby and the other Loan Documents and the financing contemplated therein, (iii) grants Superpriority Claims in the Bankruptcy Case with respect to the Post-Petition Indebtedness and all obligations owing under any Cash Management Services arrangement with Agent or any Affiliate thereof, and (iv) provides that all Post-Petition Indebtedness and all obligations owing by Market under any such Cash Management Services arrangement are secured by a first priority perfected Lien on the DIP Facility

5

EXHIBIT 2
Page 5 of 41

Collateral, subject only to valid, perfected, prior pre-petition Liens, Priming Interests and Permitted Liens and the Carveout.

"Fiscal Month" means any calendar month of a Fiscal Year.

"Fiscal Quarter" means any quarter of a Fiscal Year.

"Fiscal Year" means Borrowers' fiscal year for financial accounting purposes, beginning on January 1 and ending on the last day of December.

"Interim Order" means the interim order, in form and substance acceptable to Agent in its sole discretion, entered by the Bankruptcy Court, which, among other things, on an interim basis, (i) approves the Third Amendment, this Agreement as amended thereby and the other Loan Documents, (ii) authorizes Market to enter into the Third Amendment, this Agreement as amended thereby and the other Loan Documents and the financing contemplated therein, (iii) grants Superpriority Claims in the Bankruptcy Case with respect to the Post-Petition Indebtedness and all obligations owing under any Cash Management Services arrangement with Agent or any Affiliate thereof, and (iv) provides that all Post-Petition Indebtedness and all obligations owing by Market under any such Cash Management Services Arrangement are secured by a first priority perfected Lien on the DIP Facility Collateral, subject only to valid, perfected, prior pre-petition Liens, Priming Interests and Permitted Liens and the Carveout.

"Letter of Credit Availability" means, as of any day, an amount equal to (a) $3,000,000 less (b) the Letter of Credit Exposure as of such day.

"Letter of Credit Exposure" means, as of any day, the sum of (i) the Letter of Credit Face Amount of all outstanding Letters of Credit and (ii) all unreimbursed drawings under any Letters of Credit (whether or not outstanding).

"Loan" means each Revolving Loan (including each Overadvance), each Interim Advance, each Agent Advance, each Term Loan and each DIP Advance, and the total of all such Revolving Loans, Interim Advances, Agent Advances, Term Loans and DIP Advances outstanding at any time may be referred to as "Loans".

"Loan Collateral" means (a) the Revolving and Term Loan Collateral and (b) the DIP Facility Collateral.

"Loan Documents" means this Agreement, the 2012 Financing Agreement, the "Loan Documents" as defined in the 2012 Financing Agreement, the Notes, the Letter of Credit Documents, the Individual Guaranty Agreement, the Express Guaranty, the Security Documents, and all other agreements, instruments and documents relating to the Obligations, including mortgages, deeds of trust, security agreements, subordination agreements, intercreditor agreements, pledges, powers of attorney, consents, collateral assignments, locked box agreements, letter agreements, contracts, notices, leases, financing statements

6

EXHIBIT 2
Page 6 of 41

and all other writings, all of which must be in form and substance satisfactory to Agent, the LC Issuer, and the Lenders, which have been, are as of the date of this Agreement, or will in the future be signed by, or on behalf of, any Borrower and delivered to Agent, the LC Issuer, or the Lenders.

"Market Borrowing Base" means, as of any time, an amount in Dollars equal to the sum of:

> (i)     the applicable Receivables Advance Rate applied, with respect to Eligible Credit Card Receivables, to the then Net Amount of Eligible Credit Card Receivables of Market then outstanding; plus

> (ii)     the applicable Receivables Advance Rate applied, with respect to Eligible Pharmacy Receivables, to the then Net Amount of Eligible Pharmacy Receivables of Market then outstanding; plus

> (iii)     the applicable Inventory Advance Rate applied, with respect to the applicable categories of Eligible Inventory, to the then Eligible Inventory of Market; plus

> (iv)     the Prescription Files Advance Rate applied to the Prescription Files Value applicable to the Eligible Prescription Files of Market; plus

> (v)     during the Temporary Overadvance Period, and so long as no Event of Default has occurred and is continuing, the Temporary Overadvance Amount; less

> (vi)     the then Reserve Amount as established by the Agent in accordance with the definition thereof with respect to the assets and liabilities of Market;

provided, however, that if the calculation of the Market Borrowing Base as described above at any time results in the amount of Eligible Inventory of Market that is Perishable Inventory multiplied by the applicable Inventory Advance Rate exceeding 15% of the total Market Borrowing Base, the amount of the Market Borrowing Base shall be reduced by the amount of such excess.

"Material Adverse Effect" means a material adverse effect on (i) any Borrower's (a) business, property, assets, operations or condition, financial or otherwise, or (b) ability to perform any of its respective payment or other Obligations under this Agreement or any of the other Loan Documents, (ii) the recoverable value of any material portion of the Loan Collateral or Agent's, LC Issuer's or Lenders' rights or interests therein, or (iii) the ability of Agent, LC Issuer or Lenders to exercise any of their material rights or remedies under the Loan Documents or provided by law.

7

EXHIBIT 2
Page 7 of 41

"Maximum DIP Commitment Amount" means the $23,000,000, as such amount may be reduced from time to time pursuant to Section 12.7.

"Non-Operating Expenses" means those categories of non-operating expenses as set forth in the Budget.

"Obligations" means the Loans, the Letter of Credit Obligations, the Rate Hedging Obligations owing to the Agent, the LC Issuer or any Lender or any Affiliate of any such Persons, and each and every other debt, liability and obligation of every type and description arising under or in connection with any of the Loan Documents which the Borrowers or any Borrower may now or at any time hereafter owe to the Agent, the LC Issuer or any Lender, whether such debt, liability or obligation now exists or is hereafter created or incurred, whether it is direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or sole, joint, several or joint and several, and including specifically, but not limited to all debts, liabilities and obligations of the Borrowers or any Borrower owing to the Agent, the LC Issuer or any Lender arising prior to the Petition Date and all debts, liabilities and obligations of the Borrowers or any Borrower owing to the Agent, the LC Issuer or any Lender after the Petition Date.

"Operating Expenses" means those categories of operating expenses as set forth in the Budget.

"Permitted Purchase Money Indebtedness" means purchase money or capital lease Indebtedness incurred by a Borrower prior to the Petition Date to acquire any Equipment or real estate, provided: (i) the aggregate amount of such purchase money Indebtedness and capitalized lease Indebtedness does not at any time exceed $5,000,000; (ii) no such purchase money Indebtedness or capitalized lease Indebtedness is secured by any of the Loan Collateral other than the property so acquired and any identifiable proceeds; (iii) any Liens relating to such purchase money Indebtedness or capitalized lease Indebtedness will not extend to or cover any property of any Borrower other than the property so acquired and any identifiable proceeds, and will not extend to or cover any Inventory, Receivables or other intangible property or assets acquired in connection therewith or any proceeds thereof, (iv) the principal amount of such capitalized lease or purchase money Indebtedness will not, at the time of the incurrence thereof, exceed the value of the property so acquired, and (v) any purchase money Indebtedness incurred in connection with an acquisition permitted by the Lenders and attributable or allocated (as determined by Agent in good faith) to the acquisition of Inventory, Receivables or other intangible property or assets shall be subordinated in right of payment to Agent and Lenders pursuant to a subordination agreement in form and substance reasonably acceptable to Agent.

"Petition Date" means the date and time when Market filed its petition commencing the Bankruptcy Case.

8

EXHIBIT 2
Page 8 of 41

"Post-Petition Event of Default" means an Event of Default arising after the Petition Date.

"Post-Petition Indebtedness" means all Obligations of Market arising on and after the Petition Date.

"Pre-Petition Indebtedness" means that portion of the Obligations arising prior to the Petition Date, together with all interest continuing to accrue thereon and all fees and expenses relating thereto.

"Pre-Petition Revolving Loans" has the meaning set forth in Section 2.2(a)(i).

"Professional Fee Holding Account" has the meaning set forth in Section 2.7.7.

"Refinancing Trust Deeds" has the meaning set forth in the 2012 Financing Agreement.

"Reserve Amount" means, as of any day, the reserves that Agent in its Permitted Discretion may from time to time establish with respect of any one or more of the following:

(i)      for price adjustments, damages, unearned discounts, gift cards, coupons, returned Inventory, credit memoranda (issued or unissued), credits, contras and other similar offsets to a Borrower's accounts receivable except to the extent that any of the foregoing in this item (i) has been dealt with by Agent by designating a specific Receivable or Receivables as being ineligible pursuant to the terms of this Agreement as opposed to the establishment of a reserve general in nature;

(ii)      for any claims, interests, or rights (including Permitted Liens and including Liens disclosed in any Food Security Act Notices that have not been waived to Agent's reasonable satisfaction) of any Person ("Priming Interests") which (a) as of the date Agent learns or is notified of the existence of the applicable Priming Interest, has priority over Agent's Liens on any or all of the Loan Collateral or (b) will have priority over Agent's Liens on any or all of the Loan Collateral after any required notice or filing, the passage of time, the satisfaction of any other condition, or otherwise;

(iii)      for aged credits maintained by a Borrower in respect of its accounts receivable except to the extent that any of the foregoing in this item (iii) has been dealt with by Agent by designating a specific Receivable or Receivables as being ineligible pursuant to the terms of this Agreement as opposed to the establishment of a reserve general in nature;

9

EXHIBIT 2
Page 9 of 41

(iv)     for any amounts expended by Agent to protect or preserve any Loan Collateral or Agent's or any Lender's rights under the Loan Documents which have not been reimbursed by a Borrower;

(v)     100% of the aggregate mark-to-market exposure, as determined by Agent, of all Rate Hedging Obligations then owing by a Borrower to one or more Lenders (or their Affiliates) under a Rate Hedging Agreement;

(vi)     with respect to the Market Borrowing Base, the Letter of Credit Reserve; or

(vii)    with respect to the Market Borrowing Base or the Express Borrowing Base, upon receipt by the Agent or any Lender of any proceeds of any sale or other disposition of assets of Market or Express (respectively) other than in the ordinary course of business, an amount equal to such proceeds until such Borrower has delivered to the Agent a Borrowing Base Certificate setting forth the applicable Borrowing Base after giving effect to the disposition of such assets.

"Revolving and Term Loan Collateral" means (a) all Collateral, Property, Trademark Collateral (as defined in the Trademark Security Agreement) and all assets subject to the Refinancing Trust Deeds, and (b) all other security or collateral provided from time to time by, or on behalf of, Express or any other Person securing any Pre-Petition Indebtedness or any of the Obligations of Express, whether incurred before or after the Petition Date; together with (i) all substitutions and replacements for and products of any of the foregoing; (ii) in the case of all tangible goods, all accessions; (iii) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any tangible goods; (iv) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods, and (v) all proceeds of any and all of the foregoing.

