**Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
    Direct Dial:  (503) 802-2013
    Facsimile:    (503) 972-3713
    E-Mail:       al.kennedy@tonkon.com
**Timothy J. Conway**, OSB No. 851752
    Direct Dial:  (503) 802-2027
    Facsimile:    (503) 972-3727
    E-Mail:       tim.conway@tonkon.com
**Michael W. Fletcher**, OSB No. 010448
    Direct Dial:  (503) 802-2169
    Facsimile:    (503) 972-3869
    E-Mail:       michael.fletcher@tonkon.com
**Ava L. Schoen**, OSB No. 044072
    Direct Dial:  (503) 802-2143
    Facsimile:    (503) 972-3843
    E-Mail:       ava.schoen@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR  97204

    Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 13-64561-1 |
| C & K Market, Inc., | **DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY MOTIONS** |
| Debtor. | |

    I, Edward C. Hostmann, hereby declare that the following statements are true to the best of my knowledge and belief, that I am competent to testify to the matters stated herein, and that I understand they are made for use as evidence in court and are subject to penalty for perjury.

    1.    On November 19, 2013 (the "Petition Date"), C & K Market, Inc. ("Debtor" or "C & K") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.

**Page 1 of 15 -**   DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY MOTIONS

2.     I am the president of Edward Hostmann, Inc.  Edward Hostmann, Inc. is the Chief Restructuring Officer of C & K Market, Inc. and has been operating in such capacity since July 8, 2013.

3.     I submit this declaration to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of this Chapter 11 case, and in support of Debtor's voluntary Chapter 11 petition and various motions and applications of Debtor filed with the Court contemporaneously herewith in support of the issuance and entry of first day orders.  Except as otherwise indicated, all facts set forth in this affidavit are based on my personal knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning Debtor's operations and financial affairs.  If I was called upon to testify, I would testify to the facts set forth in this affidavit.  I am authorized to submit this affidavit.

4.     Promptly after filing its Chapter 11 petition, Debtor filed certain applications, motions, and proposed orders (the "First Day Motions").  Debtor requests that each of the First Day Motions be entered, as each constitutes a critical element in achieving a successful reorganization of Debtor for the benefit of all parties-in-interest.

## BACKGROUND OF C & K

5.     C & K is a family owned grocery store company headquartered in Brookings, Oregon.  Ray Nidiffer founded the company in 1956 with a single store in Brookings.  Over the next 50 years, the Nidiffer family and its employees grew the company to a chain of 60 stores, operating mostly in small rural communities, with 41 stores in Oregon and 19 stores in northern California.

6.     The stores operate under the banners Ray's Food Place, Shop Smart and C & K Market ("Market").  Market employs over 2,300 employees, approximately 57% of whom are full-time.  Market has an average biweekly payroll in excess of $2,700,000 and provides family health insurance for all its full-time employees.

**Page 2 of 15 -**   DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY MOTIONS

**EVENTS LEADING TO BANKRUPTCY**

7.      Historically, Debtor operated in small rural communities.  Often, Debtor operated the only grocery store in the community and the only grocery store for miles around.  As a result of both Debtor's expansion into more populated areas, and the expansion of large discounters such as Costco and Walmart into less populated areas and into the grocery business, Debtor has faced increasingly greater competition and resulting pressure on its sales and margins.

8.      Currently, most of Debtor's stores are located within 40 miles of a large discount grocery operation such as Walmart or Costco.  In the last half of 2012, new "Super Walmarts" negatively affected at least 30 of Debtor's markets.  As a result of the evolving marketplace, several of Debtor's stores are no longer viable.  Debtor has already closed or sold several stores, and is faced with the necessity of closing or selling at least 16 more stores.  Although the closures will enhance Debtor's profitability, the downsizing will result in additional debt as a result of lease rejections, and will diminish Debtor's ability to service its legacy debt incurred during its period of expansion.  As a result, Debtor must restructure its obligations.

9.      Debtor still maintains at least 40 grocery stores with proven profitability in markets that will continue to prosper.  Debtor's restructuring will enable it to emerge as a viable entity that will continue to contribute to the communities in which it operates.

