**Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
   Direct Dial:  (503) 802-2013
   Facsimile:    (503) 972-3713
   E-Mail:       al.kennedy@tonkon.com
**Timothy J. Conway**, OSB No. 851752
   Direct Dial:  (503) 802-2207
   Facsimile:    (503) 972-3727
   E-Mail:       tim.conway@tonkon.com
**Michael W. Fletcher**, OSB No. 010448
   Direct Dial:  (503) 802-2169
   Facsimile:    (503) 972-3869
   E-Mail:       michael.fletcher@tonkon.com
**Ava L. Schoen**, OSB No. 044072
   Direct Dial:  (503) 802-2143
   Facsimile:    (503) 972-3843
   E-Mail:       ava.schoen@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR  97204

    Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 13-64561-fra11 |
| C & K Market, Inc., | **DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)** |
|         Debtor. | |

DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

# TABLE OF CONTENTS

ARTICLE 1  DEFINITIONS ................................................................................1

ARTICLE 2  UNCLASSIFIED CLAIMS .............................................................10

ARTICLE 3  CLASSIFICATION .........................................................................11

ARTICLE 4  TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS......................12

ARTICLE 5  DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; SETTLEMENT............21

ARTICLE 6  RIGHTS OFFERING.......................................................................22

ARTICLE 7  MEANS FOR EXECUTION OF PLAN ...........................................26

ARTICLE 8  EXECUTORY CONTRACTS AND UNEXPIRED LEASES........................30

ARTICLE 9  EFFECT OF CONFIRMATION .......................................................31

ARTICLE 10  RETENTION OF JURISDICTION .................................................32

ARTICLE 11  ADMINISTRATIVE PROVISIONS ...............................................34

ARTICLE 12  MISCELLANEOUS PROVISIONS................................................36

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    C & K Market, Inc., an Oregon corporation ("C & K" or "Debtor") as Debtor and

2    debtor-in-possession, proposes the following Plan of Reorganization, pursuant to

3    Section 1129(a) of Title 11 of the United States Code.

4    The Plan provides for the terms upon which C & K will restructure and provide

5    payments to its creditors.  In general, the Plan provides for (a) payment in full to Secured

6    Creditors of the Allowed Amount of their Secured Claims; (b) issuance of Common Stock in

7    Reorganized Debtor in exchange for Allowed Unsecured Claims; (c) payment in an amount

8    equal to 80% of the Allowed Claims of Small Unsecured Creditors within 90 days after the

9    Effective Date; and (d) cancellation of all existing Equity Securities.

10    The Disclosure Statement is enclosed herewith to assist you in understanding this

11    Plan and making an informed judgment concerning its terms.

12    **ARTICLE 1**

13    **DEFINITIONS**

14    Definitions of certain terms used in this Plan are set forth below.  Other terms are

15    defined in the text of this Plan or the text of the Disclosure Statement.  In either case, when a

16    defined term is used, the first letter of each word in the defined term is capitalized.  Terms

17    used and not defined in this Plan or the Disclosure Statement shall have the meanings given

18    in the Bankruptcy Code or Bankruptcy Rules, or otherwise as the context requires.  The

19    meanings of all terms shall be equally applicable to both the singular and plural, and

20    masculine and feminine, forms of the terms defined.  The words "herein," "hereof," "hereto,"

21    "hereunder," and others of similar import, refer to the Plan as a whole and not to any

22    particular section, subsection, or clause contained in the Plan.  Captions and headings to

23    articles, sections, and exhibits are inserted for convenience of reference only and are not

24    intended to be part of or to affect the interpretation of the Plan.  The rules of construction set

25    forth in Section 102 of the Bankruptcy Code shall apply.  In computing any period of time

26    prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**Page 1 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

Any capitalized term that is not defined herein but is defined in the Bankruptcy Code shall have the meaning ascribed to such term in the Bankruptcy Code.

1.1.    "Administrative Expense Claim" means any Claim entitled to the priority afforded by Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

1.2.    "Allowed" means, with respect to any Claim, proof of which has been properly Filed or, if no Proof of Claim was so Filed, which was or hereafter is listed on the Schedules as liquidated in amount and not disputed or contingent, and, in either case, a Claim as to which no objection to the allowance thereof, or motion to estimate for purposes of allowance, shall have been Filed on or before any applicable period of limitation that may be fixed by the Bankruptcy Code, the Bankruptcy Rules, and/or the Bankruptcy Court, or as to which any objection, or any motion to estimate for purposes of allowance, shall have been so Filed, to the extent allowed by a Final Order.

1.3.    "Allowed Secured Claim" means an Allowed Claim that is secured by a lien, security interest, or other charge against or interest in property in which Debtor has an interest or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value (as set forth in the Plan or, if no value is specified, as determined in accordance with Section 506(a) of the Bankruptcy Code or, if applicable, Section 1111(b) of the Bankruptcy Code) of the interest of the holder of such Claim in Debtor's interest in such property or to the extent of the amount subject to setoff, as the case may be.

1.4.    "Allowed Unsecured Claim" means an Allowed Claim that is not an Allowed Secured Claim or an Allowed Administrative Expense Claim.

1.5.    "Avoidance Actions" means, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, claims and demands whatsoever, whether known or unknown, in law (including, without limitation, Sections 506(c), 510, 542, 544, 547, 548, 549, 550, and 553 of the Bankruptcy Code or equivalent provisions of applicable non-bankruptcy law), equity or otherwise.

**Page 2 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1.6.    "Backstop Commitment" means the agreement by the Backstop Party, if any, pursuant to the Backstop Rights Purchase Agreement, to purchase all of the Rights Offering Shares that are not purchased by the Rights Offering Participants as part of the Rights Offering.

1.7.    "Backstop Party" means Endeavour and/or THL and/or their affiliates, or such other Creditor as selected by Debtor, if any.

1.8.    "Backstop Rights Purchase Agreement" means the agreement between the Backstop Party and Debtor which sets forth the Backstop Commitment and the terms and conditions thereof.  If the Backstop Party and Debtor decide to proceed with the Rights Offering with a Backstop Party, a form of the Backstop Rights Purchase Agreement will be filed with the Court not less than 10 days prior  to the hearing on confirmation of the Plan.

1.9.    "Bank" or "U.S. Bank" means U.S. Bank, National Association.

1.10.    "Bankruptcy Case" means the case under Chapter 11 of the Bankruptcy Code with respect to Debtor, pending in the District of Oregon, administered as *In re C & K Market, Inc.,* Case No. 13-64561-rld11.

1.11.    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended from time to time, set forth in Sections 101 et seq. of Title 11 of the United States Code.

1.12.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Oregon, or such other court that exercises jurisdiction over the Bankruptcy Case or any proceeding therein, including the United States District Court for the District of Oregon, to the extent the reference to the Bankruptcy Court or any proceeding therein is withdrawn.

1.13.    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended and promulgated under Section 2075, Title 28, of the United States Code, and the local rules and standing orders of the Bankruptcy Court.

**Page 3 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1.14.    "Business Day" means a day other than a Saturday, Sunday, any legal holiday as defined in Bankruptcy Rule 9006(a), or other day on which banks in Portland, Oregon are authorized or required by law to be closed.

1.15.    "Cash" means lawful currency of the United States of America and equivalents, including, without limitation, checks, wire transfers and drafts.

1.16.    "Claim" means (a) any right to payment from Debtor arising before the Effective Date, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy against Debtor arising before the Effective Date for breach of performance if such breach gives rise to a right of payment from Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

1.17.    "Class" means one of the classes of Claims defined in Article 3 hereof.

1.18.    "Collateral" means any property in which Debtor has an interest that is subject to a lien or security interest securing the payment of an Allowed Secured Claim.

1.19.    "Committee" means the Official Unsecured Creditors' Committee appointed in this Bankruptcy Case by the United States Trustee pursuant to Section 1102 of the Bankruptcy Code, as reconstituted by the addition or removal of members from time to time.

1.20.    "Common Stock" means the authorized common stock, no par value, of Reorganized Debtor.

1.21.    "Confirmation Date" means the date on which the Confirmation Order is entered on the docket by the Clerk of the Bankruptcy Court.

1.22.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.23.    "Creditor" means any entity holding a Claim against Debtor.

**Page 4 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1.24.    "Debtor" means C & K Market, Inc. as Debtor and debtor-in-possession in the Bankruptcy Case.

1.25.    "Deficiency Claim" means the portion of a Secured Claim that is unsecured.

1.26.    "Disclosure Statement" means Debtor's Disclosure Statement as amended, modified, restated, or supplemented from time to time, pertaining to the Plan.

1.27.    "Disputed Claim" means a Claim with respect to which a Proof of Claim has been timely Filed or deemed timely Filed under applicable law, and as to which an objection, timely Filed, has not been withdrawn on or before the Effective Date or any date fixed for filing such objections by order of the Bankruptcy Court, and has not been denied by a Final Order.

1.28.    "DOL Consent Judgment and Order" means that certain Consent Judgment and Order filed on or about November 2, 2012 in Case No. 6:10-CV-06360-AA in the United States District Court, District of Oregon, Eugene Division.

1.29.    "Effective Date" means the first day of the first full month after the Confirmation Date and after which the conditions to effectiveness set forth in the Plan have been waived or satisfied.

1.30.    "Employee Equity Security Plan" means any plan, fund, agreement, contract or program established or entered into by Debtor prior to the Petition Date with respect to any Equity Security granted to or held by, or to be granted to or held by, any employee, director, contractor or agent of Debtor or any of its subsidiaries.

1.31.    "Employee Stock Incentive Plan" means that certain 2014 Stock Incentive Plan substantially in the form attached hereto as **Exhibit 1**, which shall be effective with respect to Reorganized Debtor as of the Effective Date.

1.32.    "Endeavour" means Endeavour Structured Equity and Mezzanine Fund, L.P.

1.33.    "Entity" shall have the meaning ascribed to it by Section 101(15) of the Bankruptcy Code.

**Page 5 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1.34.    "Equity Security" shall have the meaning ascribed to it in Section 101(16) of the Bankruptcy Code with respect to any Equity Security Holder of Debtor.

1.35.    "Equity Security Holder" means a holder of an Equity Security of Debtor.

1.36.    "Exit Financing" means one or more credit facilities to be entered into by Reorganized Debtor effective as of the Effective Date, which may be secured by a first priority lien in all or substantially all of Reorganized Debtor's property, subject only to the liens being retained by Secured Creditors under this Plan to secure the payment of Allowed Secured Claims.

1.37.    "Filed" means filed with the Bankruptcy Court in the Bankruptcy Case.

1.38.    "Final Order" means an order or judgment entered on the docket by the Clerk of the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties that has not been reversed, stayed, modified, or amended and as to which the time for filing a notice of appeal, or petition for certiorari or request for certiorari, or request for rehearing, shall have expired and is no longer subject to remand, retrial, modification or further proceedings of any kind or nature.

1.39.    "General Unsecured Claim" means an Unsecured Claim that is not a Small Unsecured Claim.

1.40.    "Insider" shall have the meaning ascribed to it by Section 101(31) of the Bankruptcy Code.

1.41.    "Other Priority Claim" means any Claim for an amount entitled to priority in right of payment under Sections 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy Code.

1.42.    "Petition Date" means November 19, 2013, the date on which the petition commencing the Bankruptcy Case was Filed.

1.43.    "Plan" means this Plan of Reorganization, as amended, modified, restated, or supplemented from time to time.

1.44.    "Primary Offering Subscription" has the meaning ascribed to it in Section 6.2.

**Page 6 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1.45.   "Priority Tax Claim" means a Claim of a governmental unit of the kind entitled to priority under Section 507(a)(8) of the Bankruptcy Code or that would otherwise be entitled to priority but for the secured status of the Claim.

1.46.   "Pro Rata Share of the Rights Offering Shares" means, with respect to an applicable Rights Offering Participant, the proportion that (a) the amount of the Class 12 Claims that are held by such Rights Offering Participant bears to (b) the aggregate amount of Class 12 Claims that are held by all Rights Offering Participants.

1.47.   "Rejection Claim" means a Claim entitled to be filed as a result of a Debtor rejecting an executory contract in this Bankruptcy Case.

1.48.   "Remaining Rights Offering Shares" means those Rights Offering Shares, if any, that are not subscribed for pursuant to the Primary Offering Subscriptions submitted by the Rights Offering Participants prior to the expiration of the Subscription Deadline.

1.49.   "Reorganized Debtor" means Debtor from and after the Effective Date.

1.50.   "Restated Articles of Incorporation" means the Second Amended and Restated Articles of Incorporation of Debtor, substantially in the form attached hereto as **Exhibit 2**, which shall modify and amend Debtor's prior Amended and Restated Articles of Incorporation and govern Reorganized Debtor from and after the Effective Date.

1.51.   "Restated Bylaws" means the Second Amended and Restated Bylaws of Debtor, substantially in the form attached hereto as **Exhibit 3**, which shall modify and amend Debtor's prior Amended and Restated Bylaws and govern Reorganized Debtor from and after the Effective Date.

1.52.   "Rights Offering" means that certain rights offering of Common Stock in an amount of up to the Rights Offering Amount to be offered to the Rights Offering Participants, the terms of which are set forth in Article 6.

1.53.   "Rights Offering Amount" means up to $10,000,000.

1.54.   "Rights Offering Participant" means each holder of a Class 12 Claim.

**Page 7 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1.55.   "Rights Offering Purchaser" means a Rights Offering Participant who timely and properly executes and delivers a Subscription to Debtor or other entity specified in the Subscription prior to the expiration of the Subscription Deadline.

1.56.   "Rights Offering Record Date" means the date for determining which holders of Class 12 Claims are eligible to participate in the Rights Offering, and shall be the voting record date applicable to such Claims, or such other date as designated in an Order of the Bankruptcy Court.

1.57.   "Rights Offering Shares" means the whole shares of Common Stock to be issued and sold through the Rights Offering (including, if there is a Backstop Party, the Remaining Rights Offering Shares to be issued pursuant to the Backstop Rights Purchase Agreement).  No fractional shares will be issued.

1.58.   "Scheduled Amounts" means the Claim amounts as set forth in Debtor's Schedules.

1.59.   "Schedules" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs Filed by Debtor pursuant to Section 521 of the Bankruptcy Code, as amended, modified, restated, or supplemented from time to time.

1.60.   "Secured Claim" means any Claim against Debtor held by any entity, including, without limitation, an affiliate or judgment creditor of Debtor, to the extent such Claim constitutes a secured Claim under Sections 506(a) or 1111(b) of the Bankruptcy Code. The unsecured portion, if any, of such Claim shall be treated as an Unsecured Claim.

1.61.   "Small Unsecured Claims" means Unsecured Claims that are equal to or less than $10,000 or that have been reduced to $10,000 by the election of the Creditor holding such Unsecured Claim.

1.62.   "Subscription" means a subscription agreement to be distributed to Rights Offering Participants, substantially in the form attached hereto as **Exhibit 4**, pursuant to which such Rights Offering Participants may exercise their Subscription Rights.

**Page 8 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1.63.    "Subscription Commencement Date" means the date on which the Subscription Period commences, which shall be the earliest date reasonably practicable occurring after the Rights Offering Record Date.

1.64.    "Subscription Deadline" means the date on which the Rights Offering shall expire as set forth in the Subscription, which date shall precede the Effective Date.

1.65.    "Subscription Notification Date" means a date that is not later than seven days following the Subscription Deadline.

1.66.    "Subscription Payment Amount" means, with respect to a particular Rights Offering Purchaser, an amount of Cash equal to the amount of Rights Offering Amount subscribed for by a Rights Offering Purchaser up to such Rights Offering Purchaser's Pro Rata Share of the Rights Offering Shares, multiplied by the Subscription Price, and rounded to the nearest whole dollar as necessary to prevent the need to issue fractional shares of Common Stock.

1.67.    "Subscription Period" means the time period during which the Rights Offering Participants may subscribe to purchase the Rights Offering Shares, which period shall commence on the Subscription Commencement Date and expire on the Subscription Deadline.

1.68.    "Subscription Price" means an amount determined by Debtor and the Backstop Party (if any) as the per-share purchase price for the Rights Offering Shares, but shall not be less than $7.50.

1.69.    "Subscription Right" means the right to participate in the Rights Offering pursuant to Article 6, which right shall be non-transferable and non-certificated.

1.70.    "THL" means THL Credit, Inc.

1.71.    "Unsecured Claim" means a Claim that is not an Administrative Claim, a Secured Claim, a Priority Tax Claim, or an Other Priority Claim.

1.72.    "Unsecured Creditor" means a holder of an Allowed Unsecured Claim.

**Page 9 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1.73.    "Utility Deposits" means deposits with utilities made by Debtor after the Petition Date pursuant to Section 366(b) of the Bankruptcy Code.

## ARTICLE 2

## UNCLASSIFIED CLAIMS

2.1.    <u>Administrative Expense Claims</u>.  Each holder of an Allowed Administrative Expense Claim shall be paid the full amount of its Allowed Administrative Expense Claim in Cash on the later of (a) the Effective Date; or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute, or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto.

2.2.    <u>Priority Tax Claims</u>.  Each holder of an Allowed Priority Tax Claim will be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim in Cash on the later of (a) the Effective Date, (b) the date on which such Claim becomes Allowed, and (c) the date it is due.

2.3.    <u>Bankruptcy Fees</u>.  Fees payable by Debtor under 28 U.S.C. § 1930, or to the Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date.  After confirmation, Reorganized Debtor shall continue to pay quarterly fees of the Office of the United States Trustee and to file quarterly reports with the Office of the United States Trustee until the Bankruptcy Case is closed by the Court, dismissed, or converted except as otherwise ordered by the Court.  This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.  After Confirmation, Reorganized Debtor shall file with the Court a monthly financial report

**Page 10 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1    for each month, or portion thereof, that the Bankruptcy Case remains open.  The monthly

2    financial report shall include a statement of all disbursements made during the course of the

3    month, whether or not pursuant to the Plan.

4    **ARTICLE 3**

5    **CLASSIFICATION**

6        For purposes of this Plan, Claims (except those treated under Article 2) are classified

7    as provided below.  A Claim is classified in a particular Class only to the extent such Claim

8    qualifies within the description of such Class, and is classified in a different Class to the

9    extent such Claim qualifies within the description of such different Class.

