1  **Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
       Direct Dial:  (503) 802-2013
2      Facsimile:    (503) 972-3713
       E-Mail:       al.kennedy@tonkon.com
3  **Timothy J. Conway**, OSB No. 851752
       Direct Dial:  (503) 802-2207
4      Facsimile:    (503) 972-3727
       E-Mail:       tim.conway@tonkon.com
5  **Michael W. Fletcher**, OSB No. 010448
       Direct Dial:  (503) 802-2169
6      Facsimile:    (503) 972-3869
       E-Mail:       michael.fletcher@tonkon.com
7  **Ava L. Schoen**, OSB No. 044072
       Direct Dial:  (503) 802-2143
8      Facsimile:    (503) 972-3843
       E-Mail:       ava.schoen@tonkon.com
9  **TONKON TORP** LLP
   1600 Pioneer Tower
10 888 S.W. Fifth Avenue
   Portland, OR  97204
11
       Attorneys for Debtor
12

13              UNITED STATES BANKRUPTCY COURT

14                  DISTRICT OF OREGON

15  In re                          | Case No. 13-64561-fra11

16  C & K Market, Inc.,            | **DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)**

17              Debtor.

18

19  **1.     INTRODUCTION**

20          On November 19, 2013 (the "Petition Date"), C & K Market, Inc. ("C & K" or

21  "Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United

22  States Code (the "Bankruptcy Code").

23          On January 31, 2014 Debtor filed its Plan of Reorganization (the "Plan") with the

24  Bankruptcy Court.  A copy of the Plan is attached hereto as **Exhibit 1**.  Debtor is seeking

25  acceptance of the Plan by its creditors.  A ballot has been enclosed with this Disclosure

26  Statement for use in voting on the Plan.  Debtor believes confirmation of the Plan is in the

**Page 1 of 48** -   DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1  best interest of Debtor's creditors and urges those parties entitled to vote to accept the

2  Plan.

3  **2.      PURPOSE OF THE DISCLOSURE STATEMENT**

4          The purpose of this Disclosure Statement is to provide you with adequate information

5  to enable you to make an informed judgment concerning whether to vote for or against the

6  Plan.  You are urged to review the Plan and, if appropriate, consult with counsel about the

7  Plan and its impact on your legal rights before voting on the Plan.  Capitalized terms used but

8  not defined in this Disclosure Statement shall have the meanings assigned to such terms in

9  the Plan or the Bankruptcy Code.

10          This Disclosure Statement has been approved by Order of the Bankruptcy Court as

11  containing adequate information to permit parties in interest to make an informed judgment

12  as to whether to vote to accept or reject the Plan, and whether or not to participate in the

13  Rights Offering.  The Bankruptcy Court's approval of this Disclosure Statement, however,

14  does not constitute a recommendation by the Bankruptcy Court either for or against the Plan

15  or the Rights Offering.

16          This Disclosure Statement is submitted in accordance with Section 1125 of the

17  Bankruptcy Code and Bankruptcy Rule 3016.  The description of the Plan contained in this

18  Disclosure Statement is intended as a summary only and is qualified in its entirety by

19  reference to the Plan itself.  This Disclosure Statement does not attempt to summarize or

20  discuss each and every section of the Plan.  If any inconsistency exists between the Plan and

21  this Disclosure Statement, the terms of the Plan are controlling.  This Disclosure Statement

22  may not be relied on for any purpose other than to determine how to vote on the Plan.

23          This Disclosure Statement has been prepared by Debtor in good faith based upon

24  information available to Debtor and information contained in Debtor's books and records.

25  The information concerning the Plan has not been subject to a verified audit.  The statements

26  contained in this Disclosure Statement are made as of the date hereof unless another time is

**Page 2 of 48** -   DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1　specified herein, and the delivery of this Disclosure Statement shall not imply there has been

2　no change in the facts set forth herein since the date of this Disclosure Statement and the date

3　the material relied on in preparation of this Disclosure Statement was compiled.

4　　　　Nothing contained herein shall constitute an admission of any fact or liability by any

5　party, or be admissible in any proceeding involving Debtor or any other party.

6　**3.　　BRIEF EXPLANATION OF CHAPTER 11**

7　　　　Chapter 11 of the Bankruptcy Code is the principal reorganization provision of the

8　Bankruptcy Code.  Pursuant to Chapter 11, a debtor-in-possession attempts to reorganize its

9　business for the benefit of the debtor, its creditors and other parties in interest.

10　　　　The formulation and confirmation of a plan of reorganization is the principal purpose

11　of a Chapter 11 case.  A plan sets forth a proposed method of compensating the debtor's

12　creditors.  Chapter 11 does not require all holders of claims to vote in favor of a plan in order

13　for the Bankruptcy Court to confirm the plan.  However, the Bankruptcy Court must find that

14　the plan meets a number of statutory tests before it may confirm, or approve, the plan.  These

15　tests are designed to protect the interests of holders of claims who do not vote to accept the

16　plan, but who will nonetheless be bound by the plan's provisions if it is confirmed by the

17　Bankruptcy Court.

18　**4.　　GENERAL SUMMARY OF TREATMENT OF CLAIMS**

19　　　　The Plan provides for the payment in full on the Effective Date of all Allowed

20　Administrative Expense Claims, Priority Tax Claims, Other Priority Claims and the Allowed

21　Secured Claim of U.S. Bank.  The Plan provides for the payment in full over time, with

22　interest, of all other Secured Claims.  In general, Secured Creditors with personal property

23　collateral will be paid in 60 equal amortizing payments, with interest at 5%, and Secured

24　Creditors with real property collateral will be paid in 84 equal amortizing payments with

25　interest at 5% based on a 25-year amortization with a balloon payment in seven years.

26

**Page 3 of 48** -　DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1      The Plan provides that each holder of a Small Unsecured Claim ($10,000 or less) will

2  receive, within 90 days after the Effective Date, a cash payment in an amount equal to 80%

3  of its Allowed Small Unsecured Claim.

4      The Plan provides that each holder of an Allowed General Unsecured Claim will

5  receive one share of Common Stock of Reorganized Debtor in exchange for each $10 of such

6  holder's Allowed General Unsecured Claim and a Subscription Right in the event Debtor

7  elects to consummate the Rights Offering.

8      The Plan provides that all existing Equity Securities and Employee Equity Security

9  Plans will be cancelled as of the Effective Date.

10  **5.      EVENTS LEADING TO CHAPTER 11 FILING**

11      Debtor is a family owned grocery store company headquartered in Brookings,

12  Oregon.  Ray Nidiffer founded the company in 1956 with a single store in Brookings.  Over

13  the next 50 years, the Nidiffer family and its employees grew the company to a chain of 60

14  plus grocery stores located in south and central Oregon and northern California.

15      The stores operate under the banners Ray's Food Place, Shop Smart and C & K

16  Market.  Debtor employs over 2,000 people, a majority of whom are employed full-time.

17  Debtor provides family health insurance for all its full-time employees.

18      Debtor's wholly owned subsidiary, C&K Express ("Express"), which is a co-obligor

19  on the obligations owing to U.S. Bank, owned and operated 15 pharmacies, several of which

20  were located in Debtor's grocery stores and several were stand-alone operations.  Prepetition,

21  Express sold 12 of the 15 pharmacies.  Postpetition, Express closed the sale of one of the

22  three remaining pharmacies, and expects to sell the remaining two pharmacies by the end of

23  February 2014.  Proceeds from the sales have been and will be paid to U.S. Bank to reduce

24  its Secured Claim.

25      Historically, Debtor operated in small rural communities.  Often, Debtor operated the

26  only grocery store in the community and the only grocery store for miles around.  As a result

**Page 4 of 48** -   DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1   of both Debtor's expansion into more populated areas, and the expansion of large discounters

2   such as Costco and Walmart into less populated areas and into the grocery business, Debtor

3   has faced increasingly greater competition and resulting pressure on its sales and margins.

4        Many of Debtor's stores are located within 40 miles of a large discount grocery

5   operation such as Walmart or Costco.  In the last half of 2012, new "Super Walmarts"

6   negatively affected at least 30 of Debtor's markets.  As a result of the evolving marketplace,

7   several of Debtor's stores became unviable.  Accordingly, Debtor has closed, or will close,

8   approximately 20 unviable stores, leaving Debtor with approximately 40 grocery stores with

9   proven profitability in markets that Debtor believes will continue to prosper.

10       Although the closures will enhance Debtor's profitability and reduce secured debt to

11  U.S. Bank, the downsizing will result in additional unsecured debt as a result of lease

12  rejections, and will diminish Debtor's ability to service its legacy debt incurred during its

13  period of expansion.  As a result, Debtor was forced to restructure its obligations and seek

14  Chapter 11 relief.

15       Debtor's restructuring will enable it to emerge as a viable entity that will continue to

16  contribute to the communities in which it operates.

17  **6.    SIGNIFICANT POST-PETITION EVENTS**

18       6.1   _Ordinary Course Operations_.  Other than the closing of unviable stores,

19  Debtor has continued to operate its stores and its business, and pay its post-petition expenses,

20  in the ordinary course of business.

21       6.2   _Appointment of Unsecured Creditors Committee_.  Early in the case, the

22  United States Trustee appointed a committee of unsecured creditors (the "Committee")

23  pursuant to 11 U.S.C. § 1102(a) and 11 U.S.C. § 1102(b)(1).  The Committee is represented

24  by Otterbourg, P.C. as lead co-counsel and by McKittrick Leonard LLP as local co-counsel.

25       6.3   _Retention of Professionals_.  Pursuant to a series of applications and orders,

26  Debtor obtained authorization from the Bankruptcy Court to employ various professionals in

**Page 5 of 48** -   DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1   the Case.  These professionals include, among others, Tonkon Torp LLP as Debtor's

2   Chapter 11 counsel; Edward Hostmann, Inc. as Chief Restructuring Officer; The Food

3   Partners, LLC as financial advisors; Great American Group, LLC to manage store closing

4   sales; Henderson Bennington Moshofsky, P.C. as accountants; and Kieckhafer Schiffer &

5   Company, LLP as financial advisors and consultants.

6       6.4    <u>First Day Orders</u>.  Early in the case, Debtor obtained a number of Bankruptcy

7   Court orders designed to ensure a smooth transition into Chapter 11.  These orders authorized

8   Debtor to, among other things: assume its supply agreement with Supervalu (Debtor's

9   primary supplier of grocery products and health and beauty products); obtain post-petition

10  financing from U.S. Bank; pay prepetition wages, PACA claims, and 503(b)(9) claims;

11  continue to honor and perform its customer loyalty programs; maintain its existing bank

12  accounts and cash management system; and conduct store closing sales.

13      6.5    <u>Post-Petition Financing</u>.  Prepetition, Debtor and U.S. Bank agreed upon the

14  terms of post-petition financing (the "DIP Facility") to be provided by U.S. Bank to Debtor

15  during the Chapter 11 case.  The DIP Facility is a secured revolving line of credit, the terms

16  of which were approved by the Bankruptcy Court.  Post-petition, Debtor has been operating

17  in the ordinary course with funds obtained from the DIP Facility.  A summary of the material

18  terms of the DIP Facility was included in Debtor's motion to approve the DIP financing

19  [Dkt. #26] and may be obtained by contacting counsel for Debtor.  Debtor has operated

20  within the terms of the DIP Facility and is confident the DIP Facility will provide funding

21  that is adequate to ensure its successful operation during the pendency of the Chapter 11

22  case.

23      6.6    <u>Payment of PACA Claims (Perishable Agricultural Commodities Act)</u>.

24  Debtor obtained Bankruptcy Court authority to pay the valid prepetition PACA claims of

25  Debtor's PACA suppliers (suppliers of fresh and frozen fruits and vegetables).  Debtor has

26  paid approximately $1,300,000 of prepetition PACA claims in accordance with the PACA

**Page 6 of 48** -   DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    order.  In addition, Debtor has paid all post-petition PACA claims in the ordinary course of

2    business.

3          6.7    Payment of 503(b)(9) Claims.  Debtor obtained an order from Bankruptcy

4    Court authorizing (but not requiring) Debtor to pay the valid prepetition 503(b)(9) claims of

5    Debtor's continuing suppliers.  Nearly all of Debtor's suppliers have continued to supply

6    goods to Debtor on payment terms equal to or better than those provided prepetition.  Debtor

7    has paid approximately $6,000,000 in 503(b)(9) claims in accordance with the 503(b)(9)

8    order, and continues to pay its suppliers in the ordinary course of business.

9          6.8    Store Closing Sales.  Pursuant to Bankruptcy Court authority, Debtor has

10   conducted store closing sales at 15 stores.  Proceeds from the store closing sales have been

11   applied to the post-petition revolver under the DIP Facility and to the U.S. Bank Term Loans

12   for proceeds received in excess of the advance rate.

13         6.9    Lease Rejections.  In connection with the store closings, Debtor has rejected

14   its leases at 15 of the closed stores.  Landlords with rejected leases will have lease rejection

15   claims against Debtor.

16         6.10   Operations.  Debtor's transition into the Chapter 11 case was successful.

17   Debtor has continued to receive ordinary trade terms from the vast majority of its suppliers.

18   As a result, Debtor's operations have met or exceeded its projections and Debtor is confident

19   that it has adequate funding available on its DIP Facility to fund its operations for the

20   remainder of the case.

21   **7.    CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN**

22         Below is a general summary of the Plan's classification and treatment of Claims.

23   Please refer to the Plan for a more complete description of the classification and treatment of

24   Claims, and for the meaning of the Capitalized (defined) terms used below.

25         7.1    Unclassified Claims.  Administrative Expense Claims and Priority Tax Claims

26   are not classified under the Plan.

**Page 7 of 48** -   DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1       An Administrative Expense Claim is any Claim entitled to the priority afforded by

2  Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

3       The Plan provides that each holder of an Allowed Administrative Expense Claim

4  shall be paid the full amount of its Allowed Administrative Expense Claim in Cash on the

5  later of (a) the Effective Date; or (b) the date on which such Claim becomes Allowed, unless

6  such holder shall agree to a different treatment of such Claim (including, without limitation,

7  any different treatment that may be provided for in any documentation, statute, or regulation

8  governing such Claim); provided, however, that Administrative Expense Claims representing

9  obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case

10  shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in

11  accordance with any terms and conditions of the particular transaction, and any agreements

12  relating thereto.

13       The amount of Administrative Expense Claims has not yet been determined.

14       A Priority Tax Claim is a claim of a governmental unit of the kind entitled to priority

15  under Section 507(a)(8) of the Bankruptcy Code.  The Plan provides that each holder of an

16  Allowed Priority Tax Claim will be paid by Reorganized Debtor the full amount of its

17  Allowed Priority Tax Claim in Cash on the later of (a) the Effective Date, or (b) the date on

18  which such Claim becomes Allowed.  The amount of Priority Tax Claims has yet to be

19  determined.

20       7.2    Classified Claims.  The Plan divides all Claims (other than Administrative

21  Expense Claims and Priority Tax Claims) into the following Classes.

22          7.2.1   Class 1 (Other Priority Claims).  Class 1 consists of all Allowed

23  Other Priority Claims.  An Other Priority Claim means any Claim for an amount entitled to

24  priority in right of payment under Sections 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy

25  Code.

26       The amount of Other Priority Claims, if any, has not yet been determined.

**Page 8 of 48** -   DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    The Plan provides that each holder of an Allowed Other Priority Claim will be paid in

2    full in Cash by Reorganized Debtor the amount of its Allowed Other Priority Claim on the

3    later of (a) the Effective Date; or (b) the date on which such Claim becomes allowed, unless

4    such holder shall agree or has agreed to a different treatment of such Claim (including any

5    different treatment that may be provided for in any documentation, agreement, contract,

6    statute, law, or regulation creating and governing such Claim).

7        Class 1 is unimpaired by the Plan.

8            7.2.2    Class 2 (C & K Market, Inc. 401(k) Plan; United States Department

9    of Labor).  Class 2 consists of the Claims of the C & K Market, Inc. 401(k) Plan and the

10   United States Department of Labor arising under or related to a Consent Judgment and Order

11   between the DOL, Debtor and the C & K Market 401(k) Plan.

12       The DOL Consent Judgment and Order settled claims of breach of ERISA fiduciary

13   duties asserted by the DOL against Debtor arising from a series of transactions pursuant to

14   which the 401(k) Plan acquired certain real estate assets, including properties generally

15   referred to as Rogue Landing, the Lakeside Property, and the John Day Market.

16       Rogue Landing is a 15.12 acre tract located in Curry County, Oregon on the southern

17   Oregon Coast.  The property has Rogue River frontage and contains a resort with an office

18   building, RV hookups, a boat ramp, docks and cabins.  There are several residential sites

19   situated on bluffs overlooking the Rogue River and beyond to the Pacific Ocean.

20       Under the terms of the DOL Consent Judgment and Order, Debtor is, among other

21   things, obligated to pay to the 401(k) Plan a total of $3 million in principal plus simple

22   interest at 8% per annum, in annual installments of $500,000.  Debtor began making such

23   payments on July 1, 2011 and is obligated to pay to the 401(k) Plan $500,000 on July 1,

24   2014; $500,000 on July 1, 2015; $500,000 on July 1, 2016; and a final payment of

25   $544,739.81 on July 1, 2017.  In addition, if the 401(k) Plan has not sold Rogue Landing

26   within six years of the date of entry of the Consent Judgment and Order, or by October 29,

**Page 9 of 48** -   DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1   2016, the Rogue Landing property is to be put up for auction to be concluded within ninety

2   days after the expiration of such six-year period.  If, prior to or at such auction, Rogue

3   Landing is purchased by an unrelated third party for less than $5 million, Debtor is obligated

4   to pay into the 401(k) Plan the difference between the net payment to the 401(k) Plan and

5   $5 million.  If Rogue Landing is not purchased by an unrelated third party, prior to or at such

6   auction, Debtor is obligated to purchase Rogue Landing by tendering payment of $5 million

7   to the 401(k) Plan within 30 days following the close of such auction.  Debtor does not have

8   a current appraisal of Rogue Landing and the marker value is uncertain.

9       The Plan provides that the DOL Consent Judgment and Order shall remain in full

10  force and effect, and is not in any way modified, altered or affected by the Plan.  Without

11  limiting the preceding, Reorganized Debtor shall continue to timely and fully perform and

12  pay all of its obligations under the DOL Consent Judgment and Order.

13      Class 2 is unimpaired by the Plan.

14          7.2.3   Class 3 (Banc of America Leasing & Capital, LLC).  Class 3 consists

15  of the Allowed Secured Claim of Banc of America Leasing & Capital, LLC ("BALC").

16      BALC has filed a proof of claim in the amount of $347,508.42 in connection with a

17  capital lease dated on or about April 13, 2007 secured by specific equipment.  In its claim,

18  BALC asserts that the value of the collateral securing its Claim is $325,000, such that BALC

19  asserts it has a Secured Claim of $325,000 and a general unsecured claim of $22,508.42.

20  Debtor and BALC have not yet agreed on the value of the BALC Collateral or the amount of

21  BALC's Claim.

22      The Plan provides that the amount of BALC's Allowed Secured Claim will be

23  determined by agreement of Debtor and BALC, or, absent agreement, in such amount as is

24  determined and Allowed by the Bankruptcy Court.

25      The Plan provides that BALC's Class 3 Claim shall be satisfied by delivery of a

26  promissory note to BALC (the "BALC Note") in the principal amount of its Allowed Secured

**Page 10 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1   Claim.  The BALC Note will bear interest from the Effective Date at a fixed per annum rate

2   of 5%, and will be payable by Reorganized Debtor as follows:

3        Commencing on the first day of the first month following the Effective Date and

4   continuing on the first day of each month thereafter until the BALC Note has been paid in

5   full, Reorganized Debtor will make equal monthly amortizing payments of principal and

6   interest on the BALC Note based on a five-year amortization schedule, with final payment

7   due five years after the Effective Date.

8        The Class 3 Claim may be prepaid in full or in part at any time without any

9   prepayment penalty or premium.

10       As security for the Class 3 Claim, BALC will retain its security interests in and liens

11  upon its Collateral with the same priority and to the same extent such security had as of the

12  Petition Date.  Reorganized Debtor will maintain the BALC Collateral in good repair, will

13  insure the BALC Collateral to its full useable value, and will pay any property taxes with

14  respect to such Collateral when due.  At any sale of its Collateral, BALC will have the right

15  to bid at such sale, and if BALC is the successful bidder, BALC may offset all or any portion

16  of its then unpaid Allowed Secured Claim.

17       Class 3 is impaired by the Plan.

18            7.2.4   Class 4 (Dell Financial Services, LLC).  Class 4 consists of the

19  Allowed Secured Claim of Dell Financial Services, LLC ("Dell").

20       Debtor scheduled Dell's total Claim at $164,455.25.  Dell's Claim is for obligations

21  owing under or in connection with a capital lease dated on or about October 3, 2011 secured

22  by various specific equipment.  The value of the equipment has not yet been determined or

23  agreed upon by Debtor and Dell.  Debtor believes that the value of the Dell Collateral is less

24  than the total amount of Dell's Claim, such that Dell will have a Secured Claim and a General

25  Unsecured Claim.

26

**Page 11 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    The Plan provides that the amount of Dell's Allowed Secured Claim will be

2    determined by agreement of Debtor and Dell, or, absent agreement, in such amount as is

3    determined and Allowed by the Bankruptcy Court.

4    The Plan provides that Dell's Class 4 Claim shall be satisfied by delivery of a

5    promissory note to Dell (the "Dell Note") in the principal amount of its Allowed Secured

6    Claim.  The Dell Note will bear interest from the Effective Date at a fixed per annum rate of

7    5%, and will be payable by Reorganized Debtor as follows:

8    Commencing on the first day of the first month following the Effective Date and

9    continuing on the first day of each month thereafter until the Dell Note has been paid in full,

10    Reorganized Debtor will make equal monthly amortizing payments of principal and interest

11    on the Dell Note based on a five-year amortization schedule, with a final payment due five

12    years after the Effective Date.

13    The Class 4 Claim may be prepaid in full or in part at any time without any

14    prepayment penalty or premium.

15    As security for the Class 4 Claim, Dell will retain its security interests in and liens

16    upon its Collateral with the same priority and to the same extent such security had as of the

17    Petition Date.  Reorganized Debtor will maintain the Dell Collateral in good repair, will

18    insure the Dell Collateral to its full useable value, and will pay any property taxes with

19    respect to such Collateral when due.  At any sale of its Collateral, Dell will have the right to

20    bid at such sale, and if Dell is the successful bidder, Dell may offset all or any portion of its

21    then unpaid Allowed Secured Claim.

22    Class 4 is impaired by the Plan.

23        7.2.5    Class 5 (Komlofske Corp.).  Class 5 consists of the Allowed Secured

24    Claim, if any, of Komlofske Corp ("Komlofske").

25    Debtor scheduled Komlofske's Claim at $1,195,502.53.  Debtor believes that the

26    entire amount of Komlofske's Claim is a General Unsecured Claim.

**Page 12 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    Komlofske's Claim is for amounts owing under or in connection with that certain

2  promissory note dated January 16, 2003 in the original principal amount of $1,222,500.  The

3  note was issued by Debtor to Komlofske in connection with the sale by Komlofske to Debtor

4  of Ray's #60 store in Prineville, Oregon, and was secured by certain specific equipment or

5  other assets located at the Ray's #60 store in Prineville.  Komlofske filed a UCC financing

6  statement against such equipment on January 21, 2003, and continued the UCC financing

7  statement in January of 2008.  However, the UCC financing statement lapsed on January 21,

8  2013 (prior to the Petition Date), and accordingly Debtor believes the Komlofske Claim is a

9  general unsecured claim.

10    If Komlofske asserts that it is a Secured Creditor, Debtor will file an adversary

11  proceeding to avoid any lien asserted by Komlofske using Debtor's "strong arm" powers

12  under Section 544 of the Bankruptcy Code.

13    If and to the extent that the Komlofske Claim, or any portion thereof, is a Secured

14  Claim, the Plan provides that Komlofske's Allowed Secured Claim shall be satisfied by

15  delivery of a promissory note to Komlofske (the "Komlofske Note") in the principal amount

16  of its Allowed Secured Claim.  The Komlofske Note will bear interest from the Effective

17  Date at a fixed per annum rate of 5%, and will be payable by Reorganized Debtor as follows:

18    Commencing on the first day of the first month following the Effective Date and

19  continuing on the first day of each month thereafter until the Komlofske Note has been paid

20  in full, Reorganized Debtor will make equal monthly amortizing payments of principal and

21  interest on the Komlofske Note based on a five-year amortization schedule, with a final

22  payment due five years after the Effective Date.

23    The Class 5 Claim may be prepaid in full or in part at any time without any

24  prepayment penalty or premium.

25    As security for the Class 5 Claim, Komlofske will retain its security interests in and

26  liens upon its Collateral (if any) with the same priority and to the same extent such security

**Page 13 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    had as of the Petition Date.  Reorganized Debtor will maintain the Komlofske Collateral in

2    good repair, will insure the Komlofske Collateral to its full useable value, and will pay any

3    property taxes with respect to such Collateral when due.  At any sale of its Collateral,

4    Komlofske will have the right to bid at such sale, and if Komlofske is the successful bidder,

5    Komlofske may offset all or any portion of its then unpaid Allowed Secured Claim.

6        Class 5 is impaired by the Plan.

7            7.2.6    Class 6 (James Gillespie).  Class 6 consists of the Allowed Secured

8    Claim of James Gillespie ("Gillespie").

9        Debtor scheduled Gillespie's Claim at $388,538.44.  The value of the Collateral

10    securing Gillespie's Claim (that certain real property located at 48067, Hwy. 58, Oakridge,

11    Oregon 97453 (Rays #50) exceeds the amount of Gillespie's Claim, such that Gillespie's

12    Claim is fully secured.

13        The Plan provides that the amount of Gillespie's Allowed Secured Claim will be

14    determined by agreement of Debtor and Gillespie, or, absent agreement, in such amount as is

15    determined and Allowed by the Bankruptcy Court.

16        The Plan provides that Gillespie's Class 6 Claim shall be satisfied by delivery of a

17    promissory note to Gillespie (the "Gillespie Note") in the principal amount of Gillespie's

18    Allowed Secured Claim.  The Gillespie Note will bear interest from the Effective Date at a

19    fixed per annum rate of 5%, and will be payable by Reorganized Debtor as follows:

20        Commencing on the first day of the first month following the Effective Date and

21    continuing on the first day of each month thereafter until the Gillespie Note has been paid in

22    full, Reorganized Debtor will make equal monthly amortizing payments of principal and

23    interest on the Gillespie Note based on a twenty five-year amortization schedule, with a

24    balloon payment due seven years after the Effective Date.

25        The Class 6 Claim may be prepaid in full or in part at any time without any

26    prepayment penalty or premium.

**Page 14 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    As security for the Class 6 Claim, Gillespie will retain its security interests in and

2    liens upon its Collateral with the same priority and to the same extent such security had as of

3    the Petition Date.  Reorganized Debtor will maintain the Gillespie Collateral in good repair,

4    will insure the Gillespie Collateral to its full useable value, and will pay any property taxes

5    with respect to such Collateral when due.  At any sale of its Collateral, Gillespie will have

6    the right to bid at such sale, and if Gillespie is the successful bidder, Gillespie may offset all

7    or any portion of its then unpaid Allowed Secured Claim.

8    The Class 6 Claim is fully secured, and Gillespie will not have any Deficiency Claim

9    with respect to the Class 6 Claim.

10    Class 6 is impaired by the Plan.

11    7.2.7    Class 7 (Greatway Center Property, LLC).  Class 7 consists of the

12    Allowed Secured Claim of Greatway Center Property, LLC ("Greatway").

13    Debtor scheduled Greatway's Claim at $1,551,508.31.  The value of the Collateral

14    securing Greatway's Claim (that certain real property located at 11100, Hwy. 62, White, City,

15    Oregon 97503 (Rays #61) exceeds the amount of Greatway's Claim, such that Greatway's

16    Claim is fully secured.

17    The Plan provides that the amount of Greatway's Allowed Secured Claim will be

18    determined by agreement of Debtor and Greatway, or, absent agreement, in such amount as

19    is determined and Allowed by the Bankruptcy Court.

20    The Plan provides that Greatway's Class 7 Claim shall be satisfied by delivery of a

21    promissory note to Greatway (the "Greatway Note") in the principal amount of its Allowed

22    Secured Claim.  The Greatway Note will bear interest from the Effective Date at a fixed per

23    annum rate of 5%, and will be payable by Reorganized Debtor as follows:

24    Commencing on the first day of the first month following the Effective Date and

25    continuing on the first day of each month thereafter until the Greatway Note has been paid in

26    full, Reorganized Debtor will make equal monthly amortizing payments of principal and

**Page 15 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1  interest on the Greatway Note based on a twenty five-year amortization schedule, with a

2  balloon payment due seven years after the Effective Date.

3       The Class 7 Claim may be prepaid in full or in part at any time without any

4  prepayment penalty or premium.

5       As security for the Class 7 Claim, Greatway will retain its security interests in and

6  liens upon its Collateral with the same priority and to the same extent such security had as of

7  the Petition Date.  Reorganized Debtor will maintain the Greatway Collateral in good repair,

8  will insure the Greatway Collateral to its full useable value, and will pay any property taxes

9  with respect to such Collateral when due.  At any sale of its Collateral, Greatway will have

10  the right to bid at such sale, and if Greatway is the successful bidder, Greatway may offset all

11  or any portion of its then unpaid Allowed Secured Claim.

12       The Class 7 Claim is fully secured, and Greatway will not have any Deficiency Claim

13  with respect to the Class 7 Claim.

14       Class 7 is impaired by the Plan.

15       7.2.8  <u>Class 8 (Green & Frahm)</u>.  Class 8 consists of the Allowed Secured

16  Claim of Green & Frahm ("Green").

17       Debtor scheduled Green's Claim at $337,507.28.  The value of the Collateral securing

18  Green's Claim (that certain real property located at 498 S. Pacific Highway, Tri City, OR

19  97457 (Shop Smart #29) exceeds the amount of Green's Claim, such that Green's Claim is

20  fully secured.

21       The Plan provides that the amount of Green's Allowed Secured Claim will be

22  determined by agreement of Debtor and Green, or, absent agreement, in such amount as is

23  determined and Allowed by the Bankruptcy Court.

24       The Plan provides that Green's Class 8 Claim shall be satisfied by delivery of a

25  promissory note to Green (the "Green Note") in the principal amount of its Allowed Secured

26

**Page 16 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    Claim.  The Green Note will bear interest from the Effective Date at a fixed per annum rate

2    of 5%, and will be payable by Reorganized Debtor as follows:

3         Commencing on the first day of the first month following the Effective Date and

4    continuing on the first day of each month thereafter until the Green Note has been paid in

5    full, Reorganized Debtor will make equal monthly amortizing payments of principal and

6    interest on the Green Note based on a twenty five-year amortization schedule, with a balloon

7    payment due seven years after the Effective Date.

8         The Class 8 Claim may be prepaid in full or in part at any time without any

9    prepayment penalty or premium.

10        As security for the Class 8 Claim, Green will retain its security interests in and liens

11   upon its Collateral with the same priority and to the same extent such security had as of the

12   Petition Date.  Reorganized Debtor will maintain the Green Collateral in good repair, will

13   insure the Green Collateral to its full useable value, and will pay any property taxes with

14   respect to such Collateral when due.  At any sale of its Collateral, Green will have the right to

15   bid at such sale, and if Green is the successful bidder, Green may offset all or any portion of

16   its then unpaid Allowed Secured Claim.

17        The Class 8 Claim is fully secured, and Green will not have any Deficiency Claim

18   with respect to the Class 8 Claim.

19        Class 8 is impaired by the Plan.

20             7.2.9   Class 9 (Ken and Lynda Martin).  Class 9 consists of the Allowed

21   Secured Claim of Ken and Lynda Martin ("Martin").

22        Debtor scheduled Martin's Claim at $702,046.58.  The value of the Collateral

23   securing Martin's Claim (that certain real property located at 110 Deer Creek R., Selma,

24   Oregon 97538 (Rays #71) exceeds the amount of Martin's Claim, such that Martin's Claim is

25   fully secured.

26

**Page 17 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

The Plan provides that the amount of Martin's Allowed Secured Claim will be determined by agreement of Debtor and Martin, or, absent agreement, in such amount as is determined and Allowed by the Bankruptcy Court.

The Plan provides that Martin's Class 9 Claim shall be satisfied by delivery of a promissory note to Martin (the "Martin Note") in the principal amount of its Allowed Secured Claim.  The Martin Note will bear interest from the Effective Date at a fixed per annum rate of 5%, and will be payable by Reorganized Debtor as follows:

Commencing on the first day of the first month following the Effective Date and continuing on the first day of each month thereafter until the Martin Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Martin Note based on a twenty five-year amortization schedule, with a balloon payment due seven years after the Effective Date.

The Class 9 Claim may be prepaid in full or in part at any time without any prepayment penalty or premium.

As security for the Class 9 Claim, Martin will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date.  Reorganized Debtor will maintain the Martin Collateral in good repair, will insure the Martin Collateral to its full useable value, and will pay any property taxes with respect to such Collateral when due.  At any sale of its Collateral, Martin will have the right to bid at such sale, and if Martin is the successful bidder, Martin may offset all or any portion of its then unpaid Allowed Secured Claim.

