UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

In Re: ) Bankruptcy Case
) No. 13-64561-fra11
C & K Market, Inc., )
) MEMORANDUM OPINION
                   Debtor. )

## FACTS

Prior to its petition for relief, the Debtor in Possession (DIP) owned and operated approximately sixty grocery stores and pharmacies in Southern Oregon and Northern California. It has an operating line of credit with US Bank ("Bank") and, at the time of the petition, was indebted to the Bank for $33,809,109. In addition, the DIP was indebted to mezzanine lenders[1] Endeavour Structured Equity and THL Credit, for a combined total of $30,600,798.

Anticipating the need for reorganization, the Debtor began in the summer of 2013 what became "arduous" negotiations with the Bank for a financing package ("DIP facility") to be put in place when the

---

[1] Generally, a mezzanine lender holds a note convertible to shares or other form of equity in the maker. In this case, the mezzanine lenders were entitled to redeem the notes for Class B Common Stock of the Debtor.

Page 1 - MEMORANDUM OPINION

Debtor filed for reorganization under Chapter 11. By autumn, the Debtor determined that it needed to develop an alternative source of post-petition financing, and approached several other lenders. The only lender which appeared willing to respond quickly enough to be of use was Sunstone Business Finance, LLC. The DIP's chief restructuring officer (CRO), Edward Hostmann, asserted that development of an additional source for DIP financing was necessary for two reasons: (1) the DIP wanted an alternative lender in order to gain leverage in its negotiations with the Bank, and (2) prudence dictated that the Debtor have a source of funds to operate post-petition in the event it was forced to file for relief without an agreement with the Bank in place.

A proposed lending facility was quickly agreed to, and the Debtor and Sunstone signed a Term Sheet on October 25, 2013. Agreed terms included:

1. A DIP facility of $5 to 7.5 million, subject to bankruptcy court authorization, for use by the Debtor post-petition for "working capital, and general corporate purposes, administrative expenses, U.S. Trustee fees, as well as any expenses approved by the Bankruptcy Court";

2. Interest on borrowed funds at Prime[2] plus 10% on "all outstanding obligations," payable monthly;

3. Administrative priority treatment on unpaid balances;

4. A security interest in all of the Debtor's assets, superior in priority to any prior lender's (a "priming first lien");

5. Payment of $5,000 to cover Sunstone's out-of-pocket expenses;

6. Payment of a "$50,000 fully earned, non-refundable Work Fee upon full execution of this Term Sheet."

7. A "facility fee" equal to 5% of the amount of the DIP facility payable upon final approval of the facility by the court.

8. A "Breakup Fee" of $250,000, payable in the event the loan facility was not closed due to the Debtor's election to seek other financing.

---

[2]The Prime rate on October 25, 2013 was 3.25%. See: http://online.wsj.com/mdc/public/page/2_3020-moneyrate-20131025.html?mod=mdc_pastcalendar

According to the Term Sheet, the purpose of the Breakup Fee was "to induce Lender to enter into this Term Sheet, to incur time and expense in participating in the negotiations contemplated herein, and to set aside the funds necessary to fund the DIP loan while foregoing pursuit of other lender opportunities…." The Term Sheet provided that the Lender's commitment would remain enforceable until a final order approving (other) financing was approved by the Bankruptcy Court. At that point the Breakup Fee would become due. The Term Sheet acknowledges that payment "must be approved" by the Court. The Debtor undertook to support Sunstone's motion for treatment of the Breakup Fee as an administrative expense.

By the time the Term Sheet was signed, Debtor and Bank had in fact made substantial progress in their negotiations, including establishing an interest rate at LIBOR[3] + 4.5% to 5%, well below the interest rate provided for in the Sunstone Term Sheet. Debtor's management revealed to the Bank that it had signed a term sheet with an alternative lender, but did not reveal the terms of the competing loan.

The Bank's representatives were unimpressed. Given the progress made in their discussions with the Debtor, they did not believe the Debtor had obtained better terms. Nevertheless, their response to the suggestion that Debtor might go elsewhere was emphatic: unless the DIP facility was with the Bank, the DIP would be required to obtain a court order subordinating the Bank's lien to that of the new lender ("Priming"), and an order allowing the DIP to use the Bank's cash collateral, or both. The Bank made it clear that the attempt would be hotly contested, at great expense to all concerned.

