**Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
 Direct Dial:  (503) 802-2013
 Facsimile:    (503) 972-3713
 E-Mail:       al.kennedy@tonkon.com
**Timothy J. Conway**, OSB No. 851752
 Direct Dial:  (503) 802-2207
 Facsimile:    (503) 972-3727
 E-Mail:       tim.conway@tonkon.com
**Michael W. Fletcher**, OSB No. 010448
 Direct Dial:  (503) 802-2169
 Facsimile:    (503) 972-3869
 E-Mail:       michael.fletcher@tonkon.com
**Ava L. Schoen**, OSB No. 044072
 Direct Dial:  (503) 802-2143
 Facsimile:    (503) 972-3843
 E-Mail:       ava.schoen@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR  97204

  Attorneys for Debtor

<br>

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| In re | Case No. 13-64561-fra11 |
|---|---|
| C & K Market, Inc., | **DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT (~~APRIL 21,~~MAY 9, 2014)** |
| Debtor. | |

## 1. INTRODUCTION

On November 19, 2013 (the "Petition Date"), C & K Market, Inc. ("C & K" or "Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

On ~~April 21,~~May 9, 2014 Debtor filed its ~~First~~Second Amended Plan of Reorganization (the "Plan") with the Bankruptcy Court.  A copy of the Plan is attached hereto as **Exhibit 1**.  Debtor is seeking acceptance of the Plan by its creditors.  A ballot has been enclosed with this Disclosure Statement for use in voting on the Plan.  Debtor believes

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  confirmation of the Plan is in the best interest of Debtor's creditors and urges those parties

2  entitled to vote to vote to accept the Plan.  The Official Committee of Unsecured Creditors

3  ("Committee") supports the Plan and has recommended that General Unsecured Creditors vote

4  to accept the Plan.  The Committee's letter supporting the Plan is enclosed with this Disclosure

5  Statement.

6  **2.    PURPOSE OF THE DISCLOSURE STATEMENT**

7           The purpose of this Disclosure Statement is to provide you with adequate information

8  to enable you to make an informed judgment concerning whether to vote for or against the

9  Plan.  You are urged to review the Plan and, if appropriate, consult with counsel about the Plan

10  and its impact on your legal rights before voting on the Plan.  Capitalized terms used but not

11  defined in this Disclosure Statement shall have the meanings assigned to such terms in the Plan

12  or the Bankruptcy Code.

13           This Disclosure Statement has been approved by Order of the Bankruptcy Court as

14  containing adequate information to permit parties in interest to make an informed judgment as

15  to whether to vote to accept or reject the Plan, and whether or not to participate in the Rights

16  Offering.  The Bankruptcy Court's approval of this Disclosure Statement, however, does not

17  constitute a recommendation by the Bankruptcy Court either for or against the Plan or the

18  Rights Offering.

19           This Disclosure Statement is submitted in accordance with Section 1125 of the

20  Bankruptcy Code and Bankruptcy Rule 3016.  The description of the Plan contained in this

21  Disclosure Statement is intended as a summary only and is qualified in its entirety by reference

22  to the Plan itself.  This Disclosure Statement does not attempt to summarize or discuss each

23  and every section of the Plan.  If any inconsistency exists between the Plan and this Disclosure

24  Statement, the terms of the Plan are controlling.  This Disclosure Statement may not be relied

25  on for any purpose other than to determine how to vote on the Plan.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    This Disclosure Statement has been prepared by Debtor in good faith based upon

2    information available to Debtor and information contained in Debtor's books and records.  The

3    information concerning the Plan has not been subject to a verified audit.  The statements

4    contained in this Disclosure Statement are made as of the date hereof unless another time is

5    specified herein, and the delivery of this Disclosure Statement shall not imply there has been

6    no change in the facts set forth herein since the date of this Disclosure Statement and the date

7    the material relied on in preparation of this Disclosure Statement was compiled.

8    Nothing contained herein shall constitute an admission of any fact or liability by any

9    party, or be admissible in any proceeding involving Debtor or any other party.

10   **3.      BRIEF EXPLANATION OF CHAPTER 11**

11   Chapter 11 of the Bankruptcy Code is the principal reorganization provision of the

12   Bankruptcy Code.  Pursuant to Chapter 11, a debtor-in-possession attempts to reorganize its

13   business for the benefit of the debtor, its creditors and other parties in interest.

14   The formulation and confirmation of a plan of reorganization is the principal purpose

15   of a Chapter 11 case.  A plan sets forth a proposed method of compensating the debtor's

16   creditors.  Chapter 11 does not require all holders of claims to vote in favor of a plan in order

17   for the Bankruptcy Court to confirm the plan.  However, the Bankruptcy Court must find that

18   the plan meets a number of statutory tests before it may confirm, or approve, the plan.  These

19   tests are designed to protect the interests of holders of claims who do not vote to accept the

20   plan, but who will nonetheless be bound by the plan's provisions if it is confirmed by the

21   Bankruptcy Court.

22   **4.      GENERAL SUMMARY OF TREATMENT OF CLAIMS**

23   The Plan provides for the payment in full on the Effective Date of all Allowed

24   Administrative Expense Claims, Priority Tax Claims, Other Priority Claims and the Allowed

25   Claim of U.S. Bank.  The Plan provides for the payment in full over time, with interest, of all

26   other Secured Claims.  In general, Secured Creditors with personal property collateral will be

**Page 3 of 63** -   DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    paid in 48 equal monthly amortizing payments, with interest at 6% per annum, and Secured

2    Creditors with real property collateral will be paid in 84 equal monthly amortizing payments

3    with interest at 6% per annum based on a 25-year amortization, with a balloon payment in

4    seven years.  A sample form promissory note that Debtor will issue to secured creditors on

5    account of their Secured Claim is attached hereto as **Exhibit 2**.

6          The Plan provides that each holder of a Small Unsecured Claim ($10,000 or less) will

7    receive, within 90 days after the Effective Date, a cash payment in an amount equal to 80% of

8    its Allowed Small Unsecured Claim.

9          The Plan provides that each holder of an Allowed General Unsecured Claim will

10   receive the combination of one share of Common Stock and one share of Series A Preferred

11   Stock (sometimes hereinafter referred to together as "Stock") of Reorganized Debtor in

12   exchange for each $10 of such holder's Allowed General Unsecured Claim and a Subscription

13   Right in the event Debtor elects to consummate the Rights Offering.

14         The Plan provides that all existing Equity Securities and Employee Equity Security

15   Plans will be cancelled as of the Effective Date.

16   **5.        EVENTS LEADING TO CHAPTER 11 FILING**

17         Debtor is a family owned grocery store company headquartered in Brookings, Oregon.

18   Ray Nidiffer founded the company in 1956 with a single store in Brookings.  Over the next 50

19   years, the Nidiffer family and its employees grew the company to a chain of 60 plus grocery

20   stores located in south and central Oregon and northern California.

21         The stores operate under the banners Ray's Food Place, Shop Smart and C & K Market.

22   Debtor employs over 2,000 people, a majority of whom are employed full-time.  Debtor

23   provides family health insurance for all its full-time employees.

24         Debtor's wholly owned subsidiary, C&K Express ("Express"), which is a co-obligor on

25   the obligations owing to U.S. Bank, owned and operated 15 pharmacies, several of which were

26   located in Debtor's grocery stores and several of which were stand-alone operations.

**Page 4 of 63** -   DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    Prepetition, Express sold 12 of the 15 pharmacies.  Postpetition, Express has closed the sale of

2    two of the three remaining pharmacies, and expects to sell the remaining pharmacy by the end

3    of June, 2014.  Proceeds from the sales have been and will be paid to U.S. Bank to reduce its

4    Secured Claim.

5         Historically, Debtor operated in small rural communities.  Often, Debtor operated the

6    only grocery store in the community and the only grocery store for miles around.  As a result of

7    both Debtor's expansion into more populated areas, and the expansion of large discounters

8    such as Costco and Walmart into less populated areas and into the grocery business, Debtor has

9    faced increasingly greater competition and resulting pressure on its sales and margins.

10        Many of Debtor's stores were located within 40 miles of a large discount grocery

11   operation such as Walmart or Costco.  In the last half of 2012, new "Super Walmarts"

12   negatively affected at least 30 of Debtor's markets.  As a result of the evolving marketplace,

13   several of Debtor's stores became unviable.  Accordingly, Debtor has closed approximately 20

14   unviable stores, leaving Debtor with approximately 40 grocery stores with proven profitability

15   in markets Debtor believes will continue to prosper.

16        Although the closures will enhance Debtor's profitability and reduce secured debt to

17   U.S. Bank, the downsizing will result in additional unsecured debt as a result of lease

18   rejections, and has diminished Debtor's ability to service its legacy debt incurred during its

19   period of expansion.  As a result, Debtor was forced to restructure its obligations and seek

20   Chapter 11 relief.

21        Debtor's restructuring will enable it to emerge as a viable entity that will continue to

22   contribute to the communities in which it operates.

23   **6.    SIGNIFICANT POST-PETITION EVENTS**

24        6.1    <u>Ordinary Course Operations</u>.  Other than the closing of unviable stores, Debtor

25   has continued to operate its stores and its business, and pay its post-petition expenses, in the

26   ordinary course of business.

**Page 5 of 63** -   DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    6.2    Underline{Appointment of Unsecured Creditors Committee}.  Early in the case, the United

2    States Trustee appointed a committee of unsecured creditors (the "Committee") pursuant to

3    11 U.S.C. § 1102(a) and 11 U.S.C. § 1102(b)(1).  The Committee was appointed to generally

4    represent the interests of General Unsecured Creditors and to participate in Debtor's

5    Chapter 11 case with respect to, among other things, the formulation of a plan of

6    reorganization.  The Committee is represented by Otterbourg P.C. as lead co-counsel and by

7    McKittrick Leonard LLP as local co-counsel.

8    6.3    <u>Retention of Professionals</u>.  Pursuant to a series of applications and orders,

9    Debtor obtained authorization from the Bankruptcy Court to employ various professionals in

10   the Case.  These professionals include, among others, Tonkon Torp LLP as Debtor's

11   Chapter 11 counsel; Edward Hostmann, Inc. as Chief Restructuring Officer; The Food

12   Partners, LLC as financial advisors; Great American Group, LLC to manage store closing

13   sales; Henderson Bennington Moshofsky, P.C. as accountants; and Kieckhafer Schiffer &

14   Company, LLP as financial advisors and consultants.

15   6.4    <u>First Day Orders</u>.  Early in the case, Debtor obtained a number of Bankruptcy

16   Court orders designed to ensure a smooth transition into Chapter 11.  These orders authorized

17   Debtor to, among other things:  assume its supply agreement with SuperValu (Debtor's

18   primary supplier of grocery products and health and beauty products); obtain post-petition

19   financing from U.S. Bank; pay prepetition wages, PACA claims, and 503(b)(9) claims;

20   continue to honor and perform its customer loyalty programs; maintain its existing bank

21   accounts and cash management system; and conduct store closing sales.

22   6.5    <u>Post-Petition Financing</u>.  Prepetition, Debtor and U.S. Bank agreed upon the

23   terms of post-petition financing (the "DIP Facility") to be provided by U.S. Bank to Debtor

24   during the Chapter 11 case.  The DIP Facility is a secured revolving line of credit, the terms of

25   which were approved by the Bankruptcy Court.  Post-petition, Debtor has been operating in the

26   ordinary course with funds obtained from the DIP Facility.  A summary of the material terms

**Page 6 of 63** -    DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

of the DIP Facility was included in Debtor's motion to approve the DIP financing [~~Dkt~~ECF No. #26] and may be obtained by contacting counsel for Debtor.  Debtor has operated within the terms of the DIP Facility and is confident the DIP Facility will provide funding that is adequate to ensure its successful operation during the pendency of the Chapter 11 case.

6.6    Payment of PACA (Perishable Agricultural Commodities Act) Claims.  Debtor obtained Bankruptcy Court authority to pay the valid prepetition PACA claims of Debtor's PACA suppliers (suppliers of fresh and frozen fruits and vegetables).  As of April 15, 2014, Debtor had paid approximately $1,270,000 out of a total estimated $1,300,000 in prepetition PACA claims in accordance with the PACA order.  In addition, Debtor has paid all post-petition PACA claims in the ordinary course of business.

6.7    Payment of 503(b)(9) Claims.  Debtor obtained an order from Bankruptcy Court authorizing (but not requiring) Debtor to pay the valid prepetition 503(b)(9) claims of Debtor's continuing suppliers.  Nearly all of Debtor's suppliers have continued to supply goods to Debtor on payment terms equal to or better than those provided prepetition.  As of April 15, 2014, Debtor had paid approximately $5,700,000 in 503(b)(9) claims in accordance with the 503(b)(9) order, and estimates there may be $1,000,000 in additional 503(b)(9) claims.  Debtor continues to pay its suppliers in the ordinary course of business.  The above 503(b)(9) payment amount does not include approximately $5,600,000 in postpetition payments made to SuperValu under Debtor's assumed contract with SuperValu that otherwise would have qualified for payment under the 503(b)(9) order.

6.8    Store Closing Sales.  Pursuant to Bankruptcy Court authority, Debtor has conducted store closing sales at 15 stores.  Proceeds from the store closing sales have been applied to the post-petition revolver under the DIP Facility and to the U.S. Bank Term Loans for proceeds received in excess of the advance rate.  In addition to the store closing sales, postpetition Debtor closed on the sale of one additional store, leaving Debtor with 44 operating

**Page 7 of 63** -   DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT (~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    stores as of April 15, 2014.  Debtor is analyzing its remaining 44 stores to determine which

2    additional stores, if any, it will sell or close prior to exiting Chapter 11.

3        6.9    Lease Rejections/Assumptions.  In connection with the store closings and sales,

4    Debtor has rejected its non-residential real property leases at 16 stores.  Pursuant to a

5    Bankruptcy Court order, Debtor has until June 17, 2014 to determine which additional leases,

6    if any, Debtor will reject [ECF No. 661], Debtor must by, June 17, 2014, assume or reject its

7    unexpired leases of non-residential real property.  Prior to the June 17, 2014 deadline, Debtor

8    will file a motion to assume those unexpired leases of non-residential real property which

9    Debtor desires to assume.  Pursuant to the Bankruptcy Code, any leases of non-residential real

10    property in which Debtor is the tenant that are not assumed by Debtor will be deemed rejected.

11    Provided a Landlord timely files a claim, Landlords with rejected leases will have lease

12    rejection claims against Debtor.  As of April 9, 2014, 15 lease rejection claims had been filed,

13    totaling approximately $10,500,000.  Debtor is in the process of reviewing the filed lease

14    rejection claims.

15        6.10    Operations.  Debtor's transition into the Chapter 11 case was successful.

16    Debtor has continued to receive ordinary trade terms from the vast majority of its suppliers.  As

17    a result Debtor has continued its valuable relationship with SuperValu, its primary supplier.

18    With the support of SuperValu and its other suppliers, Debtor's operations have met or

19    exceeded its projections and Debtor is confident it has adequate funding available on its DIP

20    Facility to fund its operations for the remainder of the case.

21        6.11    Claim of Sunstone Business Finance, LLC.  Prepetition, Sunstone Business

22    Finance, LLC ("Sunstone") agreed to provide Debtor with post-petition financing in the event

23    that (a) Debtor could not reach an agreement on postpetition financing with U.S. Bank, or

24    (b) even if an agreement was reached, the Bankruptcy Court failed to approve such agreement.

25    In connection with Sunstone agreeing to provide such financing, prepetition Debtor agreed to

26    pay Sunstone a $250,000 break-up fee in the event Debtor did not obtain post-petition

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1  financing from Sunstone.  As discussed above, Debtor ultimately obtained postpetition

2  financing from U.S. Bank and not from Sunstone.  Sunstone then filed a proof of claim with

3  the Bankruptcy Court for the break-up fee, and also filed a motion to allow the break-up fee as

4  an administrative expense claim.  Several interested parties objected to the break-up fee and to

5  Sunstone's motion to allow the fee as an administrative expense.  A hearing was held on the

6  matter, and the Bankruptcy Court entered an order [~~Dkt~~ECF No. #787] denying the claim

7  objections and also denying Sunstone's motion to allow the break-up fee as an administrative

8  expense, with the net result that Sunstone will have an allowed general unsecured claim in the

9  amount of $250,000.

10      6.12    Claim of Nidiffer Family, LLC.  Nidiffer Family, LLC filed a proof of claim in

11  the amount of $10,506,666.69 (Claim No. 32).  Certain members of the Nidiffer Family, LLC

12  are Insiders of Debtor.  The Committee objected to the claim [~~Dkt~~ECF No. #776], seeking to

13  recharacterize the claim as equity and disallow the claim as a general unsecured claim.  As ~~of~~

14  ~~the date of the filing of this Disclosure Statement, no hearing has been held on the Committee's~~

15  ~~claim objection.  If the Bankruptcy Court agrees with the Committee and recharacterizes the~~

16  ~~claim as equity (which is cancelled pursuant to the Plan), then total general unsecured claims~~

17  ~~will be reduced from approximately $60 million to approximately $50 million~~a result of

18  negotiations among the Committee, Debtor, Nidiffer Family, LLC, Endeavour and THL, a

19  stipulated order [ECF No. 867] was entered abating the contested case proceeding initiated by

20  the Committee's objection, subject to reinstatement upon notice and order of the Court.

21  Pursuant to the stipulated order, the Committee will file a notice of withdrawal of its objection,

22  without prejudice.  Presuming this Plan is confirmed, the Nidiffer Family, LLC claim will be

23  an Allowed General Unsecured Claim (Class 12).  The Nidiffer Family, LLC Claim is subject

24  to a Subordination Agreement in favor of THL and Endeavour.

25      6.13    The Food Partners Valuation.  Postpetition, Debtor engaged The Food Partners,

26  LLC ("TFP") to estimate, as of the projected Effective Date, the fair market value of the equity

**Page 9 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

1   of Reorganized Debtor on a control basis.  Portions of the report are attached hereto as

2   **Exhibit 3**.  The full report is not attached because it contains proprietary and confidential

3   information not suitable for public disclosure.  If a creditor desires to view the entire report, it

4   may contact counsel for Debtor and, if the creditor executes a release, confidentiality and

5   non-disclosure agreement acceptable to Debtor and TFP, then Debtor will share the ~~entire~~

6   report with the creditor.  Based on various assumptions, conditions, and limitations set forth in

7   the report, TFP estimates (as of an assumed July 2014 Effective Date) a fair market value of the

8   stockholder's equity in Reorganized Debtor of $48.7 million on a control basis.  Based on an

9   assumption that 6 million shares of Common Stock would be issued to holders of Allowed

10  General Unsecured Claims, the report estimates an Effective Date per-share price on a control

11  basis of $8.12 ($48.7 million divided by 6 million shares).[1]  TFP opines that a 15% discount

12  would apply to the sale of minority shares.[2]  However, it should be noted that no single

13  Creditor will hold a majority of the shares on the Effective Date.  The conclusions set forth in

14  the report are estimates only and represent The Food Partners' opinion of market conditions at

15  the time it issued its report.  The fair market value of Reorganized Debtor as of the Effective

16  Date may vary considerably from that set forth in the report.  In addition, the value of each

17  share to be distributed will depend on, among other things, the total amount of Allowed

18  General Unsecured Claims and the number of shares ultimately issued under the Plan to

19  holders of Allowed General Unsecured Claims.  In determining whether to vote in favor of or

20  against the Plan, each creditor should make its own conclusions, and consult its own advisors,

21  in estimating the value of the shares it expects to receive on account of its General Unsecured

22  Claim.  Debtor has made no estimate of the relative value of one share of Common Stock

23  _____

24  [1] ~~If the Committee's objection to the Nidiffer Family LLC Claim is sustained, then the number of shares of Common Stock and Series A Preferred Stock issued to Creditors will decline by approximately 2 million and the estimated value of the combination of one share of Common~~

25  ~~Stock and one share of Series A Preferred Stock will increase to over $9.~~

26  [2] TFP's report did not contemplate the issuance of Series A Preferred Stock as now proposed in the Plan.

**Page 10 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1  compared to one share of Series A Preferred Stock.  The Food Partners' opinion specifically

2  states it is not an assessment of value for tax purposes, and should not be used to determine the

3  tax treatment of any shares issued under the Plan in the hands of the shareholders.  Creditors

4  receiving shares should consult their tax advisors on any tax matters concerning the value of

5  any shares issued under the Plan.

6      6.14    Retention of Chief Operating Officer.  In February 2014, Debtor hired Karl V.

7  Wissmann as its chief operating officer.  Mr. Wissmann was previously president and CEO of

8  Star Markets, Honolulu from 2002 until early 2012 after working for Ralph's Grocery Co. in

9  Northern California and Alpha Beta Co. in Southern California.  Before he joined Star

10  Markets, Mr. Wissmann worked for Kroger Co. and its Ralph's division from 1989 until

11  2002—ultimately as senior vice president and general manager for Kroger Co.'s Cala Foods

12  and Bell Markets divisions.  Mr. Wissmann previously served as a group vice president for

13  Ralph's and also vice president, administration, where he oversaw the chain's Food 4 Less

14  operations in Northern California.  Earlier in his career Mr. Wissmann spent 12 years with

15  Alpha Beta Co., a division of American Stores, ultimately holding the title of director of

16  financial planning and analysis. Since 2001 he has also been a consultant with KW &

17  Associates, El Dorado Hills, California, which is involved with grocery and real estate

18  investments.

19  **7.      CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN**

20      Below is a general summary of the Plan's classification and treatment of Claims.

21  Please refer to the Plan for a more complete description of the classification and treatment of

22  Claims, and for the meaning of the capitalized (defined) terms used below.

23      7.1    Unclassified Claims.  Administrative Expense Claims and Priority Tax Claims

24  are not classified under the Plan.

25      An Administrative Expense Claim is any Claim entitled to the priority afforded by

26  Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

**Page 11 of 63** - DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

The Plan provides that each holder of an Allowed Administrative Expense Claim shall be paid the full amount of its Allowed Administrative Expense Claim in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute, or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto.

The amount of Administrative Expense Claims has not yet been determined. Debtor notes that Endeavour and THL may seek to recover, as an asserted Administrative Expense, certain fees and expenses (including attorneys' fees) incurred by Endeavour and THL in connection with this Case.

A Priority Tax Claim is a claim of a governmental unit of the kind entitled to priority under Section 507(a)(8) of the Bankruptcy Code. The Plan provides that each holder of an Allowed Priority Tax Claim will be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed. The amount of Priority Tax Claims has yet to be determined.

7.2    Classified Claims. The Plan divides all Claims (other than Administrative Expense Claims and Priority Tax Claims) into the following Classes.

7.2.1    Class 1 (Other Priority Claims). Class 1 consists of all Allowed Other Priority Claims. An Other Priority Claim means any Claim for an amount entitled to priority in right of payment under Sections 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy Code.

The amount of Other Priority Claims, if any, has not yet been determined.

**Page 12 of 63** - DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT (~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    The Plan provides that each holder of an Allowed Other Priority Claim will be paid in

2    full in Cash by Reorganized Debtor the amount of its Allowed Other Priority Claim on the later

3    of (a) the Effective Date or (b) the date on which such Claim becomes allowed, unless such

4    holder shall agree or has agreed to a different treatment of such Claim (including any different

5    treatment that may be provided for in any documentation, agreement, contract, statute, law, or

6    regulation creating and governing such Claim).

7    Class 1 is unimpaired by the Plan.

8        7.2.2    Class 2 (C & K Market, Inc. 401(k) Plan; United States Department of

9    Labor). Class 2 consists of the Claims of the C & K Market, Inc. 401(k) Plan and the United

10    States Department of Labor arising under or related to a Consent Judgment and Order between

11    the DOL, Debtor and the C & K Market 401(k) Plan (see Claim No. 89). A copy of the

12    Consent Judgment and Order is attached to Claim No. 89 filed by the United States

13    Department of Labor in this Case.

14    The Consent Judgment and Order settled claims of breach of ERISA fiduciary duties

15    asserted by the DOL against Debtor arising from a series of transactions pursuant to which the

16    401(k) Plan acquired certain real estate assets, including properties generally referred to as

17    Rogue Landing, the Lakeside Property, and the John Day Market.

18    Rogue Landing is a 15.12-acre tract located in Curry County, Oregon on the southern

19    Oregon Coast. The property has Rogue River frontage and contains a resort with an office

20    building, RV hookups, a boat ramp, docks and cabins. There are several residential sites

21    situated on bluffs overlooking the Rogue River and beyond to the Pacific Ocean.

22    Under the terms of the Consent Judgment and Order, Debtor is, among other things,

23    obligated to pay to the 401(k) Plan a total of $3 million in principal plus simple interest at 8%

24    per annum, in annual installments of $500,000. Debtor began making such payments on

25    July 1, 2011 and is obligated to pay to the 401(k) Plan $500,000 on July 1, 2014; $500,000 on

26    July 1, 2015; $500,000 on July 1, 2016; and a final payment of $544,739.81 on July 1, 2017.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    In addition, if the 401(k) Plan has not sold Rogue Landing within six years of the date of entry

2    of the Consent Judgment and Order, or by October 29, 2016, the Rogue Landing property is to

3    be put up for auction to be concluded within 90 days after the expiration of such six-year

4    period.  If, prior to or at such auction, Rogue Landing is purchased by an unrelated third party

5    for less than $5 million, Debtor is obligated to pay into the 401(k) Plan the difference between

6    the net payment to the 401(k) Plan and $5 million.  If Rogue Landing is not purchased by an

7    unrelated third party prior to or at such auction, Debtor is obligated to purchase Rogue Landing

8    by tendering payment of $5 million to the 401(k) Plan within 30 days following the close of

9    such auction.  Debtor does not have a current appraisal of Rogue Landing and the marker value

10    is uncertain.

11        The Plan provides that the Consent Judgment and Order shall remain in full force and

12    effect, and not be in any way modified, altered or affected by the Plan.  Without limiting the

13    preceding, Reorganized Debtor shall continue to timely and fully perform and pay all of its

14    obligations under the Consent Judgment and Order.

15        Paragraph 24 of the Consent Judgment and Order states that "The Parties agree that this

16    Consent Judgment and Order shall not create a judgment lien against the real property of C&K

17    or the Plan, or writ of attachment against the personal property of C&K or the Plan, unless

18    filed, registered, and/or recorded pursuant to state law.  The Secretary agrees that she will not

19    file, register, and/or record this Consent Judgment and Order in any state or county lien record,

20    unless and until C&K or the Plan defaults upon any term of this Consent Judgment and Order."

21        As of the Petition Date, neither C & K nor the Plan was in default of the Consent

22    Judgment and Order, and the Secretary had not filed, registered, or recorded the Consent

23    Judgment and Order.

24        Class 2 is unimpaired by the Plan.

25

26

**Page 14 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

1        7.2.3   <u>Class 3 (Allowed Secured Claim of Banc of America Leasing &</u>

2 <u>Capital, LLC)</u>. Class 3 is impaired. Banc of America Leasing & Capital, LLC ("BALC") shall

3 have an Allowed Secured Claim in the amount of $325,000.

4        BALC's Class 3 Claim shall be satisfied by delivery of a promissory note to BALC (the

5 "BALC Note") in the principal amount of its Allowed Secured Claim, less the amount of all

6 adequate protection payments made by Debtor to BALC. Debtor commenced paying monthly

7 $25,000 adequate protection payments to BALC in March. The BALC Note will bear interest

8 from the Effective Date at a fixed per annum rate of 6%, and will be payable by Reorganized

9 Debtor as follows:

10        Commencing on the first day of the first month following the Effective Date and

11 continuing on the first day of each month thereafter until the BALC Note has been paid in full,

12 Reorganized Debtor will make equal monthly amortizing payments of principal and interest on

13 the BALC Note based on a 48-month amortization schedule, with final payment due 48 months

14 after the Effective Date.

15        The Class 3 Claim may be prepaid in full or in part at any time without any prepayment

16 penalty or premium.

17        As security for the Class 3 Claim, BALC will retain its security interests in and liens on

18 its Collateral with the same priority and to the same extent such security had as of the Petition

19 Date. Reorganized Debtor will maintain the BALC Collateral in good repair, will insure the

20 BALC Collateral to its full useable value, and will pay any property taxes with respect to such

21 Collateral when due. At any sale of its Collateral, BALC will have the right to bid at such sale

22 and, if BALC is the successful bidder, BALC may offset all or any portion of its then unpaid

23 Allowed Secured Claim. Reorganized Debtor will provide BALC with at least 45 days' notice

24 prior to any proposed sale of its Collateral.

25        BALC's Claim is not fully secured and, accordingly, BALC will have an Allowed

26 Unsecured Claim in the amount of $22,508.42 in addition to its Class 3 Claim.

**Page 15 of 63** - DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1              7.2.4    Class 4 (Allowed Secured Claim of Dell Financial Services, LLC).

2    Class 4 is impaired.  Dell Financial Services, LLC ("Dell") shall have an Allowed Secured

3    Claim in the amount of $250,000.

4              Dell's Class 4 Claim shall be satisfied by delivery of a promissory note to Dell (the

5    "Dell Note") in the principal amount of its Allowed Secured Claim.  The Dell Note will bear

6    interest from the Effective Date at a fixed per annum rate of 6%, and will be payable by

7    Reorganized Debtor as follows:

8              Commencing on the first day of the first month following the Effective Date and

9    continuing on the first day of each month thereafter until the Dell Note has been paid in full,

10   Reorganized Debtor will make equal monthly amortizing payments of principal and interest on

11   the Dell Note based on a 48-month amortization schedule, with a final payment due 48 months

12   after the Effective Date.

13             The Class 4 Claim may be prepaid in full or in part at any time without any prepayment

14   penalty or premium.

15             As security for the Class 4 Claim, Dell will retain its security interests in and liens on

16   its Collateral with the same priority and to the same extent such security had as of the Petition

17   Date.  Reorganized Debtor will maintain the Dell Collateral in good repair, will insure the Dell

18   Collateral to its full useable value, and will pay any property taxes with respect to such

19   Collateral when due.  At any sale of its Collateral, Dell will have the right to bid at such sale

20   and, if Dell is the successful bidder, Dell may offset all or any portion of its then unpaid

21   Allowed Secured Claim.

22             Reorganized Debtor will provide Dell with at least 45 days' notice prior to any

23   proposed sale of its Collateral.

24             Dell's Claim is not fully secured, and accordingly Dell will have an Allowed Unsecured

25   Claim in the amount of $59,059 in addition to its Class 4 Claim.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1          7.2.5   <u>Class 5 (Allowed Secured Claim, if any, of Komlofske Corporation)</u>.

2  Class 5 consists of the Allowed Secured Claim, if any, of Komlofske Corporation

3  ("Komlofske").  As set forth below, Debtor believes Komlofske's entire Claim will be treated

4  as a General Unsecured Claim, and not as a Secured Claim.  If Komlofske has no Secured

5  Claim, then there will be no Class 5.

6          Komlofske filed  Claim No. 339 in the amount of $1,240,309.45 (Claim No. 339).

7  Komlofske has asserted in such claim that the entire claim is a Secured Claim.  Debtor believes

8  the entire amount of Komlofske's Claim should be treated as a General Unsecured Claim

9  because the UCC financing statement initially filed by Komlofske lapsed prior to the Petition

10  Date, leaving Komlofske unperfected as of the Petition Date.  Debtor has been in

11  communications with counsel for Komlofske, and Debtor's understanding is that Komlofske

12  will be amending its Claim to treat such claim as a General Unsecured Claim.

13          Komlofske's Claim is for amounts owing under or in connection with that certain

14  promissory note dated January 16, 2003 in the original principal amount of $1,222,500.  The

15  note was issued by Debtor to Komlofske in connection with the sale by Komlofske to Debtor

16  of Ray's #60 store in Prineville, Oregon, and was secured by certain specific equipment or

17  other assets located at the Ray's #60 store in Prineville.  Komlofske filed a UCC financing

18  statement against such equipment on January 21, 2003, and continued the UCC financing

19  statement in January 2008.  However, the UCC financing statement lapsed on January 21,

20  2013 (prior to the Petition Date).

21          If Komlofske does not amend its claim to indicate that the claim is not a Secured Claim,

22  then Debtor will file an adversary proceeding to avoid any lien asserted by Komlofske using

23  Debtor's "strong arm" powers under Section 544 of the Bankruptcy Code.

24          The Plan provides that if and to the extent the Komlofske Claim is determined to be a

25  Secured Claim, then Komlofske's Allowed Secured Claim will be satisfied by delivery of a

26  promissory note to Komlofske (the "Komlofske Note") in the principal amount of its Allowed

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    Secured Claim.  The Komlofske Note will bear interest from the Effective Date at a fixed per

2    annum rate of 6%, and will be payable by Reorganized Debtor as follows:

3            Commencing on the first day of the first month following the Effective Date and

4    continuing on the first day of each month thereafter until the Komlofske Note has been paid in

5    full, Reorganized Debtor will make equal monthly amortizing payments of principal and

6    interest on the Komlofske Note based on a five-year amortization schedule, with a final

7    payment due five years after the Effective Date.

8            The Class 5 Claim may be prepaid in full or in part at any time without any prepayment

9    penalty or premium.

10           As security for the Class 5 Claim, Komlofske will retain its security interests in and

11   liens on its Collateral (if any) with the same priority and to the same extent such security had as

12   of the Petition Date.  Reorganized Debtor will maintain the Komlofske Collateral in good

13   repair, will insure the Komlofske Collateral to its full useable value, and will pay any property

14   taxes with respect to such Collateral when due.  At any sale of its Collateral, Komlofske will

15   have the right to bid at such sale and, if Komlofske is the successful bidder, Komlofske may

16   offset all or any portion of its then unpaid Allowed Secured Claim.

17           Class 5 is impaired by the Plan.

18               7.2.6    Class 6 (Allowed Secured Claim of James and Debra Gillespie).

19   Class 6 consists of the Allowed Secured Claim of James and Debra Gillespie ("Gillespie").

20           Gillespie filed Claim No. 283 in the amount of $473,357.86.  In its proof of claim,

21   Gillespie asserts a $94,671.57 "prepayment penalty," even though no prepayment has

22   occurred.  Debtor believes there is no basis for inclusion of a prepayment penalty, and intends

23   to object to Gillespie's proof of claim.

24           The value of the Collateral securing Gillespie's Claim (that certain real property located

25   at 48067~~48063-48083~~ Hwy. 58, Oakridge, Oregon 97453 (Rays #50 and neighboring bare

26   land) exceeds the amount of Gillespie's Claim such that Gillespie's Claim is fully secured.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    The Plan provides that the amount of Gillespie's Allowed Secured Claim will be

2    determined by agreement of Debtor and Gillespie or, absent agreement, in such amount as is

3    determined and Allowed by the Bankruptcy Court.

4    The Plan provides that Gillespie's Class 6 Claim shall be satisfied by delivery of a

5    promissory note to Gillespie (the "Gillespie Note") in the principal amount of Gillespie's

6    Allowed Secured Claim.  The Gillespie Note will bear interest from the Effective Date at a

7    fixed per annum rate of 6%, and will be payable by Reorganized Debtor as follows:

8    Commencing on the first day of the first month following the Effective Date and

9    continuing on the first day of each month thereafter until the Gillespie Note has been paid in

10   full, Reorganized Debtor will make equal monthly amortizing payments of principal and

11   interest on the Gillespie Note based on a 25-year amortization schedule, with a balloon

12   payment due seven years after the Effective Date.

13   The Class 6 Claim may be prepaid in full or in part at any time without any prepayment

14   penalty or premium.

15   As security for the Class 6 Claim, Gillespie will retain its security interests in and liens

16   on its Collateral with the same priority and to the same extent such security had as of the

17   Petition Date.  Reorganized Debtor will maintain the Gillespie Collateral in good repair, will

18   insure the Gillespie Collateral to its full useable value, and will pay any property taxes with

19   respect to such Collateral when due.  At any sale of its Collateral, Gillespie will have the right

20   to bid at such sale, and if Gillespie is the successful bidder, Gillespie may offset all or any

21   portion of its then unpaid Allowed Secured Claim.

22   The Class 6 Claim is fully secured, and Gillespie will not have any Deficiency Claim

23   with respect to the Class 6 Claim.

24   Class 6 is impaired by the Plan.

25

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

7.2.7    Class 7 (Allowed Secured Claim of Greatway ~~Center~~

~~Property~~Properties, LLC).  Class 7 consists of the Allowed Secured Claim of Greatway ~~Center~~

~~Property~~Properties, LLC ("Greatway").

Debtor scheduled Greatway's Claim at $1,551,508.31.  Greatway did not file a proof of

claim by the claims bar date.  The value of the Collateral securing Greatway's Claim (that

certain real property located at 11100 Hwy. 62, ~~White, City~~Eagle Point, Oregon ~~97503~~97524

(Rays #61) exceeds the amount of Greatway's Claim, such that Greatway's Claim is fully

secured.

The Plan provides that the amount of Greatway's Allowed Secured Claim will be

determined by agreement of Debtor and Greatway or, absent agreement, in such amount as is

determined and Allowed by the Bankruptcy Court.

The Plan provides that Greatway's Class 7 Claim shall be satisfied by delivery of a

promissory note to Greatway (the "Greatway Note") in the principal amount of its Allowed

Secured Claim.  The Greatway Note will bear interest from the Effective Date at a fixed per

annum rate of 6%, and will be payable by Reorganized Debtor as follows:

Commencing on the first day of the first month following the Effective Date and

continuing on the first day of each month thereafter until the Greatway Note has been paid in

full, Reorganized Debtor will make equal monthly amortizing payments of principal and

interest on the Greatway Note based on a 25-year amortization schedule, with a balloon

payment due seven years after the Effective Date.

The Class 7 Claim may be prepaid in full or in part at any time without any prepayment

penalty or premium.

As security for the Class 7 Claim, Greatway will retain its security interests in and liens

on its Collateral with the same priority and to the same extent such security had as of the

Petition Date.  Reorganized Debtor will maintain the Greatway Collateral in good repair, will

insure the Greatway Collateral to its full useable value, and will pay any property taxes with

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

respect to such Collateral when due.  At any sale of its Collateral, Greatway will have the right to bid at such sale, and if Greatway is the successful bidder, Greatway may offset all or any portion of its then unpaid Allowed Secured Claim.

The Class 7 Claim is fully secured, and Greatway will not have any Deficiency Claim with respect to the Class 7 Claim.

Class 7 is impaired by the Plan.

7.2.8    Class 8 (Allowed Secured Claim of Green & Frahm).  Class 8 consists of the Allowed Secured Claim of Green & Frahm.

Debtor scheduled Green & Frahm's Claim at $337,507.28.  Green & Frahm did not file a proof of claim by the claims bar date.  The value of the Collateral securing Green & Frahm's Claim (that certain real property located at 498 S. Old Pacific Highway, Myrtle Creek, Oregon 97457 (Shop Smart #29) exceeds the amount of Green & Frahm's Claim, such that Green & Frahm's Claim is fully secured.

The Plan provides that the amount of Green & Frahm's Allowed Secured Claim will be determined by agreement of Debtor and Green & Frahm or, absent agreement, in such amount as is determined and Allowed by the Bankruptcy Court.

The Plan provides that Green & Frahm's Class 8 Claim shall be satisfied by delivery of a promissory note to Green & Frahm (the "Green & Frahm Note") in the principal amount of its Allowed Secured Claim.  The Green & Frahm Note will bear interest from the Effective Date at a fixed per annum rate of 6%, and will be payable by Reorganized Debtor as follows:

Commencing on the first day of the first month following the Effective Date and continuing on the first day of each month thereafter until the Green & Frahm Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Green & Frahm Note based on a 25-year amortization schedule, with a balloon payment due seven years after the Effective Date.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1     The Class 8 Claim may be prepaid in full or in part at any time without any prepayment

2   penalty or premium.

3     As security for the Class 8 Claim, Green & Frahm will retain its security interests in

4   and liens on its Collateral with the same priority and to the same extent such security had as of

5   the Petition Date.  Reorganized Debtor will maintain the Green & Frahm Collateral in good

6   repair, will insure the Green & Frahm Collateral to its full useable value, and will pay any

7   property taxes with respect to such Collateral when due.  At any sale of its Collateral, Green &

8   Frahm will have the right to bid at such sale, and if Green & Frahm is the successful bidder,

9   Green & Frahm may offset all or any portion of its then unpaid Allowed Secured Claim.

10     The Class 8 Claim is fully secured, and Green & Frahm will not have any Deficiency

11   Claim with respect to the Class 8 Claim.

12     Class 8 is impaired by the Plan.

13       7.2.9   Class 9 (Allowed Secured Claim of ~~Ken~~Kenneth and Lynda Martin).

14   Class 9 consists of the Allowed Secured Claim of ~~Ken~~Kenneth and Lynda Martin ("Martin").

15     Martin filed Claim No. 314 in the amount of $702,046.58.  The value of the Collateral

16   securing Martin's Claim (that certain real property located at 110 Deer Creek ~~R~~Rd., Selma,

17   Oregon 97538 (Rays #71) exceeds the amount of Martin's Claim, such that Martin's Claim is

18   fully secured.

19     The Plan provides that the amount of Martin's Allowed Secured Claim will be

20   determined by agreement of Debtor and Martin or, absent agreement, in such amount as is

21   determined and Allowed by the Bankruptcy Court.

22     The Plan provides that Martin's Class 9 Claim shall be satisfied by delivery of a

23   promissory note to Martin (the "Martin Note") in the principal amount of its Allowed Secured

24   Claim.  The Martin Note will bear interest from the Effective Date at a fixed per annum rate of

25   6%, and will be payable by Reorganized Debtor as follows:

26

**Page 22 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    Commencing on the first day of the first month following the Effective Date and

2    continuing on the first day of each month thereafter until the Martin Note has been paid in full,

3    Reorganized Debtor will make equal monthly amortizing payments of principal and interest on

4    the Martin Note based on a 25-year amortization schedule, with a balloon payment due seven

5    years after the Effective Date.

6    The Class 9 Claim may be prepaid in full or in part at any time without any prepayment

7    penalty or premium.

8    As security for the Class 9 Claim, Martin will retain its security interests in and liens on

9    its Collateral with the same priority and to the same extent such security had as of the Petition

10   Date.  Reorganized Debtor will maintain the Martin Collateral in good repair, will insure the

11   Martin Collateral to its full useable value, and will pay any property taxes with respect to such

12   Collateral when due.  At any sale of its Collateral, Martin will have the right to bid at such sale

13   and, if Martin is the successful bidder, Martin may offset all or any portion of its then unpaid

14   Allowed Secured Claim.

15   The Class 9 Claim is fully secured, and Martin will not have any Deficiency Claim

16   with respect to the Class 9 Claim.

17   Class 9 is impaired by the Plan.

18   7.2.10  Class 10 (Allowed Secured Claim of Protective Life).  Class 10

19   consists of the Allowed Secured Claim of Protective Life.

20   Debtor scheduled Protective Life's Claim at $420,901.21.  Protective Life did not file a

21   proof of claim by the claims bar date.  The value of the Collateral securing Protective Life's

22   Claim (that certain real property located at 15930 Dam Rd. ~~Ext~~, Clearlake, California 95422

23   (Ray's #36) exceeds the amount of Protective Life's Claim, such that Protective Life's Claim is

24   fully secured.

25

26

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  The Plan provides that the amount of Protective Life's Allowed Secured Claim will be

2  determined by agreement of Debtor and Protective Life or, absent agreement, in such amount

3  as is determined and Allowed by the Bankruptcy Court.

4  The Plan provides that Protective Life's Class 10 Claim shall be satisfied by delivery of

5  a promissory note to Protective Life (the "Protective Life Note") in the principal amount of its

6  Allowed Secured Claim.  The Protective Life Note will bear interest from the Effective Date at

7  a fixed per annum rate of 6%, and will be payable by Reorganized Debtor as follows:

8  Commencing on the first day of the first month following the Effective Date and

9  continuing on the first day of each month thereafter until the Protective Life Note has been paid

10  in full, Reorganized Debtor will make equal monthly amortizing payments of principal and

11  interest on the Protective Life Note based on a 25-year amortization schedule, with a balloon

12  payment due seven years after the Effective Date.

13  The Class 10 Claim may be prepaid in full or in part at any time without any

14  prepayment penalty or premium.

15  As security for the Class 10 Claim, Protective Life will retain its security interests in

16  and liens on its Collateral with the same priority and to the same extent such security had as of

17  the Petition Date.  Reorganized Debtor will maintain the Protective Life Collateral in good

18  repair, will insure the Protective Life Collateral to its full useable value, and will pay any

19  property taxes with respect to such Collateral when due.  At any sale of its Collateral,

20  Protective Life will have the right to bid at such sale, and if Protective Life is the successful

21  bidder, Protective Life may offset all or any portion of its then unpaid Allowed Secured Claim.

22  The Class 10 Claim is fully secured, and Protective Life will not have any Deficiency

23  Claim with respect to the Class 10 Claim.

24  Class 10 is impaired by the Plan.

25  7.2.11  Class 11 (Allowed Claim of U.S. Bank National Association).

26  Class 11 consists of the Allowed Claim of U.S. Bank (in its own capacity, and not in any

**Page 24 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1  fiduciary, trustee, or other capacity).  The Class 11 Claim includes all obligations owing to

2  U.S. Bank, whether such obligations arose pre or post-petition.  Without limiting the

3  preceding, the Class 11 Claim includes such amount as is Allowed under Section 506(b) of the

4  Bankruptcy Code for the reasonable fees, costs and charges of U.S. Bank (the "506(b)

5  Amount").

6       U.S. Bank was Debtor's primary secured lender prior to the Petition Date and has

7  continued to provide financing to Debtor post-petition under and pursuant to the DIP Facility

8  (discussed above).

9       As of the Petition Date, Debtor owed U.S. Bank in excess of $34,000,000, secured by a

10  security interest in substantially all of Debtor's real and personal property.  U.S. Bank is fully

11  secured.  In connection with the DIP Financing, Debtor agreed, among other things, that any

12  Plan proposed by Debtor would provide for the payment in full in cash on the Effective Date of

13  all obligations owing by Debtor to U.S. Bank.

14       Accordingly, the Plan provides that on the Effective Date, Debtor shall pay the

15  Class 11 Claim in full, less the undetermined 506(b) Amount, and will pay into an escrow

16  account mutually agreed to by Debtor and U.S. Bank an amount equal to 115% of the Bank's

17  estimated 506(b) Amount (the "Escrow Amount").  The Plan further provides that upon the

18  payment of the Class 11 Claim, less the 506(b) Amount, and the funding of the Escrow

19  Amount, the Class 11 Claim shall be deemed to have been paid in full, and the Bank will

20  release any and all liens and security interests it has in any assets of Debtor, other than its lien

21  in the Escrow Amount which shall continue until the 506(b) Amount has been paid in full.

22  Any provisions of U.S. Bank's agreements with Debtor that by their terms survive payment in

23  full shall survive payment in full of the Class 11 Claim.  Once the 506(b) Amount has been

24  determined and Allowed, the 506(b) Amount will be paid and satisfied from the Escrow

25  Amount, with any surplus being returned to Reorganized Debtor.

26

**Page 25 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    Debtor projects the total obligations owing to U.S. Bank on the Effective Date will be

2    approximately $25,000,000.  Those obligations will be paid with proceeds obtained from the

3    Exit Financing to be obtained by Reorganized Debtor.

4    Class 11 is unimpaired by the Plan.

5    7.2.12  <u>Class 12 (General Unsecured Claims)</u>.  Class 12 consists of all

6    Allowed General Unsecured Claims.  A General Unsecured Claim is any Unsecured Claim

7    that is not a Small Unsecured Claim.  A Small Unsecured Claim is any Unsecured Claim that is

8    equal to or less than $10,000, or that has been reduced to $10,000 by the election of the

9    Creditor holding such Unsecured Claim.

10    The Plan provides that each holder of an Allowed General Unsecured Claim will

11    receive the combination of one share of Common Stock and one share of Series A Preferred

12    Stock of Reorganized Debtor in exchange for each $10 of its Allowed General Unsecured

13    Claim on the later of the Effective Date or the date its Claim becomes an Allowed Claim,

14    rounded up to the nearest $10.  Fractional shares will not be issued.  In addition, if Debtor

15    elects to consummate the Rights Offering (see Section 10 below), each holder of an Allowed

16    General Unsecured Claim shall have a Subscription Right to purchase in the Rights Offering

17    the combination of one share of Common Stock and one share of Series A Preferred Stock of

18    Reorganized Debtor for $8 in cash.

19    Some holders of Allowed General Unsecured Claims are parties to Subordination

20    Agreements with certain "Senior Lenders."  The Plan provides that if a Senior Lender notifies

21    Debtor or Reorganized Debtor in writing that a General Unsecured Claim is subject to a

22    Subordination Agreement (the "Subordinated Claim"), then Reorganized Debtor will not issue

23    any stock on account of, or make any distribution with respect to, the Subordinated Claim

24    unless and until the first to occur of (a) receipt by Debtor or Reorganized Debtor of joint

25    instructions from the Senior Lender and the holder of the Subordinated Claim with respect to

26    such Subordinated Claim, or (b) the Bankruptcy Court enters a Final Order declaring the

**Page 26 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   relative rights of the Senior Lender and the holder of the Subordinated Claim with respect to

2   the Subordinated Claim.  Absent receipt of such written notice of a Subordination Agreement

3   from a Senior Lender, Reorganized Debtor will make distributions to holders of General

4   Unsecured Claims as described.

5          Debtor estimates that there will be approximately $60 million of Allowed General

6   Unsecured Claims and that, therefore, approximately 6 million shares of Common Stock and

7   6 million shares of Series A Preferred Stock will be issued under the Plan to holders of

8   Allowed Class 12 Claims.  If the Committee's objection to the Nidiffer Family LLC Claim is

9   sustained, then approximately 1 million fewer shares will be issued.

10         Debtor projects there will be fewer than 200 holders of Allowed Class 12 Claims.

11  Consequently, Reorganized Debtor will have fewer than 200 shareholders and will not be a

12  public company.  Of the $60 million in estimated General Unsecured Claims, approximately

13  $30 million is held by two private equity mezzanine lenders, THL and Endeavour,

14  approximately $10 million is held by Nidiffer Family, LLC, and approximately $5 million is

15  held by various subordinated note holders holding notes payable in connection with the

16  purchase of stores.  Debtor estimates that the remaining $15 million in General Unsecured

17  Claims will consist of approximately $5 to $7 million in lease rejection claims and

18  approximately $7 to $8 million in trade creditor claims.

19         If Debtor elects to consummate the Rights Offering, and if the Rights Offering is fully

20  subscribed, Reorganized Debtor will also issue an additional 1,250,000 shares of Common

21  Stock and 1,250,000 shares of Series A Preferred Stock.

22         Reorganized Debtor will also reserve approximately 800,000 to 900,000 shares of

23  Common Stock for issuance in accordance with Reorganized Debtor's Employee Stock

24  Incentive Plan for services rendered after the Effective Date.  The final number will be

25  determined upon completion of any Rights Offering.  The reserved shares will represent

26  approximately 12%, of all shares of Common Stock and Series A Preferred Stock issued and

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    reserved for issuance immediately following the Effective Date.  The reserved shares of

2    Common Stock under the Employee Stock Incentive Plan will be issued, if at all, only with the

3    approval of the Board of Directors of Reorganized Debtor after the Effective Date.

4            The Restated Articles of Incorporation authorize the issuance of up to 25,000,000

5    shares of Common Stock and up to 10,000,000 shares of Preferred Stock by the Board of

6    Directors of Reorganized Debtor without the approval of the shareholders of Reorganized

7    Debtor except as noted below with respect to certain types of Preferred Stock.  Each share of

8    Common Stock is entitled to one vote on all matters for which shareholder approval is

9    required.  The Board of Directors of Reorganized Debtor is authorized, subject to the

10   limitations in the Oregon Business Corporation Act, to provide for the issuance of any or all of

11   the authorized shares of Preferred Stock in series, to establish from time to time the number of

12   shares to be included in each series and to determine the designations, relative rights,

13   preferences and limitations of the shares of each series, except as noted below with respect to

14   certain types of Preferred Stock.

15           Shares of Series A Preferred Stock will have the following rights and preferences:

16   •    Dividends. The holders of shares of Series A Preferred Stock will be entitled to

17        receive dividends when, as and if dividends are declared by the Board of

18        Directors of Reorganized Debtor.

19   •    Liquidation Preference.  In the event of any Liquidation of Reorganized Debtor,

20        the holders of Series A Preferred Stock will be entitled to receive, prior to and

21        in preference to any distribution of any assets of Reorganized Debtor to the

22        holders of Common Stock by reason of their ownership of Common Stock, $5

23        per share (as adjusted for stock splits, stock dividends, reclassification and the

24        like) for each share of Series A Preferred Stock then held by them, plus any

25        declared but unpaid dividends (the "Liquidation Preference").

26

**Page 28 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    The term "Liquidation" means the liquidation, dissolution or winding

2    up of Reorganized Debtor, whether voluntary or involuntary.  Additionally, the

3    term Liquidation includes, unless otherwise agreed by the holders of a majority

4    of the then issued and outstanding Series A Preferred Stock, (a) a merger or

5    consolidation of Reorganized Debtor with or into another entity or any other

6    corporate reorganization, if more than 50% of the combined voting power of

7    the continuing or surviving entity's securities outstanding immediately after the

8    transaction is owned by persons who were not shareholders of Reorganized

9    Debtor immediately prior to the transaction; and (b) the sale, transfer or other

10    disposition of all or substantially all of Reorganized Debtor's assets.  A

11    transaction described in clause (a) above will not be considered a Liquidation if

12    it is done solely for the purpose of changing Reorganized Debtor's state of

13    incorporation or to create a holding company that will be owned in substantially

14    the same proportions by the persons who held Reorganized Debtor's securities

15    immediately before the transaction.

16    •    No Conversion or Participation Rights.  Series A Preferred Stock is not

17    convertible into any other security of Reorganized Debtor.  Upon any

18    Liquidation, the holders of Series A Preferred Stock will be entitled to receive

19    only the Liquidation Preference with respect to their shares of Series A

20    Preferred Stock and will not be entitled to participate in the distribution of any

21    other assets of Reorganized Debtor.

22    •    Voting Rights.  The holders of Series A Preferred Stock generally have the

23    same voting rights as holders of Common Stock and will generally vote

24    together with the holders of Common Stock as a single voting group, including

25    with respect to any matters relating to any Liquidation submitted to the

26    shareholders of Reorganized Debtor for a vote.  Each share of Series A

**Page 29 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    Preferred Stock is entitled to one vote on all matters for which shareholder

2    approval is required.

3    • Redemption Rights.  Reorganized Debtor can at any time redeem the shares of

4    Series A Preferred Stock, in whole or in part, for the Liquidation Preference.

5    On July 1, 2024 (the "Maturity Date"), Reorganized Debtor is required to

6    redeem all then issued and outstanding shares of Series A Preferred Stock for

7    the Liquidation Preference, subject to having legally available funds for such

8    redemption and complying with any applicable restrictions in Reorganized

9    Debtor's senior debt agreements relating to indebtedness for borrowed money

10    in an aggregate principal amount exceeding $5 million.  If Reorganized Debtor

11    is prohibited from redeeming all of the Series A Preferred Stock on the

12    Maturity Date, it will redeem as many shares as possible at the Maturity Date

13    and the remainder at the earliest time or times possible thereafter.  Any partial

14    redemption of Series A Preferred Stock will be made pro rata based on the

15    number of shares of Series A Preferred Stock held by each shareholder.

16    • Protective Provisions.  So long as at least 25% of the shares of Series A

17    Preferred Stock remain outstanding (as adjusted for stock splits, stock

18    dividends, reclassification and the like), Reorganized Debtor needs the

19    approval of the holders of a majority of the then issued and outstanding

20    Series A Preferred Stock before declaring cash dividends on the Common

21    Stock, altering the rights or preferences of the Series A Preferred Stock,

22    changing the total number of authorized shares of Series A Preferred Stock,

23    authorizing or issuing any security having a preference over or on a parity with

24    the Series A Preferred Stock with respect to voting, dividends, redemption or

25    liquidation rights, redeeming any shares of Preferred Stock other than Series A

26    Preferred Stock, redeeming any Common Stock (with limited exceptions), or

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

altering Reorganized Debtor's Employee Stock Incentive Plan to include shares other than the Common Stock of Reorganized Debtor.  In addition, so long as at least twenty-five percent (25%) of the shares of Series A Preferred Stock remain outstanding (as adjusted for stock splits, stock dividends, reclassification and the like), Reorganized Debtor needs the approval of the holders of at least 80% of the then outstanding shares of Series A Preferred Stock before decreasing the Liquidation Preference of the Series A Preferred Stock, altering the "Tag Along Rights" set forth in the Restated Bylaws, or amending any of the foregoing protective provisions of the Restated Articles of Incorporation.

The Restated Articles of Incorporation are attached to the Plan as Exhibit 2.

Reorganized Debtor's Restated Bylaws will place certain restrictions on the sale of the Common Stock and the Series A Preferred Stock.  Reorganized Debtor will have a right of first refusal with respect to any sale of Common Stock or Series A Preferred Stock.  The Restated Bylaws are attached to the Plan as Exhibit 3.

Class 12 is impaired by the Plan.

7.2.13  Class 13 (Small Unsecured Claims).  Class 13 consists of all Allowed Small Unsecured Claims.  A Small Unsecured Claim is any Unsecured Claim that is equal to or less than $10,000, or that has been reduced to $10,000 by the election of the Creditor holding such Unsecured Claim.

Debtor estimates that there will be approximately $1 million of Unsecured Claims under $10,000.

The Plan provides that each holder of a Small Unsecured Claim will be paid by Reorganized Debtor in cash in an amount equal to 80% of its Allowed Small Unsecured Claim on or before 90 days after the Effective Date or the date its Claim becomes an Allowed Claim, whichever is later.  The Plan allows General Unsecured Creditors to elect to reduce their

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  Allowed Claims in order to be treated as a Class 13 Claim holder, provided the election is

2  made at the time ballots are due for voting on the Plan, or such later date permitted as provided

3  for Rejection Claims.

4       Class 13 is impaired by the Plan.

5            7.2.14  <u>Class 14 (Equity Security Holders)</u>.  Class 14 consists of the Claims

6  and current interests of Equity Security Holders based on their Equity Securities.

7       The Plan provides that All Equity Securities and Employee Equity Security Plans of

8  Debtor will be cancelled as of the Effective Date, and Equity Security Holders will not receive

9  or retain any property or rights under the Plan on account of their Equity Securities or any

10  Employee Equity Security Plan.

11       Class 14 is impaired by the Plan.

12  **8.     DISPUTED CLAIMS; OBJECTIONS TO CLAIMS**

13       The Plan provides that Claims that are Allowed shall be entitled to distributions under

14  the Plan.  Debtor reserves the right to contest and object to any Claims and previously

15  Scheduled Amounts, including, without limitation, those Claims and Scheduled Amounts that

16  are specifically referenced herein, are not listed in the Schedules, are listed therein as disputed,

17  contingent and/or unliquidated in amount, or are listed therein at a different amount than

18  Debtor currently believes is validly due and owing.  Unless otherwise ordered by the

19  Bankruptcy Court, all objections to Claims and Scheduled Amounts (other than

20  Administrative Expense Claims) shall be Filed and served upon counsel for Debtor and the

21  holder of the Claim objected to on or before the later of (a) 45 days after the Effective Date or

22  (b) 60 days after the date (if any) on which a proof of claim is Filed in respect of a Rejection

23  Claim or Deficiency Claim.  The last day for filing objections to Administrative Expense

24  Claims shall be set pursuant to a further order of the Bankruptcy Court.  All Disputed Claims

25  shall be resolved by the Bankruptcy Court, except to the extent that (a) Debtor may otherwise

26

**Page 32 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    elect consistent with the Plan and the Bankruptcy Code or (b) the Bankruptcy Court may

2    otherwise order.

3    **9.      MEANS FOR EXECUTION OF PLAN**

4         9.1    <u>Continued Corporate Existence.</u>  The Plan provides that Debtor, as Reorganized

5    Debtor, shall continue to exist after the Effective Date, with all the powers of a corporation

6    under applicable law.

7         9.2    <u>Restated Articles of Incorporation and Bylaws</u>.  The Plan provides that

8    Reorganized Debtor shall be deemed to have adopted the Restated Articles of Incorporation

9    and Restated Bylaws on the Effective Date, and shall promptly thereafter cause the Restated

10   Articles of Incorporation to be filed with the Secretary of State of the State of Oregon.  After

11   the Effective Date, Reorganized Debtor may amend the Restated Articles of Incorporation and

12   may amend its Restated Bylaws in accordance with the Restated Articles of Incorporation,

13   Restated Bylaws, and applicable state law.  The Restated Articles of Incorporation and

14   Restated Bylaws are attached as Exhibits 2 and 3 to the Plan.

15        9.3    <u>Cancellation of Existing Equity Securities and Employee Equity Security Plan</u>.

16   The Plan provides that as of the Effective Date, all outstanding shares of stock (whether

17   common or preferred), and all awards of any kind consisting of shares of stock of Debtor and

18   all Employee Equity Security Plans, that have been or may be existing, granted, held, awarded,

19   outstanding, payable, or reserved for issuance, and all other Equity Securities, shall, without

20   any further corporate action, be cancelled and retired, and shall cease to exist.  This

21   cancellation does not apply with respect to any Common Stock, Series A Preferred Stock, any

22   other equity securities or rights to acquire or receive equity securities, or any other awards of

23   any kind that are issued in accordance with or pursuant to the Plan.

24        9.4    <u>Recapitalization; Issuance of New Common Stock and New Series A Preferred</u>

25   <u>Stock</u>.  As set forth above, on the Effective Date, the combination of one share of Common

26   Stock and one share of Series A Preferred Stock will be issued to holders of Allowed Class 12

**Page 33 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

1    Claims (General Unsecured Claims) in exchange for each $10 of each holder's Allowed

2    Class 12 Claim.  As set forth above, Reorganized Debtor will also reserve approximately

3    800,000 to 900,000 shares of Common Stock for issuance in accordance with Reorganized

4    Debtor's Employee Stock Incentive Plan for services rendered after the Effective Date.  As set

5    forth above, the Common Stock and Series A Preferred Stock will be subject to certain

6    restrictions on sale as more particularly stated in the Restated Bylaws attached to the Plan as

7    Exhibit 3.  As set forth above, if the Rights Offering is consummated and fully subscribed,

8    Reorganized Debtor will also issue an additional 1,250,000 shares of Common Stock and

9    1,250,000 shares of Series A Preferred Stock.

10            9.5    Exit Financing.  Pursuant to the DIP Financing Order, U.S. Bank is entitled to

11   be paid in full on the Effective Date of the Plan.  Consequently, Debtor must negotiate and

12   obtain, and enter into agreements with respect to, Exit Financing.  Such Exit Financing will,

13   among other things, provide the funds necessary to pay U.S. Bank in full on the Effective Date

14   and provide working capital for Reorganized Debtor.  The Plan provides that Debtor may enter

15   into such agreements and execute such documents with respect to the Exit Financing without

16   the necessity of obtaining additional Bankruptcy Court approval.

17            9.6    Subordination Agreements.  THL, Endeavour and U.S. Bank, as "Senior

18   Lenders," entered into Subordination Agreements with various creditors of Debtor (the "junior

19   creditors").  Debtor is aware of 10 different junior creditors.  As the "Borrower" party to the

20   Subordination Agreements, Debtor agreed, in general, to comply with the rights and priorities

21   set forth in the Subordination Agreements.  Accordingly, the Plan provides that in connection

22   with any distributions to be made under the Plan, Reorganized Debtor will comply with all

23   Subordination Agreements, and all distributions to Creditors under the Plan will remain

24   subject to such Subordination Agreements.

25            Counsel for Endeavour and THL (the remaining Senior Lenders, as U.S. Bank will be

26   paid in full on the Effective Date) has sent letters to most, if not all, of the junior creditors

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    outlining the Senior Lender's position with respect to the Subordination Agreements.  Debtor

2    does not know if any of the junior creditors have agreed with, or will agree with, the Senior

3    Lender's position.

4         Accordingly, the Plan provides that if a Senior Lender notifies Debtor or Reorganized

5    Debtor in writing that a General Unsecured Claim is subject to a Subordination Agreement (the

6    "Subordinated Claim"), then Reorganized Debtor will not issue any Stock on account of, or

7    make any distribution with respect to, the Subordinated Claim unless and until the first to occur

8    of (a) receipt by Debtor or Reorganized Debtor of joint instructions from the Senior Lender

9    and the holder of the Subordinated Claim with respect to such Subordinated Claim; or (b) the

10   Bankruptcy Court enters a Final Order declaring the relative rights of the Senior Lender and

11   the holder of the Subordinated Claim with respect to the Subordinated Claim.  However,

12   Reorganized Debtor will make distributions pursuant to the Plan to Creditors unless a written

13   notification of a Subordination Agreement is delivered by a Senior Lender to Reorganized

14   Debtor.  The Plan provides that absent receipt by Reorganized Debtor of written notification

15   from a Senior Lender that a Claim is subject to a Subordination Agreement, Reorganized

16   Debtor will make distributions on Claims as provided in this Plan and Reorganized Debtor will

17   have no obligation to inquire or otherwise investigate or determine the existence or validity of

18   any Subordination Agreement.  Promptly upon receipt of such a written notice, Reorganized

19   Debtor will serve a copy of the notice on the holder of the Subordinated Claim.  The Plan

20   provides that the Bankruptcy Court shall have and retain full and exclusive jurisdiction to

21   resolve all disputes arising out of or relating to any Subordination Agreement or Subordinated

22   Claim, including who may vote a Subordinated Claim.

23         9.7    Reorganized Debtor's Board of Directors.  The Plan provides that the initial

24   Board of Directors of Reorganized Debtor shall be composed of (a) Steven R. Wilkins,

25   (b) W. Hunter Stropp, (c) Iain G. Douglas, (d) Douglas Nidiffer, and (e) oneWilliam Kaye, the

26   director designated by the Committee.  The Committee designee shall be disclosed by the

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    ~~Committee at or prior to the confirmation hearing~~ (the "Committee Board Member").

2    Thereafter, the Board of Directors of Reorganized Debtor shall be elected by the shareholders

3    of Reorganized Debtor in accordance with the Restated Bylaws and applicable state law.  The

4    Plan provides that the Committee Board Member shall have the right, acting alone and without

5    a vote of the Board of Reorganized Debtor, but not the obligation, to: (a) other than with

6    respect to any claim by an Insider, Endeavor, THL, or any member of the Committee,

7    designate which Claims shall be the subject of an objection and direct counsel for Reorganized

8    Debtor to object to such Claims; (b) approve the settlement or other resolution of any Disputed

9    Claim by which such Claim shall be allowed in the amount of $250,000 or less; and

10   (c) approve the expenditure of up to $20,000 in legal fees and costs in connection with the

11   objection to a Claim.  If there is no Committee Board Member, or if the Committee Board

12   Member elects not to exercise any or all of the rights provided herein, all unexercised rights,

13   power and authority concerning Disputed Claims vested above to the Committee Board

14   Member shall remain with Reorganized Debtor.  Further, the rights granted to the Committee

15   Board Member, even if exercised, shall not diminish in any respect the rights, power, and

16   authority of the Board of Directors of Reorganized Debtor and, in the event of a dispute

17   between the Committee Board Member and the Board of Directors of Reorganized Debtor, the

18   decision of the Board of Directors of Reorganized Debtor shall control.

19        Steven R. Wilkins is a co-founder of Endeavour.  He has over 25 years of mezzanine,

20   leveraged lending, structured finance commercial lending, and risk management experience.

21   Prior to co-founding Endeavour, Mr. Wilkins was Senior Vice President and Team Leader for

22   GE Commercial Finance in the West Region and was responsible for the startup and

23   development of GE's corporate finance business in the Pacific Northwest and Intermountain

24   states, focusing primarily on leveraged and structured finance debt solutions.  Prior to joining

25   GE in 1997, Mr. Wilkins held senior relationship manager positions at both Bank of America

26   and U.S. Bank where he was involved in origination, underwriting and portfolio management.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  Mr. Wilkins was awarded a Bachelor of Science in Business Administration with an emphasis

2  in Finance and Management from the University of Oregon.

3      W. Hunter Stropp is the Co-President of THL Credit, Inc. and THL Credit Advisors

4  LLC.  Mr. Stropp serves on the Investment Committee and manages transaction allocation.  He

5  leads transaction origination for the eastern region and underwriting, execution and portfolio

6  management for the Los Angeles investment team.  Prior to joining THL Credit in 2007,

7  Mr. Stropp served as a Vice President and Investment Manager in the Private Equity Group of

8  GE Asset Management Inc. from 2000 to 2007.  Previously, Mr. Stropp served in private

9  equity and business development positions at Koch Industries, Inc. and began his career as a

10  consultant with Arthur Andersen LLP.  Mr. Stropp holds a Bachelor of Arts in economics and

11  political science from the University of Texas at Austin and a Masters of Business

12  Administration from Texas A&M University.

13      Iain G. Douglas is a co-founder and Managing Director of Endeavour.  Prior to

14  co-founding Endeavour in 2009, he was an Executive Vice President, Chief Sales Officer and

15  Western Region Manager for CIT's Commercial & Industrial Group, overseeing business

16  development and risk management efforts in the Western and Southwestern United States for

17  leveraged, distressed and special situations senior debt.  In addition, he managed CIT's

18  portfolio of lending concerning the food, beverage and agribusiness industries on a national

19  basis.  Prior to CIT, he was employed by GE Commercial Finance in various leadership

20  capacities, including capital markets and risk management positions.  He has also held

21  business development and risk positions with First Interstate Ltd., Security Pacific National

22  Bank and Philadelphia National Bank.  Mr. Douglas holds a Masters of Business

23  Administration from the Anderson Graduate School of Management at the University of

24  California Los Angeles, with a concentration in Finance, and a Bachelor of Arts in Economics

25  from Cornell University.

26

**Page 37 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

1   Douglas Nidiffer is the current Chairman of the Board of Debtor.  Mr. Nidiffer is the

2   son of Debtor's founders, Ray and June Nidiffer.  Mr. Nidiffer graduated from Oregon State

3   University in 1972 with a Bachelor of Science degree.  Since then, he has served in many roles

4   for Debtor, becoming Vice President in ~~1980.  After Ray Nidiffer's retirement in~~1988.  In

5   1997, ~~Doug~~Mr. Nidiffer became the company's President & Chief Executive Officer, a post he

6   held until May of 2012.

7   William Kaye is the Managing Director of JLL Consultants, Inc.  Mr. Kaye currently

8   serves and/or has served recently as the representative for several national food manufacturing

9   and sales organizations on official committees of unsecured creditors in a number of

10  supermarket cases, in many instances as either committee chairperson or co-chairperson.

11  Mr. Kaye has extensive experience in all business aspects of insolvency and bankruptcy

12  matters, as well as being familiar with the operation of supermarkets.  In addition, Mr. Kaye is

13  serving as, or has recently been serving as, liquidating trustee, litigation trustee and/or plan

14  administrator in a substantial number of major national cases, including supermarket,

15  restaurant, C-Store and other retail-oriented cases.  He has also served as a board member in

16  several supermarket cases, including Valu Foods and Eagle Supermarkets, as well as the board

17  of directors for Neumann Homes, Inc. before and during its Chapter 11 case, and on the

18  post-confirmation board of TWA Airlines.

19  Debtor does not know what current officers of Debtor will be retained by Reorganized

20  Debtor's Board of Directors.

21  9.8    Corporate Action.  The Plan provides that upon entry of the Confirmation

22  Order, all actions contemplated by the Plan shall be authorized and approved in all respects

23  (subject to the provisions of the Plan), including, without limitation, the adoption and filing of

24  the Restated Articles of Incorporation, approval of the Restated Bylaws, approval of the

25  Employee Stock Incentive Plan, the election or appointment, as applicable, of directors and

26  officers for Reorganized Debtor, and the issuance of the Common Stock and the Series A

**Page 38 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1  Preferred Stock.  The appropriate officers of Reorganized Debtor are authorized and directed

2  to execute and deliver the agreements, documents, and instruments contemplated by the Plan

3  and the Disclosure Statement in the name of and on behalf of Reorganized Debtor.

4        9.9      Employee Stock Incentive Plan.  The Plan provides that on the Effective Date,

5  the Employee Stock Incentive Plan shall become effective immediately without any further

6  corporate or other action.  The Employee Stock Incentive Plan is attached as Exhibit 1 to the

7  Plan.

8        9.10      Setoffs.  The Plan provides that Debtor may, but shall not be required to, set off

9  against any Claim and the distributions to be made pursuant to the Plan in respect of such

10  Claim, any claims of any nature whatsoever that Debtor may have against the holder of such

11  Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall

12  constitute a waiver or release of any such claim Debtor may have against such holder.

13        9.11      Utility Deposits.  The Plan provides that all utilities holding a Utility Deposit

14  shall immediately after the Effective Date return or refund such Utility Deposit to Reorganized

15  Debtor.  ~~At its~~Notwithstanding, to the extent a utility continues to provide service to the

16  Reorganized Debtor post-Effective Date, failure to return or refund a Utility Deposit to

17  Reorganized Debtor shall not constitute a breach by the utility of the confirmed Plan or a

18  violation of any order confirming the Plan or any other order entered by the court.  At the sole

19  option of Reorganized Debtor, Reorganized Debtor may apply any Utility Deposit that has not

20  been refunded to Reorganized Debtor in satisfaction of any payments due ~~or to~~for charges

21  incurred during the post-petition period, or, in the event all charges incurred during the

22  post-petition period have been paid, become due from Reorganized Debtor to a utility holding

23  such a Utility Deposit.  Nothing in the Plan, or in any order confirming the Plan, shall limit or

24  affect a utility's right to seek additional security from the Reorganized Debtor in accordance

25  with applicable non-bankruptcy law.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

9.12    <u>Event of Default; Remedy</u>.  The Plan provides that any material failure by Reorganized Debtor to perform any term of the Plan, which failure continues for a period of 10 Business Days following receipt by Reorganized Debtor of written notice of such default from the holder of an Allowed Claim to whom performance is due, shall constitute an Event of Default.  Upon the occurrence of an Event of Default, the holder of an Allowed Claim to whom performance is due shall have all rights and remedies granted by law, the Plan, or any agreement between the holder of such Claim and Debtor or Reorganized Debtor or this Plan. An Event of Default with respect to one Claim shall not be an Event of Default with respect to any other Claim.

9.13    <u>Conditions Precedent to Effectiveness of Plan</u>.  The Plan provides that unless waived by Debtor, the following conditions must occur and be satisfied for the Plan to become effective, and are conditions precedent to the Effective Date:

(a)    The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to Debtor, which shall, among other things, provide that any and all executory contracts and unexpired leases assumed pursuant to the Plan shall remain in full force and effect for the benefit of Reorganized Debtor notwithstanding any provision in any such contract or lease or in applicable law (including those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or that enables or requires termination or modification of such contract or lease;

(b)    All documents, instruments, and agreements, each in form and substance satisfactory to Reorganized Debtor, provided for or necessary to implement the Plan shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the party to be benefitted thereby; and

(c)    The Exit Financing shall have closed and all conditions to funding shall have been satisfied or waived.

**Page 40 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

## 10.    RIGHTS OFFERING

10.1    <u>Introduction</u>.  As set forth in Article 6 of the Plan, Debtor has the right in the Rights Offering to raise up to a maximum of $10 million by issuing for $8 (the "Subscription Price") the combination of one share of Common Stock and one share of Series A Preferred Stock (the "Rights Offering Shares").  On or before the Effective Date, Debtor will decide, in its sole discretion, whether or not it is desirable and feasible to complete the Rights Offering.  Under the Rights Offering, each holder of a Class 12 Claim (a "Rights Offering Participant") will have the right (a "Subscription Right"), but not the obligation, to purchase its pro rata share of the Rights Offering Shares based on the amount of Class 12 Claims held.  If Debtor decides to accept subscriptions and consummate the Rights Offering, and the holders of Class 12 Claims do not subscribe for the full number of Rights Offering Shares offered, Debtor may sell any or all of such unsubscribed Rights Offering Shares to Endeavour and/or THL and/or their affiliates, or such other Creditor as selected by Debtor (each, a "Backstop Party").

Once a Rights Offering Participant has timely and validly exercised its Subscription Rights, subject to the occurrence or satisfaction of all conditions precedent to the Rights Offering and to the Rights Offering Participants' participation in the Rights Offering,  such Rights Offering Participant's right to participate in the Rights Offering will be irreversible and shall not be subject to dissolution, avoidance or disgorgement.  No disallowance of any or all of a Rights Offering Participant's Class 12 Claim will affect its exercised Subscription Rights.

10.2    <u>Issuance of Rights</u>.  Each Rights Offering Participant will receive Subscription Rights to subscribe for a Primary Offering Subscription for an aggregate purchase price equal to the applicable Subscription Payment Amount.  The Rights Offering Shares will be issued to the Rights Offering Purchasers at the Subscription Price.  Any Subscription accepted by Debtor in the Rights Offering will only be accepted for an equal number of shares of Common Stock and Series A Preferred Stock.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1      For example, a Rights Offering Participant would be eligible to subscribe for 1% of the

2  Rights Offering Shares if its Class 12 Claim represented 1% of all Class 12 Claims.  If the

3  Rights Offering Participant wanted to exercise its Subscription Right in full, the Rights

4  Offering Participant would be able to subscribe for $100,000 of the Rights Offering (1% of

5  $10 million), which would be the combination of ~~up to 1,250,000~~12,500 shares of Common

6  Stock and ~~1,250,000~~12,500 shares of Series A Preferred Stock at the Subscription Price of $8

7  (12,500 ~~combined shares~~combinations of one share of Common Stock and one share of

8  Series A Preferred Stock x $8 = $100,000).  In this example, the "Subscription Payment

9  Amount" would be $100,000.

10      10.3    Subscription Period.  If Debtor elects to proceed with the Rights Offering, then

11  Debtor will determine a Subscription Commencement Date and a Subscription Deadline.  On

12  the Subscription Commencement Date, Debtor will mail a subscription to each holder of a

13  General Unsecured Claim (each a Rights Offering Participant).  Each Rights Offering

14  Participant that intends or desires to participate in the Rights Offering must affirmatively elect

15  to exercise its Subscription Rights, and provide written notice thereof to the parties specified in

16  the Subscription on or prior to the Subscription Deadline in accordance with the terms of the

17  Plan and the Subscription.  A form of Subscription is attached as Exhibit 4 to the Plan.  At the

18  Subscription Deadline, if Debtor selects a Backstop Party, the Remaining Rights Offering

19  Shares will be allocated to, and may be purchased by the Backstop Party.

20      10.4    Exercise of Subscription Rights and Payment of Subscription Payment

21  Amount.  On the Subscription Commencement Date, Debtor will mail the Subscription to each

22  Rights Offering Participant, together with appropriate instructions for the proper completion,

23  due execution, and timely delivery of the Subscription, as well as instructions for the payment

24  of the eventual Subscription Payment Amount for that portion of the Subscription Right sought

25  to be exercised by such Rights Offering Participant.  Debtor may adopt such additional detailed

26

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   procedures consistent with the provisions of the Plan to more efficiently administer the

2   exercise of the Subscription Rights.

3        In order to exercise the Subscription Right, each Rights Offering Participant must

4   return a duly completed Subscription (making a binding and irrevocable commitment to

5   participate in the Rights Offering), to Debtor or other party specified in the Subscription so that

6   such form and the applicable Subscription Payment Amount are actually received by Debtor or

7   such other party on or before the Subscription Deadline.  A Rights Offering Participant may

8   subscribe for its entire Pro Rata Share of the Rights Offering Shares or only a part of its Pro

9   Rata Share of the Rights Offering Shares.  If Debtor or such other party for any reason does not

10   receive from a given holder of Subscription Rights a duly completed Subscription and the

11   related Subscription Payment Amount on or prior to the Subscription Deadline, then such

12   holder shall be deemed to have forever and irrevocably relinquished and waived its right to

13   participate in the Rights Offering.  On the Subscription Notification Date, Debtor will notify

14   each Rights Offering Purchaser of its respective allocated portion of Rights Offering, and if

15   Debtor has selected Backstop Parties the terms of the Backstop Rights Purchase Agreement.

16   Debtor will notify each Backstop Party after the Subscription Deadline of its allocated portion

17   of the Remaining Rights Offering Shares that the Backstop Party may purchase pursuant to the

18   Backstop Rights Purchase Agreement.

19        Each Rights Offering Purchaser (other than a Backstop Party, if applicable) must

20   tender its Subscription Payment Amount to Debtor so it is actually received on or prior to the

21   Subscription Deadline.  Any Rights Offering Purchaser who fails to tender its Subscription

22   Payment Amount so it is received on or prior to the Subscription Deadline shall be deemed to

23   have forever and irrevocably relinquished and waived its right to participate in the Rights

24   Offering.  Debtor shall hold the payments it receives for the exercise of Subscription Rights in

25   a separate account.  If Debtor, in its sole discretion, decides not to complete the Rights

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    Offering, such payments shall be returned, without accrual or payment of any interest thereon,

2    to the applicable Rights Offering Purchaser, without reduction, offset or counterclaim.

3         10.5    <u>Rights Offering Backstop</u>.  If Debtor decides to have one or more Backstop

4    Parties for the Rights Offering, it will enter into a Backstop Rights Purchase Agreement with

5    each Backstop Party.  In accordance with the Backstop Rights Purchase Agreement, each

6    Backstop Party may commit to purchase all or some portion of the Remaining Rights Offering

7    Shares.  Debtor may grant certain rights and protections and pay certain fees to a Backstop

8    Party depending on the level of commitment by the Backstop Party to purchase the Remaining

9    Rights Offering Shares.

10         10.6    <u>Number of Rights Offering Shares; Determination of Subscription Price</u>.  The

11    number of Rights Offering Shares to be sold pursuant to the Rights Offering shall be

12    determined by dividing the Rights Offering Amount by the Subscription Price.  Debtor has

13    determined the Subscription Price based on the estimated net equity value, without giving

14    effect to any discounts for lack of liquidity, marketability or otherwise, of Reorganized Debtor

15    immediately following completion of the confirmed Plan after the Effective Date.  Debtor

16    believes the Subscription Price will equal the fair market value of the combination of one share

17    of Common Stock and one share of Series A Preferred Stock on the date issued pursuant to the

18    Rights Offering, but there can be no assurance that the Subscription Price will equal such fair

19    market value.  Debtor estimates that such net equity value of Reorganized Debtor <span style="color:blue">immediately</span>

20    <span style="color:blue">following the Effective Date</span> will be approximately $48 million, leading it to determine the

21    Subscription Price for the Rights Offering amount of up to $10 million to be $8 per

22    <span style="color:red"><s>share</s></span><span style="color:blue">combination of one share of Common Stock and one share of Series A Preferred Stock</span>

23    (rounded to avoid fractional shares).  If the entire Rights Amount is subscribed for,

24    approximately 1,250,000 shares of Common Stock and 1,250,000 shares of Series A Preferred

25    Stock would be issued in the Rights Offering.

26

**Tonkon Torp**<sub>LLP</sub>
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

10.7    <u>No Transfer; Detachment Restrictions; No Revocation</u>. The Subscription Rights are not transferable or detachable.  Any such transfer or detachment, or attempted transfer or detachment, will be null and void.  Once a Rights Offering Participant has exercised any of its Subscription Rights by properly executing and delivering a Subscription to Debtor, such exercise may only be revoked, rescinded or annulled in the sole discretion of Debtor or Reorganized Debtor.

10.8    <u>Distribution of Rights Offering Shares</u>.  On the Effective Date, or as soon as reasonably practicable thereafter, Reorganized Debtor or other applicable disbursing agent shall distribute the Rights Offering Shares purchased by each Rights Offering Purchaser.

10.9    <u>Validity of Exercise of Subscription Rights</u>.  All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights shall be determined by Debtor or Reorganized Debtor.  Debtor or Reorganized Debtor, in its discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights.  Subscriptions shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as Debtor or Reorganized Debtor determines, in its discretion reasonably exercised in good faith.  Debtor or Reorganized Debtor may, but is not required to, give written notice to any Rights Offering Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Rights Offering Participant and may permit such defect or irregularity to be cured within such time as Debtor or Reorganized Debtor may determine in good faith to be appropriate; provided, however, that neither Debtor, Reorganized Debtor nor any other party shall incur any liability for giving, or failing to give, such notification and opportunity to cure. Once a Rights Offering Participant has timely and validly exercised its Subscription Rights, subject to the occurrence or satisfaction of all conditions precedent to the Rights Offering and to the Rights Offering Participant's participation in the

**Page 45 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   Rights Offering, and notwithstanding the subsequent disallowance of any or all of its

2   underlying Claim, such Rights Offering Participant's right to participate in the Rights Offering

3   will be irreversible and shall not be subject to dissolution, avoidance or disgorgement and shall

4   not be withheld from such Rights Offering Participant on account of such disallowance

5       10.10   Rights Offering Proceeds.  The proceeds of the Rights Offering may be used to

6   fund Cash payments contemplated by the Plan and for Reorganized Debtor's general corporate

7   purposes.

8       10.11   Factors Affecting the Proposed Rights Offering.  The Plan gives Debtor the

9   right, in its sole discretion, to consummate the Rights Offering.  Proceeds from the Rights

10  Offering would be used to make the Cash payments required by the Plan or for the operating

11  needs of Reorganized Debtor.  In the event Debtor receives any proceeds from the Rights

12  Offering and does not go forward with the Rights Offering, Debtor will return such proceeds to

13  the applicable Rights Offering Purchasers in accordance with the Plan.

14      At the present time, Debtor does not have a Backstop Commitment.  There can be no

15  assurance that there will be a Backstop Commitment.  Even if a Backstop Commitment is

16  obtained, there can be no assurance that Debtor will consummate the Rights Offering.

17      A number of external and internal factors could negatively affect Debtor' ability to

18  obtain a Backstop Commitment or consummate the Rights Offering.  These factors include,

19  among others (a) the overall state of the economy as well as the capital and credit markets;

20  (b) the status of the Bankruptcy Case, including the status of Debtor's efforts to confirm the

21  Plan, resolve objections and resolve or adjudicate Claims; (c) Debtor's business or financial

22  performance; and (d) Debtor's ability to come to acceptable terms with potential Backstop

23  Parties.

24      In addition, the timeframe for Debtor to consummate the Rights Offering is very short

25  and there can be no assurance that Debtor will be able consummate such transactions or obtain

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1  sufficient proceeds even if the factors described in the preceding paragraph are favorable to

2  Debtor.

3      If Debtor determines, in its sole discretion, to consummate the Rights Offering, and is

4  successful in completing the Rights Offering, Reorganized Debtor will have a capital structure

5  that could vary materially from the capital structure Reorganized Debtor would have without

6  it.  Consummation of the Rights Offering would increase the number of shares of Common

7  Stock and Series A Preferred Stock, which may result in dilution to other shareholders, but

8  would also could decrease the amount of debt owed by Reorganized Debtor immediately after

9  the Effective Date.

10  **11.    ASSETS AND LIABILITIES**

11      11.1    <u>Assets</u>.  **Exhibit 4** attached hereto contains Debtor's internally prepared

12  balance sheet as of December 31, 2013 on a GAAP basis.  Debtor's assets consist primarily of

13  the following at December 31, 2013:

14  - Cash on hand:  $3.8 million.  This is cash primarily in stores and in transit.

15  - Accounts receivable:  $2.2 million.  This includes rebates and credits
16    earned from suppliers.

17  - Inventories (at cost):  $25 million

18  - Furniture, fixtures, equipment, and real-property (25 parcels) with an
    estimated value of $60 million.  This amount is based on the valuation
19    report from The Food Partners dated October 31, 2013.

20  - Unified Grocers stock with a value of approximately $4.2 million based on
    The Food Partners valuation dated October 31, 2013.

21  Debtor estimates that on the Effective Date Debtor's assets will have a value of approximately

22  $97 million.

23      11.2    <u>Liabilities</u>.  Debtor's liabilities consist primarily of the following at

24  December 31, 2013:

25  - Secured debt owed to U.S. Bank of approximately $20 million.  This
    includes both a revolving line of credit and two term loans.

26

**Page 47 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

- Secured debt owed to various note holders totaling approximately $3.3 million. This primarily relates to acquisition of real property and equipment that is secured by the underlying assets.

- Secured note payable to the C & K Market 401(k) Plan totaling approximately $2 million.

- Mezzanine financing provided by Endeavour and THL approximating $30 million.

- A note payable to the Nidiffer Family LLC approximating $10 million.

- Unsecured notes payable approximating $5 million. These notes primarily relate to the acquisition of grocery stores and related equipment.

- Accounts payable and accrued expenses approximating $33 million.

Debtor estimates that promptly following the Effective Date (after Claims required to be paid on the Effective Date have been paid, Small Unsecured Claims have been paid, General Unsecured Creditors' Claims have been converted to equity, and Reorganized Debtor has closed on its Exit Financing), Debtor's liabilities will be approximately $49 million. This includes the Exit Financing, which Debtor anticipates will approximate $25 million.

11.3    Projected Balance Sheet/Operating Projections. A projected Effective Date balance sheet is attached hereto as **Exhibit 5**, and projections for the one-year period following the Effective Date are attached hereto as **Exhibit 6**.

11.4    Avoidance Actions. The Plan provides that all Avoidance Actions and other claims and causes of action accruing to Debtor remain assets of Reorganized Debtor. The Plan further provides that on the Effective Date all Avoidance Actions against non-Insidersentities that are not Secured Creditors will be deemed waived and forever barred. Without limiting the preceding, the Plan does not bar any Avoidance Actions against Komlofske. Debtor has performed a preliminary analysis of potential claims and Avoidance Actions, and Debtor's preliminary conclusion is that, other than with respect to Komlofske, there are no material claims or Avoidance Actions.

**Page 48 of 63** -  DEBTOR'S FIRSTSECOND AMENDED DISCLOSURE STATEMENT (APRIL 21,MAY 9, 2014)

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

## 12.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

12.1    Assumption and Rejection.  The Plan provides that, except as may otherwise be provided, all executory contracts of Debtor that are not otherwise subject to a prior Bankruptcy Court order or pending motion before the Bankruptcy Court will be deemed assumed by Debtor as of the Effective Date and will be enforceable by the parties thereto in accordance with their terms; provided that no provision relating to default by reason of insolvency or the filing of the Bankruptcy Case shall be enforceable against Reorganized Debtor or its successors or assigns.  The Confirmation Order shall constitute an order authorizing the assumption and assignment of all executory contracts that are subject to a pending motion to assume or a pending motion to assume and assign.  Reorganized Debtor shall promptly pay all amounts required under Section 365 of the Bankruptcy Code to cure any defaults for executory contracts and unexpired leases being assumed and shall perform its obligations from and after the Effective Date in the ordinary course of business.  Without limiting the above, as discussed in Section 6.9 above, Debtor's remaining leases of non-residential real property will be subject to a prior Bankruptcy Court order or a pending motion before the Bankruptcy Court, and thus will not be deemed assumed by Debtor as of the Effective Date.

12.2    Assignment.  The Plan provides that except as may be otherwise provided in the Plan, Confirmation Order, or other Order of the Bankruptcy Court, all executory contracts shall be deemed assigned to Reorganized Debtor as of the Effective Date.  The Confirmation Order shall constitute an order authorizing such assignment of assumed executory contracts, and no further assignment documentation shall be necessary to effectuate such assignment

12.3    Rejection Claims.  The Plan provides that Rejection Claims must be Filed no later than (a) April 9, 2014 or (b) for Rejection Claims arising from a rejection order entered on or after March 10, 2014, 30 days after the entry of the order rejecting the executory contract or unexpired lease.  Any such Rejection Claim not Filed within such time shall be forever barred from asserting such Claim against Debtor or Reorganized Debtor, their property, estate,

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   and any guarantors of such obligations.  Each Rejection Claim resulting from such rejection

2   shall constitute a Small or General Unsecured Claim, as applicable.

3   **13.    VOTING PROCEDURES**

4       13.1    <u>Ballots and Voting Deadline</u>.  A ballot has been enclosed with this Disclosure

5   Statement for use in voting on the Plan.  After carefully reviewing the Plan and this Disclosure

6   Statement, and if you are entitled to vote on the Plan (see below), please indicate your

7   acceptance or rejection of the Plan by voting for or against the Plan on the enclosed ballot as

8   directed below.

9       To be counted for voting purposes, ballots must be <u>received</u> no later than 5 p.m. Pacific

10  time, on _____, 2014 by Debtor at the following address:

11                  Tonkon Torp LLP
                    Attention:  Spencer Fisher
12                  1600 Pioneer Tower
                    888 SW Fifth Avenue
13                  Portland, OR  97204-2099

14      Any ballots received after 5 p.m. Pacific time on _____, 2014 will not be

15  included in any calculation to determine whether the parties entitled to vote on the Plan have

16  voted to accept or reject the Plan.

17      If you do not receive a ballot, or if a ballot is damaged or lost, please contact Spencer

18  Fisher at the address above, by telephone at 503-802-2167, or at spencer.fisher@tonkon.com.

19      When a ballot is signed and returned without further instruction regarding acceptance

20  or rejection of the Plan, the signed ballot shall be counted as a vote accepting the Plan.  When a

21  ballot is returned indicating acceptance or rejection of the Plan but is unsigned, the unsigned

22  ballot will not be included in any calculation to determine whether parties entitled to vote on

23  the Plan have voted to accept or reject the Plan.  When a ballot is returned without indicating

24  the amount of the Claim, the amount shall be as set forth on Debtor's Schedules or any proof of

25  claim filed with respect to such Claim.

26

**Page 50 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

1    If a proof of claim has been filed with respect to such impaired Claim, then the vote will

2    be based on the amount of the proof of claim.  If no proof of claim has been filed, then the vote

3    will be based on the amount scheduled by Debtor in its Schedules.  Holders of disputed Claims

4    who have settled their dispute with Debtor are entitled to vote the settled amount of their

5    Claim.  The Bankruptcy Code provides that such votes will be counted unless the Claim has

6    been disputed, disallowed, disqualified, or suspended prior to computation of the vote on the

7    Plan.  The Claim to which an objection has been filed is not allowed to vote unless and until the

8    Bankruptcy Court rules on the objection.  The Bankruptcy Code provides that the Bankruptcy

9    Court may, if requested to do so by the holder of such Claim, estimate or temporarily allow a

10   Disputed Claim for the purposes of voting on the Plan.

11       13.2    <u>Parties Entitled to Vote</u>.  Pursuant to Section 1126 of the Bankruptcy Code, any

12   holder of an Allowed Claim that is in an impaired Class under the Plan, and whose Class is not

13   deemed to reject the Plan, is entitled to vote.  A Class is "impaired" unless the legal, equitable

14   and contractual rights of the holders of claims in that Class are left unaltered by the Plan or if

15   the Plan reinstates the Claims held by Members of such Class by (a) curing any defaults,

16   (b) reinstating the maturity of such claim, (c) compensating the holder of such claim for

17   damages that result from the reasonable reliance on any contractual provision of law that

18   allows acceleration of such claim, and (d) otherwise leaving unaltered any legal, equitable, or

19   contractual right of which the Claim entitles the holder of such Claim.  Because of their

20   favorable treatment, Classes that are not impaired are conclusively presumed to accept the

21   Plan.  Accordingly, it is not necessary to solicit votes from the holders of Claims in Classes that

22   are not impaired.

23       Classes of Claims or interests that will not receive or retain any money or property

24   under a Plan on account of such Claims or interests are deemed, as a matter of law under

25   Section 1126(g) of the Bankruptcy Code, to have rejected the Plan and are likewise not entitled

26   to vote on the Plan.

**Page 51 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Classes 1 (Other Priority Claims), 2 (C & K Market, Inc. 401(k) Plan; United States Department of Labor), and 11 (U.S. Bank) are not impaired by the Plan and are conclusively presumed to accept the Plan.  Class 14 (Equity Security Holders) will not receive or retain any money or property on account of such Equity Interests, and are deemed to have rejected the Plan.  All other Classes are impaired by the Plan and are entitled to vote on the Plan.

13.3    <u>Votes Required for Class Acceptance of the Plan</u>.  For a Class of Claims to accept the Plan, Section 1126 of the Bankruptcy Code requires acceptance by Creditors that hold at least two-thirds in dollar amount and a majority in number of the Allowed Claims of such Class, in both cases counting only those claims actually voting to accept or reject the Plan.  The holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.  If the Plan is confirmed, the Plan will be binding with respect to all holders of Claims in each Class, including Classes and members of Classes that did not vote or that voted to reject the Plan.

**14.    CONFIRMATION OF THE PLAN**

14.1    <u>Confirmation Hearing</u>.  The Bankruptcy Court has scheduled a hearing on confirmation of the Plan on _____, 2014 at _____ __.m. Pacific time.  The hearing will be held at the United States Bankruptcy Court for the District of Oregon, Courtroom No. 6, 405 E. Eighth Avenue, Eugene, Oregon 97401, before the Honorable Frank R. Alley, III, United States Bankruptcy Judge.  At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interests of creditors of Debtor.  Debtor will submit a report to the Bankruptcy Court at that time concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote thereon.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  Any objections to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and <u>received</u> by counsel for Debtor no later than

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  _____, 2014, by 5 p.m. Pacific time.  Unless an objection to confirmation is timely

2  filed and received, it may not be considered by the Bankruptcy Court.

3      14.2    Requirements of Confirmation; Liquidation Analysis.  At the hearing on

4  confirmation, the Bankruptcy Court will determine whether the provisions of Section 1129 of

5  the Bankruptcy Code have been satisfied.  If all the provisions of Section 1129 are met, the

6  Bankruptcy Court may enter an order confirming the Plan.  Debtor believes the Plan satisfies

7  all the requirements of Chapter 11 of the Bankruptcy Code, that it has complied or will have

8  complied with all the requirements of Chapter 11, and that the Plan has been proposed and is

9  made in good faith.

10      Among other requirements for confirmation, to confirm the Plan the Bankruptcy Court

11  must determine that the Plan meets the requirements of Section 1129(a)(7) of the Bankruptcy

12  Code; that is, that the Plan is in the best interests of each holder of a Claim in an impaired

13  Class that has not voted to accept the Plan.  Accordingly, if an impaired Class does not

14  unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find

15  that the Plan provides to each holder of a Claim in such impaired Class a recovery on account

16  of the holder's Claim that has a value at least equal to the value of the distribution each such

17  holder would receive if Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

18      A liquidation analysis is attached hereto as **Exhibit 7**.

19      Debtor believes the Plan provides to each holder of a Claim in such impaired Class a

20  recovery on account of the holder's Claim that has a value at least equal to the value of the

21  distribution such holder would receive if Debtor was liquidated under Chapter 7 of the

22  Bankruptcy Code.

23      Underlying the liquidation analysis are projections and assumptions that are inherently

24  subject to significant uncertainties and contingencies.  The liquidation analysis is based on

25  assumptions that may change.  Accordingly, there can be no assurance that the projected

26

**Page 53 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite
1600
Portland, Oregon 97204
503-221-1440

1    values reflected in the liquidation analysis will be realized, and actual results could vary

2    materially from those shown on the liquidation analysis.

3    **15.    MISCELLANEOUS PROVISIONS**

4            In addition to the provisions discussed above, the Plan contains a number of

5    administrative and miscellaneous provisions.  See Article 9 (Effect of Confirmation);

6    Article 10 (Retention of Jurisdiction); Article 12 (Administrative Provisions); and Article 13

7    (Miscellaneous Provisions) of the Plan.  Those provisions are not restated or summarized in

8    this Disclosure Statement.  Please review the Plan carefully and contact your legal or tax

9    adviser if you have any questions regarding the Plan.

10    **16.    TAX CONSEQUENCES TO DEBTOR OF THE PLAN**

11            CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH

12    REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM

13    YOU THAT (A) ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS

14    COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR

15    WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED

16    UPON, FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER

17    THE INTERNAL REVENUE CODE OF 1986, AS AMENDED; OR (2) PROMOTING,

18    MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR

19    TAX MATTER(S) ADDRESSED HEREIN; AND (B) THIS DISCUSSION WAS WRITTEN

20    IN CONNECTION WITH DEBTOR SOLICITING ACCEPTANCES OF THE PLAN

21    THROUGH THIS DISCLOSURE STATEMENT.

22            The following discussion is a summary of certain material United States federal

23    income tax consequences expected to result from consummation of the Plan.  This discussion

24    is for general information purposes only, and should not be relied upon for purposes of

25    determining the specific tax consequences of the Plan with respect to a particular holder of an

26    Allowed Claim or any Equity Security Holder.  This discussion does not purport to be a

**Page 54 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    complete analysis or listing of all potential tax considerations.  This discussion does not

2    address aspects of federal income taxation that may be relevant to a particular holder of an

3    Allowed Claim subject to special treatment under federal income tax laws (such as foreign

4    taxpayers, broker-dealers, banks, thrifts, insurance companies, financial institutions, regulated

5    investment companies, real estate investment trusts and pension plans, and other tax-exempt

6    investors), and does not discuss any aspects of state, local or foreign tax laws.  Furthermore,

7    this summary does not address federal taxes other than income taxes.

8            This discussion is based on existing provisions of the Internal Revenue Code of

9    1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated

10   thereunder, and current administrative rulings and court decisions.  Legislative, judicial or

11   administrative changes or interpretations enacted or promulgated after the date hereof could

12   alter or modify the discussion set forth below with respect to the federal income tax

13   consequences of the Plan.  Any such changes or interpretations may be retroactive and could

14   significantly affect the federal income tax consequences of the Plan.  No ruling has been

15   requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax

16   aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.

17   This discussion is not binding on the IRS or the courts and no assurance can be given that the

18   IRS will not assert, or that a court will not sustain, a different position than any position

19   discussed herein.  No representations or assurances are being made to the holders of Allowed

20   Claims or to the Equity Security Holders with respect to the federal income tax consequences

21   described herein.

22           Accordingly, the following summary of certain federal income tax

23   consequences of the Plan is for informational purposes only and is not a substitute for careful

24   tax planning or advice based upon the individual circumstances pertaining to a particular

25   holder of an Allowed Claim or to a particular Equity Security Holder.  Each holder of an

26

**Page 55 of 63** - DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    Allowed Claim and each Equity Security Holder is strongly urged to consult with its own tax

2    advisors regarding the federal, state, local, foreign, and other tax consequences of the Plan.

3            Any discussion of federal tax issues set forth in this Disclosure Statement was

4    written solely in connection with the confirmation of the Plan to which the transactions

5    described in this Disclosure Statement are ancillary.  Such discussion is not intended or written

6    to be legal or tax advice to any person and is not intended or written to be used, and cannot be

7    used, by any person for the purpose of avoiding any federal tax penalties that may be imposed

8    on such person.  Each holder of an Allowed Claim and each Equity Security Holder should

9    seek advice based on its particular circumstances from an independent tax advisor.

10           16.1    Cancellation of Debt Income of Debtor.  Under the IRC, a taxpayer generally

11    will recognize cancellation of debt income ("COD Income") upon satisfaction of its

12    outstanding indebtedness for consideration less than the amount of such indebtedness.  The

13    amount of COD Income, in general, is the excess of (a) the adjusted issue price of the

14    indebtedness satisfied (in most cases, the amount the debtor received on incurring the

15    obligation, with certain adjustments), over (b) the sum of the amount of cash paid and the fair

16    market value of any new consideration given in satisfaction of the indebtedness.  However,

17    IRC Section 108(a) provides an exception to this income recognition rule (the "Bankruptcy

18    Exception") where a taxpayer is in bankruptcy and the discharge is granted, or is effected,

19    pursuant to a plan approved by the bankruptcy court.  In the case of an entity taxable as a

20    corporation, eligibility for the Bankruptcy Exception is determined at the corporate level.  If

21    the Bankruptcy Exception applies (with the effect that the taxpayer excludes its COD Income

22    from its gross income), the taxpayer is required, under IRC Section 108(b), to reduce certain of

23    its tax attributes by the amount of COD Income excluded from gross income pursuant to the

24    Bankruptcy Exception.  The attributes of the taxpayer that are reduced include any net

25    operating loss ("NOL") for the taxable year of the discharge, net operating loss carryovers

26

**Page 56 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

from prior years, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and foreign tax credit tax carryforwards.

COD Income will be realized by Debtor upon the issuance of Common Stock and Series A Preferred Stock in satisfaction of the Allowed General Unsecured Claims.  The amount of COD Income is equal to the difference between the adjusted issue price of each debt and the fair market value of the stock transferred in satisfaction of each such debt.  Since the COD Income realized by Debtor on such stock issuance is excluded from Debtor's income by the Bankruptcy Exception, certain tax attributes of Debtor are subject to reduction.

COD Income will also be realized by Debtor upon satisfaction of the Allowed Small Unsecured Claims for 80% of each Claim.  The amount of COD Income is equal to the excess of the adjusted issue price of each debt over the amount paid in satisfaction of each such debt.  Since the COD Income realized by Debtor on such debt satisfaction is excluded from Debtor's income by the Bankruptcy Exception, certain tax attributes of Debtor are subject to reduction as discussed above.

Whether Debtor will realize any COD Income on the debt restructuring contemplated by the Plan depends on whether the restructuring of any debt constitutes a deemed taxable exchange of the underlying debt pursuant to IRC Section 1001 and the corresponding Treasury Regulations.  For a deemed taxable exchange to occur with respect to a debt, the modification to the debt must be "significant" as such term is defined in the applicable Treasury Regulations.  If the modification to a debt obligation of Debtor is "significant," Debtor will realize COD Income in an amount equal to the amount, if any, by which the "issue price" of the new debt (i.e., the "modified debt") is less than the "adjusted issue price" of the old debt.

16.2    Limitation of NOL Carryforwards and Other Tax Attributes.  It is uncertain whether Debtor has any NOLs.  Debtor did not have any NOLs as of the tax year ended December 31, 2012.

**Page 57 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    Even after taking into account a reduction in any NOLs as a result of COD Income,

2  Debtor anticipates Reorganized Debtor will have significant tax attributes (e.g., depreciable

3  basis) at emergence.  The amount of such tax attributes that will be available to Reorganized

4  Debtor at emergence is based on a number of factors and is impossible to calculate at this time.

5  Some of the factors that will impact the amount of available tax attributes include:  (a) the

6  amount of tax losses incurred by Debtor in 2013; (b) the fair market value of the Common

7  Stock issued pursuant to the Plan; and (c) the amount of COD Income incurred by Debtor in

8  connection with consummation of the Plan.

9    Under IRC Section 382, if a corporation undergoes an "ownership change," the amount

10  of its "pre-change losses" that may be utilized to offset future taxable income generally is

11  subject to an annual limitation.  As discussed in greater detail herein, Debtor anticipates that

12  the issuance of the Common Stock and Series A Preferred Stock to the holders of Allowed

13  General Unsecured Claims, along with the cancellation of the Equity Securities pursuant to the

14  Plan will result in an "ownership change" of Debtor for these purposes, and that Debtor's use of

15  any "pre-change losses" will be subject to limitation unless an exception to the general rules of

16  IRC Section 382 applies.

17    In general, the annual IRC Section 382 limitation on the use of "pre-change losses" in

18  any "post-change year" is equal to the product of (a) the fair market value of the stock of the

19  corporation immediately before the "ownership change" (with certain adjustments) multiplied

20  by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership change"

21  occurs.  The IRC Section 382 limitation may be increased to the extent that Debtor recognizes

22  certain built-in gains in its assets during the five-year period following the ownership change.

23  Any unused limitation may be carried forward, thereby increasing the annual limitation in the

24  subsequent taxable year.  As discussed below, however, special rules may apply in the case of

25  a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

26

**Page 58 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    The IRC Section 382(1)(5) exception to the foregoing annual limitation rules generally

2    applies when so-called "qualified creditors" of a debtor company in Chapter 11 receive, in

3    respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor

4    pursuant to a confirmed Chapter 11 plan.  Under the IRC Section 382(1)(5) exception, a

5    debtor's pre-change losses are not limited on an annual basis but, instead, the debtor's NOLs

6    are required to be reduced by the amount of any interest deductions claimed during any taxable

7    year ending during the three-year period preceding the taxable year that includes the effective

8    date of the plan of reorganization, and during the part of the taxable year prior to and including

9    the effective date of the plan of reorganization in respect of all debt converted into stock in the

10    reorganization.  If the IRC Section 382(1)(5) exception applies but the debtor undergoes

11    another ownership change within two years after consummation, then the debtor's pre-change

12    losses effectively would be eliminated in their entirety.

13    Where the IRC Section 382(1)(5) exception is not applicable (either because the debtor

14    does not qualify for it or the debtor otherwise elects not to utilize the IRC Section 382(1)(5)

15    exception), a second special rule, the IRC Section 382(1)(6) exception, will generally apply.

16    When the IRC Section 382(1)(6) exception applies, a debtor corporation that undergoes an

17    ownership change generally is permitted to determine the fair market value of its stock after

18    taking into account the increase in value resulting from any surrender or cancellation of

19    creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair

20    market value of a corporation that undergoes an ownership change to be determined before the

21    events giving rise to the change.  The IRC Section 382(1)(6) exception also differs from the

22    IRC Section 382(1)(5) exception in that the debtor corporation is not required to reduce its

23    NOLs by interest deductions in the manner described above, and the debtor may undergo a

24    change of ownership within two years without triggering the elimination of its pre-change

25    losses.

26

**Page 59 of 63** -  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~APRIL 21,~~MAY 9, 2014)

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

16.3    Holders of Allowed General Unsecured Claims Not Constituting Tax Securities.  A holder of an Allowed General Unsecured Claim not constituting a tax security should recognize gain or loss equal to the amount realized in satisfaction of his Claim minus the holder's tax basis in the Claim.  The holder's amount realized for this purpose generally will equal the fair market value of the combination of the Common Stock and Series A Preferred Stock received on the date of distribution, less any amount allocable to interest on the holder's Claim.

Any gain or loss recognized by a holder of an Allowed General Unsecured Claim not constituting a tax security will be capital or ordinary depending on the status of the Claim in the holder's hands.  Such a holder's tax basis for the Common Stock and Series A Preferred Stock received under the Plan generally should equal its fair market value on the date of distribution by Reorganized Debtor.  The  holding period for any Common Stock and Series A Preferred Stock received under the Plan by a holder of a Claim not constituting a tax security generally should begin on the day following the day of receipt.

Debtor has the right to consummate the Rights Offering on or before the Effective Date.  If the Rights Offering is implemented, each holder of an Allowed General Unsecured Claim will receive Subscription Rights to purchase Common Stock and Series A Preferred Stock in accordance with the terms of the Rights Offering.  This tax discussion assumes that the Subscription Price for the combination of each share of Common Stock and Series A Preferred Stock issued in the Rights Offering will equal its fair market value for United States federal income tax purposes.  Accordingly, neither the receipt nor the exercise of Subscription Rights by a holder of an Allowed General Unsecured Claim will affect the amount of any gain or loss recognized upon satisfaction of such holder's Claim.

16.4    Holders of Allowed Small Unsecured Claims.  In accordance with the Plan, the debt owed by Debtor to holders of Allowed Small Unsecured Claims will be satisfied by a payment of cash in an amount equal to 80% of each such Claim.  In general, the amount

1 received by each holder of an Allowed Small Unsecured Claim is treated as an amount

2 received in exchange for the satisfied debt, and each such holder will recognize taxable gain or

3 loss equal to the amount received less the holder's tax basis in the Claim.  Any gain or loss

4 recognized will be long-term or short-term capital gain or loss, or ordinary income or loss,

5 depending upon factors specific to each holder of an Allowed Small Unsecured Claim,

6 including, but not limited to:  (a) whether the Claim (or a portion thereof) is attributable to

7 principal or interest, (b) the origin of the Claim, (c) whether the holder of the Claim reports

8 income on the accrual or cash basis method, and (d) whether the holder of the Claim has taken

9 a bad debt deduction or otherwise recognized a loss with respect to the Claim.

10        16.5    Equity Security Holders.  In accordance with the Plan, all the Equity Securities,

11 which constitute all of the equity interests of Debtor, shall be deemed cancelled and shall be of

12 no further force and effect (without regard to whether the Equity Securities are surrendered for

13 cancellation or otherwise).  The Equity Security Holders will not receive anything on account

14 of such Equity Securities and will recognize loss in an amount equal to such holder's adjusted

15 tax basis in the Equity Securities.  The character of any recognized loss will depend upon

16 several factors, including, but not limited to, the status of the holder, the nature of the Equity

17 Interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's

18 holding period, and the extent to which the holder had previously claimed a deduction for the

19 worthlessness of all or a portion of the Equity Security.

20        16.6    Information Reporting and Backup Withholding.  Certain payments, including

21 payments with respect to Allowed Claims pursuant to the Plan, are generally subject to

22 information reporting by the payor to the IRS.  Moreover, under certain circumstances, a

23 holder of an Allowed Claim may be subject to "backup withholding" with respect to payments

24 made pursuant to the Plan, unless such holder either (a) comes within certain exempt

25 categories (which generally include corporations) and, when required, demonstrates this fact;

26 or (b) provides a correct United States taxpayer identification number and certifies under

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    penalty of perjury that the holder is a United States person, the taxpayer identification number

2    is correct, and the taxpayer is not subject to backup withholding because of a failure to report

3    all dividend and interest income.  Backup withholding is not an additional tax.  Amounts

4    withheld under the backup withholding rules may be credited against the holder's United States

5    federal income tax liability, and the holder may obtain a refund of any excess amounts

6    withheld under the backup withholding rules by filing an appropriate claim for refund with the

7    IRS.

8        16.7    _Importance of Obtaining Professional Tax Assistance_.  THE FOREGOING

9    DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL

10   INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR

11   CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE

12   DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX

13   ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND

14   MAY VARY DEPENDING ON A HOLDER OF AN ALLOWED CLAIM OR THE EQUITY

15   SECURITY HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, EACH

16   HOLDER OF AN ALLOWED CLAIM AND EACH EQUITY SECURITY HOLDER IS

17   URGED TO CONSULT ITS TAX ADVISOR ABOUT THE FEDERAL, STATE, LOCAL,

18   AND APPLICABLE FOREIGN, INCOME AND OTHER TAX CONSEQUENCES OF THE

19   PLAN.

20   **17.    RECOMMENDATION AND CONCLUSION**

21       Please read this Disclosure Statement and the Plan carefully.  After reviewing all the

22   information and making an informed decision, please vote by using the enclosed ballot.

23

24

25

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1      Debtor strongly urges you to vote in support of the Plan.  The Committee has also

2  recommended that General Unsecured Creditors vote in support of the Plan (see letter of

3  support from the Committee enclosed with this Disclosure Statement).

4      DATED this 21st9th day of AprilMay, 2014.

5

6                                              C & K MARKET, INC.

7                                      By /s/ Edward C. Hostmann
                                           Edward C. Hostmann
8                                          Chief Restructuring Officer

9  Presented by:

10  TONKON TORP LLP

11

   By /s/ Albert N. Kennedy
12     Albert N. Kennedy, OSB No. 821429
       Timothy J. Conway, OSB No. 851752
13     Michael W. Fletcher, OSB No. 010448
       Ava L. Schoen, OSB No. 044072
14     Of Attorneys for Debtor

15  034518/00017/5453394v5

16

17

18

19

20

21

22

23

24

25

26

**Page 63 of 63** -  DEBTOR'S FIRSTSECOND AMENDED DISCLOSURE STATEMENT
                     (APRIL 21,MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  **Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
      Direct Dial:  (503) 802-2013
2      Facsimile:    (503) 972-3713
      E-Mail:       al.kennedy@tonkon.com
3  **Timothy J. Conway**, OSB No. 851752
      Direct Dial:  (503) 802-2207
4      Facsimile:    (503) 972-3727
      E-Mail:       tim.conway@tonkon.com
5  **Michael W. Fletcher**, OSB No. 010448
      Direct Dial:  (503) 802-2169
6      Facsimile:    (503) 972-3869
      E-Mail:       michael.fletcher@tonkon.com
7  **Ava L. Schoen**, OSB No. 044072
      Direct Dial:  (503) 802-2143
8      Facsimile:    (503) 972-3843
      E-Mail:       ava.schoen@tonkon.com
9  **TONKON TORP** LLP
   1600 Pioneer Tower
10 888 S.W. Fifth Avenue
   Portland, OR  97204
11
        Attorneys for Debtor
12

13            UNITED STATES BANKRUPTCY COURT

14                 DISTRICT OF OREGON

15 | In re | Case No. 13-64561-fra11 |
16 | C & K Market, Inc., | **DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)** |
17 | Debtor. | |

18

19 **1.    INTRODUCTION**

20        On November 19, 2013 (the "Petition Date"), C & K Market, Inc. ("C & K" or

21 "Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United

22 States Code (the "Bankruptcy Code").

23        On May 9, 2014 Debtor filed its Second Amended Plan of Reorganization (the

24 "Plan") with the Bankruptcy Court.  A copy of the Plan is attached hereto as **Exhibit 1**.

25 Debtor is seeking acceptance of the Plan by its creditors.  A ballot has been enclosed with

26 this Disclosure Statement for use in voting on the Plan.  Debtor believes confirmation of the

**Page 1 of 62** -    DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    Plan is in the best interest of Debtor's creditors and urges those parties entitled to vote to vote

2    to accept the Plan.  The Official Committee of Unsecured Creditors ("Committee") supports

3    the Plan and has recommended that General Unsecured Creditors vote to accept the Plan.

4    The Committee's letter supporting the Plan is enclosed with this Disclosure Statement.

5    **2.      PURPOSE OF THE DISCLOSURE STATEMENT**

6           The purpose of this Disclosure Statement is to provide you with adequate information

7    to enable you to make an informed judgment concerning whether to vote for or against the

8    Plan.  You are urged to review the Plan and, if appropriate, consult with counsel about the

9    Plan and its impact on your legal rights before voting on the Plan.  Capitalized terms used but

10   not defined in this Disclosure Statement shall have the meanings assigned to such terms in

11   the Plan or the Bankruptcy Code.

12          This Disclosure Statement has been approved by Order of the Bankruptcy Court as

13   containing adequate information to permit parties in interest to make an informed judgment

14   as to whether to vote to accept or reject the Plan, and whether or not to participate in the

15   Rights Offering.  The Bankruptcy Court's approval of this Disclosure Statement, however,

16   does not constitute a recommendation by the Bankruptcy Court either for or against the Plan

17   or the Rights Offering.

18          This Disclosure Statement is submitted in accordance with Section 1125 of the

19   Bankruptcy Code and Bankruptcy Rule 3016.  The description of the Plan contained in this

20   Disclosure Statement is intended as a summary only and is qualified in its entirety by

21   reference to the Plan itself.  This Disclosure Statement does not attempt to summarize or

22   discuss each and every section of the Plan.  If any inconsistency exists between the Plan and

23   this Disclosure Statement, the terms of the Plan are controlling.  This Disclosure Statement

24   may not be relied on for any purpose other than to determine how to vote on the Plan.

25          This Disclosure Statement has been prepared by Debtor in good faith based upon

26   information available to Debtor and information contained in Debtor's books and records.

**Page 2 of 62** -   DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  The information concerning the Plan has not been subject to a verified audit.  The statements

2  contained in this Disclosure Statement are made as of the date hereof unless another time is

3  specified herein, and the delivery of this Disclosure Statement shall not imply there has been

4  no change in the facts set forth herein since the date of this Disclosure Statement and the date

5  the material relied on in preparation of this Disclosure Statement was compiled.

6       Nothing contained herein shall constitute an admission of any fact or liability by any

7  party, or be admissible in any proceeding involving Debtor or any other party.

8  **3.     BRIEF EXPLANATION OF CHAPTER 11**

9       Chapter 11 of the Bankruptcy Code is the principal reorganization provision of the

10  Bankruptcy Code.  Pursuant to Chapter 11, a debtor-in-possession attempts to reorganize its

11  business for the benefit of the debtor, its creditors and other parties in interest.

12       The formulation and confirmation of a plan of reorganization is the principal purpose

13  of a Chapter 11 case.  A plan sets forth a proposed method of compensating the debtor's

14  creditors.  Chapter 11 does not require all holders of claims to vote in favor of a plan in order

15  for the Bankruptcy Court to confirm the plan.  However, the Bankruptcy Court must find that

16  the plan meets a number of statutory tests before it may confirm, or approve, the plan.  These

17  tests are designed to protect the interests of holders of claims who do not vote to accept the

18  plan, but who will nonetheless be bound by the plan's provisions if it is confirmed by the

19  Bankruptcy Court.

20  **4.     GENERAL SUMMARY OF TREATMENT OF CLAIMS**

21       The Plan provides for the payment in full on the Effective Date of all Allowed

22  Administrative Expense Claims, Priority Tax Claims, Other Priority Claims and the Allowed

23  Claim of U.S. Bank.  The Plan provides for the payment in full over time, with interest, of all

24  other Secured Claims.  In general, Secured Creditors with personal property collateral will be

25  paid in 48 equal monthly amortizing payments, with interest at 6% per annum, and Secured

26  Creditors with real property collateral will be paid in 84 equal monthly amortizing payments

**Page 3 of 62** -    DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  with interest at 6% per annum based on a 25-year amortization, with a balloon payment in

2  seven years.  A sample form promissory note that Debtor will issue to secured creditors on

3  account of their Secured Claim is attached hereto as **Exhibit 2**.

4       The Plan provides that each holder of a Small Unsecured Claim ($10,000 or less) will

5  receive, within 90 days after the Effective Date, a cash payment in an amount equal to 80%

6  of its Allowed Small Unsecured Claim.

7       The Plan provides that each holder of an Allowed General Unsecured Claim will

8  receive the combination of one share of Common Stock and one share of Series A Preferred

9  Stock (sometimes hereinafter referred to together as "Stock") of Reorganized Debtor in

10  exchange for each $10 of such holder's Allowed General Unsecured Claim and a

11  Subscription Right in the event Debtor elects to consummate the Rights Offering.

12       The Plan provides that all existing Equity Securities and Employee Equity Security

13  Plans will be cancelled as of the Effective Date.

14  **5.    EVENTS LEADING TO CHAPTER 11 FILING**

15       Debtor is a family owned grocery store company headquartered in Brookings,

16  Oregon.  Ray Nidiffer founded the company in 1956 with a single store in Brookings.  Over

17  the next 50 years, the Nidiffer family and its employees grew the company to a chain of 60

18  plus grocery stores located in south and central Oregon and northern California.

19       The stores operate under the banners Ray's Food Place, Shop Smart and C & K

20  Market.  Debtor employs over 2,000 people, a majority of whom are employed full-time.

21  Debtor provides family health insurance for all its full-time employees.

22       Debtor's wholly owned subsidiary, C&K Express ("Express"), which is a co-obligor

23  on the obligations owing to U.S. Bank, owned and operated 15 pharmacies, several of which

24  were located in Debtor's grocery stores and several of which were stand-alone operations.

25  Prepetition, Express sold 12 of the 15 pharmacies.  Postpetition, Express has closed the sale

26  of two of the three remaining pharmacies, and expects to sell the remaining pharmacy by the

**Page 4 of 62** -    DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  end of June, 2014.  Proceeds from the sales have been and will be paid to U.S. Bank to

2  reduce its Secured Claim.

3        Historically, Debtor operated in small rural communities.  Often, Debtor operated the

4  only grocery store in the community and the only grocery store for miles around.  As a result

5  of both Debtor's expansion into more populated areas, and the expansion of large discounters

6  such as Costco and Walmart into less populated areas and into the grocery business, Debtor

7  has faced increasingly greater competition and resulting pressure on its sales and margins.

8        Many of Debtor's stores were located within 40 miles of a large discount grocery

9  operation such as Walmart or Costco.  In the last half of 2012, new "Super Walmarts"

10  negatively affected at least 30 of Debtor's markets.  As a result of the evolving marketplace,

11  several of Debtor's stores became unviable.  Accordingly, Debtor has closed approximately

12  20 unviable stores, leaving Debtor with approximately 40 grocery stores with proven

13  profitability in markets Debtor believes will continue to prosper.

14        Although the closures will enhance Debtor's profitability and reduce secured debt to

15  U.S. Bank, the downsizing will result in additional unsecured debt as a result of lease

16  rejections, and has diminished Debtor's ability to service its legacy debt incurred during its

17  period of expansion.  As a result, Debtor was forced to restructure its obligations and seek

18  Chapter 11 relief.

19        Debtor's restructuring will enable it to emerge as a viable entity that will continue to

20  contribute to the communities in which it operates.

21  **6.    SIGNIFICANT POST-PETITION EVENTS**

22        6.1    <u>Ordinary Course Operations</u>.  Other than the closing of unviable stores,

23  Debtor has continued to operate its stores and its business, and pay its post-petition expenses,

24  in the ordinary course of business.

25        6.2    <u>Appointment of Unsecured Creditors Committee</u>.  Early in the case, the

26  United States Trustee appointed a committee of unsecured creditors (the "Committee")

**Page 5 of 62** -   DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  pursuant to 11 U.S.C. § 1102(a) and 11 U.S.C. § 1102(b)(1).  The Committee was appointed

2  to generally represent the interests of General Unsecured Creditors and to participate in

3  Debtor's Chapter 11 case with respect to, among other things, the formulation of a plan of

4  reorganization.  The Committee is represented by Otterbourg P.C. as lead co-counsel and by

5  McKittrick Leonard LLP as local co-counsel.

6      6.3    Retention of Professionals.  Pursuant to a series of applications and orders,

7  Debtor obtained authorization from the Bankruptcy Court to employ various professionals in

8  the Case.  These professionals include, among others, Tonkon Torp LLP as Debtor's

9  Chapter 11 counsel; Edward Hostmann, Inc. as Chief Restructuring Officer; The Food

10  Partners, LLC as financial advisors; Great American Group, LLC to manage store closing

11  sales; Henderson Bennington Moshofsky, P.C. as accountants; and Kieckhafer Schiffer &

12  Company, LLP as financial advisors and consultants.

13      6.4    First Day Orders.  Early in the case, Debtor obtained a number of Bankruptcy

14  Court orders designed to ensure a smooth transition into Chapter 11.  These orders authorized

15  Debtor to, among other things:  assume its supply agreement with SuperValu (Debtor's

16  primary supplier of grocery products and health and beauty products); obtain post-petition

17  financing from U.S. Bank; pay prepetition wages, PACA claims, and 503(b)(9) claims;

18  continue to honor and perform its customer loyalty programs; maintain its existing bank

19  accounts and cash management system; and conduct store closing sales.

20      6.5    Post-Petition Financing.  Prepetition, Debtor and U.S. Bank agreed upon the

21  terms of post-petition financing (the "DIP Facility") to be provided by U.S. Bank to Debtor

22  during the Chapter 11 case.  The DIP Facility is a secured revolving line of credit, the terms

23  of which were approved by the Bankruptcy Court.  Post-petition, Debtor has been operating

24  in the ordinary course with funds obtained from the DIP Facility.  A summary of the material

25  terms of the DIP Facility was included in Debtor's motion to approve the DIP financing

26  [ECF No. 26] and may be obtained by contacting counsel for Debtor.  Debtor has operated

**Page 6 of 62** -   DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  within the terms of the DIP Facility and is confident the DIP Facility will provide funding

2  that is adequate to ensure its successful operation during the pendency of the Chapter 11

3  case.

4        6.6    Payment of PACA (Perishable Agricultural Commodities Act) Claims.

5  Debtor obtained Bankruptcy Court authority to pay the valid prepetition PACA claims of

6  Debtor's PACA suppliers (suppliers of fresh and frozen fruits and vegetables).  As of

7  April 15, 2014, Debtor had paid approximately $1,270,000 out of a total estimated

8  $1,300,000 in prepetition PACA claims in accordance with the PACA order.  In addition,

9  Debtor has paid all post-petition PACA claims in the ordinary course of business.

10        6.7    Payment of 503(b)(9) Claims.  Debtor obtained an order from Bankruptcy

11  Court authorizing (but not requiring) Debtor to pay the valid prepetition 503(b)(9) claims of

12  Debtor's continuing suppliers.  Nearly all of Debtor's suppliers have continued to supply

13  goods to Debtor on payment terms equal to or better than those provided prepetition.  As of

14  April 15, 2014, Debtor had paid approximately $5,700,000 in 503(b)(9) claims in accordance

15  with the 503(b)(9) order, and estimates there may be $1,000,000 in additional 503(b)(9)

16  claims.  Debtor continues to pay its suppliers in the ordinary course of business.  The above

17  503(b)(9) payment amount does not include approximately $5,600,000 in postpetition

18  payments made to SuperValu under Debtor's assumed contract with SuperValu that

19  otherwise would have qualified for payment under the 503(b)(9) order.

20        6.8    Store Closing Sales.  Pursuant to Bankruptcy Court authority, Debtor has

21  conducted store closing sales at 15 stores.  Proceeds from the store closing sales have been

22  applied to the post-petition revolver under the DIP Facility and to the U.S. Bank Term Loans

23  for proceeds received in excess of the advance rate.  In addition to the store closing sales,

24  postpetition Debtor closed on the sale of one additional store, leaving Debtor with 44

25  operating stores as of April 15, 2014.  Debtor is analyzing its remaining 44 stores to

26  determine which additional stores, if any, it will sell or close prior to exiting Chapter 11.

**Page 7 of 62** -    DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1        6.9    <u>Lease Rejections/Assumptions</u>.  In connection with the store closings and

2    sales, Debtor has rejected its non-residential real property leases at 16 stores.  Pursuant to a

3    Bankruptcy Court order [ECF No. 661], Debtor must by, June 17, 2014, assume or reject its

4    unexpired leases of non-residential real property.  Prior to the June 17, 2014 deadline, Debtor

5    will file a motion to assume those unexpired leases of non-residential real property which

6    Debtor desires to assume.  Pursuant to the Bankruptcy Code, any leases of non-residential

7    real property in which Debtor is the tenant that are not assumed by Debtor will be deemed

8    rejected.  Provided a Landlord timely files a claim, Landlords with rejected leases will have

9    lease rejection claims against Debtor.  As of April 9, 2014, 15 lease rejection claims had been

10    filed, totaling approximately $10,500,000.  Debtor is in the process of reviewing the filed

11    lease rejection claims.

12        6.10    <u>Operations</u>.  Debtor's transition into the Chapter 11 case was successful.

13    Debtor has continued to receive ordinary trade terms from the vast majority of its suppliers.

14    Debtor has continued its valuable relationship with SuperValu, its primary supplier.  With the

15    support of SuperValu and its other suppliers, Debtor's operations have met or exceeded its

16    projections and Debtor is confident it has adequate funding available on its DIP Facility to

17    fund its operations for the remainder of the case.

18        6.11    <u>Claim of Sunstone Business Finance, LLC</u>.  Prepetition, Sunstone Business

19    Finance, LLC ("Sunstone") agreed to provide Debtor with post-petition financing in the

20    event that (a) Debtor could not reach an agreement on postpetition financing with U.S. Bank,

21    or (b) even if an agreement was reached, the Bankruptcy Court failed to approve such

22    agreement.  In connection with Sunstone agreeing to provide such financing, prepetition

23    Debtor agreed to pay Sunstone a $250,000 break-up fee in the event Debtor did not obtain

24    post-petition financing from Sunstone.  As discussed above, Debtor ultimately obtained

25    postpetition financing from U.S. Bank and not from Sunstone.  Sunstone then filed a proof of

26    claim with the Bankruptcy Court for the break-up fee, and also filed a motion to allow the

**Page 8 of 62** -   DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  break-up fee as an administrative expense claim.  Several interested parties objected to the

2  break-up fee and to Sunstone's motion to allow the fee as an administrative expense.  A

3  hearing was held on the matter, and the Bankruptcy Court entered an order [ECF No. 787]

4  denying the claim objections and also denying Sunstone's motion to allow the break-up fee as

5  an administrative expense, with the net result that Sunstone will have an allowed general

6  unsecured claim in the amount of $250,000.

7      6.12    Claim of Nidiffer Family, LLC.  Nidiffer Family, LLC filed a proof of claim

8  in the amount of $10,506,666.69 (Claim No. 32).  Certain members of the Nidiffer Family,

9  LLC are Insiders of Debtor.  The Committee objected to the claim [ECF No. 776], seeking to

10  recharacterize the claim as equity and disallow the claim as a general unsecured claim.  As a

11  result of negotiations among the Committee, Debtor, Nidiffer Family, LLC, Endeavour and

12  THL, a stipulated order [ECF No. 867] was entered abating the contested case proceeding

13  initiated by the Committee's objection, subject to reinstatement upon notice and order of the

14  Court.  Pursuant to the stipulated order, the Committee will file a notice of withdrawal of its

15  objection, without prejudice.  Presuming this Plan is confirmed, the Nidiffer Family, LLC

16  claim will be an Allowed General Unsecured Claim (Class 12).  The Nidiffer Family, LLC

17  Claim is subject to a Subordination Agreement in favor of THL and Endeavour.

18      6.13    The Food Partners Valuation.  Postpetition, Debtor engaged The Food

19  Partners, LLC ("TFP") to estimate, as of the projected Effective Date, the fair market value

20  of the equity of Reorganized Debtor on a control basis.  Portions of the report are attached

21  hereto as **Exhibit 3**.  The full report is not attached because it contains proprietary and

22  confidential information not suitable for public disclosure.  If a creditor desires to view the

23  entire report, it may contact counsel for Debtor and, if the creditor executes a release,

24  confidentiality and non-disclosure agreement acceptable to Debtor and TFP, then Debtor will

25  share the report with the creditor.  Based on various assumptions, conditions, and limitations

26  set forth in the report, TFP estimates (as of an assumed July 2014 Effective Date) a fair

**Page 9 of 62** -    DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

market value of the stockholder's equity in Reorganized Debtor of $48.7 million on a control

basis.  Based on an assumption that 6 million shares of Common Stock would be issued to

holders of Allowed General Unsecured Claims, the report estimates an Effective Date per-

share price on a control basis of $8.12 ($48.7 million divided by 6 million shares).  TFP

opines that a 15% discount would apply to the sale of minority shares.[1]  However, it should

be noted that no single Creditor will hold a majority of the shares on the Effective Date.  The

conclusions set forth in the report are estimates only and represent The Food Partners'

opinion of market conditions at the time it issued its report.  The fair market value of

Reorganized Debtor as of the Effective Date may vary considerably from that set forth in the

report.  In addition, the value of each share to be distributed will depend on, among other

things, the total amount of Allowed General Unsecured Claims and the number of shares

ultimately issued under the Plan to holders of Allowed General Unsecured Claims.  In

determining whether to vote in favor of or against the Plan, each creditor should make its

own conclusions, and consult its own advisors, in estimating the value of the shares it expects

to receive on account of its General Unsecured Claim.  Debtor has made no estimate of the

relative value of one share of Common Stock compared to one share of Series A Preferred

Stock.  The Food Partners' opinion specifically states it is not an assessment of value for tax

purposes, and should not be used to determine the tax treatment of any shares issued under

the Plan in the hands of the shareholders.  Creditors receiving shares should consult their tax

advisors on any tax matters concerning the value of any shares issued under the Plan.

   6.14 <u>Retention of Chief Operating Officer</u>.  In February 2014, Debtor hired Karl V.

Wissmann as its chief operating officer.  Mr. Wissmann was previously president and CEO

of Star Markets, Honolulu from 2002 until early 2012 after working for Ralph's Grocery Co.

in Northern California and Alpha Beta Co. in Southern California.  Before he joined Star

---

[1] TFP's report did not contemplate the issuance of Series A Preferred Stock as now proposed in the Plan.

**Page 10 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1   Markets, Mr. Wissmann worked for Kroger Co. and its Ralph's division from 1989 until

2   2002—ultimately as senior vice president and general manager for Kroger Co.'s Cala Foods

3   and Bell Markets divisions.  Mr. Wissmann previously served as a group vice president for

4   Ralph's and also vice president, administration, where he oversaw the chain's Food 4 Less

5   operations in Northern California.  Earlier in his career Mr. Wissmann spent 12 years with

6   Alpha Beta Co., a division of American Stores, ultimately holding the title of director of

7   financial planning and analysis. Since 2001 he has also been a consultant with KW &

8   Associates, El Dorado Hills, California, which is involved with grocery and real estate

9   investments.

10  **7.      CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN**

11          Below is a general summary of the Plan's classification and treatment of Claims.

12  Please refer to the Plan for a more complete description of the classification and treatment of

13  Claims, and for the meaning of the capitalized (defined) terms used below.

14          7.1     <u>Unclassified Claims</u>.  Administrative Expense Claims and Priority Tax Claims

15  are not classified under the Plan.

16          An Administrative Expense Claim is any Claim entitled to the priority afforded by

17  Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

18          The Plan provides that each holder of an Allowed Administrative Expense Claim

19  shall be paid the full amount of its Allowed Administrative Expense Claim in Cash on the

20  later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless

21  such holder shall agree to a different treatment of such Claim (including, without limitation,

22  any different treatment that may be provided for in any documentation, statute, or regulation

23  governing such Claim); provided, however, that Administrative Expense Claims representing

24  obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case

25  shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in

26

**Page 11 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  accordance with any terms and conditions of the particular transaction, and any agreements

2  relating thereto.

3        The amount of Administrative Expense Claims has not yet been determined.  Debtor

4  notes that Endeavour and THL may seek to recover, as an asserted Administrative Expense,

5  certain fees and expenses (including attorneys' fees) incurred by Endeavour and THL in

6  connection with this Case.

7        A Priority Tax Claim is a claim of a governmental unit of the kind entitled to priority

8  under Section 507(a)(8) of the Bankruptcy Code.  The Plan provides that each holder of an

9  Allowed Priority Tax Claim will be paid by Reorganized Debtor the full amount of its

10  Allowed Priority Tax Claim in Cash on the later of (a) the Effective Date or (b) the date on

11  which such Claim becomes Allowed.  The amount of Priority Tax Claims has yet to be

12  determined.

13        7.2    Classified Claims.  The Plan divides all Claims (other than Administrative

14  Expense Claims and Priority Tax Claims) into the following Classes.

15            7.2.1    Class 1 (Other Priority Claims).  Class 1 consists of all Allowed

16  Other Priority Claims.  An Other Priority Claim means any Claim for an amount entitled to

17  priority in right of payment under Sections 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy

18  Code.

19        The amount of Other Priority Claims, if any, has not yet been determined.

20        The Plan provides that each holder of an Allowed Other Priority Claim will be paid in

21  full in Cash by Reorganized Debtor the amount of its Allowed Other Priority Claim on the

22  later of (a) the Effective Date or (b) the date on which such Claim becomes allowed, unless

23  such holder shall agree or has agreed to a different treatment of such Claim (including any

24  different treatment that may be provided for in any documentation, agreement, contract,

25  statute, law, or regulation creating and governing such Claim).

26        Class 1 is unimpaired by the Plan.

**Page 12 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

7.2.2    Class 2 (C & K Market, Inc. 401(k) Plan; United States Department of Labor).  Class 2 consists of the Claims of the C & K Market, Inc. 401(k) Plan and the United States Department of Labor arising under or related to a Consent Judgment and Order between the DOL, Debtor and the C & K Market 401(k) Plan (see Claim No. 89).  A copy of the Consent Judgment and Order is attached to Claim No. 89 filed by the United States Department of Labor in this Case.

The Consent Judgment and Order settled claims of breach of ERISA fiduciary duties asserted by the DOL against Debtor arising from a series of transactions pursuant to which the 401(k) Plan acquired certain real estate assets, including properties generally referred to as Rogue Landing, the Lakeside Property, and the John Day Market.

Rogue Landing is a 15.12-acre tract located in Curry County, Oregon on the southern Oregon Coast.  The property has Rogue River frontage and contains a resort with an office building, RV hookups, a boat ramp, docks and cabins.  There are several residential sites situated on bluffs overlooking the Rogue River and beyond to the Pacific Ocean.

Under the terms of the Consent Judgment and Order, Debtor is, among other things, obligated to pay to the 401(k) Plan a total of $3 million in principal plus simple interest at 8% per annum, in annual installments of $500,000.  Debtor began making such payments on July 1, 2011 and is obligated to pay to the 401(k) Plan $500,000 on July 1, 2014; $500,000 on July 1, 2015; $500,000 on July 1, 2016; and a final payment of $544,739.81 on July 1, 2017.  In addition, if the 401(k) Plan has not sold Rogue Landing within six years of the date of entry of the Consent Judgment and Order, or by October 29, 2016, the Rogue Landing property is to be put up for auction to be concluded within 90 days after the expiration of such six-year period.  If, prior to or at such auction, Rogue Landing is purchased by an unrelated third party for less than $5 million, Debtor is obligated to pay into the 401(k) Plan the difference between the net payment to the 401(k) Plan and $5 million.  If Rogue Landing is not purchased by an unrelated third party prior to or at such auction, Debtor is obligated to

**Page 13 of 62** - DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  purchase Rogue Landing by tendering payment of $5 million to the 401(k) Plan within

2  30 days following the close of such auction.  Debtor does not have a current appraisal of

3  Rogue Landing and the marker value is uncertain.

4          The Plan provides that the Consent Judgment and Order shall remain in full force and

5  effect, and not be in any way modified, altered or affected by the Plan.  Without limiting the

6  preceding, Reorganized Debtor shall continue to timely and fully perform and pay all of its

7  obligations under the Consent Judgment and Order.

8          Paragraph 24 of the Consent Judgment and Order states that "The Parties agree that

9  this Consent Judgment and Order shall not create a judgment lien against the real property of

10 C&K or the Plan, or writ of attachment against the personal property of C&K or the Plan,

11 unless filed, registered, and/or recorded pursuant to state law.  The Secretary agrees that she

12 will not file, register, and/or record this Consent Judgment and Order in any state or county

13 lien record, unless and until C&K or the Plan defaults upon any term of this Consent

14 Judgment and Order."

15         As of the Petition Date, neither C & K nor the Plan was in default of the Consent

16 Judgment and Order, and the Secretary had not filed, registered, or recorded the Consent

17 Judgment and Order.

18         Class 2 is unimpaired by the Plan.

19             7.2.3    Class 3 (Allowed Secured Claim of Banc of America Leasing &

20 Capital, LLC).  Class 3 is impaired.  Banc of America Leasing & Capital, LLC ("BALC")

21 shall have an Allowed Secured Claim in the amount of $325,000.

22         BALC's Class 3 Claim shall be satisfied by delivery of a promissory note to BALC

23 (the "BALC Note") in the principal amount of its Allowed Secured Claim, less the amount of

24 all adequate protection payments made by Debtor to BALC.  Debtor commenced paying

25 monthly $25,000 adequate protection payments to BALC in March.  The BALC Note will

26

**Page 14 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    bear interest from the Effective Date at a fixed per annum rate of 6%, and will be payable by

2    Reorganized Debtor as follows:

3            Commencing on the first day of the first month following the Effective Date and

4    continuing on the first day of each month thereafter until the BALC Note has been paid in

5    full, Reorganized Debtor will make equal monthly amortizing payments of principal and

6    interest on the BALC Note based on a 48-month amortization schedule, with final payment

7    due 48 months after the Effective Date.

8            The Class 3 Claim may be prepaid in full or in part at any time without any

9    prepayment penalty or premium.

10            As security for the Class 3 Claim, BALC will retain its security interests in and liens

11    on its Collateral with the same priority and to the same extent such security had as of the

12    Petition Date.  Reorganized Debtor will maintain the BALC Collateral in good repair, will

13    insure the BALC Collateral to its full useable value, and will pay any property taxes with

14    respect to such Collateral when due.  At any sale of its Collateral, BALC will have the right

15    to bid at such sale and, if BALC is the successful bidder, BALC may offset all or any portion

16    of its then unpaid Allowed Secured Claim.  Reorganized Debtor will provide BALC with at

17    least 45 days' notice prior to any proposed sale of its Collateral.

18            BALC's Claim is not fully secured and, accordingly, BALC will have an Allowed

19    Unsecured Claim in the amount of $22,508.42 in addition to its Class 3 Claim.

20            7.2.4    Class 4 (Allowed Secured Claim of Dell Financial Services, LLC).

21    Class 4 is impaired.  Dell Financial Services, LLC ("Dell") shall have an Allowed Secured

22    Claim in the amount of $250,000.

23            Dell's Class 4 Claim shall be satisfied by delivery of a promissory note to Dell (the

24    "Dell Note") in the principal amount of its Allowed Secured Claim.  The Dell Note will bear

25    interest from the Effective Date at a fixed per annum rate of 6%, and will be payable by

26    Reorganized Debtor as follows:

**Page 15 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    Commencing on the first day of the first month following the Effective Date and

2 continuing on the first day of each month thereafter until the Dell Note has been paid in full,

3 Reorganized Debtor will make equal monthly amortizing payments of principal and interest

4 on the Dell Note based on a 48-month amortization schedule, with a final payment due

5 48 months after the Effective Date.

6    The Class 4 Claim may be prepaid in full or in part at any time without any

7 prepayment penalty or premium.

8    As security for the Class 4 Claim, Dell will retain its security interests in and liens on

9 its Collateral with the same priority and to the same extent such security had as of the

10 Petition Date.  Reorganized Debtor will maintain the Dell Collateral in good repair, will

11 insure the Dell Collateral to its full useable value, and will pay any property taxes with

12 respect to such Collateral when due.  At any sale of its Collateral, Dell will have the right to

13 bid at such sale and, if Dell is the successful bidder, Dell may offset all or any portion of its

14 then unpaid Allowed Secured Claim.

15    Reorganized Debtor will provide Dell with at least 45 days' notice prior to any

16 proposed sale of its Collateral.

17    Dell's Claim is not fully secured, and accordingly Dell will have an Allowed

18 Unsecured Claim in the amount of $59,059 in addition to its Class 4 Claim.

19        7.2.5    Class 5 (Allowed Secured Claim, if any, of Komlofske Corporation).

20 Class 5 consists of the Allowed Secured Claim, if any, of Komlofske Corporation

21 ("Komlofske").  As set forth below, Debtor believes Komlofske's entire Claim will be treated

22 as a General Unsecured Claim, and not as a Secured Claim.  If Komlofske has no Secured

23 Claim, then there will be no Class 5.

24    Komlofske filed  Claim No. 339 in the amount of $1,240,309.45 (Claim No. 339).

25 Komlofske has asserted in such claim that the entire claim is a Secured Claim.  Debtor

26 believes the entire amount of Komlofske's Claim should be treated as a General Unsecured

**Page 16 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  Claim because the UCC financing statement initially filed by Komlofske lapsed prior to the

2  Petition Date, leaving Komlofske unperfected as of the Petition Date.  Debtor has been in

3  communications with counsel for Komlofske, and Debtor's understanding is that Komlofske

4  will be amending its Claim to treat such claim as a General Unsecured Claim.

5       Komlofske's Claim is for amounts owing under or in connection with that certain

6  promissory note dated January 16, 2003 in the original principal amount of $1,222,500.  The

7  note was issued by Debtor to Komlofske in connection with the sale by Komlofske to Debtor

8  of Ray's #60 store in Prineville, Oregon, and was secured by certain specific equipment or

9  other assets located at the Ray's #60 store in Prineville.  Komlofske filed a UCC financing

10  statement against such equipment on January 21, 2003, and continued the UCC financing

11  statement in January 2008.  However, the UCC financing statement lapsed on January 21,

12  2013 (prior to the Petition Date).

13       If Komlofske does not amend its claim to indicate that the claim is not a Secured

14  Claim, then Debtor will file an adversary proceeding to avoid any lien asserted by Komlofske

15  using Debtor's "strong arm" powers under Section 544 of the Bankruptcy Code.

16       The Plan provides that if and to the extent the Komlofske Claim is determined to be a

17  Secured Claim, then Komlofske's Allowed Secured Claim will be satisfied by delivery of a

18  promissory note to Komlofske (the "Komlofske Note") in the principal amount of its

19  Allowed Secured Claim.  The Komlofske Note will bear interest from the Effective Date at a

20  fixed per annum rate of 6%, and will be payable by Reorganized Debtor as follows:

21       Commencing on the first day of the first month following the Effective Date and

22  continuing on the first day of each month thereafter until the Komlofske Note has been paid

23  in full, Reorganized Debtor will make equal monthly amortizing payments of principal and

24  interest on the Komlofske Note based on a five-year amortization schedule, with a final

25  payment due five years after the Effective Date.

26

**Page 17 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    The Class 5 Claim may be prepaid in full or in part at any time without any

2    prepayment penalty or premium.

3    As security for the Class 5 Claim, Komlofske will retain its security interests in and

4    liens on its Collateral (if any) with the same priority and to the same extent such security had

5    as of the Petition Date. Reorganized Debtor will maintain the Komlofske Collateral in good

6    repair, will insure the Komlofske Collateral to its full useable value, and will pay any

7    property taxes with respect to such Collateral when due. At any sale of its Collateral,

8    Komlofske will have the right to bid at such sale and, if Komlofske is the successful bidder,

9    Komlofske may offset all or any portion of its then unpaid Allowed Secured Claim.

10    Class 5 is impaired by the Plan.

11    7.2.6    Class 6 (Allowed Secured Claim of James and Debra Gillespie).

12    Class 6 consists of the Allowed Secured Claim of James and Debra Gillespie ("Gillespie").

13    Gillespie filed Claim No. 283 in the amount of $473,357.86. In its proof of claim,

14    Gillespie asserts a $94,671.57 "prepayment penalty," even though no prepayment has

15    occurred. Debtor believes there is no basis for inclusion of a prepayment penalty, and

16    intends to object to Gillespie's proof of claim.

17    The value of the Collateral securing Gillespie's Claim (that certain real property

18    located at 48063-48083 Hwy. 58, Oakridge, Oregon 97453 (Rays #50 and neighboring bare

19    land) exceeds the amount of Gillespie's Claim such that Gillespie's Claim is fully secured.

20    The Plan provides that the amount of Gillespie's Allowed Secured Claim will be

21    determined by agreement of Debtor and Gillespie or, absent agreement, in such amount as is

22    determined and Allowed by the Bankruptcy Court.

23    The Plan provides that Gillespie's Class 6 Claim shall be satisfied by delivery of a

24    promissory note to Gillespie (the "Gillespie Note") in the principal amount of Gillespie's

25    Allowed Secured Claim. The Gillespie Note will bear interest from the Effective Date at a

26    fixed per annum rate of 6%, and will be payable by Reorganized Debtor as follows:

**Page 18 of 62** - DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    Commencing on the first day of the first month following the Effective Date and

2    continuing on the first day of each month thereafter until the Gillespie Note has been paid in

3    full, Reorganized Debtor will make equal monthly amortizing payments of principal and

4    interest on the Gillespie Note based on a 25-year amortization schedule, with a balloon

5    payment due seven years after the Effective Date.

6    The Class 6 Claim may be prepaid in full or in part at any time without any

7    prepayment penalty or premium.

8    As security for the Class 6 Claim, Gillespie will retain its security interests in and

9    liens on its Collateral with the same priority and to the same extent such security had as of

10    the Petition Date.  Reorganized Debtor will maintain the Gillespie Collateral in good repair,

11    will insure the Gillespie Collateral to its full useable value, and will pay any property taxes

12    with respect to such Collateral when due.  At any sale of its Collateral, Gillespie will have

13    the right to bid at such sale, and if Gillespie is the successful bidder, Gillespie may offset all

14    or any portion of its then unpaid Allowed Secured Claim.

15    The Class 6 Claim is fully secured, and Gillespie will not have any Deficiency Claim

16    with respect to the Class 6 Claim.

17    Class 6 is impaired by the Plan.

18           7.2.7    Class 7 (Allowed Secured Claim of Greatway Properties, LLC).

19    Class 7 consists of the Allowed Secured Claim of Greatway Properties, LLC ("Greatway").

20    Debtor scheduled Greatway's Claim at $1,551,508.31.  Greatway did not file a proof

21    of claim by the claims bar date.  The value of the Collateral securing Greatway's Claim (that

22    certain real property located at 11100 Hwy. 62, Eagle Point, Oregon 97524 (Rays #61)

23    exceeds the amount of Greatway's Claim, such that Greatway's Claim is fully secured.

24    The Plan provides that the amount of Greatway's Allowed Secured Claim will be

25    determined by agreement of Debtor and Greatway or, absent agreement, in such amount as is

26    determined and Allowed by the Bankruptcy Court.

**Page 19 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    The Plan provides that Greatway's Class 7 Claim shall be satisfied by delivery of a

2    promissory note to Greatway (the "Greatway Note") in the principal amount of its Allowed

3    Secured Claim.  The Greatway Note will bear interest from the Effective Date at a fixed

4    per annum rate of 6%, and will be payable by Reorganized Debtor as follows:

5        Commencing on the first day of the first month following the Effective Date and

6    continuing on the first day of each month thereafter until the Greatway Note has been paid in

7    full, Reorganized Debtor will make equal monthly amortizing payments of principal and

8    interest on the Greatway Note based on a 25-year amortization schedule, with a balloon

9    payment due seven years after the Effective Date.

10        The Class 7 Claim may be prepaid in full or in part at any time without any

11    prepayment penalty or premium.

12        As security for the Class 7 Claim, Greatway will retain its security interests in and

13    liens on its Collateral with the same priority and to the same extent such security had as of

14    the Petition Date.  Reorganized Debtor will maintain the Greatway Collateral in good repair,

15    will insure the Greatway Collateral to its full useable value, and will pay any property taxes

16    with respect to such Collateral when due.  At any sale of its Collateral, Greatway will have

17    the right to bid at such sale, and if Greatway is the successful bidder, Greatway may offset all

18    or any portion of its then unpaid Allowed Secured Claim.

19        The Class 7 Claim is fully secured, and Greatway will not have any Deficiency Claim

20    with respect to the Class 7 Claim.

21        Class 7 is impaired by the Plan.

22            7.2.8    Class 8 (Allowed Secured Claim of Green & Frahm).  Class 8

23    consists of the Allowed Secured Claim of Green & Frahm.

24        Debtor scheduled Green & Frahm's Claim at $337,507.28.  Green & Frahm did not

25    file a proof of claim by the claims bar date.  The value of the Collateral securing Green &

26    Frahm's Claim (that certain real property located at 498 S. Old Pacific Highway, Myrtle

**Page 20 of 62** - DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

Creek, Oregon 97457 (Shop Smart #29) exceeds the amount of Green & Frahm's Claim, such that Green & Frahm's Claim is fully secured.

The Plan provides that the amount of Green & Frahm's Allowed Secured Claim will be determined by agreement of Debtor and Green & Frahm or, absent agreement, in such amount as is determined and Allowed by the Bankruptcy Court.

The Plan provides that Green & Frahm's Class 8 Claim shall be satisfied by delivery of a promissory note to Green & Frahm (the "Green & Frahm Note") in the principal amount of its Allowed Secured Claim.  The Green & Frahm Note will bear interest from the Effective Date at a fixed per annum rate of 6%, and will be payable by Reorganized Debtor as follows:

Commencing on the first day of the first month following the Effective Date and continuing on the first day of each month thereafter until the Green & Frahm Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Green & Frahm Note based on a 25-year amortization schedule, with a balloon payment due seven years after the Effective Date.

The Class 8 Claim may be prepaid in full or in part at any time without any prepayment penalty or premium.

As security for the Class 8 Claim, Green & Frahm will retain its security interests in and liens on its Collateral with the same priority and to the same extent such security had as of the Petition Date.  Reorganized Debtor will maintain the Green & Frahm Collateral in good repair, will insure the Green & Frahm Collateral to its full useable value, and will pay any property taxes with respect to such Collateral when due.  At any sale of its Collateral, Green & Frahm will have the right to bid at such sale, and if Green & Frahm is the successful bidder, Green & Frahm may offset all or any portion of its then unpaid Allowed Secured Claim.

**Page 21 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

The Class 8 Claim is fully secured, and Green & Frahm will not have any Deficiency Claim with respect to the Class 8 Claim.

Class 8 is impaired by the Plan.

7.2.9    Class 9 (Allowed Secured Claim of Kenneth and Lynda Martin).

Class 9 consists of the Allowed Secured Claim of Kenneth and Lynda Martin ("Martin").

Martin filed Claim No. 314 in the amount of $702,046.58.  The value of the Collateral securing Martin's Claim (that certain real property located at 110 Deer Creek Rd., Selma, Oregon 97538 (Rays #71) exceeds the amount of Martin's Claim, such that Martin's Claim is fully secured.

The Plan provides that the amount of Martin's Allowed Secured Claim will be determined by agreement of Debtor and Martin or, absent agreement, in such amount as is determined and Allowed by the Bankruptcy Court.

The Plan provides that Martin's Class 9 Claim shall be satisfied by delivery of a promissory note to Martin (the "Martin Note") in the principal amount of its Allowed Secured Claim.  The Martin Note will bear interest from the Effective Date at a fixed per annum rate of 6%, and will be payable by Reorganized Debtor as follows:

Commencing on the first day of the first month following the Effective Date and continuing on the first day of each month thereafter until the Martin Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Martin Note based on a 25-year amortization schedule, with a balloon payment due seven years after the Effective Date.

The Class 9 Claim may be prepaid in full or in part at any time without any prepayment penalty or premium.

As security for the Class 9 Claim, Martin will retain its security interests in and liens on its Collateral with the same priority and to the same extent such security had as of the Petition Date.  Reorganized Debtor will maintain the Martin Collateral in good repair, will

**Page 22 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    insure the Martin Collateral to its full useable value, and will pay any property taxes with

2    respect to such Collateral when due.  At any sale of its Collateral, Martin will have the right

3    to bid at such sale and, if Martin is the successful bidder, Martin may offset all or any portion

4    of its then unpaid Allowed Secured Claim.

5         The Class 9 Claim is fully secured, and Martin will not have any Deficiency Claim

6    with respect to the Class 9 Claim.

7         Class 9 is impaired by the Plan.

8              7.2.10  <u>Class 10 (Allowed Secured Claim of Protective Life)</u>.  Class 10

9    consists of the Allowed Secured Claim of Protective Life.

10        Debtor scheduled Protective Life's Claim at $420,901.21.  Protective Life did not file

11   a proof of claim by the claims bar date.  The value of the Collateral securing Protective Life's

12   Claim (that certain real property located at 15930 Dam Rd., Clearlake, California 95422

13   (Ray's #36) exceeds the amount of Protective Life's Claim, such that Protective Life's Claim

14   is fully secured.

15        The Plan provides that the amount of Protective Life's Allowed Secured Claim will be

16   determined by agreement of Debtor and Protective Life or, absent agreement, in such amount

17   as is determined and Allowed by the Bankruptcy Court.

18        The Plan provides that Protective Life's Class 10 Claim shall be satisfied by delivery

19   of a promissory note to Protective Life (the "Protective Life Note") in the principal amount of

20   its Allowed Secured Claim.  The Protective Life Note will bear interest from the Effective

21   Date at a fixed per annum rate of 6%, and will be payable by Reorganized Debtor as follows:

22        Commencing on the first day of the first month following the Effective Date and

23   continuing on the first day of each month thereafter until the Protective Life Note has been

24   paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal

25   and interest on the Protective Life Note based on a 25-year amortization schedule, with a

26   balloon payment due seven years after the Effective Date.

**Page 23 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    The Class 10 Claim may be prepaid in full or in part at any time without any

2    prepayment penalty or premium.

3    As security for the Class 10 Claim, Protective Life will retain its security interests in

4    and liens on its Collateral with the same priority and to the same extent such security had as

5    of the Petition Date.  Reorganized Debtor will maintain the Protective Life Collateral in good

6    repair, will insure the Protective Life Collateral to its full useable value, and will pay any

7    property taxes with respect to such Collateral when due.  At any sale of its Collateral,

8    Protective Life will have the right to bid at such sale, and if Protective Life is the successful

9    bidder, Protective Life may offset all or any portion of its then unpaid Allowed Secured

10    Claim.

11    The Class 10 Claim is fully secured, and Protective Life will not have any Deficiency

12    Claim with respect to the Class 10 Claim.

13    Class 10 is impaired by the Plan.

14    7.2.11  Class 11 (Allowed Claim of U.S. Bank National Association).

15    Class 11 consists of the Allowed Claim of U.S. Bank (in its own capacity, and not in any

16    fiduciary, trustee, or other capacity).  The Class 11 Claim includes all obligations owing to

17    U.S. Bank, whether such obligations arose pre or post-petition.  Without limiting the

18    preceding, the Class 11 Claim includes such amount as is Allowed under Section 506(b) of

19    the Bankruptcy Code for the reasonable fees, costs and charges of U.S. Bank (the "506(b)

20    Amount").

21    U.S. Bank was Debtor's primary secured lender prior to the Petition Date and has

22    continued to provide financing to Debtor post-petition under and pursuant to the DIP Facility

23    (discussed above).

24    As of the Petition Date, Debtor owed U.S. Bank in excess of $34,000,000, secured by

25    a security interest in substantially all of Debtor's real and personal property.  U.S. Bank is

26    fully secured.  In connection with the DIP Financing, Debtor agreed, among other things, that

**Page 24 of 62** - DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    any Plan proposed by Debtor would provide for the payment in full in cash on the Effective

2    Date of all obligations owing by Debtor to U.S. Bank.

3        Accordingly, the Plan provides that on the Effective Date, Debtor shall pay the

4    Class 11 Claim in full, less the undetermined 506(b) Amount, and will pay into an escrow

5    account mutually agreed to by Debtor and U.S. Bank an amount equal to 115% of the Bank's

6    estimated 506(b) Amount (the "Escrow Amount").  The Plan further provides that upon the

7    payment of the Class 11 Claim, less the 506(b) Amount, and the funding of the Escrow

8    Amount, the Class 11 Claim shall be deemed to have been paid in full, and the Bank will

9    release any and all liens and security interests it has in any assets of Debtor, other than its

10   lien in the Escrow Amount which shall continue until the 506(b) Amount has been paid in

11   full.  Any provisions of U.S. Bank's agreements with Debtor that by their terms survive

12   payment in full shall survive payment in full of the Class 11 Claim.  Once the 506(b) Amount

13   has been determined and Allowed, the 506(b) Amount will be paid and satisfied from the

14   Escrow Amount, with any surplus being returned to Reorganized Debtor.

15       Debtor projects the total obligations owing to U.S. Bank on the Effective Date will be

16   approximately $25,000,000.  Those obligations will be paid with proceeds obtained from the

17   Exit Financing to be obtained by Reorganized Debtor.

18       Class 11 is unimpaired by the Plan.

19           7.2.12  <u>Class 12 (General Unsecured Claims)</u>.  Class 12 consists of all

20   Allowed General Unsecured Claims.  A General Unsecured Claim is any Unsecured Claim

21   that is not a Small Unsecured Claim.  A Small Unsecured Claim is any Unsecured Claim that

22   is equal to or less than $10,000, or that has been reduced to $10,000 by the election of the

23   Creditor holding such Unsecured Claim.

24       The Plan provides that each holder of an Allowed General Unsecured Claim will

25   receive the combination of one share of Common Stock and one share of Series A Preferred

26   Stock of Reorganized Debtor in exchange for each $10 of its Allowed General Unsecured

**Page 25 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1   Claim on the later of the Effective Date or the date its Claim becomes an Allowed Claim,

2   rounded up to the nearest $10.  Fractional shares will not be issued.  In addition, if Debtor

3   elects to consummate the Rights Offering (see Section 10 below), each holder of an Allowed

4   General Unsecured Claim shall have a Subscription Right to purchase in the Rights Offering

5   the combination of one share of Common Stock and one share of Series A Preferred Stock of

6   Reorganized Debtor for $8 in cash.

7          Some holders of Allowed General Unsecured Claims are parties to Subordination

8   Agreements with certain "Senior Lenders."  The Plan provides that if a Senior Lender notifies

9   Debtor or Reorganized Debtor in writing that a General Unsecured Claim is subject to a

10  Subordination Agreement (the "Subordinated Claim"), then Reorganized Debtor will not

11  issue any stock on account of, or make any distribution with respect to, the Subordinated

12  Claim unless and until the first to occur of (a) receipt by Debtor or Reorganized Debtor of

13  joint instructions from the Senior Lender and the holder of the Subordinated Claim with

14  respect to such Subordinated Claim, or (b) the Bankruptcy Court enters a Final Order

15  declaring the relative rights of the Senior Lender and the holder of the Subordinated Claim

16  with respect to the Subordinated Claim.  Absent receipt of such written notice of a

17  Subordination Agreement from a Senior Lender, Reorganized Debtor will make distributions

18  to holders of General Unsecured Claims as described.

19         Debtor estimates that there will be approximately $60 million of Allowed General

20  Unsecured Claims and that, therefore, approximately 6 million shares of Common Stock and

21  6 million shares of Series A Preferred Stock will be issued under the Plan to holders of

22  Allowed Class 12 Claims.

23         Debtor projects there will be fewer than 200 holders of Allowed Class 12 Claims.

24  Consequently, Reorganized Debtor will have fewer than 200 shareholders and will not be a

25  public company.  Of the $60 million in estimated General Unsecured Claims, approximately

26  $30 million is held by two private equity mezzanine lenders, THL and Endeavour,

**Page 26 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  approximately $10 million is held by Nidiffer Family, LLC, and approximately $5 million is

2  held by various subordinated note holders holding notes payable in connection with the

3  purchase of stores.  Debtor estimates that the remaining $15 million in General Unsecured

4  Claims will consist of approximately $5 to $7 million in lease rejection claims and

5  approximately $7 to $8 million in trade creditor claims.

6      If Debtor elects to consummate the Rights Offering, and if the Rights Offering is fully

7  subscribed, Reorganized Debtor will also issue an additional 1,250,000 shares of Common

8  Stock and 1,250,000 shares of Series A Preferred Stock.

9      Reorganized Debtor will also reserve approximately 800,000 to 900,000 shares of

10  Common Stock for issuance in accordance with Reorganized Debtor's Employee Stock

11  Incentive Plan for services rendered after the Effective Date.  The final number will be

12  determined upon completion of any Rights Offering.  The reserved shares will represent

13  approximately 12% of all shares of Common Stock issued and reserved for issuance

14  immediately following the Effective Date.  The reserved shares of Common Stock under the

15  Employee Stock Incentive Plan will be issued, if at all, only with the approval of the Board

16  of Directors of Reorganized Debtor after the Effective Date.

17      The Restated Articles of Incorporation authorize the issuance of up to 25,000,000

18  shares of Common Stock and up to 10,000,000 shares of Preferred Stock by the Board of

19  Directors of Reorganized Debtor without the approval of the shareholders of Reorganized

20  Debtor except as noted below with respect to certain types of Preferred Stock.  Each share of

21  Common Stock is entitled to one vote on all matters for which shareholder approval is

22  required.  The Board of Directors of Reorganized Debtor is authorized, subject to the

23  limitations in the Oregon Business Corporation Act, to provide for the issuance of any or all

24  of the authorized shares of Preferred Stock in series, to establish from time to time the

25  number of shares to be included in each series and to determine the designations, relative

26

**Page 27 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  rights, preferences and limitations of the shares of each series, except as noted below with

2  respect to certain types of Preferred Stock.

3      Shares of Series A Preferred Stock will have the following rights and preferences:

4      •  <u>Dividends</u>. The holders of shares of Series A Preferred Stock will be entitled

5         to receive dividends when, as and if dividends are declared by the Board of

6         Directors of Reorganized Debtor.

7      •  <u>Liquidation Preference</u>.  In the event of any Liquidation of Reorganized

8         Debtor, the holders of Series A Preferred Stock will be entitled to receive,

9         prior to and in preference to any distribution of any assets of Reorganized

10         Debtor to the holders of Common Stock by reason of their ownership of

11         Common Stock, $5 per share (as adjusted for stock splits, stock dividends,

12         reclassification and the like) for each share of Series A Preferred Stock then

13         held by them, plus any declared but unpaid dividends (the "Liquidation

14         Preference").

15             The term "Liquidation" means the liquidation, dissolution or winding

16         up of Reorganized Debtor, whether voluntary or involuntary.  Additionally,

17         the term Liquidation includes, unless otherwise agreed by the holders of a

18         majority of the then issued and outstanding Series A Preferred Stock, (a) a

19         merger or consolidation of Reorganized Debtor with or into another entity or

20         any other corporate reorganization, if more than 50% of the combined voting

21         power of the continuing or surviving entity's securities outstanding

22         immediately after the transaction is owned by persons who were not

23         shareholders of Reorganized Debtor immediately prior to the transaction; and

24         (b) the sale, transfer or other disposition of all or substantially all of

25         Reorganized Debtor's assets.  A transaction described in clause (a) above will

26         not be considered a Liquidation if it is done solely for the purpose of changing

**Page 28 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1       Reorganized Debtor's state of incorporation or to create a holding company

2       that will be owned in substantially the same proportions by the persons who

3       held Reorganized Debtor's securities immediately before the transaction.

4       •   <u>No Conversion or Participation Rights</u>.  Series A Preferred Stock is not

5       convertible into any other security of Reorganized Debtor.  Upon any

6       Liquidation, the holders of Series A Preferred Stock will be entitled to receive

7       only the Liquidation Preference with respect to their shares of Series A

8       Preferred Stock and will not be entitled to participate in the distribution of any

9       other assets of Reorganized Debtor.

10       •   <u>Voting Rights</u>.  The holders of Series A Preferred Stock generally have the

11       same voting rights as holders of Common Stock and will generally vote

12       together with the holders of Common Stock as a single voting group,

13       including with respect to any matters relating to any Liquidation submitted to

14       the shareholders of Reorganized Debtor for a vote.  Each share of Series A

15       Preferred Stock is entitled to one vote on all matters for which shareholder

16       approval is required.

17       •   <u>Redemption Rights</u>.  Reorganized Debtor can at any time redeem the shares of

18       Series A Preferred Stock, in whole or in part, for the Liquidation Preference.

19       On July 1, 2024 (the "Maturity Date"), Reorganized Debtor is required to

20       redeem all then issued and outstanding shares of Series A Preferred Stock for

21       the Liquidation Preference, subject to having legally available funds for such

22       redemption and complying with any applicable restrictions in Reorganized

23       Debtor's senior debt agreements relating to indebtedness for borrowed money

24       in an aggregate principal amount exceeding $5 million.  If Reorganized

25       Debtor is prohibited from redeeming all of the Series A Preferred Stock on the

26       Maturity Date, it will redeem as many shares as possible at the Maturity Date

**Page 29 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

and the remainder at the earliest time or times possible thereafter.  Any partial redemption of Series A Preferred Stock will be made pro rata based on the number of shares of Series A Preferred Stock held by each shareholder.

- <u>Protective Provisions</u>.  So long as at least 25% of the shares of Series A Preferred Stock remain outstanding (as adjusted for stock splits, stock dividends, reclassification and the like), Reorganized Debtor needs the approval of the holders of a majority of the then issued and outstanding Series A Preferred Stock before declaring cash dividends on the Common Stock, altering the rights or preferences of the Series A Preferred Stock, changing the total number of authorized shares of Series A Preferred Stock, authorizing or issuing any security having a preference over or on a parity with the Series A Preferred Stock with respect to voting, dividends, redemption or liquidation rights, redeeming any shares of Preferred Stock other than Series A Preferred Stock, redeeming any Common Stock (with limited exceptions), or altering Reorganized Debtor's Employee Stock Incentive Plan to include shares other than the Common Stock of Reorganized Debtor.  In addition, so long as at least twenty-five percent (25%) of the shares of Series A Preferred Stock remain outstanding (as adjusted for stock splits, stock dividends, reclassification and the like), Reorganized Debtor needs the approval of the holders of at least 80% of the then outstanding shares of Series A Preferred Stock before decreasing the Liquidation Preference of the Series A Preferred Stock, altering the "Tag Along Rights" set forth in the Restated Bylaws, or amending any of the foregoing protective provisions of the Restated Articles of Incorporation.

The Restated Articles of Incorporation are attached to the Plan as Exhibit 2.

**Page 30 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    Reorganized Debtor's Restated Bylaws will place certain restrictions on the sale of

2    the Common Stock and the Series A Preferred Stock.  Reorganized Debtor will have a right

3    of first refusal with respect to any sale of Common Stock or Series A Preferred Stock.  The

4    Restated Bylaws are attached to the Plan as Exhibit 3.

5    Class 12 is impaired by the Plan.

6    7.2.13  Class 13 (Small Unsecured Claims).  Class 13 consists of all

7    Allowed Small Unsecured Claims.  A Small Unsecured Claim is any Unsecured Claim that is

8    equal to or less than $10,000, or that has been reduced to $10,000 by the election of the

9    Creditor holding such Unsecured Claim.

10    Debtor estimates that there will be approximately $1 million of Unsecured Claims

11    under $10,000.

12    The Plan provides that each holder of a Small Unsecured Claim will be paid by

13    Reorganized Debtor in cash in an amount equal to 80% of its Allowed Small Unsecured

14    Claim on or before 90 days after the Effective Date or the date its Claim becomes an

15    Allowed Claim, whichever is later.  The Plan allows General Unsecured Creditors to elect to

16    reduce their Allowed Claims in order to be treated as a Class 13 Claim holder, provided the

17    election is made at the time ballots are due for voting on the Plan, or such later date permitted

18    as provided for Rejection Claims.

19    Class 13 is impaired by the Plan.

20    7.2.14  Class 14 (Equity Security Holders).  Class 14 consists of the Claims

21    and current interests of Equity Security Holders based on their Equity Securities.

22    The Plan provides that All Equity Securities and Employee Equity Security Plans of

23    Debtor will be cancelled as of the Effective Date, and Equity Security Holders will not

24    receive or retain any property or rights under the Plan on account of their Equity Securities or

25    any Employee Equity Security Plan.

26    Class 14 is impaired by the Plan.

**Page 31 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    **8.      DISPUTED CLAIMS; OBJECTIONS TO CLAIMS**

2          The Plan provides that Claims that are Allowed shall be entitled to distributions under

3    the Plan.  Debtor reserves the right to contest and object to any Claims and previously

4    Scheduled Amounts, including, without limitation, those Claims and Scheduled Amounts

5    that are specifically referenced herein, are not listed in the Schedules, are listed therein as

6    disputed, contingent and/or unliquidated in amount, or are listed therein at a different amount

7    than Debtor currently believes is validly due and owing.  Unless otherwise ordered by the

8    Bankruptcy Court, all objections to Claims and Scheduled Amounts (other than

9    Administrative Expense Claims) shall be Filed and served upon counsel for Debtor and the

10   holder of the Claim objected to on or before the later of (a) 45 days after the Effective Date

11   or (b) 60 days after the date (if any) on which a proof of claim is Filed in respect of a

12   Rejection Claim or Deficiency Claim.  The last day for filing objections to Administrative

13   Expense Claims shall be set pursuant to a further order of the Bankruptcy Court.  All

14   Disputed Claims shall be resolved by the Bankruptcy Court, except to the extent that

15   (a) Debtor may otherwise elect consistent with the Plan and the Bankruptcy Code or (b) the

16   Bankruptcy Court may otherwise order.

17   **9.      MEANS FOR EXECUTION OF PLAN**

18         9.1     Continued Corporate Existence.  The Plan provides that Debtor, as

19   Reorganized Debtor, shall continue to exist after the Effective Date, with all the powers of a

20   corporation under applicable law.

21         9.2     Restated Articles of Incorporation and Bylaws.  The Plan provides that

22   Reorganized Debtor shall be deemed to have adopted the Restated Articles of Incorporation

23   and Restated Bylaws on the Effective Date, and shall promptly thereafter cause the Restated

24   Articles of Incorporation to be filed with the Secretary of State of the State of Oregon.  After

25   the Effective Date, Reorganized Debtor may amend the Restated Articles of Incorporation

26   and may amend its Restated Bylaws in accordance with the Restated Articles of

**Page 32 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1   Incorporation, Restated Bylaws, and applicable state law.  The Restated Articles of

2   Incorporation and Restated Bylaws are attached as Exhibits 2 and 3 to the Plan.

3        9.3    Cancellation of Existing Equity Securities and Employee Equity Security

4   Plan.  The Plan provides that as of the Effective Date, all outstanding shares of stock

5   (whether common or preferred), and all awards of any kind consisting of shares of stock of

6   Debtor and all Employee Equity Security Plans, that have been or may be existing, granted,

7   held, awarded, outstanding, payable, or reserved for issuance, and all other Equity Securities,

8   shall, without any further corporate action, be cancelled and retired, and shall cease to exist.

9   This cancellation does not apply with respect to any Common Stock, Series A Preferred

10  Stock, any other equity securities or rights to acquire or receive equity securities, or any other

11  awards of any kind that are issued in accordance with or pursuant to the Plan.

12       9.4    Recapitalization; Issuance of New Common Stock and New Series A

13  Preferred Stock.  As set forth above, on the Effective Date, the combination of one share of

14  Common Stock and one share of Series A Preferred Stock will be issued to holders of

15  Allowed Class 12 Claims (General Unsecured Claims) in exchange for each $10 of each

16  holder's Allowed Class 12 Claim.  As set forth above, Reorganized Debtor will also reserve

17  approximately 800,000 to 900,000 shares of Common Stock for issuance in accordance with

18  Reorganized Debtor's Employee Stock Incentive Plan for services rendered after the

19  Effective Date.  As set forth above, the Common Stock and Series A Preferred Stock will be

20  subject to certain restrictions on sale as more particularly stated in the Restated Bylaws

21  attached to the Plan as Exhibit 3.  As set forth above, if the Rights Offering is consummated

22  and fully subscribed, Reorganized Debtor will also issue an additional 1,250,000 shares of

23  Common Stock and 1,250,000 shares of Series A Preferred Stock.

24       9.5    Exit Financing.  Pursuant to the DIP Financing Order, U.S. Bank is entitled to

25  be paid in full on the Effective Date of the Plan.  Consequently, Debtor must negotiate and

26  obtain, and enter into agreements with respect to, Exit Financing.  Such Exit Financing will,

**Page 33 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    among other things, provide the funds necessary to pay U.S. Bank in full on the Effective

2    Date and provide working capital for Reorganized Debtor. The Plan provides that Debtor

3    may enter into such agreements and execute such documents with respect to the Exit

4    Financing without the necessity of obtaining additional Bankruptcy Court approval.

5         9.6    Subordination Agreements. THL, Endeavour and U.S. Bank, as "Senior

6    Lenders," entered into Subordination Agreements with various creditors of Debtor (the

7    "junior creditors"). Debtor is aware of 10 different junior creditors. As the "Borrower" party

8    to the Subordination Agreements, Debtor agreed, in general, to comply with the rights and

9    priorities set forth in the Subordination Agreements. Accordingly, the Plan provides that in

10   connection with any distributions to be made under the Plan, Reorganized Debtor will

11   comply with all Subordination Agreements, and all distributions to Creditors under the Plan

12   will remain subject to such Subordination Agreements.

13        Counsel for Endeavour and THL (the remaining Senior Lenders, as U.S. Bank will be

14   paid in full on the Effective Date) has sent letters to most, if not all, of the junior creditors

15   outlining the Senior Lender's position with respect to the Subordination Agreements. Debtor

16   does not know if any of the junior creditors have agreed with, or will agree with, the Senior

17   Lender's position.

18        Accordingly, the Plan provides that if a Senior Lender notifies Debtor or Reorganized

19   Debtor in writing that a Claim is subject to a Subordination Agreement (the "Subordinated

20   Claim"), then Reorganized Debtor will not issue any Stock on account of, or make any

21   distribution with respect to, the Subordinated Claim unless and until the first to occur of

22   (a) receipt by Debtor or Reorganized Debtor of joint instructions from the Senior Lender and

23   the holder of the Subordinated Claim with respect to such Subordinated Claim; or (b) the

24   Bankruptcy Court enters a Final Order declaring the relative rights of the Senior Lender and

25   the holder of the Subordinated Claim with respect to the Subordinated Claim. However,

26   Reorganized Debtor will make distributions pursuant to the Plan to Creditors unless a written

**Page 34 of 62** - DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    notification of a Subordination Agreement is delivered by a Senior Lender to Reorganized

2    Debtor.  The Plan provides that absent receipt by Reorganized Debtor of written notification

3    from a Senior Lender that a Claim is subject to a Subordination Agreement, Reorganized

4    Debtor will make distributions on Claims as provided in this Plan and Reorganized Debtor

5    will have no obligation to inquire or otherwise investigate or determine the existence or

6    validity of any Subordination Agreement.  Promptly upon receipt of such a written notice,

7    Reorganized Debtor will serve a copy of the notice on the holder of the Subordinated Claim.

8    The Plan provides that the Bankruptcy Court shall have and retain full and exclusive

9    jurisdiction to resolve all disputes arising out of or relating to any Subordination Agreement

10    or Subordinated Claim, including who may vote a Subordinated Claim.

11         9.7    Reorganized Debtor's Board of Directors.  The Plan provides that the initial

12    Board of Directors of Reorganized Debtor shall be composed of (a) Steven R. Wilkins,

13    (b) W. Hunter Stropp, (c) Iain G. Douglas, (d) Douglas Nidiffer, and (e) William Kaye, the

14    director designated by the Committee (the "Committee Board Member").  Thereafter, the

15    Board of Directors of Reorganized Debtor shall be elected by the shareholders of

16    Reorganized Debtor in accordance with the Restated Bylaws and applicable state law.  The

17    Plan provides that the Committee Board Member shall have the right, acting alone and

18    without a vote of the Board of Reorganized Debtor, but not the obligation, to: (a) other than

19    with respect to any claim by an Insider, Endeavor, THL, or any member of the Committee,

20    designate which Claims shall be the subject of an objection and direct counsel for

21    Reorganized Debtor to object to such Claims; (b) approve the settlement or other resolution

22    of any Disputed Claim by which such Claim shall be allowed in the amount of $250,000 or

23    less; and (c) approve the expenditure of up to $20,000 in legal fees and costs in connection

24    with the objection to a Claim.  If there is no Committee Board Member, or if the Committee

25    Board Member elects not to exercise any or all of the rights provided herein, all unexercised

26    rights, power and authority concerning Disputed Claims vested above to the Committee

**Page 35 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  Board Member shall remain with Reorganized Debtor.  Further, the rights granted to the

2  Committee Board Member, even if exercised, shall not diminish in any respect the rights,

3  power, and authority of the Board of Directors of Reorganized Debtor and, in the event of a

4  dispute between the Committee Board Member and the Board of Directors of Reorganized

5  Debtor, the decision of the Board of Directors of Reorganized Debtor shall control.

6        Steven R. Wilkins is a co-founder of Endeavour.  He has over 25 years of mezzanine,

7  leveraged lending, structured finance commercial lending, and risk management experience.

8  Prior to co-founding Endeavour, Mr. Wilkins was Senior Vice President and Team Leader

9  for GE Commercial Finance in the West Region and was responsible for the startup and

10 development of GE's corporate finance business in the Pacific Northwest and Intermountain

11 states, focusing primarily on leveraged and structured finance debt solutions.  Prior to joining

12 GE in 1997, Mr. Wilkins held senior relationship manager positions at both Bank of America

13 and U.S. Bank where he was involved in origination, underwriting and portfolio

14 management.  Mr. Wilkins was awarded a Bachelor of Science in Business Administration

15 with an emphasis in Finance and Management from the University of Oregon.

16       W. Hunter Stropp is the Co-President of THL Credit, Inc. and THL Credit Advisors

17 LLC.  Mr. Stropp serves on the Investment Committee and manages transaction allocation.

18 He leads transaction origination for the eastern region and underwriting, execution and

19 portfolio management for the Los Angeles investment team.  Prior to joining THL Credit in

20 2007, Mr. Stropp served as a Vice President and Investment Manager in the Private Equity

21 Group of GE Asset Management Inc. from 2000 to 2007.  Previously, Mr. Stropp served in

22 private equity and business development positions at Koch Industries, Inc. and began his

23 career as a consultant with Arthur Andersen LLP.  Mr. Stropp holds a Bachelor of Arts in

24 economics and political science from the University of Texas at Austin and a Masters of

25 Business Administration from Texas A&M University.

26

**Page 36 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1      Iain G. Douglas is a co-founder and Managing Director of Endeavour.  Prior to

2    co-founding Endeavour in 2009, he was an Executive Vice President, Chief Sales Officer and

3    Western Region Manager for CIT's Commercial & Industrial Group, overseeing business

4    development and risk management efforts in the Western and Southwestern United States for

5    leveraged, distressed and special situations senior debt.  In addition, he managed CIT's

6    portfolio of lending concerning the food, beverage and agribusiness industries on a national

7    basis.  Prior to CIT, he was employed by GE Commercial Finance in various leadership

8    capacities, including capital markets and risk management positions.  He has also held

9    business development and risk positions with First Interstate Ltd., Security Pacific National

10    Bank and Philadelphia National Bank.  Mr. Douglas holds a Masters of Business

11    Administration from the Anderson Graduate School of Management at the University of

12    California Los Angeles, with a concentration in Finance, and a Bachelor of Arts in

13    Economics from Cornell University.

14      Douglas Nidiffer is the current Chairman of the Board of Debtor.  Mr. Nidiffer is the

15    son of Debtor's founders, Ray and June Nidiffer.  Mr. Nidiffer graduated from Oregon State

16    University in 1972 with a Bachelor of Science degree.  Since then, he has served in many

17    roles for Debtor, becoming Vice President in 1988.  In 1997, Mr. Nidiffer became the

18    company's President & Chief Executive Officer, a post he held until May of 2012.

19      William Kaye is the Managing Director of JLL Consultants, Inc.  Mr. Kaye currently

20    serves and/or has served recently as the representative for several national food

21    manufacturing and sales organizations on official committees of unsecured creditors in a

22    number of supermarket cases, in many instances as either committee chairperson or

23    co-chairperson.  Mr. Kaye has extensive experience in all business aspects of insolvency and

24    bankruptcy matters, as well as being familiar with the operation of supermarkets.  In

25    addition, Mr. Kaye is serving as, or has recently been serving as, liquidating trustee, litigation

26    trustee and/or plan administrator in a substantial number of major national cases, including

**Page 37 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  supermarket, restaurant, C-Store and other retail-oriented cases.  He has also served as a

2  board member in several supermarket cases, including Valu Foods and Eagle Supermarkets,

3  as well as the board of directors for Neumann Homes, Inc. before and during its Chapter 11

4  case, and on the post-confirmation board of TWA Airlines.

5      Debtor does not know what current officers of Debtor will be retained by

6  Reorganized Debtor's Board of Directors.

7      9.8   <u>Corporate Action</u>.  The Plan provides that upon entry of the Confirmation

8  Order, all actions contemplated by the Plan shall be authorized and approved in all respects

9  (subject to the provisions of the Plan), including, without limitation, the adoption and filing

10  of the Restated Articles of Incorporation, approval of the Restated Bylaws, approval of the

11  Employee Stock Incentive Plan, the election or appointment, as applicable, of directors and

12  officers for Reorganized Debtor, and the issuance of the Common Stock and the Series A

13  Preferred Stock.  The appropriate officers of Reorganized Debtor are authorized and directed

14  to execute and deliver the agreements, documents, and instruments contemplated by the Plan

15  and the Disclosure Statement in the name of and on behalf of Reorganized Debtor.

16      9.9   <u>Employee Stock Incentive Plan</u>.  The Plan provides that on the Effective Date,

17  the Employee Stock Incentive Plan shall become effective immediately without any further

18  corporate or other action.  The Employee Stock Incentive Plan is attached as Exhibit 1 to the

19  Plan.

20      9.10   <u>Setoffs</u>.  The Plan provides that Debtor may, but shall not be required to, set

21  off against any Claim and the distributions to be made pursuant to the Plan in respect of such

22  Claim, any claims of any nature whatsoever that Debtor may have against the holder of such

23  Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall

24  constitute a waiver or release of any such claim Debtor may have against such holder.

25      9.11   <u>Utility Deposits</u>.  The Plan provides that all utilities holding a Utility Deposit

26  shall immediately after the Effective Date return or refund such Utility Deposit to

**Page 38 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    Reorganized Debtor.  Notwithstanding, to the extent a utility continues to provide service to

2    the Reorganized Debtor post-Effective Date, failure to return or refund a Utility Deposit to

3    Reorganized Debtor shall not constitute a breach by the utility of the confirmed Plan or a

4    violation of any order confirming the Plan or any other order entered by the court.  At the

5    sole option of Reorganized Debtor, Reorganized Debtor may apply any Utility Deposit that

6    has not been refunded to Reorganized Debtor in satisfaction of any payments due for charges

7    incurred during the post-petition period, or, in the event all charges incurred during the post-

8    petition period have been paid, become due from Reorganized Debtor to a utility holding

9    such a Utility Deposit.  Nothing in the Plan, or in any order confirming the Plan, shall limit

10   or affect a utility's right to seek additional security from the Reorganized Debtor in

11   accordance with applicable non-bankruptcy law.

12        9.12    Event of Default; Remedy.  The Plan provides that any material failure by

13   Reorganized Debtor to perform any term of the Plan, which failure continues for a period of

14   10 Business Days following receipt by Reorganized Debtor of written notice of such default

15   from the holder of an Allowed Claim to whom performance is due, shall constitute an Event

16   of Default.  Upon the occurrence of an Event of Default, the holder of an Allowed Claim to

17   whom performance is due shall have all rights and remedies granted by law or this Plan.  An

18   Event of Default with respect to one Claim shall not be an Event of Default with respect to

19   any other Claim.

20        9.13    Conditions Precedent to Effectiveness of Plan.  The Plan provides that unless

21   waived by Debtor, the following conditions must occur and be satisfied for the Plan to

22   become effective, and are conditions precedent to the Effective Date:

23             (a)    The Bankruptcy Court shall have entered the Confirmation Order, in

24   form and substance reasonably satisfactory to Debtor, which shall, among other things,

25   provide that any and all executory contracts and unexpired leases assumed pursuant to the

26   Plan shall remain in full force and effect for the benefit of Reorganized Debtor

**Page 39 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1   notwithstanding any provision in any such contract or lease or in applicable law (including

2   those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits,

3   restricts, or conditions such transfer or that enables or requires termination or modification of

4   such contract or lease;

5        (b)    All documents, instruments, and agreements, each in form and

6   substance satisfactory to Reorganized Debtor, provided for or necessary to implement the

7   Plan shall have been executed and delivered by the parties thereto, unless such execution or

8   delivery has been waived by the party to be benefitted thereby; and

9        (c)    The Exit Financing shall have closed and all conditions to funding

10  shall have been satisfied or waived.

11  **10.    RIGHTS OFFERING**

12       10.1    <u>Introduction</u>.  As set forth in Article 6 of the Plan, Debtor has the right in the

13  Rights Offering to raise up to a maximum of $10 million by issuing for $8 (the "Subscription

14  Price") the combination of one share of Common Stock and one share of Series A Preferred

15  Stock (the "Rights Offering Shares").  On or before the Effective Date, Debtor will decide, in

16  its sole discretion, whether or not it is desirable and feasible to complete the Rights Offering.

17  Under the Rights Offering, each holder of a Class 12 Claim (a "Rights Offering Participant")

18  will have the right (a "Subscription Right"), but not the obligation, to purchase its pro rata

19  share of the Rights Offering Shares based on the amount of Class 12 Claims held.  If Debtor

20  decides to accept subscriptions and consummate the Rights Offering, and the holders of

21  Class 12 Claims do not subscribe for the full number of Rights Offering Shares offered,

22  Debtor may sell any or all of such unsubscribed Rights Offering Shares to Endeavour and/or

23  THL and/or their affiliates, or such other Creditor as selected by Debtor (each, a "Backstop

24  Party").

25       Once a Rights Offering Participant has timely and validly exercised its Subscription

26  Rights, subject to the occurrence or satisfaction of all conditions precedent to the Rights

**Page 40 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  Offering and to the Rights Offering Participants' participation in the Rights Offering,  such

2  Rights Offering Participant's right to participate in the Rights Offering will be irreversible

3  and shall not be subject to dissolution, avoidance or disgorgement.  No disallowance of any

4  or all of a Rights Offering Participant's Class 12 Claim will affect its exercised Subscription

5  Rights.

6        10.2  <u>Issuance of Rights</u>.  Each Rights Offering Participant will receive

7  Subscription Rights to subscribe for a Primary Offering Subscription for an aggregate

8  purchase price equal to the applicable Subscription Payment Amount.  The Rights Offering

9  Shares will be issued to the Rights Offering Purchasers at the Subscription Price.  Any

10  Subscription accepted by Debtor in the Rights Offering will only be accepted for an equal

11  number of shares of Common Stock and Series A Preferred Stock.

12        For example, a Rights Offering Participant would be eligible to subscribe for 1% of

13  the Rights Offering Shares if its Class 12 Claim represented 1% of all Class 12 Claims.  If

14  the Rights Offering Participant wanted to exercise its Subscription Right in full, the Rights

15  Offering Participant would be able to subscribe for $100,000 of the Rights Offering (1% of

16  $10 million), which would be the combination of 12,500 shares of Common Stock and

17  12,500 shares of Series A Preferred Stock at the Subscription Price of $8 (12,500

18  combinations of one share of Common Stock and one share of Series A Preferred

19  Stock x $8 = $100,000).  In this example, the "Subscription Payment Amount" would be

20  $100,000.

21        10.3  <u>Subscription Period</u>.  If Debtor elects to proceed with the Rights Offering,

22  then Debtor will determine a Subscription Commencement Date and a Subscription

23  Deadline.  On the Subscription Commencement Date, Debtor will mail a subscription to each

24  holder of a General Unsecured Claim (each a Rights Offering Participant).  Each Rights

25  Offering Participant that intends or desires to participate in the Rights Offering must

26  affirmatively elect to exercise its Subscription Rights, and provide written notice thereof to

**Page 41 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1   the parties specified in the Subscription on or prior to the Subscription Deadline in

2   accordance with the terms of the Plan and the Subscription.  A form of Subscription is

3   attached as Exhibit 4 to the Plan.  At the Subscription Deadline, if Debtor selects a Backstop

4   Party, the Remaining Rights Offering Shares will be allocated to, and may be purchased by

5   the Backstop Party.

6        10.4    Exercise of Subscription Rights and Payment of Subscription Payment

7   Amount.  On the Subscription Commencement Date, Debtor will mail the Subscription to

8   each Rights Offering Participant, together with appropriate instructions for the proper

9   completion, due execution, and timely delivery of the Subscription, as well as instructions for

10   the payment of the eventual Subscription Payment Amount for that portion of the

11   Subscription Right sought to be exercised by such Rights Offering Participant.  Debtor may

12   adopt such additional detailed procedures consistent with the provisions of the Plan to more

13   efficiently administer the exercise of the Subscription Rights.

14        In order to exercise the Subscription Right, each Rights Offering Participant must

15   return a duly completed Subscription (making a binding and irrevocable commitment to

16   participate in the Rights Offering), to Debtor or other party specified in the Subscription so

17   that such form and the applicable Subscription Payment Amount are actually received by

18   Debtor or such other party on or before the Subscription Deadline.  A Rights Offering

19   Participant may subscribe for its entire Pro Rata Share of the Rights Offering Shares or only

20   a part of its Pro Rata Share of the Rights Offering Shares.  If Debtor or such other party for

21   any reason does not receive from a given holder of Subscription Rights a duly completed

22   Subscription and the related Subscription Payment Amount on or prior to the Subscription

23   Deadline, then such holder shall be deemed to have forever and irrevocably relinquished and

24   waived its right to participate in the Rights Offering.  On the Subscription Notification Date,

25   Debtor will notify each Rights Offering Purchaser of its respective allocated portion of

26   Rights Offering, and if Debtor has selected Backstop Parties the terms of the Backstop Rights

**Page 42 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    Purchase Agreement.  Debtor will notify each Backstop Party after the Subscription Deadline

2    of its allocated portion of the Remaining Rights Offering Shares that the Backstop Party may

3    purchase pursuant to the Backstop Rights Purchase Agreement.

4           Each Rights Offering Purchaser (other than a Backstop Party, if applicable) must

5    tender its Subscription Payment Amount to Debtor so it is actually received on or prior to the

6    Subscription Deadline.  Any Rights Offering Purchaser who fails to tender its Subscription

7    Payment Amount so it is received on or prior to the Subscription Deadline shall be deemed to

8    have forever and irrevocably relinquished and waived its right to participate in the Rights

9    Offering.  Debtor shall hold the payments it receives for the exercise of Subscription Rights

10   in a separate account.  If Debtor, in its sole discretion, decides not to complete the Rights

11   Offering, such payments shall be returned, without accrual or payment of any interest

12   thereon, to the applicable Rights Offering Purchaser, without reduction, offset or

13   counterclaim.

14          10.5    Rights Offering Backstop.  If Debtor decides to have one or more Backstop

15   Parties for the Rights Offering, it will enter into a Backstop Rights Purchase Agreement with

16   each Backstop Party.  In accordance with the Backstop Rights Purchase Agreement, each

17   Backstop Party may commit to purchase all or some portion of the Remaining Rights

18   Offering Shares.  Debtor may grant certain rights and protections and pay certain fees to a

19   Backstop Party depending on the level of commitment by the Backstop Party to purchase the

20   Remaining Rights Offering Shares.

21          10.6    Number of Rights Offering Shares; Determination of Subscription Price.  The

22   number of Rights Offering Shares to be sold pursuant to the Rights Offering shall be

23   determined by dividing the Rights Offering Amount by the Subscription Price.  Debtor has

24   determined the Subscription Price based on the estimated net equity value, without giving

25   effect to any discounts for lack of liquidity, marketability or otherwise, of Reorganized

26   Debtor immediately following completion of the confirmed Plan after the Effective Date.

**Page 43 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    Debtor believes the Subscription Price will equal the fair market value of the combination of

2    one share of Common Stock and one share of Series A Preferred Stock on the date issued

3    pursuant to the Rights Offering, but there can be no assurance that the Subscription Price will

4    equal such fair market value.  Debtor estimates that such net equity value of Reorganized

5    Debtor immediately following the Effective Date will be approximately $48 million, leading

6    it to determine the Subscription Price for the Rights Offering amount of up to $10 million to

7    be $8 per combination of one share of Common Stock and one share of Series A Preferred

8    Stock (rounded to avoid fractional shares).  If the entire Rights Amount is subscribed for,

9    approximately 1,250,000 shares of Common Stock and 1,250,000 shares of Series A

10    Preferred Stock would be issued in the Rights Offering.

11         10.7    No Transfer; Detachment Restrictions; No Revocation. The Subscription

12    Rights are not transferable or detachable.  Any such transfer or detachment, or attempted

13    transfer or detachment, will be null and void.  Once a Rights Offering Participant has

14    exercised any of its Subscription Rights by properly executing and delivering a Subscription

15    to Debtor, such exercise may only be revoked, rescinded or annulled in the sole discretion of

16    Debtor or Reorganized Debtor.

17         10.8    Distribution of Rights Offering Shares.  On the Effective Date, or as soon as

18    reasonably practicable thereafter, Reorganized Debtor or other applicable disbursing agent

19    shall distribute the Rights Offering Shares purchased by each Rights Offering Purchaser.

20         10.9    Validity of Exercise of Subscription Rights.  All questions concerning the

21    timeliness, validity, form, and eligibility of any exercise, or purported exercise, of

22    Subscription Rights shall be determined by Debtor or Reorganized Debtor.  Debtor or

23    Reorganized Debtor, in its discretion reasonably exercised in good faith, may waive any

24    defect or irregularity, or permit a defect or irregularity to be corrected within such times as

25    they may determine, or reject the purported exercise of any Subscription Rights.

26    Subscriptions shall be deemed not to have been received or accepted until all irregularities

**Page 44 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    have been waived or cured within such time as Debtor or Reorganized Debtor determines, in

2    its discretion reasonably exercised in good faith.  Debtor or Reorganized Debtor may, but is

3    not required to, give written notice to any Rights Offering Participant regarding any defect or

4    irregularity in connection with any purported exercise of Subscription Rights by such Rights

5    Offering Participant and may permit such defect or irregularity to be cured within such time

6    as Debtor or Reorganized Debtor may determine in good faith to be appropriate; provided,

7    however, that neither Debtor, Reorganized Debtor nor any other party shall incur any liability

8    for giving, or failing to give, such notification and opportunity to cure.  Once a Rights

9    Offering Participant has timely and validly exercised its Subscription Rights, subject to the

10    occurrence or satisfaction of all conditions precedent to the Rights Offering and to the Rights

11    Offering Participant's participation in the Rights Offering, and notwithstanding the

12    subsequent disallowance of any or all of its underlying Claim, such Rights Offering

13    Participant's right to participate in the Rights Offering will be irreversible and shall not be

14    subject to dissolution, avoidance or disgorgement and shall not be withheld from such Rights

15    Offering Participant on account of such disallowance

16        10.10   Rights Offering Proceeds.  The proceeds of the Rights Offering may be used

17    to fund Cash payments contemplated by the Plan and for Reorganized Debtor's general

18    corporate purposes.

19        10.11   Factors Affecting the Proposed Rights Offering.  The Plan gives Debtor the

20    right, in its sole discretion, to consummate the Rights Offering.  Proceeds from the Rights

21    Offering would be used to make the Cash payments required by the Plan or for the operating

22    needs of Reorganized Debtor.  In the event Debtor receives any proceeds from the Rights

23    Offering and does not go forward with the Rights Offering, Debtor will return such proceeds

24    to the applicable Rights Offering Purchasers in accordance with the Plan.

25

26

**Page 45 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

At the present time, Debtor does not have a Backstop Commitment. There can be no assurance that there will be a Backstop Commitment. Even if a Backstop Commitment is obtained, there can be no assurance that Debtor will consummate the Rights Offering.

A number of external and internal factors could negatively affect Debtor' ability to obtain a Backstop Commitment or consummate the Rights Offering. These factors include, among others (a) the overall state of the economy as well as the capital and credit markets; (b) the status of the Bankruptcy Case, including the status of Debtor's efforts to confirm the Plan, resolve objections and resolve or adjudicate Claims; (c) Debtor's business or financial performance; and (d) Debtor's ability to come to acceptable terms with potential Backstop Parties.

In addition, the timeframe for Debtor to consummate the Rights Offering is very short and there can be no assurance that Debtor will be able consummate such transactions or obtain sufficient proceeds even if the factors described in the preceding paragraph are favorable to Debtor.

If Debtor determines, in its sole discretion, to consummate the Rights Offering, and is successful in completing the Rights Offering, Reorganized Debtor will have a capital structure that could vary materially from the capital structure Reorganized Debtor would have without it. Consummation of the Rights Offering would increase the number of shares of Common Stock and Series A Preferred Stock, which may result in dilution to other shareholders, but would also could decrease the amount of debt owed by Reorganized Debtor immediately after the Effective Date.

## 11. ASSETS AND LIABILITIES

11.1    <u>Assets</u>. **Exhibit 4** attached hereto contains Debtor's internally prepared balance sheet as of December 31, 2013 on a GAAP basis. Debtor's assets consist primarily of the following at December 31, 2013:

- Cash on hand: $3.8 million. This is cash primarily in stores and in transit.

**Page 46 of 62** - DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

- Accounts receivable: $2.2 million. This includes rebates and credits earned from suppliers.

- Inventories (at cost): $25 million

- Furniture, fixtures, equipment, and real-property (25 parcels) with an estimated value of $60 million. This amount is based on the valuation report from The Food Partners dated October 31, 2013.

- Unified Grocers stock with a value of approximately $4.2 million based on The Food Partners valuation dated October 31, 2013.

Debtor estimates that on the Effective Date Debtor's assets will have a value of approximately $97 million.

11.2   Liabilities. Debtor's liabilities consist primarily of the following at December 31, 2013:

- Secured debt owed to U.S. Bank of approximately $20 million. This includes both a revolving line of credit and two term loans.

- Secured debt owed to various note holders totaling approximately $3.3 million. This primarily relates to acquisition of real property and equipment that is secured by the underlying assets.

- Secured note payable to the C & K Market 401(k) Plan totaling approximately $2 million.

- Mezzanine financing provided by Endeavour and THL approximating $30 million.

- A note payable to the Nidiffer Family LLC approximating $10 million.

- Unsecured notes payable approximating $5 million. These notes primarily relate to the acquisition of grocery stores and related equipment.

- Accounts payable and accrued expenses approximating $33 million.

Debtor estimates that promptly following the Effective Date (after Claims required to be paid on the Effective Date have been paid, Small Unsecured Claims have been paid, General Unsecured Creditors' Claims have been converted to equity, and Reorganized Debtor has closed on its Exit Financing), Debtor's liabilities will be approximately $49 million. This includes the Exit Financing, which Debtor anticipates will approximate $25 million.

**Page 47 of 62** - DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1        11.3    <u>Projected Balance Sheet/Operating Projections</u>.  A projected Effective Date

2    balance sheet is attached hereto as **Exhibit 5**, and projections for the one-year period

3    following the Effective Date are attached hereto as **Exhibit 6**.

4        11.4    <u>Avoidance Actions</u>.  The Plan provides that all Avoidance Actions and other

5    claims and causes of action accruing to Debtor remain assets of Reorganized Debtor.  The

6    Plan further provides that on the Effective Date all Avoidance Actions against entities that

7    are not Secured Creditors will be deemed waived and forever barred.  Without limiting the

8    preceding, the Plan does not bar any Avoidance Actions against Komlofske.  Debtor has

9    performed a preliminary analysis of potential claims and Avoidance Actions, and Debtor's

10   preliminary conclusion is that, other than with respect to Komlofske, there are no material

11   claims or Avoidance Actions.

12   **12.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

13       12.1    <u>Assumption and Rejection</u>.  The Plan provides that, except as may otherwise

14   be provided, all executory contracts of Debtor that are not otherwise subject to a prior

15   Bankruptcy Court order or pending motion before the Bankruptcy Court will be deemed

16   assumed by Debtor as of the Effective Date and will be enforceable by the parties thereto in

17   accordance with their terms; provided that no provision relating to default by reason of

18   insolvency or the filing of the Bankruptcy Case shall be enforceable against Reorganized

19   Debtor or its successors or assigns.  The Confirmation Order shall constitute an order

20   authorizing the assumption and assignment of all executory contracts that are subject to a

21   pending motion to assume or a pending motion to assume and assign.  Reorganized Debtor

22   shall promptly pay all amounts required under Section 365 of the Bankruptcy Code to cure

23   any defaults for executory contracts and unexpired leases being assumed and shall perform

24   its obligations from and after the Effective Date in the ordinary course of business.  Without

25   limiting the above, as discussed in Section 6.9 above, Debtor's remaining leases of non-

26   residential real property will be subject to a prior Bankruptcy Court order or a pending

**Page 48 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  motion before the Bankruptcy Court, and thus will not be deemed assumed by Debtor as of

2  the Effective Date.

3      12.2    Assignment.  The Plan provides that except as may be otherwise provided in

4  the Plan, Confirmation Order, or other Order of the Bankruptcy Court, all executory contracts

5  shall be deemed assigned to Reorganized Debtor as of the Effective Date.  The Confirmation

6  Order shall constitute an order authorizing such assignment of assumed executory contracts,

7  and no further assignment documentation shall be necessary to effectuate such assignment

8      12.3    Rejection Claims.  The Plan provides that Rejection Claims must be Filed no

9  later than (a) April 9, 2014 or (b) for Rejection Claims arising from a rejection order entered

10  on or after March 10, 2014, 30 days after the entry of the order rejecting the executory

11  contract or unexpired lease.  Any such Rejection Claim not Filed within such time shall be

12  forever barred from asserting such Claim against Debtor or Reorganized Debtor, their

13  property, estate, and any guarantors of such obligations.  Each Rejection Claim resulting

14  from such rejection shall constitute a Small or General Unsecured Claim, as applicable.

15  **13.    VOTING PROCEDURES**

16      13.1    Ballots and Voting Deadline.  A ballot has been enclosed with this Disclosure

17  Statement for use in voting on the Plan.  After carefully reviewing the Plan and this

18  Disclosure Statement, and if you are entitled to vote on the Plan (see below), please indicate

19  your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed

20  ballot as directed below.

21      To be counted for voting purposes, ballots must be received no later than 5 p.m.

22  Pacific time, on _____, 2014 by Debtor at the following address:

23                      Tonkon Torp LLP
                        Attention:  Spencer Fisher
24                      1600 Pioneer Tower
                        888 SW Fifth Avenue
25                      Portland, OR  97204-2099

26

1    Any ballots received after 5 p.m. Pacific time on _____, 2014 will not be

2    included in any calculation to determine whether the parties entitled to vote on the Plan have

3    voted to accept or reject the Plan.

4    If you do not receive a ballot, or if a ballot is damaged or lost, please contact Spencer

5    Fisher at the address above, by telephone at 503-802-2167, or at spencer.fisher@tonkon.com.

6    When a ballot is signed and returned without further instruction regarding acceptance

7    or rejection of the Plan, the signed ballot shall be counted as a vote accepting the Plan.  When

8    a ballot is returned indicating acceptance or rejection of the Plan but is unsigned, the

9    unsigned ballot will not be included in any calculation to determine whether parties entitled

10   to vote on the Plan have voted to accept or reject the Plan.  When a ballot is returned without

11   indicating the amount of the Claim, the amount shall be as set forth on Debtor's Schedules or

12   any proof of claim filed with respect to such Claim.

13   If a proof of claim has been filed with respect to such impaired Claim, then the vote

14   will be based on the amount of the proof of claim.  If no proof of claim has been filed, then

15   the vote will be based on the amount scheduled by Debtor in its Schedules.  Holders of

16   disputed Claims who have settled their dispute with Debtor are entitled to vote the settled

17   amount of their Claim.  The Bankruptcy Code provides that such votes will be counted unless

18   the Claim has been disputed, disallowed, disqualified, or suspended prior to computation of

19   the vote on the Plan.  The Claim to which an objection has been filed is not allowed to vote

20   unless and until the Bankruptcy Court rules on the objection.  The Bankruptcy Code provides

21   that the Bankruptcy Court may, if requested to do so by the holder of such Claim, estimate or

22   temporarily allow a Disputed Claim for the purposes of voting on the Plan.

23   13.2    Parties Entitled to Vote.  Pursuant to Section 1126 of the Bankruptcy Code,

24   any holder of an Allowed Claim that is in an impaired Class under the Plan, and whose Class

25   is not deemed to reject the Plan, is entitled to vote.  A Class is "impaired" unless the legal,

26   equitable and contractual rights of the holders of claims in that Class are left unaltered by the

**Page 50 of 62** - DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    Plan or if the Plan reinstates the Claims held by Members of such Class by (a) curing any

2    defaults, (b) reinstating the maturity of such claim, (c) compensating the holder of such claim

3    for damages that result from the reasonable reliance on any contractual provision of law that

4    allows acceleration of such claim, and (d) otherwise leaving unaltered any legal, equitable, or

5    contractual right of which the Claim entitles the holder of such Claim.  Because of their

6    favorable treatment, Classes that are not impaired are conclusively presumed to accept the

7    Plan.  Accordingly, it is not necessary to solicit votes from the holders of Claims in Classes

8    that are not impaired.

9           Classes of Claims or interests that will not receive or retain any money or property

10    under a Plan on account of such Claims or interests are deemed, as a matter of law under

11    Section 1126(g) of the Bankruptcy Code, to have rejected the Plan and are likewise not

12    entitled to vote on the Plan.

13           Classes 1 (Other Priority Claims), 2 (C & K Market, Inc. 401(k) Plan; United States

14    Department of Labor), and 11 (U.S. Bank) are not impaired by the Plan and are conclusively

15    presumed to accept the Plan.  Class 14 (Equity Security Holders) will not receive or retain

16    any money or property on account of such Equity Interests, and are deemed to have rejected

17    the Plan.  All other Classes are impaired by the Plan and are entitled to vote on the Plan.

18           13.3    Votes Required for Class Acceptance of the Plan.  For a Class of Claims to

19    accept the Plan, Section 1126 of the Bankruptcy Code requires acceptance by Creditors that

20    hold at least two-thirds in dollar amount and a majority in number of the Allowed Claims of

21    such Class, in both cases counting only those claims actually voting to accept or reject the

22    Plan.  The holders of Claims who fail to vote are not counted as either accepting or rejecting

23    the Plan.  If the Plan is confirmed, the Plan will be binding with respect to all holders of

24    Claims in each Class, including Classes and members of Classes that did not vote or that

25    voted to reject the Plan.

26

**Page 51 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

**14.    CONFIRMATION OF THE PLAN**

14.1    <u>Confirmation Hearing</u>.  The Bankruptcy Court has scheduled a hearing on confirmation of the Plan on _____, 2014 at _____ ___.m. Pacific time.  The hearing will be held at the United States Bankruptcy Court for the District of Oregon, Courtroom No. 6, 405 E. Eighth Avenue, Eugene, Oregon 97401, before the Honorable Frank R. Alley, III, United States Bankruptcy Judge.  At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interests of creditors of Debtor.  Debtor will submit a report to the Bankruptcy Court at that time concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote thereon.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  Any objections to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and <u>received</u> by counsel for Debtor no later than _____, 2014, by 5 p.m. Pacific time.  Unless an objection to confirmation is timely filed and received, it may not be considered by the Bankruptcy Court.

14.2    <u>Requirements of Confirmation; Liquidation Analysis</u>.  At the hearing on confirmation, the Bankruptcy Court will determine whether the provisions of Section 1129 of the Bankruptcy Code have been satisfied.  If all the provisions of Section 1129 are met, the Bankruptcy Court may enter an order confirming the Plan.  Debtor believes the Plan satisfies all the requirements of Chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all the requirements of Chapter 11, and that the Plan has been proposed and is made in good faith.

Among other requirements for confirmation, to confirm the Plan the Bankruptcy Court must determine that the Plan meets the requirements of Section 1129(a)(7) of the Bankruptcy Code; that is, that the Plan is in the best interests of each holder of a Claim in an impaired Class that has not voted to accept the Plan.  Accordingly, if an impaired Class does

**Page 52 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1   not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court

2   find that the Plan provides to each holder of a Claim in such impaired Class a recovery on

3   account of the holder's Claim that has a value at least equal to the value of the distribution

4   each such holder would receive if Debtor was liquidated under Chapter 7 of the Bankruptcy

5   Code.

6           A liquidation analysis is attached hereto as **Exhibit 7**.

7           Debtor believes the Plan provides to each holder of a Claim in such impaired Class a

8   recovery on account of the holder's Claim that has a value at least equal to the value of the

9   distribution such holder would receive if Debtor was liquidated under Chapter 7 of the

10  Bankruptcy Code.

11          Underlying the liquidation analysis are projections and assumptions that are

12  inherently subject to significant uncertainties and contingencies.  The liquidation analysis is

13  based on assumptions that may change.  Accordingly, there can be no assurance that the

14  projected values reflected in the liquidation analysis will be realized, and actual results could

15  vary materially from those shown on the liquidation analysis.

16  **15.    MISCELLANEOUS PROVISIONS**

17          In addition to the provisions discussed above, the Plan contains a number of

18  administrative and miscellaneous provisions.  See Article 9 (Effect of Confirmation);

19  Article 10 (Retention of Jurisdiction); Article 12 (Administrative Provisions); and Article 13

20  (Miscellaneous Provisions) of the Plan.  Those provisions are not restated or summarized in

21  this Disclosure Statement.  Please review the Plan carefully and contact your legal or tax

22  adviser if you have any questions regarding the Plan.

23  **16.    TAX CONSEQUENCES TO DEBTOR OF THE PLAN**

24          CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH

25  REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM

26  YOU THAT (A) ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS

**Page 53 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1  COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR

2  WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED

3  UPON, FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER

4  THE INTERNAL REVENUE CODE OF 1986, AS AMENDED; OR (2) PROMOTING,

5  MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION

6  OR TAX MATTER(S) ADDRESSED HEREIN; AND (B) THIS DISCUSSION WAS

7  WRITTEN IN CONNECTION WITH DEBTOR SOLICITING ACCEPTANCES OF THE

8  PLAN THROUGH THIS DISCLOSURE STATEMENT.

9           The following discussion is a summary of certain material United States

10  federal income tax consequences expected to result from consummation of the Plan.  This

11  discussion is for general information purposes only, and should not be relied upon for

12  purposes of determining the specific tax consequences of the Plan with respect to a particular

13  holder of an Allowed Claim or any Equity Security Holder.  This discussion does not purport

14  to be a complete analysis or listing of all potential tax considerations.  This discussion does

15  not address aspects of federal income taxation that may be relevant to a particular holder of

16  an Allowed Claim subject to special treatment under federal income tax laws (such as foreign

17  taxpayers, broker-dealers, banks, thrifts, insurance companies, financial institutions,

18  regulated investment companies, real estate investment trusts and pension plans, and other

19  tax-exempt investors), and does not discuss any aspects of state, local or foreign tax laws.

20  Furthermore, this summary does not address federal taxes other than income taxes.

21           This discussion is based on existing provisions of the Internal Revenue Code

22  of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated

23  thereunder, and current administrative rulings and court decisions.  Legislative, judicial or

24  administrative changes or interpretations enacted or promulgated after the date hereof could

25  alter or modify the discussion set forth below with respect to the federal income tax

26  consequences of the Plan.  Any such changes or interpretations may be retroactive and could

**Page 54 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

significantly affect the federal income tax consequences of the Plan.  No ruling has been

requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax

aspects of the Plan and no opinion of counsel has been sought or obtained with respect

thereto.  This discussion is not binding on the IRS or the courts and no assurance can be

given that the IRS will not assert, or that a court will not sustain, a different position than any

position discussed herein.  No representations or assurances are being made to the holders of

Allowed Claims or to the Equity Security Holders with respect to the federal income tax

consequences described herein.

Accordingly, the following summary of certain federal income tax

consequences of the Plan is for informational purposes only and is not a substitute for careful

tax planning or advice based upon the individual circumstances pertaining to a particular

holder of an Allowed Claim or to a particular Equity Security Holder.  Each holder of an

Allowed Claim and each Equity Security Holder is strongly urged to consult with its own tax

advisors regarding the federal, state, local, foreign, and other tax consequences of the Plan.

Any discussion of federal tax issues set forth in this Disclosure Statement was

written solely in connection with the confirmation of the Plan to which the transactions

described in this Disclosure Statement are ancillary.  Such discussion is not intended or

written to be legal or tax advice to any person and is not intended or written to be used, and

cannot be used, by any person for the purpose of avoiding any federal tax penalties that may

be imposed on such person.  Each holder of an Allowed Claim and each Equity Security

Holder should seek advice based on its particular circumstances from an independent tax

advisor.

16.1    Cancellation of Debt Income of Debtor.  Under the IRC, a taxpayer generally

will recognize cancellation of debt income ("COD Income") upon satisfaction of its

outstanding indebtedness for consideration less than the amount of such indebtedness.  The

amount of COD Income, in general, is the excess of (a) the adjusted issue price of the

**Page 55 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    indebtedness satisfied (in most cases, the amount the debtor received on incurring the

2    obligation, with certain adjustments), over (b) the sum of the amount of cash paid and the fair

3    market value of any new consideration given in satisfaction of the indebtedness.  However,

4    IRC Section 108(a) provides an exception to this income recognition rule (the "Bankruptcy

5    Exception") where a taxpayer is in bankruptcy and the discharge is granted, or is effected,

6    pursuant to a plan approved by the bankruptcy court.  In the case of an entity taxable as a

7    corporation, eligibility for the Bankruptcy Exception is determined at the corporate level.  If

8    the Bankruptcy Exception applies (with the effect that the taxpayer excludes its COD Income

9    from its gross income), the taxpayer is required, under IRC Section 108(b), to reduce certain

10    of its tax attributes by the amount of COD Income excluded from gross income pursuant to

11    the Bankruptcy Exception.  The attributes of the taxpayer that are reduced include any net

12    operating loss ("NOL") for the taxable year of the discharge, net operating loss carryovers

13    from prior years, general business and minimum tax credit carryforwards, capital loss

14    carryforwards, the basis of the taxpayer's assets, and foreign tax credit tax carryforwards.

15         COD Income will be realized by Debtor upon the issuance of Common Stock and

16    Series A Preferred Stock in satisfaction of the Allowed General Unsecured Claims.  The

17    amount of COD Income is equal to the difference between the adjusted issue price of each

18    debt and the fair market value of the stock transferred in satisfaction of each such debt.  Since

19    the COD Income realized by Debtor on such stock issuance is excluded from Debtor's

20    income by the Bankruptcy Exception, certain tax attributes of Debtor are subject to

21    reduction.

22         COD Income will also be realized by Debtor upon satisfaction of the Allowed Small

23    Unsecured Claims for 80% of each Claim.  The amount of COD Income is equal to the

24    excess of the adjusted issue price of each debt over the amount paid in satisfaction of each

25    such debt.  Since the COD Income realized by Debtor on such debt satisfaction is excluded

26

**Page 56 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1   from Debtor's income by the Bankruptcy Exception, certain tax attributes of Debtor are

2   subject to reduction as discussed above.

3          Whether Debtor will realize any COD Income on the debt restructuring

4   contemplated by the Plan depends on whether the restructuring of any debt constitutes a

5   deemed taxable exchange of the underlying debt pursuant to IRC Section 1001 and the

6   corresponding Treasury Regulations.  For a deemed taxable exchange to occur with respect

7   to a debt, the modification to the debt must be "significant" as such term is defined in the

8   applicable Treasury Regulations.  If the modification to a debt obligation of Debtor is

9   "significant," Debtor will realize COD Income in an amount equal to the amount, if any, by

10  which the "issue price" of the new debt (i.e., the "modified debt") is less than the "adjusted

11  issue price" of the old debt.

12         16.2    <u>Limitation of NOL Carryforwards and Other Tax Attributes</u>.  It is uncertain

13  whether Debtor has any NOLs.  Debtor did not have any NOLs as of the tax year ended

14  December 31, 2012.

15         Even after taking into account a reduction in any NOLs as a result of COD Income,

16  Debtor anticipates Reorganized Debtor will have significant tax attributes (e.g., depreciable

17  basis) at emergence.  The amount of such tax attributes that will be available to Reorganized

18  Debtor at emergence is based on a number of factors and is impossible to calculate at this

19  time.  Some of the factors that will impact the amount of available tax attributes include:

20  (a) the amount of tax losses incurred by Debtor in 2013; (b) the fair market value of the

21  Common Stock issued pursuant to the Plan; and (c) the amount of COD Income incurred by

22  Debtor in connection with consummation of the Plan.

23         Under IRC Section 382, if a corporation undergoes an "ownership change," the

24  amount of its "pre-change losses" that may be utilized to offset future taxable income

25  generally is subject to an annual limitation.  As discussed in greater detail herein, Debtor

26  anticipates that the issuance of the Common Stock and Series A Preferred Stock to the

**Page 57 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1 holders of Allowed General Unsecured Claims, along with the cancellation of the Equity

2 Securities pursuant to the Plan will result in an "ownership change" of Debtor for these

3 purposes, and that Debtor's use of any "pre-change losses" will be subject to limitation unless

4 an exception to the general rules of IRC Section 382 applies.

5      In general, the annual IRC Section 382 limitation on the use of "pre-change losses" in

6 any "post-change year" is equal to the product of (a) the fair market value of the stock of the

7 corporation immediately before the "ownership change" (with certain adjustments) multiplied

8 by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership

9 change" occurs. The IRC Section 382 limitation may be increased to the extent that Debtor

10 recognizes certain built-in gains in its assets during the five-year period following the

11 ownership change. Any unused limitation may be carried forward, thereby increasing the

12 annual limitation in the subsequent taxable year. As discussed below, however, special rules

13 may apply in the case of a corporation that experiences an ownership change as the result of

14 a bankruptcy proceeding.

15      The IRC Section 382(1)(5) exception to the foregoing annual limitation rules

16 generally applies when so-called "qualified creditors" of a debtor company in Chapter 11

17 receive, in respect of their claims, at least 50% of the vote and value of the stock of the

18 reorganized debtor pursuant to a confirmed Chapter 11 plan. Under the IRC

19 Section 382(1)(5) exception, a debtor's pre-change losses are not limited on an annual basis

20 but, instead, the debtor's NOLs are required to be reduced by the amount of any interest

21 deductions claimed during any taxable year ending during the three-year period preceding the

22 taxable year that includes the effective date of the plan of reorganization, and during the part

23 of the taxable year prior to and including the effective date of the plan of reorganization in

24 respect of all debt converted into stock in the reorganization. If the IRC Section 382(1)(5)

25 exception applies but the debtor undergoes another ownership change within two years after

26

**Page 58 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1   consummation, then the debtor's pre-change losses effectively would be eliminated in their

2   entirety.

3         Where the IRC Section 382(1)(5) exception is not applicable (either because the

4   debtor does not qualify for it or the debtor otherwise elects not to utilize the IRC

5   Section 382(1)(5) exception), a second special rule, the IRC Section 382(1)(6) exception,

6   will generally apply.  When the IRC Section 382(1)(6) exception applies, a debtor

7   corporation that undergoes an ownership change generally is permitted to determine the fair

8   market value of its stock after taking into account the increase in value resulting from any

9   surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the

10  ordinary rule that requires the fair market value of a corporation that undergoes an ownership

11  change to be determined before the events giving rise to the change.  The IRC

12  Section 382(1)(6) exception also differs from the IRC Section 382(1)(5) exception in that the

13  debtor corporation is not required to reduce its NOLs by interest deductions in the manner

14  described above, and the debtor may undergo a change of ownership within two years

15  without triggering the elimination of its pre-change losses.

16        16.3    Holders of Allowed General Unsecured Claims Not Constituting Tax

17  Securities.  A holder of an Allowed General Unsecured Claim not constituting a tax security

18  should recognize gain or loss equal to the amount realized in satisfaction of his Claim minus

19  the holder's tax basis in the Claim.  The holder's amount realized for this purpose generally

20  will equal the fair market value of the combination of the Common Stock and Series A

21  Preferred Stock received on the date of distribution, less any amount allocable to interest on

22  the holder's Claim.

23        Any gain or loss recognized by a holder of an Allowed General Unsecured Claim not

24  constituting a tax security will be capital or ordinary depending on the status of the Claim in

25  the holder's hands.  Such a holder's tax basis for the Common Stock and Series A Preferred

26  Stock received under the Plan generally should equal its fair market value on the date of

**Page 59 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1   distribution by Reorganized Debtor.  The  holding period for any Common Stock and

2   Series A Preferred Stock received under the Plan by a holder of a Claim not constituting a tax

3   security generally should begin on the day following the day of receipt.

4        Debtor has the right to consummate the Rights Offering on or before the Effective

5   Date.  If the Rights Offering is implemented, each holder of an Allowed General Unsecured

6   Claim will receive Subscription Rights to purchase Common Stock and Series A Preferred

7   Stock in accordance with the terms of the Rights Offering.  This tax discussion assumes that

8   the Subscription Price for the combination of each share of Common Stock and Series A

9   Preferred Stock issued in the Rights Offering will equal its fair market value for United

10  States federal income tax purposes.  Accordingly, neither the receipt nor the exercise of

11  Subscription Rights by a holder of an Allowed General Unsecured Claim will affect the

12  amount of any gain or loss recognized upon satisfaction of such holder's Claim.

13       16.4    Holders of Allowed Small Unsecured Claims.  In accordance with the Plan,

14  the debt owed by Debtor to holders of Allowed Small Unsecured Claims will be satisfied by

15  a payment of cash in an amount equal to 80% of each such Claim.  In general, the amount

16  received by each holder of an Allowed Small Unsecured Claim is treated as an amount

17  received in exchange for the satisfied debt, and each such holder will recognize taxable gain

18  or loss equal to the amount received less the holder's tax basis in the Claim.  Any gain or loss

19  recognized will be long-term or short-term capital gain or loss, or ordinary income or loss,

20  depending upon factors specific to each holder of an Allowed Small Unsecured Claim,

21  including, but not limited to:  (a) whether the Claim (or a portion thereof) is attributable to

22  principal or interest, (b) the origin of the Claim, (c) whether the holder of the Claim reports

23  income on the accrual or cash basis method, and (d) whether the holder of the Claim has

24  taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

25       16.5    Equity Security Holders.  In accordance with the Plan, all the Equity

26  Securities, which constitute all of the equity interests of Debtor, shall be deemed cancelled

**Page 60 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

1    and shall be of no further force and effect (without regard to whether the Equity Securities

2    are surrendered for cancellation or otherwise).  The Equity Security Holders will not receive

3    anything on account of such Equity Securities and will recognize loss in an amount equal to

4    such holder's adjusted tax basis in the Equity Securities.  The character of any recognized

5    loss will depend upon several factors, including, but not limited to, the status of the holder,

6    the nature of the Equity Interest in the holder's hands, the purpose and circumstances of its

7    acquisition, the holder's holding period, and the extent to which the holder had previously

8    claimed a deduction for the worthlessness of all or a portion of the Equity Security.

9        16.6    <u>Information Reporting and Backup Withholding</u>.  Certain payments, including

10   payments with respect to Allowed Claims pursuant to the Plan, are generally subject to

11   information reporting by the payor to the IRS.  Moreover, under certain circumstances, a

12   holder of an Allowed Claim may be subject to "backup withholding" with respect to

13   payments made pursuant to the Plan, unless such holder either (a) comes within certain

14   exempt categories (which generally include corporations) and, when required, demonstrates

15   this fact; or (b) provides a correct United States taxpayer identification number and certifies

16   under penalty of perjury that the holder is a United States person, the taxpayer identification

17   number is correct, and the taxpayer is not subject to backup withholding because of a failure

18   to report all dividend and interest income.  Backup withholding is not an additional tax.

19   Amounts withheld under the backup withholding rules may be credited against the holder's

20   United States federal income tax liability, and the holder may obtain a refund of any excess

21   amounts withheld under the backup withholding rules by filing an appropriate claim for

22   refund with the IRS.

23       16.7    <u>Importance of Obtaining Professional Tax Assistance</u>.  THE FOREGOING

24   DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL

25   INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR

26   CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX

2  ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND

3  MAY VARY DEPENDING ON A HOLDER OF AN ALLOWED CLAIM OR THE

4  EQUITY SECURITY HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY,

5  EACH HOLDER OF AN ALLOWED CLAIM AND EACH EQUITY SECURITY

6  HOLDER IS URGED TO CONSULT ITS TAX ADVISOR ABOUT THE FEDERAL,

7  STATE, LOCAL, AND APPLICABLE FOREIGN, INCOME AND OTHER TAX

8  CONSEQUENCES OF THE PLAN.

9  **17.    RECOMMENDATION AND CONCLUSION**

10         Please read this Disclosure Statement and the Plan carefully.  After reviewing all the

11  information and making an informed decision, please vote by using the enclosed ballot.

12         Debtor strongly urges you to vote in support of the Plan.  The Committee has also

13  recommended that General Unsecured Creditors vote in support of the Plan (see letter of

14  support from the Committee enclosed with this Disclosure Statement).

15         DATED this 9th day of May, 2014.

16

17                                    C & K MARKET, INC.

18                              By _____

19                                    Edward C. Hostmann
                                      Chief Restructuring Officer

20  Presented by:

21  TONKON TORP LLP

22

    By _____
23       Albert N. Kennedy, OSB No. 821429
         Timothy J. Conway, OSB No. 851752
24       Michael W. Fletcher, OSB No. 010448
         Ava L. Schoen, OSB No. 044072
25       Of Attorneys for Debtor

26

**Page 62 of 62** -  DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)

# EXHIBIT 1 TO SECOND AMENDED DISCLOSURE STATEMENT

## Debtor's Second Amended Plan of Reorganization (May 9, 2014)

**Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
    Direct Dial:  (503) 802-2013
    Facsimile:    (503) 972-3713
    E-Mail:      al.kennedy@tonkon.com
**Timothy J. Conway**, OSB No. 851752
    Direct Dial:  (503) 802-2207
    Facsimile:    (503) 972-3727
    E-Mail:      tim.conway@tonkon.com
**Michael W. Fletcher**, OSB No. 010448
    Direct Dial:  (503) 802-2169
    Facsimile:    (503) 972-3869
    E-Mail:      michael.fletcher@tonkon.com
**Ava L. Schoen**, OSB No. 044072
    Direct Dial:  (503) 802-2143
    Facsimile:    (503) 972-3843
    E-Mail:      ava.schoen@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR  97204

    Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 13-64561-fra11 |
| C & K Market, Inc., | **DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)** |
|               Debtor. | |

DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 1 of 88

# TABLE OF CONTENTS

ARTICLE 1  DEFINITIONS .................................................................................................1

ARTICLE 2  UNCLASSIFIED CLAIMS ...........................................................................11

ARTICLE 3  CLASSIFICATION .......................................................................................12

ARTICLE 4  TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS.....................13

ARTICLE 5  DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; SETTLEMENT...........23

ARTICLE 6  RIGHTS OFFERING......................................................................................24

ARTICLE 7  MEANS FOR EXECUTION OF PLAN .........................................................28

ARTICLE 8  EXECUTORY CONTRACTS AND UNEXPIRED LEASES.........................33

ARTICLE 9  EFFECT OF CONFIRMATION ....................................................................35

ARTICLE 10  RETENTION OF JURISDICTION ..............................................................35

ARTICLE 11  ADMINISTRATIVE PROVISIONS............................................................38

ARTICLE 12  MISCELLANEOUS PROVISIONS.............................................................40

**Page i of i** - DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 2 of 88

1    C & K Market, Inc., an Oregon corporation ("C & K" or "Debtor") as Debtor and

2    debtor-in-possession, proposes the following Plan of Reorganization pursuant to

3    Section 1129(a) of Title 11 of the United States Code.

4    The Plan provides for the terms upon which C & K will restructure and provide

5    payments to its creditors.  In general, the Plan provides for (a) payment in full to Secured

6    Creditors of the Allowed Amount of their Secured Claims; (b) issuance of Common Stock

7    and Series A Preferred Stock in Reorganized Debtor in exchange for Allowed Unsecured

8    Claims; (c) payment in an amount equal to 80% of the Allowed Claims of Small Unsecured

9    Creditors within 90 days after the Effective Date; and (d) cancellation of all existing Equity

10   Securities.

11   The Disclosure Statement is attached hereto to assist you in understanding this Plan

12   and making an informed judgment concerning its terms.

### ARTICLE 1

### DEFINITIONS

15   Definitions of certain terms used in this Plan are set forth below.  Other terms are

16   defined in the text of this Plan or the text of the Disclosure Statement.  In either case, when a

17   defined term is used, the first letter of each word in the defined term is capitalized.  Terms

18   used and not defined in this Plan or the Disclosure Statement shall have the meanings given

19   in the Bankruptcy Code or Bankruptcy Rules, or otherwise as the context requires.  The

20   meanings of all terms shall be equally applicable to both the singular and plural, and

21   masculine and feminine, forms of the terms defined.  The words "herein," "hereof," "hereto,"

22   "hereunder," and others of similar import, refer to the Plan as a whole and not to any

23   particular section, subsection, or clause contained in the Plan.  Captions and headings to

24   articles, sections, and exhibits are inserted for convenience of reference only and are not

25   intended to be part of or to affect the interpretation of the Plan.  The rules of construction set

26   forth in Section 102 of the Bankruptcy Code shall apply.  In computing any period of time

**Page 1 of 44 -**    DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 3 of 88

1    prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

2    Any capitalized term that is not defined herein but is defined in the Bankruptcy Code shall

3    have the meaning ascribed to such term in the Bankruptcy Code.

4        1.1.    "Administrative Expense Claim" means any Claim entitled to the priority

5    afforded by Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

6        1.2.    "Allowed" means, with respect to any Claim, proof of which has been

7    properly Filed or, if no Proof of Claim was so Filed, which was or hereafter is listed on the

8    Schedules as liquidated in amount and not disputed or contingent, and, in either case, a Claim

9    as to which no objection to the allowance thereof, or motion to estimate for purposes of

10    allowance, shall have been Filed on or before any applicable period of limitation that may be

11    fixed by the Bankruptcy Code, the Bankruptcy Rules, and/or the Bankruptcy Court, or as to

12    which any objection, or any motion to estimate for purposes of allowance, shall have been so

13    Filed, to the extent allowed by a Final Order.

14        1.3.    "Allowed Secured Claim" means an Allowed Claim that is secured by a lien,

15    security interest, or other charge against or interest in property in which Debtor has an

16    interest or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of

17    the value (as set forth in the Plan or, if no value is specified, as determined in accordance

18    with Section 506(a) of the Bankruptcy Code or, if applicable, Section 1111(b) of the

19    Bankruptcy Code) of the interest of the holder of such Claim in Debtor's interest in such

20    property or to the extent of the amount subject to setoff, as the case may be.

21        1.4.    "Allowed Unsecured Claim" means an Allowed Claim that is not an Allowed

22    Secured Claim or an Allowed Administrative Expense Claim.

23        1.5.    "Avoidance Actions" means all claims and causes of action of the Debtor or

24    its estate arising under Chapter 5 of the Bankruptcy Code.

25        1.6.    "Backstop Commitment" means the agreement by the Backstop Party, if any,

26    pursuant to the Backstop Rights Purchase Agreement, to purchase all of the Rights Offering

**Page 2 of 44 -**    DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
          2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 4 of 88

1   Shares that are not purchased by the Rights Offering Participants as part of the Rights

2   Offering.

3       1.7.    "Backstop Party" means Endeavour and/or THL and/or their affiliates, or such

4   other Creditor as selected by Debtor, if any.

5       1.8.    "Backstop Rights Purchase Agreement" means the agreement between the

6   Backstop Party and Debtor which sets forth the Backstop Commitment and the terms and

7   conditions thereof.  If the Backstop Party and Debtor decide to proceed with the Rights

8   Offering with a Backstop Party, a form of the Backstop Rights Purchase Agreement will be

9   filed with the Court not less than 10 days prior to the hearing on confirmation of the Plan.

10      1.9.    "Bank" or "U.S. Bank" means U.S. Bank National Association, acting in its

11  own capacity and not in any fiduciary or other capacity.

12      1.10.   "Bankruptcy Case" means the case under Chapter 11 of the Bankruptcy Code

13  with respect to Debtor, pending in the District of Oregon, administered as *In re C & K*

14  *Market, Inc.,* Case No. 13-64561-rld11.

15      1.11.   "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended

16  from time to time, set forth in Sections 101 et seq. of Title 11 of the United States Code.

17      1.12.   "Bankruptcy Court" means the United States Bankruptcy Court for the District

18  of Oregon, or such other court that exercises jurisdiction over the Bankruptcy Case or any

19  proceeding therein, including the United States District Court for the District of Oregon, to

20  the extent the reference to the Bankruptcy Court or any proceeding therein is withdrawn.

21      1.13.   "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy

22  Procedure, as amended and promulgated under Section 2075, Title 28, of the United States

23  Code, and the local rules and standing orders of the Bankruptcy Court.

24      1.14.   "Business Day" means a day other than a Saturday, Sunday, any legal holiday

25  as defined in Bankruptcy Rule 9006(a), or other day on which banks in Portland, Oregon are

26  authorized or required by law to be closed.

**Page 3 of 44 -**    DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
                2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 5 of 88

1        1.15.   "Cash" means lawful currency of the United States of America and

2   equivalents, including, without limitation, checks, wire transfers and drafts.

3        1.16.   "Claim" means (a) any right to payment from Debtor arising before the

4   Effective Date, whether or not such right is reduced to judgment, liquidated, unliquidated,

5   fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or

6   unsecured; or (b) any right to an equitable remedy against Debtor arising before the Effective

7   Date for breach of performance if such breach gives rise to a right of payment from Debtor,

8   whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent,

9   matured, unmatured, disputed, undisputed, secured, or unsecured.

10        1.17.   "Class" means one of the classes of Claims defined in Article 3 hereof.

11        1.18.   "Collateral" means any property in which Debtor has an interest that is subject

12   to a lien or security interest securing the payment of an Allowed Secured Claim.

13        1.19.   "Committee" means the Official Unsecured Creditors' Committee appointed in

14   this Bankruptcy Case by the United States Trustee pursuant to Section 1102 of the

15   Bankruptcy Code, as reconstituted by the addition or removal of members from time to time.

16        1.20.   "Common Stock" means the authorized common stock, no par value, of

17   Reorganized Debtor.

18        1.21.   "Confirmation Date" means the date on which the Confirmation Order is

19   entered on the docket by the Clerk of the Bankruptcy Court.

20        1.22.   "Confirmation Order" means the order of the Bankruptcy Court confirming

21   the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

22        1.23.   "Creditor" means any entity holding a Claim against Debtor.

23        1.24.   "Debtor" means C & K Market, Inc. as Debtor and debtor-in-possession in the

24   Bankruptcy Case.

25        1.25.   "Deficiency Claim" means the portion of a Secured Claim that is unsecured.

26

**Page 4 of 44 -**    DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 6 of 88

1        1.26.   "Disclosure Statement" means Debtor's First Amended Disclosure Statement

2  as amended, modified, restated, or supplemented from time to time, pertaining to the Plan.

3        1.27.   "Disputed Claim" means a Claim with respect to which a Proof of Claim has

4  been timely Filed or deemed timely Filed under applicable law, and as to which an objection,

5  timely Filed, has not been withdrawn on or before the Effective Date or any date fixed for

6  filing such objections by order of the Bankruptcy Court, and has not been denied by a Final

7  Order.

8        1.28.   "DOL Consent Judgment and Order" means that certain Consent Judgment

9  and Order filed on or about November 2, 2012 in Case No. 6:10-CV-06360-AA in the United

10  States District Court, District of Oregon, Eugene Division.

11        1.29.   "Effective Date" means July 13, 2014, provided that by such date the

12  conditions precedent to the Effective Date have been waived or satisfied.  If the conditions

13  precedent to the Effective Date have not been waived or satisfied by July 13, 2014, but are

14  satisfied or waived on or before August 10, 2014, then the Effective Date shall be August 10,

15  2014.

16        1.30.   "Employee Equity Security Plan" means any plan, fund, agreement, contract

17  or program established or entered into by Debtor prior to the Petition Date with respect to

18  any Equity Security granted to or held by, or to be granted to or held by, any employee,

19  director, contractor or agent of Debtor or any of its subsidiaries.

20        1.31.   "Employee Stock Incentive Plan" means that certain 2014 Stock Incentive

21  Plan substantially in the form attached hereto as **Exhibit 1**, which shall be effective with

22  respect to Reorganized Debtor as of the Effective Date.

23        1.32.   "Endeavour" means Endeavour Structured Equity and Mezzanine Fund, L.P.

24        1.33.   "Entity" shall have the meaning ascribed to it by Section 101(15) of the

25  Bankruptcy Code.

26

**Page 5 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 7 of 88

1    1.34.    "Equity Security" shall have the meaning ascribed to it in Section 101(16) of

2    the Bankruptcy Code with respect to any Equity Security Holder of Debtor.

3    1.35.    "Equity Security Holder" means a holder of an Equity Security of Debtor.

4    1.36.    "Exit Financing" means one or more credit facilities to be entered into by

5    Reorganized Debtor effective as of the Effective Date, which may be secured by a first

6    priority lien in all or substantially all of Reorganized Debtor's property, subject only to the

7    liens being retained by Secured Creditors under this Plan to secure the payment of Allowed

8    Secured Claims.

9    1.37.    "Filed" means filed with the Bankruptcy Court in the Bankruptcy Case.

10    1.38.    "Final Order" means an order or judgment entered on the docket by the Clerk

11    of the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and

12    the parties that has not been reversed, stayed, modified, or amended and as to which the time

13    for filing a notice of appeal, or petition for certiorari or request for certiorari, or request for

14    rehearing, shall have expired and is no longer subject to remand, retrial, modification or

15    further proceedings of any kind or nature.

16    1.39.    "General Unsecured Claim" means an Unsecured Claim that is not a Small

17    Unsecured Claim.

18    1.40.    "Green & Frahm" means, collectively, the following: Gale E. & Trinidad

19    Gloria Green Revocable Trust dated 5-2-1996; Garry L. Frahm individually; Garry L. Frahm

20    Trust dated 12-18-2000; Colene T. Frahm, fka Twila C. Frahm individually; and Colene T.

21    Frahm Trust dated 12-18-2000, and any other interest holders in that certain $1,000,000

22    July 28, 2000 promissory note payable to the order of Gale E. Green and Trinidad Gloria

23    Green, Trustees, or successor Trustee, of the Gale E. Green and Trinidad Gloria Green

24    Revocable Trust dated May 2, 1996 as to an undivided one-half interest; and to Garry L.

25    Frahm and Twila C. Frahm as to an undivided one-half interest, as tenants in common.

26

**Page 6 of 44 -**    DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 8 of 88

1    1.41.    "Insider" shall have the meaning ascribed to it by Section 101(31) of the

2    Bankruptcy Code.

3    1.42.    "Other Priority Claim" means any Claim for an amount entitled to priority in

4    right of payment under Sections 507(a)(3), (4), (5), (6) or (7) of the Bankruptcy Code.

5    1.43.    "Petition Date" means November 19, 2013, the date on which the petition

6    commencing the Bankruptcy Case was Filed.

7    1.44.    "Plan" means this First Amended Plan of Reorganization, as amended,

8    modified, restated, or supplemented from time to time.

9    1.45.    "Primary Offering Subscription" has the meaning ascribed to it in Section 6.2.

10    1.46.    "Priority Tax Claim" means a Claim of a governmental unit of the kind

11    entitled to priority under Section 507(a)(8) of the Bankruptcy Code or that would otherwise

12    be entitled to priority but for the secured status of the Claim.

13    1.47.    "Pro Rata Share of the Rights Offering Shares" means, with respect to an

14    applicable Rights Offering Participant, the proportion that (a) the amount of the Class 12

15    Claims that are held by such Rights Offering Participant bears to (b) the aggregate amount of

16    Class 12 Claims that are held by all Rights Offering Participants.

17    1.48.    "Protective Life" means LaSalle National Bank, as trustee for the registered

18    holders of Protective Commercial Mortgage FASIT Master Trust, Commercial Mortgage

19    FASIT Certificates, Series I, as successor-in-interest to Protective Life Insurance Company,

20    and any other interest holders in that certain $2,550,000 March 28, 1995 promissory note

21    payable to the order of Protective Life Insurance Company.

22    1.49.    "Rejection Claim" means a Claim entitled to be filed as a result of Debtor

23    rejecting an executory contract in this Bankruptcy Case.

24    1.50.    "Remaining Rights Offering Shares" means those Rights Offering Shares, if

25    any, that are not subscribed for pursuant to the Primary Offering Subscriptions submitted by

26    the Rights Offering Participants prior to the expiration of the Subscription Deadline.

**Page 7 of 44 -**    DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 9 of 88

1       1.51.   "Reorganized Debtor" means Debtor from and after the Effective Date.

2       1.52.   "Restated Articles of Incorporation" means the Second Amended and Restated

3 Articles of Incorporation of Debtor, substantially in the form attached hereto as **Exhibit 2**,

4 which shall modify and amend Debtor's prior Amended and Restated Articles of

5 Incorporation and govern Reorganized Debtor from and after the Effective Date.

6       1.53.   "Restated Bylaws" means the Second Amended and Restated Bylaws of

7 Debtor, substantially in the form attached hereto as **Exhibit 3**, which shall modify and amend

8 Debtor's prior Amended and Restated Bylaws and govern Reorganized Debtor from and after

9 the Effective Date.

10       1.54.   "Rights Offering" means that certain rights offering of Common Stock and

11 Series A Preferred Stock in an amount of up to the Rights Offering Amount to be offered to

12 the Rights Offering Participants, the terms of which are set forth in Article 6.

13       1.55.   "Rights Offering Amount" means up to $10,000,000.

14       1.56.   "Rights Offering Participant" means each holder of a Class 12 Claim.

15       1.57.   "Rights Offering Purchaser" means a Rights Offering Participant who timely

16 and properly executes and delivers a Subscription to Debtor or other entity specified in the

17 Subscription prior to the expiration of the Subscription Deadline.

18       1.58.   "Rights Offering Record Date" means the date for determining which holders

19 of Class 12 Claims are eligible to participate in the Rights Offering, and shall be the voting

20 record date applicable to such Claims, or such other date as designated in an Order of the

21 Bankruptcy Court.

22       1.59.   "Rights Offering Shares" means the whole shares of Common Stock and

23 Series A Preferred Stock to be issued and sold through the Rights Offering (including, if

24 there is a Backstop Party, the Remaining Rights Offering Shares to be issued pursuant to the

25 Backstop Rights Purchase Agreement).  No fractional shares will be issued.

26

**Page 8 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 10 of 88

1    1.60.    "Scheduled Amounts" means the Claim amounts as set forth in Debtor's

2  Schedules.

3    1.61.    "Schedules" means the Schedules of Assets and Liabilities and the Statement

4  of Financial Affairs Filed by Debtor pursuant to Section 521 of the Bankruptcy Code, as

5  amended, modified, restated, or supplemented from time to time.

6    1.62.    "Secured Claim" means any Claim against Debtor held by any entity,

7  including, without limitation, an affiliate or judgment creditor of Debtor, to the extent such

8  Claim constitutes a secured Claim under Sections 506(a) or 1111(b) of the Bankruptcy Code.

9  The unsecured portion, if any, of such Claim shall be treated as an Unsecured Claim.

10    1.63.    "Senior Lender" means THL or Endeavour, or any other "Senior Lender," in

11  their capacity as a senior lender under any Subordination Agreement.

12    1.64.    "Series A Preferred Stock" means the authorized Series A Preferred Stock, no

13  par value, of Reorganized Debtor.

14    1.65.    "Small Unsecured Claims" means Unsecured Claims that are equal to or less

15  than $10,000 or that have been reduced to $10,000 by the election of the Creditor holding

16  such Unsecured Claim.

17    1.66.    "Subordination Agreement" means any agreement between a Creditor and a

18  Senior Lender pursuant to which a Creditor has subordinated its right to receive payments or

19  distributions on its Claim from Debtor or Reorganized Debtor.

20    1.67.    "Subscription" means a subscription to be distributed to Rights Offering

21  Participants, substantially in the form attached hereto as **Exhibit 4**, pursuant to which such

22  Rights Offering Participants may exercise their Subscription Rights.

23    1.68.    "Subscription Commencement Date" means the date on which the

24  Subscription Period commences, which shall be the earliest date reasonably practicable

25  occurring after the Rights Offering Record Date.

26

**Page 9 of 44 -**    DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
        2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 11 of 88

1      1.69.   "Subscription Deadline" means the date on which the Rights Offering shall

2  expire as set forth in the Subscription, which date shall precede the Effective Date.

3      1.70.   "Subscription Notification Date" means a date that is not later than seven days

4  following the Subscription Deadline.

5      1.71.   "Subscription Payment Amount" means, with respect to a particular Rights

6  Offering Purchaser, an amount of Cash equal to the amount of the Rights Offering Amount

7  subscribed for by a Rights Offering Purchaser up to such Rights Offering Purchaser's

8  Pro Rata Share of the Rights Offering Shares, multiplied by the Subscription Price, and

9  rounded to the nearest whole dollar as necessary to prevent the need to issue fractional shares

10  of Common Stock or Series A Preferred Stock.

11      1.72.   "Subscription Period" means the time period during which the Rights Offering

12  Participants may subscribe to purchase the Rights Offering Shares, which period shall

13  commence on the Subscription Commencement Date and expire on the Subscription

14  Deadline.

15      1.73.   "Subscription Price" means an amount determined by Debtor and the

16  Backstop Party (if any) as the per-share purchase price for the Rights Offering Shares, but

17  shall not be less than $8 for the combination of one share of Common Stock and one share of

18  Series A Preferred Stock.

19      1.74.   "Subscription Right" means the right to participate in the Rights Offering

20  pursuant to Article 6, which right shall be non-transferable and non-certificated.

21      1.75.   "THL" means THL Credit, Inc.

22      1.76.   "Unsecured Claim" means a Claim that is not an Administrative Claim, a

23  Secured Claim, a Priority Tax Claim, or an Other Priority Claim.

24      1.77.   "Unsecured Creditor" means a holder of an Allowed Unsecured Claim.

25      1.78.   "Utility Deposits" means deposits with utilities made by Debtor after the

26  Petition Date pursuant to Section 366(b) of the Bankruptcy Code.

**Page 10 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
      2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 12 of 88

**ARTICLE 2**

**UNCLASSIFIED CLAIMS**

2.1.  <u>Administrative Expense Claims</u>.  Each holder of an Allowed Administrative

Expense Claim shall be paid the full amount of its Allowed Administrative Expense Claim in

Cash on the later of (a) the Effective Date; or (b) the date on which such Claim becomes

Allowed, unless such holder shall agree to a different treatment of such Claim (including,

without limitation, any different treatment that may be provided for in any documentation,

statute, or regulation governing such Claim); provided, however, that Administrative

Expense Claims representing obligations incurred in the ordinary course of business by

Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the

ordinary course of business and in accordance with any terms and conditions of the particular

transaction, and any agreements relating thereto.

2.2.  <u>Priority Tax Claims</u>.  Each holder of an Allowed Priority Tax Claim will be

paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim in Cash on the

later of (a) the Effective Date, (b) the date on which such Claim becomes Allowed, or (c) the

date it is due.

2.3.    <u>Bankruptcy Fees</u>.  Fees payable by Debtor under 28 U.S.C. § 1930, or to the

Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date.  After

confirmation, Reorganized Debtor shall continue to pay quarterly fees of the Office of the

United States Trustee and to file quarterly reports with the Office of the United States

Trustee until the Bankruptcy Case is closed by the Court, dismissed, or converted, except as

otherwise ordered by the Court.  This requirement is subject to any amendments to 28 U.S.C.

§ 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

After Confirmation, Reorganized Debtor shall file with the Court a monthly financial report

for each month, or portion thereof, that the Bankruptcy Case remains open.  The monthly

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 13 of 88

1  financial report shall include a statement of all disbursements made during the course of the

2  month, whether or not pursuant to the Plan.

3                                    **ARTICLE 3**

4                                    **CLASSIFICATION**

5          For purposes of this Plan, Claims (except those treated under Article 2) are classified

6  as provided below.  A Claim is classified in a particular Class only to the extent such Claim

7  qualifies within the description of such Class, and is classified in a different Class to the

8  extent such Claim qualifies within the description of such different Class.

9          3.1.    Class 1 (Other Priority Claims).  Class 1 consists of all Allowed Other Priority

10  Claims.

11          3.2.    Class 2 (C & K Market, Inc. 401(k) Plan; United States Department of Labor).

12  Class 2 consists of the Claims of the C & K Market, Inc. 401(k) Plan and the United States

13  Department of Labor arising under or related to the DOL Consent Judgment and Order.

14          3.3.    Class 3 (Banc of America Leasing & Capital, LLC).  Class 3 consists of the

15  Allowed Secured Claim of Banc of America Leasing & Capital, LLC.

16          3.4.    Class 4 (Dell Financial Services, LLC).  Class 4 consists of the Allowed

17  Secured Claim of Dell Financial Services, LLC.

18          3.5.    Class 5 (Komlofske Corporation).  Class 5 consists of the Allowed Secured

19  Claim, if any, of Komlofske Corporation.

20          3.6.    Class 6 (James D. and Debra A. Gillespie).  Class 6 consists of the Allowed

21  Secured Claim of James D. and Debra A. Gillespie.

22          3.7.    Class 7 (Greatway Properties, LLC).  Class 7 consists of the Allowed Secured

23  Claim of Greatway Properties, LLC.

24          3.8.    Class 8 (Green & Frahm).  Class 8 consists of the Allowed Secured Claim of

25  Green & Frahm.

26

**Page 12 of 44 -**    DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
                     2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 14 of 88

1    3.9.    <u>Class 9 (Kenneth and Lynda Martin)</u>.  Class 9 consists of the Allowed Secured

2    Claim of Kenneth and Lynda Martin.

3    3.10.    <u>Class 10 (Protective Life)</u>.  Class 10 consists of the Allowed Secured Claim of

4    Protective Life.

5    3.11.    <u>Class 11 (U.S. Bank National Association)</u>.  Class 11 consists of the Allowed

6    Claim of U.S. Bank National Association.  The Class 11 Claim shall include all obligations

7    owing by Debtor to U.S. Bank, whether such obligations arose pre or post-petition.  Without

8    limiting the preceding, the Class 11 Claim shall include such amount as is Allowed under

9    Section 506(b) of the Bankruptcy Code for the reasonable fees, costs and charges of

10   U.S. Bank (the "506(b) Amount").

11   3.12.    <u>Class 12 (General Unsecured Claims)</u>.  Class 12 consists of all Allowed

12   General Unsecured Claims.

13   3.13.    <u>Class 13 (Small Unsecured Claims)</u>.  Class 13 consists of all Allowed Small

14   Unsecured Claims.

15   3.14.    <u>Class 14 (Equity Security Holders)</u>.  Class 14 consists of the Claims and

16   interests of Equity Security Holders based on their Equity Security.

17   **ARTICLE 4**

18   **TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

19   4.1.    <u>Class 1 (Other Priority Claims)</u>.  Class 1 is unimpaired.  Each holder of an

20   Allowed Class 1 Claim will be paid in full in Cash by Reorganized Debtor the amount of its

21   Allowed Class 1 Claim on the latter of (a) the Effective Date; or (b) the date on which such

22   Claim becomes allowed, unless such holder shall agree or has agreed to a different treatment

23   of such Claim (including any different treatment that may be provided for in any

24   documentation, agreement, contract, statute, law, or regulation creating and governing such

25   Claim).

26

**Page 13 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
        2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 15 of 88

1      4.2.    Class 2 (C & K Market, Inc. 401(k) Plan; United States Department of Labor).

2   Class 2 is unimpaired.  The DOL Consent Judgment and Order shall remain in full force and

3   effect, and is not in any way modified, altered or affected by this Plan.  Without limiting the

4   preceding, Reorganized Debtor shall continue to timely and fully perform and pay all of its

5   obligations under the DOL Consent Judgment and Order.

6      4.3.    Class 3 (Allowed Secured Claim of Banc of America Leasing & Capital,

7   LLC).  Class 3 is impaired.  Banc of America Leasing & Capital, LLC ("BALC") shall have

8   an Allowed Secured Claim in the amount of $325,000.

9      BALC's Class 3 Claim shall be satisfied by delivery of a promissory note to BALC

10   (the "BALC Note") in the principal amount of its Allowed Secured Claim, less the amount of

11   all adequate protection payments made by Debtor to BALC.  The BALC Note will bear

12   interest from the Effective Date at a fixed per annum rate of 6%, and will be payable by

13   Reorganized Debtor as follows:

14      Commencing on the first day of the first month following the Effective Date and

15   continuing on the first day of each month thereafter until the BALC Note has been paid in

16   full, Reorganized Debtor will make equal monthly amortizing payments of principal and

17   interest on the BALC Note based on a 48-month amortization schedule, with final payment

18   due 48 months after the Effective Date.

19      The Class 3 Claim may be prepaid in full or in part at any time without any

20   prepayment penalty or premium.

21      As security for the Class 3 Claim, BALC will retain its security interests in and liens

22   on its Collateral with the same priority and to the same extent such security had as of the

23   Petition Date.  Reorganized Debtor will maintain the BALC Collateral in good repair, will

24   insure the BALC Collateral to its full useable value, and will pay any property taxes with

25   respect to such Collateral when due.  At any sale of its Collateral, BALC will have the right

26   to bid at such sale and, if BALC is the successful bidder, BALC may offset all or any portion

**Page 14 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
        2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 16 of 88

1   of its then unpaid Allowed Secured Claim.  Reorganized Debtor will provide BALC with at

2   least 45 days' notice prior to any proposed sale of its Collateral.

3          BALC's Claim is not fully secured and, accordingly, BALC will have an Allowed

4   Unsecured Claim in the amount of $22,508.42 in addition to its Class 3 Claim.

5          4.4.    Class 4 (Allowed Secured Claim of Dell Financial Services, LLC).  Class 4 is

6   impaired.  Dell Financial Services, LLC ("Dell") shall have an Allowed Secured Claim in the

7   amount of $250,000.

8          Dell's Class 4 Claim shall be satisfied by delivery of a promissory note to Dell (the

9   "Dell Note") in the principal amount of its Allowed Secured Claim.  The Dell Note will bear

10  interest from the Effective Date at a fixed per annum rate of 6%, and will be payable by

11  Reorganized Debtor as follows:

12         Commencing on the first day of the first month following the Effective Date and

13  continuing on the first day of each month thereafter until the Dell Note has been paid in full,

14  Reorganized Debtor will make equal monthly amortizing payments of principal and interest

15  on the Dell Note based on a 48-month amortization schedule, with a final payment due

16  48 months after the Effective Date.

17         The Class 4 Claim may be prepaid in full or in part at any time without any

18  prepayment penalty or premium.

19         As security for the Class 4 Claim, Dell will retain its security interests in and liens on

20  its Collateral with the same priority and to the same extent such security had as of the

21  Petition Date.  Reorganized Debtor will maintain the Dell Collateral in good repair, will

22  insure the Dell Collateral to its full useable value, and will pay any property taxes with

23  respect to such Collateral when due.  At any sale of its Collateral, Dell will have the right to

24  bid at such sale and, if Dell is the successful bidder, Dell may offset all or any portion of its

25  then unpaid Allowed Secured Claim.

26

**Page 15 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
            2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 17 of 88

1    Reorganized Debtor will provide Dell with at least 45 days' notice prior to any

2    proposed sale of its Collateral.

3    Dell's Claim is not fully secured, and accordingly Dell will have an Allowed

4    Unsecured Claim in the amount of $59,059 in addition to its Class 4 Claim.

5    4.5.    Class 5 (Allowed Secured Claim, if any, of Komlofske Corporation.).  Class 5

6    is impaired.  The amount of Komlofske Corporation's ("Komlofske") Allowed Secured

7    Claim, if any, will be determined by agreement of Debtor and Komlofske, or, absent

8    agreement, in such amount as is determined and Allowed by the Bankruptcy Court.

9    If Komlofske has an Allowed Secured Claim, then Komlofske's Class 5 Claim shall

10    be satisfied by delivery of a promissory note to Komlofske (the "Komlofske Note") in the

11    principal amount of its Allowed Secured Claim, if any.  The Komlofske Note will bear

12    interest from the Effective Date at a fixed per annum rate of 6%, and will be payable by

13    Reorganized Debtor as follows:

14    Commencing on the first day of the first month following the Effective Date and

15    continuing on the first day of each month thereafter until the Komlofske Note has been paid

16    in full, Reorganized Debtor will make equal monthly amortizing payments of principal and

17    interest on the Komlofske Note based on a five-year amortization schedule, with a final

18    payment due five years after the Effective Date.

19    The Class 5 Claim may be prepaid in full or in part at any time without any

20    prepayment penalty or premium.

21    As security for the Class 5 Claim, Komlofske will retain its security interests in and

22    liens on its Collateral (if any, and to the extent not avoided) with the same priority and to the

23    same extent such security had as of the Petition Date.  Reorganized Debtor will maintain the

24    Komlofske Collateral in good repair, will insure the Komlofske Collateral to its full useable

25    value, and will pay any property taxes with respect to such Collateral when due.  At any sale

26    of its Collateral, Komlofske will have the right to bid at such sale and, if Komlofske is the

**Page 16 of 44 -**    DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 18 of 88

1  successful bidder, Komlofske may offset all or any portion of its then unpaid Allowed

2  Secured Claim.

3      Debtor believes that Komlofske has no Secured Claim. In such event, there will be

4  no Class 5.

5      4.6.  <u>Class 6 (Allowed Secured Claim of James D. and Debra A. Gillespie)</u>.

6  Class 6 is impaired. The amount of James D. and Debra A. Gillespie's ("Gillespie") Allowed

7  Secured Claim will be determined by agreement of Debtor and Gillespie, or, absent

8  agreement, in such amount as is determined and Allowed by the Bankruptcy Court.

9      Gillespie's Class 6 Claim shall be satisfied by delivery of a promissory note to

10  Gillespie (the "Gillespie Note") in the principal amount of Gillespie's Allowed Secured

11  Claim. The Gillespie Note will bear interest from the Effective Date at a fixed per annum

12  rate of 6%, and will be payable by Reorganized Debtor as follows:

13      Commencing on the first day of the first month following the Effective Date and

14  continuing on the first day of each month thereafter until the Gillespie Note has been paid in

15  full, Reorganized Debtor will make equal monthly amortizing payments of principal and

16  interest on the Gillespie Note based on a 25-year amortization schedule, with a balloon

17  payment due seven years after the Effective Date.

18      The Class 6 Claim may be prepaid in full or in part at any time without any

19  prepayment penalty or premium.

20      As security for the Class 6 Claim, Gillespie will retain its security interests in and

21  liens on its Collateral with the same priority and to the same extent such security had as of

22  the Petition Date. Reorganized Debtor will maintain the Gillespie Collateral in good repair,

23  will insure the Gillespie Collateral to its full useable value, and will pay any property taxes

24  with respect to such Collateral when due. At any sale of its Collateral, Gillespie will have

25  the right to bid at such sale and, if Gillespie is the successful bidder, Gillespie may offset all

26  or any portion of its then unpaid Allowed Secured Claim.

**Page 17 of 44 -**  DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 19 of 88

1     The Class 6 Claim is fully secured, and Gillespie will not have any Deficiency Claim

2   with respect to the Class 6 Claim.

3     4.7.    Class 7 (Greatway Properties, LLC).  Class 7 is impaired.  The amount of

4   Greatway Properties, LLC's ("Greatway") Allowed Secured Claim will be determined by

5   agreement of Debtor and Greatway or, absent agreement, in such amount as is determined

6   and Allowed by the Bankruptcy Court.

7     Greatway's Class 7 Claim shall be satisfied by delivery of a promissory note to

8   Greatway (the "Greatway Note") in the principal amount of its Allowed Secured Claim.  The

9   Greatway Note will bear interest from the Effective Date at a fixed per annum rate of 6%,

10   and will be payable by Reorganized Debtor as follows:

11     Commencing on the first day of the first month following the Effective Date and

12   continuing on the first day of each month thereafter until the Greatway Note has been paid in

13   full, Reorganized Debtor will make equal monthly amortizing payments of principal and

14   interest on the Greatway Note based on a 25-year amortization schedule, with a balloon

15   payment due seven years after the Effective Date.

16     The Class 7 Claim may be prepaid in full or in part at any time without any

17   prepayment penalty or premium.

18     As security for the Class 7 Claim, Greatway will retain its security interests in and

19   liens on its Collateral with the same priority and to the same extent such security had as of

20   the Petition Date.  Reorganized Debtor will maintain the Greatway Collateral in good repair,

21   will insure the Greatway Collateral to its full useable value, and will pay any property taxes

22   with respect to such Collateral when due.  At any sale of its Collateral, Greatway will have

23   the right to bid at such sale and, if Greatway is the successful bidder, Greatway may offset all

24   or any portion of its then unpaid Allowed Secured Claim.

25     The Class 7 Claim is fully secured, and Greatway will not have any Deficiency Claim

26   with respect to the Class 7 Claim.

**Page 18 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 20 of 88

1      4.8.   Class 8 (Green & Frahm).  Class 8 is impaired.  The amount of Green &

2 Frahm's Allowed Secured Claim will be determined by agreement of Debtor and Green or,

3 absent agreement, in such amount as is determined and Allowed by the Bankruptcy Court.

4      Green & Frahm's Class 8 Claim shall be satisfied by delivery of a promissory note to

5 Green & Frahm (the "Green & Frahm Note") in the principal amount of its Allowed Secured

6 Claim.  The Green & Frahm Note will bear interest from the Effective Date at a fixed

7 per annum rate of 6%, and will be payable by Reorganized Debtor as follows:

8      Commencing on the first day of the first month following the Effective Date and

9 continuing on the first day of each month thereafter until the Green & Frahm Note has been

10 paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal

11 and interest on the Green & Frahm Note based on a 25-year amortization schedule, with a

12 balloon payment due seven years after the Effective Date.

13      The Class 8 Claim may be prepaid in full or in part at any time without any

14 prepayment penalty or premium.

15      As security for the Class 8 Claim, Green & Frahm will retain its security interests in

16 and liens on its Collateral with the same priority and to the same extent such security had as

17 of the Petition Date.  Reorganized Debtor will maintain the Green & Frahm Collateral in

18 good repair, will insure the Green & Frahm Collateral to its full useable value, and will pay

19 any property taxes with respect to such Collateral when due.  At any sale of its Collateral,

20 Green & Frahm will have the right to bid at such sale and, if Green & Frahm is the successful

21 bidder, Green & Frahm may offset all or any portion of its then unpaid Allowed Secured

22 Claim.

23      The Class 8 Claim is fully secured, and Green & Frahm will not have any Deficiency

24 Claim with respect to the Class 8 Claim.

25      4.9.   Class 9 (Kenneth and Lynda Martin).  Class 9 is impaired.  The amount of

26 Kenneth and Lynda Martin's ("Martin") Allowed Secured Claim will be determined by

**Page 19 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 21 of 88

1   agreement of Debtor and Martin, or, absent agreement, in such amount as is determined and

2   Allowed by the Bankruptcy Court.

3       Martin's Class 9 Claim shall be satisfied by delivery of a promissory note to Martin

4   (the "Martin Note") in the principal amount of its Allowed Secured Claim.  The Martin Note

5   will bear interest from the Effective Date at a fixed per annum rate of 6%, and will be

6   payable by Reorganized Debtor as follows:

7       Commencing on the first day of the first month following the Effective Date and

8   continuing on the first day of each month thereafter until the Martin Note has been paid in

9   full, Reorganized Debtor will make equal monthly amortizing payments of principal and

10  interest on the Martin Note based on a 25-year amortization schedule, with a balloon

11  payment due seven years after the Effective Date.

12      The Class 9 Claim may be prepaid in full or in part at any time without any

13  prepayment penalty or premium.

14      As security for the Class 9 Claim, Martin will retain its security interests in and liens

15  on its Collateral with the same priority and to the same extent such security had as of the

16  Petition Date.  Reorganized Debtor will maintain the Martin Collateral in good repair, will

17  insure the Martin Collateral to its full useable value, and will pay any property taxes with

18  respect to such Collateral when due.  At any sale of its Collateral, Martin will have the right

19  to bid at such sale and, if Martin is the successful bidder, Martin may offset all or any portion

20  of its then unpaid Allowed Secured Claim.

21      The Class 9 Claim is fully secured, and Martin will not have any Deficiency Claim

22  with respect to the Class 9 Claim.

23      4.10.   Class 10 (Protective Life).  Class 10 is impaired.  The amount of Protective

24  Life's Allowed Secured Claim will be determined by agreement of Debtor and Protective

25  Life or, absent agreement, in such amount as is determined and Allowed by the Bankruptcy

26  Court.

**Page 20 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 22 of 88

1   Protective Life's Class 10 Claim shall be satisfied by delivery of a promissory note to

2 Protective Life (the "Protective Life Note") in the principal amount of its Allowed Secured

3 Claim.  The Protective Life Note will bear interest from the Effective Date at a fixed

4 per annum rate of 6%, and will be payable by Reorganized Debtor as follows:

5   Commencing on the first day of the first month following the Effective Date and

6 continuing on the first day of each month thereafter until the Protective Life Note has been

7 paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal

8 and interest on the Protective Life Note based on a 25-year amortization schedule, with a

9 balloon payment due seven years after the Effective Date.

10   The Class 10 Claim may be prepaid in full or in part at any time without any

11 prepayment penalty or premium.

12   As security for the Class 10 Claim, Protective Life will retain its security interests in

13 and liens on its Collateral with the same priority and to the same extent such security had as

14 of the Petition Date.  Reorganized Debtor will maintain the Protective Life Collateral in good

15 repair, will insure the Protective Life Collateral to its full useable value, and will pay any

16 property taxes with respect to such Collateral when due.  At any sale of its Collateral,

17 Protective Life will have the right to bid at such sale and, if Protective Life is the successful

18 bidder, Protective Life may offset all or any portion of its then unpaid Allowed Secured

19 Claim.

20   The Class 10 Claim is fully secured, and Protective Life will not have any Deficiency

21 Claim with respect to the Class 10 Claim.

22   4.11. Class 11 (U.S. Bank, National Association).  Class 11 is unimpaired.  On the

23 Effective Date, Debtor shall pay the Class 11 Claim in full, less the undetermined 506(b)

24 Amount, and will pay into an escrow account mutually agreed to by Debtor and U.S. Bank an

25 amount equal to 115% of the Bank's estimated 506(b) Amount (the "Escrow Amount").

26 Upon the payment of the Class 11 Claim, less the 506(b) Amount, and the funding of the

**Page 21 of 44 -** DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 23 of 88

1    Escrow Amount, the Class 11 Claim shall be deemed to have been paid in full and the Bank

2    will release any and all liens and security interests it has in any assets of Debtor, other than

3    its lien in the Escrow Amount, which shall continue until the 506(b) Amount has been paid in

4    full.  Any provisions of U.S. Bank's agreements with Debtor that by their terms survive

5    payment in full shall survive payment in full of the Class 11 Claim.  Once the 506(b) Amount

6    has been determined and Allowed, the 506(b) Amount will be paid and satisfied from the

7    Escrow Amount, with any surplus being returned to Reorganized Debtor.

8        4.12.   Class 12 (General Unsecured Claims).  Class 12 is impaired.  Each holder of

9    an Allowed General Unsecured Claim will receive the combination of one share of Common

10   Stock and one share of Series A Preferred Stock of Reorganized Debtor in exchange for each

11   $10 of its Allowed General Unsecured Claim on the later of the Effective Date or the date its

12   Claim becomes an Allowed Claim, rounded up to the nearest $10.  Fractional shares will not

13   be issued.  In addition, each holder of an Allowed General Unsecured Claim shall have a

14   Subscription Right.

15       4.13.   Class 13 (Small Unsecured Claims).  Class 13 is impaired.  Each holder of a

16   Class 13 Claim will paid by Reorganized Debtor in cash an amount equal to 80% of its

17   Allowed Claim on or before 90 days after the Effective Date or the date its Claim becomes

18   an Allowed Claim, whichever is later.  General Unsecured Creditors may elect to reduce their

19   Allowed Claims in order to be treated as Class 13 Claimants provided the election is made at

20   the time ballots are due for voting on the Plan or such later date as provided in Section 8.3. of

21   this Plan.

22       4.14.   Class 14 (Equity Security Holders).  Class 14 is impaired.  All Equity

23   Securities and Employee Equity Security Plans of Debtor will be cancelled as of the

24   Effective Date, and Equity Security Holders will not receive or retain any property under the

25   Plan on account of their Equity Securities or any Employee Equity Security Plan.

26

**Page 22 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
        2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 24 of 88

**ARTICLE 5**

**DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; SETTLEMENT**

     5.1.    <u>Disputed Claims; Objections to Claims</u>.  Only Claims that are Allowed shall be entitled to distributions under the Plan.  Except as otherwise provided in Section 5.2 below, Debtor reserves the right to contest and object to any Claims and previously Scheduled Amounts, including, without limitation, those Claims and Scheduled Amounts that are specifically referenced herein; are not listed in the Schedules; are listed therein as disputed, contingent and/or unliquidated in amount; or are listed therein at a different amount than Debtor currently believes is validly due and owing.  Unless extended by an Order of the Bankruptcy Court, all objections to Claims and Scheduled Amounts (other than Administrative Expense Claims) shall be Filed and served upon counsel for Debtor and the holder of the Claim objected to on or before the later of (a) 60 days after the Effective Date or (b) 60 days after the date (if any) on which a Proof of Claim is Filed in respect of a Rejection Claim or Deficiency Claim.  The last day for filing objections to Administrative Expense Claims shall be set pursuant to a further order of the Bankruptcy Court.  All Disputed Claims shall be resolved by the Bankruptcy Court, except to the extent that (a) Debtor may otherwise elect consistent with the Plan and the Bankruptcy Code or (b) the Bankruptcy Court may otherwise order.

     5.2.    <u>Subsequent Allowance of Disputed Claims</u>.  The holder of a Disputed Claim that becomes Allowed in full or in part subsequent to the Effective Date shall receive the distribution it would have received after the Effective Date had the Claim been Allowed at that time.  Until a Disputed Claim is Allowed or disallowed, Reorganized Debtor shall hold any distribution that would have been due to the holder in respect of such Disputed Claim.

**Page 23 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 25 of 88

**ARTICLE 6**

**RIGHTS OFFERING**

6.1.    <u>Introduction</u>.  Debtor shall have the right to consummate the Rights Offering on or before the Effective Date if it determines, in its sole discretion, that it is desirable and feasible to do so.  If Debtor decides to consummate the Rights Offering, it may do so with or without a Backstop Party.  Proceeds from the Rights Offering will be deposited in a separate account through the Effective Date, after which such proceeds may be released to Reorganized Debtor.

6.2.    <u>Issuance of Rights</u>.  Each Rights Offering Participant will receive Subscription Rights to subscribe for up to its Pro Rata Share of the Rights Offering Shares (each such subscription a "Primary Offering Subscription"), for an aggregate purchase price equal to the applicable Subscription Payment Amount.  The Rights Offering Shares will be issued to the Rights Offering Purchasers at a price for the combination of one share of Common Stock and one share of Series A Preferred Stock equal to the Subscription Price.

6.3.    <u>Subscription Period</u>.  The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Deadline.  Each Rights Offering Participant that intends or desires to participate in the Rights Offering must affirmatively elect to exercise its Subscription Rights and provide written notice thereof to the parties specified in the Subscription, on or prior to the Subscription Deadline in accordance with the terms of the Plan and the Subscription.  On the Subscription Deadline, if there is a Backstop Party, the Remaining Rights Offering Shares shall be allocated to, and may be purchased by, the Backstop Party.

6.4.    <u>Exercise of Subscription Rights and Payment of Subscription Payment Amount</u>.  On the Subscription Commencement Date, Debtor will mail the Subscription to each Rights Offering Participant known as of the Rights Offering Record Date, together with appropriate instructions for the proper completion, due execution, and timely delivery of the

**Page 24 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 26 of 88

1    Subscription, as well as instructions for the payment of the Subscription Payment Amount for

2    that portion of the Subscription Rights sought to be exercised by such Entity.  Debtor may

3    adopt such additional detailed procedures consistent with the provisions of the Plan to more

4    efficiently administer the exercise of the Subscription Rights.  In order to exercise the

5    Subscription Rights, each Rights Offering Participant must return a duly completed

6    Subscription (making a binding and irrevocable commitment to participate in the Rights

7    Offering) to Debtor or other party specified in the Subscription so that such Subscription and

8    the Subscription Payment Amount is actually received by Debtor or such other party on or

9    before the Subscription Deadline.  In order to exercise its Subscription Rights, a Rights

10   Offering Participant may subscribe for its entire Pro Rata Share of the Rights Offering Shares

11   or only a part of its Pro Rata Share of the Rights Offering Shares.  If Debtor or such other

12   party for any reason does not receive from a given holder of Subscription Rights a duly

13   completed Subscription and the related Subscription Payment Amount on or prior to the

14   Subscription Deadline, then such holder shall be deemed to have forever and irrevocably

15   relinquished and waived its right to participate in the Rights Offering.

16        On the Subscription Notification Date, Debtor will notify each Rights Offering

17   Purchaser of its respective allocated portion of Rights Offering Shares, and if there is a

18   Backstop Party, Debtor will notify the Backstop Party after the Subscription Deadline of its

19   portion of the Remaining Rights Offering Shares that the Backstop Party may purchase

20   pursuant to the Backstop Rights Purchase Agreement.  Each Rights Offering Purchaser (other

21   than the Backstop Party, if applicable) must tender its Subscription Payment Amount to

22   Debtor so that it is actually received on or prior to the Subscription Deadline.  Any Rights

23   Offering Purchaser who fails to tender its Subscription Payment Amount so that it is received

24   on or prior to the Subscription Deadline shall be deemed to have forever and irrevocably

25   relinquished and waived its right to participate in the Rights Offering.  Debtor shall hold the

26   payments it receives for the exercise of Subscription Rights in a separate account.  In the

**Page 25 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 27 of 88

1   event the conditions to the Effective Date are not met or waived, or Debtor decides not to

2   consummate the Rights Offering, such payments shall be returned, without accrual or

3   payment of any interest thereon, to the applicable Rights Offering Purchasers, without

4   reduction, offset or counterclaim.

5         6.5.   <u>Rights Offering Backstop</u>.  If there is a Backstop Party for the Rights

6   Offering, Debtor and the Backstop Party will enter into the Backstop Rights Purchase

7   Agreement.  In accordance with the Backstop Rights Purchase Agreement, the Backstop

8   Party will be entitled to purchase all or some lesser amount of the Remaining Rights Offering

9   Shares for a per-share price equal to the Subscription Price.  As part of the Backstop Rights

10   Purchase Agreement, Debtor may grant certain rights and protections to the Backstop Party

11   that are not granted to other Rights Offering Participants.

12         6.6.   <u>Number of Rights Offering Shares</u>.  The maximum number of Rights Offering

13   Shares to be sold pursuant to the Rights Offering shall be determined by dividing the Rights

14   Offering Amount by the Subscription Price.  An equal number of shares of Common Stock

15   and Series A Preferred Stock will be issued to each person or entity acquiring Rights

16   Offering Shares in the Rights Offering.

17         6.7.   <u>No Transfer; Detachment Restrictions; No Revocation</u>.  The Subscription

18   Rights are not transferable or detachable.  Any such transfer or detachment, or attempted

19   transfer or detachment, will be null and void and Debtor will not treat any purported

20   transferee of the Subscription Rights separate from the associated Class 12 Claims as the

21   holder of any Subscription Rights.  Once a Rights Offering Participant has exercised any of

22   its Subscription Rights by properly executing and delivering a Subscription and the related

23   Subscription Payment Amount to Debtor or other Entity specified in the Subscription, such

24   exercise may only be revoked, rescinded or annulled in the sole discretion of Debtor or

25   Reorganized Debtor.  On the Effective Date, or as soon as reasonably practicable thereafter,

26

**Page 26 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
        2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 28 of 88

1   Reorganized Debtor or other applicable disbursing agent shall distribute the Rights Offering

2   Shares purchased by each Rights Offering Purchaser.

3         6.8.    <u>Validity of Exercise of Subscription Rights</u>.  All questions concerning the

4   timeliness, validity, form, and eligibility of any exercise, or purported exercise, of

5   Subscription Rights shall be determined by Debtor or Reorganized Debtor.  Debtor or

6   Reorganized Debtor, in its discretion, reasonably exercised in good faith, may waive any

7   defect or irregularity, or permit a defect or irregularity to be corrected within such times as

8   they may determine, or reject the purported exercise of any Subscription Rights.

9   Subscriptions shall be deemed not to have been received or accepted until all irregularities

10  have been waived or cured within such time as Debtor or Reorganized Debtor determines in

11  its discretion reasonably exercised in good faith.

12        Debtor or Reorganized Debtor will use commercially reasonable efforts to give

13  written notice to any Rights Offering Participant regarding any defect or irregularity in

14  connection with any purported exercise of Subscription Rights by such Entity and may

15  permit such defect or irregularity to be cured within such time as they may determine in good

16  faith to be appropriate; provided, however, that neither Debtor or Reorganized Debtor, nor

17  any of their predecessors, successors, assigns, present and former affiliates and subsidiaries,

18  or any of their respective current and former officers, directors, principals, employees,

19  shareholders, partners, agents, financial advisors, attorneys, accountants, investment bankers,

20  investment advisors, consultants, representatives, and other professionals, in each case acting

21  in such capacity on or any time after the Petition Date, and any Entity claiming by or through

22  any of them, shall incur any liability for giving, or failing to give, such notification and

23  opportunity to cure.  Once a Rights Offering Participant has timely and validly exercised its

24  Subscription Rights, subject to the occurrence or satisfaction of all conditions precedent to

25  the Rights Offering and to the Rights Offering Participants' participation in same, and

26  notwithstanding the subsequent disallowance of any or all of its underlying Claim, such

**Page 27 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
        2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 29 of 88

1 Rights Offering Participant's right to participate in the Rights Offering will be irreversible

2 and shall not be subject to dissolution, avoidance or disgorgement, and shall not be withheld

3 from such Rights Offering Participant on account of such disallowance.

4       6.9.   <u>Rights Offering Proceeds</u>.  The proceeds of the Rights Offering will be used to

5 fund Cash payments contemplated by the Plan and for Reorganized Debtor's operating

6 needs.

7 **ARTICLE 7**

8 **MEANS FOR EXECUTION OF PLAN**

9       7.1.   <u>Continued Corporate Existence</u>.  Debtor, as Reorganized Debtor, shall

10 continue to exist after the Effective Date, with all the powers of a corporation under

11 applicable law.

12       7.2.   <u>Restated Articles of Incorporation and Bylaws</u>.  Reorganized Debtor shall be

13 deemed to have adopted the Restated Articles of Incorporation and Restated Bylaws on the

14 Effective Date, and shall promptly thereafter cause the Restated Articles of Incorporation to

15 be filed with the Secretary of State of the State of the State of Oregon.  After the Effective

16 Date, Reorganized Debtor may amend the Restated Articles of Incorporation and may amend

17 its Restated Bylaws in accordance with the Restated Articles of Incorporation, Restated

18 Bylaws, and applicable state law.

19       7.3.   <u>Cancellation of Existing Equity Securities and Employee Equity Security</u>

20 <u>Plans</u>.  As of the Effective Date, all outstanding shares of stock (whether common or

21 preferred), and all awards of any kind consisting of shares of stock of Debtor and all

22 Employee Equity Security Plans, that have been or may be existing, granted, held, awarded,

23 outstanding, payable, or reserved for issuance, and all other Equity Securities, shall, without

24 any further corporate action, be cancelled and retired and shall cease to exist.  This

25 cancellation does not apply with respect to any Common Stock, Series A Preferred Stock, or

26

**Page 28 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 30 of 88

1  any other equity securities or rights to acquire or receive equity securities or any other

2  awards of any kind that are issued in accordance with or pursuant to the Plan.

3    7.4.    <u>Issuance of New Common Stock and Series A Preferred Stock</u>.  As set forth in

4  Section 4.12 above, each holder of an Allowed Class 12 Claim (General Unsecured Claim)

5  shall be issued the combination of one share of Common Stock and one share of Series A

6  Preferred Stock (sometimes hereinafter referred to together as "Stock") in exchange for each

7  $10 of such holder's Allowed Class 12 Claim, rounded up to the nearest $10, for a total

8  issuance of approximately 6,000,000 shares of Common Stock and 6,000,000 shares of

9  Series A Preferred Stock.  No fractional shares will be issued.  If the Allowed amount of a

10  Class 12 Claim is not determined or is subject to dispute, then the Stock will be issued to the

11  holder of that Claim when the Claim is Allowed.  Sufficient shares of Stock will be reserved

12  for issuance to Class 12 claimants when their Claims are Allowed.  Reorganized Debtor will

13  also reserve approximately 800,000 to 900,000 shares of Common Stock for issuance in

14  accordance with Reorganized Debtor's Employee Stock Incentive Plan for services rendered

15  after the Effective Date, with the final number to be determined upon completion of the

16  Rights Offering to represent approximately 12% of all shares of Common Stock issued and

17  reserved for issuance immediately following the Effective Date.  These shares of Common

18  Stock reserved for issuance under the Employee Stock Incentive Plan will be issued, if at all,

19  only with the approval of the Board of Directors of Reorganized Debtor following the

20  Effective Date.

21    7.5.    <u>Exit Financing</u>.  Debtor will negotiate and obtain, and enter into agreements

22  with respect to, Exit Financing, which Exit Financing will, among other things, be utilized to

23  pay U.S. Bank's Class 11 Claim in full (including funding the Escrow Amount) and to

24  provide working capital for Reorganized Debtor.  Debtor may enter into such agreements and

25  execute such documents with respect to the Exit Financing without the necessity of obtaining

26  additional Bankruptcy Court approval.

**Page 29 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 31 of 88

1    7.6.    <u>Subordination Agreements</u>.  In connection with any distributions (of Cash,

2    stock, or otherwise) to be made under this Plan, Reorganized Debtor will comply with all

3    Subordination Agreements, and all distributions to Creditors under this Plan shall remain

4    subject to such Subordination Agreements.  Notwithstanding anything in this Plan to the

5    contrary, if a Senior Lender notifies Debtor or Reorganized Debtor in writing that a Claim is

6    subject to a Subordination Agreement (the "Subordinated Claim"), then Reorganized Debtor

7    will not issue any stock on account of, or make any distribution with respect to, the

8    Subordinated Claim unless and until the first to occur of (a) receipt by Debtor or Reorganized

9    Debtor of joint instructions from the Senior Lender and the holder of the Subordinated Claim

10    with respect to such Subordinated Claim, or (b) the Bankruptcy Court enters a Final Order

11    declaring the relative rights of the Senior Lender and the holder of the Subordinated Claim

12    with respect to the Subordinated Claim.  The Bankruptcy Court shall have and retain full and

13    exclusive jurisdiction to resolve all disputes arising out of or relating to any Subordination

14    Agreement or Subordinated Claim, including who may vote a Subordinated Claim.  Absent

15    receipt by Reorganized Debtor of written notification from a Senior Lender that a Claim is

16    subject to a Subordination Agreement, Reorganized Debtor will make distributions on

17    Claims as provided in this Plan and Reorganized Debtor will have no obligation to inquire or

18    otherwise investigate or determine the existence or validity of any Subordination Agreement.

19    Promptly upon receipt of such a written notice, Reorganized Debtor will serve a copy of the

20    notice on the holder of the Subordinated Claim.

21    7.7.    <u>Board of Directors</u>.  The initial Board of Directors of Reorganized Debtor

22    shall be composed of (a) Douglas Nidiffer, (b) William Kaye, the director designated by the

23    Committee (the "Committee Board Member"), and (c) the following three directors

24    designated by Endeavour and THL:  Steven R. Wilkins, W. Hunter Stropp, and Iain G.

25    Douglas.  Thereafter, the Board of Directors of Reorganized Debtor shall be elected by the

26    shareholders of Reorganized Debtor in accordance with the Restated Bylaws and applicable

**Page 30 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
     2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 32 of 88

1    state law.  The Committee Board Member shall have the right, acting alone and without a

2    vote of the Board of Reorganized Debtor, but not the obligation, to: (i) other than with

3    respect to any claim by an Insider, Endeavor, THL, or any member of the Committee,

4    designate which Claims shall be the subject of an objection and direct counsel for

5    Reorganized Debtor to object to such Claims; (ii) approve the settlement or other resolution

6    of any Disputed Claim by which such Claim shall be allowed in the amount of $250,000 or

7    less; and (iii) approve the expenditure of up to $20,000 in legal fees and costs in connection

8    with the objection to a Claim.  If there is no Committee Board Member, or if the Committee

9    Board Member elects not to exercise any or all of the rights provided herein, all unexercised

10   rights, power and authority concerning Disputed Claims vested above to the Committee

11   Board Member shall remain with Reorganized Debtor.  Further, the rights granted to the

12   Committee Board Member, even if exercised, shall not diminish in any respect the rights,

13   power, and authority of the Board of Directors of Reorganized Debtor and, in the event of a

14   dispute between the Committee Board Member and the Board of Directors of Reorganized

15   Debtor, the decision of the Board of Directors of Reorganized Debtor shall control.

16       7.8.    Corporate Action.  Upon entry of the Confirmation Order, all actions

17   contemplated by the Plan shall be authorized and approved in all respects (subject to the

18   provisions of the Plan), including, without limitation, the adoption and filing of the Restated

19   Articles of Incorporation, approval of the Restated Bylaws, approval of the Employee Stock

20   Incentive Plan, the election or appointment, as applicable, of directors and officers for

21   Reorganized Debtor, the termination of all Employee Equity Security Plans, and the issuance

22   of the Common Stock and the Series A Preferred Stock.  The appropriate officers of

23   Reorganized Debtor are authorized and directed to execute and deliver the agreements,

24   documents, and instruments contemplated by the Plan and the Disclosure Statement in the

25   name of and on behalf of Reorganized Debtor.

26

**Page 31 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
             2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 33 of 88

1    7.9.    Employee Stock Incentive Plan.  On the Effective Date, the Employee Stock

2    Incentive Plan shall become effective immediately without any further corporate or other

3    action.

4    7.10.    Setoffs.  Debtor may, but shall not be required to, set off against any Claim

5    and the distributions to be made pursuant to the Plan in respect of such Claim, any claims of

6    any nature whatsoever that Debtor may have against the holder of such Claim, but neither the

7    failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release

8    of any such claim Debtor may have against such holder.

9    7.11.    Utility Deposits.  All utilities holding a Utility Deposit shall immediately after

10    the Effective Date return or refund such Utility Deposit to Reorganized Debtor.

11    Notwithstanding, to the extent a utility continues to provide service to the Reorganized

12    Debtor post-Effective Date, failure to return or refund a Utility Deposit to Reorganized

13    Debtor shall not constitute a breach by the utility of the confirmed Plan or a violation of any

14    order confirming the Plan or any other order entered by the court.  At the sole option of

15    Reorganized Debtor, Reorganized Debtor may apply any Utility Deposit that has not been

16    refunded to Reorganized Debtor in satisfaction of any payments due for charges incurred

17    during the post-petition period, or, in the event all charges incurred during the post-petition

18    period have been paid, become due from Reorganized Debtor to a utility holding such a

19    Utility Deposit.  Nothing in the Plan, or in any order confirming the Plan, shall limit or affect

20    a utility's right to seek additional security from the Reorganized Debtor in accordance with

21    applicable non-bankruptcy law.

22    7.12.    Event of Default; Remedy.  Any material failure by Reorganized Debtor to

23    perform any term of this Plan, which failure continues for a period of 10 Business Days

24    following receipt by Reorganized Debtor of written notice of such default from the holder of

25    an Allowed Claim to whom performance is due, shall constitute an Event of Default.  Upon

26    the occurrence of an Event of Default, the holder of an Allowed Claim to whom performance

**Page 32 of 44 -**    DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 34 of 88

1   is due shall have all rights and remedies granted by law, this Plan, or any agreement between

2   the holder of such Claim and Debtor or Reorganized Debtor.  An Event of Default with

3   respect to one Claim shall not be an Event of Default with respect to any other Claim.

4         7.13.   <u>Conditions Precedent to Effectiveness of Plan</u>.  Unless waived by Debtor, the

5   following conditions must occur and be satisfied for the Plan to become effective, and are

6   conditions precedent to the Effective Date:

7         (a)   The Bankruptcy Court shall have entered the Confirmation Order, in form and

8   substance reasonably satisfactory to Debtor, which shall, among other things, provide that

9   any and all executory contracts and unexpired leases assumed pursuant to the Plan shall

10   remain in full force and effect for the benefit of Reorganized Debtor notwithstanding any

11   provision in any such contract or lease or in applicable law (including those described in

12   Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions

13   such transfer or that enables or requires termination or modification of such contract or lease;

14         (b)   All documents, instruments, and agreements, each in form and substance

15   satisfactory to Reorganized Debtor, provided for or necessary to implement this Plan shall

16   have been executed and delivered by the parties thereto, unless such execution or delivery

17   has been waived by the party to be benefitted thereby;

18         (c)   The Exit Financing shall have closed, the Bank's Class 11 Claim shall have

19   been paid in full (including the funding of the Escrow Amount), and all conditions to funding

20   shall have been satisfied or waived; and

21         (d)   In the event Debtor decides to consummate the Rights Offering, the proceeds

22   thereof shall have been deposited in a separate account as provided in Section 6.1.

23                     **ARTICLE 8**

24         **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

25         8.1.   <u>Assumption and Rejection</u>.  Except as may otherwise be provided, all

26   executory contracts of Debtor that are not otherwise subject to a prior Bankruptcy Court

**Page 33 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 35 of 88

1   order or pending motion before the Bankruptcy Court will be deemed assumed by Debtor as

2   of the Effective Date and will be enforceable by the parties thereto in accordance with their

3   terms; provided, however, that no provision relating to default by reason of insolvency or the

4   filing of the Bankruptcy Case shall be enforceable against Reorganized Debtor or its

5   successors or assigns.  The Confirmation Order shall constitute an order authorizing the

6   assumption and assignment of all executory contracts that are subject to a pending motion to

7   assume or a pending motion to assume and assign.  Reorganized Debtor shall promptly after

8   the Effective Date pay all amounts required under Section 365 of the Bankruptcy Code to

9   cure any defaults for executory contracts and unexpired leases being assumed and shall

10  perform its obligations from and after the Effective Date in the ordinary course of business.

11      8.2.    Assignment.  Except as may be otherwise provided in this Plan, the

12  Confirmation Order, or other Order of the Bankruptcy Court, all executory contracts shall be

13  deemed assigned to Reorganized Debtor as of the Effective Date.  The Confirmation Order

14  shall constitute an order authorizing such assignment of assumed executory contracts, and no

15  further assignment documentation shall be necessary to effectuate such assignment.

16      8.3.    Rejection Claims.  Rejection Claims must be Filed on the later of April 9,

17  2014 (the Claims Bar Date) or 30 days after the entry of the order rejecting the executory

18  contract or unexpired lease.  Any Rejection Claim not Filed within such time shall be forever

19  barred from asserting such Claim against Debtor or Reorganized Debtor, their property,

20  estate, and any guarantors of such obligations.  Each Rejection Claim resulting from such

21  rejection shall constitute a Small or General Unsecured Claim, as applicable.  Any election to

22  be treated as a Small Unsecured Claim by the holder of a Rejection Claim arising from an

23  order entered on or after the time ballots are due for voting on the Plan shall be made on the

24  date the Rejection Claim is Filed.

25

26

**Page 34 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
          2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 36 of 88

**ARTICLE 9**

**EFFECT OF CONFIRMATION**

9.1.    <u>Debtor's Injunction</u>.  The effect of confirmation shall be as set forth in Section 1141 of the Bankruptcy Code.  Except as otherwise provided in the Plan or in the Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable to entities against (a) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against Debtor or Reorganized Debtor that was or could have been commenced before the entry of the Confirmation Order; (b) the enforcement against Reorganized Debtor or its assets of a judgment obtained before the Petition Date; and (c) any act to obtain possession of or to exercise control over, or to create, perfect, or enforce a lien upon, all or any part of the assets of Reorganized Debtor.

9.2.    <u>Discharge</u>.  Except as otherwise expressly provided herein or in the Confirmation Order, the confirmation of the Plan shall, provided that the Effective Date shall have occurred, discharge all Claims to the fullest extent authorized or provided for by the Bankruptcy Code, including, without limitation, to the extent authorized or provided for by Sections 524 and 1141 thereof

**ARTICLE 10**

**RETENTION OF JURISDICTION**

10.1.    Notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code to:

(a)    classify the Claim or interest of any Creditor or stockholder, reexamine Claims or Interests that have been owed for voting purposes, and determine any objections that may be Filed to Claims or Interests;

**Page 35 of 44 -**    DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 37 of 88

1     (b)  determine requests for payment of Claims entitled to priority under

2 Section 507(a) of the Bankruptcy Code, including compensation and reimbursement of

3 expenses in favor of professionals employed at the expense of the bankruptcy estate;

4     (c)  avoid transfers or obligations to subordinate Claims under Chapter 5 of

5 the Bankruptcy Code;

6     (d)  approve the assumption, assignment, or rejection of an executory

7 contract or an unexpired lease pursuant to this Plan and resolve any related matters;

8     (e)  resolve controversies and disputes regarding the interpretation of this

9 Plan;

10     (f)  implement the provisions of this Plan and enter orders in aid of

11 confirmation;

12     (g)  determine the validity, priority or extent of any Claim or Claim of lien,

13 and resolve any Disputed Claims;

14     (h)  adjudicate adversary proceedings and contested matters pending or

15 hereafter commenced in this Bankruptcy Case;

16     (i)  order and implement such orders as may be appropriate in the event

17 the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

18     (j)  hear and determine any proceeding that involves applications to

19 modify the Plan, to cure any defect or omission, or to reconcile any inconsistency that may

20 arise in connection with the Plan or related documents or in any order of the Bankruptcy

21 Court, including the Confirmation Order;

22     (k)  determine any other matters that may arise in connection with or are

23 related to this Plan; the Disclosure Statement; the Confirmation Order or any contract,

24 instrument, release or other agreement or document created in connection with this Plan or

25 the Disclosure Statement;

26

**Page 36 of 44 -** DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
    2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 38 of 88

1          (l)        ensure that distributions to holders of Allowed Claims are

2    accomplished as provided herein;

3          (m)        to the extent Bankruptcy Court approval is required, to consider and

4    act on the compromise and settlement of any Claim or cause of action by or against Debtor's

5    estate;

6          (n)        determine the scope of any discharge of Debtor under this Plan or the

7    Bankruptcy Code;

8          (o)        recover all assets of the Debtor and property of Debtor's estate,

9    wherever located;

10          (p)        determine any and all motions, adversary proceedings, applications,

11    and contested or litigated matters that may be pending on the Effective Date or that, pursuant

12    to this Plan, may be instituted by Reorganized Debtor after the Effective Date;

13          (q)        hear and determine applications for allowances of compensation and

14    reimbursement of expenses of professionals under Sections 330 and 331 of the Bankruptcy

15    Code and any other fees and expenses authorized to be paid or reimbursed under this Plan;

16          (r)        hear and determine all matters arising out of or related to

17    Subordination Agreements and Subordinated Claims, including the voting of Subordinated

18    Claims and distributions to be made under this Plan on account of Subordinated Claims;

19          (s)        hear and determine any other matters related hereto and not

20    inconsistent with Chapter 11 of the Bankruptcy Code; and

21          (t)        enter a final decree closing this Bankruptcy Case.

22        In the event the Bankruptcy Court is not permitted under applicable law to preside

23    over any of the foregoing matters, the reference to the Bankruptcy Court in this Article 9

24    shall be deemed to be replaced by the United States District Court for the District of Oregon

25    having jurisdiction over this Chapter 11 case.  Nothing in this Article 9 shall expand the

26    exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law, or

**Page 37 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 39 of 88

1  remove any jurisdiction of the United States District Court for the District of Oregon, Eugene

2  Division, with respect to the DOL Consent Judgment and Order.

3  **ARTICLE 11**

4  **ADMINISTRATIVE PROVISIONS**

5      11.1.  <u>Dissolution of the Committee</u>.  The Committee shall continue in existence

6  until the Effective Date to exercise those powers and perform those duties specified in

7  Section 1103 of the Bankruptcy Code.  On the later of: (a) the Effective Date; or (2) the

8  conclusion of any appeals or other challenges or matters with respect to the Confirmation

9  Order, the Committee shall be dissolved and its members shall be deemed released of all

10  their duties, responsibilities and obligations in connection with the Bankruptcy Case or this

11  Plan and its implementation, except with respect to the review of and right to be heard in

12  connection with all professionals' claims for compensation for services rendered or

13  reimbursement for expenses incurred; and the retention or employment of the Committee's

14  attorneys, financial advisors, and other agents shall terminate as of the Effective Date;

15  provided, however, that such attorneys and financial advisors shall be entitled to pursue their

16  own claims for compensation for services rendered or reimbursement for expenses incurred,

17  and represent the Committee in connection with the review of and the right to be heard in

18  connection with all professionals' claims for compensation for services rendered or

19  reimbursement for expenses incurred.  Following the Confirmation Date, in accordance with

20  the foregoing, the attorneys and financial advisors to the Committee shall be entitled to

21  request any reasonable claims for compensation for services rendered or reimbursement for

22  expenses incurred after the Confirmation Date through and including the dissolution of the

23  Committee in connection with services to the Committee.  Reorganized Debtor shall pay,

24  within 10 Business Days after submission of a detailed invoice to Reorganized Debtor, such

25  reasonable claims for compensation or reimbursement of expenses incurred by the

26  professionals of the Committee.  If Reorganized Debtor disputes the reasonableness of any

**Page 38 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 40 of 88

1  such invoice, Reorganized Debtor or the affected professional may submit such dispute to the

2  Bankruptcy Court for a determination of the reasonableness of any such invoice, and the

3  disputed portion of such invoice shall not be paid until the dispute is resolved.  The

4  undisputed portion of such reasonable fees and expenses shall be paid as provided herein.

5      11.2.  <u>Final Fee Applications</u>.  Professionals shall file their final fee applications

6  under Section 330 of the Bankruptcy Code no later than 20 days after the Effective Date.

7      11.3.  <u>Modification or Withdrawal of the Plan</u>.  Debtor may alter, amend, or modify

8  the Plan pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 at any

9  time prior to the time the Bankruptcy Court has signed the Confirmation Order.  After such

10  time, and prior to the substantial consummation of the Plan, Reorganized Debtor may, so

11  long as the treatment of holders of Claims and Interests under the Plan is not adversely

12  affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to

13  reconcile any inconsistencies in the Plan, Disclosure Statement, or Confirmation Order, and

14  any other matters as may be necessary to carry out the purposes and effects of the Plan;

15  provided, however, that prior notice of such proceedings shall be served in accordance with

16  Bankruptcy Rule 2002.

17      11.4.  <u>Revocation or Withdrawal of Plan</u>

18          11.4.1.  <u>Right to Revoke</u>.  Debtor, in consultation with the Committee,

19  reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.

20          11.4.2.  <u>Effect of Withdrawal or Revocation</u>.  If Debtor revokes or withdraws

21  the Plan prior to the Effective Date, then the Plan shall be deemed null and void.  In such

22  event, nothing contained herein shall be deemed to constitute a waiver or release of any

23  claims by or against Debtor or any other Entity, or to prejudice in any manner the rights of

24  Debtor or any Entity in any further proceeding involving Debtor.

25      11.5.  <u>Nonconsensual Confirmation</u>.  Debtor shall request that the Bankruptcy Court

26  confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of

**Page 39 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
     2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 41 of 88

1  all provisions of Section 1129(a) of the Bankruptcy Code, except Subsection 1129(a)(8), are

2  met.

3  **ARTICLE 12**

4  **MISCELLANEOUS PROVISIONS**

5  12.1.  <u>Revesting</u>.  Except as otherwise expressly provided herein or in the

6  Confirmation Order, on the Effective Date all property and assets of the estate of Debtor shall

7  revest in Reorganized Debtor free and clear of all Claims, liens, encumbrances, charges, and

8  other interests arising on or before the Effective Date, and Reorganized Debtor may operate,

9  from and after the Effective Date, free of any restrictions imposed by the Bankruptcy Code or

10  the Bankruptcy Court.

11  12.2.  <u>Cancellation of Documents Evidencing Claims</u>.  As of the Effective Date, and

12  except as expressly provided in this Plan or the Confirmation Order (subject to resolution of

13  any objection to the Claim if a Disputed Claim), any note, agreement, instrument, judgment,

14  or other document evidencing a Claim in any impaired Class shall be deemed cancelled, null,

15  and void, except for the right, if any, to receive distributions under this Plan; provided,

16  however, that nothing herein shall affect the liability of any entity other than Debtor on, or

17  the property of any entity other than Debtor for, such Claim.

18  12.3.  <u>Rights of Action</u>.  Except as otherwise expressly provided herein, any claims,

19  rights, interests, causes of action, defenses, counterclaims, crossclaims, third-party claims, or

20  rights of offset, recoupment, subrogation, or subordination, including, without limitation,

21  claims under Section 550(a) of the Bankruptcy Code or any of the sections referenced therein

22  (including, without limitation, any and all Avoidance Actions) accruing to Debtor shall

23  remain assets of Reorganized Debtor, which shall have the sole right to enforce its rights.

24  Reorganized Debtor may pursue such rights of action, as appropriate, in accordance with its

25  sole best interests and for its sole benefit.  Notwithstanding anything to the contrary in this

26  Section, any beneficiary to a Subordination Agreement may seek to enforce such

**Page 40 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 42 of 88

1    Subordination Agreement.  In addition, on the Effective Date all Avoidance Actions against

2    entities that are not Secured Creditors shall be deemed waived and forever barred.  Without

3    limiting the preceding, the forgoing shall not bar any Avoidance Action against Komlofske.

4        12.4.    Governing Law.  Except to the extent the Bankruptcy Code, the Bankruptcy

5    Rules, or other federal laws apply, the laws of the State of Oregon shall govern the

6    construction and implementation of the Plan, and all rights and obligations arising under the

7    Plan.

8        12.5.    Withholding and Reporting Requirements.  In connection with the Plan and

9    all instruments issued in connection therewith and distributions thereon, Debtor and

10   Reorganized Debtor shall comply with all withholding, reporting, certification, and

11   information requirements imposed by any federal, state, local, or foreign taxing authorities

12   and all distributions hereunder shall, to the extent applicable, be subject to any such

13   withholding, reporting, certification, and information requirements.  Entities entitled to

14   receive distributions hereunder shall, as a condition to receiving such distributions, provide

15   such information and take such steps as Reorganized Debtor may reasonably require to

16   ensure compliance with such withholding and reporting requirements, and to enable

17   Reorganized Debtor to obtain the certifications and information as may be necessary or

18   appropriate to satisfy the provisions of any tax law.

19       12.6.    Time.  Unless otherwise specified herein, in computing any period of time

20   prescribed or allowed by the Plan, the day of the act or event from which the designated

21   period begins to run shall not be included.  The last day of the period so computed shall be

22   included, unless it is not a Business Day, in which event the period runs until the end of the

23   next succeeding day that is a Business Day.

24       12.7.    Section 1145 Exemption.  The issuance and distribution of all the shares of

25   Common Stock and Series A Preferred Stock hereunder shall be exempt, pursuant to

26   Section 1145 of the Bankruptcy Code, from registration under (a) the Securities Act of 1933,

**Page 41 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
               2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 43 of 88

1   as amended, and all rules and regulations promulgated thereunder; and (b) any state or local

2   law requiring registration of the offer, issuance, or distribution of securities.

3         12.8.   Section 1146(c) Exemption.   Pursuant to Section 1146(c) of the Bankruptcy

4   Code, the issuance, transfer, or exchange of any security under the Plan, or the execution,

5   delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as

6   contemplated by the Plan, or the revesting, transfer, or sale of any real property of Debtor or

7   Reorganized Debtor pursuant to, in implementation of, or as contemplated by the Plan, shall

8   not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or

9   fee.  Consistent with the foregoing, each recorder of deeds or similar official for any city,

10  county or governmental unit in which any instrument hereunder is to be recorded shall,

11  pursuant to the Confirmation Order, be ordered and directed to accept such instrument

12  without requiring the payment of any documentary stamp tax, deed stamps, transfer tax,

13  intangible tax, or similar tax.

14        12.9.   Severability.   In the event any provision of the Plan is determined to be

15  unenforceable, such determination shall not limit or affect the enforceability and operative

16  effect of any other provisions of the Plan.  To the extent any provision of the Plan would, by

17  its inclusion in the Plan, prevent or preclude the Bankruptcy Court from entering the

18  Confirmation Order, the Bankruptcy Court, on the request of Debtor, may modify or amend

19  such provision, in whole or in part, as necessary to cure any defect or remove any

20  impediment to the confirmation of the Plan existing by reason of such provision.

21        12.10.  Binding Effect.  The provisions of the Plan shall bind Debtor and Reorganized

22  Debtor, and all Creditors and Equity Security Holders, and their respective successors, heirs,

23  and assigns.

24        12.11.  Retiree Benefits.  On or after the Effective Date, to the extent required by

25  Section 1129(a)(13) of the Bankruptcy Code, Reorganized Debtor shall continue to pay all

26  retiree benefits (if any) as that term is defined in Section 1114 of the Bankruptcy Code,

**Page 42 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
      2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 44 of 88

1   maintained or established by Debtor prior to the Effective Date, without prejudice to

2   Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend or

3   terminate the foregoing arrangements.

4        12.12.  <u>Recordable Order</u>.  The Confirmation Order shall be deemed to be in

5   recordable form, and shall be accepted by any recording officer for filing and recording

6   purposes without further or additional orders, certifications or other supporting documents.

7        12.13.  <u>Plan Controls</u>.  In the event and to the extent that any provision of the Plan is

8   inconsistent with the provisions of the Disclosure Statement, or any other instrument or

9   agreement contemplated to be executed pursuant to the Plan, the provisions of the Plan shall

10  control and take precedence.

11       12.14.  <u>Effectuating Documents and Further Transactions</u>.  Debtor and Reorganized

12  Debtor are authorized to execute, deliver, file, or record such contracts, instruments,

13  assignments, and other agreements or documents, and take or direct such actions as may be

14  necessary or appropriate to effectuate and further evidence the terms and conditions of this

15  Plan.

16       12.15.  <u>Timing of Actions</u>.  Notwithstanding anything to the contrary herein, any

17  action required by the Plan to be taken on the Effective Date shall be made or taken on the

18  Effective Date or as soon as practical thereafter, but in any event within 20 days of the

19  Effective Date.  The preceding shall not apply with respect to the payment of the Bank's

20  Class 11 Claim (including the funding of the Escrow Amount) on the Effective Date.

21       12.16.  <u>Courts of Competent Jurisdiction</u>.  If the Bankruptcy Court abstains from

22  exercising, or declines to exercise, jurisdiction, or is otherwise without jurisdiction over any

23  matter arising out of this Plan, such abstention, refusal, or failure of jurisdiction shall have no

24  effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other

25  court having competent jurisdiction with respect to such matter.

26

**Page 43 of 44 -**  DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9, 2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 45 of 88

1    12.17. <u>Exhibits and Schedules</u>.  Any exhibits or schedules to this Plan are

2  incorporated into, and are part of, the Plan as if set forth herein.

3    DATED this 9th day of May, 2014.

4    C & K MARKET, INC.

5

6    By /s/ Edward C. Hostmann
      Edward C. Hostmann
      Chief Restructuring Officer

7

8  Presented by:

9  TONKON TORP LLP

10

11  By /s/ Albert N. Kennedy
      Albert N. Kennedy, OSB No. 821429
      Timothy J. Conway, OSB No. 851752

12  Michael W. Fletcher, OSB No. 010448
      Ava L. Schoen, OSB No. 044072

13  Of Attorneys for Debtor

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 44 of 44 -**   DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (MAY 9,
                2014)

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

EXHIBIT 1
Page 46 of 88

# EXHIBIT 1 TO SECOND AMENDED PLAN OF REORGANIZATION

## EMPLOYEE STOCK INCENTIVE PLAN

EXHIBIT 1
Page 47 of 88

# C & K MARKET, INC.
## 2014 STOCK INCENTIVE PLAN

**Section 1.**    **Establishment and Purpose.**

(a)    The purpose of the Plan is to offer selected individuals an opportunity to acquire a proprietary interest in the success of C & K Market, Inc., an Oregon corporation (the "**Corporation**"), or to increase such interest, by purchasing Shares of the Corporation's Stock. The Plan provides both for the direct award or sale of Shares and for the grant of Options to purchase Shares. Options granted under the Plan may include Nonstatutory Options as well as ISOs intended to qualify under Section 422 of the Code.

(b)    Capitalized terms are defined in <u>Section 13</u>.

**Section 2.**    **Administration**.

(a)    **Committees of the Board**. The Plan may be administered by one or more Committees. Each Committee shall consist of two or more members of the Board (the "**Board**") who have been appointed by the Board. Each Committee shall have such authority and be responsible for such functions as the Board has assigned to it. If no Committee has been appointed, the entire Board shall administer the Plan. Any reference to the Board shall be construed as a reference to the Committee (if any) to whom the Board has assigned a particular function.

(b)    **Authority of the Board**. Subject to the provisions of the Plan, the Board shall have full authority and discretion to take any actions it deems necessary or advisable for the administration of the Plan. All decisions, interpretations and other actions of the Board shall be final and binding on all Grantees, all Optionees and all persons deriving their rights from a Grantee or Optionee.

**Section 3.**    **Eligibility**.

(a)    **General Rule**. Only Employees and Outside Directors shall be eligible for the grant of Options or the direct award or sale of Shares. Only Employees shall be eligible for the grant of ISOs.

(b)    **Ten-Percent Shareholders**. An individual who owns more than 10% of the total combined voting power of all classes of outstanding stock of the Corporation, its Parent or any of its Subsidiaries shall not be eligible for the grant of an ISO unless (i) the Exercise Price is at least 110% of the Fair Market Value of a Share on the date of grant and (ii) such ISO by its terms is not exercisable after the expiration of five years from the date of grant. For purposes of this <u>Section 3(b)</u>, in determining stock ownership, the attribution rules of Section 424(d) of the Code shall be applied.

EXHIBIT 1
Page 1 of 10

EXHIBIT 1
Page 48 of 88

**Section 4.    Stock Subject to Plan**.

(a)    **Basic Limitation**.  Shares offered under the Plan shall be authorized but unissued Shares.  The aggregate number of Shares that may be issued under the Plan (upon exercise of Options or other rights to acquire Shares) shall not exceed _____ Shares, subject to adjustment pursuant to <u>Section 9</u>.  The number of Shares that are subject to Options or other rights outstanding at any time under the Plan shall not exceed the number of Shares that then remain available for issuance under the Plan.  The Corporation, during the term of the Plan, shall at all times reserve and keep available sufficient Shares to satisfy the requirements of the Plan.

(b)    **Additional Shares**.  In the event that any outstanding Option or other right for any reason expires or is canceled or otherwise terminated, the Shares allocable to the unexercised portion of such Option or other right shall again be available for the purposes of the Plan.  In the event that Shares issued under the Plan are reacquired by the Corporation pursuant to any forfeiture provision, right of repurchase or right of first refusal, such Shares shall again be available for the purposes of the Plan, except that the aggregate number of Shares which may be issued upon the exercise of ISOs shall in no event exceed _____ Shares (subject to adjustment pursuant to <u>Section 9</u>).

**Section 5.    Terms and Conditions of Awards or Sales**.

(a)    **Restricted Stock Agreement**.  Each award or sale of Shares under the Plan (other than upon exercise of an Option) shall be evidenced by a Restricted Stock Agreement between the Grantee and the Corporation.  Such award or sale shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions which are not inconsistent with the Plan and which the Board deems appropriate for inclusion in a Restricted Stock Agreement.  The provisions of the various Restricted Stock Agreements entered into under the Plan need not be identical.

(b)    **Nontransferability of Rights**.  Any right to acquire Shares under the Plan (other than an Option) shall not be transferable and shall be exercisable only by the Grantee to whom such right was granted.

(c)    **Purchase Price**.  The Purchase Price of Shares to be offered under the Plan shall be determined by the Board in its sole discretion.  The Purchase Price shall be payable in a form described in <u>Section 7</u>.

(d)    **Withholding Taxes**.  As a condition to the purchase of Shares, the Grantee shall make such arrangements as the Board may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with such purchase.

(e)    **Restrictions on Transfer of Shares**.  Any Shares awarded or sold under the Plan shall be subject to such special forfeiture conditions, rights of repurchase, rights of first refusal and other transfer restrictions as the Board may determine.  Such restrictions shall be set forth in the applicable Restricted Stock Agreement and shall apply in addition to any restrictions that may apply to holders of Shares generally.

C & K Market, Inc. 2014 Stock Incentive Plan
Page 2

EXHIBIT 1
Page 2 of 10

EXHIBIT 1
Page 49 of 88

(f)      **Forfeiture**.  Shares shall be forfeited and returned to the Corporation, subject to Section 4(b), and all rights of the Grantee with respect to the Shares shall terminate unless the Grantee continues in the service of the Corporation or one of its affiliates until the expiration of the forfeiture period for the Shares and the Grantee satisfies any and all other conditions set forth in the Restricted Stock Agreement.  The Board shall determine the forfeiture period (which may, but need not, lapse in installments) and any other terms and conditions applicable to any Award.

(g)      **Change in Control**.  With respect to each Award of Shares, the Board shall determine whether and to what extent such Shares shall become vested and whether and to what extent any right to repurchase a Grantee's Shares at the original Purchase Price (if any) shall lapse if the Corporation is subject to a Change in Control.

(h)      **Death or Disability**.  A Restricted Stock Agreement may provide for accelerated vesting in the event of the Optionee's death or disability.

**Section 6.      Terms and Conditions of Options**.

(a)      **Stock Option Agreement**.  Each grant of an Option under the Plan shall be evidenced by a Stock Option Agreement between the Optionee and the Corporation.  Such Option shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions which are not inconsistent with the Plan and which the Board deems appropriate for inclusion in a Stock Option Agreement.  The provisions of the various Stock Option Agreements entered into under the Plan need not be identical.

(b)      **Number of Shares**.  Each Stock Option Agreement shall specify the number of Shares that are subject to the Option and shall provide for the adjustment of such number in accordance with Section 9.  The Stock Option Agreement shall also specify whether the Option is an ISO or a Nonstatutory Option.

(c)      **Exercise Price**.  Each Stock Option Agreement shall specify the Exercise Price. The Exercise Price of an Option shall not be less than 100% of the Fair Market Value of a Share on the date of grant, and a higher percentage may be required by Section 3(b).  Subject to the preceding sentence, the Exercise Price under an Option shall be determined by the Board in its sole discretion.  The Exercise Price shall be payable in a form described in Section 7.

(d)      **Withholding Taxes**.  As a condition to the exercise of an Option, the Optionee shall make such arrangements as the Board may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with such exercise.  The Optionee shall also make such arrangements as the Board may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with the disposition of Shares acquired by exercising an Option.

(e)      **Exercisability**.  Each Stock Option Agreement shall specify the date or event upon which all or any portion of the Option is to become exercisable.  The exercisability provisions of a Stock Option Agreement shall be determined by the Board in its sole discretion. Each Option may, but need not, vest and therefore become exercisable in periodic installments that may, but need not, be equal. The Option may be subject to such other terms and conditions on the time or times when it may be exercised (which may be based on performance or other

C & K Market, Inc. 2014 Stock Incentive Plan
Page 3

EXHIBIT 1
Page 3 of 10

EXHIBIT 1
Page 50 of 88

criteria) as the Board may deem appropriate. The vesting provisions of individual Options may vary. The Board may, but shall not be required to, provide for an acceleration of vesting and exercisability of any Stock Option Agreement upon the occurrence of a specified event.

(f) **Exercisability Following Termination of Continuous Service**.  In the event an Optionee's Continuous Service terminates, the Optionee may exercise his or her Option (to the extent that the Optionee was entitled to exercise such Option as of the date of termination) but only within such period of time ending on the earlier of (i) the date three months following the termination of the Optionee's Continuous Service or (ii) the expiration of the term of the Option as set forth in the Stock Option Agreement.  Notwithstanding the foregoing, if the termination of Continuous Service is by the Corporation for Cause, all outstanding Options (whether or not vested) shall immediately terminate and cease to be exercisable.  Further, if an Optionee's employment or service relationship with the Corporation is suspended pending an investigation of whether the Optionee shall be terminated for Cause, the right of the Optionee to exercise any vested Options shall be suspended during the period of investigation.  If any facts that would constitute termination for Cause are discovered after the termination of Continuous Service of the Optionee, the right of the Optionee to exercise any vested Options shall be immediately terminated.

(g) **Basic Term**.  The Stock Option Agreement shall specify the term of the Option. The term shall not exceed 10 years from the date of grant, and in the case of an ISO a shorter term may be required by Section 3(b).  Subject to the preceding sentence, the Board in its sole discretion shall determine when an Option is to expire.  A Stock Option Agreement may provide for expiration prior to the end of its term in the event of the termination of the Optionee's Service.

(h) **Nontransferability**.  No Option or interest therein may be transferred, assigned, pledged or hypothecated by the Optionee, whether by operation of law or otherwise, or be made subject to execution, attachment or similar process.

(i) **No Rights as a Shareholder**.  An Optionee shall have no rights as a shareholder with respect to any Shares covered by the Optionee's Option until such person becomes entitled to receive such Shares by filing a notice of exercise and paying the Exercise Price pursuant to the terms of such Option.

(j) **Modification, Extension and Assumption of Options**.  Within the limitations of the Plan and Code section 409A, the Board may modify, extend or approve the assumption or cancellation of outstanding Options (whether granted by the Corporation or another issuer) in return for the grant of new Options for the same or a different number of Shares and at the same or a different Exercise Price.  The foregoing notwithstanding, no modification of an Option shall, without the consent of the Optionee, impair the Optionee's rights or increase the Optionee's obligations under such Option or subject the Option to the requirements of Code Section 409A.

(k) **Restrictions on Transfer of Shares**.  Any Shares issued upon exercise of an Option shall be subject to such special forfeiture conditions, rights of repurchase, rights of first refusal and other transfer restrictions as the Board may determine.  Such restrictions shall be set

C & K Market, Inc. 2014 Stock Incentive Plan
Page 4

EXHIBIT 1
Page 4 of 10

EXHIBIT 1
Page 51 of 88

forth in the applicable Stock Option Agreement and shall apply in addition to any restrictions that may apply to holders of Shares generally under the Corporation's Bylaws or otherwise.

**Section 7.    Payment for Shares**.

(a)    **General Rule**.  The entire Purchase Price or Exercise Price of Shares issued under the Plan shall be payable in cash or cash equivalents at the time such Shares are purchased, except as otherwise provided in this <u>Section 7</u>.

(b)    **Surrender of Stock**.  To the extent that a Stock Option Agreement so provides, all or any part of the Exercise Price may be paid by surrendering, or attesting to the ownership of, Shares that are already owned by the Optionee.  Such Shares shall be surrendered to the Corporation in good form for transfer and shall be valued at their Fair Market Value on the date the Option is exercised.  The Optionee shall not surrender, or attest to the ownership of, Shares in payment of the Exercise Price if such action would cause the Corporation to recognize compensation expense (or additional compensation expense) with respect to the Option for financial reporting purposes.

(c)    **Services Rendered**.  At the discretion of the Board, Shares may be awarded under the Plan in consideration of services rendered to the Corporation, a Parent or a Subsidiary prior to the award.  At the discretion of the Board, Shares may also be awarded under the Plan in consideration of services to be rendered to the Corporation, a Parent or a Subsidiary after the award.

(d)    **Promissory Note**.  To the extent that a Stock Option Agreement or Restricted Stock Agreement so provides, all or a portion of the Exercise Price or Purchase Price (as the case may be) of Shares issued under the Plan may be paid with a full-recourse promissory note.  The Shares shall be pledged as security for payment of the principal amount of the promissory note and interest thereon.  The interest rate payable under the terms of the promissory note shall not be less than the minimum rate (if any) required to avoid the imputation of additional interest under the Code.  Subject to the foregoing, the Board (in its sole discretion) shall specify the term, interest rate, amortization requirements (if any) and other provisions of such note.

(e)    **Exercise/Sale**.  To the extent that a Stock Option Agreement so provides, and if Stock is publicly traded, payment may be made all or in part by the delivery (on a form prescribed by the Corporation) of an irrevocable direction to a securities broker approved by the Corporation to sell Shares and to deliver all or part of the sales proceeds to the Corporation in payment of all or part of the Exercise Price and any withholding taxes.

(f)    **Exercise/Pledge**.  To the extent that a Stock Option Agreement so provides, and if Stock is publicly traded, payment may be made all or in part by the delivery (on a form prescribed by the Corporation) of an irrevocable direction to pledge Shares to a securities broker or lender approved by the Corporation, as security for a loan, and to deliver all or part of the loan proceeds to the Corporation in payment of all or part of the Exercise Price and any withholding taxes.

(g)    **Net Exercise**.  To the extent that a Stock Option Agreement so provides, payment may be made all or in part by the withholding by the Corporation as payment of the Exercise

C & K Market, Inc. 2014 Stock Incentive Plan
Page 5

EXHIBIT 1
Page 5 of 10

EXHIBIT 1
Page 52 of 88

Price of the number of Shares otherwise issuable upon exercise of the Option that have a current Fair Market Value equal to the aggregate Exercise Price of the Option (or portion thereof) being exercised.

**Section 8.    Change in Control**.  The Board may, in its discretion, provide for any one or more of the following in connection with a Change in Control:

(a)    **Accelerated Vesting**.  The Board may, in its discretion, take such actions as it deems appropriate to provide for the acceleration of the exercisability, vesting and/or settlement in connection with such Change in Control of each or any outstanding Award or portion thereof and Shares acquired pursuant thereto.

(b)    **Assumption, Continuation or Substitution**.    The surviving, continuing, successor, or purchasing corporation or other business entity or parent thereof, as the case may be (the "**Acquiror**"), may, without the consent of any Grantee or Optionee, either assume or continue the Corporation's rights and obligations under each or any Award or portion thereof outstanding immediately prior to the Change in Control or substitute for each or any such outstanding Award or portion thereof a substantially equivalent award with respect to the Acquiror's stock, as applicable.

(c)    **Cash-Out of Awards**.  The Board may, in its discretion and without the consent of any Grantee or Optionee, determine that, upon the occurrence of a Change in Control, each or any Award or a portion thereof outstanding immediately prior to the Change in Control and not previously exercised or settled shall be canceled in exchange for a payment with respect to each vested Share (and each unvested Share, if so determined by the Board) of Stock subject to such canceled Award in (i) cash, (ii) stock of the Corporation or of a corporation or other business entity a party to the Change in Control, or (iii) other property which, in any such case, shall be in an amount having a Fair Market Value equal to the Fair Market Value of the consideration to be paid per share of Stock in the Change in Control, reduced by the exercise or purchase price per share, if any, under such Award.  If any portion of such consideration may be received by holders of Stock pursuant to the Change in Control on a contingent or delayed basis, the Board may, in its sole discretion, determine such Fair Market Value per share as of the time of the Change in Control on the basis of the Board's good faith estimate of the present value of the probable future payment of such consideration. In the event such determination is made by the Board, the amount of such payment (reduced by applicable withholding taxes, if any) shall be paid to Optionees in respect of the vested portions of their canceled Awards as soon as practicable following the date of the Change in Control and in respect of the unvested portions of their canceled Awards in accordance with the vesting schedules applicable to such Awards.

**Section 9.    Adjustment of Shares**.

(a)    **General**.  In the event of a subdivision of the outstanding Stock, a declaration of a dividend payable in Shares, a declaration of an extraordinary dividend payable in a form other than Shares in an amount that has a material effect on the Fair Market Value of the Stock, a combination or consolidation of the outstanding Stock into a lesser number of Shares, a recapitalization, a spin-off, a reclassification or a similar occurrence, the Board shall make appropriate adjustments in one or more of:  (i) the number of Shares available for future grants

C & K Market, Inc. 2014 Stock Incentive Plan
Page 6

EXHIBIT 1
Page 6 of 10

EXHIBIT 1
Page 53 of 88

under Section 4; (ii) the number of Shares covered by each outstanding Option; and (iii) the Exercise Price under each outstanding Option.

(b)    **Reservation of Rights**.  Except as provided in this Section 9, an Optionee or Grantee shall have no rights by reason of:  (i) any subdivision or consolidation of shares of stock of any class; (ii) the payment of any dividend; or (iii) any other increase or decrease in the number of shares of stock of any class.  Any issuance by the Corporation of shares of stock of any class, or securities convertible into shares of stock of any class, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number or Exercise Price of Shares subject to an Option.  The grant of an Option pursuant to the Plan shall not affect in any way the right or power of the Corporation to make adjustments, reclassifications, reorganizations or changes of its capital or business structure, to merge or consolidate or to dissolve, liquidate, sell or transfer all or any part of its business or assets.

## Section 10.    Securities Law Requirements.

Shares shall not be issued under the Plan unless the issuance and delivery of such Shares comply with (or are exempt from) all applicable requirements of law, including (without limitation) the Securities Act of 1933, as amended, the rules and regulations promulgated thereunder, state securities laws and regulations, and the regulations of any stock exchange or other securities market on which the Corporation's securities may then be traded.

## Section 11.    No Retention Rights.

Nothing in the Plan or in any right or Option granted under the Plan shall confer on the Grantee or Optionee any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Corporation (or any Parent or Subsidiary employing or retaining the Grantee or Optionee) or of the Grantee or Optionee, which rights are hereby expressly reserved by each, to terminate the Grantee's or the Optionee's Service at any time and for any reason, with or without cause.

## Section 12.    Duration and Amendments.

(a)    **Term of the Plan**.  The Plan, as set forth herein, shall become effective as set forth in Section 14.  In the event that the shareholders fail to approve the Plan within 12 months after its effective date, any grants of ISOs that have already occurred shall be rescinded, and no additional grants of ISOs shall be made thereafter under the Plan.  The Plan shall terminate automatically 10 years after the effective date of this Plan and may be terminated on any earlier date pursuant to Section 12(b).

(b)    **Right to Amend or Terminate the Plan**.  The Board may amend, suspend or terminate the Plan at any time and for any reason; provided, however, that any amendment of the Plan which increases the number of Shares available for issuance under the Plan (except as provided in Section 9), or which materially changes the class of persons who are eligible for the grant of ISOs, shall be subject to the approval of the Corporation's shareholders.  Shareholder approval shall not be required for any other amendment of the Plan.

C & K Market, Inc. 2014 Stock Incentive Plan
Page 7

EXHIBIT 1
Page 7 of 10

EXHIBIT 1
Page 54 of 88

(c)    **Effect of Amendment or Termination**.  No Shares shall be issued or sold under the Plan after the termination thereof, except upon exercise of an Option granted prior to such termination.  The termination of the Plan, or any amendment thereof, shall not affect any Share previously issued or any Option previously granted under the Plan.

**Section 13.    Definitions.**

(a)    "**Award**" means any right granted under the Plan, including an Option or award of Shares.

(b)    "**Affiliate**" means any entity in which, directly or indirectly through one or more intermediaries, the Corporation has a controlling interest or is controlled by; provided, however, for purposes of any grant of an Incentive Stock Option, "**Affiliate**" means a corporation which, for purposes of Section 424 of the Code, is a parent or subsidiary of the Corporation, directly or indirectly.

(c)    "**Board**" shall mean the Board of Directors of the Corporation, as constituted from time to time.

(d)    "**Cause**" shall mean:

(i)    With respect to any Employee or Consultant: (1) the unauthorized use or disclosure of the confidential information or trade secrets of the Corporation or an Affiliate; (2) indictment of, conviction of, or plea of guilty or no contest to, a felony, under the laws of the United States or any state thereof; (3) gross negligence; (4) conduct that results in or is reasonably likely to result in harm to the reputation or business of the Corporation or any of its Affiliates; or (5) continued failure to perform assigned duties after receiving written notification from the Corporation.

(ii)    With respect to any Outside Director, a determination by a majority of the disinterested Board members that the Outside Director has engaged in any of the following: (1) malfeasance in office; (2) gross misconduct or neglect; (3) false or fraudulent misrepresentation inducing the Outside Director's appointment; (4) wilful conversion of corporate funds; or (5) repeated failure to participate in Board meetings on a regular basis despite having received proper notice of the meetings in advance.

The Board, in its absolute discretion, shall determine the effect of all matters and questions relating to whether a party has been discharged for Cause.

(e)    "**Change in Control**" shall mean:

(i)    The consummation of a merger or consolidation of the Corporation with or into another entity or any other corporate reorganization, if more than 50% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after such merger, consolidation or other reorganization is owned by persons who were not shareholders of the Corporation immediately prior to such merger, consolidation or other reorganization; or

C & K Market, Inc. 2014 Stock Incentive Plan
Page 8

EXHIBIT 1
Page 8 of 10

EXHIBIT 1
Page 55 of 88

(ii)     The sale, transfer or other disposition of all or substantially all of the Corporation's assets.

A transaction shall not constitute a Change in Control if its sole purpose is to change the state of the Corporation's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Corporation's securities immediately before such transaction.

(f)     "**Code**" shall mean the Internal Revenue Code of 1986, as amended.

(g)     "**Committee**" shall mean a committee of the Board, as described in <u>Section 2(a)</u>.

(h)     "**Continuous Service**" means that the Optionee or Grantee's Service with the Corporation or an Affiliate, whether as an Employee, Consultant or Outside Director, is not interrupted or terminated. The Optionee or Grantee's Continuous Service shall not be deemed to have terminated merely because of a change in the capacity in which the person renders service to the Corporation or an Affiliate as an Employee, Consultant or Outside Director or a change in the entity for which the Optionee renders such service; <u>provided</u>, that there is no interruption or termination of the Optionee's Continuous Service. The Board or its delegate, in its sole discretion, may determine whether Continuous Service shall be considered interrupted in the case of any leave of absence approved by that party, including sick leave, military leave or any other personal or family leave of absence.

(i)     "**Employee**" shall mean any individual who is a common-law employee of the Corporation, a Parent or a Subsidiary.

(j)     "**Exercise Price**" shall mean the amount for which one Share may be purchased upon exercise of an Option, as specified by the Board in the applicable Stock Option Agreement.

(k)     "**Fair Market Value**" shall mean the fair market value of a Share, as determined by the Board in good faith (but in any event not less than fair market value within the meaning of Code Section 409A).  Such determination shall be conclusive and binding on all persons.

(l)     "**Grantee**" shall mean an individual to whom the Board has granted the right to acquire Shares under the Plan (other than upon exercise of an Option).

(m)     "**ISO**" shall mean an employee incentive stock option described in Section 422(b) of the Code.

(n)     "**Nonstatutory Option**" shall mean a stock option not described in Section 422(b) or 423(b) of the Code.

(o)     "**Option**" shall mean an ISO or Nonstatutory Option granted under the Plan and entitling the holder to purchase Shares.

(p)     "**Optionee**" shall mean an individual who holds an Option.

(q)     "**Outside Director**" shall mean a member of the Board who is not an Employee.

C & K Market, Inc. 2014 Stock Incentive Plan
Page 9

EXHIBIT 1
Page 9 of 10

EXHIBIT 1
Page 56 of 88

(r)      "**Parent**" shall mean any corporation (other than the Corporation) in an unbroken chain of corporations ending with the Corporation, if each of the corporations other than the Corporation owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.  A corporation that attains the status of a Parent on a date after the adoption of the Plan shall be considered a Parent commencing as of such date.

(s)      "**Plan**" shall mean this C & K Market, Inc. 2014 Stock Incentive Plan.

(t)      "**Purchase Price**" shall mean the consideration for which one Share may be acquired under the Plan (other than upon exercise of an Option), as specified by the Board.

(u)      "**Restricted Stock Agreement**" shall mean the agreement between the Corporation and a Grantee who acquires Shares under the Plan which contains the terms, conditions and restrictions pertaining to the acquisition of such Shares.

(v)      "**Service**" shall mean service as an Employee, Outside Director or Consultant.

(w)      "**Share**" shall mean one share of Stock, as adjusted in accordance with <u>Section 9</u> (if applicable).

(x)      "**Stock**" shall mean the Common Stock, no par value, of the Corporation.

(y)      "**Stock Option Agreement**" shall mean the agreement between the Corporation and an Optionee which contains the terms, conditions and restrictions pertaining to the Optionee's Option.

(z)      "**Subsidiary**" means any corporation (other than the Corporation) in an unbroken chain of corporations beginning with the Corporation, if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.  A corporation that attains the status of a Subsidiary on a date after the adoption of the Plan shall be considered a Subsidiary commencing as of such date.

**Section 14.      Effectiveness**.

The Plan shall become effective upon confirmation of the Corporation's Plan of Reorganization by the bankruptcy court in the U.S. Bankruptcy Court District of Oregon, Case No. 13-64561-fra11.

034518/00017/5439859v4

C & K Market, Inc. 2014 Stock Incentive Plan
Page 10

EXHIBIT 1
Page 10 of 10

EXHIBIT 1
Page 57 of 88

# EXHIBIT 2 TO SECOND AMENDED PLAN OF REORGANIZATION

## SECOND AMENDED AND RESTATED ARTICLES OF INCORPORATION

EXHIBIT 1
Page 58 of 88

# C & K MARKET, INC.

## SECOND AMENDED AND RESTATED ARTICLES OF INCORPORATION

These Second Amended and Restated Articles of Incorporation (as amended from time to time, the "Articles") supersede the existing Amended and Restated Articles of Incorporation of C & K Market, Inc. and all amendments thereto.

## ARTICLE 1

The name of the corporation is C & K Market, Inc. (the "Corporation").

## ARTICLE 2

The purpose of the Corporation is to engage in any lawful business or activity for which corporations may be organized under the Oregon Business Corporation Act, as amended from time to time (the "OBCA").

## ARTICLE 3

A.     The Corporation is authorized to issue shares of two classes of stock:

(1)     Twenty-five million (25,000,000) shares of common stock, with no par value (the "Common Stock"); and

(2)     Ten million (10,000,000) shares of preferred stock, with no par value (the "Preferred Stock").

B.     Holders of Common Stock are entitled to one vote per share on any matter submitted to the holders of Common Stock. On dissolution of the Corporation, after any preferential amount with respect to the Preferred Stock has been paid or set aside, the holders of Common Stock and the holders of any series of Preferred Stock entitled to participate in the distribution of assets are entitled to receive the net assets of the Corporation.

C.     The Board of Directors of the Corporation (the "Board") is authorized, subject to limitations prescribed in the OBCA, and by the provisions of this Article 3, to provide for the issuance of additional shares of Preferred Stock in series (in addition to the Series A Preferred Stock identified in Article 3.D), to establish from time to time the number of shares to be included in each Series and to determine the designations, relative rights, preferences and limitations of the shares of each series. The authority of the Board with respect to each series includes determination of the following:

(1)     The number of shares in and the distinguishing designation of that series;

(2)     Whether shares of that series shall have full, special, conditional or limited voting rights, except to the extent otherwise provided by the OBCA;

EXHIBIT 2
Page 1 of 8

EXHIBIT 1
Page 59 of 88

(3)     Whether shares of that series shall be convertible and the terms and conditions of the conversion, including provision for adjustment of the conversion rate in circumstances determined by the Board;

(4)     Whether shares of that series shall be redeemable and the terms and conditions of redemption, including the date or dates upon or after which they shall be redeemable and the amount per share payable in case of redemption, which amount may vary under different conditions or at different redemption dates;

(5)     The dividend rate, if any, on shares of that series, the manner of calculating any dividends and the preferences of any dividends;

(6)     The rights of shares of that series in the event of voluntary or involuntary dissolution of the Corporation and the rights of priority of that series relative to the Common Stock and any other series of Preferred Stock on the distribution of assets on dissolution; and

(7)     Any other rights, preferences and limitations of that series that are permitted by law to vary.

D.     The rights, preferences, privileges, restrictions and other matters relating to the Corporation's Series A Preferred Stock, no par value (the "Series A Preferred Stock"), are as follows:

(1)     **Designation and Amount**.   Seven million (7,000,000) shares of the Corporation's authorized Preferred Stock are hereby designated as Series A Preferred Stock.

(2)     **Dividend Provisions**.  The holders of shares of Series A Preferred Stock shall be entitled to receive dividends, out of any assets legally available therefor, prior and in preference to any declaration or payment on the Common Stock when, as and if declared by the Board.  Dividends may not be declared or paid with respect to shares of Common Stock so long as any shares of Series A Preferred Stock remain issued and outstanding, except as provided in Article 3.D(7)(a).

(3)     **Liquidation.**

(a)     **Preference**.  In the event of any Liquidation (defined below), subject to the rights of any series of Preferred Stock that may from time to time come into existence, the holders of the Series A Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any of the assets of the Corporation to the holders of Common Stock by reason of their ownership thereof, an amount equal to $5.00 per share (as adjusted for stock splits, stock dividends, reclassification and the like) for each share of Series A Preferred Stock then held by them, plus declared but unpaid dividends, if any (the "Liquidation Preference").  If, upon the occurrence of such event, the assets and funds thus distributed among the holders of the Series A Preferred Stock shall be insufficient to permit the payment to such holders of the full Liquidation Preference, the entire assets and funds of the Corporation legally available for distribution shall be

EXHIBIT 2
Page 2 of 8

EXHIBIT 1
Page 60 of 88

distributed ratably among the holders of the Series A Preferred Stock in proportion to the preferential amount each such holder is otherwise entitled to receive.

(b)    **Liquidation Definition**.  For purposes of these Articles, the term "Liquidation" means the liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary.  Additionally, the term Liquidation shall include, unless otherwise agreed by the holders of a majority of the then issued and outstanding Series A Preferred Stock, (i) the consummation of a merger or consolidation of the Corporation with or into another entity or any other corporate reorganization, if more than 50% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after such merger, consolidation or other reorganization is owned by persons who were not shareholders of the Corporation immediately prior to such merger, consolidation or other reorganization; or (ii) the sale, transfer or other disposition of all or substantially all of the Corporation's assets; provided, that a transaction shall not constitute a Liquidation under subclause (i) of this Article 3.D(3)(b) if its sole purpose is to change the state of the Corporation's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Corporation's securities immediately before such transaction.

(4)    **No Conversion or Participation Rights**.  The Series A Preferred Stock shall not be convertible into any other equity security, including any security convertible into or exercisable for any equity security, of the Corporation.  Upon any Liquidation, holders of Series A Preferred Stock shall be entitled to receive only the Liquidation Preference with respect to their shares of Series A Preferred Stock and shall not be entitled to participate in the distribution of any other assets from the Corporation.

(5)    **Voting Rights**.  Except as expressly provided by these Articles or as otherwise required by law, the holders of Series A Preferred Stock shall have the same voting rights as the holders of Common Stock and shall be entitled to notice of any shareholders' meeting in accordance with the Bylaws of the Corporation, and the holders of Common Stock and the Series A Preferred Stock shall vote together as a single voting group on all matters.  Each holder of Series A Preferred Stock shall be entitled to one vote for each share of Series A Preferred Stock held.  Without limiting the foregoing sentence, the holders of Common Stock and Series A Preferred Stock shall vote together as a single voting group with respect to any matters relating to any Liquidation transaction or a Major Corporate Event (as defined in the Bylaws of the Corporation) submitted to the shareholders of the Corporation for a vote.

(6)    **Redemption Rights**.

(a)    **Optional Redemption**.  The Corporation shall have the right at any time, and from time to time, to redeem any or all of the Series A Preferred Stock, out of funds legally available therefor, for an amount per share equal to the Liquidation Preference.  Any partial redemption of Series A Preferred Stock shall be made ratably among the holders of the Series A Preferred Stock in proportion to the number of shares of Series A Preferred Stock held by each such holder.

EXHIBIT 2
Page 3 of 8

EXHIBIT 1
Page 61 of 88

(b) **Mandatory Redemption**.   On July 1, 2024 (the "Mandatory Redemption Date"), the Corporation shall redeem, out of funds legally available therefor, all outstanding shares of Series A Preferred Stock, by paying therefor an amount per share equal to the Liquidation Preference.

(c) **Notice of Redemption**.  Notice of any redemption of shares of Series A Preferred Stock pursuant to Article 3.D(6)(a) or (b) shall be given by notice to each registered holder of Series A Preferred Stock not fewer than 30 days prior to the date fixed for redemption (a "Redemption Notice"), at such holder's address as it appears on the transfer books of the Corporation.  In order to facilitate the redemption of Series A Preferred Stock, the Board may fix a record date for the determination of Series A Preferred Stock to be redeemed, or may cause the transfer books of the Corporation for the Series A Preferred Stock to be closed, not more than 60 days nor fewer than 30 days prior to the date fixed for such redemption.

(d) **Cancellation of Series A Preferred Stock**.  Once a Redemption Notice has been given in respect of shares of Series A Preferred Stock to be redeemed pursuant to Article 3.D(6)(c), and notwithstanding that any certificates for such shares shall not have been surrendered for cancellation, from and after the date of redemption designated in the Redemption Notice, (i) the shares of Series A Preferred Stock represented thereby shall no longer be deemed outstanding, and (ii) all rights of the holders of Series A Preferred Stock to be redeemed shall cease and terminate, excepting only the right to receive an amount per share equal to the Liquidation Preference.  All shares of Series A Preferred Stock redeemed by the Corporation shall be cancelled, shall not be re-issuable by the Corporation, and shall be eliminated from the shares of capital stock the Corporation is authorized to issue.

(e) **Senior Lender Default**.  Notwithstanding any other provision of these Articles, the Corporation may not redeem any shares of Series A Preferred Stock under this Article 3.D(6) if any Senior Lender Default has occurred and is continuing (or would result therefrom) until such redemption is permitted under the terms of the Senior Debt subject to the Senior Lender Default.  For purposes of these Articles, "Senior Lender Default" means any uncured or unwaived default by the Corporation under any loan agreement governing Senior Debt, which default permits the lender to accelerate the maturity of the indebtedness owed under such loan agreement.  For purposes of these Articles, "Senior Debt" means indebtedness of the Corporation for borrowed money in an aggregate principal amount in excess of $5,000,000.

(f) **Deferral of Mandatory Redemption Date**.  If the Corporation cannot legally redeem, or is prevented by Article 3.D(6)(e) from redeeming, all of the Series A Preferred Stock on the Mandatory Redemption Date, the Corporation shall redeem all of the shares of Series A Preferred Stock on the Mandatory Redemption Date that it can redeem under this Article 3.D(6), and shall continue redeeming the remaining Series A Preferred Stock at the earliest possible date or dates thereafter on which the Corporation can redeem shares of Series A Preferred Stock under this Article 3.D(6).  If the Corporation cannot redeem all shares of Series A Preferred Stock on the Mandatory Redemption Date, or such subsequent date or dates as redemptions shall occur, all partial

EXHIBIT 2
Page 4 of 8

EXHIBIT 1
Page 62 of 88

redemptions shall be made ratably among the holders of the Series A Preferred Stock in proportion to the number of shares of Series A Preferred Stock then held by each such holder.

(7)    **Protective Provisions**.

    (a)    So long as at least twenty-five percent (25%) of the originally issued shares of Series A Preferred Stock remain outstanding (as adjusted for stock splits, stock dividends, reclassification and the like), the Corporation shall not without first obtaining the approval (by vote or written consent, as provided by law) of the holders of a majority of the then outstanding shares of Series A Preferred Stock, voting together as a separate voting group:

    (i)    Declare or pay any dividend (payable other than in Common Stock or other securities and rights convertible into or entitling the holder thereof to receive, directly or indirectly, additional shares of Common Stock) on any shares of Common Stock;

    (ii)    Alter or change the rights, preferences or privileges of the shares of Series A Preferred Stock so as to affect adversely the shares of such series;

    (iii)    Increase or decrease the total number of authorized shares of Series A Preferred Stock;

    (iv)    Authorize or issue, or obligate itself to issue, any other equity security, including any security (other than Series A Preferred Stock) convertible into or exercisable for any equity security, having a preference over, or being on a parity with, the Series A Preferred Stock with respect to voting, dividends, redemption or upon liquidation;

    (v)    Redeem, purchase or otherwise acquire (or pay into or set funds aside for a sinking fund for such purpose) any share or shares of Preferred Stock (other than Series A Preferred Stock pursuant to Article 3.D(6)) or Common Stock; provided, however, that this restriction shall not apply to the repurchase of shares of Common Stock from employees, officers, directors, consultants or other persons performing services for the Corporation or any subsidiary pursuant to written agreements under which the Corporation has the option to repurchase such shares at the original purchase price of such shares (or a lower price) upon the occurrence of certain events, such as the termination of employment; or

    (vi)    Alter or change the Corporation's 2014 Stock Incentive Plan to include shares other than shares of the Common Stock of the Corporation.

EXHIBIT 2
Page 5 of 8

EXHIBIT 1
Page 63 of 88

(b)    So long as at least twenty-five percent (25%) of the shares of Series A Preferred Stock remain outstanding (as adjusted for stock splits, stock dividends, reclassification and the like), the Corporation shall not without first obtaining the approval (by vote or written consent, as provided by law) of the holders of at least eighty percent (80%) of the then outstanding shares of Series A Preferred Stock, voting together as a separate voting group:

(i)    Decrease the Liquidation Preference of the Series A Preferred Stock;

(ii)    Alter or change the "Tag Along Rights" set forth in the Corporation's Bylaws; or

(iii)    Amend this Article 3.D(7).

## ARTICLE 4

In addition to any other method provided for in the Corporation's Bylaws, the shareholders of the Corporation may act by written consent without a meeting if (a) the action is taken by shareholders having not less than the minimum number of votes that would be necessary to take such action at a meeting at which all shareholders entitled to vote on the action were present and voted, and (b) the written consent is delivered to the Corporation for inclusion in the minutes or filing with the corporate records.  The Corporation must give written notice of any action taken pursuant to this Article 3 to all shareholders who did not sign the written consent.  The notice provided to such shareholders must contain or be accompanied by any information required by ORS 60.211 or any other applicable provision of the OBCA.

## ARTICLE 5

The Corporation elects to waive preemptive rights, and no shareholder of the Corporation shall have any preemptive or other first right to acquire any treasury or additional shares of stock or other securities of the Corporation, either presently authorized or to be authorized.

## ARTICLE 6

No shareholder shall have the right to cumulative voting.

## ARTICLE 7

A.    The Corporation shall indemnify to the fullest extent permitted by law any person who is, after the effective date of these Second Amended and Restated Articles (the "Effective Date"), made or threatened to be made a party to, witness in, or otherwise involved in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative, or otherwise (including an action, suit or proceeding by or in the right of the Corporation) by reason of the fact that the person is or was, whether before, on or after the Effective Date, a director or executive officer of the Corporation or a fiduciary within the meaning of the Employee Retirement Income Security Act of 1974 with respect to any

EXHIBIT 2
Page 6 of 8

EXHIBIT 1
Page 64 of 88

employee benefit plan of the Corporation, or serves or served at the request of the Corporation as a director, officer, employee or agent or as a fiduciary of an employee benefit plan, of another corporation, partnership, joint venture, trust, or other enterprise; provided, that the foregoing indemnification shall only apply to directors, executive officers or fiduciaries of the Corporation in office as of the Effective Date, and to directors, executive officers and fiduciaries of the Corporation elected or appointed after the Effective Date.  The Corporation may indemnify to the fullest extent permitted by law any person who is made or threatened to be made a party to, witness in, or otherwise involved in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative, or otherwise (including an action, suit or proceeding by or in the right of the Corporation) by reason of the fact that the person is or was a non-executive officer, employee or agent of the Corporation.   Any indemnification provided pursuant to this Article 7 (any person so indemnified, an "Indemnitee") will not be exclusive of any rights to which the person indemnified may otherwise be entitled under any provision of the Corporation's bylaws or any agreement, statute, policy of insurance, vote of shareholders or board of directors, or otherwise. Expenses that may be subject to indemnification hereunder shall be paid in advance of the final disposition of the action, suit or proceeding to the full extent permitted by law, subject to the Corporation's receipt of any undertaking required thereby.  For purposes of this Article 7, the term "executive officer" means any officer of the Corporation who performs executive functions for the Corporation or is designated as an executive officer by the Board when such officer is appointed to his or her office.

B.      If a claim by an Indemnitee is not paid in full within thirty (30) days after a written claim has been received by the Corporation, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the Indemnitee also shall be entitled to be paid the expense of prosecuting such claim.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been provided to the Corporation) that the Indemnitee has not met the standards of conduct that make it permissible under the OBCA for the Corporation to indemnify the Indemnitee for the amount claimed, but the burden of proving such defense shall be on the Corporation.  Neither the failure of the Corporation to have made a determination prior to the commencement of such action that indemnification of the Indemnitee is proper under the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the OBCA, nor an actual determination by the Corporation that the Indemnitee has not met such standard of conduct shall be a defense to the action or create a presumption that the Indemnitee has not met the applicable standard of conduct.

C.      The provisions of this Article 7 shall be deemed to constitute a contract between the Corporation and each Indemnitee who serves in such Indemnitee's capacity as a director, executive officer or fiduciary at any time while this Article 7 and the relevant provisions of the OBCA are in effect, and each such Indemnitee shall be deemed to be serving as such in reliance on the provisions of this Article 7, and any repeal of any such provisions or of this Article 7 shall not affect any rights or obligations then existing with respect to any state of facts then or theretofore existing or any action, suit or proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

EXHIBIT 2
Page 7 of 8

EXHIBIT 1
Page 65 of 88

D.      Neither any amendment nor repeal of this <u>Article 7</u> nor the adoption of any provision of the Articles which is inconsistent with this <u>Article 7</u> shall eliminate or reduce the effect of this <u>Article 7</u> in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this <u>Article 7</u>, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

E.      To the fullest extent permitted by law, no director of the Corporation in office on or after the Effective Date will be personally liable to the Corporation or its shareholders for monetary damages for conduct as a director.  Without limiting the generality of the preceding, if after this <u>Article 7</u> becomes effective the Oregon Revised Statutes are amended to authorize corporate action further eliminating or limiting the personal liability of directors of the Corporation in office on or after the Effective Date, then the liability of such directors will be eliminated or limited to the fullest extent permitted by the Oregon Revised Statutes, as so amended.  No amendment or repeal of this <u>Article 7</u>, nor the adoption of any provision of these Second Amended and Restated Articles of Incorporation inconsistent with this <u>Article 7</u>, nor a change in the law will adversely affect any right or protection that is based upon this <u>Article 7</u>.E and that pertains to conduct that occurred prior to the time of such amendment, repeal, adoption or change.  No change in the law will reduce or eliminate the rights and protections set forth in this <u>Article 7</u>.E unless the change in the law specifically requires such reduction or elimination.

034518/00017/5514410v2

EXHIBIT 2
Page 8 of 8

EXHIBIT 1
Page 66 of 88

# EXHIBIT 3 TO SECOND AMENDED PLAN OF REORGANIZATION

## SECOND AMENDED AND RESTATED BYLAWS

EXHIBIT 1
Page 67 of 88

## SECOND AMENDED AND RESTATED BYLAWS OF
## C & K MARKET, INC.

These Second Amended and Restated Bylaws (the "Bylaws") amend and restate in their entirety the Amended and Restated Bylaws of C & K Market, Inc., an Oregon corporation (the "Corporation").

**1.**    <u>**Offices**</u>.

1.1.    <u>Principal Office</u>.  The principal office of the Corporation shall be located in the state of Oregon at such location as designated from time to time by the Board of Directors (the "Board").  The Corporation may have such other offices, in or out of the state of Oregon, as the Board may designate or as the business of the Corporation may require from time to time.

1.2.    <u>Registered Office</u>.  The registered office of the Corporation to be maintained in the state of Oregon, may be, but need not be, identical with the principal office in the state of Oregon.  The address of the registered office may be changed from time to time by the Board upon compliance with the requirements of the Oregon Business Corporation Act, as amended from time to time (the "OBCA"), for change of the registered office.

**2.**    <u>**Shareholders**</u>.

2.1.    <u>Annual Meeting</u>.  A meeting of the shareholders shall be held in each year on the second Thursday in April, unless otherwise determined by the Board, for the purpose of electing directors and for the transaction of such other business as may come before the meeting.  The Board shall set the time and place for the meeting.  If the day fixed for the annual meeting is a legal holiday in the state of Oregon, the meeting shall be held on the next succeeding business day.  If the election of directors is not held on the day established herein for any annual meeting of the shareholders, or at any adjournment thereof, the Board shall cause the election to be held at a special meeting of the shareholders as soon thereafter as reasonably convenient.

2.2.    <u>Special Meetings</u>.  The Corporation shall hold a special meeting of shareholders upon the call of the chief executive officer of the Corporation or the Board, or if the holders of at least 15 percent of all votes entitled to be cast on any issue proposed to be considered at the proposed special meeting sign, date and deliver to the secretary of the Corporation one or more written demands for the meeting describing the purpose or purposes for which it is to be held.

2.3.    <u>Chairperson to Preside Over Meetings</u>.  The chair of the Board shall preside at each shareholder meeting.  In the absence of the chair of the Board, the chief executive officer of the Corporation shall preside as chairperson. In the absence of the chair of the Board, or the chief executive officer, as the case may be, the secretary of the Corporation shall preside as chairperson. The chairperson shall determine the order of business and shall have the authority to establish rules for the conduct of the meeting, subject to the other rules identified in the Bylaws.

2.4.    <u>Place of Meeting</u>.  Meetings of the shareholders shall be held at the principal office of the Corporation, or at any other place in or out of the state of Oregon which the Board may, from time to time, designate.

2.5.   <u>Notice of Meeting</u>.  Written or printed notice stating the place, day and hour of any shareholder meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 nor earlier than 60 days before the meeting date, at the direction of the chief executive officer or other persons calling the meeting, to each shareholder of record entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the shareholder at the address as it appears on the stock transfer books of the Corporation, postage prepaid.

2.6.   <u>Action Without a Formal Meeting</u>.  Action required or permitted by law to be taken at a shareholders meeting may be taken without a meeting if the action is taken by shareholders having not less than the minimum number of votes that would be necessary to take such action at a meeting at which all shareholders entitled to vote on the action were present and voted.  The action will be evidenced by one or more written consents describing the action taken, signed by those shareholders taking action under this <u>Section 2.6</u> and delivered to the secretary of the Corporation for inclusion in the minutes or filing with the corporate records.  Action taken under this <u>Section 2.6</u> is effective when the consent or consents bearing sufficient signatures are delivered to the Corporation, unless the consent or consents specify an earlier or later effective date.  If not otherwise determined by law, the record date for determining shareholders entitled to take action without a meeting under this <u>Section 2.6</u> is the date the first shareholder signs the consent.  A consent signed under this <u>Section 2.6</u> has the effect of a meeting vote and may be described as such in any document.

2.7.   <u>Establishing a Shareholder Record Date</u>.  For the purpose of determining shareholders entitled to notice of or to vote at any meeting of shareholders, or shareholders entitled to receive payment of any dividend, or in order to make a determination of shareholders for any other proper purpose, the Board may establish a record date.  The record date shall not be less than 10 or more than 70 days before the meeting or action requiring a determination of shareholders.  If no record date is fixed for the determination of shareholders entitled to notice of a meeting, or shareholders entitled to receive payment of a dividend, the day immediately before the date on which notice of the meeting is mailed or the date on which the resolution of the Board declaring such dividend is adopted, as the case may be, shall be the record date for such determination of shareholders.  When a determination of shareholders entitled to vote at any meeting of shareholders has been made as provided in this paragraph, such determination shall apply to any adjournment thereof unless a court fixes a new record date pursuant to the OBCA.

2.8.   <u>Shareholder Voting Lists</u>.  The officer or agent having charge of the stock transfer books for shares of the Corporation shall make, no more than two business days after notice is given for each meeting of shareholders, a complete list of the shareholders entitled to vote at such meeting, or any adjournment thereof, which list shall be kept on file at the registered office of the Corporation and shall be subject to inspection by any shareholder at any time during usual business hours.  The original stock transfer books shall be prima facie evidence as to who are the shareholders entitled to examine such list or transfer books or to vote at any meeting of shareholders.  Failure to comply with this requirement of the Bylaws shall not affect the validity of any action taken at a shareholders meeting.

2.9.   <u>Quorum of Shareholders</u>.  Except as otherwise required by the Corporation's Articles of Incorporation, as amended from time to time (the "Articles"), or by applicable law, a

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 2

EXHIBIT 3
Page 2 of 18

EXHIBIT 1
Page 69 of 88

majority of the shares entitled to vote represented in person or by proxy shall constitute a quorum at a meeting of shareholders.  If a quorum is present, the affirmative vote of the majority of the shares represented at the meeting and entitled to vote on the subject matter shall be the act of the shareholders, except in the case of election of directors who shall be elected by a plurality of the votes cast at a meeting at which a quorum exists.  The shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum.  In the absence of a quorum, a majority of those present in person or represented by proxy may adjourn the meeting from time to time until a quorum exists.  Any business that might have been transacted at the original meeting may be transacted at the adjourned meeting if a quorum exists at the adjourned meeting.

2.10.  Proxies.  A shareholder may vote shares either in person or by proxy.  A shareholder may appoint a proxy to vote or otherwise act for the shareholder by signing an appointment form, either personally or by the shareholder's attorney-in-fact.  An appointment of a proxy is effective when received by the secretary or other officer or agent of the Corporation authorized to tabulate votes.  An appointment is valid for 11 months unless a longer period is expressly provided in the appointment form.  An appointment of a proxy is revocable by the shareholder unless the appointment form conspicuously states that it is irrevocable and the appointment is coupled with an interest.

2.11.  Voting of Shares.  Except as otherwise provided in the Articles or by applicable law, each outstanding share which has voting rights shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders.  No shareholder shall have the right to vote cumulatively.

2.12.  Voting of Shares by Certain Holders.  Shares held by an administrator, executor, guardian or conservator may be voted by the shareholder either in person or by proxy, without a transfer of such shares into the shareholder's name. Shares standing in the name of a trustee may be voted by the shareholder either in person or by proxy, but no trustee shall be entitled to vote shares held by the shareholder without a transfer of such shares into the shareholder's name. Shares standing in the name of a receiver may be voted by such receiver, and shares held by or under the control of a receiver may be voted by such receiver without the transfer thereof into the receiver's name if authority so to do be contained in an appropriate order of the court by which such receiver was appointed.  A shareholder whose shares are pledged shall be entitled to vote such shares until the shares have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares so transferred.  Shares of its own stock belonging to the Corporation or held by it in any fiduciary capacity shall not be voted, directly or indirectly, at any meeting, and shall not be counted in determining the total number of outstanding shares at any given time.

3.  **Board of Directors**.

3.1.  General Powers.  The business and affairs of the Corporation shall be managed by the Board.

3.2.  Number, Tenure, and Election.  The number of directors of the Corporation shall be not less than three nor more than seven; provided, that the Board is authorized to increase or

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 3

EXHIBIT 3
Page 3 of 18

EXHIBIT 1
Page 70 of 88

decrease the number of directors constituting the Board of Directors by action of a majority of the directors then serving, except that no director's term shall be shortened by virtue of a decrease in the number of directors constituting the Board of Directors. Directors shall be elected at the annual meeting of shareholders.

3.3.    Annual Meeting. An annual meeting of the Board shall be held without notice following the annual meeting of shareholders. The Board may provide, by resolution, the time and place, either within or without the state of Oregon, for the holding of additional regular meetings without notice thereof.

3.4.    Special Meetings. Special meetings of the Board may be called by or at the request of the chief executive officer of the Corporation or any two directors. The person or persons authorized to call special meetings of the Board may fix any place, either within or without the state of Oregon, as the place for holding any special meeting of the Board called by them.

3.5.    Notice. Notice of any special meeting shall be given at least two days prior to the scheduled date for such special meeting, either orally by telephone or in person, or by written notice delivered personally or mailed to each director at the director's address. If mailed, such notice shall be deemed to be delivered on the second day following deposit in the United States mail. Any director may waive notice of any meeting. Except as provided in the following sentence, the waiver must be in writing, signed by the director entitled to notice, specify the meeting for which notice is waived and be filed with the minutes or corporate records. The attendance of a director at a meeting shall constitute a waiver of notice of such meeting, except where a director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted nor the purpose of any special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

3.6.    Quorum. A majority of the number of directors in office immediately before the commencement of the meeting shall constitute a quorum for the transaction of business at any meeting of the Board.

3.7.    Manner of Acting. The act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board. Directors shall be deemed to be present at a regular or special meeting where all directors participating may simultaneously hear each other during the meeting, irrespective of whether or not they are present in the same location, as by a telephonic conference.

3.8.    Action Without a Formal Meeting. Unless the Articles or the Bylaws provide otherwise, action required or permitted to be taken under applicable law at a Board meeting may be taken without a meeting if the action is taken by all members of the Board. The action must be evidenced by one or more written consents describing the action taken, signed by each director, and included in the minutes or filed with the corporate records reflecting the action taken. Such action is effective when the last director signs the consent, unless the consent specifies an earlier or later effective date.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 4

EXHIBIT 3
Page 4 of 18

EXHIBIT 1
Page 71 of 88

3.9.    Vacancies.  Any vacancy occurring on the Board may be filled by the affirmative vote of the majority of the remaining directors.  If there is only one remaining director, the remaining director may appoint the person or persons required to fill any vacancies.  If there are no remaining directors, the vacancies occurring on the Board may be filled by the shareholders who would then be entitled to vote for the election of directors at an annual meeting of shareholders.  A director elected to fill a vacancy shall be elected for the unexpired term of that director's predecessor in office.

3.10.    Presumption of Assent.  A director of the Corporation who is present at a meeting of the Board at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless:

3.10.1. the director objects at the beginning of the meeting or promptly upon the director's arrival, to holding the meeting or transacting business at the meeting;

3.10.2. the director's dissent or abstention from the action taken is entered in the minutes of the meeting; or

3.10.3. the director delivers written notice of dissent or abstention to the presiding officer of the meeting before its adjournment or to the secretary of the Corporation immediately after adjournment of the meeting.  The right of dissent or abstention is not available to a director who votes in favor of the action taken.

3.11.    Removal.  A director may be removed by the affirmative vote of shareholders owning at least a majority of the issued voting shares of the Corporation.  A director may be removed by the shareholders only at a meeting called for the express purpose of removing the director and the meeting notice must state that the purpose, or that one of the purposes, of the meeting is removal of the director.

3.12.    Resignation.  Any director of the Corporation may resign at any time by giving written notice to the Corporation, to the Board, to the chair of the Board, to the chief executive officer, or to the secretary of the Corporation.  Any such resignation shall take effect at the time specified therein, or, if no time is specified therein, upon its acceptance by the Board.

**4.    Officers**.

4.1.    Number.  The officers of the Corporation shall be a chief executive officer, a president and a secretary, each of whom shall be appointed by the Board.  Other officers such as vice-president, treasurer and assistant officers may be appointed by the Board.

4.2.    Election and Term of Office.  The officers shall be appointed annually by the Board at the first meeting of the Board held after each annual meeting of the shareholders.  If the appointment of officers shall not be held at such meeting, such appointment shall be held as soon as practical thereafter.  Each officer shall hold office until that officer's successor shall have been duly appointed or until that officer's death or until the officer shall resign or shall have been removed in the manner provided in the Bylaws.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 5

EXHIBIT 3
Page 5 of 18

EXHIBIT 1
Page 72 of 88

4.3.    _Removal and Resignation_.  Any officer or agent appointed by the Board may be removed by the Board whenever in its judgment the best interests of the Corporation would be served thereby.  Any officer of the Corporation may resign at any time by giving written notice to the Corporation, to the Board, to the chair of the Board, to the chief executive officer, or to the secretary of the Corporation.  Any such resignation shall take effect at the time specified therein, or, if no time is specified, upon its acceptance by the Board.

4.4.    _Vacancies_.  A vacancy in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the Board for the unexpired portion of the term.

4.5.    _Salaries_.  The salaries of the officers shall be fixed from time to time by the Board and no officer shall be prevented from receiving such salary by reason of the fact that the officer is also a director of the Corporation.

4.6.    _Chair of the Board_.  The Board of Directors may elect a chair of the Board.  If such chair is elected, the chair shall preside at all meetings of the Board and of the shareholders, and shall perform such other duties as may be prescribed from time to time by the Board.

4.7.    _Chief Executive Officer_.  The chief executive officer shall be the principal executive officer of the Corporation and, subject to the control of the Board, shall in general supervise all of the business and affairs of the Corporation.  The chief executive officer shall preside at all meetings of the shareholders and of the Board where there is no chair of the Board.  The chief executive officer may sign, with such other officer, if any, as may be required by law or authorized by the Board, certificates for shares of the Corporation, any deeds, mortgages, bonds, contracts, or other instruments which are inherent in the authority of the office of the chief executive officer or which the Board has authorized  to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board or by the Bylaws to some other officer or agent of the Corporation, or shall be required by law to be otherwise signed or executed; and in general shall perform all duties incident to the office of chief executive officer and such other duties as may be prescribed by the Board.

4.8.    _President_.  In the absence of the chief executive officer or in the event of the chief executive officer's death, inability or refusal to act, the president shall perform the duties of the chief executive officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the chief executive officer.  The president may sign, with the secretary, certificates for shares of the Corporation; and shall perform such other duties as from time to time may be assigned to the president by the chief executive officer or by the Board.

4.9.    _Vice-President_.  In the absence of the president or in the event of the president's death, inability or refusal to act, the vice-president (or in the event there be more than one vice-president, the vice-presidents in the order designated at the time of their election, or in the absence of any designation, then in the order of their election) shall perform the duties of the president, and when so acting, shall have all the powers of and be subject to all the restrictions upon the president. Any vice-president may sign, with the secretary, certificates for shares of the Corporation; and shall perform such other duties as from time to time may be assigned to the vice-president by the chief executive officer or by the Board.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 6

EXHIBIT 3
Page 6 of 18

EXHIBIT 1
Page 73 of 88

4.10.    Secretary.  The secretary shall:

4.10.1. Keep or cause to be kept at the principal office, or such other place as the Board may order, a book of minutes of all meetings of directors and shareholders showing the time and place of the meeting, whether the meeting was regular or special and, if a special meeting, how authorized, the notice given, the names of those present at directors meetings, the number of shares present or represented at shareholders meetings and the proceedings thereof.

4.10.2. Keep or cause to be kept, at the principal office or at the office of the Corporation's transfer agent, a share register, or a duplicate share register, showing the names of the shareholders and their addressees, the number and classes of shares held by each, the number and date of certificates issued for such shares and the number and date of cancellation of certificates surrendered for cancellation.

4.10.3. Give or cause to be given such notice of the meetings of the shareholders and of the Board as is required by the Bylaws.  If the Corporation elects to have a seal, the secretary shall keep the seal and affix it to all documents requiring a seal.  The secretary shall have such other powers and perform such other duties as may be prescribed by the Board or the Bylaws.

4.10.4. In general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to the secretary by the chief executive officer or the Board.

4.11.    Treasurer.  The treasurer, if appointed, shall:

4.11.1. Be responsible for the funds of the Corporation, shall pay them out only on the checks of the Corporation signed in the manner authorized by the Board, shall deposit and withdraw such funds in such depositories as may be authorized by the Board, and shall keep full and accurate accounts of receipts and disbursements in books maintained at the Corporation's principal office.

4.11.2. In general perform all of the duties incident to the office of treasurer and such other duties as from time to time may be assigned to the treasurer by the chief executive officer or by the Board.

**5.    Contracts, Loans, Checks, and Deposits**.

5.1.    Contracts.  The Board may authorize any officer or officers, agent or agents to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be in general or confined to specific instances.

5.2.    Loans to Corporations.  No loans shall be contracted on behalf of the Corporation and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board.  Such authority may be general or confined to specific instances.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 7

EXHIBIT 3
Page 7 of 18

EXHIBIT 1
Page 74 of 88

5.3.    Checks, Drafts, Etc.  All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the Corporation, shall be signed by such officer or officers, agent or agents of the Corporation and in such manner as shall from time to time be determined by resolution of the Board.

5.4.    Deposits.  All funds of the Corporation not otherwise employed shall be deposited from time to time to the credit of the Corporation in such banks, trust companies or other depositories as the Board may select.

5.5.    Execution of Documents.  The Board may, except as otherwise provided in the Bylaws, authorize any officer or agent of the Corporation to enter into any contract or execute any instrument in the name of and on behalf of the Corporation.  Such authority may be general or confined to specific instances.  Unless so authorized by the Board, or unless inherent in the authority vested in the office under the provisions of the Bylaws, no officer, agent or employee of the Corporation shall have any power or authority to bind the Corporation by any contract or engagement, or to pledge its credit, or to render it liable for any purpose or for any amount.

## 6.    **Certificates for Shares and Their Transfer**.

6.1.    Certificates for Shares.

6.1.1.    Certificates for shares shall be in such form as the Board may designate, shall designate the name of the Corporation and the state law under which the Corporation is organized, shall state the name of the person to whom the shares represented by the certificate are issued, and shall state the number and class of shares and the designation of the series, if any, the certificate represents.  If the Corporation is authorized to issue different classes of shares or different series within a class, the designations, relative rights, preferences and limitations determined for each series and the authority of the Board to determine variations for future series shall be summarized on the front or back of each certificate, or each certificate may state conspicuously on its front or back that the Corporation shall furnish shareholders with this information on request in writing and without charge.

6.1.2.    Each certificate for shares shall be signed, either manually or in facsimile, by the chair of the Board, the chief executive officer, the president or a vice-president and the secretary or an assistant secretary of the Corporation.  The certificates may bear the corporate seal or its facsimile.

6.1.3.    If any officer who has signed a share certificate, either manually or in facsimile, no longer holds office when the certificate is issued, the certificate shall nevertheless be valid.

6.1.4.    The Corporation may in its discretion issue certificates for fractional shares, but shall not be required to do so.

6.2.    Transfer on the Books.  Upon surrender to the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, and subject to any limitations on transfer appearing on the certificate or in the

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 8

EXHIBIT 3
Page 8 of 18

EXHIBIT 1
Page 75 of 88

Corporation's stock transfer records (including, without limitation, restrictions on transfer set forth in the Bylaws), the Corporation shall issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books. The Board is authorized to impose restrictions on the transfer of shares to the extent permitted by law (including, without limitation, restrictions on transfer set forth in the Bylaws).

6.3. <u>Lost, Stolen, or Destroyed Certificates</u>. In the event a certificate is represented to be lost, stolen or destroyed, a new certificate shall be issued in place thereof upon such proof of the loss, theft or destruction and upon the giving of such bond or other indemnity as may be required by the Board.

6.4. <u>Transfer Agents and Registrars</u>. The Board may from time to time appoint one or more transfer agents and one or more registrars for the shares of the Corporation who will have such powers and duties as the Board may specify.

6.5. <u>Restrictive Legends</u>. Each certificate representing any share of stock of the Corporation shall bear substantially the following legend:

> THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS CONTAINED IN THE CORPORATION'S BYLAWS. COPIES OF SUCH BYLAWS MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION. THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

**7.** **<u>Fiscal Year</u>**. The fiscal year of the Corporation shall end on December 31, unless changed by the Board.

**8.** **<u>Seal</u>**. If the Board elects to provide a corporate seal, it shall be circular in form and shall have inscribed thereon the name of the Corporation and the state of incorporation and the words, "Corporate Seal - Oregon."

**9.** **<u>Waiver of Notice - Form of Notice</u>**.

9.1. <u>Waiver of Notice</u>. Whenever any notice is required to be given to any shareholder or director of the Corporation under the provisions of the Bylaws or under the provisions of the OBCA, a waiver thereof in writing, signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 9

EXHIBIT 3
Page 9 of 18

EXHIBIT 1
Page 76 of 88

9.2.    Form of Notice.  Whenever, under the provisions of the OBCA or the Bylaws, notice is required to be given to any director or shareholder, it shall not be construed to mean only personal notice, but shall include notices as defined below.

9.2.1.   Required notice to a director may be given in writing by mail, e-mail or facsimile, addressed to such director at the address as it appears on the records of the Corporation, or at the last known business or residence address of the director, prepaid, and such notice if mailed shall be deemed to be given at the time when the same shall be deposited in the United States mail (except as expressly provided for otherwise in Section 3.5), and if transmitted by facsimile or e-mail shall be deemed to be given upon the earlier of personal receipt by the director or 24 hours following the completed transmittal.

9.2.2.   Required notice to a shareholder shall be given in writing by mail, e-mail or facsimile, addressed to such shareholder at the address as it appears on the stock record books or similar records of the Corporation, or at the last known business or residence address of the shareholder, prepaid, and such notice if mailed shall be deemed to be given at the time when the same shall be deposited in the United States mail (except as expressly provided for otherwise in the Bylaws), and if transmitted by facsimile or e-mail shall be deemed to be given upon the earlier of personal receipt by the shareholder or 24 hours following the completed receipt of the transmittal.

## 10.    **Amendment of Bylaws**.

10.1.    Subject to Section 10.4, the Board may amend or repeal these Bylaws, unless:

10.1.1. The Articles or applicable law reserve this power exclusively to the shareholders in whole or in part.

10.1.2. The shareholders, in amending or repealing a particular bylaw, provide expressly that the Board may not amend or repeal that bylaw.

10.1.3. The Articles, the Bylaws or applicable state or federal law provide otherwise.

10.2.    Subject to Section 10.4, the shareholders may amend or repeal the Bylaws even though these Bylaws may also be amended or repealed by the Board.

10.3.    When an amendment or new Bylaw is adopted, it shall be copied in the minute book with the original Bylaws in the appropriate place.  If any Bylaw is repealed, the fact of its repeal and the date on which its repeal occurred shall be stated in such book and place.

10.4.    Notwithstanding the foregoing, Section 12 of the Bylaws may be amended solely with the approval at a shareholder meeting at which a quorum is present of shareholders holding the majority of all votes then eligible to be cast.  Notice of such shareholder meeting must provide that the purpose, or one of the purposes, of such meeting is to consider such an amendment to the Bylaws.

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 10

EXHIBIT 3
Page 10 of 18

EXHIBIT 1
Page 77 of 88

**11.    Transactions Between Corporation, Interested Directors**.  A transaction with the Corporation in which a director of the Corporation has a direct or indirect interest is not voidable by the Corporation solely because of the director's interest in the transaction if either:

11.1.    the material facts of the transaction and the director's interest were disclosed or known to the Board or a committee of the Board, and the Board or committee authorized, approved or ratified the transaction;

11.2.    the material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved or ratified the transaction; or

11.3.    the transaction was fair to the Corporation.

**12.    Restrictions on Transfer of Common Stock and Preferred Stock**.

12.1.    Restriction on Transfer. Except as otherwise permitted by this Section 12, no shareholder may Transfer any Shares.  Any Transfer of Shares to any Person other than (a) to a Permitted Transferee, (b) pursuant to any tag-along sale in accordance with Section 12.8, or (c) pursuant to any drag-along sale in accordance with Section 12.9 shall be subject to the right of first refusal provisions of Section 12.3 in addition to all other provisions of this Section 12. Any Transfer of Shares must comply with Section 12.5 in order to be a Permitted Transfer.

12.2.    Definitions.  For purposes of this Section 12, the following definitions shall apply:

12.2.1.   "Adjusted Fair Market Value" means the fair market value of the Shares as agreed by the parties in interest. If the parties do not agree on the Adjusted Fair Market Value, the Board will in good faith determine the Adjusted Fair Market Value. The Board's determination will be final and binding upon the parties. The determination will apply appropriate discounts for lack of marketability, minority interest and other factors relevant to the Shares.

12.2.2.  "Affiliate" means, when used with respect to a specified Person, any Person that directly or indirectly Controls, is Controlled by or is Under Common Control with such specified Person.   "Control," including the correlative terms "Controlling," "Controlled by" and "Under Common Control with" means possession, directly or indirectly (through one or more intermediaries), of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.

12.2.3.  "Common Stock" means the common stock, no par value, of the Corporation.

12.2.4.  "Permitted Transfer" means a Transfer of Shares permitted by and in compliance with this Section 12.

12.2.5.  "Permitted Transferee" means (a) the Corporation; (b) a shareholder who has not received any Shares in violation of the Transfer restrictions set forth in this

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 11

EXHIBIT 3
Page 11 of 18

EXHIBIT 1
Page 78 of 88

Section 12; (c) any trust for the benefit of one or more of the spouse and/or the natural or adopted lineal descendants of a shareholder, but only if the trustee with authority to exercise all rights with respect to the Shares held by such shareholder is at all times such shareholder; (d) the shareholder's executor, administrator, trustee, personal representative, or assignee to whom Shares are transferred at death or by operation of law; (e) any Person approved by the Board; (f) any Purchaser in accordance with Section 12.3; (g) a spouse in connection with a divorce; or (h) Affiliates of any shareholder that is an entity; provided, that no Person (other than a Person that is already a Permitted Transferee under clause (b) of this Section 12.2.5) shall be a Permitted Transferee if the Board determines in good faith that such Person, or any of such Person's Affiliates, is a competitor of the Corporation.

12.2.6. "Person" means any individual, partnership, limited liability company, corporation, trust, joint venture, cooperative, association or other entity.

12.2.7. "Preferred Stock" means the preferred stock, no par value, of the Corporation, regardless of series, class or other designation.

12.2.8. "Series A Preferred Stock" means the Series A Preferred Stock, no par value, of the Corporation.

12.2.9. "Shares" means one or more shares of Common Stock and/or Preferred Stock, as the context requires.

12.2.10.    "Transfer" when used as a noun means any sale, assignment, exchange, gift, devise, hypothecation, pledge, encumbrance, attachment, levy, foreclosure, sale by legal process under execution, attachment or receivership, sale or retention of any Shares or interest in any Shares by a secured party after a default, change in the beneficial ownership or the trustee of any trust which is a shareholder of the Corporation, change of ownership ordered by any court pursuant to dissolution of marriage or otherwise, or other change in ownership, voluntary or involuntary. "Transfer" when used as a verb means transferring any Shares or interests in any Shares by any means as set forth in the previous sentence.

12.3.    Right of First Refusal.

12.3.1. No Transfer of any Shares (the "Offered Stock") may be made except (a) to a Permitted Transferee, (b) pursuant to any tag-along sale in accordance with Section 12.8, or (c) pursuant to any drag-along sale in accordance with Section 12.9, unless the shareholder (the "Seller") has received a bona fide written offer (the "Purchase Offer") from a Person (the "Purchaser") to purchase the Offered Stock for a purchase price (the "Offer Price") denominated and payable in United States dollars at closing or according to specified terms, with or without interest, which offer must be in writing signed by the Purchaser and will be irrevocable for a period ending no sooner than the day following the end of the Offer Period, as defined below.

12.3.2. Prior to making any Transfer that is subject to the terms of this Section 12.3, the Seller must give to the Corporation written notice (the "Offer Notice")

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 12

EXHIBIT 3
Page 12 of 18

EXHIBIT 1
Page 79 of 88

which must include a copy of the Purchase Offer and an offer (the "Firm Offer") to sell the Offered Stock to the Corporation for the Offer Price, payable according to the same terms as (or more favorable terms than) those contained in the Purchase Offer; provided, that the Firm Offer will be made without regard to the requirement of any earnest money or similar deposit required of the Purchaser prior to closing, and without regard to any security (other than the Offered Stock) to be provided by the Purchaser for any deferred portion of the Offer Price.

12.3.3.  The Firm Offer will be irrevocable for a period (the "Offer Period") of 30 days following the date the Offer Notice is received by the Corporation.  At any time during the Offer Period the Corporation and its assigns, if any, may accept the Firm Offer for all, but not less than all, of the total amount of the Offered Stock.

12.3.4.  If the Firm Offer is accepted, the closing of the sale of the Offered Stock will take place within 15 days after the Firm Offer is accepted or, if later, the date of closing set forth in the Purchase Offer.  The Seller will execute such documents and instruments as may be necessary or appropriate to effect the sale of the Offered Stock pursuant to the terms of the Firm Offer and this Section 12.3.

12.3.5.  If the Firm Offer is not accepted in the manner outlined above, the Seller may sell the Offered Stock to the Purchaser at any time within 60 days after the last day of the Offer Period; provided, that such sale is made on terms no more favorable to the Purchaser than the terms contained in the Purchase Offer; and provided further, that such sale complies with other terms, conditions, and restrictions of these Bylaws that are applicable to Shares and are not expressly made inapplicable to sales occurring under this Section 12.3.

12.4.   Prohibited Transfers.

12.4.1.   Except as approved by the Board, no Transfer of any Shares shall be made if following such Transfer the number of shareholders of the Corporation would exceed 300.

12.4.2.   Except as approved by the Board or in connection with the exercise of tag-along rights pursuant to Section 12.8, no Transfer of any Shares shall be made unless the transferring shareholder Transfers all of such shareholder's Shares in connection with such Transfer.

12.4.3.   Any purported Transfer that is not a Permitted Transfer will be void and of no effect.  Notwithstanding the foregoing, if a court or authority of competent jurisdiction requires the Corporation to recognize a Transfer that is not a Permitted Transfer (or if the Corporation, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer): (a) the transferee will be deemed to have accepted the Shares subject to the provisions of these Bylaws, and (b) the Corporation will have an option to redeem any of the Transferred Shares within 180 days after the Corporation receives a copy of the order requiring the Corporation to recognize the Transfer.  The redemption price will be the Adjusted Fair Market Value of the Shares as of the Transfer date.  The

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 13

EXHIBIT 3
Page 13 of 18

EXHIBIT 1
Page 80 of 88

Corporation may elect to redeem the Transferred Shares by delivering a written notice of its election to the transferee specifying the number of shares to be redeemed. If the Corporation elects to redeem any such Shares, the Corporation will pay the Adjusted Fair Market Value of the Shares to the transferee over a period not to exceed 5 years, plus interest at the lowest rate that will not result in the imputation of interest under the Internal Revenue Code.

12.4.4. Any Shares Transferred in violation of this Section 12.4 that the Corporation does not redeem will be limited in accordance with this Section 12, and the Corporation may apply distributions with respect to such Shares (without limiting any other legal or equitable rights of the Corporation) to satisfy any debts, obligations, or liabilities for damages (including incremental tax liability and attorney fees and expenses incurred in negotiations, trial preparation, at trial, on appeal or in bankruptcy) that the transferor or transferee of the Shares may have to the Corporation.

12.5.  Conditions to Permitted Transfers. A Transfer allowed by this Section 12 will not be treated as a Permitted Transfer unless and until the following conditions are satisfied:

12.5.1. Except for a Transfer of Shares at death or involuntarily by operation of law, the transferor and transferee execute and deliver to the Corporation the documents and instruments of conveyance necessary to effect the Transfer and confirm the transferee's agreement to be bound by the provisions of the Bylaws. In the case of a Transfer of Shares at death or involuntarily by operation of law, the Transfer will be confirmed by presentation to the Corporation of satisfactory legal evidence of the Transfer. The transferor and transferee will reimburse the Corporation for all costs and expenses that the Corporation reasonably incurs in connection with the Transfer.

12.5.2. The transferor and transferee furnish the Corporation with the transferee's taxpayer identification number and any other information reasonably necessary to permit the Corporation to file all required federal and state tax returns and other legally required information statements or returns.

12.5.3. Except for a Transfer at death or involuntarily by operation of law, the transferor, if the Corporation requests, furnishes an opinion of legal counsel, which opinion is reasonably satisfactory to counsel to the Corporation, to the effect that either (a) the Common Stock and/or Preferred Stock will be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (b) the Transfer will not violate any applicable laws regulating the Transfer of securities.

12.5.4. The Transfer will not cause the Corporation to be deemed to be an "investment company" under the Investment Corporation Act of 1940, as amended.

12.6.  Indemnification. If a Transfer or attempted Transfer is not a Permitted Transfer, the parties engaging or attempting to engage in the Transfer will be liable to indemnify and hold harmless the Corporation and its directors, officers, employees and agents and  from all costs, liability, and damages that any of the indemnified Persons may incur (including incremental tax liability and attorney fees and expenses incurred in negotiations, trial preparation, at trial, on

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 14

EXHIBIT 3
Page 14 of 18

EXHIBIT 1
Page 81 of 88

appeal or in bankruptcy) as a result of the Transfer or attempted Transfer and efforts to enforce this indemnity.

12.7.    Assignment of Rights.  The Corporation may assign any of its rights, subject to its obligations, to purchase or redeem Shares under this Section 12, from time to time, to any Person or Persons selected by the Board.

12.8.    Tag-Along Rights.

12.8.1    If one or more shareholders holding shares of Common Stock or of Series A Preferred Stock (collectively, the "Selling Majority") seek to Transfer, in a single transaction or a series of related transactions, more than 50% of the issued and outstanding shares of Common Stock or Series A Preferred Stock, as applicable, to a Person that is not a Permitted Transferee (the "Tag-Along Transferee"), the Selling Majority shall deliver a notice in writing (a "Notice of Majority Transfer") to all of the other holders of shares of Common Stock or Series A Preferred Stock, as applicable, setting forth the terms and conditions of the proposed Transfer; provided, that the terms and conditions of this Section 12.8 shall not apply to any transfer (a) to a Permitted Transferee or (b) pursuant to a drag-along sale in accordance with Section 12.9.

12.8.2    Each holder of Common Stock or Series A Preferred Stock, as applicable, not part of the Selling Majority is hereby given the right and option, to be exercised by delivery of written notice to the Selling Majority and the Corporation within 20 days after the giving of the Notice of Majority Transfer, to Transfer to the Tag-Along Transferee a fraction of such notified shareholder's Common Stock or Series A Preferred Stock, as applicable, the numerator of which shall equal the number of shares of Common Stock or Series A Preferred Stock, as applicable, being Transferred by the Selling Majority, and the denominator of which shall equal the total number of shares of the Common Stock or Series A Preferred Stock, as applicable, owned by the Selling Majority (collectively, the "Tag-Along Shares").

12.8.3    The sale of Tag-Along Shares to the Tag-Along Transferee shall be for the same consideration per share and on the same terms and conditions as are applicable to the Selling Majority, including without limitation executing the applicable purchase or merger agreement (and any related ancillary agreements entered into by the Selling Majority in connection with the sale), and including the same representations, warranties, covenants and indemnities related to the Corporation or its business (directly to the third party purchaser and/or indirectly pursuant to a contribution agreement, as required by the Selling Majority), purchase price adjustments, escrows and other obligations as are applicable to the Selling Majority in connection with the sale).  With respect to representations and warranties that are specific to a shareholder, each seller of Tag-Along Shares shall only be obligated to make representations and warranties with respect to such seller's title to and ownership of the Tag-Along Shares, authorization, execution and delivery of relevant documents, enforceability of such documents against such seller, no conflicts and other similar representations and warranties ("Shareholder Representations") made by the Selling Majority, and shall not be obligated to make any of the Shareholder Representations with respect to any other shareholder or their shares

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 15

EXHIBIT 3
Page 15 of 18

EXHIBIT 1
Page 82 of 88

(or stock equivalents).    All indemnity obligations with respect to Shareholder Representations shall be several, and not joint and several, whether owed directly to the third-party purchaser and/or indirectly pursuant to a contribution agreement, as required by the Selling Majority.

12.8.4  Any failure by the Tag-Along Transferee to consummate the acquisition of all Tag-Along Shares offered by all shareholders simultaneously with the Transfer by the Selling Majority of such Selling Majority's shares of Common Stock or Series A Preferred Stock, as applicable, and on the terms and conditions required pursuant to this Section 12.8, shall prohibit the Selling Majority from Transferring any of the Selling Majority's Common Stock or Series A Preferred Stock, as applicable, to the Tag-Along Transferee.

12.9.  Drag-Along Rights.

12.9.1. In the event of a Major Corporate Event approved by the Board and a majority of all shares of the capital stock of the Corporation entitled to vote on such Major Corporate Event (the "Dragging Shareholders"), each shareholder hereby agrees (a) to vote all Shares held by such shareholder in favor of such Major Corporate Event and to vote in opposition to any and all other proposals that could reasonably be expected to delay or impair the ability of the Corporation to consummate the Major Corporate Event; (b) if such Major Corporate Event is a sale of shares of the capital stock of the Corporation, to sell all of such Shareholder's Shares of the same series or class for the same price per share, and upon the same terms and conditions, received by the Dragging Shareholders with respect to such series or class; (c) to execute and deliver all related documentation and take such other action in support of the Major Corporate Event as shall reasonably be requested by the Board in order to carry out the terms and provisions of this Section 12.9; and (d) to waive all dissenters' rights and other similar or related rights in connection with such approved Major Corporate Event, to the maximum extent permitted by applicable law.

12.9.2.  Each shareholder's obligations under clause (c) of Section 12.9.1 shall include, without limitation, executing the applicable purchase or merger agreement (and any related ancillary agreements entered into by the Dragging Shareholders in connection with the drag-along sale) and making or providing the same representations, warranties, covenants and indemnities related to the Corporation or its business (directly to the third-party purchaser and/or indirectly pursuant to a contribution agreement, as required by the Board), purchase price adjustments, escrows and other obligations as the Dragging Shareholders make or provide in connection with the drag-along sale.  With respect to representations and warranties that are specific to a shareholder, each shareholder shall only be obligated to make representations and warranties with respect to such seller's title to and ownership of Shares, authorization, execution and delivery of relevant documents, enforceability of such documents against such seller, no conflicts and other similar representations and warranties ("Drag-Along Shareholder Representations") made by the Dragging Shareholders, and shall not be obligated to make any of the foregoing representations and warranties with respect to any other shareholder or their shares (or stock equivalents).  All indemnity obligations

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 16

EXHIBIT 3
Page 16 of 18

EXHIBIT 1
Page 83 of 88

with respect to Drag-Along Shareholder Representations shall be several, and not joint and several, whether owed directly to the third-party purchaser and/or indirectly pursuant to a contribution agreement, as required by the Board.

12.9.3. A "Major Corporate Event" means (a) the consummation of a merger or consolidation of the Corporation with or into another entity or any other corporate reorganization, or a sale of shares, if more than 50% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after such merger, consolidation or other reorganization is owned by persons who were not shareholders of the Corporation immediately prior to such merger, consolidation or other reorganization or sale of shares or (b) the sale, transfer or other disposition of all or substantially all of the Corporation's assets.

## 13.  Miscellaneous.

13.1.  Telephonic Meetings.  Meetings of the shareholders and directors, or of any committee designated by each shareholder and director, may be held by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at the meeting.

13.2.  Books and Records.  The Corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its shareholders and the Board and shall keep at its registered office a record of its shareholders, giving the names and addresses of all shareholders and the number and class of shares held by each.  The records of the Corporation shall be open to inspection by the shareholders or the shareholders' agents or attorneys in the manner and to the extent required by applicable law.

## 14.  Director Committees.

14.1.  Creation of Committees.  Unless the Articles provide otherwise, the Board may create one or more committees and appoint members of the Board to serve on them.  Each committee must have two or more members, who shall serve at the pleasure of the Board.

14.2.  Selection of Members.  The creation of a committee and appointment of members to it must be approved a majority of all the directors in office when the action is taken.

14.3.  Authority.  Unless limited by the Articles, each committee may exercise those aspects of the authority of the Board which the Board confers upon such committee in the resolution creating the committee; provided, a committee may not:

14.3.1. Authorize distributions;

14.3.2. Approve or propose to shareholders action that the OBCA requires be approved by shareholders;

14.3.3. Fill vacancies on the Board or on any of its committees;

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 17

EXHIBIT 3
Page 17 of 18

EXHIBIT 1
Page 84 of 88

14.3.4. Amend the Articles pursuant to the authority of directors to do so granted by the OBCA.

14.3.5. Adopt, amend, or repeal the Bylaws;

14.3.6. Approve a plan of merger not requiring shareholder approval;

14.3.7. Authorize or approve reacquisition of shares, except according to a formula or method prescribed by the Board; or

14.3.8. Authorize or approve the issuance or sale or contract for sale of shares or determine the designation and relative rights, preferences, and limitations of class or series of shares, except that the Board may authorize a committee (or a senior executive officer of the Corporation) to do so within limits specifically prescribed by the Board.

034518/00017/5439918v5

Second Amended and Restated Bylaws – C & K Market, Inc.
Page 18

EXHIBIT 3
Page 18 of 18

EXHIBIT 1
Page 85 of 88

# EXHIBIT 4 TO SECOND AMENDED PLAN OF REORGANIZATION

## RIGHTS OFFERING SUBSCRIPTION FORM

EXHIBIT 1
Page 86 of 88

**RIGHTS OFFERING SUBSCRIPTION FORM**
**C & K MARKET, INC.**
**Rights Offering**
**Up to _____ Shares of Common Stock and Series A Preferred Stock**
**Pursuant to the Plan of Reorganization dated _____ __, 2014**
(as it may be supplemented from time to time, the "Plan")

**THIS RIGHTS OFFERING WILL EXPIRE AT 9:00 A.M., PORTLAND, OREGON, TIME, ON _____, 2014 (THE "SUBSCRIPTION DEADLINE," UNLESS EARLIER TERMINATED BY C & K MARKET, INC.)**

**THIS FORM AND PAYMENT OF SUBSCRIPTION AMOUNT MUST BE DELIVERED TO:**
**[TO BE INSERTED BY DEBTOR]**

**DELIVERY OF THIS SUBSCRIPTION TO AN ADDRESS OTHER THAN AS SET FORTH ABOVE OR TRANSMISSION OF THIS SUBSCRIPTION FORM VIA A FACSIMILE NUMBER OR E-MAIL ADDRESS OTHER THAN THE ONE LISTED ABOVE WILL NOT CONSTITUTE A VALID DELIVERY. THIS SUBSCRIPTION MUST BE DELIVERED TO C & K MARKET, INC. (THE "COMPANY") AT OR BEFORE THE SUBSCRIPTION DEADLINE.**

**DELIVERY OF THIS SUBSCRIPTION WILL NOT CONSTITUTE A VALID EXERCISE OF SUBSCRIPTION RIGHTS UNLESS THE UNDERSIGNED ALSO DELIVERS PAYMENT OF THE SUBSCRIPTION PRICE TO THE COMPANY AS SET FORTH BELOW AT OR BEFORE THE SUBSCRIPTION DEADLINE, UNLESS OTHER ARRANGEMENTS HAVE BEEN MADE WITH THE COMPANY PRIOR TO THE SUBSCRIPTION DEADLINE.**

The undersigned acknowledges that it has received the Plan, the accompanying Disclosure Statement and this accompanying Rights Offering Subscription Form (this "Subscription") of the Company, relating to the Company's distribution of one right (each, a "Subscription Right") to purchase up to a pro rata share of the combination (in equal numbers) of _____ shares of the Company's Common Stock and Series A Preferred Stock. The undersigned certifies that it is a holder of a Class 12 Claim under the Plan and that, as of _____, 2014, the undersigned's Class 12 Claim had not been disallowed.

---

Capitalized terms used but not defined herein have the respective meanings ascribed to them in the Plan and Disclosure Statement.

### EXERCISE OF SUBSCRIPTION RIGHTS

**Please read this entire Subscription and the information in the Plan and Disclosure Statement under "The Rights Offering" carefully before checking any box below. Additional copies of the Plan and Disclosure Statement and this Subscription may be requested from the Company at the address and telephone numbers that appear above.**

☐ CHECK HERE IF YOU WISH TO PURCHASE **ALL** OF YOUR PRO RATA SHARE OF THE RIGHTS OFFERING SHARES, ROUNDED TO THE NEAREST WHOLE SHARE.

☐ CHECK HERE IF YOU WISH TO PURCHASE **LESS THAN ALL** OF YOUR PRO RATA SHARE OF THE RIGHTS OFFERING SHARES (WHOLE SHARES ONLY).

_____ Indicate the number of shares of Common Stock and Series A Preferred Stock (must be an equal number of each) you wish to purchase under the Rights Offering at the Subscription Price.

**The Subscription Price is $8.00 for the combination of one share of Common Stock and one share of Series A Preferred Stock. Full payment of the Subscription Amount for the Rights Offering Shares subscribed for pursuant to the Rights Offering must be made in United States dollars and delivered by wire transfer of immediately available funds to the following account maintained by the Company by the Subscription Deadline:**

EXHIBIT 4
Page 1 of 2

EXHIBIT 1
Page 87 of 88

[To be inserted by Company]
**Wire** Routing #
**ACH** Routing # SWIFT Code:

for credit to:
C & K Market, Inc.
Acct. #

By signing this form, the undersigned irrevocably elects to purchase the Common Stock and Series A Preferred Stock indicated above upon the terms and conditions specified in the Plan and Disclosure Statement and agrees that if it fails to pay for the Common Stock and Series A Preferred Stock as set forth herein, this Subscription will be null and void.

PLEASE SIGN HERE

_____
Authorized Signature of Eligible Holder of Class 12 Claim

If signature is by attorney-in-fact, trustee, executor, administrator, guardian, officer of a corporation or other person acting in a fiduciary or representative capacity, please provide the following information:

Name: _____

Title: _____

Address: _____

Telephone Number: _____

Date: _____

Taxpayer Identification or Social Security Number: _____

**Signatures on this Subscription; Guarantee of Signatures.** If this Subscription is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, those persons should so indicate when signing, and proper evidence satisfactory to the Company of that authority so to act must be submitted, unless waived by the Company.

**SUBSCRIPTION ACCEPTED:**

C & K MARKET, INC.

By _____

Name _____

Title _____

Date _____

034518/00017/5473317v1

EXHIBIT 4
Page 2 of 2

EXHIBIT 1
Page 88 of 88

# EXHIBIT 2 TO SECOND AMENDED DISCLOSURE STATEMENT

## Form Promissory Note

# TERM PROMISSORY NOTE
## [_____]

$_____                          _____, _____
                                                    ("Effective Date")

For value received, C & K Market, Inc. ("Reorganized Debtor") promises to pay to the order of the [_____] ("Creditor"), in lawful money of the United States of America, the principal sum of _____ Dollars ($_____) together with interest at the rate specified below.

This Term Promissory Note ("Note") is executed and delivered in connection with and pursuant to that certain Reorganized Debtor's [First Amended Plan of Reorganization] in Case No. 13-64561-fra11 confirmed on _____, _____ ("Plan").

1.      <u>Interest</u>.  This Note will bear interest from the Effective Date at a rate of 6% per annum.

2.      <u>Maturity</u>.  This Note shall mature and be payable in full on _____, _____ ("Maturity Date").  On the Maturity Date, all unpaid principal, and all accrued and unpaid interest and other amounts owing under this Note, shall be paid in full.

3.      <u>Principal and Interest Payments</u>.  This Note is payable by Reorganized Debtor as follows:  [TO BE INSERTED DEPENDING ON PARTICULAR TREATMENT].

4.      <u>Prepayment</u>.  Reorganized Debtor may prepay this Note without penalty in whole or in part at any time without the prior consent of Creditor.

5.      <u>Default</u>.  An "Event of Default" shall occur under this Note if Reorganized Debtor fails to make any payment required by this Note within 10 days after receipt of written notice from Creditor that such payment was not paid when due.

6.      <u>Remedies</u>.  Upon the occurrence of an Event of Default:

        (a)      The entire unpaid principal balance of this Note, together with all accrued interest and other sums due under this Note, will, upon demand by Creditor, become immediately due and payable; and

        (b)      Creditor may exercise any right or remedy it has under this Note, the Plan, at law, in equity, or otherwise.

The rights and remedies of Creditor under this Note are cumulative and not alternative.

7.      <u>Governing Law</u>.  This Note will be governed by and construed under the laws of the state of Oregon, excluding its choice of law rules.

8.       <u>Severability</u>.  If any term or provision of this Note is held to be unenforceable, then that term or provision will be eliminated and the balance of this Note will be fully enforceable.

9.       <u>Parties in Interest</u>.  This Note will bind Reorganized Debtor and each of Reorganized Debtor's successors, and will inure to the benefit of Creditor and its successors and assigns.

10.      <u>Interpretation</u>.  Section and other headings contained in this Note are for reference purposes only.  The word "including" is deemed to be followed by the phrase "without limitation."  No rule of construction or interpretation that disfavors the party drafting this Note or any of its provisions will apply to the interpretation of this Note.  Instead, this Note will be interpreted according to the fair meaning of its terms.

IN WITNESS WHEREOF, Reorganized Debtor has executed and delivered this Note as of the Effective Date.

REORGANIZED DEBTOR:

C & K MARKET, INC.


By: _____

034518/00017/5469344v1

**EXHIBIT 2**
**Page 2 of 2**

# EXHIBIT 3 TO SECOND AMENDED DISCLOSURE STATEMENT

**TFP Valuation Report**

---

CONFIDENTIAL REPORT

---

ON

# C & K MARKET, INC.



BY



THE FOOD PARTNERS

MARCH 15, 2014

EXHIBIT 3
Page 1 of 14

The Food Partners, LLC                                    C&K Market, Inc.

# TABLE OF CONTENTS

1.  CONDITIONS AND LIMITATIONS ...................................................................1

2.  DESCRIPTION OF C&K...........................................................................3

    2.1   OVERVIEW ............................................................................... 3

3.  VALUATION ....................................................................................6

    3.1   PURPOSE OF ANALYSIS ............................................................... 6

    3.2   SCOPE OF ANALYSIS AND ASSUMPTIONS ....................................... 6

    3.3   RESULTS OF ANALYSIS ............................................................... 7

    3.4   WORKING CAPITAL POSITION ...................................................... 9

    3.5   FIXED ASSETS ......................................................................... 9

    3.6   UNIFIED WESTERN GROCERS CLASS B AND E SHARES....................... 9

    3.7   LIABILITIES .......................................................................... 12

4.  INDUSTRY OVERVIEW ......................................................................13

5.  SOUTHERN OREGON AND NORTHERN CALIFORNIA OVERVIEW ...............21

# TABLE OF APPENDICES

**APPENDIX A:**     STORE PROFILES

**APPENDIX B:**     OPERATING STORE VALUATION

**APPENDIX C:**     REAL ESTATE VALUATION

**APPENDIX D:**     UWG STOCK VALUATION

EXHIBIT 3
Page 2 of 14

# 1. CONDITIONS AND LIMITATIONS

In March 2014, The Food Partners, LLC ("TFP") was retained by C&K Market, Inc. ("C&K" or the "Company") to provide a valuation to determine the fair market value of the Company's equity on a control basis as of the date on which the Company emerges from a Chapter 11 bankruptcy (the "Effective Date") and to quantify the discount that would apply to the projected common stock outstanding on a minority basis.   The valuation is based on the following key assumptions:

- The Effective Date is July 12, 2014.

- The valuation is based on the Company's historical financial statements and management prepared financial projections through FYE 2018.

- The projected income statements for FY 2015 are indicative of the Company's ongoing operating results after the Effective Date.

- The Company's pharmacy operations are sold by the Effective Date.

- The Company divests or liquidates non-viable grocery stores by the Effective Date.

- A major restructuring of the corporate office occurs by the Effective Date.

- The Company retains the owned real estate related to stores operated by the Company after the Effective Date and divests of all other owned real estate in three tranches.

- The unsecured creditors of the Company will have their claims paid in part or converted to equity as of the Effective Date per the draft Plan of Reorganization and the assumptions below.

- The Company's go-forward financial statements will be based on fresh start accounting.

The following are certain conditions and limitations pertaining to the enclosed report and underlying analysis:

- The underlying analysis assumes that the Company continues to operate as a going concern and is based on past and present results of operations and on facts and conditions existing as of the date of the analysis.  Events and conditions subsequent to that date may have a material effect upon the Company's performance and value.

- The pricing analysis of a business enterprise is a matter of informed judgment.  The analysis contained herein has been prepared on the basis of information and assumptions set forth in this report and supporting work papers.  TFP has relied on information provided by the Company, publicly available data and sources that have not been verified.  TFP assumes no liability for such sources.

- The related prospective financial statements and the supporting work papers are based upon data, information and assumptions provided by the management of the Company. The achievement of prospective financial results may be affected by fluctuating economic conditions and is dependent upon the occurrence of future events that cannot be assured.

EXHIBIT 3
Page 3 of 14

The Food Partners, LLC                                                          C&K Market, Inc.

Therefore, the actual results achieved may vary from the prospective financial statements and the variations could be material.

- The Company's management is responsible for representations of its plans, expectations and for disclosure of significant information that might affect the ultimate realization of the prospective financial results in the supporting work papers. TFP has not performed an examination or compilation in accordance with AICPA standards nor has TFP verified the reasonableness of or the support for these assumptions. TFP, therefore, expresses no opinion as to the attainability of any prospective financial statements based on them.

- This report is intended solely for the benefit and use of the Company in connection with its restructuring. The Company agrees that no such information or advice will be used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner, or for any purpose, nor will any public reference to TFP be made by the Company without the prior written consent of TFP.

- The Company acknowledges that all information and advice provided by TFP in connection with TFP's engagement are based upon specific limited procedures, agreed upon between TFP and the Company. TFP makes no representation regarding the adequacy of these procedures for the Company's purposes, and therefore, any conclusions drawn from TFP's report are the sole responsibility of the Company.

Should you have questions or comments regarding this report or the underlying analysis, please contact:

**David W. Schoeder**                    **Mathew S. Morris**
*Principal*                              *Principal*
(703) 989-9615                           (202) 589-0434
dscheoder@thefoodpartners.com            msmorris@thefoodpartners.com

**The Food Partners, LLC**
5335 Wisconsin Avenue N.W.
Suite 410
Washington, DC 20015
*Fax*: (202) 589-0433
www.thefoodpartners.com

EXHIBIT 3
Page 4 of 14

# 2. DESCRIPTION OF C&K

## 2.1 *Overview*

C&K Market, Inc. ("C&K" or the "Company") was a closely held family owned company that at the beginning of 2013 operated a chain of 65 grocery stores in mainly small, rural communities in Southwestern Oregon and Northern California. These stores are generally in markets of fewer than 10,000 people with the exception of stores like the ones in Bend, Eureka, and the outskirts of Medford. These smaller markets will typically have only one other competitor and in some cases that competitor is another C&K store.

C&K evolved into a regional independent supermarket chain like many other operators nationally who have become the regional consolidators of independent stores. These regional mid-sized ($250 million to $1 billion in sales) independent supermarket chains have carved out a defendable and profitable niche as the primary surviving independent operator in their region. TFP has classified these retailers and the new "Super Independents". Typically, these operators have the following characteristics:

- Supplier of grocery products to smaller towns, rural markets and isolated neighborhoods in larger markets;
- A clear convenience advantage to the local customers who may shop periodically at distant competitors, but who still shop at the local store several times a week;
- The operational and financial wherewithal to acquire and improve the operations of other local independent operators desiring to sell;
- Minimal direct competition from major chains due to geography and demographics;
- Are operating in a post Wal-Mart Supercenter market where Wal-Mart had already altered the competitive landscape;
- A business model predicated on:
  - operating efficiency,
  - prudent capital usage,
  - understanding the needs of the local customers, and
  - pricing that is competitive within the context of the offerings of convenience, variety, and hometown support.
- A supportive and strong primary supplier.

From a historic standpoint, the Company's strategic plan to focus on small stores, rural markets and acquiring other retailers' stores was successful. The decision by the Company to build new stores and enter into urban markets has clearly proven unsuccessful in part because of poor site selection and in part because of increased competition in a number of markets. In the rural markets where the Company operates, C&K is clearly identified as the home town grocer and is relevant to the customer base in the communities they serve.

EXHIBIT 3
Page 5 of 14

The Food Partners, LLC                                    C&K Market, Inc.

The Company's current deteriorating financial position and the decision to file for bankruptcy in November 2013 was a result of the "perfect storm" for the following reasons:

- The meltdown of the U.S. economy in 2008 had a major impact on the Southern Oregon and Northern California markets. Unemployment rates in the majority of the markets where C&K operates have been and are expected to run substantially higher than the national average.

- The depressed economy combined with the major expansion of Wal-Mart supercenters in a number of C&K markets overrode the hometown advantage that the Company had with its customers resulting in a material impact on select store sales. At the same time, the Company was struggling to maintain competitive pricing due to the debt leverage of the Company. At this point, the markets where C&K operates are in transition from a pre-supercenter market to a post-supercenter market. In effect, the Company is a victim of the weeding out process during this transition period and has elected to close 21 non-viable stores.

- In addition to the impact of Wal-Mart where a single supercenter opening did impact multiple stores in a specific market where the Company operated multiple stores, in markets where the Company competed with Fred Meyer, Safeway and Albertsons, over the last thirty six months, these three competitors have elected to invest gross margin in order to maintain or increase same store sales. In select markets, these competitors have put additional pressure on the ability of the Company to maintain margins and sales.



- Since 2008, the Company has had a number of non-operating issues that resulted in one-time expenses that have materially impacted the cash flow of the Company. In addition, the Company's overhead expenses have grown as a percentage of sales. Excluding interest expense, the Company's overhead expense as a percentage of sales ranges from 1.0% to 1.25%, higher as a percentage of sales compared to its peer group of independent grocery retailers in the industry. Although the proposed restructuring includes a major reduction in corporate overhead expense, the Company lost the opportunity to reinvest the equivalent amount of capital that was spent on overhead expense in its store base during a critical time period in its life cycle with the recession and supercenter expansion occurring.

EXHIBIT 3
Page 6 of 14

The Food Partners, LLC                                        C&K Market, Inc.

Based on the Company's plan to repositioning the business by closing underperforming stores, divesting of non-core assets, focusing on performing stores and starting to reinvest in the retained stores, TFP's assessment is that C&K can reestablish itself as a consolidator of rural small store in its core markets during the weeding out process of Wal-Mart's expansion. However, Management's priority is to reinvest in its existing store base to regain a portion of the customers it initially lost to Wal-Mart from specific stores.

EXHIBIT 3
Page 7 of 14

# 3. VALUATION

## 3.1 *Purpose of Analysis*

The purpose of the analysis is to determine the fair market value of the equity of the Company's equity on a control basis as of the date on which the Company emerges from a Chapter 11 bankruptcy (the "Effective Date"). The Effective Date is assume to be July 12, 2014.

## 3.2 *Scope of Analysis and Assumptions*

In conducting its analysis TFP:

- Reviewed the Company's historic financial statements.

- Reviewed the Company prepared financial projections (the "Projections") prepared in March 2014 Prepared a profile of each retained operating grocery store (the "Store Profiles") that provided a detailed description of each individual store including historic and projected financial results, store lease information (if real estate was not owned), competitive information and demographic information. This information provided the basis to evaluate the Company prepared Projections by store and prepare the valuation of each individual store. The Store Profiles are presented in Appendix A.

- Conducted interviews with the Company's management team to assess the viability of the retained grocery stores and required capital expenditures by store.

- Reviewed select internal financial and operating information, as necessary, including a review of the overhead expenses, the method for allocating expenses at store level and identifying non-recurring operating expenses.

- Reviewed the Company's overall maintenance capital expenditure assumptions and capital expenditures for remodels.

- Quantified the fair market value of each individual retail grocery store (the "Stores") retained by the Company after the Effective Date to mark to market the retail stores compared to the projected book value as of the Effective Date. For the purposes of valuing the Stores retained and operated, the projected operating results for the Company for the fiscal year ending 2015 were used to establish a basis line of the normalized operating results for the Company after completing the restructuring and realigning the corporate overhead expenses. The approach was to establish a potential value for each individual store that potential buyers would be willing to pay based on the assumption that the individual stores can be purchased without any material contingent obligations. It is assumed that the purchase of each individual store would be structured as an asset purchase. The value of a store is stated in terms of the price a buyer would pay for the fixtures, equipment and goodwill (assuming all stores were leased) plus the book value of the store inventory on the date of the purchase, plus the market value of the owned real estate. The value that a hypothetical buyer will pay for the fixtures, equipment and goodwill is based upon the average of two methodologies. The first method used was a Sales Multiple which is applied to the annualized sales of a store to derive an indication of

EXHIBIT 3
Page 8 of 14

value.  The second method used was an EBITDA Multiple which is applied to the after overhead earnings before interest, taxes, depreciation, and amortization ("EBITDA") to derive a value.   The key metrics used to evaluate each store were, store size, sales per square foot per week, store location and competition, physical facility, rent as a percentage of sales for leased stores, demographic information and the required capital expenditures.  The choice of multiple is based on TFP's proprietary knowledge of hundreds of industry transactions involving both single stores and groups of stores.

- Reviewed the appraisals prepared on November 9, 2012 by Cushman & Wakefield of Oregon, Inc. on the Company's owned real estate to assess the fair market value of the real estate proposed to be sold and those proposed to be retained.

- Quantified the fair market value of each parcel of real estate owned by the Company that is sold to compare it against the liquidation value of the real estate assumed in the Projections.  The fair market value of a number of parcels of real estate for locations that were being divested of was materially changed due to the fact that November 9, 2012 valuation was based on the internal rents charged by the Company under the assumption that the location was a viable retail store site.  Given the closure of these stores, the value of the real estate was assessed based on the rent that an alternative use tenant would be willing to pay and the cap rates adjusted appropriately.

- Quantified the fair market value of each parcel of real estate owned by the Company that is retained to compare it against the appraised value and to mark to market the retained real estate compared to the book value.

- Evaluated the working capital position of the Company from a historic standpoint and on a projected basis after the divestiture of the pharmacy operations and the divestiture of underperforming stores.  Based on this review, the projected working capital accounts on the balance sheet were adjusted to reflect the average working capital position of the Company on a go forward basis after the Effective Date assuming that vendor credit terms would be equivalent to those prior to the bankruptcy filing.

- Reviewed the projected balance sheet of the Company as of the Effective Date to identify specific assets or liabilities where the book value did not equal the fair market value. This evaluation included a review of the Unified Western Grocers ("UWG") Class B and E shares which are held by the Company and subject to liquidation based on the liquidity position of UWG.

- Reviewed the liabilities of the Company as of the Effective Date and made the assumption that the liabilities were at fair market value.  For purposes of the analysis, the balance outstanding of the subordinated notes held by Endeavour Capital and THL Capital in the Company were assumed to be converted to equity as of the Effective Date.

- Prepared a balance sheet of the fair market value of the assets and liabilities of the Company to derive an implied fair market value of the equity as of the Effective Date.

## 3.3  *Results of Analysis*

In order to assess the fair market value of the equity of the Company on the Effective Date, the approach that TFP used was to determine the fair market value of the assets and liabilities of the

EXHIBIT 3
Page 9 of 14

The Food Partners, LLC                                    C&K Market, Inc.

Company projected as of July 12, 2014 to derive an implied equity value of the Company. July 12, 2014 was assumed to be the Effective Date due to the fact that the divestiture of the pharmacy operations and non-viable stores would have been completed at that point and the only non-operating assets remaining to be divested of was real estate held for sale which could be valued at its liquidation value net of carrying costs. Based on TFP's knowledge of the grocery industry and its review of the Company's historic and projected financial performance, operations, facilities, competition, market position and proposed plan of reorganization, the results of TFP analysis are as follows:

## C&K Market, Inc.
### Valuation
Effective Date of July 12, 2014

| | Projected 12-Jul-14 | Adjustments | Mark to Market 12-Jul-14 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current Assets | | | | |
| Cash at Store and In-Transit | $3,808,089 | | $3,808,089 | |
| Accounts & Notes Receivable | $2,219,728 | | $2,219,728 | |
| Inventories | $26,013,880 | | $26,013,880 | |
| Ppd Exp/Other Cur Assets | $1,660,757 | | $1,660,757 | |
| Total Current Assets | $33,702,454 | $0 | $33,702,454 | |
| Investments | $6,837,476 | ($2,437,250) | $4,400,226 | [a] |
| Net Property, Plant & Equip | $52,446,405 | $5,183,885 | $57,630,289 | [b] |
| Other Assets | $1,834,426 | ($516,000) | $1,318,426 | [c] |
| **TOTAL ASSETS** | **$94,820,761** | **$2,230,635** | **$97,051,396** | |
| | | | | |
| **LIABILITIES** | | | | |
| Current Liabilities | | | | |
| Accounts Payable - Pre | $550,244 | $449,756 | $1,000,000 | [d] |
| Accounts Payable - Post | $13,872,350 | | $13,872,350 | |
| Credit Line | $10,853,671 | $3,225,000 | $14,078,671 | [e] |
| Accrued Liabilities | $7,718,482 | ($4,291,783) | $3,426,699 | [f] |
| Deferred Income | $2,064,720 | | $2,064,720 | |
| Total Current Liabilities | $35,059,467 | ($617,027) | $34,442,440 | |
| Term Loan | $8,879,460 | | $8,879,460 | |
| Other Debt | $4,990,100 | | $4,990,100 | |
| **TOTAL LIABILITIES** | **$48,929,027** | **($617,027)** | **$48,312,000** | |
| | | | | |
| **TOTAL EQUITY** | **$45,891,734** | **$2,847,663** | **$48,739,396** | |
| | | | | |
| **TOTAL LIABILITIES AND EQUITY** | **$94,820,761** | **$2,230,635** | **$97,051,396** | |

Notes:
[a] Based on TFP's estimate of the redemption schedule for the Unified Class B and E shares at a 8% discount rate.
[b] Based on TFP estimate of the the aggregate fair market value of individual stores retained, real estate retained and the liquidation value of the real estate sold.
[c] Book value of Liquor Licenses ($371k) and Prepaid Contract Fees ($145k) are deducted from Other Assets because they are included in the fair market value of the stores.
[d] Accounts Payable - Pre updated based on current information.
[e] As of the Effective Date, it is assume that a total of $3.2 mm of expenses are incurred, including $175k of US Bank administrative fee, $200k of other claims, $500k of professional fees, $200k of lease cure costs, $500k of administrative tax claim, $250k of Sunstone administrative fee and $1.4mm of other costs and fees.
[f] Represents accrued interest of $4.3mm due unsecured creditors. Of that amount, $0.9mm was reversed and $3.4mm is assumed to be converted to equity per the Plan of Reorganization.

EXHIBIT 3
Page 10 of 14

Based and the analysis performed, the implied fair market value of the equity of the Company as of Effective Date is $48.7 million on a control basis. Based on the assumption that 6 million shares are issued, the per-share price on a control basis would be $8.12. Based on the fact pattern, TFP opinion is that the discount that would apply to the projected common stock outstanding on a minority basis is 15% or $1.22 per share. Further explanation of the key components and assumptions to derive this value are presented in the following sections.

## 3.4  Working Capital Position

TFP evaluated the projected working capital position of the Company as of the Effective Date and by period thereafter to assess both the components of the working capital assets and liabilities. Based on TFP review, the working capital position of the Company as of the Effective Date reflected the average working capital position of the Company for the Stores during the year. Although the Company historically had a buildup in seasonal inventory before the holiday season late in the third quarter and during the fourth quarter as a result of the holidays, the Company is projected to have sufficient liquidity to fund the working capital requirement.

## 3.5  Fixed Assets

There are two components of fixed assets that were marked to market.

- The first component is the fair market value of the Stores' operations. Based on the individual store valuation analysis, the derived value of the stores was $31.3 million using the two valuation methods described above. Using the Sales Multiple approach, the implied Sales Multiple based on $299.3 million of projected sales was 9.25%. Using the EBITDA Multiple approach, the implied EBITDA Multiple was 2.91 times the projected EBITDA of $12.0 million after overhead expense allocation and a charge for internal rents for owned properties. Given the attributes of the individual stores valued and the aggregate valuation, in TFP's opinion the results reflect the fair market value of the Stores. It should be noted that the book value of Other Assets was reduced by $0.5 million to reflect the fact that the book value of liquor licenses and Prepaid Contract Fees (the capitalized cost of negotiating store leases), because they were assumed to be part of the Stores' fair market value.

- The second component is the fair market value of real estate owned by the Company. The appraised value or estimated value of the real estate was $42.6 million, the combination of the value of the real estate retained (based on the appraised value/estimated value) and sold in the Projections was $38.8 million and TFP's assessment of the value of the real estate was $26.3 million.

Combining the fair market value of the Stores and Real Estate on the Effective Date, the total value of the fixed assets is $57.6 million compared to a book value of $52.4 million, or a $5.2 million difference.

## 3.6  Unified Western Grocers Class B and E Shares

EXHIBIT 3
Page 11 of 14

The Food Partners, LLC                                                C&K Market, Inc.

In May of 2010, the Company discontinued its supply relationship with UWG.  As a cooperative, the grocery retailers that are supplied by UWG purchase Class A and B shares of UWG and receive dividends based on the customer's patronage of the cooperative during each year, which are in part paid in the form of Class E shares.  Upon termination of membership in UWG, the Class A shares were redeemed.  As of the Effective Date, the Company is projected to own 15,210 Class B shares with an adjusted book value of $4.25 million based on a per share price of $279.50 and 17,801 Class E shares with a par value of $1.78 million based on a par value of $100 per share.  The total value of the Class B and Class E shares in aggregate is $6.4 million.  Class B shares of UWG are adjusted annually based on the adjusted book value of UWG equity and subject to fluctuation based on the financial performance of UWG annually. The price per share that Class B shares are redeemed is the prevailing price in the year redeemed.  Class E shares are redeemable at their par value of $100 per share.

In order to assess the value of the Class B and E shares held by C&K as of the Effective Date, a clear understanding of the redemption policy of UWG, the potential timing of the redemption of each class of shares and the price that the Class B shares will be redeemed at in the future is required.

UWG is restricted from redeeming Class A, Class B and Class E shares under California General Corporation Law ("CGCL") Section 501 which prohibits any distribution that would likely result in a corporation being unable to meet its liabilities as they mature. In addition, Section 500 of the CGCL prohibits any distribution to shareholders for the purchase or redemption of shares unless the board has determined in good faith that either (a) the amount of retained earnings immediately prior thereto equals or exceeds the sum of (i) the other class of shares prior to the proposed distribution, or (b) immediately after the proposed distribution, the value of the corporation's assets would equal or exceed the sum of (i) its liabilities plus (ii) the preferential rights of other classes of shares that would be required to be paid upon dissolution to holders of such shares prior to any distribution to the class of shares as to which the proposed distribution is being made. In addition, UWG's credit agreements contain financial covenants which restrict the amount of Class B and E shares that can be redeemed.

A summary of UGW's current redemption policy is as follows:

(a) Class A shares eligible for redemption by reason of termination of membership will be redeemed in the order in which memberships terminate, and will be redeemed prior to the redemption of any Class B shares or Class E shares.

(b) Subject to the exceptions noted above, the aggregate number of Class B shares that we will redeem in any fiscal year will be limited to no more than 5% of the sum of (i) the number of Class B shares outstanding at the close of the preceding fiscal year end; and (ii) the number of Class B shares issuable as a part of the patronage dividend distribution for the preceding fiscal year.

(c) Subject to the limitation above with respect to the Class B shares held by terminated Members, in any fiscal year, Class B shares which were eligible for redemption in a prior year, will be redeemed subject to the five percent limit.  In the event that the number of

EXHIBIT 3
Page 12 of 14

Class B shares excesses the five percent limit, then such shares will be redeemed pro rata in the order in which memberships terminate or shares are tendered for redemption.

(d) Without regard to each year's five percent limit or any other provision of paragraphs (a), (b) and (c) above, the Board will have the absolute discretion to redeem Excess Class B shares or to redeem Class A, Class B or Class E shares of any outgoing Member regardless of when the membership terminated or the Class B shares are tendered for redemption.

(e) Class E shares become eligible for redemption at the discretion of the Board at a price of $100 per share ten years after their issuance date, with the outstanding Class E shares becoming eligible for redemption between the end of fiscal 2013 and the end of fiscal 2018.

To assess the timing of the redemption of Class B and E shares, UWG redeemed Class A and B shares in the amount of $7.0 million, $9.8 million $6.7 million and $6.7 million in fiscal years 2010, 2011, 2012 and 2013, respectively. From the beginning of fiscal year 2010 through December 28, 2014, UWG's Shareholders Equity has declined from $187.4 million to $181.6 million; a decline of $6.8 million primarily as a result of retailers of UWG terminating their membership and their inability to attract new members to replace this retailers exiting. During the same time period, UWG financial performance has lagged. As of February 26, 2014, there were 72,327 Class B shares that had tendered for redemption (17% of the Class B shares outstanding). As of December 28, 2013, UWG, which represented a $24.2 million stock repurchase obligation. Based on the historic trend, UWG redemption of Class A shares has historically been in the range of 10,000 to 12,000 shares which have priority over the redemption of Class B shares that is expected to continue the next five years, representing approximately a $3 million stock repurchase obligation for UWG annually. In addition, Class E shares are subject to redemption starting at the end of fiscal year 2013. As of FYE 2013, UWG had $25.1 million of Class E shares outstanding that represents a $3.5 million stock repurchase obligation on average the next six years. Based on the assumption that Class A and Class E shares stock repurchase obligation will range from $5 to $6.5 million the next seven years, the probability that a material amount of Class B shares will be redeemed would appear lower compared to the prior three years. Therefore, to value of the Class B and Class E shares held by the Company as of the Effective Date, TFP used the following assumptions:

- UWG has had a transition in the senior management the last twelve months and taken major steps to realign operations and reduce operating expenses to improve operating results which should improve the liquidity position of UWG to redeem Class B shares.

- The redemption price of Class B shares is subject to change annually based an adjusted book value basis. The redemption price of UWG's Class A and B shares was $312.31, $316.11 $304.48 and $279.50 in fiscal years 2011, 2012, 2013 and 20144, respectively. Based on the financial outlook for UWG, the assumption was made that the $279.50 per share price is the best estimate of the future redemption price given the initiatives being implemented by UWG's senior management.

- The redemption price of the Class E shares is $100 per share and the Class E shares are scheduled to be redeemed over the next seven years.

EXHIBIT 3
Page 13 of 14

- Based on the combination of the stock repurchase obligation estimate for Class A and E shares above, the probability of UWG redeeming more that $2 million of Class B shares each of the next seven years in relatively low. As of the Effective Date, the Company is projected to own approximately 21% of the total Class B shares tendered for redemption by shareholders of UWG.  Therefore, the assumption was made that 5% of the Class B shares held by the Company would be redeemed each of the next two years, 10% the following three years and 15% for four years thereafter.

- To calculate the present value of both the Class B and Class E shares, the assumed proceeds received by the Company each of the next ten years was discounted to present value using an 8% discount rate.

Based on assumptions above, as of the date of the valuation, TFP estimates the value of the Class B shares is $2.8 million and the value of the Class E shares is $1.7 million for an aggregate value of the Company's holdings in UWG of $4.5 million.

## 3.7 Liabilities

The projected book value of the outstanding liabilities of the Company as of the Effective Date is assumed to equal the fair market value of these liabilities with the following exceptions:

- Based on updated information per the Plan of Reorganization, Accounts Payable pre bankruptcy was increased by $0.45 million.

- The Credit Line was increased by $3.2 million to reflect the expenses that are assumed to be incurred as of the Effective Date, including refinancing costs and other expenses.

- Accrued Liabilities were adjusted by $4.3 million to reverse accrued interest on unsecured claims of $0.9 million that will be extinguished and $3.4 million of accrued interest on the unsecured claims that will be converted to equity.

EXHIBIT 3
Page 14 of 14

# EXHIBIT 4 TO SECOND AMENDED DISCLOSURE STATEMENT

## December 31, 2013 Balance Sheet

```
1/22/2014                   C & K MARKET, INC. (101)           Wednesday,  5:26 PM
                                 BALANCE SHEET
                              DECEMBER 31, 2013
--------------------------------------------------------------------------------


                                     ASSETS

                                  12/31/2013                  12/31/2012
CURRENT ASSETS
    CASH ON HAND                   1,092,040.00               1,518,635.00
    LOTTERY TICKETS ON HAND          226,910.62                 287,372.18
    NSF CHECKS ON HAND                82,923.06                  19,727.82
    CASH IN BANK - GENERAL          -116,446.79              -6,148,125.81
    CASH IN BANK - SAVINGS         2,522,661.52               3,570,928.22
    ACCOUNTS RECEIVABLE            2,219,727.80               2,680,988.54
    INVENTORY                     25,096,289.27              36,059,360.84
    SECURITIES                        12,905.00                  25,547.72
    DEPOSITS                       2,859,917.72               2,315,530.46
    PREPAID EXPENSES               1,951,364.49               4,485,179.56
                                 ---------------            ---------------
       TOTAL CURRENT ASSETS       35,948,292.69              44,815,144.53

PROPERTY AND EQUIPMENT
    LAND                           9,605,909.64              10,063,925.67
    BUILDINGS                     34,049,038.76              34,061,997.57
    ACCUM DEPRECIATION - BLDGS    -7,396,455.50              -6,565,009.46
    EQUIPMENT                     78,201,580.68              82,912,932.99
    ACCUM DEPRECIATION - EQUIP   -48,365,628.45             -47,242,786.95
                                 ---------------            ---------------
       PROPERTY AND EQUIPMENT - NET  66,094,445.13          73,231,059.82

OTHER ASSETS
    GOODWILL                      25,302,063.09              33,405,608.54
    ACCUM AMORT - GOODWILL       -16,444,316.48             -19,889,793.45
    NONCOMPETE AGREEMENTS          3,916,603.08               4,886,369.08
    ACCUM AMORT - NONCOMPETE      -3,786,976.97              -4,616,743.01
    LIQUOR LICENSE                   483,673.50                 483,673.50
    TRADEMARK                         11,089.65                  11,089.65
    PREPAID CONTRACT FEES            634,497.24                 818,622.17
    PREPAID RENT                     131,661.34                 517,670.26
    PARTNERSHIP INTEREST - BSC       383,211.36                 381,063.36
    LLC INTEREST - C & K EXPRESS    -263,759.22              10,623,162.64
    PREPAID INTEREST                 762,351.77               1,219,936.87
    UNIFIED STOCK                  5,135,994.50               5,135,994.50
    UNIFIED STOCK APPRECIATION     2,023,370.14               2,023,370.14
    REORG VALUE IN EXCESS          7,252,561.53               7,252,561.53
                                 ---------------            ---------------
       TOTAL OTHER ASSETS         25,542,024.53              42,252,585.78
                                 ---------------            ---------------

       TOTAL ASSETS              127,584,762.35             160,298,790.13
                                 ===============            ===============
```

EXHIBIT 4
Page 1 of 2

```
1/22/2014              C & K MARKET, INC. (101)      Wednesday,  5:26 PM
                            BALANCE SHEET
                         DECEMBER 31, 2013
--------------------------------------------------------------------------------

                         LIABILITIES AND EQUITY


                              12/31/2013              12/31/2012
CURRENT LIABILITIES
   ACCOUNTS PAYABLE POST-PETITION      9,350,862.92                   .00
   ACCOUNTS PAYABLE PRE-PETITION      13,323,722.01          15,524,980.41
   BANK CREDIT LINE                    6,270,367.80          21,038,945.54
   INTEREST PAYABLE                    3,906,694.86             256,126.57
   HEALTH PLAN PAYABLE                 1,800,000.00           1,575,000.00
   EMPLOYEE BENEFITS PAYABLE             145,267.21             537,281.37
   EMPLOYEE CERTS PAYABLE                     .00              85,513.71
   DEFERRED COMP PAYABLE                 108,277.70              67,601.08
   PAYROLL PAYABLE                     1,826,951.44             172,200.54
   PAYROLL TAXES PAYABLE                 829,723.55           1,126,007.91
   DEPOSITS PAYABLE                      327,989.20              29,512.60
   PROPERTY TAXES PAYABLE                117,018.54              24,777.80
   RENT PAYABLE                           77,651.91             197,865.62
   SALES TAX PAYABLE                     358,181.84             338,163.46
   DEFERRED REVENUE                    2,380,039.18           2,955,304.42
   VACATIONS PAYABLE - VESTED            993,833.25           1,153,695.45
   VACATIONS PAYABLE - NONVESTED       1,125,250.66           1,160,379.24
                                    ----------------        ----------------
      TOTAL CURRENT LIABILITIES       42,941,832.07          46,243,355.72

LONG-TERM LIABILITIES
   CLOSED FACILITY LEASE PAYABLE       9,918,624.87                   .00
   NOTES PAYABLE                      61,329,402.55          66,960,586.77
                                    ----------------        ----------------
      TOTAL LONG-TERM LIABILITIES     71,248,027.42          66,960,586.77

STOCKHOLDERS' EQUITY
   PREFERRED CLASS B                  19,000,000.00          19,000,000.00
   COMMON CLASS C                        195,554.40             195,554.40
   ADDITIONAL PAID-IN CAPITAL          4,207,869.79           4,207,869.79
   INVESTMENT VALUATION ALLOWANCE      2,023,370.14           2,023,370.14
   RETAINED EARNINGS                  19,128,158.89          17,717,094.15
   NET INCOME (LOSS)                 -31,160,050.36           3,950,959.16
                                    ----------------        ----------------
      TOTAL STOCKHOLDERS' EQUITY      13,394,902.86          47,094,847.64
                                    ----------------        ----------------

      TOTAL LIABILITIES AND EQUITY   127,584,762.35         160,298,790.13
                                    ================        ================
```

EXHIBIT 4
Page 2 of 2

# EXHIBIT 5 TO SECOND AMENDED DISCLOSURE STATEMENT

**Projected Effective Date Balance Sheet**

**C&K Market, Inc.**
**Estimated Balance Sheet**
**July, 2014**

| | Pre-Effective Projection | Post-Effective Projection |
|---|---|---|
| Cash | $3,808 | $3,808 |
| Accounts Receivable | $2,220 | $2,220 |
| Inventory | $26,014 | $26,014 |
| Prepaid Expenses and Other Current Assets | $1,661 | $1,661 |
| Total Current Assets | $33,702 | $33,702 |
| | | |
| Investments | $4,400 | $4,400 |
| Property, Plant and Equipment | $56,253 | $56,253 |
| Intangible Assets | $32,500 | $0 |
| Other Assets | $1,318 | $1,318 |
| **Total Assets** | **$128,174** | **$95,674** |
| | | |
| Accounts Payable (Pre Petition) | $9,229 | $8,229 |
| Accounts Payable (Post Petition) | $13,872 | $13,872 |
| Accrued Liabilities | $3,427 | $3,427 |
| Deferred Income | $2,065 | $2,065 |
| Current Liabilities | $28,593 | $27,593 |
| | | |
| New Senior Revolver | $0 | $10,622 |
| New Senior Term | $0 | $20,000 |
| US Bank Revolver | $14,300 | $0 |
| US Bank Term Debt | $9,035 | $0 |
| Other Secured Debt | $3,236 | $0 |
| Unsecured Debt | $43,155 | $0 |
| Other Liabilities | $1,750 | $1,750 |
| Total Liabilities | $100,069 | $59,965 |
| | | |
| Equity | $28,105 | $35,709 |
| **Total Liabilities and Equity** | **$128,174** | **$95,674** |

**Notes:**
- $ in thousands

EXHIBIT 5
Page 1 of 1

# EXHIBIT 6 TO SECOND AMENDED DISCLOSURE STATEMENT

## PROJECTIONS FOR ONE-YEAR PERIOD FOLLOWING EFFECTIVE DATE

**C&K Market Inc.**
Projected Income
Post-Effective Date

| | | | | | | | | Projection | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| period end date | Period 7 07/12/14 | Period 8 08/09/14 | Period 9 09/06/14 | Period 10 10/04/14 | Period 11 11/01/14 | Period 12 11/29/14 | Period 13 12/27/14 | Period 1 01/24/15 | Period 2 02/21/15 | Period 3 03/21/15 | Period 4 04/18/15 | Period 5 05/16/15 | Period 6 06/13/15 | LTM 06/13/15 |
| Sales | $25,577 | $25,194 | $23,644 | $21,992 | $21,425 | $21,237 | $23,243 | $17,869 | $20,766 | $20,676 | $21,165 | $22,364 | $23,386 | $288,538 |
| Gross Profit | $8,160 | $8,298 | $7,638 | $7,257 | $6,957 | $6,442 | $7,139 | $5,900 | $6,816 | $6,708 | $6,866 | $7,117 | $7,504 | $92,804 |
| Corporate Income | $227 | $222 | $206 | $195 | $166 | $165 | $176 | $141 | $160 | $160 | $163 | $171 | $177 | $2,328 |
| Labor & Benefits | $3,508 | $3,328 | $3,154 | $3,349 | $3,246 | $3,500 | $3,777 | $2,997 | $3,311 | $3,069 | $3,254 | $3,267 | $3,211 | $42,971 |
| Advertising | $182 | $198 | $191 | $156 | $162 | $188 | $186 | $213 | $190 | $171 | $160 | $161 | $167 | $2,325 |
| Supplies | $296 | $254 | $252 | $291 | $263 | $245 | $199 | $203 | $208 | $272 | $296 | $268 | $272 | $3,320 |
| Bank Fees | $204 | $189 | $224 | $227 | $198 | $362 | $225 | $163 | $175 | $153 | $184 | $161 | $186 | $2,651 |
| Rent | $507 | $507 | $507 | $507 | $507 | $507 | $507 | $507 | $507 | $507 | $507 | $507 | $507 | $6,595 |
| Utilities | $511 | $548 | $496 | $516 | $475 | $599 | $433 | $427 | $492 | $444 | $462 | $487 | $523 | $6,414 |
| Repair & Maintenance | $127 | $136 | $120 | $158 | $130 | $119 | $122 | $134 | $124 | $138 | $143 | $130 | $127 | $1,708 |
| Property Taxes | $102 | $98 | $98 | $101 | $98 | $99 | $99 | $94 | $114 | $104 | $111 | $105 | $105 | $1,327 |
| Other Expense (Income) | $534 | $415 | $340 | $405 | $419 | $381 | $543 | $359 | $514 | $523 | $443 | $382 | $490 | $5,750 |
| **Store EBITDA** | **$2,414** | **$2,847** | **$2,462** | **$1,742** | **$1,626** | **$606** | **$1,226** | **$943** | **$1,341** | **$1,486** | **$1,468** | **$1,818** | **$2,093** | **$22,071** |
| Corporate Overhead | $701 | $680 | $678 | $681 | $664 | $680 | $685 | $665 | $675 | $673 | $672 | $670 | $687 | $8,810 |
| **EBITDA** | **$1,713** | **$2,168** | **$1,784** | **$1,062** | **$961** | **($74)** | **$541** | **$278** | **$666** | **$813** | **$796** | **$1,148** | **$1,405** | **$13,261** |
| Depreciation | $221 | $221 | $222 | $222 | $222 | $222 | $222 | $222 | $222 | $223 | $223 | $223 | $223 | $2,888 |
| Interest | $16 | $16 | $15 | $15 | $15 | $15 | $15 | $15 | $15 | $15 | $15 | $15 | $15 | $198 |
| Income Before Taxes | $1,476 | $1,931 | $1,546 | $825 | $724 | ($311) | $304 | $41 | $429 | $575 | $558 | $910 | $1,168 | $10,175 |
| Taxes | $590 | $772 | $619 | $330 | $290 | ($124) | $121 | $16 | $172 | $230 | $223 | $364 | $467 | $4,070 |
| **Net Income** | **$886** | **$1,158** | **$928** | **$495** | **$435** | **($187)** | **$182** | **$24** | **$257** | **$345** | **$335** | **$546** | **$701** | **$6,105** |

**Notes:**
- $ in thousands
- Excludes potential impact from sale of owned real estate

EXHIBIT 6
Page 1 of 1

# EXHIBIT 7 TO SECOND AMENDED DISCLOSURE STATEMENT

## LIQUIDATION ANALYSIS

# C&K MARKET, INC.
ESTIMATED LIQUIDATION ANALYSIS - Chapter 7 Conversion 1/31/2014
Projected as of 1/31/2014
**ASSUMPTIONS/NOTES**

1) Assumes C&K converts to chapter 7 on 1/31/2014.
   Assumes all employees and operations cease on conversion date.
   This analysis is based upon financial projections dated 11/20/2013 version Dip loan V14 and updated as appropriate.

2) Assumes US Bank has a senior security interest in all assets
   Assumes non accrual of interest on all loans.
   Analysis does not include accounting fees, legal, professional and audit fees for US Bank.

3) Assumes Net Accounts Receivable Recovery Rate of 50% and collected by an outside collection agency.

4) Assumes Inventory and Equipment at stores is sold by a liquidator hired by the trustee.
   Net estimated recoveries for Inventory after expense = 35% of cost.
   Net estimated recoveries for equipment after expenses = 42 stores x $30,000 = $1,260,000.

5) Assumes Real Estate is liquidated in 9 months.
   Assumes property values are based on 2012 appraisal discounted for quick sale.
   Assumes broker(s) are hired.
   Assumes there are no environmental issues which would impact the sales process.
   Assumes 7.5% closing costs.
   Assumes unpaid property taxes are paid at closing and are not included in analysis.

6) Assumes security interest of $3,700,000 on real properties by 1st secured creditors other than US Bank on stores #36, #29, #50, #61, and #71.

7) Assumes lessor rejection claims of the following:
   1) Chapter 11 rejection lessor claims estimated at 7.8 million
   2) Chapter 7 rejection lessor claims for remaining stores estimated to be 24 million.

EXHIBIT 7
Page 1 of 3

1/31/2014

**C&K MARKET, INC.**
ESTIMATED LIQUIDATION ANALYSIS - Chapter 7 Conversion 1/31/2014
Projected as of 1/31/2014

| ASSETS | BALANCE SHEET As of 1/31/14 | PERCENT | VALUE | CREDITORS POSITION IN LIQUIDATION | | | |
|---|---|---|---|---|---|---|---|
| | (See Note #1) | REALIZED | REALIZED | US BANK | OTHER REAL PROPERTY MORTAGES | UNSECURED CREDITORS | TOTAL |
| CASH - Balance as of 1/31/14 | | | | | | | |
| Cash at store and in-transit | 7,260,811 | 100.0% | 7,260,811 | 7,260,811 | - | - | 7,260,811 |
| Cash - corporate | - | 100.0% | - | - | - | - | - |
| Marketable securities | 24,750 | 100.0% | 24,750 | 24,750 | - | - | 24,750 |
| Accounts receivable & notes receivable | 1,183,483 | 50.0% | 591,742 | 591,742 | - | - | 591,742 |
| Inventories | 28,203,363 | 35.0% | 9,871,177 | 9,871,177 | - | - | 9,871,177 |
| Prepaid Expenses | 884,428 | | undetermined | - | - | - | - |
| Prepaid Income Taxes | - | | | | | | |
| Deferred Income Tax | 941,010 | 0.0% | undetermined | - | - | - | - |
| Other Current Assets | 728,040 | | undetermined | - | - | - | - |
| TOTAL | 39,225,885 | | 17,748,480 | 17,748,480 | - | - | 17,748,480 |
| INVESTMENTS | 7,555,476 | 50.0% | 3,777,738 | 3,777,738 | - | - | 3,777,738 |
| PROPERTY, PLANT & EQUIPMENT | | | | | | | |
| Real Estate Property (Gross) | 41,190,000 | 64.7% | 26,670,000 | 22,970,000 | 3,700,000 | - | 26,670,000 |
| Other PP&E (Gross) | 68,184,316 | 2.0% | 1,363,686 | - | - | | - |
| TOTAL PROPERTY, PLANT AND EQUIPMENT NET OF DEPRECIATION (Gross) | 109,374,316 | | 28,033,686 | 22,970,000 | 3,700,000 | - | 26,670,000 |
| OTHER ASSETS | 2,008,259 | 100.0% | 2,008,259 | 2,008,259 | - | - | 2,008,259 |
| RECOVERY ACTIONS | - | undetermined | 0.0% | | | | |
| TOTAL OF ASSETS PER ABOVE | 158,163,936 | | 51,568,163 | 46,504,477 | 3,700,000 | - | 50,204,477 |

Note: (1) Balance Sheet information per 1/31/14 Balance Sheet unless specifically noted.

# C&K MARKET, INC.
ESTIMATED LIQUIDATION ANALYSIS - Chapter 7 Conversion 1/31/2014
Projected as of 1/31/2014

**VALUE REALIZED FROM ASSETS AVAILABLE FOR DISTRIBUTION TO CREDITORS**    46,504,477    3,700,000    -    50,204,477

## CREDITORS POSITION IN LIQUIDATION

| | | US BANK | OTHER REAL PROPERTY MORTGAGES | UNSECURED CREDITORS | TOTAL |
|---|---|---|---|---|---|
| **SENIOR SECURED CREDITOR LOAN BALANCES:** | | | | | |
| US Bank Revolver | 6,403,508 | 6,403,508 | | | 6,403,508 |
| US Bank Term A | 10,900,000 | 10,900,000 | | | 10,900,000 |
| US Bank Term C | 200,000 | 200,000 | | | 200,000 |
| Other Term Debt Secured | 3,700,000 | | 3,700,000 | | 3,700,000 |
| **TOTAL SECURED LOAN BALANCES** | 21,203,508 | 17,503,508 | 3,700,000 | - | 21,203,508 |
| **NET SECURED CREDITOR SURPLUS/(DEFICIENCY) BEFORE ADMINISTRATIVE & PRIORITY CLAIMS** | | 29,000,969 | - | - | 29,000,969 |
| **Less: ADMINISTRATIVE CLAIMS** | | | | | |
| Chapter 7 Trustee's Fee | 1,506,134 | 1,506,134 | | | 1,506,134 |
| Chapter 7 Trustee's Legal Fee | 250,000 | 250,000 | | | 250,000 |
| **TOTAL ADMINISTRATIVE CLAIMS** | 1,756,134 | 1,756,134 | | | 1,756,134 |
| **NET SURPLUS/(DEFICIENCY) AVAILABLE TO CHAPTER 11 ADMINISTRATIVE CLAIMS** | 21,203,508 | 27,244,834 | - | - | 27,244,834 |
| **CHAPTER 11 ADMINISTRATIVE CLAIMS** | | | | | |
| Accounts Payable - Post | | | | | 12,000,000 |
| Estimated Super Valu Contract Claim | | | | | 45,000,000 |
| Professional Fee | | | | | undetermined |
| **TOTAL CHAPTER 11 ADMINISTRATIVE CLAIMS** | | | | | 57,000,000 |
| **RECOVERY % FOR CHAPTER 11 CREDITORS** | | - | - | - | 47.80% |
| **UNSECURED CREDITOR CLAIMS** | | | | | |
| Accounts Payable - Pre | | | | | 5,854,688 |
| Lessor Claims | | | | | 31,800,000 |
| 503(b)9 Claims | | | | | 382,495 |
| Accrued Liabilities | | | | | 7,725,849 |
| Mezzanine Debt | | | | | 29,665,635 |
| Other Term Debt - Unsecured | | | | | 613,266 |
| Subordinated Debt - Blocked Notes | | | | | 16,698,741 |
| DOL Claim | | | | | 2,000,000 |
| **TOTAL UNSECURED CREDITOR CLAIMS** | | - | - | - | 94,740,654 |
| **RECOVERY % UNSECURED CREDITORS** | | | | | 0% |

EXHIBIT 7
Page 3 of 3

1

## CERTIFICATE OF SERVICE

2

3      I hereby certify that the foregoing **DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (MAY 9, 2014)** was served on the parties indicated as "ECF" on the attached List of Interested Parties by electronic means through the Court's Case

4 Management/Electronic Case File system on the date set forth below.

5      In addition, the parties indicated as "Non-ECF" on the attached List of Interested Parties were served by mailing a copy thereof in a sealed, first-class postage

6 prepaid envelope, addressed to each party's last-known address and depositing in the U.S. mail at Portland, Oregon on the date set forth below.

7

     DATED this 9th day of May, 2014.

8

     TONKON TORP LLP

9

10

     By */s/ Albert N. Kennedy*

11         Albert N. Kennedy, OSB No. 821429
        Timothy J. Conway, OSB No. 851752

12         Michael W. Fletcher, OSB No. 010448
        Ava L. Schoen, OSB No. 044072

13         Attorneys for Debtor

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 1 of 1 -** CERTIFICATE OF SERVICE

## LIST OF INTERESTED PARTIES
*In re C & K Market, Inc.*
**U.S. Bankruptcy Court Case No. 13-64561-fra11**

## ECF PARTICIPANTS

- RICHARD T ANDERSON rick@andersonmonson.com, lisa@andersonmonson.com
- MATTHEW A ARBAUGH matt@fieldjerger.com, koren@fieldjerger.com
- MICHELLE PLATT BASSI MBassi@thorp-purdy.com
- CASEY B BOYLE KDWBankruptcyDepartment@kelleydrye.com
- G JEFFERSON CAMPBELL mariahd@qwestoffice.net, gjcpc@qwestoffice.net
- AMANDA L. CARTWRIGHT amanda.cartwright@bryancave.com
- DONALD J CHURNSIDE don@oregonlegalteam.com, melanie@oregonlegalteam.com
- DAN W CLARK dan@roseburglaw.com, lowletta@roseburglaw.com
- CHRISTINE COERS-MITCHELL coers@comcast.net, johnstonlaw@comcast.net
- MARK B COMSTOCK mcomstock@ghrlawyers.com, lmarcus@ghrlawyers.com
- TIMOTHY J CONWAY tim.conway@tonkon.com, nancy.kennedy@tonkon.com
- BRADLEY S COPELAND bcopeland@agsprp.com, bdavis@agsprp.com
- LAURIE E CRAGHEAD laurie_craghead@co.deschutes.or.us, Treana.Henley@deschutes.org
- JOHN E DAVIS JackD@roguefirm.com
- MELINDA DAVISON tcp@dvclaw.com
- COLIN F. DOUGHERTY colin.dougherty@faegrebd.com
- MICHAEL W FLETCHER michael.fletcher@tonkon.com, leslie.hurd@tonkon.com;andy.haro@tonkon.com
- DAVID A FORAKER david.foraker@greenemarkley.com, mena.ravassipour@greenemarkley.com
- BENJAMIN FREUDENBERG benf@roguefirm.com
- DOUGLAS L GALLAGHER doug@dglawoffice.com, douglasgallagherlawoffice@gmail.com
- MATTHEW GOLD courts@argopartners.net
- OREN B HAKER obhaker@stoel.com, docketclerk@stoel.com;cejordan@stoel.com;aepeterson-meier@stoel.com
- BRIAN T HEMPHILL brian@hemphill-attorney.com
- THOMAS A HUNTSBERGER tom@tahpc.com, laurie@tahpc.com
- SCOTT L JENSEN slj@brownrask.com, lac@brownrask.com
- ALBERT N KENNEDY al.kennedy@tonkon.com, leslie.hurd@tonkon.com;andy.haro@tonkon.com
- CHRISTINE A KOSYDAR cakosydar@stoel.com, cmwallentine@stoel.com;
  docketclerk@stoel.com;lchopkins@stoel.com
- JUSTIN D LEONARD jleonard@ml-llp.com, ecf@ml-llp.com;jleonard@pacernotice.com
- LANCE A LeFEVER llefever@thorp-purdy.com, dhay@thorp-purdy.com
- JULIA I MANELA ecf@scott-law-group.com
- DAVID B MILLS davidbmills@comcast.net, davidbmills@cs.com
- JEFFREY C MISLEY jeffm@sussmanshank.com, ecf.jeffrey.misley@sussmanshank.com
- JOHNSTON A MITCHELL johnstonlaw@comcast.net, coers@comcast.net;emenze@comcast.net
- WILSON C MUHLHEIM mkindred@luvaascobb.com;scooke@luvaascobb.com
- PETER C McKITTRICK pmckittrick@ml-llp.com, ecf@ml-llp.com
- EVAN H. NORDBY nordby.evan@dol.gov
- JOSHUA BYRON NORTON joshua.norton@kyl.com
- THOMAS M ORR torr@eugene-law.com, lmiller@eugene-law.com
- R SCOTT PALMER rspalmer@wlrlaw.com, lolson@wlrlaw.com
- CHRISTOPHER L PARNELL cparnell@dunncarney.com, taichele@dunncarney.com;sripley@dunncarney.com
- TERESA H PEARSON teresa.pearson@millernash.com, lisa.conrad@millernash.com;brenda.hale@millernash.com
- DAVID L POLLACK pollack@ballardspahr.com
- WILLARD L RANSOM wransom@roguevalleylaw.com, ddaw@roguevalleylaw.com
- RECOVERY MANAGEMENT SYSTEMS CORPORATION claims@recoverycorp.com
- TARA J SCHLEICHER tschleicher@fwwlaw.com, dfallon@fwwlaw.com;nlyman@fwwlaw.com
- AVA L SCHOEN ava.schoen@tonkon.com, larissa.stec@tonkon.com
- LOREN S SCOTT ecf@scott-law-group.com
- ALAN G SELIGSON aseligson@scslaw.org, assistant@scslaw.org
- TROY SEXTON tsexton@portlaw.com, nhenderson@portlaw.com,csturgeon@portlaw.com,mmyers@portlaw.com
- DONALD R SLAYTON dslayton@scslaw.org, michelle@scslaw.org
- RENEE STARR renee@rstarrlaw.com
- JERRY N STEHLIK jstehlik@bsss-law.com
- PATRICK L STEVENS pstevens@eugene-law.com, lmiller@eugene-law.com,ahorrigan@eugenelaw.com
- MICHAEL R. STEWART michael.stewart@faegrebd.com
- BRYCE A. SUZUKI bryce.suzuki@bryancave.com, sally.erwin@bryancave.com
- ANDREW MICHAEL THAU at@southpawasset.com
- STEPHEN T TWEET beth@albertandtweet.com, darlene@albertandtweet.com
- US TRUSTEE, Eugene USTPRegion18.EG.ECF@usdoj.gov
- JOSEPH M VANLEUVEN joevanleuven@dwt.com, lizcarter@dwt.com;pdxdocket@dwt.com
- LAURA J WALKER lwalker@cablehuston.com, mingram@cablehuston.com
- PAMELA K. WEBSTER pwebster@buchalter.com, smartin@buchalter.com

## NON-ECF PARTICIPANTS

**SECURED CREDITORS**

Banc of America
  Leasing & Capital LLC
2059 Northlake Parkway 4 South
Tucker, GA 30084

Dell Financial Services LLC
Mail Stop-PS2DF-23
One Dell Way
Round Rock, TX 78682

James D. and Debra A. Gillespie
c/o Michelle Bassi
Thorp Purdy et al
1011 Harlow Rd., #300
Springfield, OR 97477

034518/00017/5509314v2

Greatway Properties LLC
Attn: Floyd Hayner, Mgr.
722 Pennsylvania Ave.
Medford, OR 97501-2553

Green & Frahm
941 Delsie Dr.
Grants Pass, OR 97527

Protective Life
2801 Highway 280 South
Birmingham, AL 35202

LaSalle Natl Bank, Trustees for Holders
Protective Comm Mtg FASIT Master Trust
c/o Protective Life Ins-Invest. Dept.
POB 2606
Birmingham, AL 35202

**OTHER**

Jenette A. Barrow-Bosshart
Otterbourg P.C.
230 Park Avenue
New York, NY 10169-0075

**REQUESTS FOR NOTICE**

James C. Porter, Creditor
1005 Fish Hatchery Road
Grants Pass, OR 97527