"Revolving Credit Availability" means, as of any day, an amount, in Dollars, equal to:

(i)     the lesser of: (a) the Express Borrowing Base as of such day or (b) the Revolving Credit Commitment; less

(ii)    the then aggregate outstanding principal amount of all Express Revolving Loans, all due but unpaid interest thereon, and all fees, commissions, expenses and other charges with respect thereto.

"Revolving Credit Commitment" means **[$400,000]**.

"Revolving Credit Commitment Period" means the period from and including the Third Amendment Effective Date to, but not including, the Revolving Credit Commitment Termination Date.

10

EXHIBIT 2
Page 10 of 41

"Revolving Credit Commitment Termination Date" means the earlier to occur of (i) [_____ __, 20__] or (ii) the date that is [__] Business Days after the closing date set forth in the purchase agreement for the sale of the last pharmacy of Express.

"Revolving Credit Exposure" means, with respect to any Lender at any time, an amount equal to (i) the outstanding principal amount of such Lender's Express Revolving Loans, plus (ii) the Interim Advance Exposure of such Lender.

"Revolving Loans" means the Pre-Petition Revolving Loans and the Express Revolving Loans.

"Security Documents" means the Borrower Security Agreement, the 2012 Security Agreement, the Mortgages, the Refinancing Trust Deeds, the Trademark Security Agreement and any other agreements, instruments or documents executed and delivered from time to time by, or on behalf of, any Borrower or any other Person as collateral security for the Obligations.

"Superpriority Claim" means a claim against Market in the Bankruptcy Case that is an administrative expense claim having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

"Term Loan C" means the Loan evidenced by the Term Loan C Note and the 2012 Financing Agreement.

"Term Loan C Note" means the "Note" as defined in the 2012 Financing Agreement.

"Term Loan Lenders" means the Term Loan A Lenders, the Term Loan B Lenders and the holder of the Term Loan C Note.

"Term Loan Priority Collateral" means (i) the Property, (ii) all real property subject to the Refinancing Deeds of Trust, (iii) all equipment and fixtures now owned or hereafter acquired by any Borrower, (iv) the Loan Collateral subject to the Trademark Security Agreement, and (v) to the extent not otherwise included in clauses (i), (ii), (iii) or (iv), all proceeds of each of the foregoing (including insurance proceeds), and all accessions to, substitutions and replacements for and rents and products of each of the foregoing.

"Term Loans" means Term Loan A, Term Loan B and Term Loan C.

"Third Amendment" means that certain Third Amendment to Financing Agreement dated as of [_____ __, 2013], by and among the Borrowers and U.S. Bank, as Agent, LC Issuer and Lender.

"Third Amendment Effective Date" means the date that all of the conditions in Paragraph 55 of Third Amendment have been satisfied.

dms.us.53080850.06

EXHIBIT 2
Page 11 of 41

"Unrealized Sale Amount" means, as of any day, (i) the amount set forth under the "Proceeds from Sale of Inventory" line in the Budget, if the sale giving rise to the anticipated sale proceeds set forth in such line item of the Budget has not closed on or before such day or (ii) $0, if such sale has occurred on or before such day.

(b)    Section 1.1 of the Financing Agreement is also amended by amending and restating clause (vi) of the definition of "Refinancing Debt" to read in its entirety as follows:

"(vi)    [reserved]; and"

(c)    Section 1.1 of the Financing Agreement is further amended by deleting therefrom each of the following definitions:

"Excess Cash Flow"

"Financial Covenants"

"Fixed Charge Coverage Ratio"

"Fixed Charges"

"Funded Debt to EBITDA Ratio"

"Permitted Investment"

2.    **Total Facility**.  Section 2.1 of the Financing Agreement is amended and restated in its entirety to read as follows:

"2.1    Total Facility. Subject to the terms and conditions of this Agreement, the 2012 Financing Agreement and the other Loan Documents, the Lenders may extend credit to, or for the benefit of, one or more Borrowers in the form of Credit Extensions advanced or to be advanced under the following facilities: (i) the Revolving Loans, (ii) the DIP Facility, (iii) a Letter of Credit subfacility, (iv) Term Loan A, (v) Term Loan B and (vi) Term Loan C."

3.    **Revolving Loans and DIP Facility**.  Section 2.2 of the Financing Agreement is amended and restated in its entirety to read as follows:

"2.2    Revolving Loans and DIP Facility.

(a)    Revolving Loans.

(i)    The Revolving Credit Lenders have made revolving advances to the Borrowers under the revolving line of credit facility as set forth and described in Section 2.2 of this Agreement prior to giving effect to the Third Amendment (collectively, the "Pre-Petition Revolving

12

EXHIBIT 2
Page 12 of 41

Loans"). The aggregate outstanding principal balance of the Pre-Petition Revolving Loans as of the Third Amendment Effective Date is [$_____]. The Borrowers' obligation to pay the Pre-Petition Revolving Loans is secured by the Revolving and Term Loan Collateral. The Pre-Petition Revolving Loans shall constitute Revolving Loans for purposes of this Agreement, shall continue to be secured by the foregoing collateral, and shall be repayable in accordance with this Agreement (as amended by the Third Amendment and as may be further amended, restated, supplemented or otherwise modified from time to time).

(ii)     During the Revolving Credit Commitment Period, and subject to the other terms and conditions of this Agreement, each Revolving Credit Lender may in its sole discretion (and shall have no obligation to) make loans to Express (the "Express Revolving Loans") in an aggregate amount not exceeding the Revolving Credit Availability then in effect; provided that, after giving effect to the making of any such Revolving Loan, the Revolving Credit Exposure will not exceed the Revolving Credit Commitment. Within the foregoing limits, and subject to the other terms and conditions of this Agreement, Express may request to reborrow Revolving Loans after the repayment thereof.

(iii)     As an alternative or in addition to the funding of any Express Revolving Loan, the Borrowers agree that Agent may release to Express the proceeds of any assets of Express constituting Revolving and Term Loan Collateral, provided that the aggregate amount of all such collateral proceeds released to Express does not exceed the Revolving Credit Commitment.

(b)     DIP Facility. During the DIP Facility Commitment Period, and subject to the other terms and conditions of this Agreement, the DIP Lender agrees to make advances to Market (the "DIP Advances") in an aggregate amount not exceeding the DIP Commitment Amount, provided that (i) before and after giving effect to the making of any such DIP Advance, the DIP Facility Exposure will not exceed the DIP Commitment Amount and (ii) as of the date of such DIP Advance, no Post-Petition Event of Default has occurred and is continuing or would result from such DIP Advance. Within the foregoing limits, and subject to the other terms and conditions of this Agreement, Market may reborrow DIP Advances after the repayment thereof. All DIP Advances and other Post-Petition Indebtedness shall be entitled to super-priority administrative expense status."

4.     **Letter of Credit Subfacility**. Section 2.4.1 of the Financing Agreement is amended and restated in its entirety to read as follows:

"2.4.1 Letter of Credit Subfacility. Each letter of credit issued pursuant to this Section 2.4, together with those certain letters of credit nos. SLCPPDX05725 and SLCPPDX05851 in the aggregate face amount of $1,250,000 issued for the account of Market, shall be deemed issued hereunder, shall be secured by all Loan

13

EXHIBIT 2
Page 13 of 41

Collateral and shall be referred to herein as a "Letter of Credit." During the DIP Facility Commitment Period and subject to the other terms and conditions of this Agreement, Market may request the LC Issuer to issue one or more of its standard standby letters of credit or its standard commercial letters of credit in favor of such beneficiary(ies) as are designated by Market by delivering to the LC Issuer, with a copy to the Agent: (i) a Letter of Credit Application completed to the reasonable satisfaction of the LC Issuer, together with the proposed form of the Letter of Credit (which, in all respects, will comply with the applicable requirements of Section 2.4.2), (ii) a Borrowing Base Certificate with respect to the Market Borrowing Base which calculates the Letter of Credit Availability after giving effect to the proposed Letter of Credit, and (iii) such other Letter of Credit Documents that the LC Issuer then requires. The LC Issuer, in addition to the other terms of this Agreement, will have no obligation to issue the proposed Letter of Credit if, after giving effect to such proposed Letter of Credit, there exists any DIP Deficiency or the Letter of Credit Availability will be less than $0. The making of each Letter of Credit request by Market will be deemed to be a representation by Market that the Letter of Credit may be issued in accordance with, and will not violate the terms of, this Section 2.4.1. Letters of Credit issued hereunder shall constitute a utilization of the DIP Facility Commitment."

5.     **Letters of Credit**.  Section 2.4 of the Financing Agreement is further amended by: (a) deleting each reference to "Revolving Credit Commitment Period" and inserting "DIP Facility Commitment Period" in substitution therefor; (b) deleting each reference to "Borrower" or "Borrowers" and inserting "Market" in substitution therefor; (c) deleting each reference to "Revolving Credit Lender" and inserting "DIP Lender" in substitution therefor; (d) deleting each reference to "in accordance with its Revolving Credit Commitment Percentage", "such Lender's Revolving Credit Commitment Percentage of" and "such Revolving Credit Lender's Revolving Credit Commitment Percentage of"; (e) deleting the reference to "Revolving Loan" in Section 2.4.4 and inserting "DIP Advance" in substitution therefor; and (f) deleting each reference to "LIBOR Rate Loan" in Section 2.4.11 and inserting "DIP Advance" in substitution therefor.

6.     **Advance Requests**.  Section 2.5 of the Financing Agreement is amended and restated to read in its entirety as follows:

"2.5     Advance Requests.  The Term Loans will be funded in full on the first Business Day following the Closing Date by a deposit of the amount thereof to the Operating Account for Market identified by Market. Express shall submit a fully completed Advance Request to obtain any Express Revolving Loan, and Market shall submit a fully completed Advance Request to obtain any DIP Advance. Each such Advance Request shall be irrevocable. Each Advance Request shall be given to Agent by no later than 12:00 noon (Minneapolis, Minnesota time) on the Borrowing Date of the applicable LIBOR Rate Loan. Each Advance Request must be signed by an Authorized Representative; provided that Agent may rely on the authority of any officer or employee of the applicable Borrower whom Agent in good faith believes to be authorized to request advances."

14

EXHIBIT 2
Page 14 of 41

7.  **Funding of Loans**.  Section 2.7.1 of the Financing Agreement is amended by: (a) deleting each reference therein to "Borrowers" and inserting "Express" in substitution therefor; (b) deleting the reference to "Loan Collateral" in Section 2.7.1(i) and inserting "Revolving and Term Loan Collateral" in substitution therefor; and (c) inserting at the end of Section 2.7.1 the following sentence:

> "If Market makes a request for a DIP Advance as provided herein, the Agent shall notify the DIP Lender by facsimile, electronic mail or other similar form of teletransmission of the proposed DIP Advance on the same Business Day that the Agent is notified or deemed notified by Market of its request for such proposed DIP Advance pursuant to this Agreement, and thereupon the DIP Lender shall remit, so that the Agent shall have received, on or prior to 2:00 p.m. (Minneapolis, Minnesota time), on the date such DIP Advance is to be funded, immediately available funds in an amount equal to such DIP Advance."