**C & K EXPRESS, LLC**

10.      C & K Express, LLC ("Express") is a wholly-owned subsidiary of Debtor.  Express owned and operated 15 pharmacies.  Several of the pharmacies were located in Debtor's grocery stores and several were stand-alone operations.  Express is a co-borrower with Debtor on Debtor's loans with U.S. Bank, National Association ("Bank").  Bank has a security interest in virtually all of Express' assets.  In July of 2013, Debtor engaged The Food

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   Partners, LLC ("Food Partners") to assist Debtor in the sale of the pharmacies.  Express has

2   entered into asset purchase agreements for the sale of the pharmacy inventory, equipment and

3   intangible assets at 13 of the 15 stores.  The purchasers are Albertsons, Safeway, Rite Aid,

4   and Coastal Pharmacies.  Twelve of the sales have closed and the 13th is scheduled to close

5   in early December.  After all sales have closed, Express' accounts receivable have been

6   collected, and its equipment has been liquidated, Debtor projects that approximately

7   $13,000,000 of proceeds will be applied in reduction of the debt owed to Bank.

8                                                **DEBT STRUCTURE**

9              11.    Prior to the sale of the assets of Express, Bank was owed

10  approximately $37,000,000 secured by substantially all assets of Debtor and Express.  After

11  the pharmacy sales are closed and the proceeds of the pharmacy assets are applied to Bank's

12  debt, Bank will be owed approximately $24,000,000.  Bank's claim is secured by

13  substantially all of Debtor's cash accounts, inventory, equipment, intangibles and most of

14  Debtor's real property and cash.  Bank is over-secured.

15             12.    Debtor's assets, exclusive of the Express assets, include inventories at

16  cost of approximately $32,000,000, accounts receivable of approximately $2,000,000, real

17  estate with appraised values totaling in excess of $38,000,000, equipment with a book value

18  of approximately $30,000,000, stock in Unified Grocers, Inc. with a redemption value of

19  approximately $7,000,000, and cash at stores and in transit in excess of $4,000,000.

20             13.    The value of Debtor's business, after Debtor has sold or liquidated its

21  non-viable stores and sold the pharmacy assets, is projected to exceed $90,000,000.

22             14.    Debtor has five secured creditors with claims totaling approximately

23  $3,400,000, in addition to Bank.  Each of the other secured creditors sold real property to

24  Debtor and retained a lien on the real property that was sold to secure the unpaid portion of

25  the purchase price.

26

**Page 4 of 15** -    DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY
                      MOTIONS

15.    Debtor owes a total of approximately $18,000,000 to trade creditors. Approximately 70% of that amount is entitled to payment as an administrative expense pursuant to Section 503(b)(9) or is entitled to payment under the Perishable Agricultural Commodities Act.

16.    Debtor owes approximately $45,000,000 to subordinated note holders. Approximately $30,000,000 of that amount is owed to two private equity mezzanine lenders, THL Credit, Inc. and Endeavour Structured Equity and Mezzanine Fund I, LP. Approximately $10,000,000 is owed to Nidiffer Family LLC.  The remainder is owed on notes payable in connection with the purchase of stores.

17.    Debtor projects that it will have lease rejection claims with a potential maximum liability of approximately $7,500,000.  However, Debtor believes the ultimate liability will be significantly below the statutory maximum.

### SALE OR CLOSING OF SELECT STORES

18.    Debtor engaged Food Partners to assist it in formalizing its restructuring plan and in analyzing the performance of each of its stores.  After consultation with Food Partners, Debtor determined, in its business judgment, to sell or close approximately 21 stores.  Debtor is seeking immediate authority to liquidate up to 16 stores. In addition, Debtor has engaged Food Partners to market and obtain buyers for additional stores.  Debtor projects that the store closing sales will net almost $7,000,000 in proceeds from the sale of inventory and equipment.  The closures will also enable Debtor to materially improve its profitability because the stores to be closed have not been profitable and are continuing to operate at a loss.

19.    Debtor is seeking Court authority to engage Great American Group, LLC ("Great American") to assist in store closings and closing sales.  Great American is familiar with Debtor's business and the stores it seeks to close and the inventory Debtor seeks to sell.  Great American previously assisted and is assisting in the closing of pharmacies

**Page 5 of 15** -    DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY MOTIONS

1  owned by Express.  Great American is currently assisting Debtor with the closing sale being

2  conducted at Debtor's Eureka, California grocery store.