10        3.1.    Class 1 (Other Priority Claims).  Class 1 consists of all Allowed Other Priority

11    Claims.

12        3.2.    Class 2 (C & K Market, Inc. 401(k) Plan; United States Department of Labor).

13    Class 2 consists of the Claims of the C & K Market, Inc. 401(k) Plan and the United States

14    Department of Labor arising under or related to the DOL Consent Judgment and Order.

15        3.3.    Class 3 (Banc of America Leasing & Capital, LLC).  Class 3 consists of the

16    Allowed Secured Claim of Banc of America Leasing & Capital, LLC.

17        3.4.    Class 4 (Dell Financial Services, LLC).  Class 4 consists of the Allowed

18    Secured Claim of Dell Financial Services, LLC.

19        3.5.    Class 5 (James Gillespie).  Class 5 consists of the Allowed Secured Claim of

20    James Gillespie.

21        3.6.    Class 6 (Komlofske Corp.).  Class 6 consists of the Allowed Secured Claim, if

22    any, of Komlofske Corp.

23        3.7.    Class 7 (Greatway Center Property, LLC).  Class 7 consists of the Allowed

24    Secured Claim of Greatway Center Property, LLC.

25        3.8.    Class 8 (Green & Frahm).  Class 8 consists of the Allowed Secured Claim of

26    Green & Frahm.

**Page 11 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1       **3.9.**    <u>Class 9 (Ken and Lynda Martin)</u>.  Class 9 consists of the Allowed Secured

2  Claim of Ken and Lynda Martin.

3       **3.10.**   <u>Class 10 (Protective Life)</u>.  Class 10 consists of the Allowed Secured Claim of

4  Protective Life.

5       **3.11.**   <u>Class 11 (U.S. Bank, National Association)</u>.  Class 11 consists of the Allowed

6  Secured Claim of U.S. Bank, National Association.

7       **3.12.**   <u>Class 12 (General Unsecured Claims)</u>.  Class 12 consists of all Allowed

8  General Unsecured Claims.

9       **3.13.**   <u>Class 13 (Small Unsecured Claims)</u>.  Class 13 consists of all Allowed Small

10  Unsecured Claims.

11       **3.14.**   <u>Class 14 (Equity Security Holders)</u>.  Class 14 consists of the Claims and

12  interests of Equity Security Holders based on their Equity Security.

13

**ARTICLE 4**

14

**TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

15       **4.1.**    <u>Class 1 (Other Priority Claims)</u>.  Class 1 is unimpaired.  Each holder of an

16  Allowed Class 1 Claim will be paid in full in Cash by Reorganized Debtor the amount of its

17  Allowed Class 1 Claim on the latter of (a) the Effective Date; or (b) the date on which such

18  Claim becomes allowed, unless such holder shall agree or has agreed to a different treatment

19  of such Claim (including any different treatment that may be provided for in any

20  documentation, agreement, contract, statute, law, or regulation creating and governing such

21  Claim).

22       **4.2.**    <u>Class 2 (C & K Market, Inc. 401(k) Plan; United States Department of Labor)</u>.

23  Class 2 is unimpaired.  The DOL Consent Judgment and Order shall remain in full force and

24  effect, and is not in any way modified, altered or affected by this Plan.  Without limiting the

25  preceding, Reorganized Debtor shall continue to timely and fully perform and pay all of its

26  obligations under the DOL Consent Judgment and Order.

**Page 12 of 40 -**  DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1       4.3.    <u>Class 3 (Allowed Secured Claim of Banc of America Leasing & Capital,</u>

2  <u>LLC)</u>.  Class 3 is impaired.  The amount of Banc of America Leasing & Capital, LLC's

3  (BALC) Allowed Secured Claim will be determined by agreement of Debtor and BALC, or,

4  absent agreement, in such amount as is determined and Allowed by the Bankruptcy Court.

5       BALC's Class 3 Claim shall be satisfied by delivery of a promissory note to BALC

6  (the "BALC Note") in the principal amount of its Allowed Secured Claim.  The BALC Note

7  will bear interest from the Effective Date at a fixed per annum rate of 5%, and will be

8  payable by Reorganized Debtor as follows:

9       Commencing on the first day of the first month following the Effective Date and

10  continuing on the first day of each month thereafter until the BALC Note has been paid in

11  full, Reorganized Debtor will make equal monthly amortizing payments of principal and

12  interest on the BALC Note based on a five year amortization schedule, with final payment

13  due five years after the Effective Date.

14       The Class 3 Claim may be prepaid in full or in part at any time without any

15  prepayment penalty or premium.

16       As security for the Class 3 Claim, BALC will retain its security interests in and liens

17  upon its Collateral with the same priority and to the same extent such security had as of the

18  Petition Date.  Reorganized Debtor will maintain the BALC Collateral in good repair, will

19  insure the BALC Collateral to its full useable value, and will pay any property taxes with

20  respect to such Collateral when due.  At any sale of its Collateral, BALC will have the right

21  to bid at such sale, and if BALC is the successful bidder, BALC may offset all or any portion

22  of its then unpaid Allowed Secured Claim.

23       4.4.    <u>Class 4 (Allowed Secured Claim of Dell Financial Services, LLC)</u>.  Class 4 is

24  impaired.  The amount of Dell Financial Services, LLC's ("Dell") Allowed Secured Claim

25  will be determined by agreement of Debtor and Dell, or, absent agreement, in such amount as

26  is determined and Allowed by the Bankruptcy Court.

**Page 13 of 40 -**  DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1    Dell's Class 4 Claim shall be satisfied by delivery of a promissory note to Dell (the

2  "Dell Note") in the principal amount of its Allowed Secured Claim.  The Dell Note will bear

3  interest from the Effective Date at a fixed per annum rate of 5%, and will be payable by

4  Reorganized Debtor as follows:

5    Commencing on the first day of the first month following the Effective Date and

6  continuing on the first day of each month thereafter until the Dell Note has been paid in full,

7  Reorganized Debtor will make equal monthly amortizing payments of principal and interest

8  on the Dell Note based on a five year amortization schedule, with a final payment due five

9  years after the Effective Date.

10    The Class 4 Claim may be prepaid in full or in part at any time without any

11  prepayment penalty or premium.

12    As security for the Class 4 Claim, Dell will retain its security interests in and liens

13  upon its Collateral with the same priority and to the same extent such security had as of the

14  Petition Date.  Reorganized Debtor will maintain the Dell Collateral in good repair, will

15  insure the Dell Collateral to its full useable value, and will pay any property taxes with

16  respect to such Collateral when due.  At any sale of its Collateral, Dell will have the right to

17  bid at such sale, and if Dell is the successful bidder, Dell may offset all or any portion of its

18  then unpaid Allowed Secured Claim.

19    4.5.    Class 5 (Allowed Secured Claim of Komlofske Corp.).  Class 5 is impaired.

20  The amount of Komlofske Corp's ("Komlofske") Allowed Secured Claim, if any, will be

21  determined by agreement of Debtor and Komlofske, or, absent agreement, in such amount as

22  is determined and Allowed by the Bankruptcy Court.

23    Komlofske's Class 5 Claim shall be satisfied by delivery of a promissory note to

24  Komlofske (the "Komlofske Note") in the principal amount of its Allowed Secured Claim, if

25  any.  The Komlofske Note will bear interest from the Effective Date at a fixed per annum

26  rate of 5%, and will be payable by Reorganized Debtor as follows:

**Page 14 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1       Commencing on the first day of the first month following the Effective Date and

2 continuing on the first day of each month thereafter until the Komlofske Note has been paid

3 in full, Reorganized Debtor will make equal monthly amortizing payments of principal and

4 interest on the Komlofske Note based on a five year amortization schedule, with a final

5 payment due five years after the Effective Date.

6       The Class 5 Claim may be prepaid in full or in part at any time without any

7 prepayment penalty or premium.

8       As security for the Class 5 Claim, Komlofske will retain its security interests in and

9 liens upon its Collateral (if any, and to the extent not avoided) with the same priority and to

10 the same extent such security had as of the Petition Date.  Reorganized Debtor will maintain

11 the Komlofske Collateral in good repair, will insure the Komlofske Collateral to its full

12 useable value, and will pay any property taxes with respect to such Collateral when due.  At

13 any sale of its Collateral, Komlofske will have the right to bid at such sale, and if Komlofske

14 is the successful bidder, Komlofske may offset all or any portion of its then unpaid Allowed

15 Secured Claim.

16       4.6.    Class 6 (Allowed Secured Claim of James Gillespie).  Class 6 is impaired.

17 The amount of James Gillespie's ("Gillespie") Allowed Secured Claim will be determined by

18 agreement of Debtor and Gillespie, or, absent agreement, in such amount as is determined

19 and Allowed by the Bankruptcy Court.

20       Gillespie's Class 6 Claim shall be satisfied by delivery of a promissory note to

21 Gillespie (the "Gillespie Note") in the principal amount of Gillespie's Allowed Secured

22 Claim.  The Gillespie Note will bear interest from the Effective Date at a fixed per annum

23 rate of 5%, and will be payable by Reorganized Debtor as follows:

24       Commencing on the first day of the first month following the Effective Date and

25 continuing on the first day of each month thereafter until the Gillespie Note has been paid in

26 full, Reorganized Debtor will make equal monthly amortizing payments of principal and

**Page 15 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1    interest on the Gillespie Note based on a twenty five year amortization schedule, with a

2    balloon payment due seven years after the Effective Date.

3         The Class 6 Claim may be prepaid in full or in part at any time without any

4    prepayment penalty or premium.

5         As security for the Class 6 Claim, Gillespie will retain its security interests in and

6    liens upon its Collateral with the same priority and to the same extent such security had as of

7    the Petition Date.  Reorganized Debtor will maintain the Gillespie Collateral in good repair,

8    will insure the Gillespie Collateral to its full useable value, and will pay any property taxes

9    with respect to such Collateral when due.  At any sale of its Collateral, Gillespie will have

10   the right to bid at such sale, and if Gillespie is the successful bidder, Gillespie may offset all

11   or any portion of its then unpaid Allowed Secured Claim.

12        The Class 6 Claim is fully secured, and Gillespie will not have any Deficiency Claim

13   with respect to the Class 6 Claim.

14        4.7.    Class 7 (Greatway Center Property, LLC).  Class 7 is impaired.  The amount

15   of Greatway Center Property, LLC's ("Greatway") Allowed Secured Claim will be

16   determined by agreement of Debtor and Greatway, or, absent agreement, in such amount as

17   is determined and Allowed by the Bankruptcy Court.

18        Greatway's Class 7 Claim shall be satisfied by delivery of a promissory note to

19   Greatway (the "Greatway Note") in the principal amount of its Allowed Secured Claim.  The

20   Greatway Note will bear interest from the Effective Date at a fixed per annum rate of 5%,

21   and will be payable by Reorganized Debtor as follows:

22        Commencing on the first day of the first month following the Effective Date and

23   continuing on the first day of each month thereafter until the Greatway Note has been paid in

24   full, Reorganized Debtor will make equal monthly amortizing payments of principal and

25   interest on the Greatway Note based on a twenty five year amortization schedule, with a

26   balloon payment due seven years after the Effective Date.

**Page 16 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1    The Class 7 Claim may be prepaid in full or in part at any time without any

2  prepayment penalty or premium.

3    As security for the Class 7 Claim, Greatway will retain its security interests in and

4  liens upon its Collateral with the same priority and to the same extent such security had as of

5  the Petition Date.  Reorganized Debtor will maintain the Greatway Collateral in good repair,

6  will insure the Greatway Collateral to its full useable value, and will pay any property taxes

7  with respect to such Collateral when due.  At any sale of its Collateral, Greatway will have

8  the right to bid at such sale, and if Greatway is the successful bidder, Greatway may offset all

9  or any portion of its then unpaid Allowed Secured Claim.

10    The Class 7 Claim is fully secured, and Greatway will not have any Deficiency Claim

11  with respect to the Class 7 Claim.

12    4.8.    Class 8 (Green & Frahm).  Class 8 is impaired.  The amount of Green &

13  Frahm's ("Green") Allowed Secured Claim will be determined by agreement of Debtor and

14  Green, or, absent agreement, in such amount as is determined and Allowed by the

15  Bankruptcy Court.

16    Green's Class 8 Claim shall be satisfied by delivery of a promissory note to Green

17  (the "Green Note") in the principal amount of its Allowed Secured Claim.  The Green Note

18  will bear interest from the Effective Date at a fixed per annum rate of 5%, and will be

19  payable by Reorganized Debtor as follows:

20    Commencing on the first day of the first month following the Effective Date and

21  continuing on the first day of each month thereafter until the Green Note has been paid in

22  full, Reorganized Debtor will make equal monthly amortizing payments of principal and

23  interest on the Green Note based on a twenty five year amortization schedule, with a balloon

24  payment due seven years after the Effective Date.

25    The Class 8 Claim may be prepaid in full or in part at any time without any

26  prepayment penalty or premium.

**Page 17 of 40 -**  DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

As security for the Class 8 Claim, Green will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date.  Reorganized Debtor will maintain the Green Collateral in good repair, will insure the Green Collateral to its full useable value, and will pay any property taxes with respect to such Collateral when due.  At any sale of its Collateral, Green will have the right to bid at such sale, and if Green is the successful bidder, Green may offset all or any portion of its then unpaid Allowed Secured Claim.

The Class 8 Claim is fully secured, and Green will not have any Deficiency Claim with respect to the Class 8 Claim.

4.9.    Class 9 (Ken and Lynda Martin).  Class 9 is impaired.  The amount of Ken and Lynda Martin's ("Martin") Allowed Secured Claim will be determined by agreement of Debtor and Martin, or, absent agreement, in such amount as is determined and Allowed by the Bankruptcy Court.

Martin's Class 9 Claim shall be satisfied by delivery of a promissory note to Martin (the "Martin Note") in the principal amount of its Allowed Secured Claim.  The Martin Note will bear interest from the Effective Date at a fixed per annum rate of 5%, and will be payable by Reorganized Debtor as follows:

Commencing on the first day of the first month following the Effective Date and continuing on the first day of each month thereafter until the Martin Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Martin Note based on a twenty five year amortization schedule, with a balloon payment due seven years after the Effective Date.

The Class 9 Claim may be prepaid in full or in part at any time without any prepayment penalty or premium.

As security for the Class 9 Claim, Martin will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the

**Page 18 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

Petition Date.  Reorganized Debtor will maintain the Martin Collateral in good repair, will

insure the Martin Collateral to its full useable value, and will pay any property taxes with

respect to such Collateral when due.  At any sale of its Collateral, Martin will have the right

to bid at such sale, and if Martin is the successful bidder, Martin may offset all or any portion

of its then unpaid Allowed Secured Claim.

The Class 9 Claim is fully secured, and Martin will not have any Deficiency Claim

with respect to the Class 9 Claim.

4.10.   <u>Class 10 (Protective Life)</u>.  Class 10 is impaired.  The amount of Protective

Life's Allowed Secured Claim will be determined by agreement of Debtor and Protective

Life, or, absent agreement, in such amount as is determined and Allowed by the Bankruptcy

Court.

Protective Life's Class 10 Claim shall be satisfied by delivery of a promissory note to

Protective Life (the "Protective Life Note") in the principal amount of its Allowed Secured

Claim.  The Protective Life Note will bear interest from the Effective Date at a fixed per

annum rate of 5%, and will be payable by Reorganized Debtor as follows:

Commencing on the first day of the first month following the Effective Date and

continuing on the first day of each month thereafter until the Protective Life Note has been

paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal

and interest on the Protective Life Note based on a twenty five year amortization schedule,

with a balloon payment due seven years after the Effective Date.

The Class 10 Claim may be prepaid in full or in part at any time without any

prepayment penalty or premium.

As security for the Class 10 Claim, Protective Life will retain its security interests in

and liens upon its Collateral with the same priority and to the same extent such security had

as of the Petition Date.  Reorganized Debtor will maintain the Protective Life Collateral in

good repair, will insure the Protective Life Collateral to its full useable value, and will pay

**Page 19 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1   any property taxes with respect to such Collateral when due.  At any sale of its Collateral,

2   Protective Life will have the right to bid at such sale, and if Protective Life is the successful

3   bidder, Protective Life may offset all or any portion of its then unpaid Allowed Secured

4   Claim.

5         The Class 10 Claim is fully secured, and Protective Life will not have any Deficiency

6   Claim with respect to the Class 10 Claim.

7         4.11.   Class 11 (U.S. Bank, National Association).  Class 11 is unimpaired.  Except

8   to the extent that U.S. Bank agrees to a different treatment of its Allowed Secured Claim,

9   U.S. Bank shall receive on the Effective Date, in full satisfaction of its Claim, one hundred

10  percent (100%) of the unpaid amount of its Allowed Secured Claim.

11        4.12.   Class 12 (General Unsecured Claims).  Class 12 is impaired.  Each holder of

12  an Allowed General Unsecured Claim will receive one share of Common Stock in

13  Reorganized Debtor in exchange for each $10 of its Allowed General Unsecured Claim on

14  the later of the Effective Date or the date its Claim becomes an Allowed Claim, rounded up

15  to the nearest $10.  Fractional shares will not be issued.  In addition, each holder of an

16  Allowed General Unsecured Claim shall have a Subscription Right.

17        4.13.   Class 13 (Small Unsecured Claims).  Class 13 is impaired.  Each holder of a

18  Class 13 Claim will paid by Reorganized Debtor in cash in an amount equal to 80% of its

19  Allowed Claim on or before 90 days after the Effective Date or the date its Claim becomes

20  an Allowed Claim, whichever is later.  General Unsecured Creditors may elect to reduce their

21  Allowed Claims in order to be treated as a Class 13 Claimant provided the election is made at

22  the time ballots are due for voting on the Plan, or such later date as provided in Section 8.3.

23  of this Plan.