The Class 9 Claim is fully secured, and Martin will not have any Deficiency Claim with respect to the Class 9 Claim.

Class 9 is impaired by the Plan.

7.2.10  <u>Class 10 (Protective Life)</u>.  Class 10 consists of the Allowed Secured Claim of Protective Life.

**Page 18 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    Debtor scheduled Protective Life's Claim at $420,901.21.  The value of the Collateral

2  securing Protective Life's Claim (that certain real property located at 15930 Dam Rd.,

3  Clearlake, California 95422 (Rays #36) exceeds the amount of Protective Life's Claim, such

4  that Protective Life's Claim is fully secured.

5    The Plan provides that the amount of Protective Life's Allowed Secured Claim will be

6  determined by agreement of Debtor and Protective Life, or, absent agreement, in such

7  amount as is determined and Allowed by the Bankruptcy Court.

8    The Plan provides that Protective Life's Class 10 Claim shall be satisfied by delivery

9  of a promissory note to Protective Life (the "Protective Life Note") in the principal amount of

10  its Allowed Secured Claim.  The Protective Life Note will bear interest from the Effective

11  Date at a fixed per annum rate of 5%, and will be payable by Reorganized Debtor as follows:

12    Commencing on the first day of the first month following the Effective Date and

13  continuing on the first day of each month thereafter until the Protective Life Note has been

14  paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal

15  and interest on the Protective Life Note based on a twenty five-year amortization schedule,

16  with a balloon payment due seven years after the Effective Date.

17    The Class 10 Claim may be prepaid in full or in part at any time without any

18  prepayment penalty or premium.

19    As security for the Class 10 Claim, Protective Life will retain its security interests in

20  and liens upon its Collateral with the same priority and to the same extent such security had

21  as of the Petition Date.  Reorganized Debtor will maintain the Protective Life Collateral in

22  good repair, will insure the Protective Life Collateral to its full useable value, and will pay

23  any property taxes with respect to such Collateral when due.  At any sale of its Collateral,

24  Protective Life will have the right to bid at such sale, and if Protective Life is the successful

25  bidder, Protective Life may offset all or any portion of its then unpaid Allowed Secured

26  Claim.

**Page 19 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    The Class 10 Claim is fully secured, and Protective Life will not have any Deficiency

2  Claim with respect to the Class 10 Claim.

3    Class 10 is impaired by the Plan.

4    7.2.11  Class 11 (U.S. Bank, National Association).  Class 11 consists of the

5  Allowed Secured Claim of U.S. Bank.

6    U.S. Bank was Debtor's primary secured lender prior to the Petition Date, and has

7  continued to provide financing to Debtor post-petition under and pursuant to the DIP Facility

8  (discussed above).

9    As of the Petition Date, Debtor owed U.S. Bank in excess of $34,000,000, secured by

10  a security interest in substantially all of Debtor's real and personal property.  U.S. Bank is

11  fully secured.  In connection with the DIP Financing, Debtor agreed, among other things, that

12  any Plan proposed by Debtor would provide for the payment in full in cash on the Effective

13  Date of all obligations owing by Debtor to U.S. Bank.

14    The Plan provides that except to the extent that U.S. Bank agrees to a different

15  treatment of its Allowed Secured Claim, U.S. Bank shall receive on the Effective Date, in

16  full satisfaction of its Claim, one hundred percent (100%) of the unpaid amount of its

17  Allowed Secured Claim.

18    Debtor projects the total obligations owing to U.S. Bank on the Effective Date will be

19  approximately $25,000,000.  Those obligations will be paid with proceeds obtained from the

20  Exit Financing to be obtained by Reorganized Debtor.

21    Class 11 is unimpaired by the Plan.

22    7.2.12  Class 12 (General Unsecured Claims).  Class 12 consists of all

23  Allowed General Unsecured Claims.  A General Unsecured Claim is any Unsecured Claim

24  that is not a Small Unsecured Claim.  A Small Unsecured Claim is any Unsecured Claim that

25  is equal to or less than $10,000, or that has been reduced to $10,000 by the election of the

26  Creditor holding such Unsecured Claim.

**Page 20 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    The Plan provides that each holder of an Allowed General Unsecured Claim will

2    receive one share of Common Stock in Reorganized Debtor in exchange for each $10 of its

3    Allowed General Unsecured Claim on the later of the Effective Date or the date its Claim

4    becomes an Allowed Claim.  Fractional shares will not be issued.

5    Debtor estimates that there will be approximately $60 million of Allowed General

6    Unsecured Claims and that, therefore, approximately 6,000,000 shares of Common Stock

7    will be issued under the Plan to holders of Allowed Class 12 Claims.

8    Debtor projects there will be fewer than 200 holders of Allowed Class 12 Claims.

9    Consequently, Reorganized Debtor will have fewer than 200 shareholders and will not be a

10   public company.  Of the $60 million in estimated General Unsecured Claims, approximately

11   $30 million is held by two private equity mezzanine lenders, THL and Endeavour,

12   approximately $10 million is held by Nidiffer Family, LLC, and approximately $5 million is

13   held by various subordinated note holders holding notes payable in connection with the

14   purchase of stores.  Debtor estimates that the remaining $15 million in General Unsecured

15   Claims will consists of approximately $5 to $7 million in lease rejection claims and

16   approximately $7 to $8 million in trade creditor claims.

17   Reorganized Debtor will also reserve approximately 800,000 to 1,000,000 shares of

18   Common Stock for issuance in accordance with Reorganized Debtor's Employee Stock

19   Incentive Plan for services rendered after the Effective Date.  The final number will be

20   determined upon completion of any Rights Offering.  The reserved shares will represent

21   approximately 12%, on a fully diluted basis, of all shares of Common Stock issued and

22   reserved for issuance immediately following the Effective Date.  The reserved shares of

23   Common Stock will be issued, if at all, only with the approval of the Board of Directors of

24   Reorganized Debtor after the Effective Date.

25   The Restated Articles of Incorporation authorize the issuance of up to 25,000,000

26   shares of Common Stock and up to 10,000,000 shares of Preferred Stock by the Board of

**Page 21 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    Directors of Reorganized Debtor without the approval of the shareholders of Reorganized

2    Debtor.  Each share of Common Stock is entitled to one vote on all matters for which

3    shareholder approval is required.  The Board of Directors of Reorganized Debtor is

4    authorized, subject to the limitations in the Oregon Business Corporation Act, to provide for

5    the issuance of any or all of the authorized shares of Preferred Stock in series, to establish

6    from time to time the number of shares to be included in each series and to determine the

7    designations, relative rights, preferences and limitations of the shares of each series.

8           Reorganized Debtor's Restated Bylaws will place certain restrictions on the sale of

9    the Common Stock.  Any sale of Common Stock will be prohibited through December 31,

10   2015.  After that date, Reorganized Debtor will have a right of first refusal with respect to

11   any sale of Common Stock.  The Restated Bylaws are attached to the Plan as Exhibit 3.

12          Class 12 is impaired by the Plan.

13                 7.2.13  <u>Class 13 (Small Unsecured Claims)</u>.  Class 13 consists of all

14   Allowed Small Unsecured Claims.  A Small Unsecured Claim is any Unsecured Claim that is

15   equal to or less than $10,000, or that has been reduced to $10,000 by the election of the

16   Creditor holding such Unsecured Claim.

17          Debtor estimates that there will be approximately $1 million of Unsecured Claims

18   under $10,000.

19          The Plan provides that each holder of a Small Unsecured Claim will paid by

20   Reorganized Debtor in cash in an amount equal to 80% of its Allowed Small Unsecured

21   Claim on or before 90 days after the Effective Date or the date its Claim becomes an

22   Allowed Claim, whichever is later.  The Plan allows General Unsecured Creditors to elect to

23   reduce their Allowed Claims in order to be treated as a Small Unsecured Creditor provided

24   the election is made at the time ballots are due for voting on the Plan, or such later date

25   permitted as provided for Rejection Claims.

26          Class 13 is impaired by the Plan.

**Page 22 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1          7.2.14  <u>Class 14 (Equity Security Holders)</u>.  Class 14 consists of the Claims

2   and current interests of Equity Security Holders based on their Equity Securities.

3          The Plan provides that All Equity Securities and Employee Equity Security Plans of

4   Debtor will be cancelled as of the Effective Date, and Equity Security Holders will not

5   receive or retain any property or rights under the Plan on account of their Equity Securities or

6   any Employee Equity Security Plan.

7          Class 14 is impaired by the Plan.

8   **8.      DISPUTED CLAIMS; OBJECTIONS TO CLAIMS**

9          The Plan provides that Claims that are Allowed shall be entitled to distributions under

10  the Plan.  Debtor reserves the right to contest and object to any Claims and previously

11  Scheduled Amounts, including, without limitation, those Claims and Scheduled Amounts

12  that are specifically referenced herein, are not listed in the Schedules, are listed therein as

13  disputed, contingent and/or unliquidated in amount, or are listed therein at a different amount

14  than Debtor currently believes is validly due and owing.  Unless otherwise ordered by the

15  Bankruptcy Court, all objections to Claims and Scheduled Amounts (other than

16  Administrative Expense Claims) shall be Filed and served upon counsel for Debtor and the

17  holder of the Claim objected to on or before the later of (a) 45 days after the Effective Date

18  or (b)  60 days after the date (if any) on which a Proof of Claim is Filed in respect of a

19  Rejection Claim or Deficiency Claim.  The last day for filing objections to Administrative

20  Expense Claims shall be set pursuant to a further order of the Bankruptcy Court.  All

21  Disputed Claims shall be resolved by the Bankruptcy Court, except to the extent that

22  (a) Debtor may otherwise elect consistent with the Plan and the Bankruptcy Code or (b) the

23  Bankruptcy Court may otherwise order.

24

25

26

**Page 23 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

**9.      MEANS FOR EXECUTION OF PLAN**

9.1      Continued Corporate Existence.  The Plan provides that Debtor, as

Reorganized Debtor, shall continue to exist after the Effective Date, with all the powers of a

corporation under applicable law.

9.2      Restated Articles of Incorporation and Bylaws.  The Plan provides that

Reorganized Debtor shall be deemed to have adopted the Restated Articles of Incorporation

and Restated Bylaws on the Effective date, and shall promptly thereafter cause the Restated

Articles of Incorporation to be filed with the Secretary of State of the State of the State of

Oregon.  After the Effective Date, Reorganized Debtor may amend the Restated Articles of

Incorporation and may amend its Restated Bylaws in accordance with the Restated Articles

of Incorporation, Restated Bylaws, and applicable state law.  The Restated Articles of

Incorporation and Restated Bylaws are attached as Exhibits 2 and 3 to the Plan.

9.3      Cancellation of Existing Equity Securities and Employee Equity Security

Plan.  The Plan provides that as of the Effective Date, all outstanding shares of stock

(whether common or preferred), and all awards of any kind consisting of shares of stock of

Debtor and all Employee Equity Security Plans, that have been or may be existing, granted,

held, awarded, outstanding, payable, or reserved for issuance, and all other Equity Securities,

shall, without any further corporate action, be cancelled and retired and shall cease to exist.

This cancellation does not apply with respect to any Common Stock or any other equity

securities or rights to acquire or receive equity securities or any other awards of any kind that

are issued in accordance with or pursuant to the Plan.

9.4      Recapitalization; Issuance of New Common Stock.  As set forth above, on the

Effective Date, one share of Common Stock will be issued to holders of Allowed Class 12

Claims (General Unsecured Claims) in exchange for each $10 of each holder's Allowed

Class 12 Claim.  As set forth above, Reorganized Debtor will also reserve approximately

800,000 to 1,000,000 shares of Common Stock for issuance in accordance with Reorganized

**Page 24 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    Debtor's Employee Stock Incentive Plan for services rendered after the Effective Date.  As

2    set forth above, the Common Stock will be subject to certain restrictions on sale as more

3    particularly stated in the Restated Bylaws attached to the Plan as Exhibit 3.

4          9.5     Exit Financing.  Pursuant to the DIP Financing Order, U.S. Bank is entitled to

5    be paid on the Effective Date of the Plan.  Consequently, Debtor must negotiate and obtain,

6    and enter into agreements with respect to, Exit Financing which Exit Financing will, among

7    other things, provide the funds necessary to pay U.S. Bank in full on the Effective Date and

8    provide working capital for Reorganized Debtor.  The Plan provides that Debtor may enter

9    into such agreements and execute such documents with respect to the Exit Financing without

10   the necessity of obtaining additional Bankruptcy Court approval.

11         9.6     Subordination Agreements.  The Plan provides that Reorganized Debtor will

12   continue to be bound by all subordination agreements to which Debtor is a party.  In

13   connection with any distributions (of Cash, stock, or otherwise) to be made under the Plan,

14   Reorganized Debtor will comply with all subordination agreements that are outstanding and

15   in existence as of the Effective Date which pertain to Debtor or any debts or obligations

16   owing by Debtor, and all distributions to Creditors under the Plan shall remain subject to

17   such subordination agreements.

18         9.7     Board of Directors.  The Plan provides that the initial Board of Directors of

19   Reorganized Debtor shall be composed of (a) three directors designated by Endeavour and

20   THL, (b) one director designated by the Committee, and (c) Douglas Nidiffer.  The identities

21   of the members of the initial Board of Directors of Reorganized Debtors shall be disclosed by

22   Endeavour/THL and the Committee at or prior to the confirmation hearing.  Thereafter, the

23   Board of Directors of Reorganized Debtor shall be elected by the shareholders of

24   Reorganized Debtor in accordance with the Restated Articles of Incorporation and applicable

25   nonbankruptcy law.

26

**Page 25 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    9.8    <u>Corporate Action</u>.  The Plan provides that upon entry of the Confirmation

2   Order, all actions contemplated by the Plan shall be authorized and approved in all respects

3   (subject to the provisions of the Plan), including, without limitation, the adoption and filing

4   of the Restated Articles of Incorporation, approval of the Restated Bylaws, approval of the

5   Employee Stock Incentive Plan, the election or appointment, as applicable, of directors and

6   officers for Reorganized Debtor, and the issuance of the Common Stock.  The appropriate

7   officers of Reorganized Debtor are authorized and directed to execute and deliver the

8   agreements, documents, and instruments contemplated by the Plan and the Disclosure

9   Statement in the name of and on behalf of Reorganized Debtor.

10    9.9    <u>Employee Stock Incentive Plan</u>.  The Plan provides that on the Effective Date,

11   the Employee Stock Incentive Plan shall become effective immediately without any further

12   corporate or other action.  The Employee Stock Incentive Plan is attached as Exhibit 1 to the

13   Plan.

14    9.10    <u>Setoffs</u>.  The Plan provides that Debtor may, but shall not be required to, set

15   off against any Claim and the distributions to be made pursuant to the Plan in respect of such

16   Claim any claims of any nature whatsoever that Debtor may have against the holder of such

17   Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall

18   constitute a waiver or release of any such claim Debtor may have against such holder.

19    9.11    <u>Utility Deposits</u>.  The Plan provides that all utilities holding a Utility Deposit

20   shall immediately after the Effective Date return or refund such Utility Deposit to

21   Reorganized Debtor.  At its sole option, Reorganized Debtor may apply any Utility Deposit

22   that has not been refunded to Reorganized Debtor in satisfaction of any payments due or to

23   become due from Reorganized Debtor to a utility holding such a Utility Deposit.

24    9.12    <u>Event of Default; Remedy</u>.  The Plan provides that any material failure by

25   Reorganized Debtor to perform any term of the Plan, which failure continues for a period of

26   10 Business Days following receipt by Reorganized Debtor of written notice of such default

**Page 26 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    from the holder of an Allowed Claim to whom performance is due, shall constitute an Event

2    of Default.  Upon the occurrence of an Event of Default, the holder of an Allowed Claim to

3    whom performance is due shall have all rights and remedies granted by law, the Plan, or any

4    agreement between the holder of such Claim and Debtor or Reorganized Debtor.  An Event

5    of Default with respect to one Claim shall not be an Event of Default with respect to any

6    other Claim.

7         9.13    <u>Conditions Precedent to Effectiveness of Plan</u>.  The Plan provides that unless

8    waived by Debtor, the following conditions must occur and be satisfied for the Plan to

9    become effective, and are conditions precedent to the Effective Date:

10         (a)    The Bankruptcy Court shall have entered the Confirmation Order, in

11    form and substance reasonably satisfactory to Debtor, which shall, among other things,

12    provide that any and all executory contracts and unexpired leases assumed pursuant to the

13    Plan shall remain in full force and effect for the benefit of Reorganized Debtor

14    notwithstanding any provision in any such contract or lease or in applicable law (including

15    those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits,

16    restricts, or conditions such transfer or that enables or requires termination or modification of

17    such contract or lease; and

18         (b)    All documents, instruments, and agreements, each in form and

19    substance satisfactory to Reorganized Debtor, provided for or necessary to implement the

20    Plan shall have been executed and delivered by the parties thereto, unless such execution or

21    delivery has been waived by the party to be benefitted thereby; and

22         (c)    The Exit Financing shall have closed and all conditions to funding

23    shall have been satisfied or waived.

24    **10.    RIGHTS OFFERING**

25         10.1    <u>Introduction</u>.  As set forth in Article 6 of the Plan, Debtor shall have the right

26    to consummate the Rights Offering on or before the Effective Date if it determines, in its sole

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    discretion, that it is desirable and feasible to do so.  If Debtor decides to consummate the

2    Rights Offering, it may do so with or without a Backstop Party.

3         Once a Rights Offering Participant has timely and validly exercised its Subscription

4    Rights, subject to the occurrence or satisfaction of all conditions precedent to the Rights

5    Offering and to the Rights Offering Participants' participation in same, and notwithstanding

6    the subsequent disallowance of any or all of its underlying Claims, such Rights Offering

7    Participant's right to participate in the Rights Offering will be irreversible and shall not be

8    subject to dissolution, avoidance or disgorgement and shall not be withheld from such Rights

9    Offering Participant on account of such disallowance.

10        10.2    <u>Issuance of Rights</u>.  Each Rights Offering Participant will receive

11   Subscription Rights to subscribe for a Primary Offering Subscription, for an aggregate

12   purchase price equal to the applicable Subscription Payment Amount.  The Rights Offering

13   Shares will be issued to the Rights Offering Purchasers at a price per share equal to the

14   Subscription Price.

15        10.3    <u>Subscription Period</u>.  The Rights Offering shall commence on the

16   Subscription Commencement Date and shall expire at the Subscription Deadline.  Each

17   Rights Offering Participant that intends or desires to participate in the Rights Offering must

18   affirmatively elect to exercise its Subscription Rights, and provide written notice thereof to

19   the parties specified in the Subscription, on or prior to the Subscription Deadline in

20   accordance with the terms of the Plan and the Subscription.  A form of Subscription is

21   attached as **Exhibit 4** to the Plan.  At the Subscription Deadline, if Debtor selects a Backstop

22   Party, the Remaining Rights Offering Shares will be allocated to, and may be purchased by

23   the Backstop Party.

24        10.4    <u>Exercise of Subscription Rights and Payment of Subscription Payment</u>

25   <u>Amount</u>.  On the Subscription Commencement Date, Debtor will mail the Subscription to

26   each Rights Offering Participant known as of the Rights Offering Record Date, together with

**Page 28 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    appropriate instructions for the proper completion, due execution, and timely delivery of the

2    Subscription, as well as instructions for the payment of the eventual Subscription Payment

3    Amount for that portion of the Subscription Rights sought to be exercised by such Rights

4    Offering Participant.  Debtor may adopt such additional detailed procedures consistent with

5    the provisions of the Plan to more efficiently administer the exercise of the Subscription

6    Rights.

7         In order to exercise the Subscription Rights, each Rights Offering Participant must

8    return a duly completed Subscription (making a binding and irrevocable commitment to

9    participate in the Rights Offering), to Debtor or other Party specified in the Subscription so

10   that such form and the applicable Subscription Payment Amount are actually received by

11   Debtor or such other Party on or before the Subscription Deadline.  A Rights Offering

12   Participant may subscribe for its entire Pro Rata Share of the Rights Offering Shares or only

13   a part of its Pro Rata Share of the Rights Offering Shares. If Debtor or such other Party for

14   any reason does not receive from a given holder of Subscription Rights a duly completed

15   Subscription on or prior to the Subscription Deadline, then such holder shall be deemed to

16   have forever and irrevocably relinquished and waived its right to participate in the Rights

17   Offering.  On the Subscription Notification Date, Debtor will notify each Rights Offering

18   Purchaser of its respective allocated portion of Rights Offering, and if Debtor has selected a

19   Backstop Party and, if so, the terms of the Backstop Rights Purchase Agreement. Debtor will

20   notify the Backstop Party after the Subscription Deadline of its allocated portion of the

21   Remaining Rights Offering Shares that the Backstop Party may purchase pursuant to the

22   Backstop Rights Purchase Agreement. Each Rights Offering Purchaser (other than the

23   Backstop Party, if applicable) must tender its Subscription Payment Amount to Debtor so

24   that it is actually received on or prior to the Subscription Deadline. Any Rights Offering

25   Purchaser who fails to tender its Subscription Payment Amount so that it is received on or

26   prior to the Subscription Deadline shall be deemed to have forever and irrevocably

**Page 29 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1  relinquished and waived its right to participate in the Rights Offering.  Debtor shall hold the

2  payments it receives for the exercise of Subscription Rights in a separate account.  In the

3  event the conditions to the Effective Date are not waived or satisfied, such payments shall be

4  returned, without accrual or payment of any interest thereon, to the applicable Rights

5  Offering Purchaser, without reduction, offset or counterclaim.

6       10.5  Rights Offering Backstop.  If Debtor decides to have a Backstop Party for the

7  Rights Offering, it will enter into a Backstop Rights Purchase Agreement with the Backstop

8  Party.  In accordance with the Backstop Rights Purchase Agreement, the Backstop Party may

9  commit to purchase all or some portion of the Remaining Rights Offering Shares.  Debtor

10  may grant certain rights, protections and fees to the Backstop Party depending on the level of

11  commitment by the Backstop Party to purchase the Remaining Rights Offering Shares.

12       10.6  Number of Rights Offering Shares; Determination of Subscription Price.  The

13  number of Rights Offering Shares to be sold pursuant to the Rights Offering shall be

14  determined by dividing the Rights Offering Amount by the Subscription Price.  Debtor has

15  determined the Subscription Price based on the estimated net equity value, without giving

16  effect to any discounts for lack of liquidity, marketability or otherwise, of Reorganized

17  Debtor immediately following completion of the confirmed Plan after the Effective Date.

18  Debtor believes the Subscription Price will equal the fair market value of a share of Common

19  Stock on the date issued pursuant to the Rights Offering, but there can be no assurance that

20  the Subscription Price will equal such fair market value.  Debtor estimates that such net

21  equity value of Reorganized Debtor will be approximately $45 million, leading it to

22  determine the Subscription Price for the Rights Offering amount of up to $10 million to be

23  $7.50 per share (rounded to avoid fractional shares).  If the entire Rights Amount is

24  subscribed for, approximately 1,333,333 shares of Common Stock would be issued in the

25  Rights Offering.

26

**Page 30 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

10.7 <u>No Transfer; Detachment Restrictions; No Revocation</u>. The Subscription Rights are not transferable or detachable.  Any such transfer or detachment, or attempted transfer or detachment, will be null and void.  Once a Rights Offering Participant has exercised any of its Subscription Rights by properly executing and delivering a Subscription to Debtor, such exercise may only be revoked, rescinded or annulled in the sole discretion of Debtor or Reorganized Debtor.

10.8 <u>Distribution of Rights Offering Shares</u>.  On, or as soon as reasonably practicable after, the Effective Date, the Reorganized Debtor or other applicable disbursing agent shall distribute the Rights Offering Shares purchased by each Rights Offering Purchaser.

10.9 <u>Validity of Exercise of Subscription Rights</u>.  All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights shall be determined by Debtor or Reorganized Debtor.  Debtor or Reorganized Debtor, in their discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Subscriptions shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as Debtor or Reorganized Debtor determines, in its sole discretion reasonably exercised in good faith. Debtor or Reorganized Debtor may, but is not required to, give written notice to any Rights Offering Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Rights Offering Participant and may permit such defect or irregularity to be cured within such time as Debtor or Reorganized Debtor may determine in good faith to be appropriate; provided, however, that neither Debtor, Reorganized Debtor nor any other party shall incur any liability for giving, or failing to give, such notification and opportunity to cure.  Once a Rights Offering Participant has timely and validly exercised its Subscription Rights, subject

**Page 31 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    to the occurrence or satisfaction of all conditions precedent to the Rights Offering and to the

2    Rights Offering Participants' participation in same, and notwithstanding the subsequent

3    disallowance of any or all of its underlying Claim, such Rights Offering Participant's right to

4    participate in the Rights Offering will be irreversible and shall not be subject to dissolution,

5    avoidance or disgorgement and shall not be withheld from such Rights Offering Participant

6    on account of such disallowance

7        10.10   <u>Rights Offering Proceeds</u>. The proceeds of the Rights Offering may be used to

8    fund Cash payments contemplated by the Plan and for Reorganized Debtor's general

9    corporate purposes.

10       10.11   <u>Factors Affecting the Proposed Rights Offering</u>.  The Plan gives Debtor the

11   right, in its sole discretion, to consummate the Rights Offering.  Proceeds from the Rights

12   Offering would be used to make the Cash payments required by the Plan or for the operating

13   needs of Reorganized Debtor.  In the event Debtor receives any proceeds from the Rights

14   Offering and does not go forward with the Rights Offering, Debtor will return such proceeds

15   to the applicable Rights Offering Purchaser or Rights Offering Purchasers in accordance with

16   the Plan.

17       At the present time, Debtor does not have a Backstop Commitment.  There can be no

18   assurance that there will be a Backstop Commitment.  Even if a Backstop Commitment is

19   obtained, there can be no assurance that Debtor will consummate the Rights Offering.

20       A number of external and internal factors could negatively affect Debtor' ability to

21   obtain a Backstop Commitment or consummate the Rights Offering.  These factors include,

22   among others (a) the overall state of the economy as well as the capital and credit markets,

23   (b) the status of the Bankruptcy Case, including the status of Debtor's efforts to confirm the

24   Plan, resolve objections and resolve or adjudicate Claims, (c) Debtor's business or financial

25   performance, and (d) Debtor's ability to come to acceptable terms with potential Backstop

26   Parties, underwriters or other financing sources.

**Page 32 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

In addition, the timeframe for Debtor to consummate the Rights Offering is very short and there can be no assurance that Debtor will be able consummate such transactions or obtain sufficient proceeds even if the factors described in the preceding paragraph are favorable to Debtor.

If Debtor determines, in its sole discretion, to consummate the Rights Offering, and is successful in effectuating the Rights Offering, Reorganized Debtor will have a capital structure that could vary materially from the capital structure Reorganized Debtor would have without it.  Consummation of the Rights Offering would increase the number of shares of Common Stock, which shares may be issued at a discount and therefore result in dilution to other recipients of shares of Common Stock, although also likely decreasing the amount of debt incurred by Reorganized Debtor.

## 11.    ASSETS AND LIABILITIES

11.1    <u>Assets</u>.  **Exhibit 2** attached hereto contains Debtor's internally prepared balance sheet as of December 31, 2013 on a GAAP basis.  Debtor's assets consist primarily of the following at December 31, 2013:

- Cash on hand:  $3.8 million.  This is cash primarily in stores and in transit.

- Accounts receivable:  $2.2 million.  This includes rebates and credits earned from suppliers.

- Inventories (at cost):  $25 million

- Furniture, fixtures, equipment, and real-property (25 parcels) with an estimated value of $60 million.  This amount is based on the valuation report from The Food Partners dated October 31, 2013.

- Unified Grocers stock with a value of approximately $4.2 million based on The Food Partners valuation dated October 31, 2013.

Debtor estimates that on the Effective Date Debtor's assets will have a value of approximately $95,000,000.

11.2    <u>Liabilities</u>.  Debtor's liabilities consist primarily of the following at December 31, 2013:

**Page 33 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

- Secured debt owed to U.S. Bank of approximately $20 million. This includes both a revolving line of credit and two term loans.

- Secured debt owed to various note holders totaling approximately $3.3 million. This primarily relates to acquisition of real property and equipment that is secured by the underlying assets.

- Secured note payable to the C & K Market 401(k) plan totaling approximately $2,045,000.

- Mezzanine financing provided by Endeavour and THL approximating $28 million.

- A note payable to the Nidiffer Family LLC approximating $10 million.

- Unsecured notes payable approximating $5 million. These notes primarily relate to the acquisition of grocery stores and related equipment.

- Accounts payable and accrued expenses approximating $33 million.

Debtor estimates that promptly following the Effective Date (after Claims required to be paid on the Effective Date have been paid, Small Unsecured Claims have been paid, General Unsecured Creditors' Claims have been converted to equity, and Reorganized Debtor has closed on its Exit Financing), Debtor's liabilities will be approximately $50 million. This includes the Exit Financing, which Debtor anticipates will approximate $25 million.

       11.3    <u>Projected Balance Sheet/Operating Projections</u>.  A projected Effective Date balance sheet is attached hereto as **Exhibit 3**, and projections for the one year period following the Effective Date are attached hereto as **Exhibit 4**.

       11.4    <u>Avoidance Actions</u>.  The Plan provides that all Avoidance Actions and other claims and causes of action accruing to Debtor remain assets of Reorganized Debtor.  Debtor has performed a preliminary analysis of potential claims and Avoidance Actions of Debtor. Debtor's preliminary conclusion is that there are no material claims or Avoidance Actions.

**12.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

       12.1    <u>Assumption and Rejection</u>.  The Plan provides that, except as may otherwise be provided, all executory contracts of Debtor that are not otherwise subject to a prior Bankruptcy Court order or pending motion before the Bankruptcy Court will be deemed

**Page 34 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    assumed by Debtor as of the Effective Date and will be enforceable by the parties thereto in

2    accordance with their terms; provided that no provision relating to default by reason of

3    insolvency or the filing of the Bankruptcy Case shall be enforceable against Reorganized

4    Debtor or its successors or assigns.  The Confirmation Order shall constitute an order

5    authorizing the assumption and assignment of all executory contracts that are subject to a

6    pending motion to assume or a pending motion to assume and assign.  Reorganized Debtor

7    shall promptly pay all amounts required under Section 365 of the Bankruptcy Code to cure

8    any defaults for executory contracts and unexpired leases being assumed and shall perform

9    its obligations from and after the Effective Date in the ordinary course of business.

10        12.2    Assignment.  The Plan provides that except as may be otherwise provided in

11    the Plan, the Confirmation Order, or other Order of the Bankruptcy Court, all executory

12    contracts shall be deemed assigned to Reorganized Debtor as of the Effective Date.  The

13    Confirmation Order shall constitute an order authorizing such assignment of assumed

14    executory contracts, and no further assignment documentation shall be necessary to

15    effectuate such assignment

16        12.3    Rejection Claims.  The Plan provides that Rejection Claims must be Filed no

17    later than (a) April 9, 2014 or (b) for Rejection Claims arising from a rejection order entered

18    on or after March 10, 2014, 30 days after the entry of the order rejecting the executory

19    contract or unexpired lease.  Any such Rejection Claim not Filed within such time shall be

20    forever barred from asserting such Claim against Debtor or Reorganized Debtor, their

21    property, estate, and any guarantors of such obligations.  Each Rejection Claim resulting

22    from such rejection shall constitute a Small or General Unsecured Claim, as applicable.

23    **13.    VOTING PROCEDURES**

24        13.1    Ballots and Voting Deadline.  A ballot has been enclosed with this Disclosure

25    Statement for use in voting on the Plan.  After carefully reviewing the Plan and this

26    Disclosure Statement, and if you are entitled to vote on the Plan (see below), please indicate

**Page 35 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1   your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed

2   ballot as directed below.

3          To be counted for voting purposes, ballots must be received no later than 5 p.m.

4   Pacific Time, on _____, 2014 by Debtor at the following address:

5                        Tonkon Torp LLP
                         Attention:  Spencer Fisher
6                        1600 Pioneer Tower
                         888 SW Fifth Avenue
7                        Portland, OR  97204-2099

8          Any ballots received after 5 p.m. Pacific Time on _____, 2014 will not

9   be included in any calculation to determine whether the parties entitled to vote on the Plan

10  have voted to accept or reject the Plan.

11         If you do not receive a ballot, or if a ballot is damaged or lost, please contact Spencer

12  Fisher at the address above, by telephone at 503-802-2167, or at spencer.fisher@tonkon.com.

13         When a ballot is signed and returned without further instruction regarding acceptance

14  or rejection of the Plan, the signed ballot shall be counted as a vote accepting the Plan.  When

15  a ballot is returned indicating acceptance or rejection of the Plan but is unsigned, the

16  unsigned ballot will not be included in any calculation to determine whether parties entitled

17  to vote on the Plan have voted to accept or reject the Plan.  When a ballot is returned without

18  indicating the amount of the Claim, the amount shall be as set forth on Debtor's Schedules or

19  any Proof of Claim filed with respect to such Claim.