Debtor filed its Chapter 11 petition on November 19, 2013, having arrived at an agreement with the Bank the day before. First day motions included a motion for approval of an order allowing financing on considerably better terms than offered by Sunstone:

1. DIP facility: A secured revolving line of credit in an aggregate principal amount as of any day equal to the lesser of (1) $23 million; (2) the Borrowing Base plus $12 million; or (3) certain defined balances plus $4 million.

2. Interest at LIBOR plus 4.5% to 5%.

---

[3] The LIBOR 12-month rate as of November 2013 was .5867%. See http://www.fedprimerate.com/libor/libor_rates_history.htm.

Page 3 - MEMORANDUM OPINION

3. Superpriority administrative expense treatment on all unpaid post-petition advances.

4. Collateral: A first-priority perfected security interest and lien in all assets of the Debtor, subject to valid, perfected, prior pre-petition liens, Priming Interests and Permitted Liens as described in the Bank's Financing Agreement, and a carveout of $100,000 for US Trustee fees and professional fees.

5. A non-refundable "Facility Fee" of $350,000, to be reduced by 50% if a Plan of Reorganization providing for payment in full of U.S. Bank's claim on the effective date of the Plan is confirmed within 9 months of the bankruptcy petition date, or reduced by $100,000 if such a Plan is confirmed within one year.

6. Maturity Date: The date that is the earliest of: (1) one year after the bankruptcy petition date, (2) upon the closing of any sale under 11 U.S.C. § 363 that is of substantially all of Debtor's assets, or (3) upon the effective date of a confirmed Plan of Reorganization.

A final order approving the DIP facility was entered on December 27, 2013 [see docket #234]. The terms varied from the interim order in many respects, the result of negotiations between the Unsecured Creditors' Committee and the Bank. Sunstone does not appear to have been a factor in these discussions.

According to the Term Sheet, the Breakup Fee came due when the final order was entered. Sunstone filed a proof of claim (claim #72)[4], and a motion for an order allowing the $250,000 claim as an administrative expense under Code §503(b). The Committee, mezzanine lenders and the Bank object, both to the administrative treatment and the claim itself. True to its commitment, the DIP supports Sunstone's motion.

ISSUES

1. Does Sunstone have an allowable claim for the Breakup Fee?

2. If the Breakup Fee is allowable, is it entitled to administrative priority under 11 U.S.C. § 503(b)[5]?

// // //

// // //

---

[4] The $50,000 Work Fee and $5,000 in expense reimbursements were paid to Sunstone prior to the petition date and are not included in Sunstone's proof of claim.

[5] Any statutory reference herein, unless specified otherwise, is in reference to the U.S. Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

Page 4 - MEMORANDUM OPINION

DISCUSSION

A. Sunstone's Claim:

A proof of claim filed in accordance with the Federal Rules of Bankruptcy Procedure constitutes prima facie evidence of the validity and amount of the claim. Fed.R.Bankr.P. 3001(f). Should an objection be taken, the objector must produce evidence and show facts tending to defeat the claim by probitive force equal to that of the allegations of the proof of claim itself. *In re King St. Investments, Inc.*, 219 B.R. 848, 858 (9th Cir. BAP 1998).

To Sunstone's proof of claim is attached an explanation as to the nature of the claim and a copy of the executed agreement entitled "Term Sheet for Debtor-In-Possession Loan," dated October 25, 2013. The Term Sheet sets out an executed contract: Sunstone agreed to commit to advance funds throughout the process of arranging the DIP facility, and performed various tasks in furtherance of that commitment. Debtor promised to pay for that service, including the Breakup Fee, should the Debtor choose an alternate post-petition financing arrangement with another lender. Sunstone and the Debtor thereafter executed a "Superpriority DIP Credit Agreement" dated November 14, 2013, which incorporates the terms of the Term Sheet and contains an affirmative covenant regarding the Breakup Fee (see ¶ 4.4 of the Agreement).