8.  **Funding of Professional Fee Holding Account**.  Section 2.7 of the Financing Agreement is amended by adding a new subsection 2.7.7 to the end thereof to read in its entirety as follows:

> "2.7.7  <u>Funding of Professional Fee Holding Account</u>.  Market authorizes Agent and each DIP Lender to fund a DIP Advance as of the fifteenth day of each month in an amount equal to the Administrative Expenses incurred by Market during the immediately preceding month and billed before such fifteenth day, and the proceeds of such DIP Advance shall be remitted into a segregated deposit account of Market maintained with Agent (the "<u>Professional Fee Holding Account</u>"). Funds on deposit in the Professional Fee Holding Account may be used to pay any such Administrative Expenses as approved (or when allowed to be paid) by the Bankruptcy Court, provided, however, Market will not pay any Administrative Expenses incurred by Market except in accordance with the Budget. Agent shall have a perfected security interest in the Professional Fee Holding Account. To the extent that any funds remain in the Professional Fee Holding Account after payment of such Administrative Expenses, the excess funds may be applied by Agent to payment of any Obligations in such order of application as Agent shall determine in its reasonable discretion."

9.  **Notes; Records of Advances of Credit**.  Section 2.8 of the Financing Agreement is amended by deleting the reference therein to "and the Term Loans" and inserting ", Term Loan A and Term Loan B" in substitution therefor.

10.  **Collateral**.  Section 2.11 of the Financing Agreement is amended and restated in its entirety to read as follows:

> "2.11  <u>Collateral</u>.

> (a)    All Pre-Petition Indebtedness, including without limitation the Pre-Petition Revolving Loans and all Term Loans, are made on the security of the

15

EXHIBIT 2
Page 15 of 41

Revolving and Term Loan Collateral. All obligations with respect to the Pre-Petition Indebtedness shall be the joint and several obligations of the Borrowers.

(b)       The Express Revolving Loans, together with all interest thereon and all fees and expenses relating thereto, are made on the security of the assets of Express constituting Revolving and Term Loan Collateral. Market has no obligation with respect to, and is not liable for, any Express Revolving Loans.

(c)       The DIP Advances, Letter of Credit Exposure and all other advances or extensions of credit to, or for the benefit of, Market under this Agreement or the other Loan Documents and all other Post-Petition Indebtedness are made on the security of the DIP Facility Collateral. Pursuant to the Guaranty, Express guaranties the payment and performance of the Post-Petition Indebtedness."

11.       **Scheduled Termination of Commitments**.  Section 2.13.4 of the Financing Agreement is amended by inserting at the end thereof the following sentence:

"The DIP Facility Commitment will automatically terminate on the DIP Facility Commitment Termination Date."

12.       **Repayment of Principal**.  Section 3.1.1 of the Financing Agreement is amended by inserting a new subsection (vii) to the end thereof to read in its entirety as follows:

"(vii)   Market hereby promises to pay the entire unpaid principal balance of the DIP Advances, and the unpaid principal of each DIP Advance will be due and payable, on the earlier to occur of (a) the DIP Facility Maturity Date and (b) the date the DIP Advances are due and payable pursuant to Section 12."

13.       **Correction of Deficiency**.  Section 3.1.2 of the Financing Agreement is amended by amending and restating the last sentence thereof to read as follows:

"Any payments made by Borrowers in respect of a Deficiency will be applied, first, to the outstanding principal balance of Pre-Petition Revolving Loans and, second, to the outstanding principal balance of the DIP Advances, until a Deficiency no longer exists."

14.       **Mandatory Prepayments**.  Section 3.1.4 of the Financing Agreement is amended by (a) amending and restating subsection (i) thereof to read in its entirety as follows: "(i) [Reserved.]"; (b) deleting "Term Loan B, or if Term Loan B has been fully repaid, Term Loan A" in subsection (ii) thereof and inserting "any Term Loan in such order as the Agent may determine in its sole discretion" in substitution therefor; and (c) deleting the last sentence in subsection (ii) thereof.

15.       **Interest on Loans and Other Obligations**.  Section 3.2.1 of the Financing Agreement is amended by amending and restating subsections (i) and (iii) thereof to read in their entirety as follows:

EXHIBIT 2
Page 16 of 41

"(i)     Interest on each Revolving Loan, Term Loan A, Term Loan B, DIP Advance, Interim Advance and, notwithstanding the 2012 Financing Agreement, Term Loan C (each a "LIBOR Rate Loan") shall accrue at the Applicable LIBOR Rate Margin plus the LIBOR Rate."

"(iii)    The Pre-Petition Indebtedness is currently bearing interest at Default Rate and will continue to bear interest at the Default Rate. All Express Revolving Loans shall also bear interest at the Default Rate. Upon the occurrence and during the continuance of a Post-Petition Event of Default, the aggregate principal amount of all outstanding DIP Advances and all other Post-Petition Indebtedness shall bear interest at the Default Rate."

16.     **Applicable LIBOR Rate Margin, Applicable LOC Fee**.  Section 3.2.2 of the Financing Agreement is amended and restated in its entirety to read as follows:

"3.2.2   Applicable LIBOR Rate Margin, Applicable LOC Fee. Each of the Applicable LIBOR Rate Margins and the Applicable LOC Fee will be determined from time to time by reference to the table set forth below:

| Applicable LIBOR Rate Margin for Revolving Loans and Interim Advances | Applicable LIBOR Rate Margin for DIP Advances | Applicable LIBOR Rate Margin for Term Loan A | Applicable LIBOR Rate Margin for Term Loan B | Applicable LIBOR Rate Margin for Term Loan C | Applicable LOC Fee |
|---|---|---|---|---|---|
| 3.00% | 5.00% | 3.75% | 5.00% | 3.25% | 5.00% |

17.     **Interest Payment Dates**.  Section 3.3 of the Financing Agreement is amended and restated in its entirety to read as follows:

"3.3     Interest Payment Dates. Interest on all Obligations shall be payable (i) with respect to Revolving Loans, on the first Business Day of each calendar month or such earlier date on which the Revolving Credit Commitments shall be terminated, (ii) with respect to DIP Advances, on the first Business Day of each calendar month or such earlier date on which the DIP Facility Commitment shall be terminated, (iii) with respect to Term Loan A, on the last Business Day of each calendar month and on the Term Loan A Maturity Date, (iv) with respect to Term Loan B, on the last Business Day of each calendar month and on the Term Loan B Maturity Date, (v) with respect to Term Loan C, at the times set forth in the 2012 Financing Agreement, and (vi) on demand by Agent for each Agent Advance, Interim Advance or other Obligation; *provided, however*, that any interest with respect to any DIP Advance or other Post-Petition Indebtedness accrued or accruing at the Default Rate or any interest accrued or accruing on or after the Revolving Loan Maturity Date, the DIP Facility Maturity Date, the Term Loan A Maturity Date or Term Loan B Maturity Date, as applicable, shall be payable on

17

EXHIBIT 2
Page 17 of 41

the earlier of the applicable interest payment date identified in this Section or demand by Agent."

18.    **Agent Fees**.  Section 3.4 of the Financing Agreement is amended and restated in its entirety to read as follows:

> "3.4    Agent Fees. Borrowers will pay to Agent the fees as set forth in the Fee Letter. In addition, Market will pay to Agent a non-refundable fee in the amount of $350,000, which fee shall be deemed fully earned as of the Third Amendment Effective Date. Such fee will be due and payable on the earlier to occur of the DIP Facility Maturity Date or the date that is one year after the Petition Date.  If, within nine months after the Petition Date, there has been confirmed a plan of reorganization that provides for payment, in cash, on the effective date of such plan of all Obligations of Market, then fifty percent of such fee will be waived by Agent; if such a plan has been confirmed within one year after the Petition Date, then $100,000 of such fee will be waived by Agent."

19.    **Letter of Credit Fees**.  Section 3.7 of the Financing Agreement is amended by deleting "the Revolving Credit Lenders (ratably in accordance with their respective Revolving Credit Commitment Percentages)" therefrom and inserting "the DIP Lender" in substitution therefor.

20.    **Payment in Full on Applicable Maturity Date**.  Section 3.9 of the Financing Agreement is amended by adding to the end thereof the following sentence:

> "On the DIP Facility Maturity Date, all DIP Advances and all other Obligations will automatically and immediately become due and payable in full in cash, and Agent's and the Lenders' obligations under this Agreement and the other Loan Documents will automatically and immediately terminate without notice or demand, which Borrowers hereby expressly waive."

21.    **Charging of Accounts**.  Section 4.1.3 of the Financing Agreement is amended by deleting "Revolving Loans" therefrom and inserting "Revolving Loans or DIP Advances" in substitution therefor.

22.    **Security Documents**.  Section 6.1 of the Financing Agreement is amended and restated in its entirety to read as follows:

> "6.1    Security Documents.
>
> (a)    The Pre-Petition Indebtedness is secured by (in such order as may be determined by Agent in its sole discretion) a Lien on all Revolving and Term Loan Collateral, subject only to valid, perfected, prior pre-petition Liens, Priming Interests and Permitted Liens and the Carveout.
>
> (b)    The Express Revolving Loans, together with all interest thereon and all fees and expenses relating thereto, are secured by a Lien on all assets of

EXHIBIT 2
Page 18 of 41

Express constituting Revolving and Term Loan Collateral, subject only to valid, perfected, prior pre-petition Liens, Priming Interests and Permitted Liens.

(c)    The Post-Petition Indebtedness and all obligations owing by Market under any Cash Management Services arrangement with Agent or any Affiliate thereof are secured by a first priority perfected Lien on, and Market hereby grants to Agent a security interest in, the DIP Facility Collateral, subject only to valid, perfected, prior pre-petition Liens, Priming Interests and Permitted Liens and the Carveout."

23.    **Cost of Collection**.  Section 7.6 of the Financing Agreement is amended by deleting "following the occurrence and during the continuation of an Event of Default" therefrom.

24.    **Prescription Files**.  Section 7.10 of the Financing Agreement is amended by deleting each reference to "Borrowers" therein and inserting "Express" in substitution therefor.