3        20.    Great American is recognized as an expert in retail store closing sales.

4  In Debtor's business judgment, it will be able to receive greater proceeds from the store

5  closing sales in a quicker and more efficient process if Great American assists in the process.

6        21.    Great American will (a) provide qualified supervisors; (b) oversee the

7  sale of merchandise; (c) recommend appropriate pricing, display and discounts of

8  merchandise; and (d) recommend appropriate staffing levels at stores to be closed.

9        22.    Debtor will pay Great American a fee equal to (a) 4.0% of the gross

10 proceeds of merchandise sold, and (b) 20% of the proceeds of fixtures and equipment, plus

11 out-of-pocket expenses.

12                    **POST-PETITION FINANCING**

13        23.    Debtor needs authority to use cash collateral and incur post-petition

14 debt to enable it to continue the operation of its business in an orderly manner, and preserve

15 and maintain the going concern value of its business for the benefit of all of its creditors and

16 its estate.  With the crucial holiday season approaching, Debtor must meet the seasonal need

17 to build inventory and projects inventory purchases averaging more than $4,500,000 in each

18 of the next five weeks.  Its bi-weekly payroll and benefits exceed $2,700,000.  Sales and

19 administrative expenses vary between $600,000 and $1,500,000 per week.  In addition to the

20 normal operating expenses, Debtor projects it will be required to make up to $1,000,000 of

21 utility deposits.  Further, Debtor currently has approximately $1,500,000 in obligations to

22 PACA suppliers, and no assurance that PACA suppliers will continue to extend trade credit.

23 It is essential that Debtor keep its shelves stocked and that Debtor's customers remain

24 confident that Debtor will offer the products they expect and demand.

25        24.    In order to fund its ongoing operating expenses, make the required

26 utility deposits, fund the payment of PACA claims, and avoid the possibility of a disruption

**Page 6 of 15** -   DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY
                     MOTIONS

in the timely and efficient deliveries of inventory, Debtor will need authority to use cash collateral and to incur post-petition debt in an amount up to $7,000,000 on an interim basis to ensure that it is able to continue its business as usual pending a final hearing on its cash collateral motion and DIP financing motion.  Assuming a smooth transition into Chapter 11, Debtor projects post-petition borrowing needs of approximately $2,600,000 to fund utility deposits and the seasonal inventory build-up.  However, Debtor needs additional flexibility to address demands of its vendors and to ensure it will continue to serve its customers.  For example, Debtor projects sales of over $850,000 per day during the next seven weeks.  If a snowstorm results in a two-day closure of stores, Debtor may not have cash flow to pay vendors within their terms.  If all PACA suppliers demand payment of the pre-petition obligations and cash in advance for post-petition delivery, Debtor's borrowing requirements could increase by $1,500,000.  Debtor's authority to use cash collateral and borrow money on an interim basis is necessary to avoid immediate and irreparable harm to the estate.  Absent the Court's approval of this request, Debtor will confront a disruption of its business operations that would have a material and adverse effect on Debtor's operations to the detriment of Debtor, its creditors and its estate.

25.    Debtor's use of cash collateral and incurrence of post-petition debt will not harm the interests of any creditor because the use of such cash and the incurrence of such debt will enable Debtor to operate its business in the ordinary course and maintain the going concern value of its business.

## SUPERVALU SUPPLY AGREEMENT

26.    Supervalu is Debtor's primary supplier of grocery products and health and beauty products.  Pursuant to the Supply Agreement, Supervalu makes certain product lines available to Debtor for sale in Debtor's stores and provides related services such as warehousing, marketing, and merchandising.

**Page 7 of 15** -    DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY MOTIONS

27.     As set forth in the Motion for Authority to Assume the Supervalu Supply Agreement, Debtor currently pays for all product and services pursuant to 17-day trade terms by the consent of Supervalu, without waiver of its rights, despite contractual 15-day payment terms.  As a condition to Debtor's assumption of the Supply Agreement, Supervalu has agreed to continue to provide 17-day trade terms through October 31, 2014, with payment terms then reducing by three days in each annual period thereafter (i.e., 14-day payment terms commence November 1, 2014 and shall be reduced annually pursuant to the terms of the Supply Agreement).