24        4.14.   Class 14 (Equity Security Holders).  Class 14 is impaired.  All Equity

25  Securities and Employee Equity Security Plans of Debtor will be cancelled as of the

26

**Page 20 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1   Effective Date, and Equity Security Holders will not receive or retain any property under the

2   Plan on account of their Equity Securities or any Employee Equity Security Plan.

3   **ARTICLE 5**

4   **DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; SETTLEMENT**

5       5.1.   <u>Disputed Claims; Objections to Claims</u>.  Only Claims that are Allowed shall

6   be entitled to distributions under the Plan.  Except as otherwise provided in Section 5.2

7   below, Debtor reserves the right to contest and object to any Claims and previously

8   Scheduled Amounts, including, without limitation, those Claims and Scheduled Amounts

9   that are specifically referenced herein, are not listed in the Schedules, are listed therein as

10  disputed, contingent and/or unliquidated in amount, or are listed therein at a different amount

11  than Debtor currently believes is validly due and owing.  Unless extended by an Order of the

12  Bankruptcy Court, all objections to Claims and Scheduled Amounts (other than

13  Administrative Expense Claims) shall be Filed and served upon counsel for Debtor and the

14  holder of the Claim objected to on or before the later of (a) 60 days after the Effective Date

15  or (b)  60 days after the date (if any) on which a Proof of Claim is Filed in respect of a

16  Rejection Claim or Deficiency Claim.  The last day for filing objections to Administrative

17  Expense Claims shall be set pursuant to a further order of the Bankruptcy Court.  All

18  Disputed Claims shall be resolved by the Bankruptcy Court, except to the extent that

19  (a) Debtor may otherwise elect consistent with the Plan and the Bankruptcy Code or (b) the

20  Bankruptcy Court may otherwise order.

21      5.2.   <u>Subsequent Allowance of Disputed Claims</u>.  The holder of a Disputed Claim

22  that becomes Allowed in full or in part subsequent to the Effective Date shall receive the

23  distributions they would have received after the Effective Date had the Claim been Allowed

24  at that time.  Until a Disputed Claim is Allowed or disallowed, Reorganized Debtor shall

25  hold any distribution that would have been due to the holder in respect of such Disputed

26  Claim.

**Page 21 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**ARTICLE 6**

**RIGHTS OFFERING**

6.1.    <u>Introduction</u>.  Debtor shall have the right to consummate the Rights Offering on or before the Effective Date if it determines, in its sole discretion, that it is desirable and feasible to do so.  If Debtor decides to consummate the Rights Offering, it may do so with or without a Backstop Party.  Proceeds from the Rights Offering must be deposited in a separate account through the Effective Date, after which such proceeds may be released to Reorganized Debtor.

6.2.    <u>Issuance of Rights</u>.  Each Rights Offering Participant will receive Subscription Rights to subscribe for up to its Pro Rata Share of the Rights Offering Shares (each such subscription a "Primary Offering Subscription"), for an aggregate purchase price equal to the applicable Subscription Payment Amount.  The Rights Offering Shares will be issued to the Rights Offering Purchasers at a price per share equal to the Subscription Price.

6.3.    <u>Subscription Period</u>.  The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Deadline.  Each Rights Offering Participant that intends or desires to participate in the Rights Offering must affirmatively elect to exercise its Subscription Rights and provide written notice thereof to the parties specified in the Subscription, on or prior to the Subscription Deadline in accordance with the terms of the Plan and the Subscription.  On the Subscription Deadline, if there is a Backstop Party, the Remaining Rights Offering Shares shall be allocated to, and may be purchased by, the Backstop Party.

6.4.    <u>Exercise of Subscription Rights and Payment of Subscription Payment Amount</u>.  On the Subscription Commencement Date, Debtor will mail the Subscription to each Rights Offering Participant known as of the Rights Offering Record Date, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription, as well as instructions for the payment of the Subscription Payment Amount for

**Page 22 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1   that portion of the Subscription Rights sought to be exercised by such Entity.  Debtor may

2   adopt such additional detailed procedures consistent with the provisions of the Plan to more

3   efficiently administer the exercise of the Subscription Rights.  In order to exercise the

4   Subscription Rights, each Rights Offering Participant must return a duly completed

5   Subscription (making a binding and irrevocable commitment to participate in the Rights

6   Offering) to Debtor or other Party specified in the Subscription so that such Subscription and

7   the Subscription Payment Amount is actually received by Debtor or such other Party on or

8   before the Subscription Deadline.  In order to exercise its Subscription Rights, a Rights

9   Offering Participant may subscribe for its entire Pro Rata Share of the Rights Offering Shares

10  or only a part of its Pro Rata Share of the Rights Offering Shares.  If Debtor or such other

11  Party for any reason does not receive from a given holder of Subscription Rights a duly

12  completed Subscription on or prior to the Subscription Deadline, then such holder shall be

13  deemed to have forever and irrevocably relinquished and waived its right to participate in the

14  Rights Offering.  On the Subscription Notification Date, Debtor will notify each Rights

15  Offering Purchaser of its respective allocated portion of Rights Offering Shares, and if there

16  is a Backstop Party, Debtor will notify the Backstop Party after the Subscription Deadline of

17  its portion of the Remaining Rights Offering Shares that the Backstop Party may purchase

18  pursuant to the Backstop Rights Purchase Agreement.  Each Rights Offering Purchaser (other

19  than the Backstop Party, if applicable) must tender its Subscription Payment Amount to

20  Debtor so that it is actually received on or prior to the Subscription Deadline.  Any Rights

21  Offering Purchaser who fails to tender its Subscription Payment Amount so that it is received

22  on or prior to the Subscription Deadline shall be deemed to have forever and irrevocably

23  relinquished and waived its right to participate in the Rights Offering.  Debtor shall hold the

24  payments it receives for the exercise of Subscription Rights in a separate account.  In the

25  event the conditions to the Effective Date are not met or waived, such payments shall be

26

**Page 23 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1 returned, without accrual or payment of any interest thereon, to the applicable Rights

2 Offering Purchaser, without reduction, offset or counterclaim.

3       6.5.    <u>Rights Offering Backstop</u>.  If there is a Backstop Party for the Rights

4 Offering, Debtor and the Backstop Party will enter into the Backstop Rights Purchase

5 Agreement.  In accordance with the Backstop Rights Purchase Agreement, the Backstop

6 Party will be entitled to purchase all or some lesser amount of the Remaining Rights Offering

7 Shares for a per-share price equal to the Subscription Price.  As part of the Backstop Rights

8 Purchase Agreement, Debtor may grant certain rights and protections to the Backstop Party

9 that are not granted to other Rights Offering Participants.

10       6.6.    <u>Number of Rights Offering Shares</u>.  The maximum number of Rights Offering

11 Shares to be sold pursuant to the Rights Offering shall be determined by dividing the Rights

12 Offering Amount by the Subscription Price.

13       6.7.    <u>No Transfer; Detachment Restrictions; No Revocation</u>.  The Subscription

14 Rights are not transferable or detachable.  Any such transfer or detachment, or attempted

15 transfer or detachment, will be null and void and Debtor will not treat any purported

16 transferee of the Subscription Rights separate from the associated Class 12 Claims as the

17 holder of any Subscription Rights.  Once a Rights Offering Participant has exercised any of

18 its Subscription Rights by properly executing and delivering a Subscription to Debtor or

19 other Entity specified in the Subscription, such exercise may only be revoked, rescinded or

20 annulled in the sole discretion of Debtor or Reorganized Debtor.  On, or as soon as

21 reasonably practicable after, the Effective Date, Reorganized Debtor or other applicable

22 disbursing agent shall distribute the Rights Offering Shares purchased by each Rights

23 Offering Purchaser.

24       6.8.    <u>Validity of Exercise of Subscription Rights</u>.  All questions concerning the

25 timeliness, validity, form, and eligibility of any exercise, or purported exercise, of

26 Subscription Rights shall be determined by Debtor or Reorganized Debtor.  Debtor or

**Page 24 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1    Reorganized Debtor, in their discretion, reasonably exercised in good faith, may waive any

2    defect or irregularity, or permit a defect or irregularity to be corrected within such times as

3    they may determine, or reject the purported exercise of any Subscription Rights.

4    Subscriptions shall be deemed not to have been received or accepted until all irregularities

5    have been waived or cured within such time as Debtor or Reorganized Debtor determine in

6    their discretion reasonably exercised in good faith.  Debtor or Reorganized Debtor will use

7    commercially reasonable efforts to give written notice to any Rights Offering Participant

8    regarding any defect or irregularity in connection with any purported exercise of Subscription

9    Rights by such Entity and may permit such defect or irregularity to be cured within such time

10   as they may determine in good faith to be appropriate; provided, however, that neither Debtor

11   or Reorganized Debtor, nor any of their predecessors, successors, assigns, present and former

12   affiliates and subsidiaries, or any of their respective current and former officers, directors,

13   principals, employees, shareholders, partners, agents, financial advisors, attorneys,

14   accountants, investment bankers, investment advisors, consultants, representatives, and other

15   professionals, in each case acting in such capacity on or any time after the Petition Date, and

16   any Entity claiming by or through any of them, shall incur any liability for giving, or failing

17   to give, such notification and opportunity to cure.  Once a Rights Offering Participant has

18   timely and validly exercised its Subscription Rights, subject to the occurrence or satisfaction

19   of all conditions precedent to the Rights Offering and to the Rights Offering Participants'

20   participation in same, and notwithstanding the subsequent disallowance of any or all of its

21   underlying Claim, such Rights Offering Participant's right to participate in the Rights

22   Offering will be irreversible and shall not be subject to dissolution, avoidance or

23   disgorgement, and shall not be withheld from such Rights Offering Participant on account of

24   such disallowance.

25

26

**Page 25 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

6.9.    Rights Offering Proceeds.  The proceeds of the Rights Offering will be used to

fund Cash payments contemplated by the Plan and for Reorganized Debtor's operating

needs.

## ARTICLE 7

## MEANS FOR EXECUTION OF PLAN

7.1.    Continued Corporate Existence.  Debtor, as Reorganized Debtor, shall

continue to exist after the Effective Date, with all the powers of a corporation under

applicable law.

7.2.    Restated Articles of Incorporation and Bylaws.  Reorganized Debtor shall be

deemed to have adopted the Restated Articles of Incorporation and Restated Bylaws on the

Effective date, and shall promptly thereafter cause the Restated Articles of Incorporation to

be filed with the Secretary of State of the State of the State of Oregon.  After the Effective

Date, Reorganized Debtor may amend the Restated Articles of Incorporation and may amend

its Restated Bylaws in accordance with the Restated Articles of Incorporation, Restated

Bylaws, and applicable state law.

7.3.    Cancellation of Existing Equity Securities and Employee Equity Security

Plans.  As of the Effective Date, all outstanding shares of stock (whether common or

preferred), and all awards of any kind consisting of shares of stock of Debtor and all

Employee Equity Security Plans, that have been or may be existing, granted, held, awarded,

outstanding, payable, or reserved for issuance, and all other Equity Securities, shall, without

any further corporate action, be cancelled and retired and shall cease to exist.  This

cancellation does not apply with respect to any Common Stock or any other equity securities

or rights to acquire or receive equity securities or any other awards of any kind that are

issued in accordance with or pursuant to the Plan.

7.4.    Issuance of New Common Stock.  On the Effective Date, each holder of an

Allowed Class 12 Claim (General Unsecured Claim) shall be issued one share of Common

**Page 26 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1   Stock in exchange for each $10 of such holder's Allowed Class 12 Claim, rounded up to the

2   nearest $10, for a total issuance of approximately 6,000,000 shares.  No fractional shares will

3   be issued.  If the Allowed amount of a Class 12 Claim is not determined or is subject to

4   dispute, then the Common Stock will be issued to the holder of that Claim when the Claim is

5   Allowed.  Sufficient shares of Common Stock will be reserved for issuance to Class 12

6   claimants when their Claim is Allowed.  Reorganized Debtor will also reserve approximately

7   800,000 to 1,000,000 shares of Common Stock for issuance in accordance with Reorganized

8   Debtor's Employee Stock Incentive Plan for services rendered after the Effective Date, with

9   the final number to be determined upon completion of the Rights Offering to represent

10  approximately 12%, on a fully diluted basis, of all shares of Common Stock issued and

11  reserved for issuance immediately following the Effective Date.  These shares of Common

12  Stock reserved for issuance under the Employee Stock Incentive Plan will be issued, if at all,

13  only with the approval of the Board of Directors of Reorganized Debtor following the

14  Effective Date.

15        7.5.    Exit Financing.  Debtor will negotiate and obtain, and enter into agreements

16  with respect to, Exit Financing which Exit Financing will, among other things, provide the

17  funds necessary to pay U.S. Bank in full on the Effective Date and will provide working

18  capital for Reorganized Debtor.  Debtor may enter into such agreements and execute such

19  documents with respect to the Exit Financing without the necessity of obtaining additional

20  Bankruptcy Court approval.

21        7.6.    Subordination Agreements.  In connection with any distributions (of Cash,

22  stock, or otherwise) to be made under this Plan, Reorganized Debtor will comply with all

23  subordination agreements that are outstanding and in existence as of the Effective Date

24  which pertain to Debtor or any debts or obligations owing by Debtor, and all distributions to

25  Creditors under this Plan shall remain subject to such subordination agreements.

26

**Page 27 of 40 -**  DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

7.7.    Board of Directors.  The initial Board of Directors of Reorganized Debtor

shall be composed of (a) three directors designated by Endeavour and THL, (b) one director

designated by the Committee, and (c) Douglas Nidiffer.  The identities of the members of the

initial Board of Directors of Reorganized Debtors shall be disclosed by Endeavour, THL and

the Committee at or prior to the confirmation hearing.  Thereafter, the Board of Directors of

Reorganized Debtor shall be elected by the shareholders of Reorganized Debtor in

accordance with the Restated Articles of Incorporation and applicable nonbankruptcy law.

7.8.    Corporate Action.  Upon entry of the Confirmation Order, all actions

contemplated by the Plan shall be authorized and approved in all respects (subject to the

provisions of the Plan), including, without limitation, the adoption and filing of the Restated

Articles of Incorporation, approval of the Restated Bylaws, approval of the Employee Stock

Incentive Plan, the election or appointment, as applicable, of directors and officers for

Reorganized Debtor, the termination of all Employee Equity Security Plans, and the issuance

of the Common Stock.  The appropriate officers of Reorganized Debtor are authorized and

directed to execute and deliver the agreements, documents, and instruments contemplated by

the Plan and the Disclosure Statement in the name of and on behalf of Reorganized Debtor.

7.9.    Employee Stock Incentive Plan.  On the Effective Date, the Employee Stock

Incentive Plan shall become effective immediately without any further corporate or other

action.

7.10.    Setoffs.  Debtor may, but shall not be required to, set off against any Claim

and the distributions to be made pursuant to the Plan in respect of such Claim any claims of

any nature whatsoever that Debtor may have against the holder of such Claim, but neither the

failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release

of any such claim Debtor may have against such holder.

7.11.    Utility Deposits.  All utilities holding a Utility Deposit shall immediately after

the Effective Date return or refund such Utility Deposit to Reorganized Debtor.  At the sole

**Page 28 of 40 -**  DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1   option of Reorganized Debtor may apply any Utility Deposit that has not been refunded to

2   Reorganized Debtor in satisfaction of any payments due or to become due from Reorganized

3   Debtor to a utility holding such a Utility Deposit.

4        7.12.   Event of Default; Remedy.  Any material failure by Reorganized Debtor to

5   perform any term of this Plan, which failure continues for a period of 10 Business Days

6   following receipt by Reorganized Debtor of written notice of such default from the holder of

7   an Allowed Claim to whom performance is due, shall constitute an Event of Default.  Upon

8   the occurrence of an Event of Default, the holder of an Allowed Claim to whom performance

9   is due shall have all rights and remedies granted by law, this Plan, or any agreement between

10   the holder of such Claim and Debtor or Reorganized Debtor.  An Event of Default with

11   respect to one Claim shall not be an Event of Default with respect to any other Claim.

12        7.13.   Conditions Precedent to Effectiveness of Plan.  Unless waived by Debtor, the

13   following conditions must occur and be satisfied for the Plan to become effective, and are

14   conditions precedent to the Effective Date:

15           (a)    The Bankruptcy Court shall have entered the Confirmation Order, in

16   form and substance reasonably satisfactory to Debtor, which shall, among other things,

17   provide that any and all executory contracts and unexpired leases assumed pursuant to the

18   Plan shall remain in full force and effect for the benefit of Reorganized Debtor

19   notwithstanding any provision in any such contract or lease or in applicable law (including

20   those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits,

21   restricts, or conditions such transfer or that enables or requires termination or modification of

22   such contract or lease; and

23           (b)    All documents, instruments, and agreements, each in form and

24   substance satisfactory to Reorganized Debtor, provided for or necessary to implement this

25   Plan shall have been executed and delivered by the parties thereto, unless such execution or

26   delivery has been waived by the party to be benefitted thereby;

**Page 29 of 40 -**  DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

(c)     The Exit Financing shall have closed and all conditions to funding shall have been satisfied or waived; and

(d)     In the event Debtor decides to consummate the Rights Offering, the proceeds thereof shall have been deposited in a separate account as provided in Section 6.1.

## ARTICLE 8

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1.     <u>Assumption and Rejection</u>.  Except as may otherwise be provided, all executory contracts of Debtor that are not otherwise subject to a prior Bankruptcy Court order or pending motion before the Bankruptcy Court will be deemed assumed by Debtor as of the Effective Date and will be enforceable by the parties thereto in accordance with their terms; provided that no provision relating to default by reason of insolvency or the filing of the Bankruptcy Case shall be enforceable against Reorganized Debtor or its successors or assigns.  The Confirmation Order shall constitute an order authorizing the assumption and assignment of all executory contracts that are subject to a pending motion to assume or a pending motion to assume and assign.  Reorganized Debtor shall promptly after the Effective Date pay all amounts required under Section 365 of the Bankruptcy Code to cure any defaults for executory contracts and unexpired leases being assumed and shall perform its obligations from and after the Effective Date in the ordinary course of business.

8.2.     <u>Assignment</u>.  Except as may be otherwise provided in this Plan, the Confirmation Order, or other Order of the Bankruptcy Court, all executory contracts shall be deemed assigned to Reorganized Debtor as of the Effective Date.  The Confirmation Order shall constitute an order authorizing such assignment of assumed executory contracts, and no further assignment documentation shall be necessary to effectuate such assignment.