20         If a proof of claim has been filed with respect to such impaired Claim, then the vote

21  will be based on the amount of the proof of claim.  If no proof of claim has been filed, then

22  the vote will be based on the amount scheduled by Debtor in its Schedules.  Holders of

23  disputed Claims who have settled their dispute with Debtor are entitled to vote the settled

24  amount of their Claim.  The Bankruptcy Code provides that such votes will be counted unless

25  the Claim has been disputed, disallowed, disqualified, or suspended prior to computation of

26  the vote on the Plan.  The Claim to which an objection has been filed is not allowed to vote

**Page 36 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1   unless and until the Bankruptcy Court rules on the objection.  The Bankruptcy Code provides

2   that the Bankruptcy Court may, if requested to do so by the holder of such Claim, estimate or

3   temporarily allow a Disputed Claim for the purposes of voting on the Plan.

4          13.2   <u>Parties Entitled to Vote</u>.  Pursuant to Section 1126 of the Bankruptcy Code,

5   any holder of an Allowed Claim that is in an impaired Class under the Plan, and whose Class

6   is not deemed to reject the Plan, is entitled to vote.  A Class is "impaired" unless the legal,

7   equitable and contractual rights of the holders of claims in that Class are left unaltered by the

8   Plan or if the Plan reinstates the Claims held by Members of such Class by (a) curing any

9   defaults, (b) reinstating the maturity of such claim, (c) compensating the holder of such claim

10  for damages that result from the reasonable reliance on any contractual provision of law that

11  allows acceleration of such claim, and (d) otherwise leaving unaltered any legal, equitable, or

12  contractual right of which the Claim entitles the holder of such Claim.  Because of their

13  favorable treatment, Classes that are not impaired are conclusively presumed to accept the

14  Plan.  Accordingly, it is not necessary to solicit votes from the holders of Claims in Classes

15  that are not impaired.

16         Classes of Claims or interests that will not receive or retain any money or property

17  under a Plan on account of such Claims or interests are deemed, as a matter of law under

18  Section 1126(g) of the Bankruptcy Code, to have rejected the Plan and are likewise not

19  entitled to vote on the Plan.

20         Classes 1 (Other Priority Claims), 2 (C & K Market, Inc. 401(k) Plan; United States

21  Department of Labor), and 11 (U.S. Bank) are not impaired by the Plan and are conclusively

22  presumed to accept the Plan.  Class 14 (Equity Security Holders) will not receive or retain

23  any money or property on account of such Equity Interests, and are deemed to have rejected

24  the Plan.  All other Classes are impaired by the Plan and are entitled to vote on the Plan.

25         13.3   <u>Votes Required for Class Acceptance of the Plan</u>.  For a Class of Claims to

26  accept the Plan, Section 1126 of the Bankruptcy Code requires acceptance by Creditors that

**Page 37 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    hold at least two-thirds in dollar amount and a majority in number of the Allowed Claims of

2    such Class, in both cases counting only those claims actually voting to accept or reject the

3    Plan.  The holders of Claims who fail to vote are not counted as either accepting or rejecting

4    the Plan.  If the Plan is confirmed, the Plan will be binding with respect to all holders of

5    Claims in each Class, including Classes and members of Classes that did not vote or that

6    voted to reject the Plan.

7    **14.    CONFIRMATION OF THE PLAN**

8        14.1    <u>Confirmation Hearing</u>.  The Bankruptcy Court has scheduled a hearing on

9    confirmation of the Plan on _____, 2014 at _____ __.m. Pacific time.  The

10    hearing will be held at the United States Bankruptcy Court for the District of Oregon,

11    Courtroom No. 6, 405 E. Eighth Avenue, Eugene, Oregon 97401, before the Honorable

12    Frank R. Alley, III, United States Bankruptcy Judge.  At that hearing, the Bankruptcy Court

13    will consider whether the Plan satisfies the various requirements of the Bankruptcy Code,

14    including whether it is feasible and whether it is in the best interests of creditors of Debtor.

15    Debtor will submit a report to the Bankruptcy Court at that time concerning the votes for

16    acceptance or rejection of the Plan by the parties entitled to vote thereon.

17        Section 1128(b) of the Bankruptcy Code provides that any party in interest may

18    object to confirmation of the Plan.  Any objections to confirmation of the Plan must be made

19    in writing and filed with the Bankruptcy Court and <u>received</u> by counsel for Debtor no later

20    than _____, 2014, by 5 p.m. Pacific time.  Unless an objection to confirmation is

21    timely filed and received, it may not be considered by the Bankruptcy Court.

22        14.2    <u>Requirements of Confirmation; Liquidation Analysis</u>.  At the hearing on

23    confirmation, the Bankruptcy Court will determine whether the provisions of Section 1129 of

24    the Bankruptcy Code have been satisfied.  If all the provisions of Section 1129 are met, the

25    Bankruptcy Court may enter an order confirming the Plan.  Debtor believes the Plan satisfies

26    all the requirements of Chapter 11 of the Bankruptcy Code, that it has complied or will have

**Page 38 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1  complied with all the requirements of Chapter 11, and that the Plan has been proposed and is

2  made in good faith.

3      Among other requirements for confirmation, to confirm the Plan the Bankruptcy

4  Court must determine that the Plan meets the requirements of Section 1129(a)(7) of the

5  Bankruptcy Code; that is, that the Plan is in the best interests of each holder of a Claim in an

6  impaired Class that has not voted to accept the Plan.  Accordingly, if an impaired Class does

7  not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court

8  find that the Plan provides to each holder of a Claim in such impaired Class a recovery on

9  account of the holder's Claim that has a value at least equal to the value of the distribution

10 each such holder would receive if Debtor was liquidated under Chapter 7 of the Bankruptcy

11 Code.

12      A liquidation analysis is attached hereto as **Exhibit 5**.

13      Debtor believes that the Plan provides to each holder of a Claim in such impaired

14 Class a recovery on account of the holder's Claim that has a value at least equal to the value

15 of the distribution such holder would receive if Debtor was liquidated under Chapter 7 of the

16 Bankruptcy Code.

17      Underlying the liquidation analysis are projections and assumptions that are

18 inherently subject to significant uncertainties and contingencies.  The liquidation analysis is

19 based on assumptions that may change.  Accordingly, there can be no assurance that the

20 projected values reflected in the liquidation analysis will be realized, and actual results could

21 vary materially from those shown on the liquidation analysis.

22 **15.    MISCELLANEOUS PROVISIONS**

23      In addition to the provisions discussed above, the Plan contains a number of

24 administrative and miscellaneous provisions.  See Article 9 (Effect of Confirmation);

25 Article 10 (Retention of Jurisdiction); Article 12 (Administrative Provisions); and Article 13

26 (Miscellaneous Provisions) of the Plan.  Those provisions are not restated or summarized in

**Page 39 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1   this Disclosure Statement.  Please review the Plan carefully and contact your legal or tax

2   adviser if you have any questions regarding the Plan.

3   **16.    TAX CONSEQUENCES TO DEBTOR OF THE PLAN**

4           CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH

5   REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM

6   YOU THAT (A) ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS

7   COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR

8   WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED

9   UPON, FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER

10  THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, OR (2) PROMOTING,

11  MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION

12  OR TAX MATTER(S) ADDRESSED HEREIN, AND (B) THIS DISCUSSION WAS

13  WRITTEN IN CONNECTION WITH DEBTOR SOLICITING ACCEPTANCES OF THE

14  PLAN THROUGH THIS DISCLOSURE STATEMENT.

15          The following discussion is a summary of certain material United States

16  federal income tax consequences expected to result from the consummation of the Plan.  This

17  discussion is for general information purposes only, and should not be relied upon for

18  purposes of determining the specific tax consequences of the Plan with respect to a particular

19  holder of an Allowed Claim or any Equity Security Holder.  This discussion does not purport

20  to be a complete analysis or listing of all potential tax considerations.  This discussion does

21  not address aspects of federal income taxation that may be relevant to a particular holder of

22  an Allowed Claim subject to special treatment under federal income tax laws (such as foreign

23  taxpayers, broker-dealers, banks, thrifts, insurance companies, financial institutions,

24  regulated investment companies, real estate investment trusts and pension plans, and other

25  tax-exempt investors), and does not discuss any aspects of state, local or foreign tax laws.

26  Furthermore, this summary does not address federal taxes other than income taxes.

**Page 40 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1         This discussion is based on existing provisions of the Internal Revenue Code

2    of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated

3    thereunder, and current administrative rulings and court decisions.  Legislative, judicial or

4    administrative changes or interpretations enacted or promulgated after the date hereof could

5    alter or modify the discussion set forth below with respect to the federal income tax

6    consequences of the Plan.  Any such changes or interpretations may be retroactive and could

7    significantly affect the federal income tax consequences of the Plan.  No ruling has been

8    requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax

9    aspects of the Plan and no opinion of counsel has been sought or obtained with respect

10   thereto.  This discussion is not binding on the IRS or the courts and no assurance can be

11   given that the IRS will not assert, or that a court will not sustain, a different position than any

12   position discussed herein.  No representations or assurances are being made to the holders of

13   Allowed Claims or to the Equity Security Holders with respect to the federal income tax

14   consequences described herein.

15        Accordingly, the following summary of certain federal income tax

16   consequences of the Plan is for informational purposes only and is not a substitute for careful

17   tax planning or advice based upon the individual circumstances pertaining to a particular

18   holder of an Allowed Claim or to a particular Equity Security Holder.  Each holder of an

19   Allowed Claim and each Equity Security Holder is strongly urged to consult with its own tax

20   advisors regarding the federal, state, local, foreign, and other tax consequences of the Plan.

21        Any discussion of federal tax issues set forth in this Disclosure Statement was

22   written solely in connection with the confirmation of the Plan to which the transactions

23   described in this Disclosure Statement are ancillary.  Such discussion is not intended or

24   written to be legal or tax advice to any person and is not intended or written to be used, and

25   cannot be used, by any person for the purpose of avoiding any federal tax penalties that may

26   be imposed on such person.  Each holder of an Allowed Claim and each Equity Security

**Page 41 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1  Holder should seek advice based on its particular circumstances from an independent tax

2  advisor.

3      16.1    <u>Cancellation of Debt Income of Debtor</u>.  Under the IRC, a taxpayer generally

4  will recognize cancellation of debt income ("COD Income") upon satisfaction of its

5  outstanding indebtedness for consideration less than the amount of such indebtedness.  The

6  amount of COD Income, in general, is the excess of (a) the adjusted issue price of the

7  indebtedness (in most cases, the amount the debtor received on incurring the obligation, with

8  certain adjustments) satisfied, over (b) the sum of the amount of cash paid and the fair market

9  value of any new consideration given in satisfaction of the indebtedness.  However, IRC

10  Section 108(a) provides an exception to this income recognition rule (the "Bankruptcy

11  Exception") where a taxpayer is in bankruptcy and the discharge is granted, or is effected,

12  pursuant to a plan approved by the bankruptcy court.  In the case of an entity taxable as a

13  corporation, eligibility for the Bankruptcy Exception is determined at the corporate level.  If

14  the Bankruptcy Exception applies (with the effect that the taxpayer excludes its COD Income

15  from its gross income), the taxpayer is required, under IRC Section 108(b), to reduce certain

16  of its tax attributes by the amount of COD Income excluded from gross income pursuant to

17  the Bankruptcy Exception.  The attributes of the taxpayer that are reduced include any net

18  operating loss ("NOL") for the taxable year of the discharge, net operating loss carryovers

19  from prior years, general business and minimum tax credit carryforwards, capital loss

20  carryforwards, the basis of the taxpayer's assets, and foreign tax credit tax carryforwards.

21      COD Income will be realized by Debtor upon the issuance of Common Stock in

22  satisfaction of the Allowed General Unsecured Claims.  The amount of COD Income is equal

23  to the difference between the adjusted issue price of each debt and the fair market value of

24  the stock transferred in satisfaction of each such debt.  Since the COD Income realized by

25  Debtor on such stock issuance is excluded from Debtor's income by the Bankruptcy

26  Exception, certain tax attributes of Debtor are subject to reduction.

**Page 42 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

COD Income will also be realized by Debtor upon the satisfaction of the Allowed Small Unsecured Claims for eighty percent of each Claim.  The amount of COD Income is equal to the excess of the adjusted issue price of each debt over the amount paid in satisfaction of each such debt.  Since the COD Income realized by Debtor on such debt satisfaction is excluded from Debtor's income by the Bankruptcy Exception, certain tax attributes of Debtor are subject to reduction as discussed above.

Whether Debtor will realize any COD Income on the debt restructuring contemplated by the Plan depends on whether the restructuring of any debt constitutes a deemed taxable exchange of the underlying debt pursuant to IRC Section 1001 and the corresponding Treasury Regulations.  For a deemed taxable exchange to occur with respect to a debt, the modification to the debt must be "significant" as such term is defined in the applicable Treasury Regulations.  If the modification to a debt obligation of Debtor is "significant," Debtor will realize COD Income in an amount equal to the amount, if any, by which the "issue price" of the new debt (i.e., the "modified debt") is less than the "adjusted issue price" of the old debt.

16.2    <u>Limitation of NOL Carryforwards and Other Tax Attributes</u>.  It is uncertain whether Debtor has any NOLs.  Debtor did not have any NOLs as of the tax year ended December 31, 2012.

Even after taking into account a reduction in any NOLs as a result of COD Income, Debtor anticipates the Reorganized Debtor will have significant tax attributes (e.g., depreciable basis) at emergence.  The amount of such tax attributes that will be available to the Reorganized Debtor at emergence is based on a number of factors and is impossible to calculate at this time.  Some of the factors that will impact the amount of available tax attributes include: (a) the amount of tax losses incurred by Debtor in 2013; (b) the fair market value of the Common Stock issued pursuant to the Plan; and (c) the amount of COD Income incurred by Debtor in connection with consummation of the Plan.

**Page 43 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1    Under IRC Section 382, if a corporation undergoes an "ownership change," the

2    amount of its "pre-change losses" that may be utilized to offset future taxable income

3    generally is subject to an annual limitation.  As discussed in greater detail herein, Debtor

4    anticipates that the issuance of the Common Stock to the holders of Allowed General

5    Unsecured Claims, along with the cancellation of the Equity Securities, pursuant to the Plan

6    will result in an "ownership change" of Debtor for these purposes, and that Debtor's use of

7    any "pre-change losses" will be subject to limitation unless an exception to the general rules

8    of IRC Section 382 applies.

9    In general, the annual IRC Section 382 limitation on the use of "pre-change losses" in

10   any "post-change year" is equal to the product of (a) the fair market value of the stock of the

11   corporation immediately before the "ownership change" (with certain adjustments) multiplied

12   by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership

13   change" occurs.  The IRC Section 382 limitation may be increased to the extent that  Debtor

14   recognizes certain built-in gains in its assets during the five-year period following the

15   ownership change.  Any unused limitation may be carried forward, thereby increasing the

16   annual limitation in the subsequent taxable year.  As discussed below, however, special rules

17   may apply in the case of a corporation that experiences an ownership change as the result of

18   a bankruptcy proceeding.

19   The IRC Section 382(1)(5) exception to the foregoing annual limitation rules

20   generally applies when so-called "qualified creditors" of a debtor company in Chapter 11

21   receive, in respect of their claims, at least 50% of the vote and value of the stock of the

22   reorganized debtor pursuant to a confirmed Chapter 11 plan.  Under the IRC

23   Section 382(1)(5) exception, a debtor's pre-change losses are not limited on an annual basis

24   but, instead, the debtor's NOLs are required to be reduced by the amount of any interest

25   deductions claimed during any taxable year ending during the three-year period preceding the

26   taxable year that includes the effective date of the plan of reorganization, and during the part

**Page 44 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1  of the taxable year prior to and including the effective date of the plan of reorganization, in

2  respect of all debt converted into stock in the reorganization.  If the IRC Section 382(1)(5)

3  exception applies but the debtor undergoes another ownership change within two years after

4  consummation, then the debtor's pre-change losses effectively would be eliminated in their

5  entirety.

6        Where the IRC Section 382(1)(5) exception is not applicable (either because the

7  debtor does not qualify for it or the debtor otherwise elects not to utilize the IRC

8  Section 382(1)(5) exception), a second special rule, the IRC Section 382(1)(6) exception,

9  will generally apply.  When the IRC Section 382(1)(6) exception applies, a debtor

10  corporation that undergoes an ownership change generally is permitted to determine the fair

11  market value of its stock after taking into account the increase in value resulting from any

12  surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the

13  ordinary rule that requires the fair market value of a corporation that undergoes an ownership

14  change to be determined before the events giving rise to the change.  The IRC

15  Section 382(1)(6) exception also differs from the IRC Section 382(1)(5) exception in that the

16  debtor corporation is not required to reduce its NOLs by interest deductions in the manner

17  described above, and the debtor may undergo a change of ownership within two years

18  without triggering the elimination of its pre-change losses.

19        16.3    Holders of Allowed General Unsecured Claims Not Constituting Tax

20  Securities.  A holder of an Allowed General Unsecured Claim not constituting a tax security

21  should recognize gain or loss equal to the amount realized in satisfaction of his Claim minus

22  the holder's tax basis in the Claim.  The holder's amount realized for this purpose generally

23  will equal the fair market value of the Common Stock received on the date of distribution,

24  less any amount allocable to interest on the holder's Claim.

25        Any gain or loss recognized by a holder of an Allowed General Unsecured Claim not

26  constituting a tax security will be capital or ordinary depending on the status of the Claim in

**Page 45 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1   the holder's hands.  Such a holder's tax basis for the Common Stock received under the Plan

2   generally should equal its fair market value on the date of distribution by Reorganized

3   Debtor.  The  holding period for any Common Stock received under the Plan by a holder of a

4   Claim not constituting a tax security generally should begin on the day following the day of

5   receipt.

6          Debtor has the right to consummate the Rights Offering on or before the Effective

7   Date.  If the Rights Offering is implemented, each holder of an Allowed General Unsecured

8   Claim will receive Subscription Rights to purchase Common Stock in accordance with the

9   terms of the Rights Offering.  This tax discussion assumes that the Subscription Price for

10  each share of Common Stock will equal its fair market value for United States federal

11  income tax purposes.  Accordingly, neither the receipt nor the exercise of Subscription

12  Rights by a holder of an Allowed General Unsecured Claim will affect the amount of any

13  gain or loss recognized upon satisfaction of such holder's Claim.

14          16.4    Holders of Allowed Small Unsecured Claims.  In accordance with the Plan,

15  the debt owed by Debtor to holders of Allowed Small Unsecured Claims will be satisfied by

16  a payment of cash in an amount equal to eighty percent of each such Claim.  In general, the

17  amount received by each holder of an Allowed Small Unsecured Claim is treated as an

18  amount received in exchange for the satisfied debt, and each such holder will recognize

19  taxable gain or loss equal to the amount received less the holder's tax basis in the Claim.

20  Any gain or loss recognized will be long-term or short-term capital gain or loss or ordinary

21  income or loss, depending upon factors specific to each holder of an Allowed Small

22  Unsecured Claim, including but not limited to:  (a) whether the Claim (or a portion thereof)

23  is attributable to principal or interest, (b) the origin of the Claim, (c) whether the holder of

24  the Claim reports income on the accrual or cash basis method, and (d) whether the holder of

25  the Claim has taken a bad debt deduction or otherwise recognized a loss with respect to the

26  Claim.

**Page 46 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1      16.5    Equity Security Holders.  In accordance with the Plan, all the Equity

2    Securities, which constitute all of the equity interests of Debtor, shall be deemed cancelled

3    and shall be of no further force and effect (without regard to whether the Equity Securities

4    are surrendered for cancellation or otherwise).  The Equity Security Holders will not receive

5    anything on account of such Equity Securities and will recognize loss in an amount equal to

6    such holder's adjusted tax basis in the Equity Securities.  The character of any recognized

7    loss will depend upon several factors, including, but not limited to, the status of the holder,

8    the nature of the Equity Interest in the holder's hands, the purpose and circumstances of its

9    acquisition, the holder's holding period, and the extent to which the holder had previously

10    claimed a deduction for the worthlessness of all or a portion of the Equity Security.

11      16.6    Information Reporting and Backup Withholding.  Certain payments, including

12    the payments with respect to Allowed Claims pursuant to the Plan, are generally subject to

13    information reporting by the payor to the IRS.  Moreover, under certain circumstances, a

14    holder of an Allowed Claim may be subject to "backup withholding" with respect to

15    payments made pursuant to the Plan, unless such holder either (a) comes within certain

16    exempt categories (which generally include corporations) and, when required, demonstrates

17    this fact, or (b) provides a correct United States taxpayer identification number and certifies

18    under penalty of perjury that the holder is a United States person, the taxpayer identification

19    number is correct, and that the taxpayer is not subject to backup withholding because of a

20    failure to report all dividend and interest income.  Backup withholding is not an additional

21    tax.  Amounts withheld under the backup withholding rules may be credited against the

22    holder's United States federal income tax liability, and the holder may obtain a refund of any

23    excess amounts withheld under the backup withholding rules by filing an appropriate claim

24    for refund with the IRS.

25      16.7    Importance of Obtaining Professional Tax Assistance.  THE FOREGOING

26    DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL

**Page 47 of 48** - DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

1  INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR

2  CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE

3  DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX

4  ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND

5  MAY VARY DEPENDING ON A HOLDER OF AN ALLOWED CLAIM OR THE

6  EQUITY SECURITY HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY,

7  EACH HOLDER OF AN ALLOWED CLAIM AND EACH EQUITY SECURITY

8  HOLDER IS URGED TO CONSULT ITS TAX ADVISOR ABOUT THE FEDERAL,

9  STATE, LOCAL, AND APPLICABLE FOREIGN, INCOME AND OTHER TAX

10  CONSEQUENCES OF THE PLAN.

11  **17.    RECOMMENDATION AND CONCLUSION**

12       Please read this Disclosure Statement and the Plan carefully.  After reviewing all the

13  information and making an informed decision, please vote by using the enclosed ballot.

14       Debtor strongly urges you to vote in support of the Plan.

15       DATED this 31st day of January, 2014.

16
17                         C & K MARKET, INC.

18                         By /s/ Edward C. Hostmann
                               Edward C. Hostmann
19                             Chief Restructuring Officer

20  Presented by:

21  TONKON TORP LLP

22
23  By /s/ Albert N. Kennedy
       Albert N. Kennedy, OSB No. 821429
       Timothy J. Conway, OSB No. 851752
24     Michael W. Fletcher, OSB No. 010448
       Ava L. Schoen, OSB No. 044072
25     Of Attorneys for Debtor

26  034518/00017/5203762v7

**Page 48 of 48** -  DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)

# EXHIBIT 1

## Debtor's Plan of Reorganization

**Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
    Direct Dial:  (503) 802-2013
    Facsimile:    (503) 972-3713
    E-Mail:      al.kennedy@tonkon.com
**Timothy J. Conway**, OSB No. 851752
    Direct Dial:  (503) 802-2207
    Facsimile:    (503) 972-3727
    E-Mail:      tim.conway@tonkon.com
**Michael W. Fletcher**, OSB No. 010448
    Direct Dial:  (503) 802-2169
    Facsimile:    (503) 972-3869
    E-Mail:      michael.fletcher@tonkon.com
**Ava L. Schoen**, OSB No. 044072
    Direct Dial:  (503) 802-2143
    Facsimile:    (503) 972-3843
    E-Mail:      ava.schoen@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR  97204

      Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 13-64561-fra11 |
| C & K Market, Inc., | **DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)** |
|         Debtor. | |

DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 1 of 76

# TABLE OF CONTENTS

ARTICLE 1  DEFINITIONS ................................................................................................1

ARTICLE 2  UNCLASSIFIED CLAIMS ............................................................................10

ARTICLE 3  CLASSIFICATION ........................................................................................11

ARTICLE 4  TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS......................12

ARTICLE 5  DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; SETTLEMENT............21

ARTICLE 6  RIGHTS OFFERING......................................................................................22

ARTICLE 7  MEANS FOR EXECUTION OF PLAN .........................................................26

ARTICLE 8  EXECUTORY CONTRACTS AND UNEXPIRED LEASES.........................30

ARTICLE 9  EFFECT OF CONFIRMATION ....................................................................31

ARTICLE 10  RETENTION OF JURISDICTION ...............................................................32

ARTICLE 11  ADMINISTRATIVE PROVISIONS .............................................................34

ARTICLE 12  MISCELLANEOUS PROVISIONS..............................................................36

**Page i of i** - DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 2 of 76

1    C & K Market, Inc., an Oregon corporation ("C & K" or "Debtor") as Debtor and

2    debtor-in-possession, proposes the following Plan of Reorganization, pursuant to

3    Section 1129(a) of Title 11 of the United States Code.

4    The Plan provides for the terms upon which C & K will restructure and provide

5    payments to its creditors.  In general, the Plan provides for (a) payment in full to Secured

6    Creditors of the Allowed Amount of their Secured Claims; (b) issuance of Common Stock in

7    Reorganized Debtor in exchange for Allowed Unsecured Claims; (c) payment in an amount

8    equal to 80% of the Allowed Claims of Small Unsecured Creditors within 90 days after the

9    Effective Date; and (d) cancellation of all existing Equity Securities.

10    The Disclosure Statement is enclosed herewith to assist you in understanding this

11    Plan and making an informed judgment concerning its terms.

## ARTICLE 1

## DEFINITIONS

14    Definitions of certain terms used in this Plan are set forth below.  Other terms are

15    defined in the text of this Plan or the text of the Disclosure Statement.  In either case, when a

16    defined term is used, the first letter of each word in the defined term is capitalized.  Terms

17    used and not defined in this Plan or the Disclosure Statement shall have the meanings given

18    in the Bankruptcy Code or Bankruptcy Rules, or otherwise as the context requires.  The

19    meanings of all terms shall be equally applicable to both the singular and plural, and

20    masculine and feminine, forms of the terms defined.  The words "herein," "hereof," "hereto,"

21    "hereunder," and others of similar import, refer to the Plan as a whole and not to any

22    particular section, subsection, or clause contained in the Plan.  Captions and headings to

23    articles, sections, and exhibits are inserted for convenience of reference only and are not

24    intended to be part of or to affect the interpretation of the Plan.  The rules of construction set

25    forth in Section 102 of the Bankruptcy Code shall apply.  In computing any period of time

26    prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**Page 1 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 3 of 76

1  Any capitalized term that is not defined herein but is defined in the Bankruptcy Code shall

2  have the meaning ascribed to such term in the Bankruptcy Code.

3      1.1.    "Administrative Expense Claim" means any Claim entitled to the priority

4  afforded by Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

5      1.2.    "Allowed" means, with respect to any Claim, proof of which has been

6  properly Filed or, if no Proof of Claim was so Filed, which was or hereafter is listed on the

7  Schedules as liquidated in amount and not disputed or contingent, and, in either case, a Claim

8  as to which no objection to the allowance thereof, or motion to estimate for purposes of

9  allowance, shall have been Filed on or before any applicable period of limitation that may be

10  fixed by the Bankruptcy Code, the Bankruptcy Rules, and/or the Bankruptcy Court, or as to

11  which any objection, or any motion to estimate for purposes of allowance, shall have been so

12  Filed, to the extent allowed by a Final Order.

13      1.3.    "Allowed Secured Claim" means an Allowed Claim that is secured by a lien,

14  security interest, or other charge against or interest in property in which Debtor has an

15  interest or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of

16  the value (as set forth in the Plan or, if no value is specified, as determined in accordance

17  with Section 506(a) of the Bankruptcy Code or, if applicable, Section 1111(b) of the

18  Bankruptcy Code) of the interest of the holder of such Claim in Debtor's interest in such

19  property or to the extent of the amount subject to setoff, as the case may be.

20      1.4.    "Allowed Unsecured Claim" means an Allowed Claim that is not an Allowed

21  Secured Claim or an Allowed Administrative Expense Claim.

22      1.5.    "Avoidance Actions" means, without limitation, any and all actions, causes of

23  action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments,

24  claims and demands whatsoever, whether known or unknown, in law (including, without

25  limitation, Sections 506(c), 510, 542, 544, 547, 548, 549, 550, and 553 of the Bankruptcy

26  Code or equivalent provisions of applicable non-bankruptcy law), equity or otherwise.

**Page 2 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 4 of 76

1         1.6.    "Backstop Commitment" means the agreement by the Backstop Party, if any,

2  pursuant to the Backstop Rights Purchase Agreement, to purchase all of the Rights Offering

3  Shares that are not purchased by the Rights Offering Participants as part of the Rights

4  Offering.

5         1.7.    "Backstop Party" means Endeavour and/or THL and/or their affiliates, or such

6  other Creditor as selected by Debtor, if any.

7         1.8.    "Backstop Rights Purchase Agreement" means the agreement between the

8  Backstop Party and Debtor which sets forth the Backstop Commitment and the terms and

9  conditions thereof.  If the Backstop Party and Debtor decide to proceed with the Rights

10  Offering with a Backstop Party, a form of the Backstop Rights Purchase Agreement will be

11  filed with the Court not less than 10 days prior  to the hearing on confirmation of the Plan.

12        1.9.    "Bank" or "U.S. Bank" means U.S. Bank, National Association.

13       1.10.   "Bankruptcy Case" means the case under Chapter 11 of the Bankruptcy Code

14  with respect to Debtor, pending in the District of Oregon, administered as *In re C & K*

15  *Market, Inc.,* Case No. 13-64561-rld11.

16       1.11.   "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended

17  from time to time, set forth in Sections 101 et seq. of Title 11 of the United States Code.

18       1.12.   "Bankruptcy Court" means the United States Bankruptcy Court for the District

19  of Oregon, or such other court that exercises jurisdiction over the Bankruptcy Case or any

20  proceeding therein, including the United States District Court for the District of Oregon, to

21  the extent the reference to the Bankruptcy Court or any proceeding therein is withdrawn.

22       1.13.   "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy

23  Procedure, as amended and promulgated under Section 2075, Title 28, of the United States

24  Code, and the local rules and standing orders of the Bankruptcy Court.

25

26

**Page 3 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 5 of 76

1      1.14.    "Business Day" means a day other than a Saturday, Sunday, any legal holiday

2  as defined in Bankruptcy Rule 9006(a), or other day on which banks in Portland, Oregon are

3  authorized or required by law to be closed.

4      1.15.    "Cash" means lawful currency of the United States of America and

5  equivalents, including, without limitation, checks, wire transfers and drafts.

6      1.16.    "Claim" means (a) any right to payment from Debtor arising before the

7  Effective Date, whether or not such right is reduced to judgment, liquidated, unliquidated,

8  fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or

9  unsecured; or (b) any right to an equitable remedy against Debtor arising before the Effective

10  Date for breach of performance if such breach gives rise to a right of payment from Debtor,

11  whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent,

12  matured, unmatured, disputed, undisputed, secured, or unsecured.

13      1.17.    "Class" means one of the classes of Claims defined in Article 3 hereof.

14      1.18.    "Collateral" means any property in which Debtor has an interest that is subject

15  to a lien or security interest securing the payment of an Allowed Secured Claim.

16      1.19.    "Committee" means the Official Unsecured Creditors' Committee appointed in

17  this Bankruptcy Case by the United States Trustee pursuant to Section 1102 of the

18  Bankruptcy Code, as reconstituted by the addition or removal of members from time to time.

19      1.20.    "Common Stock" means the authorized common stock, no par value, of

20  Reorganized Debtor.

21      1.21.    "Confirmation Date" means the date on which the Confirmation Order is

22  entered on the docket by the Clerk of the Bankruptcy Court.

23      1.22.    "Confirmation Order" means the order of the Bankruptcy Court confirming

24  the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

25      1.23.    "Creditor" means any entity holding a Claim against Debtor.

26

**Page 4 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 6 of 76

1   1.24.   "Debtor" means C & K Market, Inc. as Debtor and debtor-in-possession in the

2   Bankruptcy Case.

3   1.25.   "Deficiency Claim" means the portion of a Secured Claim that is unsecured.

4   1.26.   "Disclosure Statement" means Debtor's Disclosure Statement as amended,

5   modified, restated, or supplemented from time to time, pertaining to the Plan.

6   1.27.   "Disputed Claim" means a Claim with respect to which a Proof of Claim has

7   been timely Filed or deemed timely Filed under applicable law, and as to which an objection,

8   timely Filed, has not been withdrawn on or before the Effective Date or any date fixed for

9   filing such objections by order of the Bankruptcy Court, and has not been denied by a Final

10   Order.

11   1.28.   "DOL Consent Judgment and Order" means that certain Consent Judgment

12   and Order filed on or about November 2, 2012 in Case No. 6:10-CV-06360-AA in the United

13   States District Court, District of Oregon, Eugene Division.

14   1.29.   "Effective Date" means the first day of the first full month after the

15   Confirmation Date and after which the conditions to effectiveness set forth in the Plan have

16   been waived or satisfied.

17   1.30.   "Employee Equity Security Plan" means any plan, fund, agreement, contract

18   or program established or entered into by Debtor prior to the Petition Date with respect to

19   any Equity Security granted to or held by, or to be granted to or held by, any employee,

20   director, contractor or agent of Debtor or any of its subsidiaries.

21   1.31.   "Employee Stock Incentive Plan" means that certain 2014 Stock Incentive

22   Plan substantially in the form attached hereto as **Exhibit 1**, which shall be effective with

23   respect to Reorganized Debtor as of the Effective Date.

24   1.32.   "Endeavour" means Endeavour Structured Equity and Mezzanine Fund, L.P.

25   1.33.   "Entity" shall have the meaning ascribed to it by Section 101(15) of the

26   Bankruptcy Code.

**Page 5 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 7 of 76

1          1.34.   "Equity Security" shall have the meaning ascribed to it in Section 101(16) of

2   the Bankruptcy Code with respect to any Equity Security Holder of Debtor.