The objecting parties argue that Sunstone's claim should be denied in its entirety for a number of reasons, including: (1) the Breakup Fee constitutes an avoidable fraudulent transfer under § 548(a)(1)(B)[6], (2) a significant material term, the amount of the credit facility, is missing, (3) the Term Sheet is "vague and illusory," (4) the Breakup Fee is not in the best interest of the estate and greatly exceeds the amounts allowed in asset sale cases, as a percentage of the sale price.

The Breakup Fee, while appearing to be on the high side, was negotiated by the Debtor and Sunstone. There was unrebutted testimony that Sunstone would not have agreed to provide post-petition financing without the Breakup Fee. Consideration was given for the Debtor's agreement to pay the contingent fee in

---

[6] Transfer may be avoided if the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation.

Page 5 - MEMORANDUM OPINION

Sunstone's willingness to become an alternate lender on short notice and to move the Debtor to the top of its client list. Without evidence, the Court cannot determine whether the $250,000 fee constituted "reasonably equivalent value" for the services provided, and will not disallow the claim on that basis.[7] No evidence was presented as to what a reasonable breakup fee should be in the circumstances of this case, other than to claim that it should be zero.

Objection is also made to the fact that the amount of the DIP facility (a material term) is provided in the Term Sheet as $5 million to $7.5 million and that the agreement as a whole is "vague and illusory," so as to render the agreement unenforceable.

Generally, where contracting parties have concluded a transaction in which it appears that they intend to make a contract, "the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left." *Corbin on Contracts* § 4.1 (1993, Supp 2013). Where a monetary amount is left vague or indefinite, the agreement will be enforceable if the parties provide a practicable method for determining the price or amount. *Id.* The amount of the DIP facility was described as a range. However, because the agreement was denominated a "Term Sheet," it is clear that a more formal agreement to fill in gaps will follow. In fact, the Debtor and Sunstone thereafter executed their "Superpriority DIP Credit Agreement," which filled in gaps left by the Term Sheet and clarified a DIP facility of "up to $7,000,000." The Term Sheet evidenced an intent by the parties to enter into a contract, provided the basic terms of the agreement, elements of default, and remedies after default.

The Term Sheet represents an enforceable contract subject to a condition subsequent that the bankruptcy court either approve the Sunstone DIP facility (in which case Sunstone would lend Debtor up to $7 million on the terms approved by the court) or enter an order approving a DIP facility from another lender (in which case the Breakup Fee would be due). The Breakup Fee is a prepetition claim against the estate. *In*

---

[7] Strictly speaking, there was no "transfer" made in this transaction as that term is defined at § 101(54), and thus no fraudulent transfer. What the objectors are actually alleging is that either no or inadequate consideration was given by Sunstone for the Debtor's promise to pay the Breakup Fee.

Page 6 - MEMORANDUM OPINION

*re Wade Cook Fin. Corp.*, 375 B.R. 580, 595 (9th Cir. BAP 2007)(The character of a claim does not transform from prepetition to postpetition because the claim is contingent).

B.  Administrative Expense Treatment

Sunstone seeks administrative expense priority under §§ 503(b)(1)(A) and (b)(3):

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –
> (1)(A) the actual, necessary costs and expenses of preserving the estate including –
> (i) wages, salaries, and commissions for services rendered after the commencement of the case; and
> (ii) wages and benefits awarded pursuant to a judicial proceeding or a proceeding of the National Labor Relations Board . . .
>
> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph 4 of this subsection, incurred by –
> . . .
> (D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title; . . . .

The burden of proving an administrative expense claim is on the claimant. *Microsoft Corp. v. DAK Industries, Inc. (In re DAK Industries, Inc.)*, 66 F.3d 1091, 1094 (9th Cir. 1995). An administrative claimant is entitled to be paid in full in cash on the effective date of the plan of reorganization. § 1129(a)(9)(A). Sunstone would benefit should administrative expense treatment be allowed, as its claim would otherwise be paid as a general unsecured claim pursuant to the terms of the Debtor's plan.

Section 503(b)(1)(A)

Under this provision, the claimant must show that the debt asserted to be an administrative expense "(1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate." *Id.* (citing *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir. 1987)). "In order to keep administrative costs to the estate at a minimum, 'the actual, necessary costs and expenses of preserving the estate,' [§ 503(b)(1)(A)], are construed narrowly." *Id.* (internal citation omitted).