25.    **Access and Inspection**.  Section 8.2 of the Financing Agreement is amended and restated in its entirety to read as follows:

"8.2    Access and Inspection. Agent, and following the occurrence and during the continuation of an Event of Default, the Lenders, may at all times during normal business hours have (i) access to, and the right to examine and inspect, all of Borrowers' real and personal property and (ii) access to, and the right to inspect, audit and make extracts from, all of Borrowers' records, files and books of account, and Borrowers shall execute and deliver at the request of Agent, or, if applicable, the Lenders such instruments as may be necessary for Agent or such Lender to obtain such information concerning the business of Borrowers as Agent or such Lender may require from any Person. Borrowers shall furnish Agent, and following the occurrence and during the continuation of an Event of Default, the Lenders, at reasonable intervals with such statements and reports regarding Borrower's financial condition and the results of Borrowers' operations, in addition to those hereinafter required, and such other information as Agent, and following the occurrence and during the continuation of an Event of Default, the Lenders, may reasonably request from time to time."

26.    **Reporting Regarding Receivables and Notes Receivable**.  Section 8.3 of the Financing Agreement is amended and restated in its entirety to read as follows:

"8.3    Reporting Regarding Receivables and Notes Receivable. As soon as available and in any event not later than the close of business (Pacific time) on Wednesday of each week, the Borrowers shall deliver to the Agent a Borrowing Base Certificate with respect to each Borrowing Base calculated as of the end of the immediately preceding Sunday (or, as of January 1, 2014 and thereafter, calculated as of the end of the immediately preceding Saturday), together with reports of the Borrowers' sales, credits to sales or credit memoranda applicable to

EXHIBIT 2
Page 19 of 41

sales, collections and non-cash charges (from whatever source, including sales and noncash journals or other credits to Receivables) for the applicable period, and acceptable supporting documentation thereto (including, a report indicating the Dollar value of the Borrower's Eligible Receivables, and all other information deemed necessary by the Agent to determine levels of that which is and is not Eligible Receivables). By no later than the 20th day after the end of each calendar month, or sooner if available, the Borrowers shall deliver to the Agent monthly agings, broken down by due date, of Receivables listed by invoice date, in each case reconciled to the Borrowing Base Certificate for the end of such month and each Borrower's general ledger, and setting forth any changes in the reserves made for bad accounts or any extensions of the maturity of, any refinancing of, or any other material changes in the terms of any Receivables in such format as is specified by the Agent from time to time, together with such further information with respect thereto in such format as the Agent may then reasonably require. If an Event of Default has occurred and is continuing, Agent may require reporting of Credit Card Receivables and sales more frequently than weekly."

27.    **Reporting Regarding Inventory**. Section 8.4 of the Financing Agreement is amended and restated in its entirety to read as follows:

"8.4    Reporting Regarding Inventory. The Borrowers will continue their current practice of cycle counts of Inventory in accordance with procedures approved by the Borrowers' independent certified public accountants and the Agent. As soon as available and in any event not later than the 20th day after the end of each calendar month, the Borrowers shall submit to the Agent an inventory report reconciled to (i) the Borrowing Base Certificate for the end of such month, (ii) the Borrowers' inventory records, and (iii) the Borrowers' general ledger, broken down into such detail and with such categories as the Agent shall reasonably require (including a report indicating the type, location, and dollar value of the Borrowers' Inventory, and all other information deemed necessary by the Agent to determine levels of that which is and is not Eligible Inventory). Values shown on reports of Inventory shall be at the lower of cost or market value determined in accordance with a "first in-first out" cost accounting system. As soon as available and in any event not later than the close of business (Pacific time) on Wednesday of each week, the Borrowers shall deliver to the Agent a Borrowing Base Certificate, and acceptable supporting documentation thereto, reporting the value of the Borrowers' Inventory as of the end of the immediately preceding Sunday (or, as of January 1, 2014 and thereafter, calculated as of the end of the immediately preceding Saturday); provided, however, that the value of grocery and GM Inventory categories shall be updated on a weekly basis and all other Inventory categories shall be updated on a monthly basis. Once per calendar year, at Agent's discretion and the Borrowers' expense, an appraisal will be performed of the Borrowers' Inventory by an appraiser acceptable to the Agent. The results of such appraisal may be utilized by Agent, in its Permitted Discretion, to adjust Net Orderly Liquidation Values used in determining Inventory Advance Rates."

dms.us.53080850.06

EXHIBIT 2
Page 20 of 41

28.    **Interim Financial Statements; Payable Information**.  Section 8.5 of the Financing Agreement is amended and restated in its entirety to read as follows:

"8.5    Interim Financial Statements; Payable Information. As soon as available and in any event not later than the 25th day after the end of each Fiscal Month and each Fiscal Quarter, the Borrowers shall furnish to the Agent, with sufficient copies for each Lender, a monthly (and, as applicable, quarterly) consolidated income statement, balance sheet and cash flow statement, (a) showing the Borrowers' financial condition and the results of the Borrowers' operations for the periods covered by such statements in such detail as the Agent may from time to time require, (b) prepared in accordance with GAAP consistently applied (except as otherwise disclosed to the Agent to the extent such exceptions are acceptable to the Agent and subject to normal year-end adjustments and the omission of footnotes), (c) containing all information required to fully and accurately present the financial position and results of operations of the Borrowers in accordance with GAAP consistently applied (subject to normal year-end adjustments and the omission of footnotes) and to make such statements not misleading under the circumstances, and (d) setting forth in comparative form, the figures for the year-to-date income statement, year-to-date cash flow statement, and balance sheet for the corresponding Fiscal Month and the corresponding portion of the Borrowers' previous Fiscal Year. As soon as available and in any event not later than the close of business (Pacific time) on Wednesday of each week, the Borrowers shall deliver to the Agent agings of accounts payable listed by invoice date and by due date, in each case reconciled to Borrowers' general ledgers as of the end of the immediately preceding month, in such format as is reasonably specified by the Agent from time to time."

29.    **Annual Projections**.  Section 8.6 of the Financing Agreement is amended and restated in its entirety to read as follows:

"8.6    [Reserved.]"

30.    **Comparisons to Financials; Certificates**.  Section 8.9 of the Financing Agreement is amended by amending and restating subsection (ii) thereof to read as follows:

"(ii)    [reserved]."

31.    **Prescription Files**.  Section 8.11 of the Financing Agreement is amended and restated in its entirety to read as follows:

"8.11    Prescription Files. By no later than the 45th day after the end of each calendar month, or sooner if available, Express shall submit to Agent a report reconciled to the Borrowing Base Certificate with respect to the Express Borrowing Base for the end of such month detailing the number and dollar volume of prescriptions filled by Express for each of the preceding Fiscal Months, broken down by store, and all other information deemed by Agent to be

21

EXHIBIT 2
Page 21 of 41

reasonably necessary to determine which Prescription Files are Eligible Prescription Files."

32.  **Indebtedness**.  Section 9.6 of the Financing Agreement is amended and restated in its entirety to read as follows:

"9.6  Indebtedness. Except for (i) Indebtedness identified on Schedule 10.10, (ii) the Obligations, (iii) Indebtedness (a) which is unsecured, (b) which is not for borrowed money, (c) which has been incurred in the ordinary course of business, (d) which is not otherwise prohibited under any provision of this Agreement, and (e) the nonpayment of or other default under which could not reasonably be expected to have a Material Adverse Effect, and (iv) other Indebtedness permitted to be incurred or paid by either Borrower pursuant to Section 10.10, Express does not have any Indebtedness. Except with respect to the Express Guaranty or as otherwise set forth or reflected in the Financials, Express has not guaranteed the obligations of any Person (except by endorsement of negotiable instruments payable at sight for deposit or collection or similar banking transactions in the usual course of business)."

33.  **Absence of Default**.  Section 9.11 of the Financing Agreement is amended and restated in its entirety to read as follows:

"9.11  Absence of Default. Express is not in default in any material respect under any Applicable Agreement. Each Credit Card Agreement to which Express is a party constitutes the legal, valid and binding obligation of Express and to the Knowledge of Express, the other parties thereto, enforceable in accordance with its terms. No default or event of default that would entitle the Credit Card Issuer or Credit Processor to terminate or suspend payments or terminate any such Credit Card Agreement has occurred and is continuing. Express has complied in all material respects with all of the terms and conditions of the Credit Card Agreements to which it is a party to the extent necessary for Express to be entitled to receive payments thereunder."34.  **Accuracy of Financials; No Material Changes**.  Section 9.12 of the Financing Agreement is amended and restated in its entirety to read as follows:

"9.12  Accuracy of Financials; No Material Changes. All financial statements (i) have been prepared in accordance with GAAP consistently applied and are true, correct and complete in all material respects and (ii) fairly present Borrowers' assets, liabilities and financial condition and results of operations and those of such other Persons described therein as of their respective dates (subject to normal year-end adjustments and the lack of footnotes in the case of monthly, quarterly or pro forma financial statements). Borrowers' outstanding advances to any Person do not constitute any equity or long term investment in any Person which is not reflected in the financial statements. Borrowers' Fiscal Year is from January 1 to December 31."

22

EXHIBIT 2
Page 22 of 41

35.    **Solvency**.  Section 9.21 of the Financing Agreement is amended and restated in its entirety to read as follows:

"9.21    [Reserved.]"

36.    **Solvency**.  Section 10.10 of the Financing Agreement is amended and restated in its entirety to read as follows:

"10.10  Indebtedness; Guaranties; Liens.

(i)    From the Closing Date to but excluding the Third Amendment Effective Date, no Borrower will incur any Indebtedness other than:

(a)    the Obligations;

(b)    existing Indebtedness identified on Schedule 10.10 which is otherwise not expressly provided for in this Section 10.10 and any Refinancing Debt in respect thereof;

(c)    Indebtedness and any Refinancing Debt in respect thereof: (1) which is unsecured, (2) which is not for borrowed money, or the issuance of any letter of credit, acceptance transaction, or similar credit instrument or facility, (3) which is incurred in the ordinary course of business, (4) which is not otherwise prohibited under any provision of this Agreement, and (5) the incurrence of which could not reasonably be expected to have a Material Adverse Effect;

(d)    Indebtedness in respect of Taxes or other governmental charges to the extent that payment thereof shall not at the time be required to be made in accordance with the provisions of Section 10.9;

(e)    Indebtedness in respect of Judgments in the manner and to the extent permitted by Section 10.27;

(f)    Permitted Purchase Money Indebtedness and any Refinancing Debt in respect thereof;

(g)    Indebtedness incurred pursuant to new store leases, and amendments and renewals of existing store leases;

(h)    Indebtedness incurred pursuant to the DOL Judgment; and

(i)    Subordinated Debt.

(ii)    From and after the Third Amendment Effective Date, no Borrower shall incur any additional Indebtedness other than:

(a)    the Obligations; and

23

EXHIBIT 2
Page 23 of 41

(b)      Indebtedness and any Refinancing Debt in respect thereof: (1) which is unsecured, (2) which is not for borrowed money, or the issuance of any letter of credit, acceptance transaction, or similar credit instrument or facility, (3) which is incurred in the ordinary course of business, (4) which is not otherwise prohibited under any provision of this Agreement, and (5) the incurrence of which could not reasonably be expected to have a Material Adverse Effect.