28.     Prior to the bankruptcy filing, Debtor fully and promptly performed its obligations under the Supply Agreement.

**PRE-PETITION WAGES**

29.     Debtor employs approximately 2,300 employees.

30.     Debtor has an average payroll of approximately $2,716,808 per pay period.

31.     Debtor's employees are paid every other Friday.  The next regular payroll date is November 29, 2013, covering the pay period November 10, 2013 through November 23, 2013.  On November 15, 2013, employees were paid their wages through November 9, 2013.  Because the Petition Date was November 19, 2013, Debtor has incurred unpaid pre-petition obligations for wages, salaries, expenses, commissions and other employment compensation and benefits for the period November 10, 2013 to November 18, 2013.

32.     The total amount Debtor is obligated to pay for accrued and unpaid pre-petition wages, salaries, expenses, commissions, compensation, taxes, and benefits is approximately $1,600,000.

33.     A failure to pay accrued wages, salaries, commissions, expenses, benefits and other related obligations, or even a delay in such payment, would have a

**Page 8 of 15** -    DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY MOTIONS

1   significant negative impact on worker morale and some employees may not report to work,

2   thereby impairing Debtor's ability to continue operations.

3       34.     Debtor's employees are vital to its efforts to reorganize and provide

4   essential services, without which Debtor would be unable to function.

5                               **BANK ACCOUNTS**

6       35.     In the ordinary course of its business, and prior to the Petition Date,

7   Debtor used a centralized cash management system ("Cash Management System").  The

8   Cash Management System is designed to efficiently collect, transfer, and disburse funds

9   generated through Debtor's ordinary course of business and to accurately record such

10  collections, transfers, and disbursements as they are made.

11      36.     Debtor's Cash Management System includes multiple integrated bank

12  accounts, including over 90 deposit accounts, at American West Bank, Bank of Willits, Coast

13  Central Credit Union, Evergreen Federal, Plumas Bank, Rogue Federal Credit Union, Scott

14  Valley Bank, Siuslaw Bank, J.P. Morgan Chase, U.S. Bank, Umpqua Bank, and Wells Fargo

15  (the "Bank Accounts").  Debtor maintains each of its Bank Accounts at financial institutions

16  insured by the FDIC.

17      37.     Debtor has deposit bank accounts for each local store as well as

18  corporate administrative accounts.  To the extent the city in which the local store is located

19  has a U.S. Bank branch, the local store bank account is held at the U.S. Bank branch.  To the

20  extent the city in which the local store is located does not have a U.S. Bank branch, the local

21  store bank account is held at an alternative local bank branch.  A U.S. Bank "shadow bank

22  account" is held for each local store that does not have a local U.S. Bank account.

23      38.     Debtor's local store bank accounts at U.S. Bank and elsewhere consist

24  of cash and check deposits ("Non-Electronic Funds").  Non-Electronic Funds from all local

25  stores are deposited into the local bank branches on a daily basis.  To the extent a particular

26  local store bank account is at U.S. Bank, all debit, credit, and EBT funds ("Electronic

**Page 9 of 15** -    DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY
                      MOTIONS

1  Funds") are also deposited into that U.S. Bank account.  To the extent a particular local store

2  has a non-U.S. Bank account, all Electronic Funds are deposited in the U.S. Bank shadow

3  bank account associated with that store on a daily basis.  All Electronic Funds and Non-

4  Electronic Funds are transferred to Debtor's U.S. Bank account on at least a weekly basis.

5          39.     If Debtor were required to establish new bank accounts, the process

6  would be lengthy and expensive, impose a substantial burden on the estate, and could disrupt

7  payments to key vendors and employees.  This is especially true because Debtor has so many

8  Bank Accounts, many of which are held in small towns with limited or no banking options,

9  let alone UST authorized depositories.  The prospect of transporting cash and checks from

10  one of Debtor's local stores to another town—just for the sake of depositing those funds at an

11  authorized depository—would be logistically challenging, waste Debtor resources, risk

12  smooth operation of Debtor's business, and endanger estate funds in the process.

13          40.     In the ordinary course of its business, Debtor uses a multitude of

14  checks.  By virtue of the nature and scope of Debtor's business operations and the large

15  number of suppliers of goods and services with whom Debtor deals on a regular basis, it is

16  important that Debtor be permitted to continue to use its existing checks without alteration or

17  change.   To the extent Debtor prints or has printed any new checks after the Petition Date, it

18  will include the legend "D.I.P." and the corresponding bankruptcy case number.