8.3.     <u>Rejection Claims</u>.  Rejection Claims must be Filed on the later of April 9, 2014 or 30 days after the entry of the order rejecting the executory contract or unexpired lease.  Any Rejection Claim not Filed within such time shall be forever barred from asserting

**Page 30 of 40 -**  DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

such Claim against Debtor or Reorganized Debtor, their property, estate, and any guarantors of such obligations.  Each Rejection Claim resulting from such rejection shall constitute a Small or General Unsecured Claim, as applicable.  Any election to be treated as a Small Unsecured Claim by the holder of a Rejection Claim arising from an order entered on or after the time ballots are due for voting on the Plan shall be made on the date the Rejection Claim is Filed.

## ARTICLE 9

## EFFECT OF CONFIRMATION

9.1.    <u>Debtor's Injunction</u>.  The effect of confirmation shall be as set forth in Section 1141 of the Bankruptcy Code.  Except as otherwise provided in the Plan or in the Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable to entities against (a) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against Debtor or Reorganized Debtor that was or could have been commenced before the entry of the Confirmation Order; (b) the enforcement against Reorganized Debtor, or its assets of a judgment obtained before the Petition Date; and (c) any act to obtain possession of or to exercise control over, or to create, perfect, or enforce a lien upon, all or any part of the assets of Reorganized Debtor.

9.2.    <u>Discharge</u>.  Except as otherwise expressly provided herein, the confirmation of the Plan shall, provided that the Effective Date shall have occurred, discharge all Claims to the fullest extent authorized or provided for by the Bankruptcy Code, including, without limitation, to the extent authorized or provided for by Sections 524 and 1141 thereof

**Page 31 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**ARTICLE 10**

**RETENTION OF JURISDICTION**

10.1.    Notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code to:

(a)    classify the Claim or interest of any Creditor or stockholder, reexamine Claims or Interests that have been owed for voting purposes, and determine any objections that may be Filed to Claims or Interests;

(b)    determine requests for payment of Claims entitled to priority under Section 507(a) of the Bankruptcy Code, including compensation and reimbursement of expenses in favor of professionals employed at the expense of the bankruptcy estate;

(c)    avoid transfers or obligations to subordinate Claims under Chapter 5 of the Bankruptcy Code;

(d)    approve the assumption, assignment, or rejection of an executory contract or an unexpired lease pursuant to this Plan and resolve any related matters;

(e)    resolve controversies and disputes regarding the interpretation of this Plan;

(f)    implement the provisions of this Plan and enter orders in aid of confirmation;

(g)    determine the validity, priority or extent of any Claim or Claim of lien, and resolve any Disputed Claims;

(h)    adjudicate adversary proceedings and contested matters pending or hereafter commenced in this Bankruptcy Case;

(i)    order and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

**Page 32 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1     (j)  hear and determine any proceeding that involves applications to

2 modify the Plan, to cure any defect or omission, or to reconcile any inconsistency that may

3 arise in connection with the Plan or related documents or in any order of the Bankruptcy

4 Court, including the Confirmation Order;

5     (k)  determine any other matters that may arise in connection with or are

6 related to this Plan, the Disclosure Statement, the Confirmation Order or any contract,

7 instrument, release or other agreement or document created in connection with this Plan or

8 the Disclosure Statement

9     (l)  ensure that distributions to holders of Allowed Claims are

10 accomplished as provided herein;

11     (m)  to the extent that Bankruptcy Court approval is required, to consider

12 and act on the compromise and settlement of any Claim or cause of action by or against the

13 Debtor's estate;

14     (n)  to determine the scope of any discharge of any Debtor under this Plan

15 or the Bankruptcy Code;

16     (o)  to recover all assets of the Debtor and property of the Debtor's estate,

17 wherever located;

18     (p)  determine any and all motions, adversary proceedings, applications,

19 and contested or litigated matters that may be pending on the Effective Date or that, pursuant

20 to this Plan, may be instituted by the Reorganized Debtor after the Effective Date;

21     (q)  hear and determine applications for allowances of compensation and

22 reimbursement of expenses of professionals under sections 330 and 331 of the Bankruptcy

23 Code and any other fees and expenses authorized to be paid or reimbursed under this Plan;

24     (r)  hear and determine any other matters related hereto and not

25 inconsistent with Chapter 11 of the Bankruptcy Code; and

26     (s)  enter a final decree closing this Bankruptcy Case.

**Page 33 of 40 -** DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    In the event the Bankruptcy Court is not permitted under applicable law to preside

2    over any of the foregoing matters, the reference to the Bankruptcy Court in this Article 9

3    shall be deemed to be replaced by the United States District Court for the District of Oregon

4    having jurisdiction over this Chapter 11 case.  Nothing in this Article 9 shall expand the

5    exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

**ARTICLE 11**

**ADMINISTRATIVE PROVISIONS**

8    11.1.  <u>Dissolution of the Committee</u>.  The Committee shall continue in existence

9    until the Effective Date to exercise those powers and perform those duties specified in

10   section 1103 of the Bankruptcy Code.  On the later of: (1) the Effective Date; and (2) the

11   conclusion of any appeals or other challenges or matters with respect to the Confirmation

12   Order, the Committee shall be dissolved and its members shall be deemed released of all

13   their duties, responsibilities and obligations in connection with the Bankruptcy Case or this

14   Plan and its implementation, except with respect to the review of and right to be heard in

15   connection with all professionals' claims for compensation for services rendered or

16   reimbursement for expenses incurred, and the retention or employment of the Committee's

17   attorneys, financial advisors, and other agents shall terminate as of the Effective Date;

18   provided, however, such attorneys and financial advisors shall be entitled to pursue their own

19   claims for compensation for services rendered or reimbursement for expenses incurred and

20   represent the Committee in connection with the review of and the right to be heard in

21   connection with all professionals' claims for compensation for services rendered or

22   reimbursement for expenses incurred.  Following the Confirmation Date, in accordance with

23   the foregoing, the attorneys and financial advisors to the Committee shall be entitled to

24   request any reasonable claims for compensation for services rendered or reimbursement for

25   expenses incurred after the Confirmation Date through and including the dissolution of the

26   Committee in connection with services to the Committee.  The Reorganized Debtor shall

**Page 34 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1   pay, within ten (10) Business Days after submission of a detailed invoice to the Reorganized

2   Debtor, such reasonable claims for compensation or reimbursement of expenses incurred by

3   the professionals of the Committee.  If the Reorganized Debtor disputes the reasonableness

4   of any such invoice, the Reorganized Debtor or the affected professional may submit such

5   dispute to the Bankruptcy Court for a determination of the reasonableness of any such

6   invoice, and the disputed portion of such invoice shall not be paid until the dispute is

7   resolved.  The undisputed portion of such reasonable fees and expenses shall be paid as

8   provided herein.

9        11.2.   Final Fee Applications.  Professionals shall file their final fee applications

10  under Section 330 of the Bankruptcy Code no later than 20 days after the Effective Date.

11       11.3.   Modification or Withdrawal of the Plan.  Debtor may alter, amend, or modify

12  the Plan pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 at any

13  time prior to the time the Bankruptcy Court has signed the Confirmation Order.  After such

14  time, and prior to the substantial consummation of the Plan, Reorganized Debtor may, so

15  long as the treatment of holders of Claims and Interests under the Plan is not adversely

16  affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to

17  reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation

18  Order, and any other matters as may be necessary to carry out the purposes and effects of the

19  Plan; provided, however, that prior notice of such proceedings shall be served in accordance

20  with Bankruptcy Rule 2002.

21       11.4.   Revocation or Withdrawal of Plan

22           11.4.1.   Right to Revoke.  Debtor, in consultation with the Committee,

23  reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.

24           11.4.2.   Effect of Withdrawal or Revocation.  If Debtor revokes or withdraws

25  the Plan prior to the Effective Date, then the Plan shall be deemed null and void.  In such

26  event, nothing contained herein shall be deemed to constitute a waiver or release of any

**Page 35 of 40 -**  DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1    claims by or against Debtor or any other Entity, or to prejudice in any manner the rights of

2    Debtor or any Entity in any further proceeding involving Debtor.

3         11.5.    <u>Nonconsensual Confirmation</u>.  Debtor shall request that the Bankruptcy Court

4    confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of

5    all provisions of Section 1129(a) of the Bankruptcy Code, except Subsection 1129(a)(8), are

6    met.

7                                          **ARTICLE 12**

8                              **MISCELLANEOUS PROVISIONS**

9         12.1.    <u>Revesting</u>.  Except as otherwise expressly provided herein, on the Effective

10   Date all property and assets of the estate of Debtor shall revest in Reorganized Debtor free

11   and clear of all Claims, liens, encumbrances, charges, and other interests arising on or before

12   the Effective Date, and Reorganized Debtor may operate, from and after the Effective Date,

13   free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

14        12.2.    <u>Cancellation of Documents Evidencing Claims</u>.  As of the Effective Date

15   (subject to resolution of any objection to the Claim if a Disputed Claim), any note,

16   agreement, instrument, judgment, or other document evidencing a Claim in any Class shall

17   be deemed cancelled, null, and void, except for the right, if any, to receive distributions under

18   this Plan; provided, however, that nothing herein shall affect the liability of any entity other

19   than Debtor on, or the property of any entity other than Debtor for, such Claim.

20        12.3.    <u>Rights of Action</u>.  Except as otherwise expressly provided herein, any claims,

21   rights, interests, causes of action, defenses, counterclaims, crossclaims, third-party claims, or

22   rights of offset, recoupment, subrogation, or subordination, including, without limitation,

23   claims under Section 550(a) of the Bankruptcy Code or any of the sections referenced therein

24   (including, without limitation, any and all Avoidance Actions) accruing to Debtor shall

25   remain assets of Reorganized Debtor, who shall have the sole right to enforce its rights.

26   Reorganized Debtor may pursue such rights of action, as appropriate, in accordance with its

**Page 36 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1    sole best interests and for its sole benefit.  Notwithstanding anything to the contrary in this

2    Section, any beneficiary to a contractual subordination agreement may seek to enforce such

3    agreements.

4         12.4.    Governing Law.  Except to the extent the Bankruptcy Code, the Bankruptcy

5    Rules, or other federal laws as applicable, the laws of the State of Oregon shall govern the

6    construction and implementation of the Plan, and all rights and obligations arising under the

7    Plan.

8         12.5.    Withholding and Reporting Requirements.  In connection with the Plan and

9    all instruments issued in connection therewith and distributions thereon, Debtor and

10   Reorganized Debtor shall comply with all withholding, reporting, certification, and

11   information requirements imposed by any federal, state, local, or foreign taxing authorities

12   and all distributions hereunder shall, to the extent applicable, be subject to any such

13   withholding, reporting, certification, and information requirements.  Entities entitled to

14   receive distributions hereunder shall, as a condition to receiving such distributions, provide

15   such information and take such steps as Reorganized Debtor may reasonably require to

16   ensure compliance with such withholding and reporting requirements, and to enable

17   Reorganized Debtor to obtain the certifications and information as may be necessary or

18   appropriate to satisfy the provisions of any tax law.

19        12.6.    Time.  Unless otherwise specified herein, in computing any period of time

20   prescribed or allowed by the Plan, the day of the act or event from which the designated

21   period begins to run shall not be included.  The last day of the period so computed shall be

22   included, unless it is not a Business Day, in which event the period runs until the end of the

23   next succeeding day that is a Business Day.

24        12.7.    Section 1145 Exemption.  The issuance and distribution of all the shares of

25   Common Stock hereunder shall be exempt, pursuant to section 1145 of the Bankruptcy Code,

26   from registration under (i) the Securities Act of 1933, as amended, and all rules and

**Page 37 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1   regulations promulgated thereunder and (ii) any state or local law requiring registration of for

2   the offer, issuance, or distribution of securities.

3       12.8.   Section 1146(c) Exemption.  Pursuant to Section 1146(c) of the Bankruptcy

4   Code, the issuance, transfer, or exchange of any security under the Plan, or the execution,

5   delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as

6   contemplated by the Plan, or the revesting, transfer, or sale of any real property of Debtor or

7   Reorganized Debtor pursuant to, in implementation of, or as contemplated by the Plan, shall

8   not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or

9   fee.  Consistent with the foregoing, each recorder of deeds or similar official for any city,

10  county or governmental unit in which any instrument hereunder is to be recorded shall,

11  pursuant to the Confirmation Order, be ordered and directed to accept such instrument

12  without requiring the payment of any documentary stamp tax, deed stamps, transfer tax,

13  intangible tax, or similar tax.

14      12.9.   Severability.  In the event any provision of the Plan is determined to be

15  unenforceable, such determination shall not limit or affect the enforceability and operative

16  effect of any other provisions of the Plan.  To the extent any provision of the Plan would, by

17  its inclusion in the Plan, prevent or preclude the Bankruptcy Court from entering the

18  Confirmation Order, the Bankruptcy Court, on the request of Debtor, may modify or amend

19  such provision, in whole or in part, as necessary to cure any defect or remove any

20  impediment to the confirmation of the Plan existing by reason of such provision.

21      12.10.  Binding Effect.  The provisions of the Plan shall bind Debtor and Reorganized

22  Debtor, and all Creditors and Equity Security Holders, and their respective successors, heirs,

23  and assigns.

24      12.11.  Retiree Benefits.  On or after the Effective Date, to the extent required by

25  Section 1129(a)(13) of the Bankruptcy Code, Reorganized Debtor shall continue to pay all

26  retiree benefits (if any) as that term is defined in Section 1114 of the Bankruptcy Code,

**Page 38 of 40 -**  DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

1   maintained or established by Debtor prior to the Effective Date, without prejudice to

2   Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend or

3   terminate the foregoing arrangements.

4       12.12.  <u>Recordable Order</u>.  The Confirmation Order shall be deemed to be in

5   recordable form, and shall be accepted by any recording officer for filing and recording

6   purposes without further or additional orders, certifications or other supporting documents.

7       12.13.  <u>Plan Controls</u>.  In the event and to the extent that any provision of the Plan is

8   inconsistent with the provisions of the Disclosure Statement, or any other instrument or

9   agreement contemplated to be executed pursuant to the Plan, the provisions of the Plan shall

10  control and take precedence.

11      12.14.  <u>Effectuating Documents and Further Transactions</u>.  Debtor and Reorganized

12  Debtor are authorized to execute, deliver, file, or record such contracts, instruments,

13  assignments, and other agreements or documents, and take or direct such actions as may be

14  necessary or appropriate to effectuate and further evidence the terms and conditions of this

15  Plan.

16      12.15.  <u>Timing of Actions</u>.  Notwithstanding anything to the contrary herein, any

17  action required by the Plan to be taken on the Effective Date shall be made or taken on the

18  Effective Date or as soon as practical thereafter, but in any event within 20 days of the

19  Effective Date.

20      12.16.  <u>Courts of Competent Jurisdiction</u>.  If the Bankruptcy Court abstains from

21  exercising, or declines to exercise, jurisdiction, or is otherwise without jurisdiction over any

22  matter arising out of this Plan, such abstention, refusal, or failure of jurisdiction shall have no

23  effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other

24  court having competent jurisdiction with respect to such matter.

25

26

**Page 39 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

12.17.  <u>Exhibits and Schedules</u>.  Any exhibits or schedules to this Plan are incorporated into, and are part of, the Plan as if set forth herein.

DATED this 31st day of January, 2014.

C & K MARKET, INC.


By /s/ Edward C. Hostmann
    Edward C. Hostmann
    Chief Restructuring Officer

Presented by:

TONKON TORP LLP


By /s/ Albert N. Kennedy
    Albert N. Kennedy, OSB No. 821429
    Timothy J. Conway, OSB No. 851752
    Michael W. Fletcher, OSB No. 010448
    Ava L. Schoen, OSB No. 044072
    Of Attorneys for Debtor

034518/00017/5190086v7

**Page 40 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

# EXHIBIT 1

## EMPLOYEE STOCK INCENTIVE PLAN

## C & K MARKET, INC.
## 2014 STOCK INCENTIVE PLAN

**Section 1.    Establishment and Purpose.**

(a)    The purpose of the Plan is to offer selected individuals an opportunity to acquire a proprietary interest in the success of C & K Market, Inc., an Oregon corporation (the "**Corporation**"), or to increase such interest, by purchasing Shares of the Corporation's Stock. The Plan provides both for the direct award or sale of Shares and for the grant of Options to purchase Shares.  Options granted under the Plan may include Nonstatutory Options as well as ISOs intended to qualify under Section 422 of the Code.

(b)    Capitalized terms are defined in <u>Section 12</u>.

**Section 2.    Administration**.

(a)    **Committees of the Board of Directors**.  The Plan may be administered by one or more Committees.  Each Committee shall consist of two or more members of the Board of Directors who have been appointed by the Board of Directors.  Each Committee shall have such authority and be responsible for such functions as the Board of Directors has assigned to it.  If no Committee has been appointed, the entire Board of Directors shall administer the Plan.  Any reference to the Board of Directors in the Plan shall be construed as a reference to the Committee (if any) to whom the Board of Directors has assigned a particular function.

(b)    **Authority of the Board of Directors**.  Subject to the provisions of the Plan, the Board of Directors shall have full authority and discretion to take any actions it deems necessary or advisable for the administration of the Plan.  All decisions, interpretations and other actions of the Board of Directors shall be final and binding on all Purchasers, all Optionees and all persons deriving their rights from a Purchaser or Optionee.

**Section 3.    Eligibility**.

(a)    **General Rule**.  Only Employees, Outside Directors and Consultants shall be eligible for the grant of Options or the direct award or sale of Shares.  Only Employees shall be eligible for the grant of ISOs.

(b)    **Ten-Percent Shareholders**.  An individual who owns more than 10% of the total combined voting power of all classes of outstanding stock of the Corporation, its Parent or any of its Subsidiaries shall not be eligible for the grant of an ISO unless (i) the Exercise Price is at least 110% of the Fair Market Value of a Share on the date of grant and (ii) such ISO by its terms is not exercisable after the expiration of five years from the date of grant.  For purposes of this <u>Section 3(b)</u>, in determining stock ownership, the attribution rules of Section 424(d) of the Code shall be applied.