3          1.35.   "Equity Security Holder" means a holder of an Equity Security of Debtor.

4          1.36.   "Exit Financing" means one or more credit facilities to be entered into by

5   Reorganized Debtor effective as of the Effective Date, which may be secured by a first

6   priority lien in all or substantially all of Reorganized Debtor's property, subject only to the

7   liens being retained by Secured Creditors under this Plan to secure the payment of Allowed

8   Secured Claims.

9          1.37.   "Filed" means filed with the Bankruptcy Court in the Bankruptcy Case.

10         1.38.   "Final Order" means an order or judgment entered on the docket by the Clerk

11   of the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and

12   the parties that has not been reversed, stayed, modified, or amended and as to which the time

13   for filing a notice of appeal, or petition for certiorari or request for certiorari, or request for

14   rehearing, shall have expired and is no longer subject to remand, retrial, modification or

15   further proceedings of any kind or nature.

16         1.39.   "General Unsecured Claim" means an Unsecured Claim that is not a Small

17   Unsecured Claim.

18         1.40.   "Insider" shall have the meaning ascribed to it by Section 101(31) of the

19   Bankruptcy Code.

20         1.41.   "Other Priority Claim" means any Claim for an amount entitled to priority in

21   right of payment under Sections 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy Code.

22         1.42.   "Petition Date" means November 19, 2013, the date on which the petition

23   commencing the Bankruptcy Case was Filed.

24         1.43.   "Plan" means this Plan of Reorganization, as amended, modified, restated, or

25   supplemented from time to time.

26         1.44.   "Primary Offering Subscription" has the meaning ascribed to it in Section 6.2.

**Page 6 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 8 of 76

1       1.45.   "Priority Tax Claim" means a Claim of a governmental unit of the kind

2 entitled to priority under Section 507(a)(8) of the Bankruptcy Code or that would otherwise

3 be entitled to priority but for the secured status of the Claim.

4       1.46.   "Pro Rata Share of the Rights Offering Shares" means, with respect to an

5 applicable Rights Offering Participant, the proportion that (a) the amount of the Class 12

6 Claims that are held by such Rights Offering Participant bears to (b) the aggregate amount of

7 Class 12 Claims that are held by all Rights Offering Participants.

8       1.47.   "Rejection Claim" means a Claim entitled to be filed as a result of a Debtor

9 rejecting an executory contract in this Bankruptcy Case.

10       1.48.   "Remaining Rights Offering Shares" means those Rights Offering Shares, if

11 any, that are not subscribed for pursuant to the Primary Offering Subscriptions submitted by

12 the Rights Offering Participants prior to the expiration of the Subscription Deadline.

13       1.49.   "Reorganized Debtor" means Debtor from and after the Effective Date.

14       1.50.   "Restated Articles of Incorporation" means the Second Amended and Restated

15 Articles of Incorporation of Debtor, substantially in the form attached hereto as **Exhibit 2**,

16 which shall modify and amend Debtor's prior Amended and Restated Articles of

17 Incorporation and govern Reorganized Debtor from and after the Effective Date.

18       1.51.   "Restated Bylaws" means the Second Amended and Restated Bylaws of

19 Debtor, substantially in the form attached hereto as **Exhibit 3**, which shall modify and amend

20 Debtor's prior Amended and Restated Bylaws and govern Reorganized Debtor from and after

21 the Effective Date.

22       1.52.   "Rights Offering" means that certain rights offering of Common Stock in an

23 amount of up to the Rights Offering Amount to be offered to the Rights Offering

24 Participants, the terms of which are set forth in Article 6.

25       1.53.   "Rights Offering Amount" means up to $10,000,000.

26       1.54.   "Rights Offering Participant" means each holder of a Class 12 Claim.

**Page 7 of 40 -**     DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

EXHIBIT 1
Page 9 of 76

1       1.55.   "Rights Offering Purchaser" means a Rights Offering Participant who timely

2 and properly executes and delivers a Subscription to Debtor or other entity specified in the

3 Subscription prior to the expiration of the Subscription Deadline.

4       1.56.   "Rights Offering Record Date" means the date for determining which holders

5 of Class 12 Claims are eligible to participate in the Rights Offering, and shall be the voting

6 record date applicable to such Claims, or such other date as designated in an Order of the

7 Bankruptcy Court.

8       1.57.   "Rights Offering Shares" means the whole shares of Common Stock to be

9 issued and sold through the Rights Offering (including, if there is a Backstop Party, the

10 Remaining Rights Offering Shares to be issued pursuant to the Backstop Rights Purchase

11 Agreement). No fractional shares will be issued.

12       1.58.   "Scheduled Amounts" means the Claim amounts as set forth in Debtor's

13 Schedules.

14       1.59.   "Schedules" means the Schedules of Assets and Liabilities and the Statement

15 of Financial Affairs Filed by Debtor pursuant to Section 521 of the Bankruptcy Code, as

16 amended, modified, restated, or supplemented from time to time.

17       1.60.   "Secured Claim" means any Claim against Debtor held by any entity,

18 including, without limitation, an affiliate or judgment creditor of Debtor, to the extent such

19 Claim constitutes a secured Claim under Sections 506(a) or 1111(b) of the Bankruptcy Code.

20 The unsecured portion, if any, of such Claim shall be treated as an Unsecured Claim.

21       1.61.   "Small Unsecured Claims" means Unsecured Claims that are equal to or less

22 than $10,000 or that have been reduced to $10,000 by the election of the Creditor holding

23 such Unsecured Claim.

24       1.62.   "Subscription" means a subscription agreement to be distributed to Rights

25 Offering Participants, substantially in the form attached hereto as **Exhibit 4**, pursuant to

26 which such Rights Offering Participants may exercise their Subscription Rights.

**Page 8 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 10 of 76

1       1.63.    "Subscription Commencement Date" means the date on which the

2 Subscription Period commences, which shall be the earliest date reasonably practicable

3 occurring after the Rights Offering Record Date.

4       1.64.    "Subscription Deadline" means the date on which the Rights Offering shall

5 expire as set forth in the Subscription, which date shall precede the Effective Date.

6       1.65.    "Subscription Notification Date" means a date that is not later than seven days

7 following the Subscription Deadline.

8       1.66.    "Subscription Payment Amount" means, with respect to a particular Rights

9 Offering Purchaser, an amount of Cash equal to the amount of Rights Offering Amount

10 subscribed for by a Rights Offering Purchaser up to such Rights Offering Purchaser's

11 Pro Rata Share of the Rights Offering Shares, multiplied by the Subscription Price, and

12 rounded to the nearest whole dollar as necessary to prevent the need to issue fractional shares

13 of Common Stock.

14       1.67.    "Subscription Period" means the time period during which the Rights

15 Offering Participants may subscribe to purchase the Rights Offering Shares, which period

16 shall commence on the Subscription Commencement Date and expire on the Subscription

17 Deadline.

18       1.68.    "Subscription Price" means an amount determined by Debtor and the

19 Backstop Party (if any) as the per-share purchase price for the Rights Offering Shares, but

20 shall not be less than $7.50.

21       1.69.    "Subscription Right" means the right to participate in the Rights Offering

22 pursuant to Article 6, which right shall be non-transferable and non-certificated.

23       1.70.    "THL" means THL Credit, Inc.

24       1.71.    "Unsecured Claim" means a Claim that is not an Administrative Claim, a

25 Secured Claim, a Priority Tax Claim, or an Other Priority Claim.

26       1.72.    "Unsecured Creditor" means a holder of an Allowed Unsecured Claim.

**Page 9 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 11 of 76

1       1.73.   "Utility Deposits" means deposits with utilities made by Debtor after the

2   Petition Date pursuant to Section 366(b) of the Bankruptcy Code.

3                                          **ARTICLE 2**

4                                 **UNCLASSIFIED CLAIMS**

5       2.1.    Administrative Expense Claims.  Each holder of an Allowed Administrative

6   Expense Claim shall be paid the full amount of its Allowed Administrative Expense Claim in

7   Cash on the later of (a) the Effective Date; or (b) the date on which such Claim becomes

8   Allowed, unless such holder shall agree to a different treatment of such Claim (including,

9   without limitation, any different treatment that may be provided for in any documentation,

10  statute, or regulation governing such Claim); provided, however, that Administrative

11  Expense Claims representing obligations incurred in the ordinary course of business by

12  Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the

13  ordinary course of business and in accordance with any terms and conditions of the particular

14  transaction, and any agreements relating thereto.

15      2.2.    Priority Tax Claims.  Each holder of an Allowed Priority Tax Claim will be

16  paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim in Cash on the

17  later of (a) the Effective Date, (b) the date on which such Claim becomes Allowed, and

18  (c) the date it is due.

19      2.3.    Bankruptcy Fees.  Fees payable by Debtor under 28 U.S.C. § 1930, or to the

20  Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date.  After

21  confirmation, Reorganized Debtor shall continue to pay quarterly fees of the Office of the

22  United States Trustee and to file quarterly reports with the Office of the United States

23  Trustee until the Bankruptcy Case is closed by the Court, dismissed, or converted except as

24  otherwise ordered by the Court.  This requirement is subject to any amendments to 28 U.S.C.

25  § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

26  After Confirmation, Reorganized Debtor shall file with the Court a monthly financial report

**Page 10 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 12 of 76

1      for each month, or portion thereof, that the Bankruptcy Case remains open.  The monthly

2      financial report shall include a statement of all disbursements made during the course of the

3      month, whether or not pursuant to the Plan.

4      <div align="center">**ARTICLE 3**</div>

5      <div align="center">**CLASSIFICATION**</div>

6      For purposes of this Plan, Claims (except those treated under Article 2) are classified

7      as provided below.  A Claim is classified in a particular Class only to the extent such Claim

8      qualifies within the description of such Class, and is classified in a different Class to the

9      extent such Claim qualifies within the description of such different Class.

10      3.1.     <u>Class 1 (Other Priority Claims)</u>.  Class 1 consists of all Allowed Other Priority

11      Claims.

12      3.2.     <u>Class 2 (C & K Market, Inc. 401(k) Plan; United States Department of Labor)</u>.

13      Class 2 consists of the Claims of the C & K Market, Inc. 401(k) Plan and the United States

14      Department of Labor arising under or related to the DOL Consent Judgment and Order.

15      3.3.     <u>Class 3 (Banc of America Leasing & Capital, LLC)</u>.  Class 3 consists of the

16      Allowed Secured Claim of Banc of America Leasing & Capital, LLC.

17      3.4.     <u>Class 4 (Dell Financial Services, LLC)</u>.  Class 4 consists of the Allowed

18      Secured Claim of Dell Financial Services, LLC.

19      3.5.     <u>Class 5 (James Gillespie)</u>.  Class 5 consists of the Allowed Secured Claim of

20      James Gillespie.

21      3.6.     <u>Class 6 (Komlofske Corp.)</u>.  Class 6 consists of the Allowed Secured Claim, if

22      any, of Komlofske Corp.

23      3.7.     <u>Class 7 (Greatway Center Property, LLC)</u>.  Class 7 consists of the Allowed

24      Secured Claim of Greatway Center Property, LLC.

25      3.8.     <u>Class 8 (Green & Frahm)</u>.  Class 8 consists of the Allowed Secured Claim of

26      Green & Frahm.

**Page 11 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 13 of 76

1    3.9.    <u>Class 9 (Ken and Lynda Martin)</u>.  Class 9 consists of the Allowed Secured

2 Claim of Ken and Lynda Martin.

3    3.10.    <u>Class 10 (Protective Life)</u>.  Class 10 consists of the Allowed Secured Claim of

4 Protective Life.

5    3.11.    <u>Class 11 (U.S. Bank, National Association)</u>.  Class 11 consists of the Allowed

6 Secured Claim of U.S. Bank, National Association.

7    3.12.    <u>Class 12 (General Unsecured Claims)</u>.  Class 12 consists of all Allowed

8 General Unsecured Claims.

9    3.13.    <u>Class 13 (Small Unsecured Claims)</u>.  Class 13 consists of all Allowed Small

10 Unsecured Claims.

11    3.14.    <u>Class 14 (Equity Security Holders)</u>.  Class 14 consists of the Claims and

12 interests of Equity Security Holders based on their Equity Security.

13    **ARTICLE 4**

14    **TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

15    4.1.    <u>Class 1 (Other Priority Claims)</u>.  Class 1 is unimpaired.  Each holder of an

16 Allowed Class 1 Claim will be paid in full in Cash by Reorganized Debtor the amount of its

17 Allowed Class 1 Claim on the latter of (a) the Effective Date; or (b) the date on which such

18 Claim becomes allowed, unless such holder shall agree or has agreed to a different treatment

19 of such Claim (including any different treatment that may be provided for in any

20 documentation, agreement, contract, statute, law, or regulation creating and governing such

21 Claim).

22    4.2.    <u>Class 2 (C & K Market, Inc. 401(k) Plan; United States Department of Labor)</u>.

23 Class 2 is unimpaired.  The DOL Consent Judgment and Order shall remain in full force and

24 effect, and is not in any way modified, altered or affected by this Plan.  Without limiting the

25 preceding, Reorganized Debtor shall continue to timely and fully perform and pay all of its

26 obligations under the DOL Consent Judgment and Order.

**Page 12 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 14 of 76

1          4.3.    Class 3 (Allowed Secured Claim of Banc of America Leasing & Capital,

2    LLC). Class 3 is impaired. The amount of Banc of America Leasing & Capital, LLC's

3    (BALC) Allowed Secured Claim will be determined by agreement of Debtor and BALC, or,

4    absent agreement, in such amount as is determined and Allowed by the Bankruptcy Court.

5          BALC's Class 3 Claim shall be satisfied by delivery of a promissory note to BALC

6    (the "BALC Note") in the principal amount of its Allowed Secured Claim. The BALC Note

7    will bear interest from the Effective Date at a fixed per annum rate of 5%, and will be

8    payable by Reorganized Debtor as follows:

9          Commencing on the first day of the first month following the Effective Date and

10   continuing on the first day of each month thereafter until the BALC Note has been paid in

11   full, Reorganized Debtor will make equal monthly amortizing payments of principal and

12   interest on the BALC Note based on a five year amortization schedule, with final payment

13   due five years after the Effective Date.

14         The Class 3 Claim may be prepaid in full or in part at any time without any

15   prepayment penalty or premium.

16         As security for the Class 3 Claim, BALC will retain its security interests in and liens

17   upon its Collateral with the same priority and to the same extent such security had as of the

18   Petition Date. Reorganized Debtor will maintain the BALC Collateral in good repair, will

19   insure the BALC Collateral to its full useable value, and will pay any property taxes with

20   respect to such Collateral when due. At any sale of its Collateral, BALC will have the right

21   to bid at such sale, and if BALC is the successful bidder, BALC may offset all or any portion

22   of its then unpaid Allowed Secured Claim.

23         4.4.    Class 4 (Allowed Secured Claim of Dell Financial Services, LLC). Class 4 is

24   impaired. The amount of Dell Financial Services, LLC's ("Dell") Allowed Secured Claim

25   will be determined by agreement of Debtor and Dell, or, absent agreement, in such amount as

26   is determined and Allowed by the Bankruptcy Court.

**Page 13 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 15 of 76

1    Dell's Class 4 Claim shall be satisfied by delivery of a promissory note to Dell (the

2    "Dell Note") in the principal amount of its Allowed Secured Claim.  The Dell Note will bear

3    interest from the Effective Date at a fixed per annum rate of 5%, and will be payable by

4    Reorganized Debtor as follows:

5        Commencing on the first day of the first month following the Effective Date and

6    continuing on the first day of each month thereafter until the Dell Note has been paid in full,

7    Reorganized Debtor will make equal monthly amortizing payments of principal and interest

8    on the Dell Note based on a five year amortization schedule, with a final payment due five

9    years after the Effective Date.

10       The Class 4 Claim may be prepaid in full or in part at any time without any

11   prepayment penalty or premium.

12       As security for the Class 4 Claim, Dell will retain its security interests in and liens

13   upon its Collateral with the same priority and to the same extent such security had as of the

14   Petition Date.  Reorganized Debtor will maintain the Dell Collateral in good repair, will

15   insure the Dell Collateral to its full useable value, and will pay any property taxes with

16   respect to such Collateral when due.  At any sale of its Collateral, Dell will have the right to

17   bid at such sale, and if Dell is the successful bidder, Dell may offset all or any portion of its

18   then unpaid Allowed Secured Claim.

19       4.5.    Class 5 (Allowed Secured Claim of Komlofske Corp.).  Class 5 is impaired.

20   The amount of Komlofske Corp's ("Komlofske") Allowed Secured Claim, if any, will be

21   determined by agreement of Debtor and Komlofske, or, absent agreement, in such amount as

22   is determined and Allowed by the Bankruptcy Court.

23       Komlofske's Class 5 Claim shall be satisfied by delivery of a promissory note to

24   Komlofske (the "Komlofske Note") in the principal amount of its Allowed Secured Claim, if

25   any.  The Komlofske Note will bear interest from the Effective Date at a fixed per annum

26   rate of 5%, and will be payable by Reorganized Debtor as follows:

**Page 14 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 16 of 76

1    Commencing on the first day of the first month following the Effective Date and

2    continuing on the first day of each month thereafter until the Komlofske Note has been paid

3    in full, Reorganized Debtor will make equal monthly amortizing payments of principal and

4    interest on the Komlofske Note based on a five year amortization schedule, with a final

5    payment due five years after the Effective Date.

6    The Class 5 Claim may be prepaid in full or in part at any time without any

7    prepayment penalty or premium.

8    As security for the Class 5 Claim, Komlofske will retain its security interests in and

9    liens upon its Collateral (if any, and to the extent not avoided) with the same priority and to

10    the same extent such security had as of the Petition Date.  Reorganized Debtor will maintain

11    the Komlofske Collateral in good repair, will insure the Komlofske Collateral to its full

12    useable value, and will pay any property taxes with respect to such Collateral when due.  At

13    any sale of its Collateral, Komlofske will have the right to bid at such sale, and if Komlofske

14    is the successful bidder, Komlofske may offset all or any portion of its then unpaid Allowed

15    Secured Claim.

16    4.6.    Class 6 (Allowed Secured Claim of James Gillespie).  Class 6 is impaired.

17    The amount of James Gillespie's ("Gillespie") Allowed Secured Claim will be determined by

18    agreement of Debtor and Gillespie, or, absent agreement, in such amount as is determined

19    and Allowed by the Bankruptcy Court.

20    Gillespie's Class 6 Claim shall be satisfied by delivery of a promissory note to

21    Gillespie (the "Gillespie Note") in the principal amount of Gillespie's Allowed Secured

22    Claim.  The Gillespie Note will bear interest from the Effective Date at a fixed per annum

23    rate of 5%, and will be payable by Reorganized Debtor as follows:

24    Commencing on the first day of the first month following the Effective Date and

25    continuing on the first day of each month thereafter until the Gillespie Note has been paid in

26    full, Reorganized Debtor will make equal monthly amortizing payments of principal and

**Page 15 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 17 of 76

1    interest on the Gillespie Note based on a twenty five year amortization schedule, with a

2    balloon payment due seven years after the Effective Date.

3        The Class 6 Claim may be prepaid in full or in part at any time without any

4    prepayment penalty or premium.

5        As security for the Class 6 Claim, Gillespie will retain its security interests in and

6    liens upon its Collateral with the same priority and to the same extent such security had as of

7    the Petition Date.  Reorganized Debtor will maintain the Gillespie Collateral in good repair,

8    will insure the Gillespie Collateral to its full useable value, and will pay any property taxes

9    with respect to such Collateral when due.  At any sale of its Collateral, Gillespie will have

10   the right to bid at such sale, and if Gillespie is the successful bidder, Gillespie may offset all

11   or any portion of its then unpaid Allowed Secured Claim.

12       The Class 6 Claim is fully secured, and Gillespie will not have any Deficiency Claim

13   with respect to the Class 6 Claim.

14       4.7.    Class 7 (Greatway Center Property, LLC).  Class 7 is impaired.  The amount

15   of Greatway Center Property, LLC's ("Greatway") Allowed Secured Claim will be

16   determined by agreement of Debtor and Greatway, or, absent agreement, in such amount as

17   is determined and Allowed by the Bankruptcy Court.

18       Greatway's Class 7 Claim shall be satisfied by delivery of a promissory note to

19   Greatway (the "Greatway Note") in the principal amount of its Allowed Secured Claim.  The

20   Greatway Note will bear interest from the Effective Date at a fixed per annum rate of 5%,

21   and will be payable by Reorganized Debtor as follows:

22       Commencing on the first day of the first month following the Effective Date and

23   continuing on the first day of each month thereafter until the Greatway Note has been paid in

24   full, Reorganized Debtor will make equal monthly amortizing payments of principal and

25   interest on the Greatway Note based on a twenty five year amortization schedule, with a

26   balloon payment due seven years after the Effective Date.

**Page 16 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 18 of 76

1     The Class 7 Claim may be prepaid in full or in part at any time without any

2     prepayment penalty or premium.

3     As security for the Class 7 Claim, Greatway will retain its security interests in and

4     liens upon its Collateral with the same priority and to the same extent such security had as of

5     the Petition Date.  Reorganized Debtor will maintain the Greatway Collateral in good repair,

6     will insure the Greatway Collateral to its full useable value, and will pay any property taxes

7     with respect to such Collateral when due.  At any sale of its Collateral, Greatway will have

8     the right to bid at such sale, and if Greatway is the successful bidder, Greatway may offset all

9     or any portion of its then unpaid Allowed Secured Claim.

10     The Class 7 Claim is fully secured, and Greatway will not have any Deficiency Claim

11     with respect to the Class 7 Claim.

12     4.8.     Class 8 (Green & Frahm).  Class 8 is impaired.  The amount of Green &

13     Frahm's ("Green") Allowed Secured Claim will be determined by agreement of Debtor and

14     Green, or, absent agreement, in such amount as is determined and Allowed by the

15     Bankruptcy Court.

16     Green's Class 8 Claim shall be satisfied by delivery of a promissory note to Green

17     (the "Green Note") in the principal amount of its Allowed Secured Claim.  The Green Note

18     will bear interest from the Effective Date at a fixed per annum rate of 5%, and will be

19     payable by Reorganized Debtor as follows:

20     Commencing on the first day of the first month following the Effective Date and

21     continuing on the first day of each month thereafter until the Green Note has been paid in

22     full, Reorganized Debtor will make equal monthly amortizing payments of principal and

23     interest on the Green Note based on a twenty five year amortization schedule, with a balloon

24     payment due seven years after the Effective Date.

25     The Class 8 Claim may be prepaid in full or in part at any time without any

26     prepayment penalty or premium.

**Page 17 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 19 of 76

1        As security for the Class 8 Claim, Green will retain its security interests in and liens

2    upon its Collateral with the same priority and to the same extent such security had as of the

3    Petition Date.  Reorganized Debtor will maintain the Green Collateral in good repair, will

4    insure the Green Collateral to its full useable value, and will pay any property taxes with

5    respect to such Collateral when due.  At any sale of its Collateral, Green will have the right to

6    bid at such sale, and if Green is the successful bidder, Green may offset all or any portion of

7    its then unpaid Allowed Secured Claim.

8        The Class 8 Claim is fully secured, and Green will not have any Deficiency Claim

9    with respect to the Class 8 Claim.

10        4.9.    Class 9 (Ken and Lynda Martin).  Class 9 is impaired.  The amount of Ken

11    and Lynda Martin's ("Martin") Allowed Secured Claim will be determined by agreement of

12    Debtor and Martin, or, absent agreement, in such amount as is determined and Allowed by

13    the Bankruptcy Court.

14        Martin's Class 9 Claim shall be satisfied by delivery of a promissory note to Martin

15    (the "Martin Note") in the principal amount of its Allowed Secured Claim.  The Martin Note

16    will bear interest from the Effective Date at a fixed per annum rate of 5%, and will be

17    payable by Reorganized Debtor as follows:

18        Commencing on the first day of the first month following the Effective Date and

19    continuing on the first day of each month thereafter until the Martin Note has been paid in

20    full, Reorganized Debtor will make equal monthly amortizing payments of principal and

21    interest on the Martin Note based on a twenty five year amortization schedule, with a balloon

22    payment due seven years after the Effective Date.

23        The Class 9 Claim may be prepaid in full or in part at any time without any

24    prepayment penalty or premium.

25        As security for the Class 9 Claim, Martin will retain its security interests in and liens

26    upon its Collateral with the same priority and to the same extent such security had as of the

**Page 18 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 20 of 76

Petition Date.  Reorganized Debtor will maintain the Martin Collateral in good repair, will insure the Martin Collateral to its full useable value, and will pay any property taxes with respect to such Collateral when due.  At any sale of its Collateral, Martin will have the right to bid at such sale, and if Martin is the successful bidder, Martin may offset all or any portion of its then unpaid Allowed Secured Claim.

The Class 9 Claim is fully secured, and Martin will not have any Deficiency Claim with respect to the Class 9 Claim.

4.10.  Class 10 (Protective Life).  Class 10 is impaired.  The amount of Protective Life's Allowed Secured Claim will be determined by agreement of Debtor and Protective Life, or, absent agreement, in such amount as is determined and Allowed by the Bankruptcy Court.

Protective Life's Class 10 Claim shall be satisfied by delivery of a promissory note to Protective Life (the "Protective Life Note") in the principal amount of its Allowed Secured Claim.  The Protective Life Note will bear interest from the Effective Date at a fixed per annum rate of 5%, and will be payable by Reorganized Debtor as follows:

Commencing on the first day of the first month following the Effective Date and continuing on the first day of each month thereafter until the Protective Life Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Protective Life Note based on a twenty five year amortization schedule, with a balloon payment due seven years after the Effective Date.

The Class 10 Claim may be prepaid in full or in part at any time without any prepayment penalty or premium.

As security for the Class 10 Claim, Protective Life will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date.  Reorganized Debtor will maintain the Protective Life Collateral in good repair, will insure the Protective Life Collateral to its full useable value, and will pay

**Page 19 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 21 of 76

1  any property taxes with respect to such Collateral when due.  At any sale of its Collateral,

2  Protective Life will have the right to bid at such sale, and if Protective Life is the successful

3  bidder, Protective Life may offset all or any portion of its then unpaid Allowed Secured

4  Claim.

5      The Class 10 Claim is fully secured, and Protective Life will not have any Deficiency

6  Claim with respect to the Class 10 Claim.

7      4.11.   Class 11 (U.S. Bank, National Association).  Class 11 is unimpaired.  Except

8  to the extent that U.S. Bank agrees to a different treatment of its Allowed Secured Claim,

9  U.S. Bank shall receive on the Effective Date, in full satisfaction of its Claim, one hundred

10  percent (100%) of the unpaid amount of its Allowed Secured Claim.

11      4.12.   Class 12 (General Unsecured Claims).  Class 12 is impaired.  Each holder of

12  an Allowed General Unsecured Claim will receive one share of Common Stock in

13  Reorganized Debtor in exchange for each $10 of its Allowed General Unsecured Claim on

14  the later of the Effective Date or the date its Claim becomes an Allowed Claim, rounded up

15  to the nearest $10.  Fractional shares will not be issued.  In addition, each holder of an

16  Allowed General Unsecured Claim shall have a Subscription Right.

17      4.13.   Class 13 (Small Unsecured Claims).  Class 13 is impaired.  Each holder of a

18  Class 13 Claim will paid by Reorganized Debtor in cash in an amount equal to 80% of its

19  Allowed Claim on or before 90 days after the Effective Date or the date its Claim becomes

20  an Allowed Claim, whichever is later.  General Unsecured Creditors may elect to reduce their

21  Allowed Claims in order to be treated as a Class 13 Claimant provided the election is made at

22  the time ballots are due for voting on the Plan, or such later date as provided in Section 8.3.

23  of this Plan.

24      4.14.   Class 14 (Equity Security Holders).  Class 14 is impaired.  All Equity

25  Securities and Employee Equity Security Plans of Debtor will be cancelled as of the

26

**Page 20 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 22 of 76

1    Effective Date, and Equity Security Holders will not receive or retain any property under the

2    Plan on account of their Equity Securities or any Employee Equity Security Plan.

3                                    **ARTICLE 5**

4          **DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; SETTLEMENT**

5          5.1.    Disputed Claims; Objections to Claims.  Only Claims that are Allowed shall

6    be entitled to distributions under the Plan.  Except as otherwise provided in Section 5.2

7    below, Debtor reserves the right to contest and object to any Claims and previously

8    Scheduled Amounts, including, without limitation, those Claims and Scheduled Amounts

9    that are specifically referenced herein, are not listed in the Schedules, are listed therein as

10   disputed, contingent and/or unliquidated in amount, or are listed therein at a different amount

11   than Debtor currently believes is validly due and owing.  Unless extended by an Order of the

12   Bankruptcy Court, all objections to Claims and Scheduled Amounts (other than

13   Administrative Expense Claims) shall be Filed and served upon counsel for Debtor and the

14   holder of the Claim objected to on or before the later of (a) 60 days after the Effective Date

15   or (b)  60 days after the date (if any) on which a Proof of Claim is Filed in respect of a

16   Rejection Claim or Deficiency Claim.  The last day for filing objections to Administrative

17   Expense Claims shall be set pursuant to a further order of the Bankruptcy Court.  All

18   Disputed Claims shall be resolved by the Bankruptcy Court, except to the extent that

19   (a) Debtor may otherwise elect consistent with the Plan and the Bankruptcy Code or (b) the

20   Bankruptcy Court may otherwise order.

21         5.2.    Subsequent Allowance of Disputed Claims.  The holder of a Disputed Claim

22   that becomes Allowed in full or in part subsequent to the Effective Date shall receive the

23   distributions they would have received after the Effective Date had the Claim been Allowed

24   at that time.  Until a Disputed Claim is Allowed or disallowed, Reorganized Debtor shall

25   hold any distribution that would have been due to the holder in respect of such Disputed

26   Claim.

**Page 21 of 40 -**  DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 23 of 76

1                       **ARTICLE 6**

2                    **RIGHTS OFFERING**

3       6.1.    <u>Introduction</u>.  Debtor shall have the right to consummate the Rights Offering

4 on or before the Effective Date if it determines, in its sole discretion, that it is desirable and

5 feasible to do so.  If Debtor decides to consummate the Rights Offering, it may do so with or

6 without a Backstop Party.  Proceeds from the Rights Offering must be deposited in a separate

7 account through the Effective Date, after which such proceeds may be released to

8 Reorganized Debtor.

9       6.2.    <u>Issuance of Rights</u>.  Each Rights Offering Participant will receive

10 Subscription Rights to subscribe for up to its Pro Rata Share of the Rights Offering Shares

11 (each such subscription a "Primary Offering Subscription"), for an aggregate purchase price

12 equal to the applicable Subscription Payment Amount.  The Rights Offering Shares will be

13 issued to the Rights Offering Purchasers at a price per share equal to the Subscription Price.

14       6.3.    <u>Subscription Period</u>.  The Rights Offering shall commence on the

15 Subscription Commencement Date and shall expire on the Subscription Deadline.  Each

16 Rights Offering Participant that intends or desires to participate in the Rights Offering must

17 affirmatively elect to exercise its Subscription Rights and provide written notice thereof to

18 the parties specified in the Subscription, on or prior to the Subscription Deadline in

19 accordance with the terms of the Plan and the Subscription.  On the Subscription Deadline, if

20 there is a Backstop Party, the Remaining Rights Offering Shares shall be allocated to, and

21 may be purchased by, the Backstop Party.

22       6.4.    <u>Exercise of Subscription Rights and Payment of Subscription Payment</u>

23 <u>Amount</u>.  On the Subscription Commencement Date, Debtor will mail the Subscription to

24 each Rights Offering Participant known as of the Rights Offering Record Date, together with

25 appropriate instructions for the proper completion, due execution, and timely delivery of the

26 Subscription, as well as instructions for the payment of the Subscription Payment Amount for

**Page 22 of 40 -**    DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 24 of 76

1    that portion of the Subscription Rights sought to be exercised by such Entity.  Debtor may

2    adopt such additional detailed procedures consistent with the provisions of the Plan to more

3    efficiently administer the exercise of the Subscription Rights.  In order to exercise the

4    Subscription Rights, each Rights Offering Participant must return a duly completed

5    Subscription (making a binding and irrevocable commitment to participate in the Rights

6    Offering) to Debtor or other Party specified in the Subscription so that such Subscription and

7    the Subscription Payment Amount is actually received by Debtor or such other Party on or

8    before the Subscription Deadline.  In order to exercise its Subscription Rights, a Rights

9    Offering Participant may subscribe for its entire Pro Rata Share of the Rights Offering Shares

10    or only a part of its Pro Rata Share of the Rights Offering Shares.  If Debtor or such other

11    Party for any reason does not receive from a given holder of Subscription Rights a duly

12    completed Subscription on or prior to the Subscription Deadline, then such holder shall be

13    deemed to have forever and irrevocably relinquished and waived its right to participate in the

14    Rights Offering.  On the Subscription Notification Date, Debtor will notify each Rights

15    Offering Purchaser of its respective allocated portion of Rights Offering Shares, and if there

16    is a Backstop Party, Debtor will notify the Backstop Party after the Subscription Deadline of

17    its portion of the Remaining Rights Offering Shares that the Backstop Party may purchase

18    pursuant to the Backstop Rights Purchase Agreement.  Each Rights Offering Purchaser (other

19    than the Backstop Party, if applicable) must tender its Subscription Payment Amount to

20    Debtor so that it is actually received on or prior to the Subscription Deadline.  Any Rights

21    Offering Purchaser who fails to tender its Subscription Payment Amount so that it is received

22    on or prior to the Subscription Deadline shall be deemed to have forever and irrevocably

23    relinquished and waived its right to participate in the Rights Offering.  Debtor shall hold the

24    payments it receives for the exercise of Subscription Rights in a separate account.  In the

25    event the conditions to the Effective Date are not met or waived, such payments shall be

26

**Page 23 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 25 of 76

1    returned, without accrual or payment of any interest thereon, to the applicable Rights

2    Offering Purchaser, without reduction, offset or counterclaim.

3           6.5.     Rights Offering Backstop. If there is a Backstop Party for the Rights

4    Offering, Debtor and the Backstop Party will enter into the Backstop Rights Purchase

5    Agreement. In accordance with the Backstop Rights Purchase Agreement, the Backstop

6    Party will be entitled to purchase all or some lesser amount of the Remaining Rights Offering

7    Shares for a per-share price equal to the Subscription Price. As part of the Backstop Rights

8    Purchase Agreement, Debtor may grant certain rights and protections to the Backstop Party

9    that are not granted to other Rights Offering Participants.