Sunstone argues that its pre-petition actions provided a substantial benefit to the estate, including the "smooth and successful launching of the bankruptcy case," and the benefit derived from "softened" lending

Page 7 -   MEMORANDUM OPINION

terms eventually provided by US Bank. Sunstone provided the Debtor with the assurances it needed to prepare for and file for bankruptcy, and the confidence to communicate with vendors, knowing it had alternate financing should Debtor not be successful in reaching an agreement with US Bank. Moreover, Sunstone provided the Debtor with leverage in its negotiations with US Bank which resulted in the Bank making concessions.

These alleged beneficial effects of the Debtor and Sunstone entering into the Term Sheet, however, occurred pre-petition, as did the execution of the Term Sheet itself. The Term Sheet was an agreement between Sunstone and the prepetition non-debtor entity C & K Market, Inc. Under the test provided by the Ninth Circuit above, the claim arising from the pre-petition Term Sheet does not qualify for administrative expense treatment under § 503(b)(1). Even disregarding the requirements of the *DAK* opinion, the evidence presented to the Court showed that, while US Bank knew generally that the Debtor had an agreement with another lender, it did not know any of the details of the Term Sheet, and that the Bank was not influenced by Sunstone in its negotiations with the Debtor. In fact, by the time the Term Sheet was entered into, the Debtor and the Bank had made substantial progress in their negotiations.

It could be argued that by holding its offer to provide post-petition lending open until the Court entered a final order approving the post-petition loan facility with US Bank, Sunstone provided consideration to the DIP. That may be so, but that in itself is not the "direct and substantial" benefit to the estate that would transform a pre-petition contingent claim to an administrative expense claim. There is no evidence that providing an alternate, if costly, loan facility should the Court not enter a final order approving the Bank financing provided more than an incidental benefit to the estate. The Bank indicated a willingness to make changes post-petition in order to allow entry of a final order, as evidenced by the changes it made in negotiations with the Unsecured Creditors' Committee. Any benefit provided by Sunstone, if any, was too indirect and intangible to qualify for priority treatment.

Section 503(b)(3)

Sunstone argues that its actions in providing alternate post-petition financing made a "substantial contribution" in the case, such that its Breakup Fee should be accorded administrative expense priority. The

Page 8 - MEMORANDUM OPINION

opposition cites to *Christian Life Center Litigation Defense Comm. v. Silva (In re Christian Life Center)*, 821 F.2d 1370, 1373-74 (9th Cir. 1987), that "[c]laims that arise from a creditor's pre-petition services to the debtor are not entitled to administrative expense priority." Sunstone counters that *Christian Life* is distinguishable from the facts in this case.

Section 503(b)(3)(D) allows as an administrative expense to a creditor "the actual, necessary expenses" incurred by the creditor in making a substantial contribution in a bankruptcy case. The Breakup Fee is not, however, an actual expense of Sunstone – it's not an expense at all. Sunstone's actual expenditures were repaid pre-petition. Even if the Court could find that costs associated with pre-petition services by a creditor which make a substantial contribution in a later-filed bankruptcy could be accorded administrative expense priority under § 503(b)(3)[8], it would not help Sunstone in this instance.

## CONCLUSION

Sunstone makes a policy argument that breakup fees should be allowed so as to encourage competing bids by lenders. However, restrictive language of the Bankruptcy Code respecting administrative priority, and priorities in general, reflects a Congressional policy of promoting equal distribution among creditors. Moreover, restrictions on breakup fees are just as likely to promote competition and broader negotiations, and less expensive credit for debtors, by encouraging lenders to submit proposals more likely to be accepted by debtors, other creditors, and ultimately, bankruptcy courts.

Objections to Sunstone's unsecured claim in the amount of $250,000 will be denied as will Sunstone's motion for an administrative expense under § 503(b). The Court will enter an order to that effect.

FRANK R. ALLEY, III
Chief Bankruptcy Judge

---

[8] Because Sunstone is not seeking reimbursement of expenses and does not qualify for administrative expense treatment under § 503(b)(3) on that basis, the Court does not reach the question posed by the opposition in its citation to *Christian Life Center*.

Page 9 - MEMORANDUM OPINION