(iii)      Other than the Express Guaranty, no Borrower will guaranty or enter into any agreements of guaranty or indemnity of the obligations of any Person (except by endorsement of negotiable instruments payable at sight for deposit or collection or similar banking transactions in the usual course of Borrower's business).

(iv)      Express will not permit any of its assets or properties (including the Loan Collateral) to become subject to any Liens other than Permitted Liens. The DIP Facility Collateral shall be subject only to valid, perfected, prior pre-petition Liens, Priming Interests and Permitted Liens and the Carveout."

37.      **Solvency**.  Section 10.13 of the Financing Agreement is amended and restated in its entirety to read as follows:

"10.13 [Reserved.]"

38.      **Investments**.  Section 10.17 of the Financing Agreement is amended and restated in its entirety to read as follows:

"10.17 <u>Investments</u>. No Borrower will, and will not permit any Subsidiary to, invest in any Person, whether payment therefor is made in cash or Capital Stock of a Borrower or any Subsidiary, and whether such investment is by acquisition of Capital Stock or Indebtedness, or by loan, advance, transfer of property out of the ordinary course of business, capital contribution, equity or other profit sharing interest, extension of credit on terms other than those normal in the ordinary course of business or otherwise, or deposit with a financial institution."

39.      **Distributions; Redemptions**.  Section 10.18 of the Financing Agreement is amended and restated in its entirety to read as follows:

"10.18 <u>Distributions; Redemptions</u>. No Borrower will (i) declare or pay cash or stock distributions (including any return of capital) or dividends upon any of such Borrower's Capital Stock (including any preferred stock now or hereafter issued by such Borrower), (ii) make any distributions of such Borrower's assets, or (iii) voluntarily or pursuant to any contractual or other obligations, redeem, retire, purchase, repurchase or otherwise acquire, directly or indirectly, or exercise any call rights relating to, Borrower's Capital Stock or any other securities now or hereafter issued by such Borrower (including any warrants or options for any

24

EXHIBIT 2
Page 24 of 41

Capital Stock of Borrower); except that Express may pay cash distributions to Market."

40. **Loans and Fees**. Section 10.19 of the Financing Agreement is amended and restated in its entirety to read as follows:

"10.19 Loans and Fees. No Borrower will (i) incur, permit, or make any loans, advances or extensions of credit to any Person, including any of such Borrower's Affiliates, officers, employees, or directors, or (ii) pay any consulting, management or directors' fees to or for the account of any stockholder, director, officer, or other Affiliate of such Borrower, except that: (a) Express may make advances to its officers and employees with respect to expenses incurred by those officers and employees which (1) expenses are (A) ordinary and necessary business expenses and (B) reimbursable and (2) do not exceed in the aggregate, $50,000 outstanding at any one time; (b) Market may pay fees to its directors in accordance with the Budget; and (c) Express may extend credit to officers, directors and employees in connection with ordinary course purchases of goods and services as permitted by Section 10.22."

41. **Capital Structure; Fiscal Year**. Section 10.21 of the Financing Agreement is amended by amending and restating the first sentence thereof to read as follows:

"Express will not make any change in any of its business purposes which could reasonably be expected to have a Material Adverse Effect."

42. **Affiliate Transactions**. Section 10.22 of the Financing Agreement is amended and restated in its entirety to read as follows:

"10.22 Affiliate Transactions. No Borrower will enter into, or be a party to, any transaction with any of such Borrower's Affiliates, except (i) transactions (a) in the ordinary course of business pursuant to the reasonable requirements of such Borrower's business and (b) upon fair and reasonable terms which are no less favorable to such Borrower than such Borrower could obtain in a comparable arm's length transaction with a Person who is not such Borrower's Affiliate, and (ii) in the manner and to the extent permitted by Section 10.18. Notwithstanding the foregoing, a Borrower may not (1) extend credit to, or have amounts owing from, its Affiliates, except as permitted by Section 10.19 and for ordinary course purchases of goods and services in an amount not exceeding $15,000 for each such Affiliate at any one time outstanding, or (2) pay in whole or in part any Indebtedness of a Borrower to any Affiliate except as expressly permitted by a subordination agreement entered into by such Affiliate in favor of Agent and Lenders."

43. **Sale of Assets**. Section 10.24 of the Financing Agreement is amended and restated in its entirety to read as follows:

"10.24 Sale of Assets. Without the prior written consent of Agent, no Borrower will sell, lease or otherwise dispose of or transfer, whether by sale,

EXHIBIT 2
Page 25 of 41

merger, consolidation, liquidation, dissolution or otherwise (including by a sale-leaseback transaction), any of its assets, including any Loan Collateral, other than (i) the sale of Inventory in the ordinary course of business and (ii) the sale of other Inventory and Equipment in an aggregate amount not to exceed $50,000; provided, however, Market may file a motion with the Bankruptcy Court to seek approval of any sale, lease or other disposition or transfer before having received such consent Agent.  All proceeds from any sale, lease or other disposition or transfer of any assets of any Borrower will be remitted directly to Agent for application to the Obligations in the manner set forth in Section 12.7."

44.    **Budget**.  Section 10.28 of the Financing Agreement is amended and restated in its entirety to read as follows:

"10.28 Budget.

(i)    Market shall deliver to Agent a detailed weekly budget in form and substance satisfactory to Agent (with such supporting detail as Agent or its financial advisors may request) on the following dates and for the periods set forth below (the initial budget, together with the following updates thereto which are acceptable to Agent, the "**Budget**"): (a) on or before the filing of the Petition Date, Market shall deliver to Agent a Budget for the 26-week period following the Petition Date; (b) on January 8, 2014, Market shall deliver to Agent a Budget for the period commencing January 13, 2014 through and including May 4, 2014; (c) on March 12, 2014 and every eight weeks thereafter, Market shall deliver to Agent a Budget for the immediately succeeding 13-week period. Each update to the Budget shall be accompanied by a variance analysis to the most recently accepted Budget. Each update to the Budget and all such variances shall be acceptable to Agent in its reasonable discretion before it accepts such update as the "Budget" for purposes of this Agreement.

(ii)    No proceeds of the DIP Facility shall be used in a manner or for a purpose other than in accordance with the Budget.

(iii)    Market shall not:

(a)    as of any week, permit disbursements for all Operating Expenses to exceed 115% (tested on a four-week cumulative trailing basis) of the aggregate amount of Operating Expenses set forth in the Budget for such week; provided, however, that the Borrower may increase disbursements for expenditures under the "Inventory Purchase" line in the Budget by an amount equal to 68 cents of each dollar of grocery sale revenue collected by the Borrower in excess of the amount of such revenue set forth in the Budget for such week;

(b)    at any time, permit disbursements for any line item of Non-Operating Expense (other than disbursements for Expenses) to exceed the maximum aggregate amount set forth in the Budget with respect to such

dms.us.53080850.06

EXHIBIT 2
Page 26 of 41

line item of Non-Operating Expense (tested on a cumulative basis from and after the Petition Date); or

      (c)     as of any week, permit revenues of Market generated in the ordinary course of business to be less than 85% of the amount of revenues set forth in the Budget (tested on a four-week cumulative trailing basis).

      (iv)     All disbursements of the Borrower shall be consistent with the Budget (except as set forth in subsection (iii) above) and shall be under the control of the chief restructuring officer or other board-appointed turnaround professional of Market.

      (v)     By the close of business (Pacific time) on Wednesday of each week, Market shall provide Agent an actual-to-Budget comparison as of the end of the previous week (for the four-week cumulative trailing period and on a cumulative basis from and after the Petition Date).

      (vi)     Market acknowledges and agrees that the Expenses set forth in the Budget are for information purposes only and the Expenses may be greater or less than the amounts set forth in the Budget. By including the Expenses in the Budget, Market does not agree in advance that the amounts of Expenses set forth therein are reasonable."

      45.    **Payments on Nidiffer Note**.  Section 10.29.3 of the Financing Agreement is amended by amending and restating subsections (c) and (d) thereof to read in their entirety as follows: "(c) [reserved], (d) [reserved]".

      46.    **Additional Covenants**.  Section 10 of the Financing Agreement is amended by adding a new Section 10.35 to the end thereof to read in its entirety as follows:

      "10.35 <u>Additional Covenants</u>.

      (i)     Proceeds of the DIP Facility shall only be used to provide for Market's working capital and other general corporate purposes during the Bankruptcy Case in accordance with the Budget. No proceeds of the DIP Facility shall be used to pay any fees or expenses incurred at any time in connection with any action that seeks to invalidate, avoid, subordinate or otherwise impair the claims of Agent or any Lender under any of the Loan Documents or in connection with the DIP Facility, or any Liens or priorities created under the Loan Documents or in connection with the DIP Facility, or that seeks to recover on any claims against or transfers made to Agent or any Lender.

      (ii)     Market agrees that it (a) will not seek authority for any use of cash collateral of Agent or any Lender without the prior written consent of Agent, (b) will not seek to prime any Lien of Agent or any Lender in any of the Loan Collateral, (c) will keep insured and properly care for all tangible Loan Collateral, and (d) will segregate and account for all cash collateral of Agent or any Lender. Market agrees that none of the Loan Collateral shall be subject to any surcharge

27

EXHIBIT 2
Page 27 of 41

under Section 506(c) of the Bankruptcy Code and the "equities of the case" exception in Section 552 of the Bankruptcy Code shall not apply with respect to any Loan Collateral.

(iii)    Market will continue to perform all of its obligations under the documents evidencing Cash Management Services, with such changes to cash management services, procedures and requirements as the unit, division, subsidiary or Affiliate of U.S. Bank providing such Cash Management Services may require. Market will continue to perform all of its obligations under its credit card processing arrangement with Elavon, Inc.

(iv)    Market will not seek any debtor-in-possession financing (other than the DIP Facility) until (a) all Letters of Credit have been terminated, cash collateralized in an amount equal to 105% of the aggregate face amount of such Letters of Credit, or supported by one or more letters of credit naming Agent as beneficiary with terms and conditions (and issued by one or more financial institutions) acceptable to Agent in its sole discretion, (b) all other Obligations (other than contingent indemnification obligations) at any time owing by Market to Agent or any Lender have been paid in full in cash and (c) all commitments of the Lenders under the Loan Documents (including without limitation the DIP Facility Commitment) have been terminated.

(v)    Market will cause the funds and other assets currently held by a trustee in connection with Market's nonqualified deferred compensation plan(s) to be promptly remitted into the bankruptcy estate for use in the Bankruptcy Case.

(vi)    Not later than one year after the Petition Date, Market shall have confirmed a plan of reorganization that provides for payment, in full in cash on the effective date of such plan, of all Obligations of Market.