19                      **GOODS RECEIVED WITHIN 20 DAYS**

20          41.     Within 20 days immediately prior to the Petition Date, Debtor

21  purchased and received a variety of inventory and other goods used in its grocery operations.

22          42.     The great majority of the suppliers of these goods are essential to

23  Debtor's grocery store operations.  Debtor relies on these suppliers to frequently and timely

24  deliver critical goods to Debtor's stores.  Debtor estimates that approximately $11,000,000

25  was owing to these suppliers as of the Petition Date.

26

**Page 10 of 15** -  DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY
               MOTIONS

43.    Payment of these suppliers is necessary for Debtor to maintain its existing vendor relationships and preserve the going concern value of Debtor's estate.  Any erosion in Debtor's relationships with its suppliers may threaten Debtor's ability to keep its stores adequately stocked.  Debtor cannot afford any material disruptions in obtaining goods from its vendors or present anything less than a business-as-usual appearance to the public.

**PACA GOODS**

44.    Debtor's grocery stores rely on a constant supply of fresh and frozen fruits and vegetables ("PACA Goods").

45.    Debtor estimates that as of the Petition Date it owes approximately $1,500,000 to suppliers for PACA Goods.

46.    Any delays in paying suppliers for PACA Goods will interfere with Debtor's ability to timely obtain agricultural produce, likely cause those suppliers to discontinue supplying PACA Goods on credit, cause immediate and irreparable harm to Debtor's retail operations, decrease Debtor's value as a going concern, and hinder Debtor's ability to reorganize.  Alternatively, the timely payment of suppliers for PACA Goods will benefit Debtor and its estate by facilitating the continued purchase and receipt of fresh produce and other products.

**UTILITIES**

47.    In connection with the operation of its business, Debtor obtains telephone, electric, gas, water, and other utility services (collectively, "Utility Services") from approximately 150 utility companies ("Utility Companies").

48.    If Utility Companies are permitted to refuse or discontinue service for even a brief period, the impact on Debtor's operations could be devastating.  Such an interruption would damage customer relationships, revenue, and profits, and would ultimately adversely affect Debtor's efforts to reorganize.  Moreover, such an interruption would result in a diminution in value of Debtor's assets and cause irreparable harm to

**Page 11 of 15** -   DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY
MOTIONS

1    Debtor's estate.  For example, if a provider of electricity was to terminate or disrupt service

2    to Debtor, perishable goods (including dairy products, meat and produce) would spoil in

3    short order.  In addition, if Debtor's waste is not removed from the premises of its stores,

4    unsanitary and unpleasant conditions would become manifest.  As a result of the foregoing,

5    customer confidence in the quality of Debtor's products would likely be lost which, in turn,

6    would affect Debtor's ability to generate revenue.  Accordingly, maintaining uninterrupted

7    Utility Services is essential to Debtor's ability to maintain its business operations and to

8    preserve the value of its assets.

9              49.    Debtor has proposed to make adequate assurance payments to the

10    Utility Companies consisting of a cash deposit upon request equal to one month of average

11    service for each utility.

12                              **CUSTOMER REWARDS PROGRAMS**

13              50.    Debtor's business depends on customer loyalty.  To maximize

14    customer loyalty, Debtor has adopted certain programs for the benefit of its customers,

15    including those described herein (collectively, the "Customer Programs").

16              51.    The Customer Programs reward customer loyalty and provide

17    customers incentives to buy certain products from Debtor's stores.  Most, if not all, of the

18    Customer Programs are standard in the grocery store business.  Without the ability to

19    continue the Customer Programs and satisfy Debtor's pre-petition obligations in connection

20    therewith, Debtor risks losing customer confidence and goodwill, and surrendering market

21    share to competitors.  The Customer Programs include (a) return, refund, and exchange

22    policies, (b) a coupon program, (c) sales promotions, (d) a gift card program, and (e) the All

23    Access Rewards Program whereby customers accumulate rewards points based on the

24    amount they spend at Debtor's stores.