EXHIBIT 1
Page 1 of 9

**Section 4.**    **Stock Subject to Plan**.

(a)    **Basic Limitation**.  Shares offered under the Plan shall be authorized but unissued Shares.  The aggregate number of Shares that may be issued under the Plan (upon exercise of Options or other rights to acquire Shares) shall not exceed _____ Shares, subject to adjustment pursuant to <u>Section 8</u>.  The number of Shares that are subject to Options or other rights outstanding at any time under the Plan shall not exceed the number of Shares that then remain available for issuance under the Plan.  The Corporation, during the term of the Plan, shall at all times reserve and keep available sufficient Shares to satisfy the requirements of the Plan.

(b)    **Additional Shares**.  In the event that any outstanding Option or other right for any reason expires or is canceled or otherwise terminated, the Shares allocable to the unexercised portion of such Option or other right shall again be available for the purposes of the Plan.  In the event that Shares issued under the Plan are reacquired by the Corporation pursuant to any forfeiture provision, right of repurchase or right of first refusal, such Shares shall again be available for the purposes of the Plan, except that the aggregate number of Shares which may be issued upon the exercise of ISOs shall in no event exceed _____ Shares (subject to adjustment pursuant to <u>Section 8</u>).

**Section 5.**    **Terms and Conditions of Awards or Sales**.

(a)    **Restricted Stock Agreement**.  Each award or sale of Shares under the Plan (other than upon exercise of an Option) shall be evidenced by a Restricted Stock Agreement between the Purchaser and the Corporation.  Such award or sale shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions which are not inconsistent with the Plan and which the Board of Directors deems appropriate for inclusion in a Restricted Stock Agreement.  The provisions of the various Restricted Stock Agreements entered into under the Plan need not be identical.

(b)    **Nontransferability of Rights**.  Any right to acquire Shares under the Plan (other than an Option) shall not be transferable and shall be exercisable only by the Purchaser to whom such right was granted.

(c)    **Purchase Price**.  The Purchase Price of Shares to be offered under the Plan shall be determined by the Board of Directors at its sole discretion.  The Purchase Price shall be payable in a form described in <u>Section 7</u>.

(d)    **Withholding Taxes**.  As a condition to the purchase of Shares, the Purchaser shall make such arrangements as the Board of Directors may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with such purchase.

(e)    **Restrictions on Transfer of Shares**.  Any Shares awarded or sold under the Plan shall be subject to such special forfeiture conditions, rights of repurchase, rights of first refusal and other transfer restrictions as the Board of Directors may determine.  Such restrictions shall be set forth in the applicable Restricted Stock Agreement and shall apply in addition to any restrictions that may apply to holders of Shares generally.

C & K Market, Inc. 2014 Stock Incentive Plan
Page 2

EXHIBIT 1
Page 2 of 9

(f)    **Accelerated Vesting**.  Unless the applicable Restricted Stock Agreement provides otherwise, any right to repurchase a Purchaser's Shares at the original Purchase Price (if any) upon termination of the Purchaser's Service shall lapse and all of such Shares shall become vested if:

(i)    The Corporation is subject to a Change in Control before the Purchaser's Service terminates; and

(ii)    The repurchase right is not assigned to the entity that employs the Purchaser immediately after the Change in Control or to its parent or subsidiary.

(iii)    A Restricted Stock Agreement may also provide for accelerated vesting in the event of the Optionee's death or disability or other events.

**Section 6.    Terms and Conditions of Options**.

(a)    **Stock Option Agreement**.  Each grant of an Option under the Plan shall be evidenced by a Stock Option Agreement between the Optionee and the Corporation.  Such Option shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions which are not inconsistent with the Plan and which the Board of Directors deems appropriate for inclusion in a Stock Option Agreement.  The provisions of the various Stock Option Agreements entered into under the Plan need not be identical.

(b)    **Number of Shares**.  Each Stock Option Agreement shall specify the number of Shares that are subject to the Option and shall provide for the adjustment of such number in accordance with Section 8.  The Stock Option Agreement shall also specify whether the Option is an ISO or a Nonstatutory Option.

(c)    **Exercise Price**.  Each Stock Option Agreement shall specify the Exercise Price.  The Exercise Price of an Option shall not be less than 100% of the Fair Market Value of a Share on the date of grant, and a higher percentage may be required by Section 3(b).  Subject to the preceding sentence, the Exercise Price under an Option shall be determined by the Board of Directors at its sole discretion.  The Exercise Price shall be payable in a form described in Section 7.

(d)    **Withholding Taxes**.  As a condition to the exercise of an Option, the Optionee shall make such arrangements as the Board of Directors may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with such exercise.  The Optionee shall also make such arrangements as the Board of Directors may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with the disposition of Shares acquired by exercising an Option.

(e)    **Exercisability**.  Each Stock Option Agreement shall specify the date when all or any portion of the Option is to become exercisable.  The exercisability provisions of a Stock Option Agreement shall be determined by the Board of Directors at its sole discretion.

(f)    **Accelerated Exercisabilit**y.  Unless the applicable Stock Option Agreement provides otherwise, all of an Optionee's Options shall become exercisable in full if:

C & K Market, Inc. 2014 Stock Incentive Plan
Page 3

EXHIBIT 1
Page 3 of 9

(i)    The Corporation is subject to a Change in Control before the Optionee's Service terminates;

(ii)    Such Options do not remain outstanding;

(iii)    Such Options are not assumed by the surviving corporation or its parent; and

(iv)    The surviving corporation or its parent does not substitute options with substantially the same terms for such Options.

(v)    A Stock Option Agreement may also provide for accelerated exercisability in the event of the Optionee's death, disability, retirement or other events.

(g)    **Basic Term**.  The Stock Option Agreement shall specify the term of the Option. The term shall not exceed 10 years from the date of grant, and in the case of an ISO a shorter term may be required by Section 3(b).  Subject to the preceding sentence, the Board of Directors at its sole discretion shall determine when an Option is to expire.  A Stock Option Agreement may provide for expiration prior to the end of its term in the event of the termination of the Optionee's Service.

(h)    **Nontransferability**.  No Option or interest therein may be transferred, assigned, pledged or hypothecated by the Optionee, whether by operation of law or otherwise, or be made subject to execution, attachment or similar process.

(i)    **No Rights as a Shareholder**.  An Optionee shall have no rights as a shareholder with respect to any Shares covered by the Optionee's Option until such person becomes entitled to receive such Shares by filing a notice of exercise and paying the Exercise Price pursuant to the terms of such Option.

(j)    **Modification, Extension and Assumption of Options**.  Within the limitations of the Plan, the Board of Directors may modify, extend or approve the assumption or cancellation of outstanding Options (whether granted by the Corporation or another issuer) in return for the grant of new Options for the same or a different number of Shares and at the same or a different Exercise Price.  The foregoing notwithstanding, no modification of an Option shall, without the consent of the Optionee, impair the Optionee's rights or increase the Optionee's obligations under such Option.

(k)    **Restrictions on Transfer of Shares**.  Any Shares issued upon exercise of an Option shall be subject to such special forfeiture conditions, rights of repurchase, rights of first refusal and other transfer restrictions as the Board of Directors may determine.  Such restrictions shall be set forth in the applicable Stock Option Agreement and shall apply in addition to any restrictions that may apply to holders of Shares generally.

(l)    **Accelerated Vesting**.  Unless the applicable Stock Option Agreement provides otherwise, any right to repurchase an Optionee's Shares at the original Exercise Price upon termination of the Optionee's Service shall lapse and all of such Shares shall become vested if:

C & K Market, Inc. 2014 Stock Incentive Plan
Page 4

EXHIBIT 1
Page 4 of 9

(i)     The Corporation is subject to a Change in Control before the Optionee's Service terminates; and

(ii)    The repurchase right is not assigned to the entity that employs the Optionee immediately after the Change in Control or to its parent or subsidiary.

(iii)   A Stock Option Agreement may also provide for accelerated vesting in the event of the Optionee's death, disability or other events.

**Section 7.     Payment for Shares**.

(a)     **General Rule**.  The entire Purchase Price or Exercise Price of Shares issued under the Plan shall be payable in cash or cash equivalents at the time such Shares are purchased, except as otherwise provided in this <u>Section 7</u>.

(b)     **Surrender of Stock**.  To the extent that a Stock Option Agreement so provides, all or any part of the Exercise Price may be paid by surrendering, or attesting to the ownership of, Shares that are already owned by the Optionee.  Such Shares shall be surrendered to the Corporation in good form for transfer and shall be valued at their Fair Market Value on the date the Option is exercised.  The Optionee shall not surrender, or attest to the ownership of, Shares in payment of the Exercise Price if such action would cause the Corporation to recognize compensation expense (or additional compensation expense) with respect to the Option for financial reporting purposes.

(c)     **Services Rendered**.  At the discretion of the Board of Directors, Shares may be awarded under the Plan in consideration of services rendered to the Corporation, a Parent or a Subsidiary prior to the award.  At the discretion of the Board of Directors, Shares may also be awarded under the Plan in consideration of services to be rendered to the Corporation, a Parent or a Subsidiary after the award.

(d)     **Promissory Note**.  To the extent that a Stock Option Agreement or Restricted Stock Agreement so provides, all or a portion of the Exercise Price or Purchase Price (as the case may be) of Shares issued under the Plan may be paid with a full-recourse promissory note.  The Shares shall be pledged as security for payment of the principal amount of the promissory note and interest thereon.  The interest rate payable under the terms of the promissory note shall not be less than the minimum rate (if any) required to avoid the imputation of additional interest under the Code.  Subject to the foregoing, the Board of Directors (at its sole discretion) shall specify the term, interest rate, amortization requirements (if any) and other provisions of such note.

(e)     **Exercise/Sale**.  To the extent that a Stock Option Agreement so provides, and if Stock is publicly traded, payment may be made all or in part by the delivery (on a form prescribed by the Corporation) of an irrevocable direction to a securities broker approved by the Corporation to sell Shares and to deliver all or part of the sales proceeds to the Corporation in payment of all or part of the Exercise Price and any withholding taxes.

(f)     **Exercise/Pledge**.  To the extent that a Stock Option Agreement so provides, and if Stock is publicly traded, payment may be made all or in part by the delivery (on a form

prescribed by the Corporation) of an irrevocable direction to pledge Shares to a securities broker or lender approved by the Corporation, as security for a loan, and to deliver all or part of the loan proceeds to the Corporation in payment of all or part of the Exercise Price and any withholding taxes.

(g)     **Net Exercise**.  To the extent that a Stock Option Agreement so provides, payment may be made all or in part by the withholding by the Corporation as payment of the Exercise Price of the number of Shares otherwise issuable upon exercise of the Option that have a current Fair Market Value equal to the aggregate Exercise Price of the Option (or portion thereof) being exercised.

**Section 8.     Adjustment of Shares**.

(a)     **General**.  In the event of a subdivision of the outstanding Stock, a declaration of a dividend payable in Shares, a declaration of an extraordinary dividend payable in a form other than Shares in an amount that has a material effect on the Fair Market Value of the Stock, a combination or consolidation of the outstanding Stock into a lesser number of Shares, a recapitalization, a spin-off, a reclassification or a similar occurrence, the Board of Directors shall make appropriate adjustments in one or more of:  (i) the number of Shares available for future grants under Section 4; (ii) the number of Shares covered by each outstanding Option; and (iii) the Exercise Price under each outstanding Option.

(b)     **Corporate Transactions**.  In the event that the Corporation is a party to a merger, consolidation or similar transaction, outstanding Options shall be subject to the agreement of merger, consolidation or similar transaction.  Such agreement, without the Optionees' consent, may provide for:

(i)     The continuation of such outstanding Options by the Corporation (if the Corporation is the surviving corporation);

(ii)     The assumption of the Plan and such outstanding Options by the surviving corporation or its parent; or

(iii)     The substitution by the surviving corporation or its parent of options with substantially the same terms for such outstanding Options.

In lieu of the foregoing, the Board may, in its sole discretion, provide for a 30-day period immediately prior to such event during which Optionee shall have the right to exercise the Option in whole or in part, without any limitation on exercisability and upon the expiration of such period any unexercised portion of the Option shall immediately terminate.

(c)     **Reservation of Rights**.  Except as provided in this Section 8, an Optionee or Purchaser shall have no rights by reason of:  (i) any subdivision or consolidation of shares of stock of any class; (ii) the payment of any dividend; or (iii) any other increase or decrease in the number of shares of stock of any class.  Any issuance by the Corporation of shares of stock of any class, or securities convertible into shares of stock of any class, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number or Exercise Price of Shares subject to an Option.  The grant of an Option pursuant to the Plan shall not affect in any

way the right or power of the Corporation to make adjustments, reclassifications, reorganizations or changes of its capital or business structure, to merge or consolidate or to dissolve, liquidate, sell or transfer all or any part of its business or assets.

**Section 9.      Securities Law Requirements**.

Shares shall not be issued under the Plan unless the issuance and delivery of such Shares comply with (or are exempt from) all applicable requirements of law, including (without limitation) the Securities Act of 1933, as amended, the rules and regulations promulgated thereunder, state securities laws and regulations, and the regulations of any stock exchange or other securities market on which the Corporation's securities may then be traded.

**Section 10.      No Retention Rights**.

Nothing in the Plan or in any right or Option granted under the Plan shall confer on the Purchaser or Optionee any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Corporation (or any Parent or Subsidiary employing or retaining the Purchaser or Optionee) or of the Purchaser or Optionee, which rights are hereby expressly reserved by each, to terminate the Purchaser's or the Optionee's Service at any time and for any reason, with or without cause.

**Section 11.      Duration and Amendments**.

(a)      **Term of the Plan**.  The Plan, as set forth herein, shall become effective as set forth in <u>Section 13</u>.  In the event that the shareholders fail to approve the Plan within 12 months after its effective date, any grants of ISOs that have already occurred shall be rescinded, and no additional grants of ISOs shall be made thereafter under the Plan.  The Plan shall terminate automatically 10 years after the effective date of this Plan and may be terminated on any earlier date pursuant to <u>Section 11(b)</u>.

(b)      **Right to Amend or Terminate the Plan**.  The Board of Directors may amend, suspend or terminate the Plan at any time and for any reason; <u>provided</u>, <u>however</u>, that any amendment of the Plan which increases the number of Shares available for issuance under the Plan (except as provided in <u>Section 8</u>), or which materially changes the class of persons who are eligible for the grant of ISOs, shall be subject to the approval of the Corporation's shareholders. Shareholder approval shall not be required for any other amendment of the Plan.

(c)      **Effect of Amendment or Termination**.  No Shares shall be issued or sold under the Plan after the termination thereof, except upon exercise of an Option granted prior to such termination.  The termination of the Plan, or any amendment thereof, shall not affect any Share previously issued or any Option previously granted under the Plan.

**Section 12.      Definitions**.

(a)      "**Board of Directors**" shall mean the Board of Directors of the Corporation, as constituted from time to time.

(b)      "**Change in Control**" shall mean:

C & K Market, Inc. 2014 Stock Incentive Plan
Page 7

EXHIBIT 1
Page 7 of 9

(i)        The consummation of a merger or consolidation of the Corporation with or into another entity or any other corporate reorganization, if more than 50% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after such merger, consolidation or other reorganization is owned by persons who were not shareholders of the Corporation immediately prior to such merger, consolidation or other reorganization; or

(ii)       The sale, transfer or other disposition of all or substantially all of the Corporation's assets.

(iii)      A transaction shall not constitute a Change in Control if its sole purpose is to change the state of the Corporation's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Corporation's securities immediately before such transaction.

(c)       "**Code**" shall mean the Internal Revenue Code of 1986, as amended.

(d)       "**Committee**" shall mean a committee of the Board of Directors, as described in <u>Section 2(a)</u>.

(e)       "**Consultant**" shall mean a person who performs bona fide services for the Corporation, a Parent or a Subsidiary as a consultant or advisor, excluding Employees and Outside Directors.

(f)       "**Employee**" shall mean any individual who is a common-law employee of the Corporation, a Parent or a Subsidiary.

(g)       "**Exercise Price**" shall mean the amount for which one Share may be purchased upon exercise of an Option, as specified by the Board of Directors in the applicable Stock Option Agreement.

(h)       "**Fair Market Value**" shall mean the fair market value of a Share, as determined by the Board of Directors in good faith.  Such determination shall be conclusive and binding on all persons.

(i)       "**Grantee**" shall mean an individual to whom the Board of Directors has granted the right to acquire Shares under the Plan (other than upon exercise of an Option).

(j)       "**ISO**" shall mean an employee incentive stock option described in Section 422(b) of the Code.

(k)       "**Nonstatutory Option**" shall mean a stock option not described in Section 422(b) or 423(b) of the Code.

(l)       "**Option**" shall mean an ISO or Nonstatutory Option granted under the Plan and entitling the holder to purchase Shares.

(m)       "**Optionee**" shall mean an individual who holds an Option.

C & K Market, Inc. 2014 Stock Incentive Plan
Page 8

EXHIBIT 1
Page 8 of 9

(n)        "**Outside Director**" shall mean a member of the Board of Directors who is not an Employee.

(o)        "**Parent**" shall mean any corporation (other than the Corporation) in an unbroken chain of corporations ending with the Corporation, if each of the corporations other than the Corporation owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.  A corporation that attains the status of a Parent on a date after the adoption of the Plan shall be considered a Parent commencing as of such date.

(p)        "**Plan**" shall mean this C & K Market, Inc. 2014 Stock Incentive Plan.

(q)        "**Purchase Price**" shall mean the consideration for which one Share may be acquired under the Plan (other than upon exercise of an Option), as specified by the Board of Directors.

(r)        "**Restricted Stock Agreement**" shall mean the agreement between the Corporation and a Purchaser who acquires Shares under the Plan which contains the terms, conditions and restrictions pertaining to the acquisition of such Shares.

(s)        "**Service**" shall mean service as an Employee, Outside Director or Consultant.

(t)        "**Share**" shall mean one share of Stock, as adjusted in accordance with Section 8 (if applicable).