10           6.6.     Number of Rights Offering Shares. The maximum number of Rights Offering

11    Shares to be sold pursuant to the Rights Offering shall be determined by dividing the Rights

12    Offering Amount by the Subscription Price.

13           6.7.     No Transfer; Detachment Restrictions; No Revocation. The Subscription

14    Rights are not transferable or detachable. Any such transfer or detachment, or attempted

15    transfer or detachment, will be null and void and Debtor will not treat any purported

16    transferee of the Subscription Rights separate from the associated Class 12 Claims as the

17    holder of any Subscription Rights. Once a Rights Offering Participant has exercised any of

18    its Subscription Rights by properly executing and delivering a Subscription to Debtor or

19    other Entity specified in the Subscription, such exercise may only be revoked, rescinded or

20    annulled in the sole discretion of Debtor or Reorganized Debtor. On, or as soon as

21    reasonably practicable after, the Effective Date, Reorganized Debtor or other applicable

22    disbursing agent shall distribute the Rights Offering Shares purchased by each Rights

23    Offering Purchaser.

24           6.8.     Validity of Exercise of Subscription Rights. All questions concerning the

25    timeliness, validity, form, and eligibility of any exercise, or purported exercise, of

26    Subscription Rights shall be determined by Debtor or Reorganized Debtor. Debtor or

**Page 24 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 26 of 76

1    Reorganized Debtor, in their discretion, reasonably exercised in good faith, may waive any

2    defect or irregularity, or permit a defect or irregularity to be corrected within such times as

3    they may determine, or reject the purported exercise of any Subscription Rights.

4    Subscriptions shall be deemed not to have been received or accepted until all irregularities

5    have been waived or cured within such time as Debtor or Reorganized Debtor determine in

6    their discretion reasonably exercised in good faith.  Debtor or Reorganized Debtor will use

7    commercially reasonable efforts to give written notice to any Rights Offering Participant

8    regarding any defect or irregularity in connection with any purported exercise of Subscription

9    Rights by such Entity and may permit such defect or irregularity to be cured within such time

10   as they may determine in good faith to be appropriate; provided, however, that neither Debtor

11   or Reorganized Debtor, nor any of their predecessors, successors, assigns, present and former

12   affiliates and subsidiaries, or any of their respective current and former officers, directors,

13   principals, employees, shareholders, partners, agents, financial advisors, attorneys,

14   accountants, investment bankers, investment advisors, consultants, representatives, and other

15   professionals, in each case acting in such capacity on or any time after the Petition Date, and

16   any Entity claiming by or through any of them, shall incur any liability for giving, or failing

17   to give, such notification and opportunity to cure.  Once a Rights Offering Participant has

18   timely and validly exercised its Subscription Rights, subject to the occurrence or satisfaction

19   of all conditions precedent to the Rights Offering and to the Rights Offering Participants'

20   participation in same, and notwithstanding the subsequent disallowance of any or all of its

21   underlying Claim, such Rights Offering Participant's right to participate in the Rights

22   Offering will be irreversible and shall not be subject to dissolution, avoidance or

23   disgorgement, and shall not be withheld from such Rights Offering Participant on account of

24   such disallowance.

25

26

**Page 25 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 27 of 76

1        6.9.   Rights Offering Proceeds.  The proceeds of the Rights Offering will be used to

2    fund Cash payments contemplated by the Plan and for Reorganized Debtor's operating

3    needs.

4    **ARTICLE 7**

5    **MEANS FOR EXECUTION OF PLAN**

6        7.1.   Continued Corporate Existence.  Debtor, as Reorganized Debtor, shall

7    continue to exist after the Effective Date, with all the powers of a corporation under

8    applicable law.

9        7.2.   Restated Articles of Incorporation and Bylaws.  Reorganized Debtor shall be

10   deemed to have adopted the Restated Articles of Incorporation and Restated Bylaws on the

11   Effective date, and shall promptly thereafter cause the Restated Articles of Incorporation to

12   be filed with the Secretary of State of the State of the State of Oregon.  After the Effective

13   Date, Reorganized Debtor may amend the Restated Articles of Incorporation and may amend

14   its Restated Bylaws in accordance with the Restated Articles of Incorporation, Restated

15   Bylaws, and applicable state law.

16       7.3.   Cancellation of Existing Equity Securities and Employee Equity Security

17   Plans.  As of the Effective Date, all outstanding shares of stock (whether common or

18   preferred), and all awards of any kind consisting of shares of stock of Debtor and all

19   Employee Equity Security Plans, that have been or may be existing, granted, held, awarded,

20   outstanding, payable, or reserved for issuance, and all other Equity Securities, shall, without

21   any further corporate action, be cancelled and retired and shall cease to exist.  This

22   cancellation does not apply with respect to any Common Stock or any other equity securities

23   or rights to acquire or receive equity securities or any other awards of any kind that are

24   issued in accordance with or pursuant to the Plan.

25       7.4.   Issuance of New Common Stock.  On the Effective Date, each holder of an

26   Allowed Class 12 Claim (General Unsecured Claim) shall be issued one share of Common

**Page 26 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 28 of 76

1   Stock in exchange for each $10 of such holder's Allowed Class 12 Claim, rounded up to the

2   nearest $10, for a total issuance of approximately 6,000,000 shares.  No fractional shares will

3   be issued.  If the Allowed amount of a Class 12 Claim is not determined or is subject to

4   dispute, then the Common Stock will be issued to the holder of that Claim when the Claim is

5   Allowed.  Sufficient shares of Common Stock will be reserved for issuance to Class 12

6   claimants when their Claim is Allowed.  Reorganized Debtor will also reserve approximately

7   800,000 to 1,000,000 shares of Common Stock for issuance in accordance with Reorganized

8   Debtor's Employee Stock Incentive Plan for services rendered after the Effective Date, with

9   the final number to be determined upon completion of the Rights Offering to represent

10   approximately 12%, on a fully diluted basis, of all shares of Common Stock issued and

11   reserved for issuance immediately following the Effective Date.  These shares of Common

12   Stock reserved for issuance under the Employee Stock Incentive Plan will be issued, if at all,

13   only with the approval of the Board of Directors of Reorganized Debtor following the

14   Effective Date.

15         7.5.   <u>Exit Financing</u>.  Debtor will negotiate and obtain, and enter into agreements

16   with respect to, Exit Financing which Exit Financing will, among other things, provide the

17   funds necessary to pay U.S. Bank in full on the Effective Date and will provide working

18   capital for Reorganized Debtor.  Debtor may enter into such agreements and execute such

19   documents with respect to the Exit Financing without the necessity of obtaining additional

20   Bankruptcy Court approval.

21         7.6.   <u>Subordination Agreements</u>.  In connection with any distributions (of Cash,

22   stock, or otherwise) to be made under this Plan, Reorganized Debtor will comply with all

23   subordination agreements that are outstanding and in existence as of the Effective Date

24   which pertain to Debtor or any debts or obligations owing by Debtor, and all distributions to

25   Creditors under this Plan shall remain subject to such subordination agreements.

26

**Page 27 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 29 of 76

1       7.7.   <u>Board of Directors</u>.  The initial Board of Directors of Reorganized Debtor

2 shall be composed of (a) three directors designated by Endeavour and THL, (b) one director

3 designated by the Committee, and (c) Douglas Nidiffer.  The identities of the members of the

4 initial Board of Directors of Reorganized Debtors shall be disclosed by Endeavour, THL and

5 the Committee at or prior to the confirmation hearing.  Thereafter, the Board of Directors of

6 Reorganized Debtor shall be elected by the shareholders of Reorganized Debtor in

7 accordance with the Restated Articles of Incorporation and applicable nonbankruptcy law.

8       7.8.   <u>Corporate Action</u>.  Upon entry of the Confirmation Order, all actions

9 contemplated by the Plan shall be authorized and approved in all respects (subject to the

10 provisions of the Plan), including, without limitation, the adoption and filing of the Restated

11 Articles of Incorporation, approval of the Restated Bylaws, approval of the Employee Stock

12 Incentive Plan, the election or appointment, as applicable, of directors and officers for

13 Reorganized Debtor, the termination of all Employee Equity Security Plans, and the issuance

14 of the Common Stock.  The appropriate officers of Reorganized Debtor are authorized and

15 directed to execute and deliver the agreements, documents, and instruments contemplated by

16 the Plan and the Disclosure Statement in the name of and on behalf of Reorganized Debtor.

17       7.9.   <u>Employee Stock Incentive Plan</u>.  On the Effective Date, the Employee Stock

18 Incentive Plan shall become effective immediately without any further corporate or other

19 action.

20       7.10.   <u>Setoffs</u>.  Debtor may, but shall not be required to, set off against any Claim

21 and the distributions to be made pursuant to the Plan in respect of such Claim any claims of

22 any nature whatsoever that Debtor may have against the holder of such Claim, but neither the

23 failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release

24 of any such claim Debtor may have against such holder.

25       7.11.   <u>Utility Deposits</u>.  All utilities holding a Utility Deposit shall immediately after

26 the Effective Date return or refund such Utility Deposit to Reorganized Debtor.  At the sole

**Page 28 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 30 of 76

option of Reorganized Debtor may apply any Utility Deposit that has not been refunded to

Reorganized Debtor in satisfaction of any payments due or to become due from Reorganized

Debtor to a utility holding such a Utility Deposit.

7.12.  Event of Default; Remedy.  Any material failure by Reorganized Debtor to

perform any term of this Plan, which failure continues for a period of 10 Business Days

following receipt by Reorganized Debtor of written notice of such default from the holder of

an Allowed Claim to whom performance is due, shall constitute an Event of Default.  Upon

the occurrence of an Event of Default, the holder of an Allowed Claim to whom performance

is due shall have all rights and remedies granted by law, this Plan, or any agreement between

the holder of such Claim and Debtor or Reorganized Debtor.  An Event of Default with

respect to one Claim shall not be an Event of Default with respect to any other Claim.

7.13.  Conditions Precedent to Effectiveness of Plan.  Unless waived by Debtor, the

following conditions must occur and be satisfied for the Plan to become effective, and are

conditions precedent to the Effective Date:

(a)  The Bankruptcy Court shall have entered the Confirmation Order, in

form and substance reasonably satisfactory to Debtor, which shall, among other things,

provide that any and all executory contracts and unexpired leases assumed pursuant to the

Plan shall remain in full force and effect for the benefit of Reorganized Debtor

notwithstanding any provision in any such contract or lease or in applicable law (including

those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits,

restricts, or conditions such transfer or that enables or requires termination or modification of

such contract or lease; and

(b)  All documents, instruments, and agreements, each in form and

substance satisfactory to Reorganized Debtor, provided for or necessary to implement this

Plan shall have been executed and delivered by the parties thereto, unless such execution or

delivery has been waived by the party to be benefitted thereby;

**Page 29 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 31 of 76

1         (c)      The Exit Financing shall have closed and all conditions to funding

2 shall have been satisfied or waived; and

3         (d)      In the event Debtor decides to consummate the Rights Offering, the

4 proceeds thereof shall have been deposited in a separate account as provided in Section 6.1.

5 <div align="center">**ARTICLE 8**</div>

6 <div align="center">**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**</div>

7         8.1.    <u>Assumption and Rejection</u>.  Except as may otherwise be provided, all

8 executory contracts of Debtor that are not otherwise subject to a prior Bankruptcy Court

9 order or pending motion before the Bankruptcy Court will be deemed assumed by Debtor as

10 of the Effective Date and will be enforceable by the parties thereto in accordance with their

11 terms; provided that no provision relating to default by reason of insolvency or the filing of

12 the Bankruptcy Case shall be enforceable against Reorganized Debtor or its successors or

13 assigns.  The Confirmation Order shall constitute an order authorizing the assumption and

14 assignment of all executory contracts that are subject to a pending motion to assume or a

15 pending motion to assume and assign.  Reorganized Debtor shall promptly after the Effective

16 Date pay all amounts required under Section 365 of the Bankruptcy Code to cure any

17 defaults for executory contracts and unexpired leases being assumed and shall perform its

18 obligations from and after the Effective Date in the ordinary course of business.

19         8.2.    <u>Assignment</u>.  Except as may be otherwise provided in this Plan, the

20 Confirmation Order, or other Order of the Bankruptcy Court, all executory contracts shall be

21 deemed assigned to Reorganized Debtor as of the Effective Date.  The Confirmation Order

22 shall constitute an order authorizing such assignment of assumed executory contracts, and no

23 further assignment documentation shall be necessary to effectuate such assignment.

24         8.3.    <u>Rejection Claims</u>.  Rejection Claims must be Filed on the later of April 9,

25 2014 or 30 days after the entry of the order rejecting the executory contract or unexpired

26 lease.  Any Rejection Claim not Filed within such time shall be forever barred from asserting

**Page 30 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

<div align="center">**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440</div>

EXHIBIT 1
Page 32 of 76

1  such Claim against Debtor or Reorganized Debtor, their property, estate, and any guarantors

2  of such obligations.  Each Rejection Claim resulting from such rejection shall constitute a

3  Small or General Unsecured Claim, as applicable.  Any election to be treated as a Small

4  Unsecured Claim by the holder of a Rejection Claim arising from an order entered on or after

5  the time ballots are due for voting on the Plan shall be made on the date the Rejection Claim

6  is Filed.

7  <center>**ARTICLE 9**</center>

8  <center>**EFFECT OF CONFIRMATION**</center>

9       9.1.    <u>Debtor's Injunction</u>.  The effect of confirmation shall be as set forth in

10 Section 1141 of the Bankruptcy Code.  Except as otherwise provided in the Plan or in the

11 Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable

12 to entities against (a) the commencement or continuation, including the issuance or

13 employment of process, of a judicial, administrative, or other action or proceeding against

14 Debtor or Reorganized Debtor that was or could have been commenced before the entry of

15 the Confirmation Order; (b) the enforcement against Reorganized Debtor, or its assets of a

16 judgment obtained before the Petition Date; and (c) any act to obtain possession of or to

17 exercise control over, or to create, perfect, or enforce a lien upon, all or any part of the assets

18 of Reorganized Debtor.

19      9.2.    <u>Discharge</u>.  Except as otherwise expressly provided herein, the confirmation

20 of the Plan shall, provided that the Effective Date shall have occurred, discharge all Claims

21 to the fullest extent authorized or provided for by the Bankruptcy Code, including, without

22 limitation, to the extent authorized or provided for by Sections 524 and 1141 thereof

23

24

25

26

**Page 31 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

<center>**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440</center>

EXHIBIT 1
Page 33 of 76

**ARTICLE 10**

**RETENTION OF JURISDICTION**

10.1.    Notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code to:

(a)    classify the Claim or interest of any Creditor or stockholder, reexamine Claims or Interests that have been owed for voting purposes, and determine any objections that may be Filed to Claims or Interests;

(b)    determine requests for payment of Claims entitled to priority under Section 507(a) of the Bankruptcy Code, including compensation and reimbursement of expenses in favor of professionals employed at the expense of the bankruptcy estate;

(c)    avoid transfers or obligations to subordinate Claims under Chapter 5 of the Bankruptcy Code;

(d)    approve the assumption, assignment, or rejection of an executory contract or an unexpired lease pursuant to this Plan and resolve any related matters;

(e)    resolve controversies and disputes regarding the interpretation of this Plan;

(f)    implement the provisions of this Plan and enter orders in aid of confirmation;

(g)    determine the validity, priority or extent of any Claim or Claim of lien, and resolve any Disputed Claims;

(h)    adjudicate adversary proceedings and contested matters pending or hereafter commenced in this Bankruptcy Case;

(i)    order and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

**Page 32 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 34 of 76

1           (j)        hear and determine any proceeding that involves applications to

2   modify the Plan, to cure any defect or omission, or to reconcile any inconsistency that may

3   arise in connection with the Plan or related documents or in any order of the Bankruptcy

4   Court, including the Confirmation Order;

5           (k)        determine any other matters that may arise in connection with or are

6   related to this Plan, the Disclosure Statement, the Confirmation Order or any contract,

7   instrument, release or other agreement or document created in connection with this Plan or

8   the Disclosure Statement

9           (l)        ensure that distributions to holders of Allowed Claims are

10  accomplished as provided herein;

11          (m)        to the extent that Bankruptcy Court approval is required, to consider

12  and act on the compromise and settlement of any Claim or cause of action by or against the

13  Debtor's estate;

14          (n)        to determine the scope of any discharge of any Debtor under this Plan

15  or the Bankruptcy Code;

16          (o)        to recover all assets of the Debtor and property of the Debtor's estate,

17  wherever located;

18          (p)        determine any and all motions, adversary proceedings, applications,

19  and contested or litigated matters that may be pending on the Effective Date or that, pursuant

20  to this Plan, may be instituted by the Reorganized Debtor after the Effective Date;

21          (q)        hear and determine applications for allowances of compensation and

22  reimbursement of expenses of professionals under sections 330 and 331 of the Bankruptcy

23  Code and any other fees and expenses authorized to be paid or reimbursed under this Plan;

24          (r)        hear and determine any other matters related hereto and not

25  inconsistent with Chapter 11 of the Bankruptcy Code; and

26          (s)        enter a final decree closing this Bankruptcy Case.

**Page 33 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 35 of 76

1    In the event the Bankruptcy Court is not permitted under applicable law to preside

2  over any of the foregoing matters, the reference to the Bankruptcy Court in this Article 9

3  shall be deemed to be replaced by the United States District Court for the District of Oregon

4  having jurisdiction over this Chapter 11 case.  Nothing in this Article 9 shall expand the

5  exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

6                                **ARTICLE 11**

7                        **ADMINISTRATIVE PROVISIONS**

8    11.1.    <u>Dissolution of the Committee</u>.  The Committee shall continue in existence

9  until the Effective Date to exercise those powers and perform those duties specified in

10  section 1103 of the Bankruptcy Code.  On the later of: (1) the Effective Date; and (2) the

11  conclusion of any appeals or other challenges or matters with respect to the Confirmation

12  Order, the Committee shall be dissolved and its members shall be deemed released of all

13  their duties, responsibilities and obligations in connection with the Bankruptcy Case or this

14  Plan and its implementation, except with respect to the review of and right to be heard in

15  connection with all professionals' claims for compensation for services rendered or

16  reimbursement for expenses incurred, and the retention or employment of the Committee's

17  attorneys, financial advisors, and other agents shall terminate as of the Effective Date;

18  provided, however, such attorneys and financial advisors shall be entitled to pursue their own

19  claims for compensation for services rendered or reimbursement for expenses incurred and

20  represent the Committee in connection with the review of and the right to be heard in

21  connection with all professionals' claims for compensation for services rendered or

22  reimbursement for expenses incurred.  Following the Confirmation Date, in accordance with

23  the foregoing, the attorneys and financial advisors to the Committee shall be entitled to

24  request any reasonable claims for compensation for services rendered or reimbursement for

25  expenses incurred after the Confirmation Date through and including the dissolution of the

26  Committee in connection with services to the Committee.  The Reorganized Debtor shall

**Page 34 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 36 of 76

1    pay, within ten (10) Business Days after submission of a detailed invoice to the Reorganized

2    Debtor, such reasonable claims for compensation or reimbursement of expenses incurred by

3    the professionals of the Committee.  If the Reorganized Debtor disputes the reasonableness

4    of any such invoice, the Reorganized Debtor or the affected professional may submit such

5    dispute to the Bankruptcy Court for a determination of the reasonableness of any such

6    invoice, and the disputed portion of such invoice shall not be paid until the dispute is

7    resolved.  The undisputed portion of such reasonable fees and expenses shall be paid as

8    provided herein.

9        11.2.    Final Fee Applications.  Professionals shall file their final fee applications

10    under Section 330 of the Bankruptcy Code no later than 20 days after the Effective Date.

11        11.3.    Modification or Withdrawal of the Plan.  Debtor may alter, amend, or modify

12    the Plan pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 at any

13    time prior to the time the Bankruptcy Court has signed the Confirmation Order.  After such

14    time, and prior to the substantial consummation of the Plan, Reorganized Debtor may, so

15    long as the treatment of holders of Claims and Interests under the Plan is not adversely

16    affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to

17    reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation

18    Order, and any other matters as may be necessary to carry out the purposes and effects of the

19    Plan; provided, however, that prior notice of such proceedings shall be served in accordance

20    with Bankruptcy Rule 2002.

21        11.4.    Revocation or Withdrawal of Plan

22        11.4.1.    Right to Revoke.  Debtor, in consultation with the Committee,

23    reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.

24        11.4.2.    Effect of Withdrawal or Revocation.  If Debtor revokes or withdraws

25    the Plan prior to the Effective Date, then the Plan shall be deemed null and void.  In such

26    event, nothing contained herein shall be deemed to constitute a waiver or release of any

**Page 35 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 37 of 76

1   claims by or against Debtor or any other Entity, or to prejudice in any manner the rights of

2   Debtor or any Entity in any further proceeding involving Debtor.

3       11.5.   <u>Nonconsensual Confirmation</u>.   Debtor shall request that the Bankruptcy Court

4   confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of

5   all provisions of Section 1129(a) of the Bankruptcy Code, except Subsection 1129(a)(8), are

6   met.

7                                   **ARTICLE 12**

8                         **MISCELLANEOUS PROVISIONS**

9       12.1.   <u>Revesting</u>.   Except as otherwise expressly provided herein, on the Effective

10  Date all property and assets of the estate of Debtor shall revest in Reorganized Debtor free

11  and clear of all Claims, liens, encumbrances, charges, and other interests arising on or before

12  the Effective Date, and Reorganized Debtor may operate, from and after the Effective Date,

13  free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

14      12.2.   <u>Cancellation of Documents Evidencing Claims</u>.   As of the Effective Date

15  (subject to resolution of any objection to the Claim if a Disputed Claim), any note,

16  agreement, instrument, judgment, or other document evidencing a Claim in any Class shall

17  be deemed cancelled, null, and void, except for the right, if any, to receive distributions under

18  this Plan; provided, however, that nothing herein shall affect the liability of any entity other

19  than Debtor on, or the property of any entity other than Debtor for, such Claim.

20      12.3.   <u>Rights of Action</u>.   Except as otherwise expressly provided herein, any claims,

21  rights, interests, causes of action, defenses, counterclaims, crossclaims, third-party claims, or

22  rights of offset, recoupment, subrogation, or subordination, including, without limitation,

23  claims under Section 550(a) of the Bankruptcy Code or any of the sections referenced therein

24  (including, without limitation, any and all Avoidance Actions) accruing to Debtor shall

25  remain assets of Reorganized Debtor, who shall have the sole right to enforce its rights.

26  Reorganized Debtor may pursue such rights of action, as appropriate, in accordance with its

**Page 36 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 38 of 76

1 sole best interests and for its sole benefit.  Notwithstanding anything to the contrary in this

2 Section, any beneficiary to a contractual subordination agreement may seek to enforce such

3 agreements.

4       12.4.   Governing Law.  Except to the extent the Bankruptcy Code, the Bankruptcy

5 Rules, or other federal laws as applicable, the laws of the State of Oregon shall govern the

6 construction and implementation of the Plan, and all rights and obligations arising under the

7 Plan.

8       12.5.   Withholding and Reporting Requirements.  In connection with the Plan and

9 all instruments issued in connection therewith and distributions thereon, Debtor and

10 Reorganized Debtor shall comply with all withholding, reporting, certification, and

11 information requirements imposed by any federal, state, local, or foreign taxing authorities

12 and all distributions hereunder shall, to the extent applicable, be subject to any such

13 withholding, reporting, certification, and information requirements.  Entities entitled to

14 receive distributions hereunder shall, as a condition to receiving such distributions, provide

15 such information and take such steps as Reorganized Debtor may reasonably require to

16 ensure compliance with such withholding and reporting requirements, and to enable

17 Reorganized Debtor to obtain the certifications and information as may be necessary or

18 appropriate to satisfy the provisions of any tax law.

19       12.6.   Time.  Unless otherwise specified herein, in computing any period of time

20 prescribed or allowed by the Plan, the day of the act or event from which the designated

21 period begins to run shall not be included.  The last day of the period so computed shall be

22 included, unless it is not a Business Day, in which event the period runs until the end of the

23 next succeeding day that is a Business Day.

24       12.7.   Section 1145 Exemption.  The issuance and distribution of all the shares of

25 Common Stock hereunder shall be exempt, pursuant to section 1145 of the Bankruptcy Code,

26 from registration under (i) the Securities Act of 1933, as amended, and all rules and

**Page 37 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 39 of 76

1    regulations promulgated thereunder and (ii) any state or local law requiring registration of for

2    the offer, issuance, or distribution of securities.

3         12.8.    <u>Section 1146(c) Exemption</u>.   Pursuant to Section 1146(c) of the Bankruptcy

4    Code, the issuance, transfer, or exchange of any security under the Plan, or the execution,

5    delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as

6    contemplated by the Plan, or the revesting, transfer, or sale of any real property of Debtor or

7    Reorganized Debtor pursuant to, in implementation of, or as contemplated by the Plan, shall

8    not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or

9    fee.   Consistent with the foregoing, each recorder of deeds or similar official for any city,

10    county or governmental unit in which any instrument hereunder is to be recorded shall,

11    pursuant to the Confirmation Order, be ordered and directed to accept such instrument

12    without requiring the payment of any documentary stamp tax, deed stamps, transfer tax,

13    intangible tax, or similar tax.

14         12.9.    <u>Severability</u>.   In the event any provision of the Plan is determined to be

15    unenforceable, such determination shall not limit or affect the enforceability and operative

16    effect of any other provisions of the Plan.   To the extent any provision of the Plan would, by

17    its inclusion in the Plan, prevent or preclude the Bankruptcy Court from entering the

18    Confirmation Order, the Bankruptcy Court, on the request of Debtor, may modify or amend

19    such provision, in whole or in part, as necessary to cure any defect or remove any

20    impediment to the confirmation of the Plan existing by reason of such provision.

21         12.10.   <u>Binding Effect</u>.   The provisions of the Plan shall bind Debtor and Reorganized

22    Debtor, and all Creditors and Equity Security Holders, and their respective successors, heirs,

23    and assigns.

24         12.11.   <u>Retiree Benefits</u>.   On or after the Effective Date, to the extent required by

25    Section 1129(a)(13) of the Bankruptcy Code, Reorganized Debtor shall continue to pay all

26    retiree benefits (if any) as that term is defined in Section 1114 of the Bankruptcy Code,

**Page 38 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 40 of 76

1   maintained or established by Debtor prior to the Effective Date, without prejudice to

2   Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend or

3   terminate the foregoing arrangements.

4        12.12.  Recordable Order.  The Confirmation Order shall be deemed to be in

5   recordable form, and shall be accepted by any recording officer for filing and recording

6   purposes without further or additional orders, certifications or other supporting documents.

7        12.13.  Plan Controls.  In the event and to the extent that any provision of the Plan is

8   inconsistent with the provisions of the Disclosure Statement, or any other instrument or

9   agreement contemplated to be executed pursuant to the Plan, the provisions of the Plan shall

10  control and take precedence.

11       12.14.  Effectuating Documents and Further Transactions.  Debtor and Reorganized

12  Debtor are authorized to execute, deliver, file, or record such contracts, instruments,

13  assignments, and other agreements or documents, and take or direct such actions as may be

14  necessary or appropriate to effectuate and further evidence the terms and conditions of this

15  Plan.

16       12.15.  Timing of Actions.  Notwithstanding anything to the contrary herein, any

17  action required by the Plan to be taken on the Effective Date shall be made or taken on the

18  Effective Date or as soon as practical thereafter, but in any event within 20 days of the

19  Effective Date.

20       12.16.  Courts of Competent Jurisdiction.  If the Bankruptcy Court abstains from

21  exercising, or declines to exercise, jurisdiction, or is otherwise without jurisdiction over any

22  matter arising out of this Plan, such abstention, refusal, or failure of jurisdiction shall have no

23  effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other

24  court having competent jurisdiction with respect to such matter.

25

26

**Page 39 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 41 of 76

1     12.17.  <u>Exhibits and Schedules</u>.  Any exhibits or schedules to this Plan are

2  incorporated into, and are part of, the Plan as if set forth herein.

3         DATED this 31st day of January, 2014.

4                              C & K MARKET, INC.

5

6                         By /s/ Edward C. Hostmann
                              Edward C. Hostmann
7                              Chief Restructuring Officer

8  Presented by:

9  TONKON TORP LLP

10

11 By /s/ Albert N. Kennedy
       Albert N. Kennedy, OSB No. 821429
12     Timothy J. Conway, OSB No. 851752
       Michael W. Fletcher, OSB No. 010448
13     Ava L. Schoen, OSB No. 044072
       Of Attorneys for Debtor

14 034518/00017/5190086v7

15

16

17

18

19

20

21

22

23

24

25

26

**Page 40 of 40 -**   DEBTOR'S PLAN OF REORGANIZATION (JANUARY 31, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 42 of 76

# EXHIBIT 1

## EMPLOYEE STOCK INCENTIVE PLAN

EXHIBIT 1
Page 43 of 76

# C & K MARKET, INC.
## 2014 STOCK INCENTIVE PLAN

**Section 1.**     **Establishment and Purpose.**

(a)     The purpose of the Plan is to offer selected individuals an opportunity to acquire a proprietary interest in the success of C & K Market, Inc., an Oregon corporation (the "**Corporation**"), or to increase such interest, by purchasing Shares of the Corporation's Stock. The Plan provides both for the direct award or sale of Shares and for the grant of Options to purchase Shares.  Options granted under the Plan may include Nonstatutory Options as well as ISOs intended to qualify under Section 422 of the Code.

(b)     Capitalized terms are defined in <u>Section 12</u>.

**Section 2.**     **Administration**.

(a)     **Committees of the Board of Directors**.  The Plan may be administered by one or more Committees.  Each Committee shall consist of two or more members of the Board of Directors who have been appointed by the Board of Directors.  Each Committee shall have such authority and be responsible for such functions as the Board of Directors has assigned to it.  If no Committee has been appointed, the entire Board of Directors shall administer the Plan.  Any reference to the Board of Directors in the Plan shall be construed as a reference to the Committee (if any) to whom the Board of Directors has assigned a particular function.

(b)     **Authority of the Board of Directors**.  Subject to the provisions of the Plan, the Board of Directors shall have full authority and discretion to take any actions it deems necessary or advisable for the administration of the Plan.  All decisions, interpretations and other actions of the Board of Directors shall be final and binding on all Purchasers, all Optionees and all persons deriving their rights from a Purchaser or Optionee.

**Section 3.**     **Eligibility**.

(a)     **General Rule**.  Only Employees, Outside Directors and Consultants shall be eligible for the grant of Options or the direct award or sale of Shares.  Only Employees shall be eligible for the grant of ISOs.

(b)     **Ten-Percent Shareholders**.  An individual who owns more than 10% of the total combined voting power of all classes of outstanding stock of the Corporation, its Parent or any of its Subsidiaries shall not be eligible for the grant of an ISO unless (i) the Exercise Price is at least 110% of the Fair Market Value of a Share on the date of grant and (ii) such ISO by its terms is not exercisable after the expiration of five years from the date of grant.  For purposes of this <u>Section 3(b)</u>, in determining stock ownership, the attribution rules of Section 424(d) of the Code shall be applied.

EXHIBIT 1
Page 1 of 9
EXHIBIT 1
Page 44 of 76

**Section 4.**       **Stock Subject to Plan**.

     (a)       **Basic Limitation**.  Shares offered under the Plan shall be authorized but unissued Shares.  The aggregate number of Shares that may be issued under the Plan (upon exercise of Options or other rights to acquire Shares) shall not exceed _____ Shares, subject to adjustment pursuant to <u>Section 8</u>.  The number of Shares that are subject to Options or other rights outstanding at any time under the Plan shall not exceed the number of Shares that then remain available for issuance under the Plan.  The Corporation, during the term of the Plan, shall at all times reserve and keep available sufficient Shares to satisfy the requirements of the Plan.