(vii)    If, within eight months after the Petition Date, Market has not filed a plan that provides for payment in full in cash on the effective date of such plan of all Obligations of Market, Market shall promptly deliver to Agent a non-binding plan with respect to a proposed sale of all or substantially all of the assets of Market pursuant to Section 363 of the Bankruptcy Code.

(viii)    Market shall (a) as soon as available and in any event not later than thirty days after the Petition Date, deliver to Agent a listing of locations that Market and Food Partners have identified as locations to potentially be sold pursuant to Section 363 of the Bankruptcy Code, (b) not later than thirty days after the Petition Date, apply for Bankruptcy Court approval of Market's retention of its real estate broker (or similar professional) engaged by Market in connection with its potential sale of such locations, and (c) not later than close of business (Pacific time) on Wednesday of each week, deliver to Agent a written update of all sales and sale processes, including without limitation the sale process and potential sale of the foregoing locations, all going-out-of-business sales and all sales under Section 363 of the Bankruptcy Code.

28

(ix)    Market shall deliver to Agent any other information Agent may reasonably request, including without limitation the status of any recapitalization or reorganization plan of Market and any other business plans of Market.

(x)    Market shall engage in a telephone conference with representatives of Agent on Thursday of every week at 10:00 a.m. (Pacific time), or at such other time as may be acceptable to Agent.

(xi)    Market shall not open any new deposit or securities accounts, except new deposit or securities accounts maintained with Agent.

(xii)    If any real property of Market is determined to be located within a 100-year flood plain, such real property will be excluded from the DIP Facility Collateral until such time as Agent receives evidence that Market (or Agent, on behalf of Market) has obtained flood insurance with respect to such property. Market agrees to cooperate with Agent and provide Agent with any information it may reasonably request in connection with obtaining flood zone determinations and flood insurance."

47.    **Events of Default**.  Section 11.1(i) of the Financing Agreement is amended and restated in its entirety to read as follows:

"(i)    Each of the following events, whether or not caused by or within the control of Borrower, will constitute an "Event of Default" under this Agreement:

(a)    any failure to pay, when due, any principal of or interest on any Loan or any other amount with respect to any Pre-Petition Indebtedness or Post-Petition Indebtedness;

(b)    any failure to immediately remit to Agent any net proceeds of any sale, lease, transfer or other disposition of assets of any Borrower;

(c)    any failure to deliver any reports or other information when due, provided, however, no Event of Default shall occur the first three times such failure occurs if, with respect to each such occurrence, Borrowers deliver such reports or other information within three Business Days after receipt of written notice from Agent that the same are required to be delivered to Agent;

(d)    any default in the performance, or breach, of any other covenant or agreement under this Agreement (exclusive of those defaults set forth elsewhere in this Section 11.1(i));

(e)    either the Interim Order or the Final Order, or any portion thereof, shall be vacated, reversed or modified;

dms.us.53080850.06

EXHIBIT 2
Page 29 of 41

(f)      relief from the automatic stay under the Bankruptcy Code shall be granted in favor of any other secured creditor to foreclose on any Loan Collateral;

(g)      a Chapter 11 Trustee or examiner with expanded powers shall be appointed, or the Bankruptcy Case shall be converted to a case under Chapter 7 of the Bankruptcy Code;

(h)      the Bankruptcy Case shall be dismissed;

(i)      Market's chief restructuring officer or other board-appointed turnaround professional of Market resigns or is terminated by Market and no replacement acceptable to Agent shall have been named by Market within two weeks after such resignation or termination, or the chief restructuring officer or other board-appointed turnaround professional shall no longer have all of the authority and responsibilities set forth in its engagement letter with Market;

(j)      any representation, warranty or statement made by, or on behalf of any Borrower, Express (in its capacity as a guarantor) or the Individual Guarantor, (1) in this Agreement, in connection with this Agreement, in connection with any transaction relating to this Agreement or in any of the other Loan Documents to which it is a party was false in any material respect when made or furnished or when treated as being made or furnished or (2) to induce Lenders to make any Loan or LC Issuer to issue any Letter of Credit was false in any material respect when made or furnished or when treated as being made or furnished;

(k)      there occurs an uninsured casualty loss with respect to any of the Loan Collateral having an aggregate fair market value of greater than $1,000,000, such that when the loss amount is deducted from Excess Availability as of the date of the casualty loss (or at Agent's discretion, the end of the month immediately following the casualty loss), the resulting amount is less than $4,000,000;

(l)      a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA;

(m)      there is instituted against any Borrower any criminal proceeding for which forfeiture of any material asset is a potential penalty, or any Borrower is enjoined, restrained or in any way prevented by order of any Governmental Authority from conducting any material part of its business affairs and such order is not completely stayed, to the reasonable satisfaction of Agent, or dissolved within five (5) Business Days from the effective date of such order;

(n)      there occurs a Change of Control; or

30

EXHIBIT 2
Page 30 of 41

(o)    any Borrower or any of its Subsidiaries discovers, identifies, is given notice by any Person, or otherwise has Knowledge of (1) the existence of any Environmental Liability or (2) any Release of Hazardous Substances on, about or affecting a Borrower's Facility or such Borrower's or such Subsidiary business operations, which, in each case by itself (an "Environmental Default") will or could reasonably be estimated to subject such Borrower or such Subsidiary to indebtedness, liability, or obligations in excess of $1,000,000, and when the amount of such indebtedness, liability and obligations is deducted from Excess Availability as of the date of such Knowledge (or at the Agent's discretion, the end of the month immediately following such Knowledge), the resulting amount is less than $4,000,000; or two or more Environmental Defaults have occurred which will or could reasonably be estimated to subject such Borrower or such Subsidiary to indebtedness, liability or obligations in excess of $5,000,000 in the aggregate over the term of this Agreement, and when the amount of such indebtedness, liability and obligations is deducted from Excess Availability as of the date of Knowledge of the last to occur of the Environmental Defaults (or at Agent's discretion, the end of the month immediately following such Knowledge), the resulting amount is less than $4,000,000."

48.    **Cure Periods**.  Section 11.2 of the Financing Agreement is amended by amending and restating subsections (i) and (ii) thereof and adding a new subsection (v) to the end thereof to read as follows:

"(i)    An event or condition of the type described in clause (d) of Section 11.1(i) (exclusive of a default arising under Sections 10.24, 10.28(ii) or (iv), or 10.35(iv), (v), (vi) or (xi)) will be considered an Event of Default only if Borrowers fail to cure the default within three Business Days after Borrowers' receipt of written notice of such default from Agent."

"(ii)    Any event which would constitute an Event of Default, but for the applicability of a Cure Period identified in Section 11.2(i) shall be referred to as a "Potential Event of Default." The Cure Period identified in Section 11.2(i) will not be applicable with regard to any Potential Event of Default which by its nature is not susceptible of cure."

"(v)    Agent will deliver to Endeavour Structured Equity and Mezzanine Fund I, L.P., THL Credit, Inc. and the official creditors' committee a copy of the written notice (if any) delivered by Agent to Borrowers with respect to (a) any Potential Event of Default arising after the Petition Date or any Post-Petition Event of Default or (b) any termination of the DIP Facility Commitment upon any appeal of the Final Order or any successful challenge of the validity, perfection or priority of any pre-petition Liens in favor Agent or any Lender as more fully described in Section 12.1. A failure to give any such notice shall not give rise to any liability or diminish Agent's rights under the Loan Documents or applicable law."

EXHIBIT 2
Page 31 of 41

49.    **Acceleration**. Section 12.1 of the Financing Agreement is amended and restated in its entirety to read as follows:

"12.1    Acceleration. Upon the occurrence of any Post-Petition Event of Default, in addition to all other rights and remedies provided in the Loan Documents or available at law or in equity, Agent, without further notice or demand but subject to Section 11.2, (i) may in its sole discretion, (a) declare the Loans and all other Obligations to be immediately due and payable, whereupon the Loans and all other Obligations shall be immediately due and payable, and (b) terminate the obligation and power of LC Issuer to issue Letters of Credit and terminate all or any portion of the Commitments, and thereupon such obligations, powers and Commitments shall terminate immediately, (ii) may terminate this Agreement, (iii) will have all rights to sue on the Notes, the Express Guaranty and the Individual Guaranty Agreement, or any of them, as permitted by applicable law, (iv) may realize upon, and exercise Agent's, LC Issuer's and the Lenders' rights with respect to the Loan Collateral pursuant to this Agreement and the other Loan Documents and as otherwise provided by applicable law, and (v) will have the rights to avail itself of any other right or remedy available under this Agreement, the other Loan Documents and applicable law. If any party shall appeal the Final Order or shall successfully challenge the validity, perfection or priority of any pre-petition Liens in favor of Agent or any Lender (a "Special Event"), the DIP Lender may terminate the DIP Facility Commitment upon seven days prior written notice to Market. No termination (if any) of the DIP Facility Commitment shall affect, limit or modify the validity, priority or enforceability of any liability of any Borrower under the Loan Documents or any Lien granted to Agent or any Lender thereunder; provided, however, that if such termination is due to a Special Event, then the DIP Advances and all other Post-Petition Indebtedness will have super priority administrative expense status and other priority status provided under 11 U.S.C. § 364 only to the extent of any increase in exposure of Agent and DIP Lender during the pendency of the Bankruptcy Case, and Market may seek to use DIP Lender's cash collateral and may also seek to obtain alternative post-petition financing, and Agent and DIP Lender may oppose any such use of cash collateral and any such alternative post-petition financing."

50.    **Affidavit Following Event of Default**. Section 12.2 of the Financing Agreement is amended and restated in its entirety to read as follows:

"12.2    Affidavit Following Post-Petition Event of Default. Without limiting Section 12.1, upon the occurrence of any Post-Petition Event of Default Agent may, in its sole discretion, file an affidavit with the Bankruptcy Court certifying the occurrence of such Post-Petition Event of Default. Agent shall, contemporaneously with the filing of any such affidavit with the Bankruptcy Court, serve via email a copy of the affidavit on Market and its counsel, the U.S. Trustee's office, and counsel for any official creditors' committee. Contemporaneously with the filing and service of any such affidavit, Agent may request (and Market shall cooperate in scheduling) an expedited hearing regarding

32

EXHIBIT 2
Page 32 of 41

relief from the automatic stay for Agent to enforce its rights and remedies under the Loan Documents and applicable law. Market agrees that such expedited hearing may be heard as early as seventy-two (72) hours after Agent files such affidavit.  Agent may file a response with the Bankruptcy Court opposing relief from the automatic stay, which response must be limited to whether a Post-Petition Event of Default has occurred that has not been cured. Market agrees that if the Bankruptcy Court determines that an uncured Post-Petition Event of Default has occurred, the Bankruptcy Court may enter an order terminating the automatic stay so that Agent may enforce its rights and remedies. If Market fails to file a response, the Bankruptcy Court may enter an order terminating the automatic stay, which Market agrees may be entered."