25

26

**Page 12 of 15** -  DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY
                     MOTIONS

1

## EMPLOYMENT APPLICATIONS

2

**A.     Edward Hostmann Inc. ("EHI") as Chief Restructuring Officer**

3

52.     EHI's billing rates are at market rate.

4

53.     Because I am already acting in the capacity of chief restructuring

5

officer ("CRO"), I did not interview any other firms to act as CRO prior to selecting EHI.

6

54.     EHI will maintain detailed, contemporaneous time records of expenses

7

incurred.  Expenses shall be reasonable pursuant to LBR 2016(b)(2).  Compensation and

8

reimbursement of expenses shall be paid as administrative expenses in such amounts as may

9

be allowed by this Court after notice and hearing pursuant to Section 330 of the Bankruptcy

10

code or as otherwise provided by Court order.

11

12

**B.     Henderson Bennington Moshofsky, P.C. ("Henderson Bennington") as Accountants**

13

55.     Henderson Bennington's billing rates are at market rate.

14

56.     I did not interview any other firms to act as accountants for Debtor

15

prior to selecting Henderson Bennington.

16

57.     Henderson Bennington will maintain detailed, contemporaneous time

17

records of expenses incurred.  Expenses shall be reasonable pursuant to LBR 2016(b)(2).

18

Compensation and reimbursement of expenses shall be paid as administrative expenses in

19

such amounts as may be allowed by this Court after notice and hearing pursuant to

20

Section 330 of the Bankruptcy code or as otherwise provided by Court order.

21

22

**C.     Kieckhafer Schiffer & Company LLP ("KS&Co") as Financial Advisors and Consultants**

23

58.     KS&Co's billing rates are at market rate.

24

59.     I did not interview any other firms to act as financial advisors and

25

consultants prior to KS&Co.

26

**Page 13 of 15** -  DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY MOTIONS

1        60.     KS&Co will maintain detailed, contemporaneous time records of

2   expenses incurred.  Expenses shall be reasonable pursuant to LBR 2016(b)(2).

3   Compensation and reimbursement of expenses shall be paid as administrative expenses in

4   such amounts as may be allowed by this Court after notice and hearing pursuant to

5   Section 330 of the Bankruptcy code or as otherwise provided by Court order.

6        **D.**     **The Food Partners as Financial Advisors**

7        61.     Food Partners' billing rates are at market rate.

8        62.     I did not interview any other firms to act as financial advisors prior to

9   Food Partners.

10        63.     Food Partners will maintain detailed, contemporaneous time records of

11   expenses incurred.  Expenses shall be reasonable pursuant to LBR 2016(b)(2).

12   Compensation and reimbursement of expenses shall be paid as administrative expenses in

13   such amounts as may be allowed by this Court after notice and hearing pursuant to

14   Section 330 of the Bankruptcy code or as otherwise provided by Court order

15        **E.**     **Tonkon Torp LLP as Attorneys**

16        64.     Tonkon Torp's billing rates are at market rate.

17        65.     I did not interview any other firms to act as attorneys for Debtor prior

18   to selecting Tonkon Torp.

19        66.     Tonkon Torp will maintain detailed, contemporaneous time records of

20   expenses incurred.  Expenses shall be reasonable pursuant to LBR 2016(b)(2).

21   Compensation and reimbursement of expenses shall be paid as administrative expenses in

22   such amounts as may be allowed by this Court after notice and hearing pursuant to

23   Section 330 of the Bankruptcy code or as otherwise provided by Court order.

24        **F.**     **Great American Group LLC to Assist in Store Closing Sales**

25        67.     Great American's rates are at market rates.

26

**Page 14 of 15** -  DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY
          MOTIONS

1        68.    I did not interview any other firms to assist in the store closings prior

2  to Great American.

3        69.    Great American will maintain detailed, contemporaneous time records

4  of expenses incurred.  Compensation and reimbursements shall be paid as an administrative

5  expense as stores are closed, without further Court order.

6        I declare under penalty of perjury under the laws of the United States of

7  America that the foregoing is true and correct.

8        DATED this 19th day of November, 2013.

9

10                  */s/ Edward C. Hostmann*
                        Edward C. Hostmann

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 15 of 15** -  DECLARATION OF EDWARD C. HOSTMANN IN SUPPORT OF FIRST DAY
                MOTIONS