(u)        "**Stock**" shall mean the Common Stock, no par value, of the Corporation.

(v)        "**Stock Option Agreement**" shall mean the agreement between the Corporation and an Optionee which contains the terms, conditions and restrictions pertaining to the Optionee's Option.

(w)        "**Subsidiary**" means any corporation (other than the Corporation) in an unbroken chain of corporations beginning with the Corporation, if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.  A corporation that attains the status of a Subsidiary on a date after the adoption of the Plan shall be considered a Subsidiary commencing as of such date.

**Section 13.     Effectiveness**.

The Plan shall become effective upon confirmation of the Corporation's Plan of Reorganization by the bankruptcy court in the U.S. Bankruptcy Court District of Oregon, Case No.  13-64561-fra11.

034518/00017/5200091v1

C & K Market, Inc. 2014 Stock Incentive Plan
Page 9

EXHIBIT 1
Page 9 of 9

# EXHIBIT 2

## SECOND AMENDED AND RESTATED ARTICLES OF INCORPORATION

# C & K MARKET, INC.

## SECOND AMENDED AND RESTATED ARTICLES OF INCORPORATION

These Second Amended and Restated Articles of Incorporation supersede the existing Amended and Restated Articles of Incorporation of C & K Market, Inc. and all amendments thereto.

## ARTICLE 1

The name of the corporation is C & K Market, Inc. (the "Corporation").

## ARTICLE 2

The purpose of the Corporation is to engage in any lawful business or activity for which corporations may be organized under the Oregon Business Corporation Act, as amended from time to time (the "OBCA").

## ARTICLE 3

A.  The Corporation is authorized to issue shares of two classes of stock:

(1)  twenty-five million (25,000,000) shares of common stock, with no par value (the "Common Stock"); and

(2)  ten million (10,000,000) shares of preferred stock, with no par value (the "Preferred Stock").

B.  Holders of Common Stock are entitled to one vote per share on any matter submitted to the shareholders.  On dissolution of the Corporation, after any preferential amount with respect to the Preferred Stock has been paid or set aside, the holders of Common Stock and the holders of any series of Preferred Stock entitled to participate in the distribution of assets are entitled to receive the net assets of the Corporation.

C.  The Board of Directors is authorized, subject to limitations prescribed in the OBCA, and by the provisions of this Article, to provide for the issuance of shares of Preferred Stock in series, to establish from time to time the number of shares to be included in each series and to determine the designations, relative rights, preferences and limitations of the shares of each series.  The authority of the Board of Directors with respect to each series includes determination of the following:

(1)  The number of shares in and the distinguishing designation of that series;

(2)  Whether shares of that series shall have full, special, conditional, limited or no voting rights, except to the extent otherwise provided by the OBCA;

(3)    Whether shares of that series shall be convertible and the terms and conditions of the conversion, including provision for adjustment of the conversion rate in circumstances determined by the Board of Directors;

(4)    Whether shares of that series shall be redeemable and the terms and conditions of redemption, including the date or dates upon or after which they shall be redeemable and the amount per share payable in case of redemption, which amount may vary under different conditions or at different redemption dates;

(5)    The dividend rate, if any, on shares of that series, the manner of calculating any dividends and the preferences of any dividends;

(6)    The rights of shares of that series in the event of voluntary or involuntary dissolution of the Corporation and the rights of priority of that series relative to the Common Stock and any other series of Preferred Stock on the distribution of assets on dissolution; and

(7)    Any other rights, preferences and limitations of that series that are permitted by law to vary.

## ARTICLE 4

In addition to any other method provided for in the Corporation's Bylaws, the shareholders of the Corporation may act by written consent without a meeting if (i) the action is taken by shareholders having not less than the minimum number of votes that would be necessary to take such action at a meeting at which all shareholders entitled to vote on the action were present and voted and (ii) the written consent is delivered to the Corporation for inclusion in the minutes or filing with the corporate records.  The Corporation must give written notice of any action taken pursuant to this Article 4 to all shareholders who did not sign the written consent.  The notice provided to such shareholders must contain or be accompanied by any information required by ORS 60.211 or any other applicable provision of the OBCA.

## ARTICLE 5

The Corporation elects to waive preemptive rights.

## ARTICLE 6

No shareholder shall have the right to cumulative voting.

## ARTICLE 7

A.    The Corporation shall indemnify to the fullest extent permitted by law any person who is, after the effective date of these Second Amended and Restated Articles (the "Effective Date"), made or threatened to be made a party to, witness in, or otherwise involved in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative, or otherwise (including an action, suit or proceeding by or in the

right of the Corporation) by reason of the fact that the person is or was, whether before, on or after the Effective Date, a director or officer of the Corporation or a fiduciary within the meaning of the Employee Retirement Income Security Act of 1974 with respect to any employee benefit plan of the Corporation, or serves or served at the request of the Corporation as a director, officer, employee or agent or as a fiduciary of an employee benefit plan, of another corporation, partnership, joint venture, trust, or other enterprise; provided, that the foregoing indemnification shall only apply to directors, officers or fiduciaries of the Corporation in office as of the Effective Date, and to directors, officers and fiduciaries of the Corporation elected or appointed after the Effective Date.  The Corporation may indemnify to the fullest extent permitted by law any person who is made or threatened to be made a party to, witness in, or otherwise involved in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative, or otherwise (including an action, suit or proceeding by or in the right of the Corporation) by reason of the fact that the person is or was an employee or agent of the Corporation.  Any indemnification provided pursuant to this Article 7 will not be exclusive of any rights to which the person indemnified may otherwise be entitled under any provision of articles of incorporation, bylaw, agreement, statute, policy of insurance, vote of shareholders or board of directors, or otherwise.

B.      To the fullest extent permitted by law, no director of the Corporation in office on or after the Effective Date will be personally liable to the Corporation or its shareholders for monetary damages for conduct as a director.  Without limiting the generality of the preceding, if after this Article 7 becomes effective the Oregon Revised Statutes are amended to authorize corporate action further eliminating or limiting the personal liability of directors of the Corporation in office on or after the Effective Date, then the liability of such directors will be eliminated or limited to the fullest extent permitted by the Oregon Revised Statutes, as so amended.  No amendment or repeal of this Article 7, nor the adoption of any provision of these Second Amended and Restated Articles of Incorporation inconsistent with this Article 7, nor a change in the law will adversely affect any right or protection that is based upon this paragraph B and that pertains to conduct that occurred prior to the time of such amendment, repeal, adoption or change.  No change in the law will reduce or eliminate the rights and protections set forth in this paragraph B unless the change in the law specifically requires such reduction or elimination.

034518/00003/5173047v1

# EXHIBIT 3

## SECOND AMENDED AND RESTATED BYLAWS

## SECOND AMENDED AND RESTATED BYLAWS OF
## C & K MARKET, INC.

These Second Amended and Restated Bylaws (the "Bylaws") amend and restate in their entirety the Amended and Restated Bylaws of C & K Market, Inc., an Oregon corporation (the "Corporation").

1. **Offices**.

   1.1. <u>Principal Office</u>. The principal office of the Corporation shall be located in the state of Oregon at such location as designated from time to time by the Board of Directors (the "Board"). The Corporation may have such other offices, in or out of the state of Oregon, as the Board may designate or as the business of the Corporation may require from time to time.

   1.2. <u>Registered Office</u>. The registered office of the Corporation to be maintained in the state of Oregon, may be, but need not be, identical with the principal office in the state of Oregon. The address of the registered office may be changed from time to time by the Board upon compliance with the requirements of the Oregon Business Corporation Act, as amended from time to time (the "OBCA"), for change of the registered office.

2. **Shareholders**.

   2.1. <u>Annual Meeting</u>. A meeting of the shareholders shall be held in each year on the second Thursday in April, unless otherwise determined by the Board, for the purpose of electing directors and for the transaction of such other business as may come before the meeting. The Board shall set the time and place for the meeting. If the day fixed for the annual meeting is a legal holiday in the state of Oregon, the meeting shall be held on the next succeeding business day. If the election of directors is not held on the day established herein for any annual meeting of the shareholders, or at any adjournment thereof, the Board shall cause the election to be held at a special meeting of the shareholders as soon thereafter as reasonably convenient.

   2.2. <u>Special Meetings</u>. The Corporation shall hold a special meeting of shareholders upon the call of the chief executive officer of the Corporation or the Board, or if the holders of at least 15 percent of all votes entitled to be cast on any issue proposed to be considered at the proposed special meeting sign, date and deliver to the secretary of the Corporation one or more written demands for the meeting describing the purpose or purposes for which it is to be held.

   2.3. <u>Chairperson to Preside Over Meetings</u>. The chair of the Board shall preside at each shareholder meeting. In the absence of the chair of the Board, the chief executive officer of the Corporation shall preside as chairperson. In the absence of the chair of the Board, or the chief executive officer, as the case may be, the secretary of the Corporation shall preside as chairperson. The chairperson shall determine the order of business and shall have the authority to establish rules for the conduct of the meeting, subject to the other rules identified in the Bylaws.

---

EXHIBIT 3
Page 1 of 16

2.4.    <u>Place of Meeting</u>.  Meetings of the shareholders shall be held at the principal office of the Corporation, or at any other place in or out of the state of Oregon which the Board may, from time to time, designate.

2.5.    <u>Notice of Meeting</u>.  Written or printed notice stating the place, day and hour of any shareholder meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 nor earlier than 60 days before the meeting date, at the direction of the chief executive officer or other persons calling the meeting, to each shareholder of record entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the shareholder at the address as it appears on the stock transfer books of the Corporation, postage prepaid.

2.6.    <u>Action Without a Formal Meeting</u>.  Action required or permitted by law to be taken at a shareholders meeting may be taken without a meeting if the action is taken by shareholders having not less than the minimum number of votes that would be necessary to take such action at a meeting at which all shareholders entitled to vote on the action were present and voted.  The action will be evidenced by one or more written consents describing the action taken, signed by those shareholders taking action under this <u>Section 2.6</u> and delivered to the secretary of the Corporation for inclusion in the minutes or filing with the corporate records.  Action taken under this <u>Section 2.6</u> is effective when the consent or consents bearing sufficient signatures are delivered to the Corporation, unless the consent or consents specify an earlier or later effective date.  If not otherwise determined by law, the record date for determining shareholders entitled to take action without a meeting under this <u>Section 2.6</u> is the date the first shareholder signs the consent.  A consent signed under this <u>Section 2.6</u> has the effect of a meeting vote and may be described as such in any document.

2.7.    <u>Establishing a Shareholder Record Date</u>.  For the purpose of determining shareholders entitled to notice of or to vote at any meeting of shareholders, or shareholders entitled to receive payment of any dividend, or in order to make a determination of shareholders for any other proper purpose, the Board may establish a record date.  The record date shall not be less than 10 or more than 70 days before the meeting or action requiring a determination of shareholders.  If no record date is fixed for the determination of shareholders entitled to notice of a meeting, or shareholders entitled to receive payment of a dividend, the day immediately before the date on which notice of the meeting is mailed or the date on which the resolution of the Board declaring such dividend is adopted, as the case may be, shall be the record date for such determination of shareholders.  When a determination of shareholders entitled to vote at any meeting of shareholders has been made as provided in this paragraph, such determination shall apply to any adjournment thereof unless a court fixes a new record date pursuant to the OBCA.

2.8.    <u>Shareholder Voting Lists</u>.  The officer or agent having charge of the stock transfer books for shares of the Corporation shall make, no more than two business days after notice is given for each meeting of shareholders, a complete list of the shareholders entitled to vote at such meeting, or any adjournment thereof, which list shall be kept on file at the registered office of the Corporation and shall be subject to inspection by any shareholder at any time during usual business hours.  The original stock transfer books shall be prima facie evidence as to who are the shareholders entitled to examine such list or transfer books or to vote at any meeting of

EXHIBIT 3
Page 2 of 16

shareholders.  Failure to comply with this requirement of the Bylaws shall not affect the validity of any action taken at a shareholders meeting.

2.9.    Quorum of Shareholders.   Except as otherwise required by the Corporation's Articles of Incorporation, as amended from time to time (the "Articles"), or by applicable law, a majority of the shares entitled to vote represented in person or by proxy shall constitute a quorum at a meeting of shareholders.  If a quorum is present, the affirmative vote of the majority of the shares represented at the meeting and entitled to vote on the subject matter shall be the act of the shareholders, except in the case of election of directors who shall be elected by a plurality of the votes cast at a meeting at which a quorum exists.  The shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum.  In the absence of a quorum, a majority of those present in person or represented by proxy may adjourn the meeting from time to time until a quorum exists.  Any business that might have been transacted at the original meeting may be transacted at the adjourned meeting if a quorum exists at the adjourned meeting.

2.10.    Proxies.   A shareholder may vote shares either in person or by proxy.  A shareholder may appoint a proxy to vote or otherwise act for the shareholder by signing an appointment form, either personally or by the shareholder's attorney-in-fact.  An appointment of a proxy is effective when received by the secretary or other officer or agent of the Corporation authorized to tabulate votes.  An appointment is valid for 11 months unless a longer period is expressly provided in the appointment form.  An appointment of a proxy is revocable by the shareholder unless the appointment form conspicuously states that it is irrevocable and the appointment is coupled with an interest.

2.11.    Voting of Shares.   Except as otherwise provided in the Articles or by applicable law, each outstanding share which has voting rights shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders.  No shareholder shall have the right to vote cumulatively.

2.12.    Voting of Shares by Certain Holders.   Shares held by an administrator, executor, guardian or conservator may be voted by the shareholder either in person or by proxy, without a transfer of such shares into the shareholder's name.  Shares standing in the name of a trustee may be voted by the shareholder either in person or by proxy, but no trustee shall be entitled to vote shares held by the shareholder without a transfer of such shares into the shareholder's name.  Shares standing in the name of a receiver may be voted by such receiver, and shares held by or under the control of a receiver may be voted by such receiver without the transfer thereof into the receiver's name if authority so to do be contained in an appropriate order of the court by which such receiver was appointed.  A shareholder whose shares are pledged shall be entitled to vote such shares until the shares have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares so transferred.  Shares of its own stock belonging to the Corporation or held by it in fiduciary capacity shall not be voted, directly or indirectly, at any meeting, and shall not be counted in determining the total number of outstanding shares at any given time.

3.    **Board of Directors**.

3.1.    <u>General Powers</u>.  The business and affairs of the Corporation shall be managed by the Board.

3.2.    <u>Number, Tenure, and Election</u>.  The number of directors of the Corporation shall be not less than three nor more than seven; provided, that the Board is authorized to increase or decrease the number of directors constituting the Board of Directors by action of a majority of the directors then serving, except that no director's term shall be shortened by virtue of a decrease in the number of directors constituting the Board of Directors.  Directors shall be elected at the annual meeting of shareholders.

3.3.    <u>Annual Meeting</u>.  An annual meeting of the Board shall be held without notice following the annual meeting of shareholders.  The Board may provide, by resolution, the time and place, either within or without the state of Oregon, for the holding of additional regular meetings without notice thereof.

3.4.    <u>Special Meetings</u>.  Special meetings of the Board may be called by or at the request of the chief executive officer of the Corporation or any two directors. The person or persons authorized to call special meetings of the Board may fix any place, either within or without the state of Oregon, as the place for holding any special meeting of the Board called by them.

3.5.    <u>Notice</u>.  Notice of any special meeting shall be given at least two days prior to the scheduled date for such special meeting, either orally by telephone or in person, or by written notice delivered personally or mailed to each director at the director's address.  If mailed, such notice shall be deemed to be delivered on the second day following deposit in the United States mail.  Any director may waive notice of any meeting.  Except as provided in the following sentence, the waiver must be in writing, signed by the director entitled to notice, specify the meeting for which notice is waived and be filed with the minutes or corporate records.  The attendance of a director at a meeting shall constitute a waiver of notice of such meeting, except where a director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted nor the purpose of any special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

3.6.    <u>Quorum</u>.  A majority of the number of directors in office immediately before the commencement of the meeting shall constitute a quorum for the transaction of business at any meeting of the Board.

3.7.    <u>Manner of Acting</u>.  The act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board.  Directors shall be deemed to be present at a regular or special meeting where all directors participating may simultaneously hear each other during the meeting, irrespective of whether or not they are present in the same location, as by a telephonic conference.

EXHIBIT 3
Page 4 of 16

3.8.    Action Without a Formal Meeting.    Unless the Articles or the Bylaws provide otherwise, action required or permitted to be taken under applicable law at a Board meeting may be taken without a meeting if the action is taken by all members of the Board.  The action must be evidenced by one or more written consents describing the action taken, signed by each director, and included in the minutes or filed with the corporate records reflecting the action taken.  Such action is effective when the last director signs the consent, unless the consent specifies an earlier or later effective date.

3.9.    Vacancies.  Any vacancy occurring on the Board may be filled by the affirmative vote of the majority of the remaining directors.  If there is only one remaining director, the remaining director may appoint the person or persons required to fill any vacancies.  If there are no remaining directors, the vacancies occurring on the Board may be filled by the shareholders who would then be entitled to vote for the election of directors at an annual meeting of shareholders.  A director elected to fill a vacancy shall be elected for the unexpired term of that director's predecessor in office.

3.10.   Presumption of Assent.  A director of the Corporation who is present at a meeting of the Board at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless:

3.10.1. the director objects at the beginning of the meeting or promptly upon the director's arrival, to holding the meeting or transacting business at the meeting;

3.10.2. the director's dissent or abstention from the action taken is entered in the minutes of the meeting; or

3.10.3. the director delivers written notice of dissent or abstention to the presiding officer of the meeting before its adjournment or to the secretary of the Corporation immediately after adjournment of the meeting.  The right of dissent or abstention is not available to a director who votes in favor of the action taken.

3.11.   Removal.  A director may be removed by the affirmative vote of shareholders owning at least a majority of the issued voting shares of the Corporation.  A director may be removed by the shareholders only at a meeting called for the express purpose of removing the director and the meeting notice must state that the purpose, or that one of the purposes, of the meeting is removal of the director.