     (b)       **Additional Shares**.  In the event that any outstanding Option or other right for any reason expires or is canceled or otherwise terminated, the Shares allocable to the unexercised portion of such Option or other right shall again be available for the purposes of the Plan.  In the event that Shares issued under the Plan are reacquired by the Corporation pursuant to any forfeiture provision, right of repurchase or right of first refusal, such Shares shall again be available for the purposes of the Plan, except that the aggregate number of Shares which may be issued upon the exercise of ISOs shall in no event exceed _____ Shares (subject to adjustment pursuant to <u>Section 8</u>).

**Section 5.**       **Terms and Conditions of Awards or Sales**.

     (a)       **Restricted Stock Agreement**.  Each award or sale of Shares under the Plan (other than upon exercise of an Option) shall be evidenced by a Restricted Stock Agreement between the Purchaser and the Corporation.  Such award or sale shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions which are not inconsistent with the Plan and which the Board of Directors deems appropriate for inclusion in a Restricted Stock Agreement.  The provisions of the various Restricted Stock Agreements entered into under the Plan need not be identical.

     (b)       **Nontransferability of Rights**.  Any right to acquire Shares under the Plan (other than an Option) shall not be transferable and shall be exercisable only by the Purchaser to whom such right was granted.

     (c)       **Purchase Price**.  The Purchase Price of Shares to be offered under the Plan shall be determined by the Board of Directors at its sole discretion.  The Purchase Price shall be payable in a form described in <u>Section 7</u>.

     (d)       **Withholding Taxes**.  As a condition to the purchase of Shares, the Purchaser shall make such arrangements as the Board of Directors may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with such purchase.

     (e)       **Restrictions on Transfer of Shares**.  Any Shares awarded or sold under the Plan shall be subject to such special forfeiture conditions, rights of repurchase, rights of first refusal and other transfer restrictions as the Board of Directors may determine.  Such restrictions shall be set forth in the applicable Restricted Stock Agreement and shall apply in addition to any restrictions that may apply to holders of Shares generally.

C & K Market, Inc. 2014 Stock Incentive Plan
Page 2

EXHIBIT 1
Page 2 of 9
EXHIBIT 1
Page 45 of 76

(f)    **Accelerated Vesting**.    Unless the applicable Restricted Stock Agreement provides otherwise, any right to repurchase a Purchaser's Shares at the original Purchase Price (if any) upon termination of the Purchaser's Service shall lapse and all of such Shares shall become vested if:

(i)    The Corporation is subject to a Change in Control before the Purchaser's Service terminates; and

(ii)    The repurchase right is not assigned to the entity that employs the Purchaser immediately after the Change in Control or to its parent or subsidiary.

(iii)    A Restricted Stock Agreement may also provide for accelerated vesting in the event of the Optionee's death or disability or other events.

**Section 6.    Terms and Conditions of Options**.

(a)    **Stock Option Agreement**.    Each grant of an Option under the Plan shall be evidenced by a Stock Option Agreement between the Optionee and the Corporation.    Such Option shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions which are not inconsistent with the Plan and which the Board of Directors deems appropriate for inclusion in a Stock Option Agreement.    The provisions of the various Stock Option Agreements entered into under the Plan need not be identical.

(b)    **Number of Shares**.    Each Stock Option Agreement shall specify the number of Shares that are subject to the Option and shall provide for the adjustment of such number in accordance with Section 8.    The Stock Option Agreement shall also specify whether the Option is an ISO or a Nonstatutory Option.

(c)    **Exercise Price**.    Each Stock Option Agreement shall specify the Exercise Price. The Exercise Price of an Option shall not be less than 100% of the Fair Market Value of a Share on the date of grant, and a higher percentage may be required by Section 3(b).    Subject to the preceding sentence, the Exercise Price under an Option shall be determined by the Board of Directors at its sole discretion.    The Exercise Price shall be payable in a form described in Section 7.

(d)    **Withholding Taxes**.    As a condition to the exercise of an Option, the Optionee shall make such arrangements as the Board of Directors may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with such exercise.    The Optionee shall also make such arrangements as the Board of Directors may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with the disposition of Shares acquired by exercising an Option.

(e)    **Exercisability**.    Each Stock Option Agreement shall specify the date when all or any portion of the Option is to become exercisable.    The exercisability provisions of a Stock Option Agreement shall be determined by the Board of Directors at its sole discretion.

(f)    **Accelerated Exercisabilit**y.    Unless the applicable Stock Option Agreement provides otherwise, all of an Optionee's Options shall become exercisable in full if:

C & K Market, Inc. 2014 Stock Incentive Plan
Page 3

EXHIBIT 1
Page 3 of 9
EXHIBIT 1
Page 46 of 76

(i)      The Corporation is subject to a Change in Control before the Optionee's Service terminates;

(ii)      Such Options do not remain outstanding;

(iii)      Such Options are not assumed by the surviving corporation or its parent; and

(iv)      The surviving corporation or its parent does not substitute options with substantially the same terms for such Options.

(v)      A Stock Option Agreement may also provide for accelerated exercisability in the event of the Optionee's death, disability, retirement or other events.

(g)      **Basic Term**.  The Stock Option Agreement shall specify the term of the Option. The term shall not exceed 10 years from the date of grant, and in the case of an ISO a shorter term may be required by Section 3(b).  Subject to the preceding sentence, the Board of Directors at its sole discretion shall determine when an Option is to expire.  A Stock Option Agreement may provide for expiration prior to the end of its term in the event of the termination of the Optionee's Service.

(h)      **Nontransferability**.  No Option or interest therein may be transferred, assigned, pledged or hypothecated by the Optionee, whether by operation of law or otherwise, or be made subject to execution, attachment or similar process.

(i)      **No Rights as a Shareholder**.  An Optionee shall have no rights as a shareholder with respect to any Shares covered by the Optionee's Option until such person becomes entitled to receive such Shares by filing a notice of exercise and paying the Exercise Price pursuant to the terms of such Option.

(j)      **Modification, Extension and Assumption of Options**.  Within the limitations of the Plan, the Board of Directors may modify, extend or approve the assumption or cancellation of outstanding Options (whether granted by the Corporation or another issuer) in return for the grant of new Options for the same or a different number of Shares and at the same or a different Exercise Price.  The foregoing notwithstanding, no modification of an Option shall, without the consent of the Optionee, impair the Optionee's rights or increase the Optionee's obligations under such Option.

(k)      **Restrictions on Transfer of Shares**.  Any Shares issued upon exercise of an Option shall be subject to such special forfeiture conditions, rights of repurchase, rights of first refusal and other transfer restrictions as the Board of Directors may determine.  Such restrictions shall be set forth in the applicable Stock Option Agreement and shall apply in addition to any restrictions that may apply to holders of Shares generally.

(l)      **Accelerated Vesting**.  Unless the applicable Stock Option Agreement provides otherwise, any right to repurchase an Optionee's Shares at the original Exercise Price upon termination of the Optionee's Service shall lapse and all of such Shares shall become vested if:

C & K Market, Inc. 2014 Stock Incentive Plan
Page 4

EXHIBIT 1
Page 4 of 9
EXHIBIT 1
Page 47 of 76

(i)     The Corporation is subject to a Change in Control before the Optionee's Service terminates; and

(ii)     The repurchase right is not assigned to the entity that employs the Optionee immediately after the Change in Control or to its parent or subsidiary.

(iii)     A Stock Option Agreement may also provide for accelerated vesting in the event of the Optionee's death, disability or other events.

**Section 7.     Payment for Shares**.

(a)     **General Rule**.  The entire Purchase Price or Exercise Price of Shares issued under the Plan shall be payable in cash or cash equivalents at the time such Shares are purchased, except as otherwise provided in this <u>Section 7</u>.

(b)     **Surrender of Stock**.  To the extent that a Stock Option Agreement so provides, all or any part of the Exercise Price may be paid by surrendering, or attesting to the ownership of, Shares that are already owned by the Optionee.  Such Shares shall be surrendered to the Corporation in good form for transfer and shall be valued at their Fair Market Value on the date the Option is exercised.  The Optionee shall not surrender, or attest to the ownership of, Shares in payment of the Exercise Price if such action would cause the Corporation to recognize compensation expense (or additional compensation expense) with respect to the Option for financial reporting purposes.

(c)     **Services Rendered**.  At the discretion of the Board of Directors, Shares may be awarded under the Plan in consideration of services rendered to the Corporation, a Parent or a Subsidiary prior to the award.  At the discretion of the Board of Directors, Shares may also be awarded under the Plan in consideration of services to be rendered to the Corporation, a Parent or a Subsidiary after the award.

(d)     **Promissory Note**.  To the extent that a Stock Option Agreement or Restricted Stock Agreement so provides, all or a portion of the Exercise Price or Purchase Price (as the case may be) of Shares issued under the Plan may be paid with a full-recourse promissory note.  The Shares shall be pledged as security for payment of the principal amount of the promissory note and interest thereon.  The interest rate payable under the terms of the promissory note shall not be less than the minimum rate (if any) required to avoid the imputation of additional interest under the Code.  Subject to the foregoing, the Board of Directors (at its sole discretion) shall specify the term, interest rate, amortization requirements (if any) and other provisions of such note.

(e)     **Exercise/Sale**.  To the extent that a Stock Option Agreement so provides, and if Stock is publicly traded, payment may be made all or in part by the delivery (on a form prescribed by the Corporation) of an irrevocable direction to a securities broker approved by the Corporation to sell Shares and to deliver all or part of the sales proceeds to the Corporation in payment of all or part of the Exercise Price and any withholding taxes.

(f)     **Exercise/Pledge**.  To the extent that a Stock Option Agreement so provides, and if Stock is publicly traded, payment may be made all or in part by the delivery (on a form

C & K Market, Inc. 2014 Stock Incentive Plan
Page 5

EXHIBIT 1
Page 5 of 9
EXHIBIT 1
Page 48 of 76

prescribed by the Corporation) of an irrevocable direction to pledge Shares to a securities broker or lender approved by the Corporation, as security for a loan, and to deliver all or part of the loan proceeds to the Corporation in payment of all or part of the Exercise Price and any withholding taxes.

(g)    **Net Exercise**.  To the extent that a Stock Option Agreement so provides, payment may be made all or in part by the withholding by the Corporation as payment of the Exercise Price of the number of Shares otherwise issuable upon exercise of the Option that have a current Fair Market Value equal to the aggregate Exercise Price of the Option (or portion thereof) being exercised.

**Section 8.    Adjustment of Shares**.

(a)    **General**.  In the event of a subdivision of the outstanding Stock, a declaration of a dividend payable in Shares, a declaration of an extraordinary dividend payable in a form other than Shares in an amount that has a material effect on the Fair Market Value of the Stock, a combination or consolidation of the outstanding Stock into a lesser number of Shares, a recapitalization, a spin-off, a reclassification or a similar occurrence, the Board of Directors shall make appropriate adjustments in one or more of:  (i) the number of Shares available for future grants under Section 4; (ii) the number of Shares covered by each outstanding Option; and (iii) the Exercise Price under each outstanding Option.

(b)    **Corporate Transactions**.  In the event that the Corporation is a party to a merger, consolidation or similar transaction, outstanding Options shall be subject to the agreement of merger, consolidation or similar transaction.  Such agreement, without the Optionees' consent, may provide for:

(i)    The continuation of such outstanding Options by the Corporation (if the Corporation is the surviving corporation);

(ii)    The assumption of the Plan and such outstanding Options by the surviving corporation or its parent; or

(iii)    The substitution by the surviving corporation or its parent of options with substantially the same terms for such outstanding Options.

In lieu of the foregoing, the Board may, in its sole discretion, provide for a 30-day period immediately prior to such event during which Optionee shall have the right to exercise the Option in whole or in part, without any limitation on exercisability and upon the expiration of such period any unexercised portion of the Option shall immediately terminate.

(c)    **Reservation of Rights**.  Except as provided in this Section 8, an Optionee or Purchaser shall have no rights by reason of:  (i) any subdivision or consolidation of shares of stock of any class; (ii) the payment of any dividend; or (iii) any other increase or decrease in the number of shares of stock of any class.  Any issuance by the Corporation of shares of stock of any class, or securities convertible into shares of stock of any class, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number or Exercise Price of Shares subject to an Option.  The grant of an Option pursuant to the Plan shall not affect in any

C & K Market, Inc. 2014 Stock Incentive Plan
Page 6

EXHIBIT 1
Page 6 of 9
EXHIBIT 1
Page 49 of 76

way the right or power of the Corporation to make adjustments, reclassifications, reorganizations or changes of its capital or business structure, to merge or consolidate or to dissolve, liquidate, sell or transfer all or any part of its business or assets.

**Section 9.    Securities Law Requirements**.

Shares shall not be issued under the Plan unless the issuance and delivery of such Shares comply with (or are exempt from) all applicable requirements of law, including (without limitation) the Securities Act of 1933, as amended, the rules and regulations promulgated thereunder, state securities laws and regulations, and the regulations of any stock exchange or other securities market on which the Corporation's securities may then be traded.

**Section 10.    No Retention Rights**.

Nothing in the Plan or in any right or Option granted under the Plan shall confer on the Purchaser or Optionee any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Corporation (or any Parent or Subsidiary employing or retaining the Purchaser or Optionee) or of the Purchaser or Optionee, which rights are hereby expressly reserved by each, to terminate the Purchaser's or the Optionee's Service at any time and for any reason, with or without cause.

**Section 11.    Duration and Amendments**.

(a)    **Term of the Plan**.  The Plan, as set forth herein, shall become effective as set forth in <u>Section 13</u>.  In the event that the shareholders fail to approve the Plan within 12 months after its effective date, any grants of ISOs that have already occurred shall be rescinded, and no additional grants of ISOs shall be made thereafter under the Plan.  The Plan shall terminate automatically 10 years after the effective date of this Plan and may be terminated on any earlier date pursuant to <u>Section 11(b)</u>.

(b)    **Right to Amend or Terminate the Plan**.  The Board of Directors may amend, suspend or terminate the Plan at any time and for any reason; <u>provided</u>, <u>however</u>, that any amendment of the Plan which increases the number of Shares available for issuance under the Plan (except as provided in <u>Section 8</u>), or which materially changes the class of persons who are eligible for the grant of ISOs, shall be subject to the approval of the Corporation's shareholders. Shareholder approval shall not be required for any other amendment of the Plan.

(c)    **Effect of Amendment or Termination**.  No Shares shall be issued or sold under the Plan after the termination thereof, except upon exercise of an Option granted prior to such termination.  The termination of the Plan, or any amendment thereof, shall not affect any Share previously issued or any Option previously granted under the Plan.

**Section 12.    Definitions**.

(a)    "**Board of Directors**" shall mean the Board of Directors of the Corporation, as constituted from time to time.

(b)    "**Change in Control**" shall mean:

C & K Market, Inc. 2014 Stock Incentive Plan
Page 7

EXHIBIT 1
Page 7 of 9
EXHIBIT 1
Page 50 of 76

(i)     The consummation of a merger or consolidation of the Corporation with or into another entity or any other corporate reorganization, if more than 50% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after such merger, consolidation or other reorganization is owned by persons who were not shareholders of the Corporation immediately prior to such merger, consolidation or other reorganization; or

(ii)     The sale, transfer or other disposition of all or substantially all of the Corporation's assets.

(iii)     A transaction shall not constitute a Change in Control if its sole purpose is to change the state of the Corporation's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Corporation's securities immediately before such transaction.

(c)     "**Code**" shall mean the Internal Revenue Code of 1986, as amended.

(d)     "**Committee**" shall mean a committee of the Board of Directors, as described in Section 2(a).

(e)     "**Consultant**" shall mean a person who performs bona fide services for the Corporation, a Parent or a Subsidiary as a consultant or advisor, excluding Employees and Outside Directors.

(f)     "**Employee**" shall mean any individual who is a common-law employee of the Corporation, a Parent or a Subsidiary.

(g)     "**Exercise Price**" shall mean the amount for which one Share may be purchased upon exercise of an Option, as specified by the Board of Directors in the applicable Stock Option Agreement.

(h)     "**Fair Market Value**" shall mean the fair market value of a Share, as determined by the Board of Directors in good faith.  Such determination shall be conclusive and binding on all persons.

(i)     "**Grantee**" shall mean an individual to whom the Board of Directors has granted the right to acquire Shares under the Plan (other than upon exercise of an Option).

(j)     "**ISO**" shall mean an employee incentive stock option described in Section 422(b) of the Code.

(k)     "**Nonstatutory Option**" shall mean a stock option not described in Section 422(b) or 423(b) of the Code.

(l)     "**Option**" shall mean an ISO or Nonstatutory Option granted under the Plan and entitling the holder to purchase Shares.

(m)     "**Optionee**" shall mean an individual who holds an Option.

C & K Market, Inc. 2014 Stock Incentive Plan
Page 8

EXHIBIT 1
Page 8 of 9
EXHIBIT 1
Page 51 of 76

(n)     "**Outside Director**" shall mean a member of the Board of Directors who is not an Employee.

(o)     "**Parent**" shall mean any corporation (other than the Corporation) in an unbroken chain of corporations ending with the Corporation, if each of the corporations other than the Corporation owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.  A corporation that attains the status of a Parent on a date after the adoption of the Plan shall be considered a Parent commencing as of such date.

(p)     "**Plan**" shall mean this C & K Market, Inc. 2014 Stock Incentive Plan.

(q)     "**Purchase Price**" shall mean the consideration for which one Share may be acquired under the Plan (other than upon exercise of an Option), as specified by the Board of Directors.

(r)     "**Restricted Stock Agreement**" shall mean the agreement between the Corporation and a Purchaser who acquires Shares under the Plan which contains the terms, conditions and restrictions pertaining to the acquisition of such Shares.

(s)     "**Service**" shall mean service as an Employee, Outside Director or Consultant.

(t)     "**Share**" shall mean one share of Stock, as adjusted in accordance with <u>Section 8</u> (if applicable).

(u)     "**Stock**" shall mean the Common Stock, no par value, of the Corporation.

(v)     "**Stock Option Agreement**" shall mean the agreement between the Corporation and an Optionee which contains the terms, conditions and restrictions pertaining to the Optionee's Option.

(w)     "**Subsidiary**" means any corporation (other than the Corporation) in an unbroken chain of corporations beginning with the Corporation, if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.  A corporation that attains the status of a Subsidiary on a date after the adoption of the Plan shall be considered a Subsidiary commencing as of such date.

**Section 13.     Effectiveness**.

The Plan shall become effective upon confirmation of the Corporation's Plan of Reorganization by the bankruptcy court in the U.S. Bankruptcy Court District of Oregon, Case No.  13-64561-fra11.

034518/00017/5200091v1

C & K Market, Inc. 2014 Stock Incentive Plan
Page 9

EXHIBIT 1
Page 9 of 9
EXHIBIT 1
Page 52 of 76

# EXHIBIT 2

## SECOND AMENDED AND RESTATED ARTICLES OF INCORPORATION

EXHIBIT 1
Page 53 of 76

# C & K MARKET, INC.

## SECOND AMENDED AND RESTATED ARTICLES OF INCORPORATION

These Second Amended and Restated Articles of Incorporation supersede the existing Amended and Restated Articles of Incorporation of C & K Market, Inc. and all amendments thereto.

## ARTICLE 1

The name of the corporation is C & K Market, Inc. (the "Corporation").

## ARTICLE 2

The purpose of the Corporation is to engage in any lawful business or activity for which corporations may be organized under the Oregon Business Corporation Act, as amended from time to time (the "OBCA").

## ARTICLE 3

A.    The Corporation is authorized to issue shares of two classes of stock:

(1)    twenty-five million (25,000,000) shares of common stock, with no par value (the "Common Stock"); and

(2)    ten million (10,000,000) shares of preferred stock, with no par value (the "Preferred Stock").

B.    Holders of Common Stock are entitled to one vote per share on any matter submitted to the shareholders.  On dissolution of the Corporation, after any preferential amount with respect to the Preferred Stock has been paid or set aside, the holders of Common Stock and the holders of any series of Preferred Stock entitled to participate in the distribution of assets are entitled to receive the net assets of the Corporation.

C.    The Board of Directors is authorized, subject to limitations prescribed in the OBCA, and by the provisions of this Article, to provide for the issuance of shares of Preferred Stock in series, to establish from time to time the number of shares to be included in each series and to determine the designations, relative rights, preferences and limitations of the shares of each series.  The authority of the Board of Directors with respect to each series includes determination of the following:

(1)    The number of shares in and the distinguishing designation of that series;

(2)    Whether shares of that series shall have full, special, conditional, limited or no voting rights, except to the extent otherwise provided by the OBCA;

C & K MARKET, INC.
SECOND AMENDED AND RESTATED ARTICLES OF INCORPORATION
PAGE 1

EXHIBIT 2
Page 1 of 3
EXHIBIT 1
Page 54 of 76

(3)     Whether shares of that series shall be convertible and the terms and conditions of the conversion, including provision for adjustment of the conversion rate in circumstances determined by the Board of Directors;

(4)     Whether shares of that series shall be redeemable and the terms and conditions of redemption, including the date or dates upon or after which they shall be redeemable and the amount per share payable in case of redemption, which amount may vary under different conditions or at different redemption dates;

(5)     The dividend rate, if any, on shares of that series, the manner of calculating any dividends and the preferences of any dividends;

(6)     The rights of shares of that series in the event of voluntary or involuntary dissolution of the Corporation and the rights of priority of that series relative to the Common Stock and any other series of Preferred Stock on the distribution of assets on dissolution; and

(7)     Any other rights, preferences and limitations of that series that are permitted by law to vary.

## ARTICLE 4

In addition to any other method provided for in the Corporation's Bylaws, the shareholders of the Corporation may act by written consent without a meeting if (i) the action is taken by shareholders having not less than the minimum number of votes that would be necessary to take such action at a meeting at which all shareholders entitled to vote on the action were present and voted and (ii) the written consent is delivered to the Corporation for inclusion in the minutes or filing with the corporate records.  The Corporation must give written notice of any action taken pursuant to this Article 4 to all shareholders who did not sign the written consent.  The notice provided to such shareholders must contain or be accompanied by any information required by ORS 60.211 or any other applicable provision of the OBCA.

## ARTICLE 5

The Corporation elects to waive preemptive rights.

## ARTICLE 6

No shareholder shall have the right to cumulative voting.

## ARTICLE 7

A.     The Corporation shall indemnify to the fullest extent permitted by law any person who is, after the effective date of these Second Amended and Restated Articles (the "Effective Date"), made or threatened to be made a party to, witness in, or otherwise involved in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative, or otherwise (including an action, suit or proceeding by or in the

C & K MARKET, INC.
SECOND AMENDED AND RESTATED ARTICLES OF INCORPORATION
PAGE 2

EXHIBIT 2
Page 2 of 3
EXHIBIT 1
Page 55 of 76

right of the Corporation) by reason of the fact that the person is or was, whether before, on or after the Effective Date, a director or officer of the Corporation or a fiduciary within the meaning of the Employee Retirement Income Security Act of 1974 with respect to any employee benefit plan of the Corporation, or serves or served at the request of the Corporation as a director, officer, employee or agent or as a fiduciary of an employee benefit plan, of another corporation, partnership, joint venture, trust, or other enterprise; provided, that the foregoing indemnification shall only apply to directors, officers or fiduciaries of the Corporation in office as of the Effective Date, and to directors, officers and fiduciaries of the Corporation elected or appointed after the Effective Date.  The Corporation may indemnify to the fullest extent permitted by law any person who is made or threatened to be made a party to, witness in, or otherwise involved in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative, or otherwise (including an action, suit or proceeding by or in the right of the Corporation) by reason of the fact that the person is or was an employee or agent of the Corporation.  Any indemnification provided pursuant to this Article 7 will not be exclusive of any rights to which the person indemnified may otherwise be entitled under any provision of articles of incorporation, bylaw, agreement, statute, policy of insurance, vote of shareholders or board of directors, or otherwise.

B.      To the fullest extent permitted by law, no director of the Corporation in office on or after the Effective Date will be personally liable to the Corporation or its shareholders for monetary damages for conduct as a director.  Without limiting the generality of the preceding, if after this Article 7 becomes effective the Oregon Revised Statutes are amended to authorize corporate action further eliminating or limiting the personal liability of directors of the Corporation in office on or after the Effective Date, then the liability of such directors will be eliminated or limited to the fullest extent permitted by the Oregon Revised Statutes, as so amended.  No amendment or repeal of this Article 7, nor the adoption of any provision of these Second Amended and Restated Articles of Incorporation inconsistent with this Article 7, nor a change in the law will adversely affect any right or protection that is based upon this paragraph B and that pertains to conduct that occurred prior to the time of such amendment, repeal, adoption or change.  No change in the law will reduce or eliminate the rights and protections set forth in this paragraph B unless the change in the law specifically requires such reduction or elimination.

EXHIBIT 2
Page 3 of 3
EXHIBIT 1
Page 56 of 76

# EXHIBIT 3

## SECOND AMENDED AND RESTATED BYLAWS

EXHIBIT 1
Page 57 of 76

## SECOND AMENDED AND RESTATED BYLAWS OF
## C & K MARKET, INC.

These Second Amended and Restated Bylaws (the "Bylaws") amend and restate in their entirety the Amended and Restated Bylaws of C & K Market, Inc., an Oregon corporation (the "Corporation").

**1.    Offices**.

1.1.    Principal Office.  The principal office of the Corporation shall be located in the state of Oregon at such location as designated from time to time by the Board of Directors (the "Board").  The Corporation may have such other offices, in or out of the state of Oregon, as the Board may designate or as the business of the Corporation may require from time to time.

1.2.    Registered Office.  The registered office of the Corporation to be maintained in the state of Oregon, may be, but need not be, identical with the principal office in the state of Oregon.  The address of the registered office may be changed from time to time by the Board upon compliance with the requirements of the Oregon Business Corporation Act, as amended from time to time (the "OBCA"), for change of the registered office.

**2.    Shareholders**.

2.1.    Annual Meeting.  A meeting of the shareholders shall be held in each year on the second Thursday in April, unless otherwise determined by the Board, for the purpose of electing directors and for the transaction of such other business as may come before the meeting.  The Board shall set the time and place for the meeting.  If the day fixed for the annual meeting is a legal holiday in the state of Oregon, the meeting shall be held on the next succeeding business day.  If the election of directors is not held on the day established herein for any annual meeting of the shareholders, or at any adjournment thereof, the Board shall cause the election to be held at a special meeting of the shareholders as soon thereafter as reasonably convenient.

2.2.    Special Meetings.  The Corporation shall hold a special meeting of shareholders upon the call of the chief executive officer of the Corporation or the Board, or if the holders of at least 15 percent of all votes entitled to be cast on any issue proposed to be considered at the proposed special meeting sign, date and deliver to the secretary of the Corporation one or more written demands for the meeting describing the purpose or purposes for which it is to be held.

2.3.    Chairperson to Preside Over Meetings.  The chair of the Board shall preside at each shareholder meeting.  In the absence of the chair of the Board, the chief executive officer of the Corporation shall preside as chairperson. In the absence of the chair of the Board, or the chief executive officer, as the case may be, the secretary of the Corporation shall preside as chairperson. The chairperson shall determine the order of business and shall have the authority to establish rules for the conduct of the meeting, subject to the other rules identified in the Bylaws.

EXHIBIT 3
Page 1 of 16
EXHIBIT 1
Page 58 of 76

2.4.    Place of Meeting.  Meetings of the shareholders shall be held at the principal office of the Corporation, or at any other place in or out of the state of Oregon which the Board may, from time to time, designate.

2.5.    Notice of Meeting.  Written or printed notice stating the place, day and hour of any shareholder meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 nor earlier than 60 days before the meeting date, at the direction of the chief executive officer or other persons calling the meeting, to each shareholder of record entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the shareholder at the address as it appears on the stock transfer books of the Corporation, postage prepaid.

2.6.    Action Without a Formal Meeting.  Action required or permitted by law to be taken at a shareholders meeting may be taken without a meeting if the action is taken by shareholders having not less than the minimum number of votes that would be necessary to take such action at a meeting at which all shareholders entitled to vote on the action were present and voted.  The action will be evidenced by one or more written consents describing the action taken, signed by those shareholders taking action under this Section 2.6 and delivered to the secretary of the Corporation for inclusion in the minutes or filing with the corporate records.  Action taken under this Section 2.6 is effective when the consent or consents bearing sufficient signatures are delivered to the Corporation, unless the consent or consents specify an earlier or later effective date.  If not otherwise determined by law, the record date for determining shareholders entitled to take action without a meeting under this Section 2.6 is the date the first shareholder signs the consent.  A consent signed under this Section 2.6 has the effect of a meeting vote and may be described as such in any document.

2.7.    Establishing a Shareholder Record Date.  For the purpose of determining shareholders entitled to notice of or to vote at any meeting of shareholders, or shareholders entitled to receive payment of any dividend, or in order to make a determination of shareholders for any other proper purpose, the Board may establish a record date.  The record date shall not be less than 10 or more than 70 days before the meeting or action requiring a determination of shareholders.  If no record date is fixed for the determination of shareholders entitled to notice of a meeting, or shareholders entitled to receive payment of a dividend, the day immediately before the date on which notice of the meeting is mailed or the date on which the resolution of the Board declaring such dividend is adopted, as the case may be, shall be the record date for such determination of shareholders.  When a determination of shareholders entitled to vote at any meeting of shareholders has been made as provided in this paragraph, such determination shall apply to any adjournment thereof unless a court fixes a new record date pursuant to the OBCA.

2.8.    Shareholder Voting Lists.  The officer or agent having charge of the stock transfer books for shares of the Corporation shall make, no more than two business days after notice is given for each meeting of shareholders, a complete list of the shareholders entitled to vote at such meeting, or any adjournment thereof, which list shall be kept on file at the registered office of the Corporation and shall be subject to inspection by any shareholder at any time during usual business hours.  The original stock transfer books shall be prima facie evidence as to who are the shareholders entitled to examine such list or transfer books or to vote at any meeting of

EXHIBIT 3
Page 2 of 16
EXHIBIT 1
Page 59 of 76

shareholders.  Failure to comply with this requirement of the Bylaws shall not affect the validity of any action taken at a shareholders meeting.

2.9.    <u>Quorum of Shareholders</u>.    Except as otherwise required by the Corporation's Articles of Incorporation, as amended from time to time (the "Articles"), or by applicable law, a majority of the shares entitled to vote represented in person or by proxy shall constitute a quorum at a meeting of shareholders.  If a quorum is present, the affirmative vote of the majority of the shares represented at the meeting and entitled to vote on the subject matter shall be the act of the shareholders, except in the case of election of directors who shall be elected by a plurality of the votes cast at a meeting at which a quorum exists.  The shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum.  In the absence of a quorum, a majority of those present in person or represented by proxy may adjourn the meeting from time to time until a quorum exists.  Any business that might have been transacted at the original meeting may be transacted at the adjourned meeting if a quorum exists at the adjourned meeting.

2.10.    <u>Proxies</u>.    A shareholder may vote shares either in person or by proxy.    A shareholder may appoint a proxy to vote or otherwise act for the shareholder by signing an appointment form, either personally or by the shareholder's attorney-in-fact.  An appointment of a proxy is effective when received by the secretary or other officer or agent of the Corporation authorized to tabulate votes.  An appointment is valid for 11 months unless a longer period is expressly provided in the appointment form.  An appointment of a proxy is revocable by the shareholder unless the appointment form conspicuously states that it is irrevocable and the appointment is coupled with an interest.

2.11.    <u>Voting of Shares</u>.    Except as otherwise provided in the Articles or by applicable law, each outstanding share which has voting rights shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders.  No shareholder shall have the right to vote cumulatively.

2.12.    <u>Voting of Shares by Certain Holders</u>.    Shares held by an administrator, executor, guardian or conservator may be voted by the shareholder either in person or by proxy, without a transfer of such shares into the shareholder's name. Shares standing in the name of a trustee may be voted by the shareholder either in person or by proxy, but no trustee shall be entitled to vote shares held by the shareholder without a transfer of such shares into the shareholder's name. Shares standing in the name of a receiver may be voted by such receiver, and shares held by or under the control of a receiver may be voted by such receiver without the transfer thereof into the receiver's name if authority so to do be contained in an appropriate order of the court by which such receiver was appointed.  A shareholder whose shares are pledged shall be entitled to vote such shares until the shares have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares so transferred.  Shares of its own stock belonging to the Corporation or held by it in fiduciary capacity shall not be voted, directly or indirectly, at any meeting, and shall not be counted in determining the total number of outstanding shares at any given time.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 3

EXHIBIT 3
Page 3 of 16
EXHIBIT 1
Page 60 of 76

3.    **Board of Directors**.

    3.1.    <u>General Powers</u>.  The business and affairs of the Corporation shall be managed by the Board.

    3.2.    <u>Number, Tenure, and Election</u>.  The number of directors of the Corporation shall be not less than three nor more than seven; provided, that the Board is authorized to increase or decrease the number of directors constituting the Board of Directors by action of a majority of the directors then serving, except that no director's term shall be shortened by virtue of a decrease in the number of directors constituting the Board of Directors.  Directors shall be elected at the annual meeting of shareholders.

    3.3.    <u>Annual Meeting</u>.  An annual meeting of the Board shall be held without notice following the annual meeting of shareholders.  The Board may provide, by resolution, the time and place, either within or without the state of Oregon, for the holding of additional regular meetings without notice thereof.