51.    **Application of Payments**.  Section 12.7 of the Financing Agreement is amended and restated in its entirety to read as follows:

"12.7    Application of Payments.

(i)    All payments shall be remitted to Agent, and all such payments and all proceeds of Loan Collateral received by Agent, shall be applied as set forth in this Section 12.7. If Agent is uncertain as to the proper application of payments or proceeds of the Loan Collateral, or if any dispute or disagreement shall arise with respect thereto, Agent may interplead such payments or proceeds in any court of competent jurisdiction. Agent shall not be liable for any application of amounts made by it in good faith and, if any such application is subsequently determined to have been made in error, the sole recourse of any Lender or other Person to which such amount should have been made shall be to recover the amount from the Person that actually received it (and, if such amount was received by any Lender, such Lender hereby agrees to return it). No application of funds pursuant to this Section 12.7 shall be treated as a setoff unless specifically elected by Agent.

(ii)    All proceeds of any sale or other disposition of Loan Collateral (other than the sale of Inventory in the ordinary course of business in accordance with the Budget) shall be remitted to Agent for application as follows:

(a)    solely with respect to proceeds from the sale or other disposition of property subject to a Refinancing Deed of Trust, to payment of: (1) the outstanding principal balance of Term Loan C in inverse order of maturity, together with accrued but unpaid interest thereon, then to (2) the outstanding principal balance of Term Loan A in inverse order of maturity, together with accrued but unpaid interest thereon, and finally to (3) the other obligations described in subsection (d) below;

(b)    solely with respect to proceeds from the sale or other disposition of other property subject to a Mortgage, to payment of: (1) the outstanding principal balance of Term Loan A in inverse order of

33

EXHIBIT 2
Page 33 of 41

maturity, together with accrued but unpaid interest thereon, then to (2) the other obligations described in subsection (d) below;

(c)    solely with respect to proceeds from the sale or other disposition of eligible assets under any Borrowing Base, to payment of (1) the outstanding principal balance of the Pre-Petition Revolving Loans and the DIP Advances, and accrued but unpaid interest thereon, in an amount (the "Advance Rate Amount") equal to the value of such eligible assets multiplied by the Advance Rates applicable to such assets (and the Maximum DIP Commitment Amount shall be permanently reduced by such Advance Rate Amount), then to (2) the other obligations described in subsection (d) below with respect all proceeds in excess of the Advance Rate Amount; and

(d)    with respect to all other proceeds (including without limitation proceeds from the sale or other disposition of any Loan Collateral that does not constitute eligible assets under any Borrowing Base), to payment of the Obligations in such order of application as Agent shall determine in its sole discretion. After Term Loan A and Term Loan C and all accrued interest thereon have been paid in full, each of the Maximum DIP Commitment Amount and the Borrowing Base DIP Commitment Amount shall be permanently reduced upon the receipt of, and by an amount equal to, the proceeds received from each sale or other disposition of Loan Collateral (other than the sale of Inventory in the ordinary course of business).

(iii)    Any other payments received by Agent (other than regularly scheduled payments of principal or interest on any Loans) shall be applied to payment of the Obligations in such order of application as Agent shall determine in its sole discretion

(iv)    Notwithstanding any of the foregoing, no proceeds or other amounts received by Agent from any Borrower will be applied to payment of the outstanding principal balance of the DIP Advances until the outstanding principal balance of the Pre-Petition Revolving Loans and all accrued but unpaid interest thereon have been paid in full in cash."

52.    **Fees and Expenses**.  Section 15.6 of the Financing Agreement is amended by adding a new subsection (iv) to the end thereof to read in its entirety as follows:

"(iv)    Market agrees that Agent may seek reimbursement of the Expenses on at least the same frequency as Market may seek payment or reimbursement of its professional fees and expenses under the Bankruptcy Case, whether in connection with any *Knudsen* order or otherwise."

53.    **Exhibit F**.  The Financing Agreement is amended by deleting Exhibit F therefrom.

dms.us.53080850.06

EXHIBIT 2
Page 34 of 41

54.     **No Other Changes**.  Except as explicitly amended by this Amendment, all of the terms and conditions of the Financing Agreement and the other Loan Documents shall remain in full force.

55.     **Conditions Precedent**.  This Amendment shall be effective when U.S. Bank shall have received an executed original hereof, duly executed by all of the parties hereto, together with each of the following, each in form and substance acceptable to U.S. Bank in its sole discretion (or reasonable discretion if expressly set forth below):

(a)     the Express Guaranty, duly executed by Express;

(b)     copies of all "first day pleadings" in the Bankruptcy Case acceptable to U.S. Bank in its reasonable discretion;

(c)     entry by the Bankruptcy Court of the Interim Order in form and substance acceptable to U.S. Bank in its sole discretion, after adequate notice to all parties entitled to service, which, among other provisions, (i) approves this Amendment, the Financing Agreement as amended hereby and the other Loan Documents, (ii) authorizes Market to enter into this Amendment, the Financing Agreement as amended hereby and the other Loan Documents and the financing contemplated therein, (iii) grants Superpriority Claims in the Bankruptcy Case with respect to the Post-Petition Indebtedness and all obligations owing under any Cash Management Services arrangement with U.S. Bank or any Affiliate thereof, and (iv) provides that all Post-Petition Indebtedness and all obligations of Market owing under any such Cash Management Services Arrangement are secured by a first priority perfected Lien on the DIP Facility Collateral, subject only to valid, perfected, prior pre-petition Liens, Priming Interests and Permitted Liens and the Carveout;

(d)     a copy of the Budget for the 26-week period following the Petition Date, which Budget shall have been delivered to U.S. Bank on or before the Petition Date;

(d)     Market shall have caused all proceeds of pharmacy sales that have been disbursed on or prior to the Petition Date to be remitted directly to U.S. Bank in accordance with the terms and conditions set forth in the letter agreement among U.S. Bank and the Borrowers with respect to such sales; and

(e)     each of Endeavour Structured Equity and Mezzanine Fund I, L.P., THL Credit, Inc. and Nidiffer Family LLC shall have acknowledged and consented to this Amendment and agreed that the Subordination Agreement to which such Subordinated Creditor is a party remains in full force and effect.

56.     **Acknowledgments of the Borrowers**.  The Borrowers hereby acknowledge and agree as follows:

(a)     As of November 18, 2013, (i) the outstanding principal balance of the Pre-Petition Revolving Loans, accrued but unpaid interest thereon and the accrued but unpaid Unused Commitment Fee is $16,783,747.46, (ii) the outstanding principal balance of Term Loan A and accrued but unpaid interest thereon is $11,714,328.96, (iii) the

35

outstanding principal balance of Term Loan C and accrued but unpaid interest thereon is $4,058,032.63, and (iv) the Letter of Credit Exposure (as defined in the Financing Agreement before giving effect to this Amendment) is $1,250,000. All of the foregoing Obligations and all other Pre-Petition Indebtedness are due and owing in their entirety without offset, defense or counterclaim of any kind, are not subject to avoidance in the Bankruptcy Case, and are secured by first-priority perfected Liens in the Revolving and Term Loan Collateral, subject only to valid, perfected, prior Priming Interests and Permitted Liens.

(b)     The Financing Agreement, the 2012 Financing Agreement and all other Loan Documents are each the valid, binding and enforceable obligations of the Borrowers, subject to no offset, defense or counterclaim of any kind.

57.     **Representations and Warranties**.  The Borrowers hereby represent and warrant to U.S. Bank as follows:

(a)     Each Borrower has all requisite power and authority, corporate or otherwise, to execute and deliver this Amendment and to perform its obligations under the Financing Agreement as amended hereby and the other Loan Documents to which it is a party. This Amendment, the Financing Agreement as amended hereby and the other Loan Documents to which it is a party have been duly and validly executed by such Borrower and delivered to U.S. Bank and constitute such Borrower's legal, valid and binding obligations, enforceable in accordance with their terms.

(b)     The execution, delivery and performance by each Borrower of this Amendment, the Financing Agreement as amended hereby and the other Loan Documents to which it is a party have been duly authorized by all necessary corporate or other action of such Borrower and do not and will not (i) require any authorization, consent or approval by any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, (ii) violate any of its organizational documents or any provision of any law, rule, regulation or order presently in effect having applicability to such Borrower, or (iii) result in a breach of or constitute a default under any indenture or agreement to which such Borrower is a party or by which such Borrower or its properties may be bound or affected.

(c)     All of the representations and warranties contained in Section 9 of the Financing Agreement as amended by this Amendment are correct on and as of the date hereof as though made on and as of the date hereof, except to the extent that such representations and warranties relate solely to an earlier date.

58.     **References**.  All references in the Financing Agreement to "this Agreement" shall be deemed to refer to the Financing Agreement as amended by this Amendment; and any and all references in any of the other Loan Documents to the Financing Agreement shall be deemed to refer to the Financing Agreement as amended hereby.

59.     **No Waiver**.  The execution of this Amendment and acceptance of any documents related hereto shall not be deemed to be a waiver of any of breach, Potential Event of

dms.us.53080850.06

EXHIBIT 2
Page 36 of 41

Default or Event of Default which may now or hereafter exist under the Financing Agreement, whether or not known to U.S. Bank and whether or not existing on the date of this Amendment.

60.  **Release**.  Each Borrower hereby absolutely and unconditionally releases and forever discharges U.S. Bank, and any and all participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns thereof, together with all of the present and former directors, officers, agents, consultants and employees of any of the foregoing, from any and all known claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which the Borrowers and/or any Borrower has had, now has or has made claim to have against any such Person for or by reason of any act, omission, matter, cause or thing whatsoever arising from the beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown.

61.  **Miscellaneous**.  This Amendment, the Financing Agreement as amended hereby and the other Loan Documents set forth the entire agreement of the parties with respect to the subject matter thereof and supersede all previous understandings, written or oral, in respect thereof. Two or more duplicate originals of this Amendment may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument. Any documents delivered by, or on behalf of, any party by fax transmission or other electronic delivery of an image file reflecting the execution hereof (i) may be relied on by the other parties as if the document were a manually signed original and (ii) will be binding for all purposes of the Loan Documents. This Amendment, the Financing Agreement as amended hereby and the other Loan Documents are solely for the benefit of the parties hereto and thereto and their permitted successors and assigns, and no other Person (including any Subordinated Creditor unless such Subordinated Creditor is a permitted assignee of a party hereto) will have any rights as a third party beneficiary of this Amendment or the Financing Agreement as amended hereby. This Amendment shall be deemed to be a contract made under and governed by the internal law of the State of Oregon (without reference to conflicts of laws principles).

62.  **Oregon Notice**.  UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY U.S. BANK CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY THE BORROWERS' RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION, AND BE SIGNED BY THE LENDERS TO BE ENFORCEABLE.