3.12.   Resignation.  Any director of the Corporation may resign at any time by giving written notice to the Corporation, to the Board, or to the chair of the Board, or to the chief executive officer, or to the secretary of the Corporation.  Any such resignation shall take effect at the time specified therein, or, if the time be not specified therein, upon its acceptance by the Board.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 5

EXHIBIT 3
Page 5 of 16

**4.** **Officers**.

     4.1.   Number.  The officers of the Corporation shall be a chief executive officer, a president and a secretary, each of whom shall be appointed by the Board.  Other officers such as vice-president and treasurer and assistant officers may be elected or appointed by the Board.

     4.2.   Election and Term of Office.  The officers shall be appointed annually by the Board at the first meeting of the Board held after each annual meeting of the shareholders.  If the appointment of officers shall not be held at such meeting, such appointment shall be held as soon as practical thereafter.  Each officer shall hold office until that officer's successor shall have been duly elected and shall have qualified or until that officer's death or until the officer shall resign or shall have been removed in the manner provided in the Bylaws.

     4.3.   Removal and Resignation.  Any officer or agent elected or appointed by the Board may be removed by the Board whenever in its judgment the best interests of the Corporation would be served thereby.  Any officer of the Corporation may resign at any time by giving written notice to the Corporation, to the Board, or to the chair of the Board, or to the chief executive officer, or to the secretary of the Corporation.  Any such resignation shall take effect at the time specified therein, or, if no time is specified, upon its acceptance by the Board.

     4.4.   Vacancies.  A vacancy in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the Board for the unexpired portion of the term.

     4.5.   Salaries.  The salaries of the officers shall be fixed from time to time by the Board and no officer shall be prevented from receiving such salary by reason of the fact that the officer is also a director of the Corporation.

     4.6.   Chair of the Board.  The Board of Directors may elect a chair of the Board.  If such chair is elected, the chair shall preside at all meetings of the Board and of the shareholders, and shall perform such other duties as may be prescribed from time to time by the Board.

     4.7.   Chief Executive Officer.  The chief executive officer shall be the principal executive officer of the Corporation and, subject to the control of the Board, shall in general supervise all of the business and affairs of the Corporation.  The chief executive officer shall preside at all meetings of the shareholders and of the Board where there is no chair of the Board.  The chief executive officer may sign, with such other officer, if any, as may be required by law or authorized by the Board, certificates for shares of the Corporation, any deeds, mortgages, bonds, contracts, or other instruments which are inherent in the authority of the office of the chief executive officer or which the Board has authorized  to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board or by the Bylaws to some other officer or agent of the Corporation, or shall be required by law to be otherwise signed or executed; and in general shall perform all duties incident to the office of chief executive officer and such other duties as may be prescribed by the Board.

     4.8.   President.  In the absence of the chief executive officer or in the event of the chief executive officer's death, inability or refusal to act, the president shall perform the duties of the

EXHIBIT 3
Page 6 of 16

chief executive officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the chief executive officer.  The president may sign, with the secretary, certificates for shares of the Corporation; and shall perform such other duties as from time to time may be assigned to the president by the chief executive officer or by the Board.

4.9.    Vice-President.  In the absence of the president or in the event of the president's death, inability or refusal to act, the vice-president (or in the event there be more than one vice-president, the vice-presidents in the order designated at the time of their election, or in the absence of any designation, then in the order of their election) shall perform the duties of the president, and when so acting, shall have all the powers of and be subject to all the restrictions upon the president.  Any vice-president may sign, with the secretary, certificates for shares of the Corporation; and shall perform such other duties as from time to time may be assigned to the vice-president by the chief executive officer or by the Board.

4.10.    Secretary.  The secretary shall:

4.10.1. Keep or cause to be kept at the principal office, or such other place as the Board may order, a book of minutes of all meetings of directors and shareholders showing the time and place of the meeting, whether the meeting was regular or special and, if a special meeting, how authorized, the notice given, the names of those present at directors meetings, the number of shares present or represented at shareholders meetings and the proceedings thereof.

4.10.2. Keep or cause to be kept, at the principal office or at the office of the Corporation's transfer agent, a share register, or a duplicate share register, showing the names of the shareholders and their addressees, the number and classes of shares held by each, the number and date of certificates issued for such shares and the number and date of cancellation of certificates surrendered for cancellation.

4.10.3. Give or cause to be given such notice of the meetings of the shareholders and of the Board as is required by the Bylaws.  If the Corporation elects to have a seal, the secretary shall keep the seal and affix it to all documents requiring a seal.  The secretary shall have such other powers and perform such other duties as may be prescribed by the Board or the Bylaws.

4.10.4. In general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to the secretary by the chief executive officer or the Board.

4.11.    Treasurer.  The treasurer, if appointed, shall:

4.11.1. Be responsible for the funds of the Corporation, shall pay them out only on the checks of the Corporation signed in the manner authorized by the Board, shall deposit and withdraw such funds in such depositories as may be authorized by the Board, and shall keep full and accurate accounts of receipts and disbursements in books maintained at the Corporation's principal office.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 7

EXHIBIT 3
Page 7 of 16

4.11.2. In general perform all of the duties incident to the office of treasurer and such other duties as from time to time may be assigned to the treasurer by the chief executive officer or by the Board.

**5.      Contracts, Loans, Checks, and Deposits.**

5.1.      Contracts.  The Board may authorize any officer or officers, agent or agents to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be in general or confined to specific instances.

5.2.      Loans to Corporations.  No loans shall be contracted on behalf of the Corporation and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board.  Such authority may be general or confined to specific instances.

5.3.      Checks, Drafts, Etc.  All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the Corporation, shall be signed by such officer or officers, agent or agents of the Corporation and in such manner as shall from time to time be determined by resolution of the Board.

5.4.      Deposits.  All funds of the Corporation not otherwise employed shall be deposited from time to time to the credit of the Corporation in such banks, trust companies or other depositories as the Board may select.

5.5.      Execution of Documents.  The Board may, except as otherwise provided in the Bylaws, authorize any officer or agent of the Corporation to enter into any contract or execute any instrument in the name of and on behalf of the Corporation.  Such authority may be general or confined to specific instances.  Unless so authorized by the Board, or unless inherent in the authority vested in the office under the provisions of the Bylaws, no officer, agent or employee of the Corporation shall have any power or authority to bind the Corporation by any contract or engagement, or to pledge its credit, or to render it liable for any purpose or for any amount.

**6.      Certificates for Shares and Their Transfer.**

6.1.      Certificates for Shares.

6.1.1.   Certificates for shares shall be in such form as the Board may designate, shall designate the name of the Corporation and the state law under which the Corporation is organized, shall state the name of the person to whom the shares represented by the certificate are issued, and shall state the number and class of shares and the designation of the series, if any, the certificate represents.  If the Corporation is authorized to issue different classes of shares or different series within a class, the designations, relative rights, preferences and limitations determined for each series and the authority of the Board to determine variations for future series shall be summarized on the front or back of each certificate, or each certificate may state conspicuously on its front or back that the Corporation shall furnish shareholders with this information on request in writing and without charge.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 8

EXHIBIT 3
Page 8 of 16

6.1.2.  Each certificate for shares shall be signed, either manually or in facsimile, by the chair of the Board, the chief executive officer, the president or a vice-president and the secretary or an assistant secretary of the Corporation.  The certificates may bear the corporate seal or its facsimile.

6.1.3.  If any officer who has signed a share certificate, either manually or in facsimile, no longer holds office when the certificate is issued, the certificate shall nevertheless be valid.

6.1.4.  The Corporation may in its discretion issue certificates for fractional shares, but shall not be required to do so.

6.2.    <u>Transfer on the Books</u>.  Upon surrender to the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, and subject to any limitations on transfer appearing on the certificate or in the Corporation's stock transfer records (including, without limitation, restrictions on transfer set forth in the Bylaws), the Corporation shall issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.  The Board is authorized to impose restrictions on the transfer of shares to the extent permitted by law (including, without limitation, restrictions on transfer set forth in the Bylaws).

6.3.    <u>Lost, Stolen, or Destroyed Certificates</u>.  In the event a certificate is represented to be lost, stolen or destroyed, a new certificate shall be issued in place thereof upon such proof of the loss, theft or destruction and upon the giving of such bond or other indemnity as may be required by the Board.

6.4.    <u>Transfer Agents and Registrars</u>.  The Board may from time to time appoint one or more transfer agents and one or more registrars for the shares of the Corporation who will have some powers and duties as the Board may specify.

6.5.    <u>Restrictive Legends</u>.  Each certificate representing any share of stock of the Corporation shall bear substantially the following legend:

THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS CONTAINED IN THE CORPORATION'S BYLAWS.  COPIES OF SUCH BYLAWS MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION

**7.**    **<u>Fiscal Year</u>**.  The fiscal year of the Corporation shall end on December 31, unless changed by the Board.

**8.**    **<u>Seal</u>**.  If the Board elects to provide a corporate seal, it shall be circular in form and shall have inscribed thereon the name of the Corporation and the state of incorporation and the words, "Corporate Seal - Oregon."

---

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 9

EXHIBIT 3
Page 9 of 16

**9.**    **Waiver of Notice - Form of Notice**.

9.1.    <u>Waiver of Notice</u>.    Whenever any notice is required to be given to any shareholder or director of the Corporation under the provisions of the Bylaws or under the provisions of the OBCA, a waiver thereof in writing, signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

9.2.    <u>Form of Notice</u>.    Whenever, under the provisions of the Oregon Business Corporation Act or these Bylaws, notice is required to be given to any director or shareholder, it shall not be construed to mean only personal notice, but shall include notices as defined below.

9.2.1.    Required notice to a director may be given in writing by mail or facsimile, addressed to such director at the address as it appears on the records of the Corporation, or at the last known business or residence address of the director, prepaid, and such notice if mailed shall be deemed to be given at the time when the same shall be deposited in the United States mail (except as expressly provided for otherwise in <u>Section 3.5</u>), and if transmitted by facsimile shall be deemed to be given upon the earlier of personal receipt by the director or 24 hours following the completed transmittal.

9.2.2.    Required notice to a shareholder shall be given in writing by mail or facsimile, addressed to such shareholder at the address as it appears on the stock record books or similar records of the Corporation, or at the last known business or residence address of the shareholder, prepaid, and such notice if mailed shall be deemed to be given at the time when the same shall be deposited in the United States mail (except as expressly provided for otherwise in the Bylaws), and if transmitted by facsimile shall be deemed to be given upon the earlier of personal receipt by the shareholder or 24 hours following the completed receipt of the transmittal.

**10.**    **Amendment of Bylaws**.

10.1.    Subject to <u>Section 10.4</u>, the Board may amend or repeal these Bylaws, unless:

10.1.1. The Articles or applicable law reserve this power exclusively to the shareholders in whole or in part.

10.1.2. The shareholders, in amending or repealing a particular bylaw, provide expressly that the Board may not amend or repeal that bylaw.

10.1.3. The Articles, the Bylaws or applicable state or federal law provide otherwise.

10.2.    Subject to <u>Section 10.4</u>, the shareholders may amend or repeal the Bylaws even though these Bylaws may also be amended or repealed by the Board.

---

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 10

EXHIBIT 3
Page 10 of 16

10.3.    When an amendment or new Bylaw is adopted, it shall be copied in the minute book with the original Bylaws in the appropriate place.  If any Bylaw is repealed, the fact of its repeal and the date on which its repeal occurred shall be stated in such book and place.

10.4.    Notwithstanding the foregoing, Section 12 of the Bylaws may be amended solely with the approval at a shareholder meeting at which a quorum is present of shareholders holding at least 67% of all votes then eligible to be cast.  Notice of such shareholder meeting must provide that the purpose, or one of the purposes, of such meeting is to consider such an amendment to the Bylaws.

## 11.    Transactions Between Corporation, Interested Directors.

11.1.    Conflict of Interest.  A transaction with the Corporation in which a director of the Corporation has a direct or indirect interest is not voidable by the Corporation solely because of the director's interest in the transaction if either:

11.1.1. the material facts of the transaction and the director's interest were disclosed or known to the Board or a committee of the Board, and the Board or committee authorized, approved or ratified the transaction; or

11.1.2. the material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved or ratified the transaction; or

11.1.3. the transaction was fair to the Corporation.  Authorization, approval or ratification occurs if a majority of the directors on the Board or on the committee, who have no direct or indirect interest in the transaction, vote to authorize.

11.2.    Authorization.

11.2.1. For purposes of Section 11.1.1, a transaction in which a director has an interest is authorized, approved or ratified if it receives the affirmative vote of a majority of the directors on the Board, or on the committee acting on the matter, who have no direct or indirect interest in the transaction.  A transaction may not be authorized, approved or ratified under this Section 11 by a single director.  If a majority of the directors who have no direct or indirect interest in the transaction vote to authorize, approve or ratify the transaction, a quorum will be deemed to be present for the purpose of taking action under this Section 11  The presence of, or a vote cast by, a director with a direct or indirect interest in the transaction does not affect the validity of any action taken by the Board or a committee thereof if the transaction is otherwise authorized, approved or ratified in any manner as provided in Section 11.1.1.

11.2.2. For purposes of Section 11.1.2, a transaction in which a director has an interest is authorized, approved or ratified if it receives the vote of a majority of the shares entitled to be voted under this Section 11 voting as a single voting group.  Shares owned by or voted under the control of a director who has a direct or indirect interest in

the transaction may be counted in a vote of shareholders to determine whether to authorize, approve or ratify a transaction by vote of the shareholders under this <u>Section 11</u>. A majority of the shares, whether or not present, that are entitled to be counted in a vote on the transaction under this <u>Section 11</u> constitutes a quorum for the purpose of taking action under this <u>Section 11</u>.

11.3.    <u>Disqualification</u>.  A director of the Corporation shall not be disqualified from the director's office for contracting with the Corporation as vendor, purchaser, or otherwise.

## 12.    <u>Restrictions on Transfer of Common Stock and Preferred Stock</u>.

12.1.    <u>Restriction on Transfer</u>. Except as otherwise permitted by this <u>Section 12</u>, no shareholder may Transfer any Shares.  No shareholder may Transfer any Shares to any Person other than a Permitted Transferee prior to January 1, 2016.  Any Transfer of Shares on or after January 1, 2016 to any Person other than a Permitted Transferee shall be subject to the right of first refusal provisions of <u>Section 12.3</u> in addition to all other provisions of this <u>Section 12</u>.  Any Transfer of Shares must comply with <u>Section 12.5</u> in order to be a Permitted Transfer.

12.2.    <u>Definitions.</u>  For purposes of this <u>Section 12</u>, the following definitions shall apply:

12.2.1.  "Adjusted Fair Market Value" means the fair market value of the Shares as agreed by the parties in interest. If the parties do not agree on the Adjusted Fair Market Value, the Board will in good faith determine the Adjusted Fair Market Value. The Board's determination will be final and binding upon the parties. The determination will apply appropriate discounts for lack of marketability, minority interest and other factors relevant to the Shares.

12.2.2. "Common Stock" means the common stock, no par value, of the Corporation.

12.2.3. "Permitted Transfer" means a Transfer of Shares permitted by and in compliance with this <u>Section 12</u>.

12.2.4. "Permitted Transferee" means (a) the Corporation; (b) any trust for the benefit of one or more of the spouse and/or the natural or adopted lineal descendants of a shareholder, but only if the trustee with authority to exercise all rights with respect to the Shares held by such shareholder is at all times such shareholder; (c) the shareholder's executor, administrator, trustee, personal representative, or assignee to whom Shares are transferred at death or by operation of law; (d) any Person approved by the Board; or (e) any Purchaser in accordance with <u>Section 12.3</u>; or (e) a spouse in connection with a divorce.

12.2.5. "Person" means any individual, partnership, limited liability company, corporation, trust, joint venture, cooperative, association or other entity.

EXHIBIT 3
Page 12 of 16

12.2.6. "Preferred Stock" means the preferred stock, no par value, of the Corporation, regardless of series, class or other designation.

12.2.7. "Shares" means one or more shares of Common Stock and/or Preferred Stock, as the context requires.

12.2.8. "Transfer" when used as a noun means any sale, assignment, exchange, gift, devise, hypothecation, pledge, encumbrance, attachment, levy, foreclosure, sale by legal process under execution, attachment or receivership, sale or retention of any Shares or interest in any Shares by a secured party after a default, change in the beneficial ownership or the trustee of any trust which is a shareholder of the Corporation, change of ownership ordered by any court pursuant to dissolution of marriage or otherwise, or other change in ownership, voluntary or involuntary. "Transfer" when used as a verb means transferring any Shares or interests in any Shares by any means as set forth in the previous sentence.

12.3.    <u>Corporation's Right of First Refusal</u>.

12.3.1. No Transfer of any Shares (the "Offered Stock") may be made on or after January 1, 2016 unless the shareholder (the "Seller") has received a bona fide written offer (the "Purchase Offer") from a Person (the "Purchaser") to purchase the Offered Stock for a purchase price (the "Offer Price") denominated and payable in United States dollars at closing or according to specified terms, with or without interest, which offer must be in writing signed by the Purchaser and will be irrevocable for a period ending no sooner than the day following the end of the Offer Period, as defined below.

12.3.2. Prior to making any Transfer that is subject to the terms of this <u>Section 12.3</u>, the Seller must give to the Corporation written notice (the "Offer Notice") which must include a copy of the Purchase Offer and an offer (the "Firm Offer") to sell the Offered Stock to the Corporation for the Offer Price, payable according to the same terms as (or more favorable terms than) those contained in the Purchase Offer; <u>provided</u>, that the Firm Offer will be made without regard to the requirement of any earnest money or similar deposit required of the Purchaser prior to closing, and without regard to any security (other than the Offered Stock) to be provided by the Purchaser for any deferred portion of the Offer Price.

12.3.3. The Firm Offer will be irrevocable for a period (the "Offer Period") of 30 days following the date the Offer Notice is received by the Corporation.  At any time during the Offer Period the Corporation may accept the Firm Offer for all, but not less than all, of the total amount of the Offered Stock.

12.3.4. If the Firm Offer is accepted, the closing of the sale of the Offered Stock will take place within 15 days after the Firm Offer is accepted or, if later, the date of closing set forth in the Purchase Offer.  The Seller will execute such documents and

EXHIBIT 3
Page 13 of 16

instruments as may be necessary or appropriate to effect the sale of the Offered Stock pursuant to the terms of the Firm Offer and this <u>Section 12.3</u>.