    3.4.    <u>Special Meetings</u>.  Special meetings of the Board may be called by or at the request of the chief executive officer of the Corporation or any two directors. The person or persons authorized to call special meetings of the Board may fix any place, either within or without the state of Oregon, as the place for holding any special meeting of the Board called by them.

    3.5.    <u>Notice</u>.  Notice of any special meeting shall be given at least two days prior to the scheduled date for such special meeting, either orally by telephone or in person, or by written notice delivered personally or mailed to each director at the director's address.  If mailed, such notice shall be deemed to be delivered on the second day following deposit in the United States mail.  Any director may waive notice of any meeting.  Except as provided in the following sentence, the waiver must be in writing, signed by the director entitled to notice, specify the meeting for which notice is waived and be filed with the minutes or corporate records.  The attendance of a director at a meeting shall constitute a waiver of notice of such meeting, except where a director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted nor the purpose of any special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

    3.6.    <u>Quorum</u>.  A majority of the number of directors in office immediately before the commencement of the meeting shall constitute a quorum for the transaction of business at any meeting of the Board.

    3.7.    <u>Manner of Acting</u>.  The act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board.  Directors shall be deemed to be present at a regular or special meeting where all directors participating may simultaneously hear each other during the meeting, irrespective of whether or not they are present in the same location, as by a telephonic conference.

---

EXHIBIT 3
Page 4 of 16
EXHIBIT 1
Page 61 of 76

3.8.    <u>Action Without a Formal Meeting</u>.    Unless the Articles or the Bylaws provide otherwise, action required or permitted to be taken under applicable law at a Board meeting may be taken without a meeting if the action is taken by all members of the Board.  The action must be evidenced by one or more written consents describing the action taken, signed by each director, and included in the minutes or filed with the corporate records reflecting the action taken.    Such action is effective when the last director signs the consent, unless the consent specifies an earlier or later effective date.

3.9.    <u>Vacancies</u>.  Any vacancy occurring on the Board may be filled by the affirmative vote of the majority of the remaining directors.  If there is only one remaining director, the remaining director may appoint the person or persons required to fill any vacancies.  If there are no remaining directors, the vacancies occurring on the Board may be filled by the shareholders who would then be entitled to vote for the election of directors at an annual meeting of shareholders.  A director elected to fill a vacancy shall be elected for the unexpired term of that director's predecessor in office.

3.10.    <u>Presumption of Assent</u>.  A director of the Corporation who is present at a meeting of the Board at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless:

3.10.1. the director objects at the beginning of the meeting or promptly upon the director's arrival, to holding the meeting or transacting business at the meeting;

3.10.2. the director's dissent or abstention from the action taken is entered in the minutes of the meeting; or

3.10.3. the director delivers written notice of dissent or abstention to the presiding officer of the meeting before its adjournment or to the secretary of the Corporation immediately after adjournment of the meeting.  The right of dissent or abstention is not available to a director who votes in favor of the action taken.

3.11.    <u>Removal</u>.  A director may be removed by the affirmative vote of shareholders owning at least a majority of the issued voting shares of the Corporation.  A director may be removed by the shareholders only at a meeting called for the express purpose of removing the director and the meeting notice must state that the purpose, or that one of the purposes, of the meeting is removal of the director.

3.12.    <u>Resignation</u>.  Any director of the Corporation may resign at any time by giving written notice to the Corporation, to the Board, or to the chair of the Board, or to the chief executive officer, or to the secretary of the Corporation.  Any such resignation shall take effect at the time specified therein, or, if the time be not specified therein, upon its acceptance by the Board.

EXHIBIT 3
Page 5 of 16
EXHIBIT 1
Page 62 of 76

4.    **Officers**.

4.1.    <u>Number</u>.    The officers of the Corporation shall be a chief executive officer, a president and a secretary, each of whom shall be appointed by the Board.  Other officers such as vice-president and treasurer and assistant officers may be elected or appointed by the Board.

4.2.    <u>Election and Term of Office</u>.    The officers shall be appointed annually by the Board at the first meeting of the Board held after each annual meeting of the shareholders.  If the appointment of officers shall not be held at such meeting, such appointment shall be held as soon as practical thereafter.  Each officer shall hold office until that officer's successor shall have been duly elected and shall have qualified or until that officer's death or until the officer shall resign or shall have been removed in the manner provided in the Bylaws.

4.3.    <u>Removal and Resignation</u>.    Any officer or agent elected or appointed by the Board may be removed by the Board whenever in its judgment the best interests of the Corporation would be served thereby.  Any officer of the Corporation may resign at any time by giving written notice to the Corporation, to the Board, or to the chair of the Board, or to the chief executive officer, or to the secretary of the Corporation.  Any such resignation shall take effect at the time specified therein, or, if no time is specified, upon its acceptance by the Board.

4.4.    <u>Vacancies</u>.    A vacancy in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the Board for the unexpired portion of the term.

4.5.    <u>Salaries</u>.    The salaries of the officers shall be fixed from time to time by the Board and no officer shall be prevented from receiving such salary by reason of the fact that the officer is also a director of the Corporation.

4.6.    <u>Chair of the Board</u>.    The Board of Directors may elect a chair of the Board.  If such chair is elected, the chair shall preside at all meetings of the Board and of the shareholders, and shall perform such other duties as may be prescribed from time to time by the Board.

4.7.    <u>Chief Executive Officer</u>.    The chief executive officer shall be the principal executive officer of the Corporation and, subject to the control of the Board, shall in general supervise all of the business and affairs of the Corporation.  The chief executive officer shall preside at all meetings of the shareholders and of the Board where there is no chair of the Board.  The chief executive officer may sign, with such other officer, if any, as may be required by law or authorized by the Board, certificates for shares of the Corporation, any deeds, mortgages, bonds, contracts, or other instruments which are inherent in the authority of the office of the chief executive officer or which the Board has authorized  to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board or by the Bylaws to some other officer or agent of the Corporation, or shall be required by law to be otherwise signed or executed; and in general shall perform all duties incident to the office of chief executive officer and such other duties as may be prescribed by the Board.

4.8.    <u>President</u>.  In the absence of the chief executive officer or in the event of the chief executive officer's death, inability or refusal to act, the president shall perform the duties of the

EXHIBIT 3
Page 6 of 16
EXHIBIT 1
Page 63 of 76

chief executive officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the chief executive officer.   The president may sign, with the secretary, certificates for shares of the Corporation; and shall perform such other duties as from time to time may be assigned to the president by the chief executive officer or by the Board.

4.9.    Vice-President.   In the absence of the president or in the event of the president's death, inability or refusal to act, the vice-president (or in the event there be more than one vice-president, the vice-presidents in the order designated at the time of their election, or in the absence of any designation, then in the order of their election) shall perform the duties of the president, and when so acting, shall have all the powers of and be subject to all the restrictions upon the president.  Any vice-president may sign, with the secretary, certificates for shares of the Corporation; and shall perform such other duties as from time to time may be assigned to the vice-president by the chief executive officer or by the Board.

4.10.    Secretary.  The secretary shall:

4.10.1. Keep or cause to be kept at the principal office, or such other place as the Board may order, a book of minutes of all meetings of directors and shareholders showing the time and place of the meeting, whether the meeting was regular or special and, if a special meeting, how authorized, the notice given, the names of those present at directors meetings, the number of shares present or represented at shareholders meetings and the proceedings thereof.

4.10.2. Keep or cause to be kept, at the principal office or at the office of the Corporation's transfer agent, a share register, or a duplicate share register, showing the names of the shareholders and their addressees, the number and classes of shares held by each, the number and date of certificates issued for such shares and the number and date of cancellation of certificates surrendered for cancellation.

4.10.3. Give or cause to be given such notice of the meetings of the shareholders and of the Board as is required by the Bylaws.  If the Corporation elects to have a seal, the secretary shall keep the seal and affix it to all documents requiring a seal.  The secretary shall have such other powers and perform such other duties as may be prescribed by the Board or the Bylaws.

4.10.4. In general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to the secretary by the chief executive officer or the Board.

4.11.    Treasurer.  The treasurer, if appointed, shall:

4.11.1. Be responsible for the funds of the Corporation, shall pay them out only on the checks of the Corporation signed in the manner authorized by the Board, shall deposit and withdraw such funds in such depositories as may be authorized by the Board, and shall keep full and accurate accounts of receipts and disbursements in books maintained at the Corporation's principal office.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 7

EXHIBIT 3
Page 7 of 16
EXHIBIT 1
Page 64 of 76

4.11.2. In general perform all of the duties incident to the office of treasurer and such other duties as from time to time may be assigned to the treasurer by the chief executive officer or by the Board.

5. **Contracts, Loans, Checks, and Deposits**.

5.1.    Contracts.  The Board may authorize any officer or officers, agent or agents to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be in general or confined to specific instances.

5.2.    Loans to Corporations.  No loans shall be contracted on behalf of the Corporation and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board.  Such authority may be general or confined to specific instances.

5.3.    Checks, Drafts, Etc.  All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the Corporation, shall be signed by such officer or officers, agent or agents of the Corporation and in such manner as shall from time to time be determined by resolution of the Board.

5.4.    Deposits.  All funds of the Corporation not otherwise employed shall be deposited from time to time to the credit of the Corporation in such banks, trust companies or other depositories as the Board may select.

5.5.    Execution of Documents.  The Board may, except as otherwise provided in the Bylaws, authorize any officer or agent of the Corporation to enter into any contract or execute any instrument in the name of and on behalf of the Corporation.  Such authority may be general or confined to specific instances.  Unless so authorized by the Board, or unless inherent in the authority vested in the office under the provisions of the Bylaws, no officer, agent or employee of the Corporation shall have any power or authority to bind the Corporation by any contract or engagement, or to pledge its credit, or to render it liable for any purpose or for any amount.

6. **Certificates for Shares and Their Transfer**.

6.1.    Certificates for Shares.

6.1.1.    Certificates for shares shall be in such form as the Board may designate, shall designate the name of the Corporation and the state law under which the Corporation is organized, shall state the name of the person to whom the shares represented by the certificate are issued, and shall state the number and class of shares and the designation of the series, if any, the certificate represents.  If the Corporation is authorized to issue different classes of shares or different series within a class, the designations, relative rights, preferences and limitations determined for each series and the authority of the Board to determine variations for future series shall be summarized on the front or back of each certificate, or each certificate may state conspicuously on its front or back that the Corporation shall furnish shareholders with this information on request in writing and without charge.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 8

EXHIBIT 3
Page 8 of 16
EXHIBIT 1
Page 65 of 76

6.1.2.  Each certificate for shares shall be signed, either manually or in facsimile, by the chair of the Board, the chief executive officer, the president or a vice-president and the secretary or an assistant secretary of the Corporation.  The certificates may bear the corporate seal or its facsimile.

6.1.3.  If any officer who has signed a share certificate, either manually or in facsimile, no longer holds office when the certificate is issued, the certificate shall nevertheless be valid.

6.1.4.  The Corporation may in its discretion issue certificates for fractional shares, but shall not be required to do so.

6.2.  <u>Transfer on the Books</u>.  Upon surrender to the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, and subject to any limitations on transfer appearing on the certificate or in the Corporation's stock transfer records (including, without limitation, restrictions on transfer set forth in the Bylaws), the Corporation shall issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.  The Board is authorized to impose restrictions on the transfer of shares to the extent permitted by law (including, without limitation, restrictions on transfer set forth in the Bylaws).

6.3.  <u>Lost, Stolen, or Destroyed Certificates</u>.  In the event a certificate is represented to be lost, stolen or destroyed, a new certificate shall be issued in place thereof upon such proof of the loss, theft or destruction and upon the giving of such bond or other indemnity as may be required by the Board.

6.4.  <u>Transfer Agents and Registrars</u>.  The Board may from time to time appoint one or more transfer agents and one or more registrars for the shares of the Corporation who will have some powers and duties as the Board may specify.

6.5.  <u>Restrictive Legends</u>.  Each certificate representing any share of stock of the Corporation shall bear substantially the following legend:

THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS CONTAINED IN THE CORPORATION'S BYLAWS.  COPIES OF SUCH BYLAWS MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION

**7.**  **<u>Fiscal Year</u>**.  The fiscal year of the Corporation shall end on December 31, unless changed by the Board.

**8.**  **<u>Seal</u>**.  If the Board elects to provide a corporate seal, it shall be circular in form and shall have inscribed thereon the name of the Corporation and the state of incorporation and the words, "Corporate Seal - Oregon."

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 9

EXHIBIT 3
Page 9 of 16
EXHIBIT 1
Page 66 of 76

9.      **Waiver of Notice - Form of Notice**.

        9.1.    Waiver of Notice.   Whenever any notice is required to be given to any shareholder or director of the Corporation under the provisions of the Bylaws or under the provisions of the OBCA, a waiver thereof in writing, signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

        9.2.    Form of Notice.   Whenever, under the provisions of the Oregon Business Corporation Act or these Bylaws, notice is required to be given to any director or shareholder, it shall not be construed to mean only personal notice, but shall include notices as defined below.

               9.2.1.   Required notice to a director may be given in writing by mail or facsimile, addressed to such director at the address as it appears on the records of the Corporation, or at the last known business or residence address of the director, prepaid, and such notice if mailed shall be deemed to be given at the time when the same shall be deposited in the United States mail (except as expressly provided for otherwise in Section 3.5), and if transmitted by facsimile shall be deemed to be given upon the earlier of personal receipt by the director or 24 hours following the completed transmittal.

               9.2.2.   Required notice to a shareholder shall be given in writing by mail or facsimile, addressed to such shareholder at the address as it appears on the stock record books or similar records of the Corporation, or at the last known business or residence address of the shareholder, prepaid, and such notice if mailed shall be deemed to be given at the time when the same shall be deposited in the United States mail (except as expressly provided for otherwise in the Bylaws), and if transmitted by facsimile shall be deemed to be given upon the earlier of personal receipt by the shareholder or 24 hours following the completed receipt of the transmittal.

10.     **Amendment of Bylaws**.

        10.1.   Subject to Section 10.4, the Board may amend or repeal these Bylaws, unless:

               10.1.1. The Articles or applicable law reserve this power exclusively to the shareholders in whole or in part.

               10.1.2. The shareholders, in amending or repealing a particular bylaw, provide expressly that the Board may not amend or repeal that bylaw.

               10.1.3. The Articles, the Bylaws or applicable state or federal law provide otherwise.

        10.2.   Subject to Section 10.4, the shareholders may amend or repeal the Bylaws even though these Bylaws may also be amended or repealed by the Board.

---

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 10

EXHIBIT 3
Page 10 of 16
EXHIBIT 1
Page 67 of 76

10.3.    When an amendment or new Bylaw is adopted, it shall be copied in the minute book with the original Bylaws in the appropriate place.  If any Bylaw is repealed, the fact of its repeal and the date on which its repeal occurred shall be stated in such book and place.

10.4.    Notwithstanding the foregoing, Section 12 of the Bylaws may be amended solely with the approval at a shareholder meeting at which a quorum is present of shareholders holding at least 67% of all votes then eligible to be cast.  Notice of such shareholder meeting must provide that the purpose, or one of the purposes, of such meeting is to consider such an amendment to the Bylaws.

## 11.    Transactions Between Corporation, Interested Directors.

11.1.    Conflict of Interest.  A transaction with the Corporation in which a director of the Corporation has a direct or indirect interest is not voidable by the Corporation solely because of the director's interest in the transaction if either:

11.1.1. the material facts of the transaction and the director's interest were disclosed or known to the Board or a committee of the Board, and the Board or committee authorized, approved or ratified the transaction; or

11.1.2. the material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved or ratified the transaction; or

11.1.3. the transaction was fair to the Corporation.  Authorization, approval or ratification occurs if a majority of the directors on the Board or on the committee, who have no direct or indirect interest in the transaction, vote to authorize.

11.2.    Authorization.

11.2.1. For purposes of Section 11.1.1, a transaction in which a director has an interest is authorized, approved or ratified if it receives the affirmative vote of a majority of the directors on the Board, or on the committee acting on the matter, who have no direct or indirect interest in the transaction.  A transaction may not be authorized, approved or ratified under this Section 11 by a single director.  If a majority of the directors who have no direct or indirect interest in the transaction vote to authorize, approve or ratify the transaction, a quorum will be deemed to be present for the purpose of taking action under this Section 11  The presence of, or a vote cast by, a director with a direct or indirect interest in the transaction does not affect the validity of any action taken by the Board or a committee thereof if the transaction is otherwise authorized, approved or ratified in any manner as provided in Section 11.1.1.

11.2.2. For purposes of Section 11.1.2, a transaction in which a director has an interest is authorized, approved or ratified if it receives the vote of a majority of the shares entitled to be voted under this Section 11 voting as a single voting group.  Shares owned by or voted under the control of a director who has a direct or indirect interest in

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 11

EXHIBIT 3
Page 11 of 16
EXHIBIT 1
Page 68 of 76

the transaction may be counted in a vote of shareholders to determine whether to authorize, approve or ratify a transaction by vote of the shareholders under this <u>Section 11</u>. A majority of the shares, whether or not present, that are entitled to be counted in a vote on the transaction under this <u>Section 11</u> constitutes a quorum for the purpose of taking action under this <u>Section 11</u>.

11.3.  <u>Disqualification</u>. A director of the Corporation shall not be disqualified from the director's office for contracting with the Corporation as vendor, purchaser, or otherwise.

## 12.    <u>Restrictions on Transfer of Common Stock and Preferred Stock</u>.

12.1.  <u>Restriction on Transfer</u>. Except as otherwise permitted by this <u>Section 12</u>, no shareholder may Transfer any Shares. No shareholder may Transfer any Shares to any Person other than a Permitted Transferee prior to January 1, 2016. Any Transfer of Shares on or after January 1, 2016 to any Person other than a Permitted Transferee shall be subject to the right of first refusal provisions of <u>Section 12.3</u> in addition to all other provisions of this <u>Section 12</u>. Any Transfer of Shares must comply with <u>Section 12.5</u> in order to be a Permitted Transfer.

12.2.  <u>Definitions</u>. For purposes of this <u>Section 12</u>, the following definitions shall apply:

12.2.1.  "Adjusted Fair Market Value" means the fair market value of the Shares as agreed by the parties in interest. If the parties do not agree on the Adjusted Fair Market Value, the Board will in good faith determine the Adjusted Fair Market Value. The Board's determination will be final and binding upon the parties. The determination will apply appropriate discounts for lack of marketability, minority interest and other factors relevant to the Shares.

12.2.2. "Common Stock" means the common stock, no par value, of the Corporation.

12.2.3. "Permitted Transfer" means a Transfer of Shares permitted by and in compliance with this <u>Section 12</u>.

12.2.4. "Permitted Transferee" means (a) the Corporation; (b) any trust for the benefit of one or more of the spouse and/or the natural or adopted lineal descendants of a shareholder, but only if the trustee with authority to exercise all rights with respect to the Shares held by such shareholder is at all times such shareholder; (c) the shareholder's executor, administrator, trustee, personal representative, or assignee to whom Shares are transferred at death or by operation of law; (d) any Person approved by the Board; or (e) any Purchaser in accordance with <u>Section 12.3</u>; or (e) a spouse in connection with a divorce.

12.2.5. "Person" means any individual, partnership, limited liability company, corporation, trust, joint venture, cooperative, association or other entity.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 12

EXHIBIT 3
Page 12 of 16
EXHIBIT 1
Page 69 of 76

12.2.6. "Preferred Stock" means the preferred stock, no par value, of the Corporation, regardless of series, class or other designation.

12.2.7. "Shares" means one or more shares of Common Stock and/or Preferred Stock, as the context requires.

12.2.8. "Transfer" when used as a noun means any sale, assignment, exchange, gift, devise, hypothecation, pledge, encumbrance, attachment, levy, foreclosure, sale by legal process under execution, attachment or receivership, sale or retention of any Shares or interest in any Shares by a secured party after a default, change in the beneficial ownership or the trustee of any trust which is a shareholder of the Corporation, change of ownership ordered by any court pursuant to dissolution of marriage or otherwise, or other change in ownership, voluntary or involuntary. "Transfer" when used as a verb means transferring any Shares or interests in any Shares by any means as set forth in the previous sentence.

12.3.   Corporation's Right of First Refusal.

12.3.1. No Transfer of any Shares (the "Offered Stock") may be made on or after January 1, 2016 unless the shareholder (the "Seller") has received a bona fide written offer (the "Purchase Offer") from a Person (the "Purchaser") to purchase the Offered Stock for a purchase price (the "Offer Price") denominated and payable in United States dollars at closing or according to specified terms, with or without interest, which offer must be in writing signed by the Purchaser and will be irrevocable for a period ending no sooner than the day following the end of the Offer Period, as defined below.

12.3.2. Prior to making any Transfer that is subject to the terms of this Section 12.3, the Seller must give to the Corporation written notice (the "Offer Notice") which must include a copy of the Purchase Offer and an offer (the "Firm Offer") to sell the Offered Stock to the Corporation for the Offer Price, payable according to the same terms as (or more favorable terms than) those contained in the Purchase Offer; provided, that the Firm Offer will be made without regard to the requirement of any earnest money or similar deposit required of the Purchaser prior to closing, and without regard to any security (other than the Offered Stock) to be provided by the Purchaser for any deferred portion of the Offer Price.

12.3.3. The Firm Offer will be irrevocable for a period (the "Offer Period") of 30 days following the date the Offer Notice is received by the Corporation. At any time during the Offer Period the Corporation may accept the Firm Offer for all, but not less than all, of the total amount of the Offered Stock.

12.3.4. If the Firm Offer is accepted, the closing of the sale of the Offered Stock will take place within 15 days after the Firm Offer is accepted or, if later, the date of closing set forth in the Purchase Offer. The Seller will execute such documents and

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 13

EXHIBIT 3
Page 13 of 16
EXHIBIT 1
Page 70 of 76

instruments as may be necessary or appropriate to effect the sale of the Offered Stock pursuant to the terms of the Firm Offer and this <u>Section 12.3</u>.

12.3.5. If the Firm Offer is not accepted in the manner outlined above, the Seller may sell the Offered Stock to the Purchaser at any time within 60 days after the last day of the Offer Period; <u>provided</u>, that such sale is made on terms no more favorable to the Purchaser than the terms contained in the Purchase Offer; and, <u>provided further</u>, that such sale complies with other terms, conditions, and restrictions of this Agreement that are applicable to Shares and are not expressly made inapplicable to sales occurring under this <u>Section 12.3</u>.

12.4.   <u>Prohibited Transfers</u>.

12.4.1.   Any purported Transfer that is not a Permitted Transfer will be void and of no effect.  Notwithstanding the foregoing, if a court or authority of competent jurisdiction requires the Corporation to recognize a Transfer that is not a Permitted Transfer (or if the Corporation, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer): (a) the transferee will be deemed to have accepted the Shares subject to the provisions of this Agreement, and (b) the Corporation will have an option to redeem any of the Transferred Shares within 180 days after the Corporation receives a copy of the order requiring the Corporation to recognize the Transfer.  The redemption price will be the Adjusted Fair Market Value of the Shares as of the Transfer date.  The Corporation may elect to redeem the Transferred Shares by delivering a written notice of its election to the transferee specifying the number of shares to be redeemed.  If the Corporation elects to redeem any such Shares, the Corporation will pay the Adjusted Fair Market Value of the Shares to the transferee over a period not to exceed 5 years, plus interest at the lowest rate that will not result in the imputation of interest under the Internal Revenue Code.

12.4.2.   Any Shares Transferred pursuant to <u>Section 12.4.1</u> that the Corporation does not redeem will be limited in accordance with this <u>Section 12</u>, and the Corporation may apply distributions with respect to such Shares  (without limiting any other legal or equitable rights of the Corporation) to satisfy any debts, obligations, or liabilities for damages (including incremental tax liability and attorney fees and expenses incurred in negotiations, trial preparation, at trial, on appeal or in bankruptcy) that the transferor or transferee of the Shares may have to the Corporation.

12.5.   <u>Conditions to Permitted Transfers</u>. A Transfer allowed by this <u>Section 12</u> will not be treated as a Permitted Transfer unless and until the following conditions are satisfied:

12.5.1. Except for a Transfer of Shares at death or involuntarily by operation of law, the transferor and transferee execute and deliver to the Corporation the documents and instruments of conveyance necessary to effect the Transfer and confirm the transferee's agreement to be bound by the provisions of the Bylaws. In the case of a Transfer of Shares at death or involuntarily by operation of law, the Transfer will be confirmed by presentation to the Corporation of satisfactory legal evidence of the

EXHIBIT 3
Page 14 of 16
EXHIBIT 1
Page 71 of 76

Transfer. The transferor and transferee will reimburse the Corporation for all costs and expenses that the Corporation reasonably incurs in connection with the Transfer.

12.5.2. The transferor and transferee furnish the Corporation with the transferee's taxpayer identification number and any other information reasonably necessary to permit the Corporation to file all required federal and state tax returns and other legally required information statements or returns.

12.5.3. Except for a Transfer at death or involuntarily by operation of law, the transferor, if the Corporation requests, furnishes an opinion of legal counsel, which counsel and opinions are satisfactory to the Corporation, to the effect that either (a) the Common Stock and/or Preferred Stock will be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (b) the Transfer is exempt from all applicable registration requirements and the Transfer will not violate any applicable laws regulating the Transfer of securities.

12.5.4. The Transfer will not cause the Corporation to be deemed to be an "investment company" under the Investment Corporation Act of 1940, as amended.

12.6.  If a Transfer or attempted Transfer is not a Permitted Transfer, the parties engaging or attempting to engage in the Transfer will be liable to indemnify and hold harmless the Corporation and its directors, officers, employees and agents and from all costs, liability, and damages that any of the indemnified Persons may incur (including incremental tax liability and attorney fees and expenses incurred in negotiations, trial preparation, at trial, on appeal or in bankruptcy) as a result of the Transfer or attempted Transfer and efforts to enforce this indemnity.

12.7.    The Corporation may assign any of its rights to purchase or redeem Shares under this Section 12, from time to time, to any Person or Persons selected by the Board.

## 13.    Miscellaneous.

13.1.    Telephonic Meetings.    Meetings of the shareholders and directors, or of any committee designated by each shareholder and director, may be held by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at the meeting.

13.2.    Books and Records.    The Corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its shareholders and the Board and shall keep at its registered office a record of its shareholders, giving the names and addresses of all shareholders and the number and class of shares held by each.    The records of the Corporation shall be open to inspection by the shareholders or the shareholders' agents or attorneys in the manner and to the extent required by applicable law.

## 14.    Director Committees.

---

EXHIBIT 3
Page 15 of 16
EXHIBIT 1
Page 72 of 76

14.1.  <u>Creation of Committees</u>.  Unless the Articles provide otherwise, the Board may create one or more committees and appoint members of the Board to serve on them.  Each committee must have two or more members, who serve at the pleasure of the Board.

14.2.  <u>Selection of Members</u>.  The creation of a committee and appointment of members to it must be approved a majority of all the directors in office when the action is taken.

14.3.  <u>Authority</u>.  Unless limited by the Articles, each committee may exercise those aspects of the authority of the Board which the Board confers upon such committee in the resolution creating the committee; <u>provided</u>, a committee may not:

14.3.1. Authorize distributions;

14.3.2. Approve or propose to shareholders action that the OBCA requires be approved by shareholders;

14.3.3. Fill vacancies on the Board or on any of its committees;

14.3.4. Amend the Articles pursuant to the authority of directors to do so granted by the OBCA.

14.3.5. Adopt, amend, or repeal these Bylaws;

14.3.6. Approve a plan of merger not requiring shareholder approval;

14.3.7. Authorize or approve reacquisition of shares, except according to a formula or method prescribed by the Board; or

14.3.8. Authorize or approve the issuance or sale or contract for sale of shares or determine the designation and relative rights, preferences, and limitations of class or series of shares, except that the Board may authorize a committee (or a senior executive officer of the Corporation) to do so within limits specifically prescribed by the Board.

034518/00003/5173095v3

EXHIBIT 3
Page 16 of 16
EXHIBIT 1
Page 73 of 76

# EXHIBIT 4

## RIGHTS OFFERING SUBSCRIPTION FORM

EXHIBIT 1
Page 74 of 76

**RIGHTS OFFERING SUBSCRIPTION FORM**

**C & K MARKET, INC.**

**Rights Offering**
**Up to _____ Shares of Common Stock**

**Pursuant to the Plan of Reorganization dated January __, 2014**
(as it may be supplemented from time to time, the "Plan")

**THIS RIGHTS OFFERING WILL EXPIRE AT 9:00 A.M., PORTLAND, OREGON, TIME, ON _____, 2014 (THE "SUBSCRIPTION DEADLINE," UNLESS EARLIER TERMINATED BY C & K MARKET, INC.)**

**THIS FORM AND PAYMENT OF SUBSCRIPTION AMOUNT MUST BE DELIVERED TO:**
**[TO BE INSERTED BY DEBTOR]**

**DELIVERY OF THIS SUBSCRIPTION TO AN ADDRESS OTHER THAN AS SET FORTH ABOVE OR TRANSMISSION OF THIS SUBSCRIPTION FORM VIA A FACSIMILE NUMBER OR E-MAIL ADDRESS OTHER THAN THE ONE LISTED ABOVE WILL NOT CONSTITUTE A VALID DELIVERY. THIS SUBSCRIPTION MUST BE DELIVERED TO C & K MARKET, INC. (THE "COMPANY") AT OR BEFORE THE SUBSCRIPTION DEADLINE.**

**DELIVERY OF THIS SUBSCRIPTION WILL NOT CONSTITUTE A VALID EXERCISE OF SUBSCRIPTION RIGHTS UNLESS THE UNDERSIGNED ALSO DELIVERS PAYMENT OF THE SUBSCRIPTION PRICE TO THE COMPANY AS SET FORTH BELOW AT OR BEFORE THE SUBSCRIPTION DEADLINE, UNLESS OTHER ARRANGEMENTS HAVE BEEN MADE WITH THE COMPANY PRIOR TO THE SUBSCRIPTION DEADLINE.**

The undersigned acknowledges that it has received the Plan, the accompanying Disclosure Statement and this accompanying Rights Offering Subscription Form (this "Subscription") of the Company, relating to the Company's distribution of one right (each, a "Subscription Right") to purchase up to a pro rata share of _____ shares of the Company's Common Stock, at a price of [$___ per share]. The undersigned certifies that it is a holder of a Class 12 Claim under the Plan and that, as of [_____, 2014], the undersigned's Class 12 Claim had not been disallowed.

Capitalized terms used but not defined herein have the respective meanings ascribed to them in the Plan and Disclosure Statement.

**EXERCISE OF SUBSCRIPTION RIGHTS**

**Please read this entire Subscription and the information in the Plan and Disclosure Statement under "The Rights Offering" carefully before checking any box below.  Additional copies of the Plan and Disclosure Statement and this Subscription may be directed to the Company at the address and telephone numbers that appear at the end of this form.**

☐ CHECK HERE IF YOU WISH TO PURCHASE **ALL** OF YOUR PRO RATA SHARE OF THE RIGHTS OFFERING SHARES, ROUNDED TO THE NEAREST WHOLE SHARE.

☐ CHECK HERE IF YOU WISH TO PURCHASE **LESS THAN ALL** OF YOUR PRO RATA SHARE OF THE RIGHTS OFFERING SHARES (WHOLE SHARES ONLY).

_____ Indicate the number of shares of Common Stock you wish to purchase under the Rights Offering at the Subscription Price.

EXHIBIT 4
Page 1 of 2
EXHIBIT 1
Page 75 of 76

**The Subscription Price is [$___] per share of Common Stock. Full payment of the Subscription Amount for the Common Stock subscribed for pursuant to the Primary Rights Offering must be made in United States dollars and delivered by wire transfer of immediately available funds to the following account maintained by the Company by the Subscription Deadline:**

[To be inserted by Company]
**Wire** Routing #
**ACH** Routing # SWIFT Code:

for credit to:
C & K Market, Inc.
Acct. #

By signing this form, the undersigned irrevocably elects to purchase the Common Stock indicated above upon the terms and conditions specified in the Plan and Disclosure Statement and agrees that if it fails to pay for the Common Stock as set forth herein, this Subscription will be null and void.
PLEASE SIGN HERE

Authorized Signature of Eligible Holder
of Class 12 Claim

If signature is by attorney-in-fact, trustee, executor, administrator, guardian, officer of a corporation or other person acting in a fiduciary or representative capacity, please provide the following information:

Name:

Title:

Address:

Telephone
Number:

Date:

Taxpayer Identification or Social Security Number:

**Signatures on this Subscription; Guarantee of Signatures.** If this Subscription is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, those persons should so indicate when signing, and proper evidence satisfactory to the Company of that authority so to act must be submitted, unless waived by the Company.