(Signature Pages Follow)

dms.us.53080850.06

EXHIBIT 2
Page 37 of 41

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**C & K MARKET, INC.**

By: _____
Name: _____
Title: _____

*Signature Page to Third Amendment to Financing Agreement*

EXHIBIT 2
Page 38 of 41

**C&K EXPRESS, LLC**
**By C & K Market, Inc., its Manager**


By: _____
Name: _____
Title: _____

*Signature Page to Third Amendment to Financing Agreement*

EXHIBIT 2
Page 39 of 41

**U.S. BANK NATIONAL ASSOCIATION, as Agent, LC Issuer and sole Lender**

By: _____

Name: _____

Title: _____

*Signature Page to Third Amendment to Financing Agreement*

EXHIBIT 2
Page 40 of 41

## ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned Subordinated Creditors hereby: (a) acknowledges receipt of the foregoing Third Amendment to Financing Agreement (the "**Amendment**"); (b) consents to the terms and execution thereof; and (c) agrees that the Subordination Agreement to which it is a party remains in full force and effect.

Date: _____ __, 2013

**ENDEAVOUR STRUCTURED EQUITY AND MEZZANINE FUND I, L.P.**

**By:** **Endeavour SEAM I GP, LLC**
**Its:** **General Partner**

By: _____
Name: _____
Title: _____

**THL CREDIT, INC.**

By: _____
Name: _____
Title: _____

**NIDIFFER FAMILY LLC**

By: _____
Name: _____
Title: _____

*Signature Page to Acknowledgment and Agreement*
*to Third Amendment to Financing Agreement*

EXHIBIT 2
Page 41 of 41

# EXHIBIT 3 TO MOTION

## Sunstone Term Sheet

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

# TERM SHEET
## FOR
## DEBTOR-IN-POSSESSION LOAN

October 25, 2013

The following is a summary of proposed terms and conditions for the establishment of a secured debtor-in-possession multiple advance term loan from Sunstone Business Finance, LLC and its affiliates or assigns ("Lender") to C & K Market, Inc. ("Borrower") in Borrower's capacity as a Chapter 11 debtor-in-possession in a case to be commenced in the United States Bankruptcy Court for the District of Oregon ("Bankruptcy Court"). This Term Sheet is subject to completion of due diligence and the execution of definitive documents.

| | |
|---|---|
| Borrower | C & K Market, Inc. |
| Lender | Sunstone Business Finance, LLC and its affiliates or assigns. Borrower acknowledges and agrees that Sunstone Business Finance, LLC and its affiliates may create a separate entity to be the Lender, and may assign to such entity all of Sunstone Business Finance, LLC's rights under this Term Sheet. |
| DIP Loan/Facility | $[TBD; 5 to 7.5MM] million multiple advance DIP loan ("DIP Loan" or "DIP Facility"). The DIP Financing shall be subject to entry by the Bankruptcy Court of an interim (the "Interim Order") and final order (the "Final Order") in form and substance satisfactory to Lender in its discretion. In the discretion of Lender, no advances will be made, and all obligations will be due and owing, if an Event of Default occurs and has not been cured or waived. |
| Closing/Initial Funding Date | Date of entry of the Interim Order. |
| Use of Proceeds | Working capital and general corporate purposes, administrative expenses, U.S. Trustee fees, as well as any expenses approved by the Bankruptcy Court. |
| Interest Rate | Prime plus 10% on all outstanding obligations. Accrued interest shall be payable monthly on the first day of each month. |
| Priority | In addition to the priority with respect to the Collateral set forth below, all amounts owing by Borrower under the DIP Financing in respect thereof at all times will constitute allowed super-priority administrative expense claims in Borrower's Chapter 11 case ("Chapter 11 Case"), having priority over all administrative expenses of the kind specified in Sections 503(b) and 507(b) of Title 11 of the United States |

EXHIBIT 3
Page 1 of 5

Code ("Bankruptcy Code").

**Collateral**

All amounts owing by Borrower will be secured pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code by a fully perfected, priming, first lien priority security interest and liens on all assets of Borrower, and the Bankruptcy Court's Interim Order and Final Order shall include a provision that such Order(s) constitute sufficient, conclusive evidence of the validity, perfection and priority of the liens granted to Lender without the necessity for any other filing or recording, whether at the county, state or federal levels.

**Term**

The period from the Closing Date to the earliest to occur of (1) nine months after the commencement of the Bankruptcy Case; (2) the closing of a sale of substantially all the assets of Debtor; (3) the date Borrower pays Lender in full and elects to terminate the DIP Financing; (4) ) the effective date of a confirmed plan of reorganization; (5) the occurrence of an Event of Default; or (6) conversion or dismissal of the Bankruptcy Case (such earliest date, the "Termination Date"). Lender's obligation, if any, to make advances shall terminate on the Termination Date.

**Payments**

Interest shall be payable monthly on the first day of each month. Except for interest and the Facility Fee (discussed below), all of Borrower's obligations to Lender shall be due and payable in full on the Termination Date. Borrower may prepay the obligations in whole or in part at any time without penalty. All payments shall be applied first to any outstanding fees, then to any accrued but unpaid interest, and finally to principal.

**Cash Collateral**

During the term, and provided no Event of Default exists, Lender consents to Borrower's use of cash collateral and to any sales of assets outside the ordinary course of business.

**Conditions Precedent to Closing**

Lender shall be satisfied in all respects with its due diligence review.

All motions and other documents to be filed with and submitted to the Bankruptcy Court by Borrower in connection with the DIP Financing (including, without limitation, the Interim Order and Final Order, as the case may be) shall be in form and substance satisfactory to Lender.

With respect to the initial funding, the Bankruptcy Court

2

EXHIBIT 3
Page 2 of 5

|                    |                                                                                                                                                                                                                                                                                  |
|--------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                    | shall have entered the Interim Order, and all loan documentation shall be in form and substance satisfactory to Lender in its discretion.                                                                                                                                          |
| Events of Default  | Failure of the Bankruptcy Court to enter the Final Order within 90 days of the Closing Date.                                                                                                                                                                                       |
|                    | Failure at any time of any liens or super-priority claims granted to Lender with respect to the DIP Financing to be valid, perfected, enforceable and priming in all respects.                                                                                                     |
|                    | Borrower enters into a DIP financing arrangement or agreement with any lender other than Lender.                                                                                                                                                                                   |
|                    | Conversion or dismissal of the Bankruptcy Case.                                                                                                                                                                                                                                    |
|                    | Confirmation of any reorganization plan that modifies any term(s) of the Interim Order or the Final Order.                                                                                                                                                                         |
|                    | Upon an Event of Default, Lender shall have no further obligation to make any further advances to Borrower and, at its option, may terminate the DIP Facility and declare all obligations immediately due and owing regardless of any injunction or "stay" that might otherwise arise under the Bankruptcy Code; provided, however, that in its sole discretion, Lender may elect to delay exercising its rights for reasons including an acceptable enhancement fee in return for Lender's forbearance. |
| Reporting          | Borrower shall provide to Lender such reports from time to time as reasonably requested by Lender.                                                                                                                                                                                 |
| Governing Law      | State of Oregon, except as governed by the Bankruptcy Code.                                                                                                                                                                                                                        |
| Lender Expenses    | At the execution of this Term Sheet, Borrower will submit a $5,000 payment to Lender to cover any out-of-pocket expenses of Lender. To the extent such payment exceeds Lender's out-of-pocket expenses, any excess amounts shall be returned to Borrower at Closing.               |
| Work Fee           | Borrower shall pay to Lender a $50,000 fully earned, non-refundable Work Fee upon the full execution of this Term Sheet. Such payment shall not be considered as part of any advance under the DIP Facility.                                                                        |
| Facility Fee       | An amount equal to 5% of the amount of the DIP Facility amount that is approved by the Bankruptcy Court, fully                                                                                                                                                                     |

3

EXHIBIT 3
Page 3 of 5

earned and due and payable on the date such amount is determined and approved by the Bankruptcy Court. Accordingly, a Facility Fee of 5% of the amount that is approved by the Bankruptcy Court will be earned and due and payable on the date the Interim Order is entered by the Bankruptcy Court, and a Facility Fee of 5% of the amount that is approved by the Bankruptcy Court will be earned and due and payable on the date the Final Order is entered by the Bankruptcy Court (after giving credit to the Facility Fee paid under the Interim Order). The Facility Fee shall not be considered as part of any advance under the DIP Facility.

Break-up Fee

To induce Lender to enter into this Term Sheet, to incur time and expense in participating in the negotiations contemplated herein, and to set aside and reserve the funds necessary to fund the DIP Loan while foregoing pursuit of other lender opportunities, Borrower agrees as follows: If after the full execution of this Term Sheet Lender is committed to close the DIP Facility, but Borrower does not close the DIP Facility with Lender and closes an alternate post-petition financing arrangement with another lender (including, but not limited to, an alternate DIP facility or cash collateral arrangement with Borrower's existing lender), then Borrower shall pay to Lender a break-up fee in the amount of $250,000 (the "Break-Up Fee"), due and payable upon entry of the Bankruptcy Court order approving (on an interim or final basis) the alternate financing arrangement. Lender understands that payment of such Break-Up Fee must be approved by the Bankruptcy Court. Borrower will support any motion filed by Lender for the payment of such fee as an administrative expense under the Bankruptcy Code.

Unused Line Fee

By the 10th day of each month, Borrower shall pay to Lender a fee (the "Unused Line Fee") in an amount equal to .25% of the average unused line amount for the preceding month.

Expiration

This Term Sheet shall expire if not executed by Borrower within two days after it has been executed by Lender and delivered to Borrower.

Relationship

There is no pre-existing relationship between Borrower and Lender, and this Term Sheet and the transactions contemplated herein are arms'-length commercial transactions arising from Borrower's inability to secure financing on terms more favorable than those proposed herein.

4

EXHIBIT 3
Page 4 of 5

The paragraphs of this Term Sheet entitled "Lender Expenses", "Work Fee" and "Break-up Fee" are binding and enforceable upon the full execution of this Term Sheet.  All other proposed terms and understandings set forth in this Term Sheet are intended only to provide a framework upon which Lender contemplates providing DIP financing to Borrower.

IT WITNESS WHEREOF, this Term Sheet has been entered into this 25th day of October, 2013.

**DIP LENDER:**

SUNSTONE BUSINESS FINANCE, LLC

By _____

Name _Dann G. Wheeler_____

Title _President_____

**BORROWER:**

C & K MARKET, INC.

By _____

Name _EDWARD HOSTMANN_____

Title _CRO_____

IF " DOCVARIABLE "SWDocIDLocation" 4" = "4" "034518/00017/5010191v7" "" 034518/00017/5010191v8

5

EXHIBIT 3
Page 5 of 5