12.3.5. If the Firm Offer is not accepted in the manner outlined above, the Seller may sell the Offered Stock to the Purchaser at any time within 60 days after the last day of the Offer Period; <u>provided</u>, that such sale is made on terms no more favorable to the Purchaser than the terms contained in the Purchase Offer; and, <u>provided further</u>, that such sale complies with other terms, conditions, and restrictions of this Agreement that are applicable to Shares and are not expressly made inapplicable to sales occurring under this <u>Section 12.3</u>.

12.4.    <u>Prohibited Transfers</u>.

12.4.1.    Any purported Transfer that is not a Permitted Transfer will be void and of no effect.   Notwithstanding the foregoing, if a court or authority of competent jurisdiction requires the Corporation to recognize a Transfer that is not a Permitted Transfer (or if the Corporation, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer): (a) the transferee will be deemed to have accepted the Shares subject to the provisions of this Agreement, and (b) the Corporation will have an option to redeem any of the Transferred Shares within 180 days after the Corporation receives a copy of the order requiring the Corporation to recognize the Transfer.  The redemption price will be the Adjusted Fair Market Value of the Shares as of the Transfer date.  The Corporation may elect to redeem the Transferred Shares by delivering a written notice of its election to the transferee specifying the number of shares to be redeemed.  If the Corporation elects to redeem any such Shares, the Corporation will pay the Adjusted Fair Market Value of the Shares to the transferee over a period not to exceed 5 years, plus interest at the lowest rate that will not result in the imputation of interest under the Internal Revenue Code.

12.4.2.    Any Shares Transferred pursuant to <u>Section 12.4.1</u> that the Corporation does not redeem will be limited in accordance with this <u>Section 12</u>, and the Corporation may apply distributions with respect to such Shares  (without limiting any other legal or equitable rights of the Corporation) to satisfy any debts, obligations, or liabilities for damages (including incremental tax liability and attorney fees and expenses incurred in negotiations, trial preparation, at trial, on appeal or in bankruptcy) that the transferor or transferee of the Shares may have to the Corporation.

12.5.    <u>Conditions to Permitted Transfers</u>. A Transfer allowed by this <u>Section 12</u> will not be treated as a Permitted Transfer unless and until the following conditions are satisfied:

12.5.1. Except for a Transfer of Shares at death or involuntarily by operation of law, the transferor and transferee execute and deliver to the Corporation the documents and instruments of conveyance necessary to effect the Transfer and confirm the transferee's agreement to be bound by the provisions of the Bylaws. In the case of a Transfer of Shares at death or involuntarily by operation of law, the Transfer will be confirmed by presentation to the Corporation of satisfactory legal evidence of the

EXHIBIT 3
Page 14 of 16

Transfer. The transferor and transferee will reimburse the Corporation for all costs and expenses that the Corporation reasonably incurs in connection with the Transfer.

12.5.2. The transferor and transferee furnish the Corporation with the transferee's taxpayer identification number and any other information reasonably necessary to permit the Corporation to file all required federal and state tax returns and other legally required information statements or returns.

12.5.3. Except for a Transfer at death or involuntarily by operation of law, the transferor, if the Corporation requests, furnishes an opinion of legal counsel, which counsel and opinions are satisfactory to the Corporation, to the effect that either (a) the Common Stock and/or Preferred Stock will be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (b) the Transfer is exempt from all applicable registration requirements and the Transfer will not violate any applicable laws regulating the Transfer of securities.

12.5.4. The Transfer will not cause the Corporation to be deemed to be an "investment company" under the Investment Corporation Act of 1940, as amended.

12.6.   If a Transfer or attempted Transfer is not a Permitted Transfer, the parties engaging or attempting to engage in the Transfer will be liable to indemnify and hold harmless the Corporation and its directors, officers, employees and agents and  from all costs, liability, and damages that any of the indemnified Persons may incur (including incremental tax liability and attorney fees and expenses incurred in negotiations, trial preparation, at trial, on appeal or in bankruptcy) as a result of the Transfer or attempted Transfer and efforts to enforce this indemnity.

12.7.   The Corporation may assign any of its rights to purchase or redeem Shares under this Section 12, from time to time, to any Person or Persons selected by the Board.

## 13.   **Miscellaneous**.

13.1.   Telephonic Meetings.   Meetings of the shareholders and directors, or of any committee designated by each shareholder and director, may be held by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at the meeting.

13.2.   Books and Records.   The Corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its shareholders and the Board and shall keep at its registered office a record of its shareholders, giving the names and addresses of all shareholders and the number and class of shares held by each.   The records of the Corporation shall be open to inspection by the shareholders or the shareholders' agents or attorneys in the manner and to the extent required by applicable law.

## 14.   **Director Committees**.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 15

EXHIBIT 3
Page 15 of 16

14.1.  <u>Creation of Committees</u>.  Unless the Articles provide otherwise, the Board may create one or more committees and appoint members of the Board to serve on them.  Each committee must have two or more members, who serve at the pleasure of the Board.

14.2.  <u>Selection of Members</u>.  The creation of a committee and appointment of members to it must be approved a majority of all the directors in office when the action is taken.

14.3.  <u>Authority</u>.  Unless limited by the Articles, each committee may exercise those aspects of the authority of the Board which the Board confers upon such committee in the resolution creating the committee; <u>provided</u>, a committee may not:

14.3.1. Authorize distributions;

14.3.2. Approve or propose to shareholders action that the OBCA requires be approved by shareholders;

14.3.3. Fill vacancies on the Board or on any of its committees;

14.3.4. Amend the Articles pursuant to the authority of directors to do so granted by the OBCA.

14.3.5. Adopt, amend, or repeal these Bylaws;

14.3.6. Approve a plan of merger not requiring shareholder approval;

14.3.7. Authorize or approve reacquisition of shares, except according to a formula or method prescribed by the Board; or

14.3.8. Authorize or approve the issuance or sale or contract for sale of shares or determine the designation and relative rights, preferences, and limitations of class or series of shares, except that the Board may authorize a committee (or a senior executive officer of the Corporation) to do so within limits specifically prescribed by the Board.

034518/00003/5173095v3

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 16

EXHIBIT 3
Page 16 of 16

# EXHIBIT 4

## RIGHTS OFFERING SUBSCRIPTION FORM

### RIGHTS OFFERING SUBSCRIPTION FORM

### C & K MARKET, INC.

#### Rights Offering
#### Up to _____ Shares of Common Stock

#### Pursuant to the Plan of Reorganization dated January __, 2014
(as it may be supplemented from time to time, the "Plan")

**THIS RIGHTS OFFERING WILL EXPIRE AT 9:00 A.M., PORTLAND, OREGON, TIME, ON _____, 2014 (THE "SUBSCRIPTION DEADLINE," UNLESS EARLIER TERMINATED BY C & K MARKET, INC.)**

**THIS FORM AND PAYMENT OF SUBSCRIPTION AMOUNT MUST BE DELIVERED TO:**
**[TO BE INSERTED BY DEBTOR]**

**DELIVERY OF THIS SUBSCRIPTION TO AN ADDRESS OTHER THAN AS SET FORTH ABOVE OR TRANSMISSION OF THIS SUBSCRIPTION FORM VIA A FACSIMILE NUMBER OR E-MAIL ADDRESS OTHER THAN THE ONE LISTED ABOVE WILL NOT CONSTITUTE A VALID DELIVERY. THIS SUBSCRIPTION MUST BE DELIVERED TO C & K MARKET, INC. (THE "COMPANY") AT OR BEFORE THE SUBSCRIPTION DEADLINE.**

**DELIVERY OF THIS SUBSCRIPTION WILL NOT CONSTITUTE A VALID EXERCISE OF SUBSCRIPTION RIGHTS UNLESS THE UNDERSIGNED ALSO DELIVERS PAYMENT OF THE SUBSCRIPTION PRICE TO THE COMPANY AS SET FORTH BELOW AT OR BEFORE THE SUBSCRIPTION DEADLINE, UNLESS OTHER ARRANGEMENTS HAVE BEEN MADE WITH THE COMPANY PRIOR TO THE SUBSCRIPTION DEADLINE.**

The undersigned acknowledges that it has received the Plan, the accompanying Disclosure Statement and this accompanying Rights Offering Subscription Form (this "Subscription") of the Company, relating to the Company's distribution of one right (each, a "Subscription Right") to purchase up to a pro rata share of _____ shares of the Company's Common Stock, at a price of [$___ per share]. The undersigned certifies that it is a holder of a Class 12 Claim under the Plan and that, as of [_____, 2014], the undersigned's Class 12 Claim had not been disallowed.

Capitalized terms used but not defined herein have the respective meanings ascribed to them in the Plan and Disclosure Statement.

### EXERCISE OF SUBSCRIPTION RIGHTS

**Please read this entire Subscription and the information in the Plan and Disclosure Statement under "The Rights Offering" carefully before checking any box below. Additional copies of the Plan and Disclosure Statement and this Subscription may be directed to the Company at the address and telephone numbers that appear at the end of this form.**

☐ CHECK HERE IF YOU WISH TO PURCHASE **ALL** OF YOUR PRO RATA SHARE OF THE RIGHTS OFFERING SHARES, ROUNDED TO THE NEAREST WHOLE SHARE.

☐ CHECK HERE IF YOU WISH TO PURCHASE **LESS THAN ALL** OF YOUR PRO RATA SHARE OF THE RIGHTS OFFERING SHARES (WHOLE SHARES ONLY).

_____ Indicate the number of shares of Common Stock you wish to purchase under the Rights Offering at the Subscription Price.

EXHIBIT 4
Page 1 of 2

**The Subscription Price is [$___] per share of Common Stock. Full payment of the Subscription Amount for the Common Stock subscribed for pursuant to the Primary Rights Offering must be made in United States dollars and delivered by wire transfer of immediately available funds to the following account maintained by the Company by the Subscription Deadline:**

[To be inserted by Company]

**Wire** Routing #

**ACH** Routing # SWIFT Code:

for credit to:

C & K Market, Inc.

Acct. #

By signing this form, the undersigned irrevocably elects to purchase the Common Stock indicated above upon the terms and conditions specified in the Plan and Disclosure Statement and agrees that if it fails to pay for the Common Stock as set forth herein, this Subscription will be null and void.

PLEASE SIGN HERE

Authorized Signature of Eligible Holder
of Class 12 Claim

If signature is by attorney-in-fact, trustee, executor, administrator, guardian, officer of a corporation or other person acting in a fiduciary or representative capacity, please provide the following information:

Name:

Title:

Address:

Telephone
Number:

Date:

Taxpayer Identification or Social Security Number:

**Signatures on this Subscription; Guarantee of Signatures.** If this Subscription is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, those persons should so indicate when signing, and proper evidence satisfactory to the Company of that authority so to act must be submitted, unless waived by the Company.

034518/00017/5235361v2

EXHIBIT 4
Page 2 of 2

1

**CERTIFICATE OF SERVICE**

2

    I hereby certify that I served the foregoing **DEBTOR'S PLAN OF**
3 **REORGANIZATION (JANUARY 31, 2014)** on the parties indicated as "ECF" on the
attached List of Interested Parties by electronic means through the Court's Case
4 Management/Electronic Case File system on the date set forth below.

5     In addition, I served the foregoing on the parties indicated as "Non-ECF" on
the attached List of Interested Parties by mailing a copy thereof in a sealed, first-class
6 postage prepaid envelope, addressed to each party's last-known address and depositing in the
U.S. mail at Portland, Oregon on the date set forth below.

7     DATED this 31st day of January, 2014.

8                TONKON TORP LLP

9

10        By /s/ Albert N. Kennedy
             Albert N. Kennedy, OSB No. 821429
11           Michael W. Fletcher, OSB No. 010448
             Timothy J. Conway, OSB No. 851752
12           Ava L. Schoen, OSB No. 044072
             Of Attorneys for Debtor

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 1 of 1** -   CERTIFICATE OF SERVICE

# <u>LIST OF INTERESTED PARTIES</u>

### *In re C & K Market, Inc.*
### U.S. Bankruptcy Court Case No. 13-64561-fra11

## ECF PARTICIPANTS

- RICHARD T ANDERSON rick@andersonmonson.com, lisa@andersonmonson.com
- MATTHEW A ARBAUGH matt@fieldjerger.com, koren@fieldjerger.com
- CASEY B BOYLE KDWBankruptcyDepartment@kelleydrye.com
- G JEFFERSON CAMPBELL mariahd@qwestoffice.net, gjcpc@qwestoffice.net
- DONALD J CHURNSIDE don@oregonlegalteam.com, melanie@oregonlegalteam.com
- TIMOTHY J CONWAY tim.conway@tonkon.com, nancy.kennedy@tonkon.com
- BRADLEY S COPELAND bcopeland@agsprp.com, bdavis@agsprp.com
- JOHN E DAVIS JackD@roguefirm.com
- MELINDA DAVISON tcp@dvclaw.com
- COLIN F. DOUGHERTY colin.dougherty@faegrebd.com
- MICHAEL W FLETCHER michael.fletcher@tonkon.com, leslie.hurd@tonkon.com;andy.haro@tonkon.com
- DAVID A FORAKER david.foraker@greenemarkley.com, joyce.chartrand@greenemarkley.com
- BENJAMIN FREUDENBERG benf@roguefirm.com
- DOUGLAS L GALLAGHER doug@dglawoffice.com, douglasgallagherlawoffice@gmail.com
- RUSSELL D GARRETT russ.garrett@jordanramis.com, mike.scott@jordanramis.com;priscilla.gray@jordanramis.com;litparalegal@jordanramis.com
- OREN B HAKER obhaker@stoel.com
- BRIAN T HEMPHILL brian@hemphill-attorney.com
- THOMAS A HUNTSBERGER tom@tahpc.com
- SCOTT L JENSEN slj@brownrask.com, lac@brownrask.com
- GREGG D JOHNSON gdj@aterwynne.com, jmh@aterwynne.com
- ALBERT N KENNEDY al.kennedy@tonkon.com, leslie.hurd@tonkon.com;andy.haro@tonkon.com
- CHRISTINE A KOSYDAR cakosydar@stoel.com, cmwallentine@stoel.com;docketclerk@stoel.com;lchopkins@stoel.com
- JUSTIN D LEONARD jleonard@ml-llp.com, ecf@ml-llp.com
- JULIA I MANELA ecf@scott-law-group.com
- DAVID B MILLS davidbmills@comcast.net, davidbmills@cs.com
- JEFFREY C MISLEY jeffm@sussmanshank.com, ecf.jeffrey.misley@sussmanshank.com
- JOHNSTON A MITCHELL johnstonlaw@comcast.net, coers@comcast.net;emenze@comcast.net
- WILSON C MUHLHEIM mkindred@luvaascobb.com;scooke@luvaascobb.com
- PETER C McKITTRICK pmckittrick@ml-llp.com, ecf@ml-llp.com
- EVAN H. NORDBY nordby.evan@dol.gov
- JOSHUA BYRON NORTON joshua.norton@kyl.com
- THOMAS M ORR torr@eugene-law.com, elynch@eugene-law.com,lmiller@eugene-law.com
- R SCOTT PALMER rspalmer@wlrlaw.com, lolson@wlrlaw.com
- CHRISTOPHER L PARNELL cparnell@dunncarney.com, taichele@dunncarney.com;sripley@dunncarney.com
- TERESA H PEARSON teresa.pearson@millernash.com, lisa.conrad@millernash.com;brenda.hale@millernash.com
- DAVID L POLLACK pollack@ballardspahr.com
- WILLARD L RANSOM wransom@roguevalleylaw.com, ddaw@roguevalleylaw.com
- FRANK C ROTE frank.rote@southernoregonlawyer.com
- Recovery Management Systems Corporation claims@recoverycorp.com
- TARA J SCHLEICHER tschleicher@fwwlaw.com, dfallon@fwwlaw.com;nlyman@fwwlaw.com
- AVA L SCHOEN ava.schoen@tonkon.com, larissa.stec@tonkon.com
- LOREN S SCOTT ecf@scott-law-group.com
- ALAN G SELIGSON aseligson@scslaw.org, assistant@scslaw.org
- TROY SEXTON tsexton@portlaw.com, nhenderson@portlaw.com,csturgeon@portlaw.com,mmyers@portlaw.com
- DALE L SMITH ofscourt@gmail.com
- RENEE STARR renee@rstarrlaw.com
- JERRY N STEHLIK jstehlik@bsss-law.com
- PATRICK L STEVENS pstevens@eugene-law.com, lmiller@eugene-law.com,ahorrigan@eugenelaw.com
- MICHAEL R. STEWART michael.stewart@faegrebd.com
- ANDREW MICHAEL THAU at@southpawasset.com
- STEPHEN T TWEET beth@albertandtweet.com, darlene@albertandtweet.com
- US Trustee, Eugene USTPRegion18.EG.ECF@usdoj.gov
- JOSEPH M VANLEUVEN joevanleuven@dwt.com, lizcarter@dwt.com;pdxdocket@dwt.com
- LAURA J WALKER lwalker@cablehuston.com, mingram@cablehuston.com
- PAMELA K. WEBSTER pwebster@buchalter.com, smartin@buchalter.com

## NON-ECF PARTICIPANTS

**SECURED CREDITORS**

Banc of America
 Leasing & Capital LLC
2059 Northlake Parkway 4 South
Tucker, GA 30084

Dell Financial Services LLC
Mail Stop-PS2DF-23
One Dell Way
Round Rock, TX 78682

James D. Gillespie
28274 S. Fork Rd.
Dayville, OR 97825

Greatway Center Property LLC
8816 E. Evans Creeks
Rogue River, OR 97537

Green & Frahm
941 Delsie Dr.
Grants Pass, OR 97527

Komlofske Corp.
1535 E. 3rd St.
Prineville, OR 97754

Protective Life
2801 Highway 280 South
Birmingham, AL 35202

**OTHER**

Jenette A. Barrow-Bosshart
Otterbourg P.C.
230 Park Avenue
New York, NY 10169-0075