034518/00017/5235361v2

EXHIBIT 4
Page 2 of 2
EXHIBIT 1
Page 76 of 76

# EXHIBIT 2

**Balance Sheet as of December 31, 2013**

```
1/22/2014              C & K MARKET, INC. (101)        Wednesday,  5:26 PM
                             BALANCE SHEET
                           DECEMBER 31, 2013
--------------------------------------------------------------------------------
```

### ASSETS

| | 12/31/2013 | 12/31/2012 |
|---|---|---|
| **CURRENT ASSETS** | | |
| CASH ON HAND | 1,092,040.00 | 1,518,635.00 |
| LOTTERY TICKETS ON HAND | 226,910.62 | 287,372.18 |
| NSF CHECKS ON HAND | 82,923.06 | 19,727.82 |
| CASH IN BANK - GENERAL | -116,446.79 | -6,148,125.81 |
| CASH IN BANK - SAVINGS | 2,522,661.52 | 3,570,928.22 |
| ACCOUNTS RECEIVABLE | 2,219,727.80 | 2,680,988.54 |
| INVENTORY | 25,096,289.27 | 36,059,360.84 |
| SECURITIES | 12,905.00 | 25,547.72 |
| DEPOSITS | 2,859,917.72 | 2,315,530.46 |
| PREPAID EXPENSES | 1,951,364.49 | 4,485,179.56 |
| | ---------------- | ---------------- |
| TOTAL CURRENT ASSETS | 35,948,292.69 | 44,815,144.53 |
| | | |
| **PROPERTY AND EQUIPMENT** | | |
| LAND | 9,605,909.64 | 10,063,925.67 |
| BUILDINGS | 34,049,038.76 | 34,061,997.57 |
| ACCUM DEPRECIATION - BLDGS | -7,396,455.50 | -6,565,009.46 |
| EQUIPMENT | 78,201,580.68 | 82,912,932.99 |
| ACCUM DEPRECIATION - EQUIP | -48,365,628.45 | -47,242,786.95 |
| | ---------------- | ---------------- |
| PROPERTY AND EQUIPMENT - NET | 66,094,445.13 | 73,231,059.82 |
| | | |
| **OTHER ASSETS** | | |
| GOODWILL | 25,302,063.09 | 33,405,608.54 |
| ACCUM AMORT - GOODWILL | -16,444,316.48 | -19,889,793.45 |
| NONCOMPETE AGREEMENTS | 3,916,603.08 | 4,886,369.08 |
| ACCUM AMORT - NONCOMPETE | -3,786,976.97 | -4,616,743.01 |
| LIQUOR LICENSE | 483,673.50 | 483,673.50 |
| TRADEMARK | 11,089.65 | 11,089.65 |
| PREPAID CONTRACT FEES | 634,497.24 | 818,622.17 |
| PREPAID RENT | 131,661.34 | 517,670.26 |
| PARTNERSHIP INTEREST - BSC | 383,211.36 | 381,063.36 |
| LLC INTEREST - C & K EXPRESS | -263,759.22 | 10,623,162.64 |
| PREPAID INTEREST | 762,351.77 | 1,219,936.87 |
| UNIFIED STOCK | 5,135,994.50 | 5,135,994.50 |
| UNIFIED STOCK APPRECIATION | 2,023,370.14 | 2,023,370.14 |
| REORG VALUE IN EXCESS | 7,252,561.53 | 7,252,561.53 |
| | ---------------- | ---------------- |
| TOTAL OTHER ASSETS | 25,542,024.53 | 42,252,585.78 |
| | ---------------- | ---------------- |
| | | |
| TOTAL ASSETS | 127,584,762.35 | 160,298,790.13 |
| | ================ | ================ |

EXHIBIT 2
Page 1 of 2

1/22/2014              C & K MARKET, INC. (101)        Wednesday,  5:26 PM
                            BALANCE SHEET
                         DECEMBER 31, 2013
--------------------------------------------------------------------------------

                          LIABILITIES AND EQUITY

                                  12/31/2013              12/31/2012
CURRENT LIABILITIES
   ACCOUNTS PAYABLE POST-PETITION     9,350,862.92                  .00
   ACCOUNTS PAYABLE PRE-PETITION     13,323,722.01           15,524,980.41
   BANK CREDIT LINE                   6,270,367.80           21,038,945.54
   INTEREST PAYABLE                   3,906,694.86              256,126.57
   HEALTH PLAN PAYABLE                1,800,000.00            1,575,000.00
   EMPLOYEE BENEFITS PAYABLE            145,267.21              537,281.37
   EMPLOYEE CERTS PAYABLE                     .00               85,513.71
   DEFERRED COMP PAYABLE                108,277.70               67,601.08
   PAYROLL PAYABLE                    1,826,951.44              172,200.54
   PAYROLL TAXES PAYABLE                829,723.55            1,126,007.91
   DEPOSITS PAYABLE                     327,989.20               29,512.60
   PROPERTY TAXES PAYABLE               117,018.54               24,777.80
   RENT PAYABLE                          77,651.91              197,865.62
   SALES TAX PAYABLE                    358,181.84              338,163.46
   DEFERRED REVENUE                    2,380,039.18            2,955,304.42
   VACATIONS PAYABLE - VESTED            993,833.25            1,153,695.45
   VACATIONS PAYABLE - NONVESTED       1,125,250.66            1,160,379.24
                                     ----------------        ----------------
      TOTAL CURRENT LIABILITIES       42,941,832.07           46,243,355.72

LONG-TERM LIABILITIES
   CLOSED FACILITY LEASE PAYABLE       9,918,624.87                  .00
   NOTES PAYABLE                      61,329,402.55           66,960,586.77
                                     ----------------        ----------------
      TOTAL LONG-TERM LIABILITIES     71,248,027.42           66,960,586.77

STOCKHOLDERS' EQUITY
   PREFERRED CLASS B                  19,000,000.00           19,000,000.00
   COMMON CLASS C                        195,554.40              195,554.40
   ADDITIONAL PAID-IN CAPITAL          4,207,869.79            4,207,869.79
   INVESTMENT VALUATION ALLOWANCE      2,023,370.14            2,023,370.14
   RETAINED EARNINGS                  19,128,158.89           17,717,094.15
   NET INCOME (LOSS)                 -31,160,050.36            3,950,959.16
                                     ----------------        ----------------
      TOTAL STOCKHOLDERS' EQUITY      13,394,902.86           47,094,847.64
                                     ----------------        ----------------
      TOTAL LIABILITIES AND EQUITY   127,584,762.35          160,298,790.13
                                     ================        ================

EXHIBIT 2
Page 2 of 2

# EXHIBIT 3

## Projected Effective Date Balance Sheet

# C&K Market, Inc.

## Estimated Balance Sheet

May 2014 at Plan Confirmation
1/25/14

| | Pre-confirmation Projected May-14 | Post-confirmation Projected May-14 |
|---|---|---|
| **Current Assets** | | |
| Cash at store and in-transit | 3,808,089 | 3,808,089 |
| Accounts & Notes Receivable | 2,219,728 | 2,219,728 |
| Inventories | 25,756,317 | 25,756,317 |
| Prepaid Expenses | 830,217 | 830,217 |
| Other Current Assets | 830,540 | 830,540 |
| **Total Current Assets** | 33,444,891 | 33,444,891 |
| **Investments** | 6,837,476 | 6,837,476 |
| **Property, Plant and Equipment** | 98,457,336 | 98,457,336 |
| Accumulated Depreciation | (45,607,329) | (45,607,329) |
| **Total Property, Plant and Equipment Net of Depreciation** | 52,850,007 | 52,850,007 |
| **Intangible Assets** | | |
| Goodwill | 44,861,256 | - |
| **Other Assets** | 1,834,426 | 1,834,426 |
| **Total Assets** | 139,828,055 | 94,966,799 |

1/25/2014

Estimated Balance Sheet
at Confirmation

EXHIBIT 3
Page 1 of 2

# C&K Market, Inc.
## Estimated Balance Sheet
May 2014 at Plan Confirmation
1/25/14

| | Pre-confirmation Projected May-14 | Post-confirmation Projected May-14 |
|---|---|---|
| **Current Liabilities:** | | |
| Accounts Payable - Pre (small claims) | 9,510,243 | 825,366 |
| Accounts Payable - Post | 13,735,000 | 13,735,000 |
| Lessor claims | 7,778,227 | - |
| Credit Line | 14,412,443 | 14,412,443 |
| Accrued liabilities | 7,606,928 | 7,606,928 |
| Deferred Income | 2,064,720 | 2,064,720 |
| **Total Current Liabilities** | 55,107,561 | 38,644,457 |
| | | |
| **Term Loan** | 9,083,000 | 9,083,000 |
| **Mezzanine Debt** | 28,142,077 | - |
| **Other Term Debt** | 3,358,542 | 3,358,542 |
| **Subordinated Debt - Blocked Notes** | 15,012,602 | - |
| **Deferred Income Taxes (noncurrent)** | 13,923,335 | - |
| | | |
| **Total Liabilities** | 124,627,116 | 51,085,998 |
| | | |
| **Stockholders' Equity:** | | |
| Pre-confirmation equity | 15,200,939 | - |
| Post-confirmation equity | - | 43,880,801 |
| **Total Stockholders' Equity** | 15,200,939 | 43,880,801 |
| | | |
| **Total Liabilities and Stockholders' Equity** | 139,828,055 | 94,966,799 |

Note> Numbers may not total due to rounding

1/25/2014

Estimated Balance Sheet
at Confirmation

EXHIBIT 3
Page 2 of 2

# EXHIBIT 4

## Projections for One-Year Period Following Effective Date

**C&K Market, Inc.**
**Estimated P&L**
**Post-confirmation**
**1/25/14**

*All monthly columns are "Projected."*

| | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Trailing 12 months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | 26,022,487 | 29,639,333 | 27,877,222 | 24,891,907 | 24,800,539 | 23,582,993 | 24,430,009 | 21,623,690 | 20,871,704 | 23,736,831 | 22,459,386 | 25,690,681 | 295,656,892 |
| Product Cost | 17,650,802 | 20,359,677 | 19,210,603 | 17,163,418 | 17,172,288 | 16,645,337 | 17,233,606 | 14,966,528 | 14,473,085 | 16,540,034 | 15,621,076 | 17,795,911 | 205,130,365 |
| Rebates | (62,945) | (67,215) | (67,315) | (60,189) | (59,915) | (57,123) | (59,309) | (52,531) | (50,738) | (57,737) | (54,476) | (62,203) | (716,694) |
| Disc Earned | (395,076) | (450,120) | (423,172) | (377,783) | (374,576) | (357,130) | (371,471) | (329,227) | (318,046) | (362,228) | (341,450) | (390,079) | (4,490,358) |
| Freight | 349,205 | 376,202 | 374,282 | 334,064 | 333,371 | 315,785 | 328,249 | 290,880 | 280,998 | 320,050 | 301,789 | 344,834 | 3,969,566 |
| Winners | (2,355) | (2,654) | (2,463) | (2,226) | (2,210) | (1,929) | (2,195) | (1,956) | (1,900) | (2,169) | (2,036) | (2,327) | (26,533) |
| Health | 508,331 | 554,491 | 513,733 | 514,648 | 500,424 | 497,074 | 498,947 | 508,592 | 459,910 | 496,525 | 484,267 | 534,233 | 6,071,177 |
| Salaries | 2,755,340 | 2,787,697 | 2,790,104 | 2,790,104 | 2,714,704 | 2,696,156 | 2,698,898 | 2,758,765 | 2,495,684 | 2,692,878 | 2,625,806 | 2,895,768 | 32,916,333 |
| PR Taxes | 268,605 | 291,027 | 268,549 | 265,220 | 251,688 | 242,001 | 280,441 | 313,917 | 272,021 | 280,302 | 260,426 | 281,214 | 3,275,410 |
| Supplies | 298,511 | 338,791 | 318,311 | 284,884 | 281,936 | 269,384 | 280,993 | 248,841 | 240,651 | 273,953 | 258,345 | 295,035 | 3,589,635 |
| **Gross Margin** | 4,351,965 | 5,217,001 | 4,897,117 | 3,979,767 | 3,984,830 | 3,333,522 | 3,541,851 | 2,920,082 | 3,020,039 | 3,585,224 | 3,305,639 | 4,000,295 | 46,137,331 |
| Advertising | 231,600 | 263,790 | 248,107 | 221,538 | 220,725 | 209,888 | 217,427 | 192,453 | 185,758 | 211,525 | 199,889 | 228,647 | 2,631,346 |
| Amortization | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 125,856 |
| Bad Debts | 3,569 | 4,075 | 3,832 | 3,456 | 3,891 | 3,264 | 3,393 | 3,020 | 2,923 | 3,222 | 3,130 | 3,548 | 40,923 |
| Bank Charges | 194,619 | 222,639 | 208,987 | 185,447 | 181,218 | 174,359 | 183,526 | 161,671 | 156,248 | 178,128 | 167,514 | 191,717 | 2,206,083 |
| Bottle Shell O/S | 505 | 537 | 461 | 461 | 493 | 431 | 440 | 420 | 445 | 445 | 458 | 458 | 5,599 |
| Cash O/S | 7,664 | 8,682 | 8,370 | 7,374 | 7,332 | 6,938 | 7,275 | 6,422 | 6,190 | 7,043 | 6,598 | 7,574 | 87,451 |
| Depreciation | 234,960 | 234,914 | 234,985 | 235,111 | 235,183 | 235,097 | 235,053 | 235,043 | 235,055 | 235,075 | 235,088 | 235,085 | 2,820,650 |
| Equipment Rent | 33,030 | 37,912 | 35,445 | 31,280 | 30,077 | 28,770 | 30,213 | 27,109 | 26,291 | 28,733 | 27,000 | 32,310 | 370,772 |
| General Insurance | 31,026 | 34,985 | 32,929 | 29,555 | 29,397 | 28,314 | 29,679 | 26,124 | 25,267 | 28,773 | 27,000 | 30,846 | 353,854 |
| General Operating | 101,954 | 116,122 | 109,202 | 96,867 | 95,021 | 90,883 | 95,547 | 84,450 | 81,837 | 93,370 | 87,842 | 100,641 | 1,153,815 |
| Item Place Pricing | 18,356 | 20,783 | 19,517 | 17,461 | 17,240 | 16,356 | 16,997 | 15,199 | 14,710 | 16,827 | 15,873 | 18,113 | 207,432 |
| Janitor | 17,873 | 19,988 | 18,888 | 17,163 | 17,297 | 16,416 | 16,955 | 15,113 | 14,615 | 16,619 | 16,159 | 16,862 | 204,439 |
| Laundry | 52,045 | 59,279 | 55,754 | 48,784 | 49,601 | 45,166 | 48,860 | 43,348 | 41,743 | 47,534 | 44,919 | 51,381 | 591,314 |
| Community Rel | 101,376 | 101,312 | 101,315 | 101,311 | 101,377 | 101,386 | 101,365 | 101,365 | 101,936 | 101,383 | 101,377 | 101,377 | 1,216,404 |
| Property Taxes | 626,633 | 626,659 | 626,617 | 626,560 | 626,495 | 626,549 | 626,570 | 626,584 | 626,577 | 626,566 | 626,559 | 626,558 | 7,518,936 |
| Rent | 145,439 | 155,247 | 155,039 | 138,702 | 137,620 | 130,705 | 137,508 | 121,913 | 117,936 | 134,518 | 126,559 | 145,960 | 1,653,750 |
| Repairs & Maint | 1,928 | 2,178 | 2,049 | 1,808 | 1,768 | 1,675 | 1,760 | 1,579 | 1,529 | 1,750 | 1,655 | 1,909 | 21,588 |
| Security Costs | 37,247 | 42,142 | 39,741 | 35,664 | 35,537 | 33,666 | 34,885 | 31,820 | 29,999 | 34,288 | 32,340 | 36,859 | 423,606 |
| Smallwares | 21,926 | 24,705 | 23,232 | 20,819 | 20,838 | 19,668 | 20,432 | 18,222 | 17,644 | 20,114 | 19,003 | 21,865 | 248,288 |
| Telephone | 481,773 | 540,526 | 509,014 | 459,796 | 459,369 | 439,965 | 457,991 | 406,692 | 393,996 | 447,416 | 421,565 | 483,576 | 5,495,678 |
| Utilities | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 19,950 | 239,400 |
| Inventory Service | 114,018 | 121,299 | 121,299 | 109,138 | 109,628 | 104,224 | 107,788 | 95,975 | 92,136 | 104,803 | 99,089 | 112,964 | 1,299,237 |
| Worker's Comp | 128,775 | 128,775 | 128,775 | 128,775 | 128,775 | 128,775 | 128,775 | 128,775 | 128,775 | 128,775 | 128,775 | 128,775 | 1,545,300 |
| Corp Expenses | 887,118 | 850,736 | 850,736 | 823,953 | 820,132 | 809,752 | 822,488 | 798,585 | 797,094 | 799,937 | 796,156 | 799,828 | 9,930,148 |
| **Total Operating Expenses** | 3,514,472 | 3,688,056 | 3,544,755 | 3,341,261 | 3,325,485 | 3,248,905 | 3,323,767 | 3,128,252 | 3,081,960 | 3,264,720 | 3,175,970 | 3,373,657 | 40,011,241 |
| Promotions | (7,260) | (8,269) | (7,775) | (6,856) | (6,697) | (6,486) | (6,668) | (6,008) | (5,807) | (6,550) | (6,187) | (7,100) | (81,874) |
| Baler Income | 6,983 | 7,926 | 7,459 | 6,677 | 6,642 | 6,327 | 6,539 | 5,807 | 5,656 | 6,446 | 6,065 | 6,915 | 79,492 |
| Misc Income | 3,858 | 4,201 | 3,936 | 3,641 | 3,661 | 3,387 | 3,678 | 3,276 | 3,167 | 3,605 | 3,438 | 3,873 | 43,841 |
| Corp Income | 257,927 | 274,120 | 272,389 | 176,040 | 175,409 | 169,572 | 172,508 | 160,266 | 312,977 | 169,307 | 163,717 | 177,770 | 2,482,072 |
| **Total Other Income** | 261,509 | 277,977 | 276,009 | 179,502 | 179,015 | 172,920 | 175,857 | 163,391 | 315,993 | 172,868 | 167,032 | 181,459 | 2,523,531 |
| **Net Income (Loss)** | 1,099,002 | 1,806,921 | 1,628,371 | 818,007 | 838,360 | 257,536 | 393,942 | (44,780) | 254,072 | 493,392 | 296,701 | 808,096 | 8,649,620 |
| EBITDA Add Backs | | | | | | | | | | | | | |
| Amortization | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 10,488 | 125,856 |
| Depreciation | 273,330 | 273,294 | 273,365 | 273,491 | 273,563 | 273,477 | 273,433 | 273,423 | 273,435 | 273,455 | 273,468 | 273,465 | 3,281,210 |
| Interest | 159,832 | 152,623 | 120,494 | 96,158 | 92,963 | 84,226 | 83,670 | 74,101 | 73,931 | 71,137 | 70,965 | 70,792 | 1,150,871 |
| **EBITDA** | 1,542,643 | 2,243,326 | 2,032,718 | 1,198,145 | 1,215,373 | 625,727 | 761,533 | 313,233 | 611,926 | 848,472 | 651,622 | 1,162,841 | 13,207,558 |

**Notes**
i) Numbers may not total due to rounding
ii) Excludes potential impact from real-estate sales
iii) Depreciation add-back for EBITDA includes depreciation included in Corporate Expenses
iv) Interest expense is included within Corporate Expenses

Post-confirmation income statement

1/25/2014

EXHIBIT 4
Page 1 of 1

# EXHIBIT 5

## Liquidation Analysis

# C&K MARKET, INC.

ESTIMATED LIQUIDATION ANALYSIS - Chapter 7 Conversion 1/31/2014
Projected as of 1/31/2014

**ASSUMPTIONS/NOTES**

1) Assumes C&K converts to chapter 7 on 1/31/2014.
   Assumes all employees and operations cease on conversion date.
   This analysis is based upon financial projections dated 11/20/2013 version Dip loan V14 and updated as appropriate.

2) Assumes US Bank has a senior security interest in all assets
   Assumes non accrual of interest on all loans.
   Analysis does not include accounting fees, legal, professional and audit fees for US Bank.

3) Assumes Net Accounts Receivable Recovery Rate of 50% and collected by an outside collection agency.

4) Assumes Inventory and Equipment at stores is sold by a liquidator hired by the trustee.
   Net estimated recoveries for Inventory after expense = 35% of cost.
   Net estimated recoveries for equipment after expenses = 42 stores x $30,000 = $1,260,000.

5) Assumes Real Estate is liquidated in 9 months.
   Assumes property values are based on 2012 appraisal discounted for quick sale.
   Assumes broker(s) are hired.
   Assumes there are no environmental issues which would impact the sales process.
   Assumes 7.5% closing costs.
   Assumes unpaid property taxes are paid at closing and are not included in analysis.

6) Assumes security interest of $3,700,000 on real properties by 1st secured creditors other than US Bank on stores #36, #29, #50, #61, and #71.

7) Assumes lessor rejection claims of the following:
   1) Chapter 11 rejection lessor claims estimated at 7.8 million
   2) Chapter 7 rejection lessor claims for remaining stores estimated to be 24 million.

EXHIBIT 5
Page 1 of 3

# C&K MARKET, INC.
## ESTIMATED LIQUIDATION ANALYSIS - Chapter 7 Conversion 1/31/2014
### Projected as of 1/31/2014

| ASSETS | BALANCE SHEET As of 1/31/14 (See Note #1) | PERCENT REALIZED | VALUE REALIZED | US BANK | OTHER REAL PROPERTY MORTAGES | UNSECURED CREDITORS | TOTAL |
|---|---|---|---|---|---|---|---|
| **CASH - Balance as of 1/31/14** | | | | | | | |
| Cash at store and in-transit | 7,260,811 | 100.0% | 7,260,811 | 7,260,811 | - | - | 7,260,811 |
| Cash - corporate | - | 100.0% | - | - | - | - | - |
| Marketable securities | 24,750 | 100.0% | 24,750 | 24,750 | - | - | 24,750 |
| Accounts receivable & notes receivable | 1,183,483 | 50.0% | 591,742 | 591,742 | - | - | 591,742 |
| Inventories | 28,203,363 | 35.0% | 9,871,177 | 9,871,177 | - | - | 9,871,177 |
| Prepaid Expenses | 864,428 | 0.0% | undetermined | - | - | - | - |
| Prepaid Income Taxes | - | | | - | - | - | - |
| Deferred Income Tax | 941,010 | | undetermined | - | - | - | - |
| Other Current Assets | 728,040 | | undetermined | - | - | - | - |
| **TOTAL** | 39,225,885 | | 17,748,480 | 17,748,480 | - | - | 17,748,480 |
| **INVESTMENTS** | 7,555,476 | 50.0% | 3,777,738 | 3,777,738 | - | - | 3,777,738 |
| **PROPERTY, PLANT & EQUIPMENT** | | | | | | | |
| Real Estate Property (Gross) | 41,190,000 | 64.7% | 26,670,000 | 22,970,000 | 3,700,000 | - | 26,670,000 |
| Other PP&E (Gross) | 68,184,316 | 2.0% | 1,363,686 | - | - | - | - |
| **TOTAL PROPERTY, PLANT AND EQUIPMENT NET OF DEPRECIATION (Gross)** | 109,374,316 | | 28,033,686 | 22,970,000 | 3,700,000 | - | 26,670,000 |
| **OTHER ASSETS** | 2,008,259 | 100.0% | 2,008,259 | 2,008,259 | - | - | 2,008,259 |
| **RECOVERY ACTIONS** | - | undetermined | 0.0% | | | | |
| **TOTAL OF ASSETS PER ABOVE** | 158,163,936 | | 51,568,163 | 46,504,477 | 3,700,000 | - | 50,204,477 |

CREDITORS POSITION IN LIQUIDATION

Note: (1) Balance Sheet information per 1/31/14 Balance Sheet unless specifically noted.

EXHIBIT 5
Page 2 of 3
page 2

C&K Market - Liquidation Analysis 1.31.14 v9 final

# C&K MARKET, INC.
ESTIMATED LIQUIDATION ANALYSIS - Chapter 7 Conversion 1/31/2014
Projected as of 1/31/2014

**CREDITORS POSITION IN LIQUIDATION**

| | | US BANK | OTHER REAL PROPERTY MORTGAGES | UNSECURED CREDITORS | TOTAL |
|---|---|---|---|---|---|
| **VALUE REALIZED FROM ASSETS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | 46,504,477 | 3,700,000 | - | 50,204,477 |
| **SENIOR SECURED CREDITOR LOAN BALANCES:** | | | | | |
| US Bank Revolver | 6,403,508 | 6,403,508 | | | 6,403,508 |
| US Bank Term A | 10,900,000 | 10,900,000 | | | 10,900,000 |
| US Bank Term C | 200,000 | 200,000 | | | 200,000 |
| Other Term Debt Secured | 3,700,000 | | 3,700,000 | | 3,700,000 |
| **TOTAL SECURED LOAN BALANCES** | 21,203,508 | 17,503,508 | 3,700,000 | - | 21,203,508 |
| **NET SECURED CREDITOR SURPLUS/(DEFICIENCY) BEFORE ADMINISTRATIVE & PRIORITY CLAIMS** | 29,000,969 | 29,000,969 | - | - | 29,000,969 |
| **Less: ADMINISTRATIVE CLAIMS** | | | | | |
| Chapter 7 Trustee's Fee | 1,506,134 | 1,506,134 | | | 1,506,134 |
| Chapter 7 Trustee's Legal Fee | 250,000 | 250,000 | | | 250,000 |
| **TOTAL ADMINISTRATIVE CLAIMS** | 1,756,134 | 1,756,134 | | | 1,756,134 |
| **NET SURPLUS/(DEFICIENCY) AVAILABLE TO CHAPTER 11 ADMINISTRATIVE CLAIMS** | 27,244,834 | 27,244,834 | - | - | 27,244,834 |
| **CHAPTER 11 ADMINISTRATIVE CLAIMS** | | | | | |
| Accounts Payable - Post | | | | | 12,000,000 |
| Estimated Super Valu Contract Claim | | | | | 45,000,000 |
| Professional Fee | | | | | undetermined |
| **TOTAL CHAPTER 11 ADMINISTRATIVE CLAIMS** | | | | | 57,000,000 |
| **RECOVERY % FOR CHAPTER 11 CREDITORS** | | | | | 47.80% |
| **UNSECURED CREDITOR CLAIMS** | | | | | |
| Accounts Payable - Pre | | | | | 5,854,668 |
| Lessor Claims | | | | | 31,800,000 |
| 503(b)9 Claims | | | | | 382,495 |
| Accrued Liabilities | | | | | 7,725,849 |
| Mezzanine Debt | | | | | 29,665,635 |
| Other Term Debt - Unsecured | | | | | 613,266 |
| Subordinated Debt - Blocked Notes | | | | | 16,698,741 |
| DOL Claim | | | | | 2,000,000 |
| **TOTAL UNSECURED CREDITOR CLAIMS** | | | | | 94,740,654 |
| **RECOVERY % UNSECURED CREDITORS** | | | | | 0% |

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing **DEBTOR'S DISCLOSURE STATEMENT (JANUARY 31, 2014)** was served on the parties indicated as "ECF" on the attached List of Interested Parties by electronic means through the Court's Case Management/Electronic Case File system on the date set forth below.

In addition, the parties indicated as "Non-ECF" on the attached List of Interested Parties were served by mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to each party's last-known address and depositing in the U.S. mail at Portland, Oregon on the date set forth below.

DATED this 31st day of January, 2014.

TONKON TORP LLP


By /s/ Albert N. Kennedy
    Albert N. Kennedy, OSB No. 821429
    Timothy J. Conway, OSB No. 851752
    Michael W. Fletcher, OSB No. 010448
    Ava L. Schoen, OSB No. 044072
    Attorneys for Debtor

**Page 1 of 1** -   CERTIFICATE OF SERVICE

# LIST OF INTERESTED PARTIES

### *In re C & K Market, Inc.*
### U.S. Bankruptcy Court Case No. 13-64561-fra11

## ECF PARTICIPANTS

- RICHARD T ANDERSON rick@andersonmonson.com, lisa@andersonmonson.com
- MATTHEW A ARBAUGH matt@fieldjerger.com, koren@fieldjerger.com
- CASEY B BOYLE KDWBankruptcyDepartment@kelleydrye.com
- G JEFFERSON CAMPBELL mariahd@qwestoffice.net, gjcpc@qwestoffice.net
- DONALD J CHURNSIDE don@oregonlegalteam.com, melanie@oregonlegalteam.com
- TIMOTHY J CONWAY tim.conway@tonkon.com, nancy.kennedy@tonkon.com
- BRADLEY S COPELAND bcopeland@agsprp.com, bdavis@agsprp.com
- JOHN E DAVIS JackD@roguefirm.com
- MELINDA DAVISON tcp@dvclaw.com
- COLIN F. DOUGHERTY colin.dougherty@faegrebd.com
- MICHAEL W FLETCHER michael.fletcher@tonkon.com, leslie.hurd@tonkon.com;andy.haro@tonkon.com
- DAVID A FORAKER david.foraker@greenemarkley.com, joyce.chartrand@greenemarkley.com
- BENJAMIN FREUDENBERG benf@roguefirm.com
- DOUGLAS L GALLAGHER doug@dglawoffice.com, douglasgallagherlawoffice@gmail.com
- RUSSELL D GARRETT russ.garrett@jordanramis.com, mike.scott@jordanramis.com;priscilla.gray@jordanramis.com;litparalegal@jordanramis.com
- OREN B HAKER obhaker@stoel.com
- BRIAN T HEMPHILL brian@hemphill-attorney.com
- THOMAS A HUNTSBERGER tom@tahpc.com
- SCOTT L JENSEN slj@brownrask.com, lac@brownrask.com
- GREGG D JOHNSON gdj@aterwynne.com, jmh@aterwynne.com
- ALBERT N KENNEDY al.kennedy@tonkon.com, leslie.hurd@tonkon.com;andy.haro@tonkon.com
- CHRISTINE A KOSYDAR cakosydar@stoel.com, cmwallentine@stoel.com;docketclerk@stoel.com;lchopkins@stoel.com
- JUSTIN D LEONARD jleonard@ml-llp.com, ecf@ml-llp.com
- JULIA I MANELA ecf@scott-law-group.com
- DAVID B MILLS davidbmills@comcast.net, davidbmills@cs.com
- JEFFREY C MISLEY jeffm@sussmanshank.com, ecf.jeffrey.misley@sussmanshank.com
- JOHNSTON A MITCHELL johnstonlaw@comcast.net, coers@comcast.net;emenze@comcast.net
- WILSON C MUHLHEIM mkindred@luvaascobb.com;scooke@luvaascobb.com
- PETER C McKITTRICK pmckittrick@ml-llp.com, ecf@ml-llp.com
- EVAN H. NORDBY nordby.evan@dol.gov
- JOSHUA BYRON NORTON joshua.norton@kyl.com
- THOMAS M ORR torr@eugene-law.com, elynch@eugene-law.com,lmiller@eugene-law.com
- R SCOTT PALMER rspalmer@wlrlaw.com, lolson@wlrlaw.com
- CHRISTOPHER L PARNELL cparnell@dunncarney.com, taichele@dunncarney.com;sripley@dunncarney.com
- TERESA H PEARSON teresa.pearson@millernash.com, lisa.conrad@millernash.com;brenda.hale@millernash.com
- DAVID L POLLACK pollack@ballardspahr.com
- WILLARD L RANSOM wransom@roguevalleylaw.com, ddaw@roguevalleylaw.com
- FRANK C ROTE frank.rote@southernoregonlawyer.com
- Recovery Management Systems Corporation claims@recoverycorp.com
- TARA J SCHLEICHER tschleicher@fwwlaw.com, dfallon@fwwlaw.com;nlyman@fwwlaw.com
- AVA L SCHOEN ava.schoen@tonkon.com, larissa.stec@tonkon.com
- LOREN S SCOTT ecf@scott-law-group.com
- ALAN G SELIGSON aseligson@scslaw.org, assistant@scslaw.org
- TROY SEXTON tsexton@portlaw.com, nhenderson@portlaw.com,csturgeon@portlaw.com,mmyers@portlaw.com
- DALE L SMITH ofscourt@gmail.com
- RENEE STARR renee@rstarrlaw.com
- JERRY N STEHLIK jstehlik@bsss-law.com
- PATRICK L STEVENS pstevens@eugene-law.com, lmiller@eugene-law.com,ahorrigan@eugenelaw.com
- MICHAEL R. STEWART michael.stewart@faegrebd.com
- ANDREW MICHAEL THAU at@southpawasset.com
- STEPHEN T TWEET beth@albertandtweet.com, darlene@albertandtweet.com
- US Trustee, Eugene USTPRegion18.EG.ECF@usdoj.gov
- JOSEPH M VANLEUVEN joevanleuven@dwt.com, lizcarter@dwt.com;pdxdocket@dwt.com
- LAURA J WALKER lwalker@cablehuston.com, mingram@cablehuston.com
- PAMELA K. WEBSTER pwebster@buchalter.com, smartin@buchalter.com

## NON-ECF PARTICIPANTS

**SECURED CREDITORS**

Banc of America
  Leasing & Capital LLC
2059 Northlake Parkway 4 South
Tucker, GA 30084

Dell Financial Services LLC
Mail Stop-PS2DF-23
One Dell Way
Round Rock, TX 78682

James D. Gillespie
28274 S. Fork Rd.
Dayville, OR 97825

Greatway Center Property LLC
8816 E. Evans Creeks
Rogue River, OR 97537

Green & Frahm
941 Delsie Dr.
Grants Pass, OR 97527

Komlofske Corp.
1535 E. 3rd St.
Prineville, OR 97754

Protective Life
2801 Highway 280 South
Birmingham, AL 35202

**OTHER**

Jenette A. Barrow-Bosshart
Otterbourg P.C.
230 Park Avenue
New York, NY 10169-0075